IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **UNDER SEAL** |
| | : | |
| v. | : | CR No. 1:21-CR-245 (AJT) |
| | : | |
| IGOR Y. DANCHENKO, | : | COUNTS ONE – FIVE |
| | : | 18 U.S.C. § 1001(a)(2) |
| Defendant. | : | False Statements |
| | : | |

FILED
IN OPEN COURT

NOV – 3 2021

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

INDICTMENT

The Grand Jury Charges that:

I.   Introduction and Overview

1.      On or about July 31, 2016, the Federal Bureau of Investigation ("FBI") opened an investigation known as "Crossfire Hurricane" into whether individuals associated with the Donald J. Trump presidential campaign (the "Trump Campaign") were coordinating activities with the Russian government.

2.      Beginning in or about July 2016 and continuing through December 2016, the FBI began receiving a series of reports from a former British government employee ("U.K. Person-1") that contained derogatory information on then-candidate Donald J. Trump ("Trump") concerning Trump's purported ties to Russia (the "Company Reports").

3.      Earlier that year, a U.S.-based international law firm ("Law Firm-1"), acting as counsel to the Hillary Clinton Presidential campaign (the "Clinton Campaign"), had retained a U.S.-based investigative firm ("U.S. Investigative Firm-1") to conduct research on Trump and his associates.   In or about June 2016, U.S. Investigative Firm-1, in turn, retained U.K. Person-1, a

former officer in a friendly foreign intelligence service ("Foreign Intelligence Service-1"), and his U.K.-based firm ("U.K Investigative Firm-1"), to investigate Trump's purported ties to Russia.

4.       During the U.S. presidential election season and afterwards, U.K. Person-1 and employees of U.S. Investigative Firm-1 provided the Company Reports to multiple media outlets and to U.S. government personnel.

5.       The Company Reports played an important role in applications that FBI personnel prepared and submitted to obtain warrants pursuant to the Foreign Intelligence Surveillance Act ("FISA") targeting a United States citizen who had been an advisor to then-candidate Trump ("Advisor-1").   In connection with the FBI's Crossfire Hurricane investigation and the later investigation by Special Counsel Robert S. Mueller III, the FBI relied substantially on the Company Reports in these FISA applications to assert probable cause that Advisor-1 was a witting agent of the Russian Federation.

6.       The FBI obtained a total of four court-approved FISA applications targeting Advisor-1, which authorized intrusive electronic surveillance of Advisor-1 from in or about October 2016 through in or about September 2017.   Each of the FISA applications set forth the FBI's assessment that Advisor-1 was a knowing agent of Russia and further alleged – based on the Company Reports – that Advisor-1 was part of a "well-coordinated conspiracy of co-operation" between Trump's campaign and the Russian government.

7.       Over time, the FBI attempted to investigate, vet, and analyze the Company Reports but ultimately was not able to confirm or corroborate most of their substantive allegations.

8.       In the context of these efforts, the FBI learned that U.K. Person-1 relied primarily on a U.S.-based Russian national, **IGOR DANCHENKO ("DANCHENKO")**, the defendant herein, to collect the information that ultimately formed the core of the allegations found in the

Company Reports. From in or about January 2017 through in or about November 2017, and as part of its efforts to determine the truth or falsity of specific information in the Company Reports, the FBI conducted several interviews of **DANCHENKO** regarding, among other things, the information that **DANCHENKO** had provided to U.K. Person-1 (collectively, the "Interviews").

9. As alleged in further detail below, **DANCHENKO** lied to FBI agents during these Interviews.

10. First, **DANCHENKO** stated falsely that he had never communicated with a particular U.S.-based individual – who was a long-time participant in Democratic Party politics and was then an executive at a U.S. public relations firm ("PR Executive-1") – about any allegations contained in the Company Reports. In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** sourced one or more specific allegations in the Company Reports anonymously to PR Executive-1.

11. PR Executive-1's role as a contributor of information to the Company Reports was highly relevant and material to the FBI's evaluation of those reports because (a) PR Executive-1 maintained pre-existing and ongoing relationships with numerous persons named or described in the Company Reports, including one of **DANCHENKO's** Russian sub-sources (detailed below), (b) PR Executive-1 maintained historical and ongoing involvement in Democratic politics, which bore upon PR Executive-1's reliability, motivations, and potential bias as a source of information for the Company Reports, and (c) **DANCHENKO** gathered some of the information contained in the Company Reports at events in Moscow organized by PR Executive-1 and others that **DANCHENKO** attended at PR Executive-1's invitation. Indeed, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in the Company

Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

12.     Second, **DANCHENKO** stated falsely during the Interviews, that, in or about late July 2016, he received an anonymous phone call from an individual who **DANCHENKO** believed to be a particular U.S. citizen and who was then president of the Russian-American Chamber of Commerce ("Chamber President-1"). **DANCHENKO** also falsely stated that, during this phone call, (i) the person he believed to be Chamber President-1 informed him, in part, about information that the Company Reports later described as demonstrating a well-developed "conspiracy of cooperation" between the Trump Campaign and Russian officials, and (ii) **DANCHENKO** and the aforementioned person agreed to meet in New York.   In truth and fact, and as **DANCHENKO** well knew, **DANCHENKO** never received such a phone call or such information from any person he believed to be Chamber President-1, and **DANCEHNKO** never made any arrangements to meet Chamber President-1 in New York.   Rather, **DANCHENKO** fabricated these facts regarding Chamber President-1.

13.     As alleged in further detail below, all of **DANCHENKO's** lies were material to the FBI because, among other reasons, (1) the FBI's investigation of the Trump Campaign relied in large part on the Company Reports to obtain FISA warrants on Advisor-1, (2) the FBI ultimately devoted substantial resources attempting to investigate and corroborate the allegations contained in the Company Reports, including the reliability of **DANCHENKO's** sub-sources; and (3) the Company Reports, as well as information collected for the Reports by **DANCHENKO**, played a role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period.

4

A. The Defendant

14.     At all times relevant to this Indictment, **DANCHENKO** was a citizen of the Russian Federation and was lawfully in the United States. **DANCHENKO** resided in Washington, D.C. and Virginia.

15.     From in or about 2005 through in or about 2010, **DANCHENKO** worked as an analyst at a Washington, D.C.-based think tank ("Think Tank-1") where he focused primarily on Russian and Eurasian geo-political matters.

16.     In or about 2010, an employee of Think Tank-1 ("Think Tank Employee-1") introduced **DANCHENKO** to U.K. Person-1.    In or about 2011, U.K. Person-1 retained **DANCHENKO** as a contractor at U.K. Investigative Firm-1.    In his work for U.K. Investigative Firm-1, **DANCHENKO** focused primarily on Russian and Eurasian business risk assessment and geopolitical analysis.

B. U.K. Investigative Firm-1 and Its Role in the 2016 Presidential Election Campaign

17.     U.K. Investigative Firm-1 was at all times relevant to this Indictment a U.K.-based business intelligence firm. Beginning in or around June 2016, U.K. Person-1 – using information provided primarily by **DANCHENKO** – began to compile and draft the Company Reports containing purported evidence of illicit ties between Trump and the Russian government.   On or about July 5, 2016, U.K. Person-1 provided the first of the Company Reports to an FBI agent overseas.

C. PR Executive-1

18.     At all times relevant to this indictment, PR Executive-1 was a Virginia-based public relations professional employed by a Washington, D.C.-based public relations firm ("PR Firm-1"). In or about February 2016, Think Tank Employee-1 – the aforementioned individual who

5

introduced **DANCHENKO** to U.K. Person-1 in 2010 – introduced **DANCHENKO** to PR Executive-1 in connection with potential business opportunities.

19.     In addition to his work as a public relations professional, PR Executive-1 had served as (1) chairman of a national Democratic political organization, (2) state chairman of former President Clinton's 1992 and 1996 presidential campaigns, and (3) an advisor to Hillary Clinton's 2008 Presidential campaign. Moreover, beginning in or about 1997, President Clinton appointed PR Executive-1 to two four-year terms on an advisory commission at the U.S. State Department. With respect to the 2016 Clinton Campaign, PR Executive-1 actively campaigned and participated in calls and events as a volunteer on behalf of Hillary Clinton.

20.     In his role as a public relations professional, PR Executive-1 spent much of his career interacting with Eurasian clients with a particular focus on Russia. For example, from in or about 2006 through in or about 2014, the Russian Federation retained PR Executive-1 and his then-employer to handle global public relations for the Russian government and a state-owned energy company. PR Executive-1 served as a lead consultant during that project and frequently interacted with senior Russian Federation leadership whose names would later appear in the Company Reports, including the Press Secretary of the Russian Presidential Administration ("Russian Press Secretary-1"), the Deputy Press Secretary ("Russian Deputy Press Secretary-1"), and others in the Russian Presidential Press Department. Additionally, PR Executive-1 maintained relationships with the then-Russian Ambassador to the United States ("Russian Ambassador-1") and the head of the Russian Embassy's Economic Section in Washington, D.C. ("Russian Diplomat-1"), both of whom also would later appear by name in the Company Reports.

21.     Beginning in or about early 2015, an acquaintance of PR Executive-1 ("Organizer-1") was planning a business conference that Organizer-1 and others would host in October 2016

(the "October Conference") at a Moscow hotel that would later appear in the Company Reports (the "Moscow Hotel"). Organizer-1 planned the October Conference on behalf of a group of senior international business people who were seeking to explore potential business investments in Russia. To that end, the October Conference included individuals who could provide insight into the economic, political, diplomatic and cultural aspects of the Russian Federation. Organizer-1 enlisted PR Executive-1 to participate in the October Conference because of PR Executive-1's ability to set up meetings with senior Russian government officials and provide analysis of the 2016 U.S. Democratic presidential primary at the October Conference.

22.     In preparation for the October Conference, Organizer-1 and PR Executive-1 planned and carried out a trip to Moscow in or about June 2016 (the "June 2016 Planning Trip").

D. DANCHENKO's Relationship with PR Executive-1

23.     In or about late April 2016, **DANCHENKO** and PR Executive-1 engaged in discussions regarding potential business collaboration between PR Firm-1 and U.K. Investigative Firm-1 on issues relating to Russia. These discussions reflected that **DANCHENKO** and PR Executive-1 had exchanged information regarding each other's backgrounds and professional activities, including **DANCHENKO's** work for U.K. Investigative Firm-1 and U.K. Person-1.

24.     For example, on or about April 29, 2016, **DANCHENKO** sent an email to PR Executive-1 indicating that **DANCHENKO** had passed a letter to U.K. Person-1 on behalf of PR Executive-1. Specifically, the email stated that **DANCHENKO** had "forwarded your letter" to [U.K. Person-1] and his business partner. "I'll make sure you gentlemen meet when they are in Washington or when you are in London."

25.     That same day, **DANCHENKO** sent an email to PR Executive-1 outlining certain work that **DANCHENKO** was conducting with U.K. Investigative Firm-1. The email attached a

U.K Investigative Firm-1 report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector."

26.     Shortly thereafter, PR Executive-1 asked **DANCHENKO** to assist PR Executive-1 and Organizer-1 with the October Conference, which **DANCHENKO** agreed to do.  PR Executive-1 subsequently asked and received permission from Organizer-1 to enlist **DANCHENKO** to assist with logistics, provide translation services, and present on various relevant topics at the October Conference.

27.     On or about June 10, 2016, and prior to the June 2016 Planning Trip, PR Executive-1 sent an email to a U.S.-based acquaintance which reflected that PR Executive-1 and **DANCHENKO** had become colleagues and were exchanging information.  In describing **DANCHENKO,** PR Executive-1 stated: "He is too young for KGB.  But I think he worked for FSB.  Since he told me he spent two years in Iran.  And when I first met him he knew more about me than I did. [winking emoticon]."  (The Federal Security Service of the Russian Federation, or "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.)

28.     In or about May, August, and September 2016, in preparation for the October Conference, PR Executive-1 and Organizer-1 attended at least three meetings at the Russian Embassy in Washington, D.C., and communicated with Russian Embassy staff, including Russian Ambassador-1 and Russian Diplomat-1 (both of whom, as described above and in further detail below, appeared in the Company Reports).   PR Executive-1 and Organizer-1 also attended a meeting at the Russian Embassy on or about September 14, 2016.  **DANCHENKO** did not attend any of these meetings.

29.     In anticipation of the June 2016 Planning Trip to Moscow, PR Executive-1 also communicated with Russian Press Secretary-1 and Russian Deputy Press Secretary-1, both of whom worked in the Kremlin and, as noted above, also appeared in the Company Reports.

30.     On or about June 13, 2016, PR Executive-1 and Organizer-1 traveled to Moscow for the June 2016 Planning Trip.   PR Executive-1 and Organizer-1 stayed at the Moscow Hotel. On or about June 14, 2016, **DANCHENKO**, who, at the time was already present in Russia working on behalf of U.K. Investigative Firm-1, met with PR Executive-1 and Organizer-1 in Moscow. **DANCHENKO** did not stay at the Moscow Hotel during the June 2016 Planning Trip.

31.     During the June 2016 Planning Trip at the Moscow Hotel, PR Executive-1 and Organizer-1 participated in, among other things, (1) a meeting with the general manager of the Moscow Hotel ("General Manager-1") and a female hotel staff member ("Staff Member-1") to discuss the October Conference, (2) a lunch on or about June 15, 2016 with Staff Member-1 and other members of the Moscow Hotel staff who assisted in the preparations for the October Conference, and (3) a tour of the Moscow Hotel, including the Presidential Suite.

32.     In addition, and as described in further detail below, references to the Moscow Hotel, the Presidential Suite, and a Moscow Hotel manager and other staff would all later appear in the Company Reports.

33.     On or about June 14, 2016, **DANCHENKO** visited PR Executive-1 and others at the Moscow Hotel, and posted a picture on social media of himself and PR Executive-1 with Red Square appearing in the background.

34.     On or about June 17, 2016, **DANCHENKO** flew from Moscow to London.  While in London, **DANCHENKO** met with U.K. Person-1 to provide him with information that would later appear in the Company Reports.

35.     On or about October 4, 2016, PR Executive-1, Organizer-1, and **DANCHENKO** traveled to Moscow for the October Conference.  The October Conference featured several Russian government officials including (i) a prominent member of the Duma (Russian Parliament) ("Duma Member-1") and (ii) members of the Russian Ministry of Foreign Affairs, including, as discussed above, Russian Diplomat-1 and another Russian diplomat ("Russian Diplomat-2").  As part of the October Conference, participants also attended meetings in the Kremlin with the Russian Ministry of Foreign Affairs and the Russian Presidential Press Department.

36.     According to PR Executive-1, individuals affiliated with the Clinton Campaign did not direct, and were not aware of, the aforementioned meetings and activities with **DANCHENKO** and other Russian nationals.

E.  (U) Russian Sub-Source-1

37.     At all times relevant to this Indictment, **DANCHENKO** maintained communications with a Russian national ("Russian Sub-Source-1") based in a foreign country ("Country-1") who, according to **DANCHENKO**, acted as one of **DANCHENKO's** primary sources of information for allegations contained in the Company Reports.  **DANCHENKO** and Russian Sub-Source-1 had initially met as children in Russia, and remained friends thereafter.

38.     In or about early 2016, Russian Sub-Source-1 began working at a business based in Country-1 ("Business-1") that was owned by a Russian national and would later appear in the Company Reports.  Russian Sub-Source-1 conducted public relations and communications work for Business-1.

F.  DANCHENKO Introduces Russian Sub-Source-1 to PR Executive-1

39.     In or about March 2016, and prior to the June 2016 Planning Trip, **DANCHENKO** learned from Russian Sub-Source-1 that Business-1 was interested in retaining a U.S.-based public

relations firm to assist with Business-1's entry into the U.S. market.  **DANCHENKO** brokered a meeting between PR Executive-1 and Russian Sub-Source-1 to discuss a potential business relationship.  Thereafter, PR Firm-1 and Business-1 entered a contractual relationship.

40.     In or around the same time period, **DANCHENKO**, PR Executive-1, and Russian Sub-Source-1 communicated about, among other things, the business relationship between Business-1 and PR Firm-1.

41.     During the same time period, Russian Sub-Source-1 and PR Executive-1 communicated regularly via social media, telephone, and other means.  In these communications and others, Russian Subsource-1 and PR Executive-1 discussed their political views and their support for Hillary Clinton.

a.     For example, during July 2016 meetings in Country-1, PR Executive-1 gifted to Russian Sub-Source-1 an autobiography of Hillary Clinton, which he signed and inscribed with the handwritten message, "To my good friend [first name of Russian Sub-Source-1], A Great Democrat."

b.     Additionally, on or about July 13, 2016, Russian Sub-Source-1 sent a message to a Russia-based associate and stated that PR Executive-1 had written a letter to Russian Press Secretary-1 in support of Russian-Sub-Source-1's candidacy for a position in the Russian Presidential Administration.

c.     On or about July 22, 2016, PR Executive-1 sent an email to Russian Sub-Source-1 and informed Russian Sub-Source-1 that he would be attending a reception for Hillary Clinton. Shortly thereafter, Russian Sub-Source-1 responded: "[T]ell her please she [Clinton] has a big fan in [Country-1].  Can I please ask you to sign for me her (anything)."

      d.    In or about August 2016, Russian Sub-Source-1 sent a message to a Russia-based associate describing PR Executive-1 as an "advisor" to Hillary Clinton.  Russian Sub-Source-1 further commented regarding what might happen if Clinton were to win the election, stating in Russian, "[W]hen [PR Executive-1 and others] take me off to the State Department [to handle] issues of the former USSR, then we'll see who is looking good and who is not."

      e.    In or about September 2016, Russian Sub-Source-1 made a similar comment in a message to the same associate, stating in Russian that PR Executive-1 would "take me to the State Department if Hillary wins."

      f.    On or about November 7, 2016 (the day before the 2016 U.S. Presidential election), Russian Sub-Source-1 emailed PR Executive-1 in English and stated, in part:

> [] I am preparing you some information on former USSR/UIC countries, Igor **[DANCHENKO]** possibly told you about that. . . . . Tomorrow your country is having a great day, so, as a big Hillary fan, I wish her and all her supporters to have a Victory day.  Hope, that someday her book will have one more autograph on it)
>
> Thank you for your help and support,
>
> Best regards,
> [First Name of Russian Sub-Source-1]

G. <u>Chamber President-1</u>

    42.    At all times relevant to this Indictment, Chamber President-1 was a New York-based real estate broker.  Chamber President-1 previously served as president of the Russian-American Chamber of Commerce from 2006 to 2016.  In the course of his employment, Chamber President-1 had occasion to work on real estate projects with Trump and staff at the Trump Organization, which at all times relevant to this Indictment was owned by Trump.

43.     As discussed more fully below, **DANCHENKO** claimed to have sourced several allegations contained in the Company Reports to Chamber President-1, including allegations of purported ongoing communications between the Trump campaign and Russian officials.

H. DANCHENKO's U.S. Election Reporting

44.     As alleged above and in further detail below, from in or about May 2016 through in or about December 2016, during the same time period as the events set forth above involving PR Executive-1 and Organizer-1 (including the June 2016 Planning Trip and the October Conference), **DANCHENKO** assembled and provided to U.K. Person-1 purported information that U.K. Person-1 would, in turn, use to draft the Company Reports. **DANCHENKO** gathered some of this purported information during the June 2016 Planning Trip and the October Conference. Indeed, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in the Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

II. DANCHENKO's False Statements Involving PR Executive-1

A. PR Executive-1 Provides Information Regarding Campaign Manager-1

45.     At least one allegation contained in a Company Report dated August 22, 2016, reflected information that **DANCHENKO** collected directly from PR Executive-1. In particular, that Company Report detailed the August 2016 resignation of Trump's Campaign Manager ("Campaign Manager-1") and his allegedly strained relationship with another campaign staff member ("Campaign Staff Member-1"). The allegation in the Company Report stated:

> Close associate of TRUMP explains **reasoning behind [Campaign Manager-1's] recent resignation.** Ukraine revelations played part but others wanted [Campaign Manager-1] out for various reasons, especially [Campaign Staff Member-1] who remains influential . . .

> Speaking separately, also in late August 2016, **an American political figure associated with Donald TRUMP** and his campaign outlined the reasons behind [Campaign Manager-1's] recent demise. S/he said it was true that the Ukraine corruption revelations had played a part in this, but also, **several senior players close to TRUMP had wanted [Campaign Manager-1] out**, primarily to loosen his control on strategy and policy formulation. Of particular importance in this regard was [Campaign Manager-1's] **predecessor as campaign manager, [Campaign Staff Member-1], who hated [Campaign Manager-1] personally and remained close to TRUMP** with whom he discussed the presidential campaign on a regular basis.

(emphasis added) (capitalization in original).

46.     This Company Report contained information that **DANCHENKO** had gathered directly from PR Executive-1 in response to a specific request. In particular, on or about August 19, 2016, **DANCHENKO** emailed PR Executive-1 to solicit any "thought, rumor, or allegation" about Campaign Manager-1. In the email, **DANCHENKO** also informed PR Executive-1 that he (**DANCHENKO**) was working on a "project against Trump":

> Could you please ask someone to comment on [Campaign Manager-1's] resignation and anything on Trump campaign? Off the record of course! **Any thought, rumor, allegation. I am working on a related project against Trump.** I asked [PR Executive-1's acquaintance] three months ago but he didn't say much although shared a couple of valuable insights.
>
> Thanks a lot!
>
> Best,
> Igor

(emphasis added)

47.     Later that day, PR Executive-1 replied to **DANCHENKO**, stating in part:

> Let me dig around on [Campaign Manager-1]. Pretty sure the new team wanted him gone asap and used today's NYT story to drive a stake in his heart.

48.     On or about August 20, 2016, PR Executive-1 emailed **DANCHENKO** the following:

> Hi Igor:
>
> I had a drink with **a GOP friend of mine** who knows some of the players and got some of what is in this article, which provides even more detail.  **She also told me that [Campaign Staff Member-1], who hates [Campaign Manager-1] and still speaks to Trump regularly played a role.  He is said to be doing a happy dance over it.**
>
> **I think the bottom line is that in addition to the Ukraine revelations, a number of people wanted Campaign Manager-1 gone.  It is a very sharp elbows crowd.**

(emphasis added).   PR Executive-1 attached to the email a link to an internet news article that discussed Campaign Manager-1's resignation as Trump Campaign manager.

49.     Later that day, **DANCHENKO** replied to PR Executive-1, expressing his appreciation for the information, and stating that their "goals clearly coincide[d]" with regard to **DANCHENKO's** efforts to gather derogatory information about Trump:

> Dear [PR Executive-1],
>
> Thank you for this.   Any additional insights will be much appreciated.
>
> **It is an important project for me, and our goals clearly coincide.** I've been following the Russia trail in Trump's campaign.  It is there so what you read in the news is hardly an exaggeration.  Some things are less dramatic while others are more than they seem.

(emphasis added).

50.     PR Executive-1 replied to **DANCHENKO** with the following: "Thanks!  I'll let you know if I hear anything else."

51.     PR Executive-1 provided this information regarding Campaign Manager-1 to **DANCHENKO** two days before it appeared in the August 22, 2016 Company Report.   As

reflected above, the information provided by PR Executive-1 was substantially the same as the information contained in the Company Report. In particular:

a. PR Executive-1 claimed to have received the information from a "GOP friend," whom the above-referenced Company Report describes as a "close associate of Trump."

b. In his email, PR Executive-1 referred to "Ukraine revelations" about Campaign Manager-1, which the Company Report also refers to as the "Ukraine corruption revelations."

c. PR Executive-1's email stated a **"number of people wanted [Campaign Manager-1] gone."** The Company Report similarly stated that **"several senior players close to TRUMP had wanted [Campaign Manager-1] out**." (emphasis added).

d. PR Executive-1's email stated that "[Campaign Staff Member-1], who **hates [Campaign Manager-1]** and **still speaks to Trump** regularly played a role" in Campaign Manager-1's departure. (emphasis added). The Company Report similarly states that Campaign Manager-1's departure was due to "[Campaign Staff Member-1], who **hated [Campaign Manager-1]** personally and **remained close to TRUMP**." (emphasis added).

52.    PR Executive-1 later acknowledged to the FBI that he never met with a "GOP friend" in relation to this information that he passed to **DANCHENKO**, but, rather, fabricated the fact of the meeting in his communications with **DANCHENKO**. PR Executive-1 instead obtained the information about Campaign Manager-1 from public news sources. According to PR Executive-1, he (PR Executive-1) was not aware at the time of the specifics of **DANCHENKO's** "project against Trump," or that **DANCHENKO's** reporting would be provided to the FBI.

B.  DANCHENKO's Statements to the FBI Regarding PR Executive-1

53.    On or about June 15, 2017, the FBI interviewed **DANCHENKO** in the Eastern District of Virginia regarding the Company Reports.  FBI agents recorded the June Interview without **DANCHENKO's** knowledge.

54.    During the interview, the FBI asked **DANCHENKO**, among other things, if he had talked to PR Executive-1 regarding any allegations contained in the Company Reports. **DANCHENKO** denied that PR Executive-1 provided any specific information related to the Company Reports.  In particular, when an FBI agent ("Agent-1") mentioned PR Executive-1's name during a conversation about individuals who may have contributed to the Company Reports, the following exchange, in part, occurred:

| | |
|---|---|
| FBI AGENT-1: | Um, because obviously I don't think you're the only . . . |
| **DANCHENKO:** | Mm-hmm. |
| FBI AGENT-1: | Person that has been contributing.  You may have said one – and this is the other thing we are trying to figure out. |
| | [. . .] |
| FBI AGENT-1: | Do you know a [PR Executive-1]? |
| **DANCHENKO:** | Do I know [PR Executive-1]? Yeah. |
| FBI AGENT-1: | How long have you known him? [laughing] [pause] |
| **DANCHENKO:** | I've known [PR-Executive-1] for [pause] I don't know, a couple years maybe. |
| FBI AGENT-1: | Couple years? |
| **DANCHENKO:** | But but but but but but but I've known of him for like 12 years. |

[. . .]

| | |
|---|---|
| **DANCHENKO:** | Yeah.  Yeah he likes Russia.  **I don't think he is, uh, – would be any way be involved.**  But—but—uh—b—but he's uh [UI] what I would think would be easily played.  Maybe.  Uh, he's a bit naïve in his, um liking of Russia. |
| FBI AGENT-1: | Okay, so you've had . . . was there any . . . but you had **never talked to [PR Executive-1] about anything that showed up in the dossier [Company Reports] right?** |
| **DANCHENKO:** | **No.** |
| FBI AGENT-1: | You don't think so? |
| **DANCHENKO:** | **No.  We talked about, you know, related issues perhaps but no, no, no, nothing specific.** |

(emphasis added).

55.    In a later part of the conversation, **DANCHENKO** stated, in substance and in part, that PR Executive-1 had traveled on the October "delegation" to Moscow; that PR Executive-1 conducted business with Business-1 and Russian Sub-source-1; and that PR Executive-1 had a professional relationship with Russian Press Secretary-1.

56.    **DANCHENKO's** June 15, 2017 statements that (i) he never talked to [PR Executive-1] about "anything [specific] that showed up" in the Company Reports, and that (ii) he did not think PR Executive-1 was "involved in any way" in those reports, were knowingly and intentionally false.  In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** had gathered specific information from PR Executive-1 that appeared in the August 22, 2016 Company Report concerning Campaign Manager-1's resignation.

III. The Materiality of DANCHENKO's Lies Regarding PR Executive-1

57.     **DANCHENKO's** lies denying PR Executive-1's role in specific information referenced in the Company Reports were material to the FBI because, among other reasons, they deprived FBI agents and analysts of probative information concerning PR Executive-1 that would have, among other things, assisted them in evaluating the credibility, reliability, and veracity of the Company Reports, including **DANCHENKO's** sub-sources. In particular, PR Executive-1 maintained connections to numerous people and events described in several other reports, and **DANCHENKO** gathered information that appeared in the Company Reports during the June Planning Trip and the October Conference. In addition, and as alleged below, certain allegations that **DANCHENKO** provided to U.K. Person-1, and which appeared in other Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals. As alleged below, all of these facts rendered **DANCHENKO's** lies regarding PR Executive-1's role as a source of information for the Company Reports highly material to the FBI's ongoing investigation.

A.     DANCHENKO's Allegations Regarding Trump's Salacious Sexual Activity

58.     For example, an allegation in a Company Report dated June 20, 2016 indicated that Trump had previously engaged in salacious sexual activity while a guest at the Moscow Hotel. The allegation stated, in part:

> According to Source D, where s/he had been present, TRUMP's (perverted) conduct in Moscow included hiring the presidential suite of the [Moscow Hotel], where he knew President and Mrs OBAMA (whom he hated) had stayed on one of their official trips to Russia, and [engaged in sexual activity]. The hotel was known to be under FSB control with microphones and concealed cameras in all the main rooms to record anything they wanted to.

> The [Moscow Hotel] episode involving TRUMP reported above was **confirmed by Source E, a senior (western) member of staff at**

**the hotel**, who said that s/he and several of the staff were aware of it at the time and subsequently. S/he believed it had happened in 2013. Source E provided an introduction for a company ethnic Russian operative to **Source F, a female staffer** at the hotel when TRUMP had stayed there, who also confirmed the story.

(emphasis added) (capitalization in original).

*PR Executive-1 and Organizer-1 Receive a Tour of the Moscow Hotel's Presidential Suite*

59.     Certain of the information in the June 20, 2016 Company Report reflected facts that PR Executive-1 and Organizer-1 also learned during the June 2016 Planning Trip to Moscow.

60.     For example, and as alleged above, during the June 2016 Planning Trip, both PR Executive-1 and Organizer-1 stayed at the Moscow Hotel.   While at the Moscow Hotel, PR Executive-1 and Organizer-1 (i) received a tour of the Moscow Hotel's Presidential Suite (ii) met with the general manager ("General Manager-1") and other staff of the Moscow Hotel, and (iii) attended meetings – to include with **DANCHENKO** – at various Russian government ministries. Further, PR Executive-1 had lunch with **DANCHENKO** during the June 2016 Planning Trip.

61.     According to Organizer-1, during the aforementioned tour of the Presidential Suite, a Moscow Hotel staff member told the participants, including PR Executive-1, that Trump had stayed in the Presidential Suite.  According to both Organizer-1 and PR Executive-1, the staff member did not mention any sexual or salacious activity.

*DANCHENKO's Statements to the FBI Regarding the Moscow Hotel*

62.     During the Interviews in or about 2017 in which he was asked about this Company Report, **DANCHENKO** initially claimed to have stayed at the Moscow Hotel in June 2016. **DANCHENKO** later acknowledged in a subsequent interview, however, that he did not stay at the Moscow Hotel until the October Conference.

63. During the Interviews, **DANCHENKO** claimed to have collected information concerning Trump's purported activities at the Moscow Hotel from various sources, including but not limited to General Manager-1 and other Moscow Hotel staff.

64. **DANCHENKO** further claimed that he characterized Trump's alleged activity to U.K. Person-1 as "rumor and speculation," and that **DANCHENKO** had been unable to confirm the veracity of the story.

65. Based on the foregoing, **DANCHENKO's** lies to the FBI denying that he had communicated with PR Executive-1 regarding information in the Company Reports were highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the aforementioned Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might have taken further investigative steps to, among other things, interview PR Executive-1 about (i) the June 2016 Planning Trip, (ii) whether PR Executive-1 spoke with **DANCHENKO** about Trump's stay and alleged activity in the Presidential Suite of the Moscow Hotel, and (iii) PR Executive-1's interactions with General Manager-1 and other Moscow Hotel staff. In sum, given that PR Executive-1 was present at places and events where **DANCHENKO** collected information for the Company Reports, **DANCHENKO's** subsequent lie about PR Executive-1's connection to the Company Reports was highly material to the FBI's investigation of these matters.

B. DANCHENKO's Allegations Regarding Russian Diplomat-1

66. Another allegation in the Company Reports that demonstrated the materiality of **DANCHENKO's** lies regarding PR Executive-1 was dated September 14, 2016 and claimed that the Russian government withdrew Russian Diplomat-1 from his job at the Russian Embassy in

Washington, D.C. due to fears relating to the diplomat's purported role in meddling in the U.S.

presidential election.   Specifically, the allegation in the Company Report stated:

> [S]peaking [] to [a] compatriot, a senior Russian [Ministry of Foreign Affairs] official reported that as a prophylactic measure, a leading Russia diplomat, **[Russian Diplomat-1], had been withdrawn from Washington on short notice because Moscow feared his heavy involvement in the US presidential election operation,** including the so-called veterans' pensions ruse (reported previously), would be exposed in the media there. **His replacement, [Russian Diplomat-2] however was clean in this regard.**

*PR Executive-1 Receives Information Regarding Russian Diplomat-1*

67.     This allegation – like the allegation concerning the Presidential Suite of the

Moscow Hotel – bore substantial similarities to information that PR Executive-1 received during

the 2016 time period.

68.     For example, and as discussed above, in or about May, August, and September

2016, and in preparation for the October Conference, PR Executive-1 and Organizer-1 had

attended meetings with staff of the Russian Embassy in Washington, D.C., including Russian

Diplomat-1. **DANCHENKO** was not present at these meetings.

69.     After one of these meetings on or about May 31, 2016, a member of the Russian

Embassy staff informed PR Executive-1 and Organizer-1 in an email that Russian Diplomat-1

would be recalled back to Russia in September 2016 and replaced by Russian Diplomat-2.

**DANCHENKO** was not a recipient of this email.

70.     On or about August 2, 2016, PR Executive-1 and Organizer-1 attended another

meeting with Russian Diplomat-1 at the Russian Embassy in Washington, D.C. **DANCHENKO**

was not present at this meeting.

71.     On or about August 19, 2016, Russian Diplomat-1 sent an email to PR Executive-

1 and others.  The email stated, in substance and part, that Russian Diplomat-1 was returning to

Russia and was being replaced by Russian Diplomat-2. Russian Diplomat-1 further stated: "[Russian Diplomat-2] **is a talented diplomat and economist with impressive experience in American studies**." (emphasis added).

72.     On or about September 13, 2016 – the day prior to the date of the Company Report containing the allegation regarding Russian Diplomat-1 – PR Executive-1 called **DANCHENKO**. At the time of the call, **DANCHENKO** was in Russia.

*DANCHENKO's Statements to the FBI Regarding Russian Diplomat-1*

73.     When interviewed separately by the FBI in or about 2017, **DANCHENKO** and U.K. Person-1 provided differing information about the purported source(s) of these allegations regarding Russian Diplomat-1:

a.     In particular, on or about January 25, 2017, **DANCHENKO** stated to FBI agents that he learned of the information about Russian Diplomat-1's departure from Russian Diplomat-1 himself while Russian Diplomat-1 was helping **DANCHENKO** obtain a new Russian passport. **DANCHENKO** further stated that Russian Diplomat-1 described his replacement, Russian Diplomat-2, as a **"bright young guy"** – similar to the statement contained in the aforementioned August 2016 email from Russian Diplomat-1 to PR Executive-1. **DANCHENKO** also stated to the FBI that his conversation with Russian Diplomat-1 occurred in late spring 2016 – in or around the same time that PR Executive-1 and Organizer-1 first learned of Russian Diplomat-1's impending return to Russia.   **DANCHENKO** denied speaking with Russian Diplomat-1 at the October Conference in Moscow.

74.     However, when interviewed by the FBI on or about September 18 and 19, 2017, U.K. Person-1 stated that **DANCHENKO** learned of the aforementioned allegation in Moscow

after bumping into Russian Diplomat-1 on the street in August 2016. In fact, **DANCHENKO** was located in the United States in August 2016.

75.     Based on the foregoing, **DANCHENKO's** lies to the FBI denying that he had communicated with PR Executive-1 regarding information in the Company Reports were highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might also have taken further investigative steps to, among other things, interview PR Executive-1 regarding his potential knowledge of Russian Diplomat-1's departure from the United States. Such investigative steps might have assisted the FBI in resolving the above-described discrepancy between **DANCHENKO** and U.K. Person-1 regarding the sourcing of the allegation concerning Russian Diplomat-1.

C.     DANCHENKO's Allegation Regarding Russian Chief of Staff-1

76.     A final allegation in a Company Report that demonstrated the materiality of **DANCHENKO's** false statements denying PR Executive-1's role as a source for information in the Company Reports was dated September 14, 2016, and contained information related to the firing of the chief of staff of the Russian Presidential Administration ("Russian Chief of Staff-1"). The allegation stated:

> PUTIN had been receiving conflicting advice on interfering from three separate and expert groups. On one side had been the Russian ambassador to the US, [Russian Ambassador-1], and the Ministry of Foreign Affairs, together with an independent and informal network run by presidential foreign policy advisor, [Former Russian Ambassador to the U.S.] who had urged caution and the potential negative impact on Russia from the operation/s. On the other side was former [Russian Chief of Staff-1], backed by Russian Foreign Intelligence (SVR), who had advised PUTIN that the pro-TRUMP, anti-CLINTON operation/s would be both effective and plausibly

deniable with little blowback. **The first group/s had been proven right and this had been the catalyst in PUTIN's decision to sack [Russian Chief of Staff-1] (unexpectedly) as PA Head in August. His successor, [name of Russian Official], had been selected for the job partly because he had not been involved in the US presidential election operation/s.**

(emphasis added) (capitalization in original).

*PR Executive-1 Receives Information Regarding Chief of Staff-1*

77.      This allegation coincided with information that PR Executive-1 had received regarding changes in the Russian Presidential Administration in the weeks prior to the issuance of the Company Report.

78.      In particular, on or about August 12, 2016, the same day that Russian Chief of Staff-1 was reportedly fired, Russian Sub-Source-1 sent a message to PR Executive-1 on social media and stated, "Russian presidential administration is making significant changes right now." **DANCHENKO** was not copied on this message.

79.      Minutes later, PR Executive-1 and Russian Sub-Source-1 spoke for approximately 10 minutes.

80.      On or about September 13, 2016 – the day prior to the date of the Company Report containing the allegation regarding Russian Chief of Staff-1 – PR Executive-1 called **DANCHENKO**.   At the time of the call, **DANCHENKO** was in Russia.

*DANCHENKO's Statements to the FBI Regarding Chief of Staff-1*

81.      In the aforementioned January 25, 2017 interview, the FBI asked **DANCHENKO** about the sourcing of this allegation. **DANCHENKO** stated to the FBI that he learned about the allegation involving Russian Chief of Staff-1 from Russian Sub-Source-1 and "two other friends." **DANCHENKO** did not identify the two other "friends," nor did he mention PR Executive-1 in connection with the allegation.

82.     Based on the foregoing, **DANCHENKO's** lie to the FBI about PR Executive-1 not providing information contained in the Company Reports was highly material. Had **DANCHENKO** accurately disclosed to FBI agents that PR Executive-1 was a source for specific information in the aforementioned Company Reports regarding Campaign Manager-1's departure from the Trump campaign, *see* Paragraphs 45-57, *supra*, the FBI might have taken further investigative steps to, among other things, interview PR Executive-1 regarding his potential knowledge of additional allegations in the Company Reports regarding Russian Chief of Staff-1. Such investigative steps might have, among other things, assisted the FBI in determining whether PR Executive-1 was one of **DANCHENKO's** "other friends" who provided the aforementioned information regarding Putin's firing of Russian Chief of Staff-1.

IV.   DANCHENKO's False Statement Regarding Disclosure of
      his Relationship with U.K. Person-1 and U.K. Investigative Firm-1

83.     In another interview conducted by the FBI on or about January 24, 2017 in the District of Columbia, **DANCHENKO** made another intentionally false statement that involved his activities with PR Executive-1, among others. In particular, the FBI questioned **DANCHENKO** during this interview about, among other things, his relationship with U.K. Person-1 and U.K. Investigative Firm-1. FBI agents asked **DANCHENKO** whether his friends, associates, and/or sub-sources were aware that he (**DANCHENKO**) worked for U.K. Person-1 and U.K. Investigative Firm-1.

84.     In response, **DANCHENKO** falsely stated, in sum and substance, that while certain friends were aware that **DANCHENKO** worked generally in due diligence and business intelligence, **DANCHENKO** never mentioned that he worked for U.K. Person-1 or U.K. Investigative Firm-1 to his friends or associates. **DANCHENKO** further stated, "you [the FBI] are the first people" he had told. **DANCHENKO** added that the reason he never told associates

26

about his relationship with U.K. Person-1 and U.K. Investigative Firm-1 was the existence of a non-disclosure agreement he signed with U.K. Person-1 and U.K. Investigative Firm-1.

85.   **DANCHENKO's** statements asserting that he had not informed friends and associates of his relationship with U.K. Person-1 and the U.K. Investigative Firm were knowingly and intentionally false.   On numerous occasions, and as **DANCHENKO** well knew, he had informed PR Executive-1, Russian Sub-Source-1, and others about his relationship with U.K. Person-1 and U.K. Investigative Firm-1.   For example, and as alleged above, **DANCHENKO** attempted to broker business between PR Executive-1 and U.K. Person-1 as early as in or about April 2016. *See* Paragraphs 23-25, *supra*.   Moreover, in the context of these efforts and afterwards, PR Executive-1 exhibited specific awareness of **DANCHENKO's** relationships with U.K. Person-1 and U.K. Investigative Firm-1.   For example, on or about June 10, 2016, PR Executive-1, while in Country-1 with Russian Sub-Source-1, emailed a U.S.-based acquaintance regarding efforts to assist **DANCHENKO** in obtaining a U.S. visa:

> Monday night I fly to Moscow and will meet with a Russian guy who is working with me on a couple of projects.  He also **works for a group of former [allied foreign intelligence service] guys in London who do intelligence for business** . . . . [H]e owes me as his Visa is being held up and I am having a word with the Ambassador.

(emphasis added).

86.   Approximately seven months later, on or about January 13, 2017, PR Executive-1 replied to an email sent by a U.S.-based person discussing a recent news article regarding the Company Reports, including the allegations concerning Business-1.   In the email, PR Executive-1 again demonstrated his knowledge of **DANCHENKO's** relationship with U.K. Investigative Firm-1 and the Company Reports:

> [] I've been interviewed by the Washington Post and the London Times – three times over the last two days over the **[Foreign**

27

Intelligence Service-1] **Dossier on Trump and I know the Russian agent who made the report (He used to work for me).** My client in [Country-1] [Business-1] has been accused of being the party that organized the hacking.  Presently speaking with the barrister in London who is filing a brief against **Former British [Government Employee] [U.K. Person-1] has been unmasked** as <u>the man behind an explosive</u> dossier about <u>US president-elect Donald Trump</u>.  Also in conversation with former British Ambassador who knows [U.K. Person-1].  Quite right – Oh what a boring life.

(bold emphasis added) (underline in original).

87.     At this time, **DANCHENKO** was not publicly known to be a source for U.K. Person-1.

88.     Further demonstrating the falsity of **DANCHENKO's** statements to the FBI, **DANCHENKO's** email and social media communications reflect that he also previously had disclosed his relationship with U.K. Investigative Firm-1 to at least five other individuals, including Russian Sub-Source-1 and acquaintances based in the United States, the United Kingdom, and Russia.  For example, on or about July 28, 2016, **DANCHENKO** sent a message to an acquaintance and stated "Thanks to my reporting in the past 36 hours, [U.K. Person-1] and [U.K. Investigative Firm-1 Employee] are flying in tomorrow for a few days so I might be busy . . . ."  In addition, on or about September 18, 2016, **DANCHENKO** sent a message to the same acquaintance stating that **DANCHENKO** had "[w]ork to do for [U.K. Person-1] who's probably coming to DC on Wednesday."  U.K. Person-1 did, in fact, travel to Washington. D.C. on or about September 21, 2016.

89.     Accordingly, **DANCHENKO's** January 24, 2017 statements (i) that he never mentioned U.K. Person-1 or U.K. Investigative Firm-1 to his friends or associates and (ii) that "you [the FBI] are the first people he's told," were knowingly and intentionally false.  In truth and in fact, and as **DANCHENKO** well knew, **DANCHENKO** had informed a number of individuals

about his relationship with U.K. Person-1 and U.K. Investigative Firm-1. Such lies were material

to the FBI's ongoing investigation because, among other reasons, it was important for the FBI to

understand how discreet or open **DANCHENKO** had been with his friends and associates about

his status as an employee of U.K. Investigative Firm-1, since his practices in this regard could, in

turn, affect the likelihood that other individuals – including hostile foreign intelligence services –

would learn of and attempt to influence **DANCHENKO's** reporting for U.K. Investigative Firm-

1.

V. DANCHENKO's False Statements Regarding
   Allegations Sourced to Chamber President-1

  90. In addition to making the aforementioned intentionally false statements to the FBI

during the Interviews, **DANCHENKO** also lied to the FBI regarding a call that he purportedly

received from someone he claimed to believe was Chamber President-1 (referenced in Paragraphs

42-43, *supra*) in or about July of 2016. Information that **DANCHENKO** attributed to that

purported call served as a basis for allegations that appeared in the Company Reports.

  91. In particular, an allegation contained in an undated Company Report described a

"well-developed conspiracy of cooperation" between Donald Trump, the Trump Campaign, and

senior Russian officials. This allegation would ultimately underpin the four FISA applications

targeting Advisor-1. Specifically, the allegation stated:

> Speaking in confidence to a compatriot **in late July 2016, Source
> E, an ethnic Russian close associate of Republican US
> presidential candidate Donald TRUMP,** admitted that there was a
> well-developed conspiracy of co-operation between them and the
> Russian leadership. This was managed on the TRUMP side by the
> Republican candidate's campaign manager, [Campaign Manager-
> 1], who was using foreign policy advisor, [Advisor-1], and others as
> intermediaries. The two sides had a mutual interest in defeating
> Democratic presidential candidate Hillary CLINTON, whom
> President PUTIN apparently both hated and feared. (capitalization
> in original).

29

(emphasis added). An additional allegation contained in this same Company Report indicated that Russian diplomatic staff in Washington, D.C., New York, and Miami were paying U.S.-based cyber actors to conduct operations against the Democratic Party and Hillary Clinton.

A. DANCHENKO's Alleged Phone Call with Chamber President-1

92.    During several interviews, including on or about March 16, 2017, May 18, 2017, October 24, 2017, and November 2, 2017, **DANCHENKO** informed the FBI that he believed "Source E" in the above-referenced allegations referred, at least in part, to Chamber President-1.

93.    As described in further detail below, **DANCHENKO** falsely stated to the FBI during the Interviews that in or around the summer of 2016, he received a phone call from an anonymous Russian male who did not identify himself to **DANCHENKO** but who **DANCHENKO** claimed to believe was Chamber President-1.

B. DANCHENKO's False Statement Regarding
his Alleged Phone Call with Chamber President-1

94.    On or about January 24, 2017 and January 25, 2017, the FBI interviewed **DANCHENKO** at an FBI office in Washington, D.C. about, among other things, his relationship with Chamber President-1. During this interview, **DANCHENKO** falsely stated that, in or around July 2016, he received a phone call from an unidentified individual who he believed to be Chamber President-1.

95.    In particular, **DANCHENKO** stated, in part:

a.    In or about June or July 2016, **DANCHENKO** communicated with a U.S.-based Russian journalist ("Russian Journalist-1") who worked for a Russian state-run media outlet ("Russian Media Company-1") about reaching out to Chamber President-1. Russian Journalist-1 indicated that his colleague ("Russian Journalist-2") had a relationship with Chamber President-1.

30

b.   Thereafter, **DANCHENKO** reached out to Chamber President-1 via email twice.

c.   In or about July 2016, **DANCHENKO** received a call from an unidentified Russian male who **DANCHENKO** believed – and claimed to still believe at the time of the Interviews – to be Chamber President-1.

d.   **DANCHENKO** and the anonymous caller he believed to be Chamber President-1 spoke for approximately 10 to 15 minutes, during which **DANCHENKO** mentioned Advisor-1 and Campaign Manager-1.  On the same call, the anonymous caller stated, among other things, that there was communication between the Trump campaign and Russian officials, but that there was "nothing bad about it."  **DANCHENKO** claimed that the anonymous caller also indicated on the call that the Kremlin might be of help to get Trump elected.

e.   **DANCHENKO** claimed that, on the call, he and the anonymous caller he believed to be Chamber President-1 made arrangements to meet in New York.

96.    When interviewed by the FBI on or about September 18 and 19, 2017, U.K. Person-1 contradicted **DANCHENKO's** account.    In particular, U.K. Person-1 stated that **DANCHENKO** had met in-person with Chamber President-1 on two or three separate occasions – at least once in New York City and perhaps once in Charleston, South Carolina.

97.    U.K. Person-1 further stated that **DANCHENKO** sourced the aforementioned allegation regarding Trump's purported salacious sexual activity, in part, to Chamber President-1. Specifically, U.K. Person-1 stated that "Source D" in the Company Report dated June 20, 2016 was Chamber President-1.

98.    **DANCHENKO's** January 24, 2017 and January 25, 2017 statements claiming that he spoke with an individual that he believed to be Chamber President-1 and arranged to meet him in New York, were knowingly and intentionally false.  In truth and in fact, and as reflected in

31

contemporaneous communications, **DANCHENKO** did not receive such a call from Chamber President-1, and did not agree to meet Chamber President-1 in New York. In particular, the above-referenced statements were knowingly and intentionally false for the following reasons, among others:

a.   On or about July 21, 2016 – the same time period as the purported "late July" information referenced in the aforementioned, undated Company Report – **DANCHENKO** emailed Chamber President-1, stating, in part:

> Colleagues from [Russian Media Company-1] gave me your contact information. You spoke to [Russian Journalist-2] about Donald Trump and his trips to Russia. I wanted to ask you: what projects was he looking into or were these just image-building trips for beauty contests? There has been a lot of speculation for months now on this topic. It would be interesting to chat about this topic. The question is from a construction company from Switzerland. I think a political component exists, but it can be counterbalanced. Russian-Chinese cooperation is also of great interest, the sanctions aspect included. There are projects in Russia which are looking for investors and equipment suppliers. Like many others in Russia, they are looking at Asia – China and Hong Kong – but they don't know how to approach. It's confidential of course – I don't have any relationship to the media, though of course I do have acquaintances here. In any case, it would be interesting if and when possible to chat with you by phone or meet for coffee/beer in Washington or in New York where I will be next week. I myself am in Washington. It is also possible by e-mail in Russian or in English. I sent you a request to LinkedIn – there my work is clearer.

b.   From on about July 26, 2016 through July 28, 2016, **DANCHENKO** traveled to New York with a family member. On or about July 28, 2016, **DANCHENKO** visited, among other places, the Bronx Zoo with the family member. During this trip, **DANCHENKO** did not meet or communicate with Chamber President-1.

c. Also on or about July 28, 2016, **DANCHENKO** messaged an acquaintance the following: "Another meeting tonight. Thanks to my reporting in the past 36 hours, [U.K. Person-1] and [U.K. Investigative Firm Employee] are flying in tomorrow [i.e., July 29, 2016] for a few days so I might be busy – don't know when but in Downtown D.C."

d. On or about August 18, 2016 – more than two weeks *after* **DANCHENKO** purportedly received the aforementioned anonymous call and allegedly agreed to meet with Chamber President-1 in New York – **DANCHENKO** emailed Chamber President-1 and stated, in part: "Hello [Chamber President-1], I wrote to you a few weeks ago. We are contacts on Linkedin." **DANCHENKO** then described to Chamber President-1 a potential real estate investment in Russia. **DANCHENKO** continued: "If there is opportunity and interest, let's meet and chat about this and other projects . . . . Write, call. My contact information is below."

e. **DANCHENKO's** August 18, 2016 email to Chamber President-1 – which post-dated the purported "late July" information from the aforementioned Company Report – reflected that **DANCHENKO** had not, in fact, spoken with Chamber President-1 in "late July." Specifically, **DANCHENKO's** email did not mention a possible call from Chamber President-1 in or about late July, did not discuss plans to meet in New York, did not ask why Chamber President-1 did not show up to the alleged meeting in New York, and did not refer to any other exchanges or interactions between **DANCHENKO** and Chamber President-1. Rather, and as **DANCHENKO's** email made clear, **DANCHENKO** had not received any response from Chamber President-1 ("I wrote you several weeks ago"), and was still hoping to arrange an in-person meeting ("If there is opportunity and interest, let's meet and chat[.]").

f. Moreover, in a message dated on or about August 24, 2016 – which **DANCHENKO** provided to the FBI – **DANCHENKO** emailed Russian Journalist-2 and stated, in part:

> Good Afternoon, [first name of Russian Journalist-2],
>
> [Russian Journalist-1] recommended that I get in touch with [Chamber President-1]. I've read your interviews with him. **But for some reason [Chamber President-1] doesn't respond.** I already both asked him about TRUMP (capitalization in original) and also proposed a project in Russia. What is your relationship with him like? **Would you be able to ask him to reply to me? I could call or write on LinkedIn, but until he responds I would not like to pester him.**

(emphasis added). This August 24, 2016 email to Russian Journalist-2 again reflected that **DANCHENKO** had not, in fact, spoken with Chamber President-1 in "late July." Specifically, **DANCHENKO's** email did not mention a possible call from Chamber President-1, did not discuss plans to meet in New York with Chamber President-1, and did not inform Russian Journalist-2 that Chamber President-1 did not show up to the alleged meeting in New York.

g. Chamber President-1 has claimed in public statements and on social media that he never responded to **DANCHEKNO's** emails, and that he and **DANCHENKO** never met or communicated.

99. On or about March 16, May 18, October 24, and November 16, 2017, the FBI conducted additional interviews of **DANCHENKO** in the Eastern District of Virginia. In these Interviews, **DANCHENKO** repeated, in substance, his prior false statements regarding a purported anonymous call and a planned meeting in New York. In particular:

a. In the March 16, 2017 interview, which the FBI recorded without **DANCHENKO's** knowledge, **DANCHENKO** confirmed, in substance, his claim that he had received an anonymous call from someone he believed was "probably" Chamber President-1,

stating, in part, "I have to talk to guys with [Russian Media Company-1] . . . [a]nd see what what's he really about . . . [w]hether he was the person who contacted me[,] [w]here he is now and **and I probably spoke** with him, but I don't know.  Anyway.  Strange character." (emphasis added)

b.   In the interview conducted on or about May 18, 2017, which the FBI also recorded without **DANCHENKO's** knowledge, **DANCHENKO** repeated, in substance, the same claim. Specifically, an FBI agent reminded **DANCHENKO** that he had previously told the FBI that he "got the call from the guy up in uh, New York [] [t]hat you thought was [Chamber President-1]," to which **DANCHENKO** responded, "yes."  Thereafter, **DANCHENKO** stated, in part, "I'm not sure if I, he called, but . . . I just don't remember.  But I, I was at the time **I was under the impression it was him,** because I talked to [] [Russian Media Company-1] [t]o [Russian Journalist-2]. . . and **I assumed it would have been him** . . . He never showed up.  He never showed up in New York." (emphasis added).

c.   In a subsequent interview with the FBI on or about October 24, 2017, **DANCHENKO** denied meeting in-person with Chamber President-1 in New York and Charleston, South Carolina (which, as noted above, is what U.K. Person-1 told the FBI had occurred).

d.   In that same interview, **DANCHENKO** stated, **"I believe I spoke to [Chamber President-1] on the phone a couple of times,** at least someone who I thought was him," thus confirming his earlier false assertions regarding an anonymous call and contradicting his earlier statements that he had only spoken to the person he believed to be Chamber President-1 on one occasion.  (emphasis added).

e.   During the same interview, **DANCHENKO** also told FBI agents that "I scheduled a meet time and place in New York [and] [Chamber President-1] never showed."

35

100.    In a subsequent November 16, 2017 interview, **DANCHENKO** repeated his false claims to the FBI regarding Chamber President-1. Specifically, **DANCHENKO** stated, in substance and in part, the following:

a.    U.K. Person-1 believed that **DANCHENKO** had direct contact (*i.e.*, meetings) with Chamber President-1, and **DANCHENKO** never corrected U.K. Person-1 about that erroneous belief.

b.    **DANCHENKO** received a phone call from an individual who **DANCHENKO** believed to be Chamber President-1. **DANCHENKO** based this belief on the fact that he (**DANCHENKO**) had listened to online videos of Chamber President-1 speaking, and the individual on the call "sounded like" the same person. The call lasted approximately 15 minutes.

c.    **DANCHENKO** and the person he purportedly believed to be Chamber President-1 attempted to meet face-to-face in a midtown bar in New York City. Chamber President-1 never showed up for the meeting.

VI.    The Materiality of DANCHENKO's Lies Regarding Chamber President-1

101.    Based on the foregoing, **DANCHENKO's** lies to the FBI claiming to have received a late July 2016 anonymous phone call from an individual that **DANCHENKO** believed to be Chamber President-1 were highly material to the FBI because, among other reasons, the allegations sourced to Chamber President-1 by **DANCHENKO** formed the basis of a Company Report that, in turn, underpinned the aforementioned four FISA applications targeting a U.S. citizen (Advisor-1). Indeed, the allegations sourced to Chamber President-1 played a key role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period. Further, at all times relevant to this

Indictment, the FBI continued its attempts to analyze, vet, and corroborate the information in the Company Reports.

## COUNT ONE

102.    Paragraphs 1 to 101 are incorporated by reference.

103.    On or about June 15, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about June 15, 2017, the defendant denied to agents of the FBI that he had spoken with PR Executive-1 about any material contained in the Company Reports, when in truth and in fact, and as the defendant well knew, PR Executive-1 was the source for an allegation contained in a Company Report dated August 22, 2016 and was otherwise involved in the events and information described in the reports.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT TWO

104.    Paragraphs 1 to 101 are incorporated by reference.

105.    On or about March 16, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about March 16, 2017, the defendant stated to agents of the FBI that he received a late July 2016 telephone call from an individual who **DANCHENKO** believed was "probably" Chamber President-1, when in truth and in fact, and as the defendant well knew, Chamber President-1 never called **DANCHENKO**.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT THREE

106.    Paragraphs 1 to 101 are incorporated by reference.

107.    On or about May 18, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about May 18, 2017, the defendant stated to agents of the FBI that he "was under the impression" that a late July 2016 telephone call that he received was from Chamber President-1, when in truth and in fact, and as the defendant well knew, Chamber President-1 never called **DANCHENKO**.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT FOUR

108.    Paragraphs 1 to 101 are incorporated by reference.

109.    On or about October 24, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about October 24, 2017, the defendant stated to agents of the FBI that he believed that he spoke to Chamber President-1 on the telephone on more than one occasion, when in truth and in fact, and as the defendant well knew, **DANCHENKO** never spoke to Chamber President-1.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

## COUNT FIVE

110.   Paragraphs 1 to 101 are incorporated by reference.

111.   On or about November 16, 2017, within the Eastern District of Virginia, **IGOR DANCHENKO**, the defendant, did willfully and knowingly make a materially false, fictitious, and fraudulent statement or representation in a matter before the jurisdiction of the executive branch of the Government of the United States, to wit, on or about November 16, 2017, the defendant stated to agents of the FBI that he believed that he had spoken to Chamber President-1 on the telephone, when in truth and in fact, and as the defendant well knew, **DANCHENKO** never spoke to Chamber President-1.

(In violation of Title 18, United States Code, Sections 1001(a)(2))

JOHN H. DURHAM
Special Counsel
U.S. Department of Justice


A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.


_____
Foreperson
Date: November 3, 2021

39