UNITED STATES OF AMERICA     :
    :     Criminal No. 21-CR-245 (AJT)
    v.     :
    :     **Filed Under Seal**
IGOR Y. DANCHENKO,     :
    :
    Defendant.     :

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully moves *in limine* for the admission and exclusion of certain evidence at trial. Specifically, the Government moves to (i) admit certain acts and statements as direct evidence or, alternatively, pursuant to Federal Rule of Evidence 404(b), (ii) admit emails referenced in the Indictment and other, similar emails, (iii) admit evidence regarding the FBI's prior counterintelligence investigation of the defendant, and (iv) exclude evidence and preclude argument concerning allegations of political bias underpinning the Indictment. For reasons stated below, the Government submits that the motions should be granted.

The Government notes that all the information set forth below is unclassified and has been provided to the defense in pretrial discovery. Further, much of the information contained in this motion has previously been disclosed in the public record. This motion is being filed under seal, however, to afford defense counsel the opportunity to advise the Court whether any of its contents should appropriately be sealed at this time.

## FACTUAL BACKGROUND

The defendant is charged in a five-count indictment ("Indictment") with making materially false statements to an FBI official, in violation of Title 18, United States Code,

Section 1001. As set forth in the Indictment, on July 31, 2016, the FBI opened an investigation known as "Crossfire Hurricane" into whether individuals associated with the Donald J. Trump presidential campaign were coordinating activities with the Russian government. Beginning in or about July 2016 and continuing through December 2016, the FBI began receiving a series of reports from former British government employee Christopher Steele and his firm, Orbis Business Solutions ("Orbis"), that contained derogatory information on then-candidate Trump ("Trump") concerning Trump's purported ties to Russia (the "Steele Reports"). Earlier that year, Perkins Coie, a U.S.-based international law firm, acting as counsel to the Hillary Clinton Presidential campaign, had retained Fusion GPS, a U.S.-based investigative firm, to conduct research on Trump and his associates. In or about June 2016, Fusion GPS, in turn, retained Steele and Orbis to investigate Trump's purported ties to Russia. The Steele Reports played an important role in applications that FBI personnel prepared and submitted to obtain warrants pursuant to the Foreign Intelligence Surveillance Act ("FISA") targeting Carter Page, a United States citizen who for a period of time had been an advisor to then-candidate Trump.

Over a fairly lengthy period of time, the FBI attempted to investigate, vet, and analyze the Steele Reports but ultimately was not able to confirm or corroborate most of their substantive allegations. In the context of these efforts, the FBI learned that Christopher Steele relied primarily on a U.S.-based Russian national, the defendant Igor Danchenko ("Danchenko" or the "defendant"), to collect information that ultimately formed the core allegations found in the Steele Reports. From January 2017 through October 2020, and as part of its efforts to determine the truth or falsity of specific information in the Steele Reports, the FBI conducted multiple interviews of the defendant regarding, among other things, the information that he had provided to Steele.

In March 2017, the FBI signed the defendant up as a paid confidential human source of the FBI. The FBI terminated its source relationship with the defendant in October 2020. As alleged in further detail below, the defendant lied to FBI agents during several of these interviews.

First, in an interview on June 15, 2017, the defendant stated falsely that he had never communicated with Charles Dolan – who was a long-time participant in Democratic Party politics and was then an executive at a U.S. public relations firm – about any allegations contained in the Steele Reports. Specifically, the defendant was asked:

FBI AGENT-1: Do you know a Chuck Dolan?

THE DEFENDANT: Do I know Chuck Dolan? Yeah.

FBI AGENT -1: How long have you known him?

[Pause]

THE DEFENDANT: I've known Chuck Dolan for [pause] I don't know, a couple years maybe.

FBI AGENT-1: Couple years?

THE DEFENDANT: But but but but but but I've known of him for like 12 years.

[...]

THE DEFENDANT: Yeah. Yeah he likes Russia. I don't think he is, uh, -- would be any way involved. But—but—uh—b-but he's uh [UI] what I would think would be easily played. Maybe. Uh, he's a bit naïve in his, um liking of Russia.

FBI AGENT-1: Okay, so you've had . . . was there any . . . but you had never talked to Chuck Dolan about anything that showed up in the dossier [Steele Reports] right?

THE DEFENDANT: No.

FBI AGENT-1: You don't think so?

THE DEFENDANT: No. We talked about, you know, related issues perhaps but no, no, no, nothing specific.

The Government intends to prove at trial that in fact the defendant sourced at least one specific allegation in the Steele Report anonymously to Dolan. Dolan's role as a contributor to the Steele Reports was highly relevant and material to the FBI's evaluation of those reports because, among other things, (1) Dolan maintained a relationship with several high-ranking Russian government officials who appear in the Steele Reports, (2) Dolan maintained a relationship with another of the defendant's alleged sub-sources, (3) Dolan was present in Moscow with the defendant when the defendant allegedly gathered some of the information reflected in the Steele Reports, and (4) Dolan's historical and ongoing involvement in Democratic politics had the potential to bear on his reliability, motivations, and potential bias as a source for the Steele Reports.

Second, the defendant stated falsely over several interviews that, in or about late July 2016, he received an anonymous phone call from an individual who the defendant believed to be Sergei Millian, a naturalized U.S. citizen, who at the time was president of the Russian-American Chamber of Commerce. The defendant also falsely stated that during this purported phone call, (1) the person he believed to be Millian informed him, in part, about information that the Steele Reports later described as demonstrating a well-developed "conspiracy of cooperation" between the Trump Campaign and Russian officials, including the fact that the Kremlin had been cultivating Trump for years, and (2) the defendant and Millian agreed to meet in New York in late July. The Government expects to prove at trial that the defendant in fact never received a phone call or any information from Millian, and the defendant never made arrangements to meet

with Millian in New York. Rather, the defendant fabricated these facts regarding Millian. As alleged in further detail below, these lies were highly relevant and material to the FBI because, among other reasons, the information allegedly provided by Millian was an important part of the FISA applications targeting Carter Page.

## ARGUMENT

### I. The Court Should Admit Certain Acts and Statements as Direct Evidence, or Alternatively, Pursuant to Federal Rule of Evidence 404(b)

The Government moves to admit certain evidence and statements, including: (1) the defendant's uncharged false statements to the FBI regarding his purported receipt of information reflecting Donald's Trump's alleged salacious sexual activity at the Ritz-Carlton Hotel in Moscow; (2) the defendant's uncharged false statements to the FBI reflecting the fact that he never informed friends, associates and/or sources that he worked for Orbis or Christopher Steele and that "you [the FBI] are the first people he's told"; and (3) the defendant's February 24, 2016 email to former employer, Cenk Sidar, in which the defendant advised Sidar, when necessary, to fabricate sources of information. In the first instance, and for the reasons set forth hereinafter, the Government will move to admit this evidence as direct evidence of the charged crimes. The Government believes the evidence is also admissible as "other act" evidence pursuant to Federal Rule of Evidence 404(b) to prove the defendant's motive, intent, plan, and absence of mistake or accident.

#### A. Applicable Law

The Court need not rely on Rule 404(b) to admit evidence that is plainly intrinsic to the charged crimes. *See, e.g., United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) ("Acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence.") (quoting *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). Evidence is

5

"intrinsic" when it is "necessary to complete the story of the crime on trial," or when it is "inextricably intertwined[,] part of a single criminal episode[,] or the other acts were necessary preliminaries to the crime charged." *United States v. Stitt*, 250 F.3d 878, 888 (4th Cir. 2001); *Chin*, 83 F.3d at 88 (quoting *United States v. Lambert*, 995, F.2d 1006, 1007 (10th Cir. 1993)). Evidence is also intrinsic when it is "necessary to provide context relevant to the criminal charges." *Basham*, 561 F.3d at 326 (quoting *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007)).

Federal Rule of Evidence 404(b) provides that '[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (quoting Fed. R. Evid. 404(b)). "The Rule 404(b) inquiry, however, applies only to evidence of other acts that are 'extrinsic to the one charged.'" *Id.* (citation omitted). "[A]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *Id.* (citations omitted). "Other criminal acts are intrinsic," for example, when they are "necessary preliminaries to the crime charged," are "necessary to complete the story of the crime on trial" or "provide context relevant to the criminal charges," are "inextricably intertwined," or "arose out of the same series of transactions as the charged offense." *Id.* (citations omitted).

Even if other acts are not "intrinsic," "Rule 404(b) is an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *Id.* Such evidence may thus be admitted for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* (quoting Fed. R. Evid. 404(b)). The Fourth Circuit has accordingly "provided a four-factor test for courts to consider when determining the admissibility of [Rule 404(b)] evidence":

(1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*United States v. Johnson*, 617 F.3d 286, 296-97 (4th Cir. 2010) (quoting *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997)). "Rule 404(b)'s terminology 'other crimes, wrongs, or acts' includes conduct that is neither criminal nor unlawful if it is relevant to a consequential fact." 2 Weinstein's Federal Evidence § 404.20[2][a].

### B. The Defendant's Statements to the FBI Regarding Donald Trump's Alleged Salacious Sexual Activity at the Ritz-Carlton Hotel in Moscow

#### 1. Relevant Facts

In June 2016, the defendant reported to Christopher Steele certain allegations regarding Donald Trump's purported sexual activity at the Ritz-Carlton Moscow (the "Ritz-Carlton Allegations"). The Steele Report reflecting these allegations was dated June 20, 2016. That Report states, among other things, that "Source D," described as a close associate of Trump who had organized and managed his recent trips to Moscow, had confirmed that Trump had engaged in lurid sexual activity at the hotel.[1] The Report goes on to say that the Ritz-Carlton Allegations had also been confirmed by "Source E, a senior (western) member of staff at the hotel."

In his January 2017 FBI interview, which occurred in Washington, D.C., the defendant claimed that he had sourced this information, in part, while staying at the Ritz-Carlton Moscow in mid-June 2016 during a planning trip for a future business conference. The defendant had

---

[1] This Steele Report also states that "Source D" confirmed that the Kremlin had been providing Trump and his team "valuable intelligence on his opponents for several years" and had offered Trump lucrative real estate deals in Russia.

been invited to attend this planning trip by Charles Dolan.[2] While during the January 2017 interview, the defendant asserted to the FBI that he had been a guest at the Ritz-Carlton Moscow during the June 2016 trip, in a subsequent interview, however, he acknowledged that he had visited, but not stayed at, the hotel during that June 2016 trip. In his January 2017 interview with the FBI, the defendant also claimed that he inquired about the Ritz-Carlton Allegations with hotel staff who did not deny their veracity. The defendant also informed the FBI that he reported the names of these hotel staff to Christopher Steele. In a subsequent May 2017 FBI interview, the defendant again confirmed that he had spoken with hotel management about the Ritz-Carlton Allegations. In that interview, the defendant also stated that "Source D" – the purported source of the aforementioned sexual allegations – "could be referring to Sergei Millian."

The Government has interviewed and expects to call at trial the then-general manager of the Ritz-Carlton Moscow, Bernd Kuhlen, a German citizen who does not speak Russian (and whom the Steele Reports describe as "Source E," a senior (western) member of staff at the hotel."). Mr. Kuhlen does not recall ever meeting or speaking with the defendant in June 2016, or at any time. Mr. Kuhlen also has denied (1) having knowledge of the Ritz-Carlton Allegations at any time prior to their being reported in the media, (2) discussing such allegations with, or hearing them from, the defendant. Mr. Kuhlen also has confirmed to the Government and will testify at trial that he was the only "western" member of management at the hotel in June 2016. In short, the Government intends to prove at trial that the defendant falsely sought to attribute the

---

[2] Beginning in early 2015, an acquaintance of Dolan, Steven Kupka, was planning a business conference that Kupka and others would host in October 2016 on behalf of the Young President's Organization at the Ritz-Carlton Moscow. Kupka planned the conference on behalf of a group of senior international businesspeople who were seeking to explore potential investments in Russia. According to Kupka, he enlisted Dolan to participate in the conference because of Dolan's connections with senior Russian government officials and to provide analysis of the 2016 U.S. Democratic presidential primary.

Ritz Carlton Allegations to Mr. Kuhlen, and, as referenced above, to Sergei Millian as part of his work on the Steele Reports that are described in the Indictment.

## 2. Discussion

The Government should be permitted to present evidence of the defendant's false statement regarding his sourcing of the Ritz-Carlton Allegations as direct evidence of the charged crime. The defendant's statements regarding these allegations constitute direct evidence of the charged offenses because they reflect the defendant's efforts to fabricate and misattribute information reflected in the Steele Reports, and provide important factual context regarding the two individuals – Charles Dolan and Sergei Millian – who are the subjects of the defendant's false statements to the FBI. *See Basham*, 562 F.3d at 326 (evidence is intrinsic when it provides context relevant to the criminal charges). They are also inextricably intertwined with the charged conduct as they relate to the same subject matter, *i.e.*, the Steele Reports, Trump and purported Russian events, and were made in the same FBI interviews. *Id.* (evidence is intrinsic when it "[arises] out of the same series of transactions as the charged offense.").

The defendant's efforts to falsely attribute the Ritz Carlton Allegations to Source D (who the defendant said "could be referring to Millian") and to Source E (Bernd Kuhlen) were part and parcel of the very same efforts to fabricate information that underlie false statements charged in the Indictment. As noted above, the charged false statements include the defendant's misrepresentation to the FBI that the information he purportedly obtained from Millian came from a single, ten or fifteen minute anonymous phone call that allegedly took place in late-July 2016 and was the only time the defendant ever purported to have communicated with Millian. The above-described evidence concerning the Ritz Carlton Allegations is highly probative of the fact that there was never such a phone call between the defendant and Millian, given that the

Steele Report containing those sexual allegations was dated June 20, 2016 – *over a month prior* to the defendant's alleged call with Millian. To state the obvious, it would be impossible for Millian to confirm the Ritz Carlton Allegations (and other information) to the defendant in June 2016 because the defendant repeatedly informed the FBI that the *first* and *only* time he allegedly communicated with Millian was late July 2016. Put bluntly, these facts demonstrate that the defendant could not keep his lies straight, and that the defendant engaged in a concerted effort to deceive the FBI about the sourcing (or lack thereof) of the Steele Reports. Accordingly, this evidence is intrinsic to the charged offenses as they relate to Millian and is properly admitted as direct evidence.

These facts concerning the defendant's attribution of the Ritz Carlton Allegations are also admissible as direct evidence because they underscore the materiality of the defendant's charged false statement concerning Charles Dolan. With respect to Dolan, the defendant falsely denied to the FBI that Dolan had any role as a source for the Steele Reports. But the evidence at trial will demonstrate that hotel staff provided Dolan and Kupka a tour of the Presidential Suite that was the purported location of Trump's alleged lurid sexual activities. Had the FBI known that Dolan was a fact witness in this respect, it is more likely that they would have interviewed Dolan about the Ritz-Carlton Allegations, given his proximity to the defendant and the hotel staff at the time the information was allegedly collected. Indeed, the Government anticipates that Mr. Dolan will testify that (1) it was he and Mr. Kupka who attended a lunch with the Ritz-Carlton general manager and other hotel staff during the June 2016 Moscow trip and that the defendant was not present, and (2) neither Donald Trump nor his purported sexual practices were ever discussed at that lunch. Further, the Government also anticipates that Mr. Dolan will testify that Ritz-Carlton hotel staff did, in fact, provide the aforementioned tour of the presidential suite as part of the

June 2016 trip and that, again, Donald Trump and his purported sexual practices were not discussed during that tour.

Again, this evidence clearly bears directly on the materiality of the defendant's false statement as it goes to the heart of the actions the FBI might have taken had they known of Dolan's role as a source for the Steele Reports. *See United States v. Parks*, 849 F. App'x 400, 403 (4th Cir. 2021) (evidence is intrinsic to the charged crime when it is "necessary and relevant to an element of the offense"). Moreover, this evidence is properly admitted as direct evidence because it provides the jury with context about Dolan, including his relationship with the defendant at a time when the defendant was allegedly collecting information that would later be reflected in the Steele Reports. *See United States v. Marfo*, 572 F. App'x 215, 225 (4th Cir. 2014) (evidence is "relevant and necessary" when it provides context to the relationship between individuals central to the charged crime).

Alternatively, the Government should be permitted to present evidence concerning the defendant's role in the 2016 Ritz-Carlton Allegations pursuant to Rule 404(b) as evidence of the defendant's intent, preparation, knowledge, common scheme or plan, and absence of mistake. In particular, the defendant's false statements about the Ritz-Carlton Allegations are highly probative of the defendant's intent to deceive the FBI, and perhaps others, regarding his sourcing of the allegations contained in the Steele Reports. Indeed, the defendant's false statement regarding the Ritz-Carlton Allegations is exceedingly relevant because it "shows a pattern of operation that would suggest intent," and such a pattern tends to defeat any innocent explanation for the charged false statements. *See United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) (quoting 2 Weinstein's Federal Evidence § 404.22[1][a]).[3]

---

[3] To that end, the Government anticipates the defense may argue that the defendant's

Furthermore, the defendant's false statement regarding the Ritz-Carlton Allegations satisfies the balancing test of Rule 403. The false statement is highly probative, as described above, and does not reflect conduct that is any more sensational, disturbing, or prejudicial than the subject matter of the charged crimes. Indeed, it would be difficult to think of a more sensational claim than the information that the Steele Reports attributed to "Source E" (purportedly Millian), *i.e.*, that a presidential candidate and his campaign were immersed in a "well-developed conspiracy of cooperation" with the Kremlin. Therefore, the defendant's false statement regarding the Ritz-Carlton Allegations do not give rise to any unfair prejudice that substantially outweighs its probative value. As the Fourth Circuit has held, "damage to a defendant's case is not a basis for excluding probative evidence, because evidence that is highly probative invariably will be prejudicial to the defense." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1988). Similarly, Rule 403 only requires suppression of evidence when the evidence "damages an opponent for reasons other than its probative value, for instance, an appeal to emotion, and only when that unfair prejudice *substantially* outweighs the probative value of the evidence." *United States v. Mohr*, 318 F.3d 613, 619–20 (4th Cir. 2003) (emphasis in original).

Accordingly, the defendant's false statement regarding the Ritz-Carlton Allegations supports the inference that both statements (the charged false statements and the Ritz Carlton Allegations false statement) reflected a common "plan" and an "intent" to fabricate information and conceal from the FBI the true source (or lack thereof) for the information reflected in the Steele Reports. Such evidence also further supports the inference that the charged false

---

charged false statement regarding Charles Dolan was simply the byproduct of foggy memory or an innocent mistake. The Government should be permitted to counter those arguments with evidence of additional false statements made by the defendant during the *same* series of interviews with the FBI regarding the *same* subject matter, *i.e.*, the Steele Reports.

statements were not simply a product of "mistake" or "accident" but, rather, reflected a deliberate effort to conceal from the FBI Charles Dolan's role as a source for the Steele Reports and to deceive the FBI regarding Millian's role (or lack thereof).

### C. The Defendant's Statements to the FBI
### Regarding Orbis and Christopher Steele

#### 1. Relevant Facts

As the Indictment also alleges, during the January 2017 FBI interview in Washington, D.C., agents questioned the defendant about his relationship with Christopher Steele and Orbis. In particular, the FBI asked the defendant whether his friends, associates, and/or sources were aware that he (the defendant) worked for Steele and Orbis. In response, the defendant falsely stated, in sum and substance, that while certain friends were aware that the defendant worked generally in due diligence and business intelligence, the defendant never mentioned that he worked for Steele or Orbis to any friends or associates. The defendant further stated, "you [the FBI] are the first people" he had told. The defendant added that the reason he never told associates about his relationship with Steele and Orbis was the existence of a non-disclosure agreement he signed with Steele and Orbis. The Government plans to introduce documentary evidence and testimony refuting the defendant's contention that the never told associates about his work for Steele and Orbis.

In particular, the Government plans to introduce evidence that the defendant on multiple occasions communicated and emailed with, among others, Charles Dolan regarding his work for Steele and Orbis. Indeed, the defendant attempted to broker business between Dolan and Steele as early as April 2016. For example, on April 29, 2016, the defendant sent an email to Dolan indicating that he (the defendant) had passed a letter to Steele on behalf of Dolan. Specifically, the email stated that the defendant had "forwarded your letter" to Steele and his business partner.

The defendant further stated, "I'll make sure you gentlemen meet when they are in Washington or when you are in London." That same day, the defendant sent an email to Dolan outlining certain work that the defendant was conducting with Orbis. The email attached an Orbis report titled "Intelligence Briefing Note, 'Kompromat' and 'Nadzor' in the Russian Banking Sector." On June 10, 2016, Dolan, while in Cyprus meeting with Olga Galkina (another source for the defendant), emailed a U.S.-based acquaintance regarding efforts to assist the defendant in obtaining a U.S. visa:

> Monday night I fly to Moscow and will meet with a Russian guy
> who is working with me on a couple of projects. He also works for
> a group of former MI 6 guys in London who do intelligence for
> business . . . . [H]e owes me as his Visa is being held up and I am
> having a word with the Ambassador.

Approximately seven months later, on January 13, 2017, Dolan replied to an email sent by a U.S.-based person discussing a recent news article regarding Buzzfeed's recent publication of the Steele Reports. In the email, Dolan again demonstrated his knowledge of the defendant's relationship with Orbis and the Steele Reports:

> [] I've been interviewed by the Washington Post and the London
> Times - three times over the last two days over the MI-6 Dossier
> on Trump and I know the Russian agent who made the report (He
> used to work for me). My client in Cyprus has been accused of
> being the party that organized the hacking. Presently speaking
> with the barrister in London who is filing a brief against Former
> British
> intelligence officer Christopher Steele [] has been unmasked as
> the man behind an explosive dossier about US president-elect
> Donald Trump. Also in conversation with former British
> Ambassador who knows Steele. Quite right- Oh what a
> boring life.

(underline in original). At the time the email was sent, the defendant was not publicly known to be a source for Steele.

Further demonstrating the falsity of the defendant's statement to the FBI regarding Steele, the defendant's email and social media communications reflect that he previously disclosed his relaltionship to Steele and Orbis with at least five other individuals, including an additional sub-source for the Steele Reports. As stated above, the Government intends to introduce evidence of these communications.

## 2. Discussion

Evidence concerning this false statement constitutes direct evidence of the charged offenses. As an initial matter, the false statements are inextricably intertwined with the charged conduct as they relate to the same subject matter, *i.e.*, the Steele Reports, and were made in the same FBI interviews. Further, they directly bear upon the defendant's relationship with Charles Dolan and his knowledge of Christopher Steele and Orbis. To the extent the defense argues or the Court might conclude, however, that some or all of this evidence is not admissible as direct evidence of the crimes charged, it would still be admissible since it constitutes "other crimes, wrongs, or acts" pursuant to Rule 404(b). Such evidence is admissible to show the defendant's knowledge, motive, intent, preparation, plan, and absence of mistake or accident. Such evidence and communications are relevant to prove, among other things, the defendant's intent to deceive the FBI regarding his sourcing for the Steele Reports. Indeed, had the defendant been truthful about the disclosure of his work for Steele and Orbis, it is highly likely the FBI would have conducted interviews of those individuals in an effort to determine whether the information provided by the defendant was accurate, false, or a product of Russian disinformation. In particular, this lie is highly probative of the defendant's intent and motive to conceal from the FBI the full nature of Dolan's knowledge regarding the defendant's work with Steele and Orbis. Had the FBI been aware, for instance, that the defendant, who had been in Moscow with Dolan

at relevant times and had attempted to broker a work relationship between Steele and Dolan, they may have interviewed Dolan and learned of Dolan's role in providing information to the defendant that ultimately was reflected in the Steele Reports. In fact, the Government intends to offer evidence that proves that Dolan was aware that the defendant's reporting was a part of a "related project against Trump" and that this work was being done on behalf of Steele and Orbis. Indeed, on August 19, 2016, the defendant emailed Dolan the following:

> Could you please ask someone to comment on Manafort's resignation and anything on Trump campaign? Off the record of course! Any thought, rumor, allegation. I am working on a related project against Trump. I asked [an acquaintance of Dolan] three months ago but he didn't say much although shared a couple of valuable insights.

Given that Dolan was aware of the fact that the defendant was employed by Steele, the only inference to be drawn is that the "project against Trump" was being done on behalf of Steele and Orbis. In sum, the defendant's false denial to the FBI that he had ever disclosed to anyone his working relationship with Orbis is admissible to prove that the defendant engaged in an over-arching "plan" to deceive the FBI about the manner and methods by which he conducted his work for Orbis (including the collection of information contained in the Steele Reports.)

### D. The Defendant's February 24, 2016 Email to Former Employer Cenk Sidar

#### 1. Relevant Facts

The Government also plans to introduce a February 24, 2016 email the defendant sent to his former employer Cenk Sidar. Mr. Sidar was the managing partner of Sidar Global, a business intelligence firm that contracted with the defendant to provide reports on various subject matters, including geopolitical analysis and the international energy sector. In an email dated February 24, 2016 – just months before the defendant began collecting information for the Steele Reports -- Mr. Sidar asked the defendant to review a report that Sidar Global had

prepared. Later that day, the defendant emailed Sidar with certain recommendations to improve the report. One of those recommendations was the following:

> Emphasize sources. Make them bold or CAPITALISED [*sic*]. The more sources the better. If you lack them, use oneself as a source ("Istanbul-Washington-based businessman" or whatever) to save the situation and make it look a bit better.

(Capitalization in original).

## 2. Discussion

This additional evidence constitutes "other crimes, wrongs, or acts" pursuant to Rule 404(b) and is admissible to show the defendant's knowledge, motive, intent, preparation, plan, and absence of mistake or accident. The Government's theory of the case, in part, is that in some instances the defendant fabricated and in others denied some of the sources of information that he provided to Christopher Steele. In particular, the Government intends to prove that the defendant fabricated the fact that Sergei Millian, among others, acted as a source for various allegations contained in the Steele Reports. In addition, the Government will prove that the defendant falsely denied Dolan's role in sourcing information for those reports. The defendant's advice to Mr. Sidar that he attach multiple sources to information and obscure one's own role as a source for information is consistent with the defendant's alleged false statements in which he denied or fabricated the roles of these individuals. Moreover, when a source is referenced in the Steele Reporting, the name (or anonymized identity) is capitalized consistent with the defendant's directive to Mr. Sidar. Accordingly, the above-quoted email falls squarely in the category of evidence that proves a common "plan" and a lack of mistake or accident because it demonstrates that the defendant's misattribution of sources was an intentional feature of his business intelligence work.

## II.    The Court Should Admit Three Highly Relevant Emails and Certain Statements Made by Christopher Steele to the FBI

As discussed above, the defendant informed the FBI – during multiple interviews – that in late July 2016, he received an anonymous phone call from an individual who the defendant believed to be Sergei Millian, a naturalized U.S. citizen, who at the time was president of the Russian-American Chamber of Commerce. The defendant stated that during this purported phone call, (1) the person he believed to be Millian informed him, in part, about information that the Steele Reports later described as demonstrating a well-developed "conspiracy of cooperation" between the Trump Campaign and Russian officials, including the fact that the Kremlin had been cultivating Trump for years, and (2) the defendant and Millian agreed to meet in New York in late July. As a result of search warrant returns, the Government is in possession of three highly probative emails – discussed in greater detail below – that bear directly on a key issue in this trial, namely, whether the defendant received a phone call from Millian in late July. For the reasons stated below, the Government moves to admit these three emails because they do not constitute hearsay and, alternatively, pursuant to the residual hearsay exception under Fed. R. Evid. 807.

The Government also seeks to admit certain statements made by Christopher Steele to the FBI on September 18, 2017 and September 19, 2017. Specifically, Steele informed the FBI that his primary subsource for the Steele Reports (the defendant) had met with Sergei Millian on two or three occasions – at least once in New York and once in Charleston, South Carolina. For the reasons stated below, the Government moves to admit these statements because they are not hearsay.

## A. Applicable Law

Hearsay – a statement made other than at a hearing or trial in which the declarant is testifying and which a party offers for the truth of the matter asserted – is generally inadmissible. Fed. R. Evid. 801(c). Questions or inquiries, however, *are* admissible as non-hearsay because they are not intended to assert anything. *See e.g., United States v. Sinclair*, 301 F. App'x 251, 253 (4th Cir. 2008) ("A question or inquiry is not a statement, and therefore is not hearsay unless it can be construed as an intended assertion."); *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015); *United States v. Rodriguez–Lopez*, 565 F.3d 312, 314–15 (6th Cir. 2009) (same); *United States v. Thomas,* 451 F.3d 543, 547–48 (8th Cir.2006) (same); *Lexington Ins. Co. v. W. Pa. Hosp.,* 423 F.3d 318, 330 (3d Cir. 2005) (same); *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990) (same); *United States v. Oguns,* 921 F.2d 442, 449 (2d Cir. 1990) (same); *United States v. Hamidullin*, 14-CR-140 (HEH), 2015 WL 4393393 at *2 (E.D. Va. July 14, 2015). Further, a statement is only hearsay if it is "offered in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The Confrontation Clause does not bar the use of "testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).

The residual hearsay exception, Fed. R. Evid. 807, is a "catchall provision to allow the admission of statements that do not fall within a specific hearsay exception, yet carry equivalent guarantees of trustworthiness." *United States v. Dunford*, 148 F.3d 385, 393 (4th Cir. 1998). In determining whether evidence should be admitted pursuant to the residual hearsay exception, courts should consider six factors:

> the unavailability of the declarant; (2) the circumstantial guarantees of trustworthiness surrounding the statement; (3) whether the statement relates to a material fact; (4) whether the statement is the most probative evidence on the point; (5)

whether the interest of justice is served by the statement's admittance; and (6) whether the opposing party has been given reasonable notice that the statement is being sought for admittance.

*United States v. Shaw*, 69 F.3d 1249, 1253 (4th Cir. 1995). A district court's ruling on the admission of evidence pursuant to the residual hearsay exception is reviewed for abuse of discretion. *Id.* at 1249.

### B. Relevant Facts

#### 1. Sergei Millian's Emails Regarding the Defendant

As set forth in the Indictment at paragraph 95, the defendant informed the FBI that in June or July 2016, he communicated with Alexey Bogdanovsky (described in the Indictment as "Russian Journalist-1"), a U.S.-based Russian national employee of RIA Novosti[4] about reaching out to Sergei Millian, an individual that the defendant had never met or spoken with. Bogdanovsky indicated that his colleague at RIA Novosti, Dimitry Zlodorev (described in the Indictment as "Russian Journalist-2"), had a relationship with Millian and had previously interviewed Millian about Trump. Bogdanovsky ultimately provided the defendant with Millian's contact information. On July 21, 2016, the defendant emailed Millian the following:

> Colleagues from RIA Novosti gave me your contact information. You spoke to Dimitry Zlodorev about Donald Trump and his trips to Russia. I wanted to ask you: what projects was he looking into or were these just image-building trips for beauty contests? There has been a lot of speculation for months now on this topic. It would be interesting to chat about this topic . . . . It's confidential of course – I don't have any relationship to media, though of course I do have acquaintances here. In any case, it would be interesting if and when possible to chat with you by phone or meet for coffee/beer in Washington or in New York where I will be next week. I myself am in Washington. It is also possible by e-mail in Russian or in English. I sent to you a request to LinkedIn – there my work is clearer.

---

[4] RIA Novosti is a Russian state-run media outlet.

Millian was traveling in Asia at the time the defendant sent this email and did not return to New York until late on the night of July 27, 2016. Notably, Millian had suspended his cellular phone service effective July 14, 2016 (prior to his travel) and his service was reconnected effective August 8, 2016. The defendant did travel to New York from July 26, 2016 through July 28, 2016 with his young daughter and spent much of his time sight-seeing, including a trip to the Bronx Zoo on July 28, 2016. The defendant would later claim to the FBI that it was during this trip to New York that the defendant attempted to meet Sergei Millian (after having received the alleged anonymous phone call from a person he purportedly believed to be Millian).

On July 26, 2016, Millian emailed Dimitry Zlodorev the following:

> Dimitry, on Friday I'm returning from Asia. An email came from Igor. Who is that? What sort of person?

That same day, Zlodorev responded:

> Sergey, hello! Do you remember I said that a friend of my colleague wanted to get acquainted with you? You gave permission to give your email. The way I understand it, this is who this is. He and I are not personally acquainted, though he is, it seems, in my LinkedIn. And I didn't know what he wanted to talk about. If I remember correctly, he works at some think tank in Washington.

Millian did not respond to the defendant's July 21, 2016 email. On August 18, 2016, the defendant again emailed Millian, stating in part: "Hello, Sergey! I wrote you several weeks ago. We are contacts on LinkedIn." The defendant then described a real estate deal in Russia and inquired about Millian's interest in the transaction. The defendant closed the email by stating, "Write, call. My contact information is below." This email – which post-dated the purported "late July" call from Millian, clearly reflected that the defendant had not, in fact, spoken with Millian and did not believe he had done so.

On August 24, 2016, the defendant emailed Zlodorev, stating in part:

> Aleksey Bogdanovsky recommended that I get in touch with
> Sergey Millian. I've read your interviews with him. **But for some
> reason Sergey doesn't respond.** I already both asked him about
> TRUMP and also proposed a project in Russia.
>
> What is your relationship with him like? **Would you be able to
> ask him to reply to me? I could call or write on LinkedIn, but
> until he responds I would not like to pester him.** By the way,
> you and I are also contacts there.

(Emphasis added; capitalization in original). Later that day, Zlodorev responded, stating in part:

> Igor, hello, Sergey Millian asked me a couple of weeks ago who
> Igor Danchenko is. I had told him earlier, but he apparently forgot.
> At that time, he wrote to me from South Korea. The thing is that
> he, based on his own words, now spends more time in Asia than in
> America. Try to write to him once again. I simply know that he is
> constantly travelling and could actually have forgotten.

The emails quoted above are further evidence that between July 21, 2016 and August 24, 2016,

Millian did not call, email or meet with the defendant, and the defendant knew he had not

received a call from someone who he believed to be Millian.

In addition, in July 2020, Congress released to the public a heavily redacted report of the

defendant's January 2017 interview. In the report, the defendant is only identified as Christopher

Steele's "primary subsource." When the redacted interview was released, Millian had been

publicly reported to be a source for certain information in the Steele Reports, including the

information purportedly collected in "late July" 2016 reflecting that Donald Trump and his

campaign were engaged in a "conspiracy of cooperation" with Russian officials. The redacted

and anonymized report also indicated that the "primary subsource" (the defendant) had received

contact information for "Source 6," *i.e.*, Millian, from a journalist who had previously

interviewed Millian, *i.e.*, Zlodorev. Following the release of the report, Millian began to email

Zlodorev attempting to uncover the identity of Steele's primary subsource. In late July 2020,

the defendant was identified by name in press reporting as being Steele's primary subsource. On July 19, 2020, Millian emailed Zlodorev, stating in part:

> "I believe they've already found Steele's source: [internet address]. Do you remember such a person? Igor Danchenko?"

On July 20, 2020, Millian again emailed Zlodorev the following:

> I've been informed that Bogdanovsky travelled to New York with Danchenko at the end of July 2016; Danchenko, supposedly to meet with me (but the meeting didn't take place). Can you inquire with Bogdanovsky whether he remembers something from that trip and whether they touched upon my name in conversation, as well as for what reason Danchenko was travelling to NY? Steele, it seems, made Danchenko the fall guy, but Danchenko himself made several statements that were difficult to understand, for example, about the call with me. Did he tell Bogdanovsky that he communicated with me by phone and on what topic? Thank you! This will clarify a lot for me personally. It's a convoluted story!

These 2020 emails between Millian and Zlodorev are also highly probative of the fact that the defendant did not receive a call from Millian in late-July 2016.

The Government has conducted a virtual interview of Millian. Based on representations from counsel, the Government believes that Millian was located in Dubai at the time of the interview. During the interview, Millian stated, in sum and substance, that he has never met with or spoken with the defendant. Millian informed investigators that he left the United States in March 2017 and he has not returned. Millian stated, in sum, that he left the United States due to threats on his and his family's personal safety because of his alleged role in the Steele Reports. On multiple occasions, the Government has inquired about Millian's availability to testify at the defendant's trial. Millian has repeatedly informed the Government that he has concerns for his and his family's safety (who reside abroad) should he testify. Millian also informed the Government that he does not trust the FBI and fears being arrested if he returns to the United States. The Government has repeatedly informed Millian that it will work to ensure his security

during his time in the United States, as it does with all witnesses. The Government has also been in contact with Millian's counsel about the possibility of his testimony at trial. Nonetheless, despite its best efforts, the Government's attempts to secure Millian's voluntary testimony have been unsuccessful. Moreover, counsel for Millian would not accept service of a trial subpoena and advised that he does not know Millian's address in order to effect service abroad.

### 2. Christopher Steele's Statements to the FBI

On September 18 and 19, 2017, FBI personnel from the Robert Mueller Special Counsel team interviewed Christopher Steele. Steele informed the FBI personnel, in part, that the defendant had collected election-related material in the United States for Orbis. As part of that undertaking, the defendant informed Steele that he met in person with Sergei Millian on two or three occasions – in New York and once in Charleston, South Carolina. The defendant subsequently informed the FBI that he had not in fact met with Millian on any occasion. On November 2, 2017, the defendant further stated to the FBI that Steele incorrectly believed the defendant had met in-person with Millian, and that he (the defendant) did not correct Steele in that misimpression.

### C. Discussion

#### 1. The Emails Are Admissible

The Government seeks to admit three emails sent by Millian to Dimitry Zlodorev as non-hearsay and/or pursuant to the residual hearsay clause, Fed. R. Evid. 807. The three emails at issue are the following:

1. Millian's July 26, 2016 email to Zlodorev stating:

   *Dimitry, on Friday I'm returning from Asia. An email came from Igor. Who is that? What sort of person?*

   (Attached hereto as **Exhibit A**).

2. Millian's July 19, 2020 email to Zlodorev stating, in part:

*I believe they've already found Steele's source: [internet address]. Do you remember such a person? Igor Danchenko?*

(Attached hereto as **Exhibit B**).

3. Millian's July 20, 2020 email to Zlodorev stating:

*I've been informed that Bogdanovsky travelled to New York with Danchenko at the end of July 2016; Danchenko, supposedly to meet with me (but the meeting didn't take place). Can you inquire with Bogdanovsky whether he remembers something from that trip and whether they touched upon my name in conversation, as well as for what reason Danchenko was travelling to NY? Steele, it seems, made Danchenko the fall guy, but Danchenko himself made several statements that were difficult to understand, for example, about the call with me. Did he tell Bogdanovsky that he communicated with me by phone and on what topic? Thank you! This will clarify a lot for me personally. It's a convoluted story!*

(Attached hereto as **Exhibit C**).

As an initial matter, all three emails to Zlodorev are admissible non-hearsay because each email consists of a series of questions, *i.e.*, (1) "Who is that? What sort of person?" (July 26, 2016), (2) "Do you remember such a person? Igor Danchenko?" (July 19, 2020), and (3) (a) "Can you inquire with Bogdanovsky whether he remembers something from that trip and whether they touched upon my name in conversation, as well as for what reason Danchenko was travelling to NY? (b) "Did he tell Bogdanovsky that he communicated with me by phone and on what topic?" (July 20, 2020). *See Sinclair*, F. App'x at 253. To the extent the remaining sentences in those emails are statements, they are not being offered to prove the truth of the matter asserted. Indeed, with respect to the July 26, 2016 email, the Government is not seeking to prove that (1) Millian was returning from Asia on Friday or (2) that an email came from the defendant. With respect to the July 19, 2020 email, the Government is also not seeking to prove that Steele's source had been identified. Similarly, with respect to the July 20, 2020 email, the

Government is not seeking to prove that (1) Bogdanovsky travelled to New York with the defendant at the end of July 2016 to meet with Millian, (2) Steele was making the defendant the "fall guy", or (3) the defendant made statements that were difficult to understand. Rather these statements are being offered to prove Millian's state of mind at the time he sent the emails. *See* Fed. R. Evid. 803(3). To the extent hearsay related concerns arise, the Government would not object to the Court giving the jury a limiting instruction on this issue should the Court deem one appropriate.

Alternatively, should the Court determine that the emails constitute hearsay, which, respectfully, these are not, the emails are admissible pursuant to the residual hearsay exception. As discussed above, *Shaw* sets forth a six-factor test to determine whether evidence should be admitted pursuant to the residual hearsay exception. Upon careful review, the Government respectfully submits that each factor in this case is met. The Government will analyze each factor in turn.

First, *the unavailability of the declarant*. A declarant is "unavailable" at a hearing or trial when he "is absent from the hearing and the proponent of a statement has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony. Fed. R. Evid. 804(a)(5)(B). "Courts have consistently held that hearsay exceptions premised on the unavailability of a witness require the proponent of a statement to show a good faith, genuine, and bona fide effort to procure a witness's attendance." *United States v. Wrenn*, 170 F. Supp. 2d 604, 607 (E.D. Va. 2001) (citing *Barber v. Page*, 390 U.S. 719, 724 (1968)). Courts considering whether a prosecutor, as the proponent of a statement, "has made such a good faith effort have focused on the reasonableness of the prosecutor's efforts." *Id.*; *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) ("The lengths to which the prosecutor must go to produce a witness . . . is a question of

reasonableness. The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present the witness."). In the case of a U.S. national residing in a foreign country, 28 U.S.C. § 1783 allows for the service of a subpoena on a U.S. national residing abroad. Here, the Government has made substantial and repeated efforts to secure Millian's voluntary testimony. When those efforts failed, the Government attempted to serve a subpoena on Millian's counsel who advised that he was not authorized to accept service on behalf of Mr. Millian. The Government, not being aware of Millian's exact location or address, asked counsel to provide Millian's address so that service of a subpoena could be effectuated pursuant to 28 U.S.C. § 1783. Counsel stated that he does not know Millian's address. In any event, even if the Government had been able to locate Millian, it appears unlikely that Millian would comply with the subpoena and travel to the United States to testify. Indeed, as discussed above, Millian has shown a reluctance to travel to the United States for fear of his personal safety and his family's safety. Accordingly, the Government has demonstrated good faith efforts to secure Millian's appearance at trial.

Second, *the circumstantial guarantees of trustworthiness surrounding the statement.* As an initial matter, the prohibition against hearsay is not intended to be a mechanical bar to evidence that is otherwise reliable. To that end, there can be no question that the contents of the three emails are highly probative to the charges in the case and bear all the circumstantial guarantees of trustworthiness. The Government is not aware of any evidence that Millian was aware of who the defendant was in July of 2016. Millian also had no motive to lie about his knowledge of the defendant in July 2016. Indeed, at that time of the July 2016 email the existence of the Steele Reports were not public. Further, Millian had no apparent motive to lie to Zlodorev, an individual he appears to consider a friend.

Additionally, the July 2016 email to Zlodorev is in direct response to an email Millian received from the defendant while he (Millian) was out of the country. As noted, the Government plans to introduce emails the defendant subsequently sent to Zlodorev in August 2016 stating, among other things, that Millian had not responded to the defendant's email. Thus, the July 2016 email bears further guarantees of high reliability because the message was sent to Zlodorev, an individual both the defendant and Millian were communicating with on the same subject, *e.g.*, the defendant's attempt to communicate with Millian.

The July 2020 emails between Millian and Zlodorev also bear circumstantial guarantees of trustworthiness. Again, in July 2020, Millian had no motive to lie to Zlodorev.

Third, *whether the statements relate to a material fact*. The Government submits that this factor is not in dispute.

Fourth, *whether the statements are the most probative evidence on the point*. Millian's emails written contemporaneous to the events at issue are undoubtedly the most probative evidence to support the fact that Millian had never met or spoken with the defendant.

Fifth, *whether the interests of justice are served by the statement's admittance*. The Government respectfully submits that the jury should be allowed to consider this highly probative evidence that goes to the crux of a central issue in the case.

Sixth, *whether the opposing party has been given reasonable notice that the statement is being sought for admittance*. The Government's motion *in limine*, filed more than six weeks before trial is scheduled to begin, provides reasonable notice to the defense of its intent to seek admittance of the three emails at issue, which the Government produced a number of months ago.

In sum, "hearsay evidence "should be admissible when it is reliable, when the jury can understand its strengths and limitations, and when it will materially enhance the likelihood of a correct outcome." *United States v. Boyce*, 742 F.3d 792, 802 (7th Cir. 2014). All of those factors are met here.

### 2. Steele's Statements to the FBI are Admissible

The Government also seeks to admit Christopher Steele's statements to the FBI stating that the defendant had conducted meetings with Sergei Millian in New York and in Charleston, South Carolina. (The Government attaches the relevant excerpt of Steele's interview as **Exhibit D**). Here, the Government will not be offering those statements to prove that the defendant did, in fact, meet with Millian (*i.e.,* for the truth of the matter asserted). Rather, the Government is offering these statements to prove their *falsity, i.e.,* that the defendant *never* met in person with Millian, just as he never received an anonymous phone call from Millian. The Government intends to offer these statements by Steele in connection with the defendant's own admission that he (the defendant) never corrected Steele in his inaccurate belief that the defendant had met in person with Millian. The Government intends to argue to the jury that (1) the charged false statement by the defendant regarding a purported call from Millian, (2) Steele's belief that the defendant actually met with Millian, and (3) the defendant's acknowledgement that he never corrected that inaccurate understanding, demonstrates that the defendant could not keep his own lies straight and left different people (*e.g.,* the FBI and Steele) with false understandings of his purported contacts with Millian. The Government will further prove that the defendant told these lies because he had to conceal the fact that he never communicated with Millian but instead falsely attributed information in the Steele Reports to Millian.

Given the foregoing, the described statements are plainly admissible. First, they are not offered for the truth of the matter asserted (*i.e.*, that the defendant met in person with Millian) and are therefore not hearsay. Moreover, they are both relevant and probative because they shed light on the defendant's motive and state of mind, and explain his future conduct. Indeed, Christopher Steele's statements regarding the defendant's alleged meetings with Millian shed important light on the defendant's later admission to the FBI that he had never met with Millian, and help to explain why he fabricated the existence of a 10–15-minute phone call with Millian in his FBI interviews. Put another way, the Government intends to show that the defendant had motive to lie about the purported phone call with Millian in an attempt to reconcile and/or explain away his previous false statements to Steele that Millian was a source of information in the Steele Reports whom the defendant said he had met in New York and Charleston.

### III.    The Court Should Admit Evidence of the FBI's Prior Counterintelligence Investigation of the Defendant

#### 1.  Relevant Facts

As has been publicly reported, the defendant was the subject of an FBI counterintelligence investigation from 2009 to 2011. In late 2008, while the defendant was employed by a prominent think tank in Washington, D.C., the defendant engaged two fellow employees about whether one of the employees might be willing or able in the future to provide classified information in exchange for money. According to one employee ("Employee-1"), the defendant believed that he (Employee-1) might be in a position to enter the incoming Obama administration and have access to classified information. During this exchange, the defendant informed Employee-1 that he had access to people who would be willing to pay money in exchange for classified information. Employee-1 passed this information to a U.S. government contact, and the information was subsequently passed to the FBI. Based on this information, the

FBI initiated a "preliminary investigation" into the defendant. The FBI converted its investigation into a "full investigation" after learning that the defendant (1) had been identified as an associate of two FBI counterintelligence subjects and (2) had previous contact with the Russian Embassy and known Russian intelligence officers. The defendant had also informed one Russian intelligence officer that he had interest in entering the Russian diplomatic service. The investigation into the defendant was closed in 2010 after the FBI incorrectly believed that the defendant had left the country.

During his January 2017 interview with the FBI, the defendant initially denied having any contact with Russian intelligence or security services but later – as noted by the agents, contradicted himself and stated that he had contact with two indiviudals who he believed to be connected to those services.

## 2. Discussion

The Government anticipates that a potential defense strategy at trial will be to argue that the defendant's alleged lies about the sourcing of the Steele Reports were not material because they had no affect on, and could not have affected, the course of the FBI's investigations concerning potential coordination or conspiracy between the Trump campaign and the Russian Government. Thus, the Government should be able to introduce evidence of this prior counterintelligence investigation (and that facts underlying that investigation) as direct evidence of the materiality of the defendant's false statements. Such evidence is admissible because in any investigation of potential collusion between the Russian Government and a political campaign, it is appropriate and necessary for the FBI to consider whether information it receives via foreign nationals may be a product of Russian intelligence efforts or disinformation. Had the FBI known at the time of his 2017 interviews that the defendant was providing them with false

31

information about the sourcing of his claims, this naturally would have (or should have) caused investigators to revisit the prior counterintelligence investigation and raise the prospect that the defendant might have in fact been under the control or guidance of the Russian intelligence services. Whether or not the defendant *did or did not* carry out work on behalf of Russian intelligence, the mere possibility that he might have such ties is something that any investigator would consider and, therefore, the jury is entitled to learn at trial about the prior investigation in assessing the materiality of the defendant's alleged false statements.

Here, the FBI's prior investigation of the defendant is highly probative for any assessment of the materiality of the defendant's alleged lies because the evidence at trial will demonstrate that Dolan, on *two* separate occasions, stated in emails dated June 10, 2016 and January 13, 2017 that he believed the defendant was "former FSB" and a Russian "agent." Specifically, on June 10, 2016, Dolan sent an email to a U.S.-based acquaintance and described the defendant as being "too young for KGB. But I think he worked for FSB. Since he told me he spent two years in Iran. And when I first met him he knew more about me that I did. [winking emoticon]."] (The Federal Security Service of the Russian Federation, or "FSB," is the principal security agency of Russia and the principal successor agency to the KGB.) Similarly, on January 13, 2017 – three days after Buzzfeed first published the Steele Reports and before the defendant's name was publicly known – Dolan informed a U.S.-based acquaintance, in part, that he [Dolan] knew "the Russian agent who made the report (He used to work for me)." Accordingly, had the defendant truthfully told the FBI that Dolan played a role in providing certain information for the Steele Reports, the FBI might well have interviewed and/or collected such emails from Dolan, which would have permitted them to further explore the possibility that the defendant was, in fact, connected to the Russian intelligence services.

In sum, the defendant's alleged false statements to the FBI were all the more material in light of the fact that he himself was the subject of a prior counterintelligence investigation. As such, the Government should be permitted to offer such evidence in its case-in-chief, or alternatively, as rebuttal evidence should the defense argue that the defendant's false statements were not material. *See e.g., United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (Rebuttal evidence is "evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party. That which tends to explain or contradict or disprove evidence offered by the adverse party.")

Furthermore, evidence of the FBI's prior counterintelligence investigation into the defendant satisfies the balancing test of Rule 403. The fact of the investigation is highly probative, as described above, and does not reflect conduct that is any more sensational, disturbing, or prejudicial than the subject matter of the charged crimes. As discussed above, it would be difficult to think of a more sensational claim than the information that the Steele Reports attributed to "Source E" (purported to be Millian), *i.e.*, that a presidential candidate and his campaign were immersed in a "well-developed conspiracy of cooperation" with the Kremlin. Further, the Government expects the defense to introduce evidence of FBI investigations into other individuals who the Government anticipates will feature prominently at trial. Thus, the introduction of the defendant's prior counterintelligence investigation – should the defense open the door – does not give rise to unfair prejudice that substantially outweighs its probative value. As the Fourth Circuit has held, "damage to a defendant's case is not a basis for excluding probative evidence, because evidence that is highly probative invariably will be prejudicial to the defense." *Grimmond*, 137 F.3d at 833. Similarly, Rule 403 only requires suppression of evidence when the evidence "damages an opponent for reasons other than its probative value, for

instance, an appeal to emotion, and only when that unfair prejudice *substantially* outweighs the probative value of the evidence." *Mohr,* 318 F.3d at 619-20.

### IV.    The Court Should Exclude Evidence and Preclude Argument Concerning Allegations of Political Bias Underpinning the Pending Charges

The Government expects that defense counsel may seek to present evidence at trial and make arguments to the jury that depict the instant prosecution as politically motived or biased based on its initiation during the prior administration. Notwithstanding the patently untrue nature of any such allegations, the claim would be irrelevant to this case and would create a substantial danger of unfair prejudice, confusion, and delay. In particular, the government seeks to preclude the defendant from introducing evidence or making any argument concerning the circumstances surrounding the appointment of the Special Counsel and alleged political motivation for initiating the instant prosecution.

First, only relevant evidence is admissible at a criminal trial. Fed. R. Evid. 402. The definition of relevance is inclusive, *see* Fed. R. Evid. 401(a), but depends on the possibility of establishing a fact that "is of consequence in determining the action," Fed. R. Evid. 401(b). Evidence is therefore relevant only if it logically relates to matters that are at issue in the case. *E.g., Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 387 (2008). Importantly, the party seeking to introduce evidence bears the burden of establishing relevancy. *Dowling v. United States,* 493 U.S. 342, 351 n.3 (1990).

Here, the defendant is charged with making false statements to the FBI in violation of 18 U.S.C. § 1001. A jury will have to decide only whether the defendant knowingly and willfully made materially false statements to the FBI regarding his sourcing for information reflected in the Steele Reports. Nothing more, nothing less. Baseless political allegations are irrelevant to the crime charged. *See, e.g., United States v. Regan,* 103 F. 3d 1072, 1082 (2d Cir. 1997)

(claims of Government misconduct are "ultimately separate from the issue of [a defendant's] factual guilt"); *United States v. Washington*, 705 F. 2d 489, 495 (D.C. Cir. 1983) (similar). Evidence or argument concerning these issues should therefore be excluded. *See* Fed. R. Evid. 402; *see, e.g., United States v. Stone*, 19 CR 18 (D.D.C. Sept. 26, 2019) ECF Minute Order (granting the government's motion *in limine* to exclude evidence or argument regarding alleged misconduct in the government's investigation or prosecution of Roger Stone).

The only purpose in advancing these arguments would be to stir the pot of political polarization, garner public attention, and, most inappropriately, confuse jurors or encourage jury nullification. *See United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) ("defendant is not entitled to inform the jury that it can acquit him on grounds other than the facts in evidence, *i.e.* a jury has the power of nullification but defense counsel is not entitled to urge the jury to exercise this power.") Put bluntly, the defense may wish to paint the instant prosecution as politically motivated. Injecting politics into the trial proceedings is in no way relevant, dangerous, and unjustified.

For the foregoing reasons, the defendant should not be permitted to introduce evidence or argue to the jury, directly or indirectly, that the prosecution in this case is a politically tainted or biased one.

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motions *in limine*.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

/s/
Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov

# EXHIBIT A



From: Sergio Millian <milliangroup@gmail.com>
Sent: Tuesday, July 26, 2016 9:33 AM
To: Dmitri Zloderev
Subject: Fwd: Question about Trump, China.

Dmitriy, on Friday I'm returning from Asia. An e-mail came from Igor. Who is that? What sort of person?

Sergey

EXHIBIT B



From: Sergei Millian
Sent: Sunday, July 19, 2020 3:39 PM
To: Dmitri Zlodorev
Subject: Re: News

It was most likely *Catherine Belton FT* who called you.
I believe they've already found Steele's source:
*https://ifoundthepss.blogspot.com/2020/07/unmistakable-proof.html?m=1*
Do you remember such a person? Igor Danchenko?



SCO-101605

# EXHIBIT C



From: Sergei Millian
Sent: Monday, July 20, 2020 11:44 AM
To: Dmitri Zlodorev
Subject: Re: News

Good afternoon, Dmitriy!

SCO-101608

I've been informed that Bogdanovskiy travelled to New York with Danchenko at the end of July 2016; Danchenko, supposedly to meet with me (but the meeting didn't take place). Can you inquire with Bogdanovskiy whether he remembers something from that trip and whether they touched upon my name in conversation, as well as for what reason Danchenko was travelling to NY?

Steele, it seems, made Danchenko the fall guy, but Danchenko himself made several statements that were difficult to understand, for example, about the call with me. Did he tell Bogdanovskiy that he communicated with me by phone and on what topic?

Thank you! This will clarify a lot for me personally. It's a convoluted story!

All the best!
Sergey



# EXHIBIT D

STEELE said that his primary subsource did a bit of work in the United States on election-related collecting. In the United States, the primary subsource talked to SERGEY MILLIAN and one or two others. Regarding MILLIAN, STEELE said that the primary subsource was introduced to MILLIAN through "some émigré" in Washington, DC. MILLIAN and the primary subsource met in New York and perhaps in Charleston, South Carolina. The primary subsource had two or three meetings with MILLIAN. The primary subsource and MILLIAN discussed a possible business project. The business project wasn't notional — it dealt with some sort of warehouse in Moscow. STEELE recalled seeing some documentation about this business project. STEELE described it as a pretty standard Russian type of thing dealing with land registration or land documentation. STEELE emphasized that it was a pretty typical Russian business endeavor.