**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 1:21-cr-00245-AJT** |
| | ) | |
| IGOR Y. DANCHENKO, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT IGOR DANCHENKO'S MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE AND MEMORANDUM IN SUPPORT

Defendant IGOR DANCHENKO, by and through counsel, respectfully moves this Court to dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) because the five counts therein "fail to state an offense."

### INTRODUCTION

This false statements prosecution is a case of extraordinary government overreach. Section 1001(a)(2) of Title 18 criminalizes the *knowing and willful* making of a *materially false* statement to the government.  The law criminalizes only unambiguously false statements that are material to a specific decision of the government. By contrast, literally true or ambiguous statements, even if they are unresponsive or misleading, or false statements about ancillary matters, do not give rise to criminal liability.

For nearly a year, from January 2017 through November 2017, Mr. Danchenko sat through numerous voluntary FBI interviews and provided hours of truthful information to the government. Four years later, Special Counsel John Durham returned an indictment that alleges Mr. Danchenko knowingly made false statements about two matters when he: (1) acknowledged to the FBI that he talked with PR Executive-1 about issues "related" to the content of the Company Reports but stated that he did not talk about "specific" allegations contained in one of the reports; and (2) made four

1

consistent statements to the FBI about his equivocal "belief" that an anonymous man who called him may have been Chamber President-1. These equivocal and ambiguous answers were prompted by fundamentally ambiguous questions, are literally true, and are immaterial as a matter of law.

Further, the government's attempt here to stretch § 1001(a)(2) to a defendant's equivocal and speculative statements about his subjective belief appears to be a first.  And it would be a first for good reason.  In order to meet its burden of proof in a case predicated on a subjective belief the government would need to prove not whether something did or did not happen but that the defendant did not truly subjectively believe what he said happened or did not happen. That would be a heavy burden in any case and it is an insurmountable one here.

For those reasons and the ones that follow, the charges against Mr. Danchenko should be dismissed.

## BACKGROUND

On July 31, 2016, the FBI opened an investigation "known as 'Crossfire Hurricane' into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interfere in the 2016 U.S. presidential election." Office of the Inspector General for the U.S. Department of Justice, Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation (December 2019) ("IG Report") at vi.  As the IG found, the "articulable factual basis" for the investigation was information received from a Friendly Foreign Government ("FFG") and well known Russian efforts to interfere in the 2016 elections.  *Id*. at 351.

In the summer leading up to the November 2016 presidential election, the FBI began receiving reports (the "Company Reports" or "Reports" or "dossier") from U.K. Person-1 that contained information about interactions between then-candidate Donald J. Trump and Russian

government officials.[1]  Several of those Reports were eventually obtained and published in January 2017 by Buzzfeed.com.  During the course of its investigation into the Reports, the FBI determined that the defendant, Igor Danchenko, was a potential source of information contained in the Reports. In order to assist the FBI in its investigation of the accuracy and sources of the information in the Reports, Mr. Danchenko agreed to numerous voluntary interviews with the FBI from in or about January 2017 through November 2017.  He answered every question he was asked to the best of his ability and recollection.

As part of the 2017 interviews, FBI agents asked Mr. Danchenko to review portions of the Reports and describe where he believed the relevant information had derived from and to explain how any information he had provided to U.K. Person-1 may have been overstated or misrepresented in the Reports.  Importantly, Mr. Danchenko played no role in the actual drafting of the Reports, had no knowledge of their existence, had never seen the Reports until their publication in 2017, and had no prior knowledge that the Reports had been shared with the FBI. Indeed, Mr. Danchenko did not even know what specific project U.K. Person-1 was working on when he began to solicit Mr. Danchenko for information about Trump and his connections to Russia. Mr. Danchenko was also unaware of how many other sources had contributed to the creation of the Reports.

Between January and November 2017, Mr. Danchenko not only answered every question to the best of his ability, even when asked to speculate, but also provided emails and contact information for other potential sources of information in the Reports.  The investigation into the Reports was ultimately completed by Special Counsel Robert S. Mueller, III, in or about November

---

[1] As the IG would later find, there was "no evidence the [U.K. Person-1] election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation."  IG Report at 56 n.169.

2017 and the Special Counsel's office closed its entire investigation into possible Trump/Russia collusion in March 2019.  Approximately thirty-four individuals were charged by Mueller's office, including several for providing false statements to investigators.  Mr. Danchenko was not among them.  To the contrary, not only did investigators and government officials repeatedly represent that Mr. Danchenko had been honest and forthcoming in his interviews, but also resolved discrepancies between his recollection of events and that of others in Mr. Danchenko's favor.

In or about April 2019, and just one month after Mueller had concluded his investigation, then President Trump's Attorney General, William Barr, tapped John Durham, the U.S. Attorney for the District of Connecticut, to review the origins of the Russia investigation and efforts by law enforcement to investigate the Trump campaign.  Just prior to the end of former President Trump's term, Barr appointed Mr. Durham Special Counsel to carry out his investigation. Through the instant indictment, the Durham Special Counsel's Office now claims to have uncovered false statements made by Mr. Danchenko that the previous special counsel did not, despite relying substantially on the same evidence, the same statements, and the same agents involved in the Mueller investigation.

The November 3, 2021, indictment charges five counts of false statements under 18 U.S.C. § 1001(a)(2) based on Mr. Danchenko's statements to the FBI regarding his involvement as a source for the Company Reports created by U.K. Person-1. Count One of the indictment alleges that "Danchenko stated falsely that he had never communicated with a particular U.S.-based individual – who was a long-time participant in Democratic Party politics and was then an executive at a U.S. public relations firm ("PR Executive-1") – about any [*specific*] allegations contained in the Company Reports [created by U.K Person-1]." Indictment at 3, ECF No. 1 (hereinafter "Indictment") (emphasis added).

4

It is undisputed and acknowledged in the indictment that Mr. Danchenko told the FBI that he talked with PR Executive-1 about "*related issues*" pertaining to the Company Reports. The falsity alleged in the indictment is that Mr. Danchenko's answer that admitted discussing "related issues" with PR Executive-1 also denied discussing "specific" allegations that showed up in one of the Company Reports. The indictment alleges that the distinction between "related issues" and "specific" allegations demonstrates falsity even though the information that the indictment argues Mr. Danchenko should have attributed to PR Executive-1 actually originated "from public news sources." Indictment at 16.

Further, the indictment alleges that Mr. Danchenko's alleged false statement was material because:

> (a) PR Executive-1 maintained pre-existing and ongoing relationships with numerous persons named or described in the Company Reports, including one of Danchenko's Russian sub-sources[], (b) PR Executive-1 maintained historical and ongoing involvement in Democratic politics, which bore upon PR Executive-1's reliability, motivations, and potential bias as a source of information for the Company Reports, and (c) Danchenko gathered some of the information contained the Company Reports at events in Moscow organized by PR Executive-1 and others that Danchenko attended at PR Executive-1's invitation. Indeed, [] certain allegations that Danchenko provided to U.K. Person-1, and which appeared in the Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

Indictment at 3-4.

Counts Two through Five of the indictment all relate to statements Mr. Danchenko made about his personal and equivocal "belief" regarding the identity of an anonymous person who telephoned Mr. Danchenko in July 2016:

> Danchenko stated falsely during the Interviews, that, in or about late July 2016, he received an anonymous phone call *from an individual who Danchenko believed* to be a particular U.S. citizen and who was then president of the Russian-American Chamber of Commerce. . . Danchenko also falsely stated that, during this phone call, (i) the person he believed to be Chamber President-1 informed him, in part, about information that the Company Reports later described as demonstrating a well-developed 'conspiracy of cooperation' between the Trump Campaign and

Russian officials, and (ii) Danchenko and the aforementioned person agreed to meet in New York. In truth and fact, and as Danchenko well knew, Danchenko never received such a phone call or such information from any person he believed to be Chamber President-1, and Danchenko never made any arrangement to meet Chamber President-1 in New York. Rather, Danchenko fabricated these facts regarding Chamber President-1.

Indictment at 4 (emphasis added).

Notably, the indictment does not allege that Mr. Danchenko did not receive an anonymous phone call in or about late July 2016. Instead, the indictment alleges only that Mr. Danchenko "never received such a phone call or information from any person *he believed to be* Chamber President-1[.]" The alleged false statement is that Danchenko did not truly believe that the anonymous caller was Chamber President-1. The indictment also alleges that Mr. Danchenko "never made any arrangements to meet Chamber President-1." However, Mr. Danchenko never stated that he made such arrangements. Rather, he told the FBI that he arranged to meet *the anonymous caller*, but *the anonymous caller* never showed up for the meeting.

The government argues that these allegedly false statements were material because:

(1) the FBI's investigation of the Trump Campaign relied in large part on the Company Reports to obtain FISA warrants on Advisor-1, (2) the FBI ultimately devoted substantial resources attempting to investigate and corroborate the allegations contained in the Company Reports, including the reliability of Danchenko's sub-sources; and (3) the Company Reports, as well as information collected for the Reports by Danchenko, played a role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period.

Indictment at 4. Significantly, the indictment does not allege that Mr. Danchenko's allegedly false statements themselves were material, but instead alleges only that the Company Reports, and the information contained in those reports, some of which allegedly came from Mr. Danchenko, were material.

These allegations fail to state an offense and consequently the five counts in the indictment must be dismissed.

6

**LEGAL STANDARD**

Prior to trial, a criminal defendant may move to dismiss an indictment based on a "defect in the indictment, including . . . failure to state an offense" if the "motion can be determined without a trial on the merits[.]" Fed. R. Crim. P. 12(b)(3)(B). For such motions, dismissal is required if it is "demonstrate[d] that the allegations [in the indictment], even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004).

**ARGUMENT**

The Indictment charges Mr. Danchenko with making false statements in response to questions asked during the course of several voluntary interviews by FBI agents. As will be shown, Mr. Danchenko's statements were literally true, or at the very least literally true to the best of Mr. Danchenko's understanding of fundamentally ambiguous questions and were not material to any government decision. As such, the Indictment fails to the state an offense and must be dismissed.

**I.      Without Falsity and Materiality, There Can Be No § 1001 Offense.**

In order to prove a false statement under 18 U.S.C. § 1001(a)(2), the government must prove the following elements: "the making (a) in any matter within the jurisdiction of any department or agency of the United States, of (b) a false statement of (c) material fact with (d) fraudulent intent." *United Stated v. Race*, 632 F.2d 1114, 1116 (4th Cir. 1980) (internal citations omitted). "These elements are sequential. Thus, the two threshold issues that must first be answered in every case under § 1001 are the involvement of an agency of the United States and *the falsity of the statement.*" *Id.* (emphasis added).

A statement that is literally true is, by definition, not false. *See United States v. Harra*, 985 F.3d 196, 209 (3d Cir. 2021). Therefore, an indictment that charges a §1001(a)(2) violation based on a "literally true" statement *must be dismissed*. *See United States v. Good*, 326 F.3d 589, 592

(4th Cir. 2003) (upholding grant of a motion to dismiss because "defendant's response to the question was literally true, and thus, her indictment charging a violation of Section 1001 was properly dismissed"); *see also Bronston v. United States*, 409 U.S. 352, 353 (1973) (holding that a person cannot "be convicted of perjury for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication"); *United States v. Ricard*, 922 F.3d 639, 652 (5th Cir. 2019) ("[T]wo of the few available defenses to a false statement charge are that the defendant was responding to a fundamentally ambiguous question or that her answer was literally true."); *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999) ("an indictment premised on a statement which on its face is not false cannot survive").

For example, in *Good*, the government alleged that the defendant falsely certified in a government application that she had never been convicted of certain listed crimes, which included "Theft" and "Dishonesty, Fraud, or Misrepresentation."  326 F.3d at 590.  The defendant had been convicted of embezzlement but responded "No" to these listed crimes.  *Id*. The Fourth Circuit upheld the district court's dismissal of the indictment because, even though embezzlement *involves* theft, dishonesty, fraud, and misrepresentation, it was a different crime from those that were listed. *Id*. The indictment therefore failed to allege an actual false certification sufficient to survive dismissal. *Id*. at 592; *see also United States v. Baer*, 92 F. App'x 942, 944, 946 (4th Cir. 2004) (affirming dismissal of indictment where the defendant's statement about past convictions in a government application was "literally true," because a conviction cannot stand "on the basis of a statement that is literally true, even if that statement is misleading"). Similarly, in *Gatewood*, the defendant certified that "he had made payments to subcontractors and suppliers." 173 F.3d at 987. The government alleged that this certification was false because the defendant "***had not made full payment*** to the subcontractors and suppliers." *Id.* (emphasis added). The Sixth Circuit reversed the

defendant's conviction and held that the indictment's false-certification theory relied on a "false dichotomy" because "certifying that one has made payments to subcontractors is not inconsistent with having yet to pay the subcontractors in full." *Id*. Because the indictment did not actually "present a false statement" or "raise a direct conflict between the certification" and "the actual facts," the indictment failed to state an offense. *Id*.

In addition, "[t]he answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement." *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012). A question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id*. (quoting *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1985)). *See Harra*, 985 F.3d at 209 ("fundamental ambiguity" rule "screens out perjury and false statement charges for which a jury could never determine 'which construction the defendant placed on the question' and, consequently, whether that defendant intended to give a false answer"). Where a question posed to a defendant is arguably ambiguous but not fundamentally so, ***the government bears the burden*** of "negativ[ing] any reasonable interpretations that would make a defendant's statement factually correct." *Race*, 632 F.2d at 1120 (quoting *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir.), *cert. denied*, 439 U.S. 980, (1978)); *see also United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994). The government's interpretation of the question must therefore be "the only objectively reasonable interpretation" and "under this interpretation, the defendant's statement" must have been false, or the defendant's statement must have been "false under each alternative, objectively reasonable interpretation." *Harra*, 985 F.3d at 215; *see also United States*

*v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("[T]here has been no crime if the statements were not false … under an objectively reasonable interpretation of the law imposing the duty.").

To be material, a false statement must be more than merely of general interest to the government. Materiality requires that a false statement concern a specific decision of a governmental agency and "have 'a natural tendency to influence, or [be] capable of influencing, the decision.'" *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys*, 485 U.S. 759 770 (1988). As Justice Scalia explained in *Gaudin*, "[d]eciding whether a statement is 'material' requires the determination of at least two subsidiary questions . . . (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" *Id*. at 512. Only after a factfinder has identified the "statement" and the relevant "decision" can it answer the "ultimate question," which is "whether the statement was material to the decision." *Id*. That "ultimate question" of materiality requires that the false statement be capable of influencing the relevant government decision, which in turn requires that the false statement have a sufficient nexus, or close connection, to the decision at issue. *See Naserkhaki*, 722 F. Supp. at 248 ("Where, as here, a misstatement relates to an ancillary, non-determinative fact, it is not material and cannot support a conviction under Section 1001"); *see also United States v. Facchini*, 874 F.2d 638, 643 (9th Cir. 1989) (noting that a "false statement must . . . be capable of having some non-trivial effect on a federal agency"); *cf. United States v. Martinez*, 855 F.2d 621, 624 (9th Cir. 1988) (accepting, in 18 U.S.C. § 1623 prosecutions, that "the government must establish materiality by showing a 'nexus' between the false statements and the scope of the grand jury investigation").

Here, the charges against Mr. Danchenko suffer from all three fatal defects, as the questions were fundamentally ambiguous, Mr. Danchenko's answers were literally true, non-responsive, or ambiguous, and the statements were not material to a specific government decision.

## II.    Count One Regarding PR Executive-1 Fails to State an Offense

Count One alleges that Mr. Danchenko made a false statement when "he denied to agents of the FBI that he had **spoken** with PR Executive-1 about any [specific] material contained in the Company Reports, when in truth and in fact, and as the defendant well knew, PR Executive-1 was the source for an allegation contained in a Company Report dated August 22, 2016 and was otherwise involved in the events and information described in the reports." Indictment at 37 (emphasis added). This allegation is based on the following questions and answers:

| | |
|---|---|
| FBI AGENT-1: | Um, because obviously ***I don't think you're the only*** ... |
| DANCHENKO: | Mm-hmm. |
| FBI AGENT-1: | ***Person that has been contributing.*** You may have said one - and this is the other thing we are trying to figure out. |
| | [. . .] |
| FBI AGENT-1: | Do you know a [PR Executive-1]? |
| DANCHENKO: | Do I know [PR Executive-1]? Yeah. |
| FBI AGENT-1: | How long have you known him? [laughing] |
| DANCHENKO: | I've known [PR-Executive-1] for [pause] I don't know, a couple years maybe. |
| FBI AGENT-1: | Couple years? |
| DANCHENKO: | But but but but but but but I've known of him for like 12 years. |
| | [. . .] |
| DANCHENKO: | Yeah. Yeah he likes Russia. ***I don't think he is, uh, - would be any way be involved. But—but—uh—b—but he's uh [UI] what I would think would be easily played. Maybe.*** Uh, he's a bit naive in his, um liking of Russia. |
| FBI AGENT-1: | Okay, so you've had ... was there any ... but you had never ***talked*** to [PR Executive-1] about anything that showed up in the dossier [Company Reports] right? |
| DANCHENKO: | No. |
| FBI AGENT-1: | You don't think so? |
| DANCHENKO: | No. We ***talked*** about, you know, ***related issues perhaps but no, no, no, nothing specific.*** |

Indictment at 17-18 (emphasis added).

For "proof" of the alleged false statement under this charge, the indictment relies on ***an email exchange*** between PR Executive-1 and Mr. Danchenko on or about August 19-20, 2016. Indictment at 46-50. In an email to Mr. Danchenko on August 20, 2016, PR Executive-1 wrote

11

about the Trump Campaign manager's resignation, citing "an internet news article that discussed Campaign Manager-1's resignation as Trump Campaign manager." Indictment at 48.

A.  The Questions Were Fundamentally Ambiguous and Mr. Danchenko's Answers Were Literally True, Ambiguous, or Unresponsive.

Count One fails because Mr. Danchenko's statements – (1) "I don't think [PR Executive-1] . . . would be any way be involved. But . . . he's [] what I would think would be easily played. Maybe." and (2) we talked about "related issues" but not "specific" allegations contained in the Company Report – were literally true. At worst, the questions and discussion that elicited Mr. Danchenko's answers were fundamentally ambiguous, and Mr. Danchenko's statements were literally true under the most reasonable interpretation of the questions.

Contrary to the indictment's allegations that Mr. Danchenko falsely denied that "PR Executive-1 was the source for an allegation contained in a Company Report dated August 22, 2016," Indictment 37, the FBI agent **never asked** Mr. Danchenko if PR Executive-1 was his "source." Instead, the only reasonable reading of the discussion that elicited Mr. Danchenko's first answer indicates that both FBI Agent-1 and Mr. Danchenko were discussing whether PR Executive-1 was a **direct source to U.K. Person-1**, not whether he was a **source to Mr. Danchenko**.

This is so because the discussion began with FBI Agent-1 stating, "obviously I don't think you are the only. . . person contributing." The only reasonable interpretation of this statement is that FBI Agent-1 wanted to know if [U.K. Person 1] had other sources in addition to Mr. Danchenko. And Mr. Danchenko's indecisive answer - "*I don't think he is*, uh, - *would be in any way be involved. But* . . . He's uh [] what I would think would be easily played. *Maybe*." – is only

responsive to that understanding of the statement.[2] Mr. Danchenko's response was essentially that he did not know whether PR Executive-1 was a direct source to U.K. Person-1. This answer is literally true, and the government has never alleged otherwise. As noted above, Mr. Danchenko did not write the Company Reports, never saw them until they were published by Buzzfeed in early January 2017, and he did not know what or how many other direct sources U.K. Person-1 may have relied upon in compiling the Reports.

At best, the discussion was fundamentally ambiguous, as evidenced by Mr. Danchenko's response, which was literally true under the most reasonable interpretation, but entirely unresponsive under the government's interpretation. *See Sarwari*, 669 F.3d at 407 (finding that a question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony"). Had Mr. Danchenko understood the question as asking whether PR Executive-1 was **one of his own sources**, Mr. Danchenko would have offered a definitive answer – yes, no, or that he doesn't remember – because he would obviously have direct knowledge of his own sources. But the FBI agent did not ask Mr. Danchenko whether PR Executive-1 was one of Mr. Danchenko's sources.

Even if the Court somehow found that the statement was unambiguously asking whether PR Executive-1 was Mr. Danchenko's source, rather than U.K. Person-1's, Mr. Danchenko's answer – "I don't think he . . . would be any way involved. But . . . Maybe" – is non-responsive

---

[2] It should be noted here as well that Mr. Danchenko did tell the FBI about PR Executive-1's connection to another of Mr. Danchenko's overseas sources, advised the FBI that he had attended events in Moscow with PR-Executive-1 in June and October 2016, informed the FBI that U.K Person-1 knew of PR Executive-1, and even raised concerns with the FBI about PR Executive-1's close contacts with high-level Kremlin officials.

and equivocal, not false. *See United States v. Earp*, 812 F.2d 917, 919-20 (4th Cir. 1987) (finding that a literally true statement, albeit unresponsive, cannot support a perjury charge). And it was the questioner's responsibility to clarify any ambiguity, which he failed to do. *See Bronston*, 409 U.S. at 360 ("[S]o long as the witness speaks the literal truth[, t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry."); *see also Race*, 632 F.2d at 1120 (finding that the government bears the burden of "negativ[ing] any reasonable interpretations that would make a defendant's statement factually correct").

Next, when asked whether Mr. Danchenko and PR Executive-1 ever "***talked*** . . . about anything that showed up in the dossier [Company Reports]," Mr. Danchenko responded, "No. We ***talked about***, you know, related issues perhaps but no, no, no, nothing specific." Indictment at 18 (emphasis added). The most reasonable reading of this question is whether Mr. Danchenko and PR Executive-1 ***talked*** about the Company Reports themselves ***after they were published***. Mr. Danchenko's answer to this question was literally true because he never talked to PR Executive-1 about the specific allegations contained ***in the Company Reports*** themselves, but they did talk about issues "related" to the allegations ***later*** published in those reports. Moreover, the specific question posed to Mr. Danchenko was whether Mr. Danchenko and PR Executive-1 "***talked***" about anything in the dossier. That part of the question was not ambiguous and, importantly, FBI Agent-1 never asked whether Mr. Danchenko and PR Executive-1 had ever exchanged emails about information that showed up in the dossier. For that reason alone, evidence that PR Executive-1 allegedly emailed Mr. Danchenko about information contained in the Reports does not make Mr. Danchenko's answer false. Talking refers to communication through spoken words, not in writing. *See* Indictment at 37 (alleging in Count One that "the defendant denied to agents of the FBI that ***he had spoken*** with PR Executive-1 about any material contained in the Company Reports….")

14

(emphasis added).  Therefore, ***Mr. Danchenko's answer to the specific question he was asked was literally true*** and the burden was on FBI Agent-1 to ask additional questions or to make clear what he meant by the term "talked."  Even if the government wants to expand the definition of talked to encompass written communications, which it cannot, the question was fundamentally ambiguous at best and cannot support criminal liability. *See Sarwari*, 669 F.3d at 407.

Moreover, without additional questions by FBI Agent-1 or explanation from Mr. Danchenko, the distinction between talking about "anything" or "related issues" and something "specific" is at best vague and open to subjective interpretation, and consequently cannot support a false statement charge under § 1001. "[S]o long as the witness speaks the literal truth[, t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston*, 409 U.S. at 360; *see also United States v. Bonds*, 580 F. Supp. 2d 925, 930–31 (N.D. Cal. 2008) (finding that the term "anything like steroids" is not "one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony. . . Accordingly, ***defendant's response to this statement cannot sustain a perjury conviction*** and the Court GRANTS the defendant's motion to dismiss this count") (emphasis added). Here, the agent failed at that task by not asking the appropriate follow-up questions in a pointed, direct fashion. In false statement cases, "[p]recise questioning is imperative as a predicate for the offense[.]" *Bronston*, 409 U.S. at 362. Further, it is immaterial if a defendant "intended to mislead his examiner," since it is not a crime to assert "an unresponsive answer, true and complete on its face" even if it "was intended to mislead or divert the examiner." *Id*. at 359. Under the literal truth defense, a witness may not be convicted where his statement is literally true, even if it is unresponsive to the question asked or arguably misleading by negative implication. *See id*. at 353; *see also Good*, 326 F.3d at 592.

B. <u>Mr. Danchenko's Answers Were Immaterial as a Matter of Law.</u>

Even if the questions were clear and unambiguous and Mr. Danchenko's answers were false, which they were not, the answers were immaterial. The indictment alleges that the answers were material because:

> (a) PR Executive-1 maintained pre-existing and ongoing relationships with numerous persons named or described in the Company Reports, including one of Danchenko's Russian sub-sources [], (b) PR Executive-1 maintained historical and ongoing involvement in Democratic politics, which bore upon PR Executive-1's reliability, motivations, and potential bias as a source of information for the Company Reports, and (c) Danchenko gathered some of the information contained the Company Reports at events in Moscow organized by PR Executive-1 and others that Danchenko attended at PR Executive-1's invitation. Indeed, [] certain allegations that Danchenko provided to U.K. Person-1, and which appeared in the Company Reports, mirrored and/or reflected information that PR Executive-1 himself also had received through his own interactions with Russian nationals.

Indictment 3 to 4.

While the indictment argues that, had the FBI known that the information originated from PR Executive-1, it may have questioned PR Executive-1's credibility, as the indictment admits, the information never originated from PR Executive-1 and was already available "from public news sources." *See* Indictment at 16 ("PR Executive-1 later acknowledged to the FBI that he never met with a 'GOP friend' in relation to this information that he passed to Danchenko, but, rather, fabricated the meeting in his communications with Danchenko. ***PR Executive-1 instead obtained the information about Campaign Manager-1 from public news sources.***") (emphasis added).[3]

---

[3] While the indictment does not provide a link to the "internet news article" PR Executive-1 cited in his email to Mr. Danchenko on or about August 20, 2016, Indictment at 48, numerous articles on this very subject had been published before PR Executive-1 ever sent his email. *See, e.g.*, *Paul Manafort Thrown From Trump Crazy Train*, https://www.thedailybeast.com/paul-manafort-thrown-from-trump-crazy-train (Aug. 19, 2016); Vanity Fair, *Paul Manafort Quits the Trump Campaign*, https://www.vanityfair.com/news/2016/08/paul-manafort-quits-trump-campaign (Aug. 19, 2016); Politico, *Lewandowski on Manafort firing: 'People think I won'*, https://www.politico.com/story/2016/08/corey-lewandowski-paul-manafort-trump-winning-227198 (Apr. 19, 2016); NBC News, *Trump Campaign Chair Paul Manafort Resigns*, https://www.nbcnews.com/politics/2016-election/trump-campaign-chair-paul-manafort-resigns-

The indictment fails to explain why PR Executive-1's credibility would affect in any way the veracity of public information that did not even originate from PR Executive-1 in the first place. Nor does the indictment explain how it could be a material, false statement for Mr. Danchenko to fail to attribute already public information as coming from PR Executive-1 rather than a range of public sources that were providing the same information. The indictment's logic on this point is, in a word, nonsensical. Perhaps more fatal to the government's materiality argument is that the government apparently never even asked Mr. Danchenko about the specific information regarding Campaign Manager-1 that was contained in the relevant Company Report. Therefore, it is difficult to understand how Mr. Danchenko's alleged failure to properly attribute public information about a topic of no interest to the government could have been material to any government decision.  That is especially so when Mr. Danchenko did provide that he spoke to PR Executive-1 about issues related to the information contained in the Company Reports and did raise concerns about PR Executive-1 and his connections to Russian officials, as well as his contacts with other Company Report sub-sources and his familiarity with U.K. Person-1.

## III.     Counts Two Through Five Regarding Chamber President-1 Fail to State an Offense.

Counts Two through Five allege that Mr. Danchenko made false statements when he told FBI agents that he assumed or believed an anonymous caller was Chamber President-1. Notably, the indictment does not allege that Mr. Danchenko never received an anonymous call. Rather, the indictment alleges that the statements were false because Mr. Danchenko did not truly believe that

---

n634366 (Aug. 19, 2016); The Washington Post, *The Daily 202: What Trump's latest shakeup says about his flailing campaign*, https://www.washingtonpost.com/news/powerpost/paloma/daily-202/2016/08/17/daily-202-what-trump-s-latest-shakeup-says-about-his-flailing-campaign/57b3ba48cd249a2fe363ba23/ (Aug. 17, 2016); The Hill, Social media erupts as Lewandowski tweets report on Manafort's ties to Ukraine, https://thehill.com/blogs/ballot-box/presidential-races/291414-lewandowskis-tweets-report-on-manaforts-ukraine-ties (Aug. 14, 2016).

the anonymous caller was Chamber President-1. As noted above, there does not appear to be a single case where criminal charges have been brought under 18 U.S.C. § 1001 based on a defendant making equivocal, speculative statements about his belief, as opposed to unequivocal statements about verifiable facts.

Specifically, the Indictment alleges that:

- On March 16, 2017, Mr. Danchenko said: "I have to talk to guys with [Russian Media Company-1] . . . [a]nd see what what's he really about . . . [w]hether he was the person who contacted me[,] [w]here he is now and [] *I probably spoke with him, but I don't know*. Anyway. Strange character." Indictment at 35.

- On May 18, 2017, when asked whether he "got the call from the guy up in uh, New York [] [t]hat you thought was [Chamber President-1]," Mr. Danchenko responded, "Yes . . . I'm not sure if I, he called, but . . . *I just don't remember*. *But I, I was at the time I was under the impression it was him, because I talked to [] [Russian Media Company-1] [t]o [Russian Journalist-2] . . . and I assumed it would have been him* . . . He never showed up. He never showed up in New York." *Id*.

- On October 24, 2017, Mr. Danchenko told the FBI that he "scheduled a meet time and place in New York [and] [Chamber President-1] never showed." Additionally, Mr. Danchenko stated, "I *believe* I spoke to [Chamber President-1] on the phone a couple of times, *at least someone who I thought was him.*" *Id*.

- On November 16, 2017, Mr. Danchenko said that he believed the phone call was from Chamber President-1 because he had listened to videos of Chamber President-1 online and the anonymous caller "*sounded like*" the same person. *Id*. at 36.

These statements were literally true and are immaterial to any government decision.

A. Mr. Danchenko's Statements Were Literally True.

The facts alleged in the indictment inexplicably argue that Mr. Danchenko did not in fact speak or meet with Chamber President-1. But that is essentially exactly what Mr. Danchenko consistently told the FBI throughout eleven months of interviews. While U.K. Person-1 may have previously told the FBI that Mr. Danchenko met or spoke with Chamber President-1, Mr. Danchenko, as the indictment admits, contradicted U.K. Person-1's account and **denied** ever definitively speaking or meeting with Chamber President-1. According to the indictment, Mr. Danchenko told the FBI the following: Mr. Danchenko was trying to contact Chamber President-1; Mr. Danchenko received an anonymous phone call from a person that he believed could be Chamber President-1 based on the circumstances of Mr. Danchenko's contemporaneous outreach to Chamber President-1; Mr. Danchenko tried to meet with the anonymous caller in New York, but the anonymous person did not show; and Mr. Danchenko never knew whether the anonymous person was in fact Chamber President-1. Ironically, the facts alleged in the indictment show that Mr. Danchenko's statements to the FBI were literally true. This alone requires dismissal of Counts Two through Five.

First, the indictment alleges that on July 21, 2016, Mr. Danchenko sent Chamber President-1 an email in which Mr. Danchenko introduced himself and suggested that "it would be interesting if and when possible to **chat with you by phone or meet for coffee/beer in Washington or in New York where I will be next week**." Indictment at 32 (emphasis added). This is consistent with what Mr. Danchenko told the FBI – that he was in communication with Russian Media Company-1 and Russian Journalist-2 and that when he received an anonymous phone call later that month, he could not say who the caller was, but he had reason to believe the anonymous caller may have been Chamber President-1.

19

Second, the indictment alleges that on about July 26, 2016, through July 28, 2016, Mr. Danchenko "traveled to New York with a family member. . . During this trip, Mr. Danchenko did not meet or communicate with Chamber President-1." Again, this is exactly what Mr. Danchenko told the FBI – that Mr. Danchenko never confirmed that he had in fact spoken with Chamber President-1 and that he was not able to meet with the anonymous caller in New York.

Third, the indictment alleges that on or about July 28, 2016, Mr. Danchenko messaged an acquaintance: "Another meeting tonight." Again, this is entirely consistent with what Mr. Danchenko told the FBI – that he had scheduled a meeting with the anonymous caller but that no one showed to the meeting place.

Finally, the indictment references two emails that were sent after Mr. Danchenko received the anonymous phone call in late July. First, the indictment alleges that on or about August 18, 2016, Mr. Danchenko emailed Chamber President-1, stating in part: "Hello [Chamber President-1], I wrote to you a few weeks ago. We are contacts on Linkedin. . . If there is opportunity and interest, let's meet and chat about this and other projects . . . Write, call. My contact information is below."  Second, the indictment alleges that on or about August 24, 2016, Mr. Danchenko emailed Russian Journalist-2:

> Good Afternoon, [first name of Russian Journalist-2],
>
> [Russian Journalist-1] recommended that I get in touch with [Chamber President-1]. I've read your interviews with him. But for some reason [Chamber President-1] doesn't respond. I already both asked him about TRUMP and also proposed a project in Russia. What is your relationship with him like? Would you be able to ask him to reply to me? I could call or write on LinkedIn, but until he responds I would not like to pester him.

Indictment at 34. Not only are these emails entirely consistent with what Mr. Danchenko told the FBI, as the indictment admits, but Mr. Danchenko described the August 18 email to the FBI during

his January 25, 2017, interview[4] and the August 24 email *was actually "provided to the FBI" by Mr. Danchenko himself at the time of his first interview in January 2017*.  Indictment at 34.

Nevertheless, the indictment argues that the August 18 and 24 emails prove that Mr. Danchenko did not genuinely believe he may have spoken with Chamber President-1 because, if he did believe that, the emails would have mentioned his earlier phone call with an anonymous man or his scheduled meeting (which never took place) with an anonymous man in New York. However, Mr. Danchenko, as he consistently told the FBI, did not know whether the anonymous call he received was in fact from Chamber President-1.

On this point, the government's argument is desperate at best. Common sense tells us that both emails, one of which was given to the FBI by Mr. Danchenko himself, show that Mr. Danchenko's statements to the FBI regarding his equivocal belief and assumption that the anonymous caller may have been Chamber President-1 are literally true. Mr. Danchenko told the FBI that he was not sure whether the anonymous caller was in fact Chamber President-1, and even if Mr. Danchenko had definitively known the identity of the anonymous caller, which he did not, it is perfectly logical for Mr. Danchenko to not "out" a source that wished to remain anonymous. Had the government actually viewed this email as being inconsistent with Mr. Danchenko's equivocal belief, it would have addressed that inconsistency with Mr. Danchenko during one of his many voluntary interviews with the FBI that spanned from January to November 2017.[5]

---

[4] *See* Electronic Communication at 37 (Feb. 9, 2017), *available at* https://www.judiciary.senate.gov/imo/media/doc/February%209,%202017%20Electronic%20Communication.pdf.

[5] The government had unfettered access to Mr. Danchenko for approximately four years following his first interview in January 2017, and not once did any agent ever raise concerns about the now purportedly contradictory post-call emails.

Presumably, Mr. Danchenko was never asked about that email because it did nothing to clarify whether Chamber President-1 had been the anonymous caller and because it was, in truth and in fact, ultimately immaterial to the FBI's investigation.[6]

Perplexingly, while the facts alleged in the indictment may show that U.K. Person-1 provided the FBI with an inaccurate statement about a meeting between Mr. Danchenko and Chamber President-1 in New York, the facts also clearly show that Mr. Danchenko corrected the record for the FBI by unequivocally stating, on multiple occasions, that he had never met with Chamber President-1 in New York and did not know whether he ever spoke on the phone with Chamber President-1. For these reasons, Counts Two through Five must be dismissed because Mr. Danchenko's answers were literally true. *See Good*, 326 F.3d at 592.

B. Mr. Danchenko's Equivocal Statements About His Belief Were Immaterial.

Mr. Danchenko's allegedly false statements – that he ***believed*** an anonymous caller was Chamber President-1 – plainly fail to meet the legal standard for materiality. Following the Supreme Court's clear instruction in *Gaudin*, in order to assess the materiality of the false statements that Mr. Danchenko is alleged to have made, this Court must ask what statements he is alleged to have made to the FBI; what decision the FBI was trying to make; and whether the false statements could have influenced that decision.

---

[6] Indeed, the FBI was already investigating Chamber President-1's potential involvement with Russian interference efforts long before it had ever interviewed or even identified Mr. Danchenko. Moreover, U.K. Person-1 had told the FBI that Mr. Danchenko had reported meeting with Chamber President-1 in person on multiple occasions. Thus, far from confirming U.K. Person-1's claim that Chamber President-1 was the source of the relevant information, Mr. Danchenko's true statements that he never met with Chamber President-1 and could not be sure he ever spoke to him, called U.K. Person-1's statements, and portions of the Company Reports, into question. Given U.K. Person-1's prior statements to the FBI, it is difficult to fathom how the government would have made any decision other than to continue investigating Chamber President-1 potential involvement regardless of what Mr. Danchenko told them.

As an initial matter, the indictment itself fails to even allege that Mr. Danchenko's statements to the FBI were material. Instead, the indictment argues that the Company Reports created by U.K. Person-1 prior to Mr. Danchenko's statements to the FBI were material:

> (1) the FBI's investigation of the Trump Campaign **relied in large part on the Company Reports** to obtain FISA warrants on Advisor-1, (2) the FBI ultimately **devoted substantial resources attempting to investigate and corroborate the allegations contained in the Company Reports**, including the reliability of Danchenko's sub-sources; and (3) the **Company Reports**, as well as information collected for the Reports by Danchenko, **played a role in the FBI's investigative decisions and in sworn representations that the FBI made to the Foreign Intelligence Surveillance Court throughout the relevant time period.**

Indictment at 4. The materiality of the Company Reports, if any, is irrelevant to the materiality of the statements that Mr. Danchenko later made to the FBI and cannot provide a basis for a false statement charge against Mr. Danchenko.[7]

Moreover, Mr. Danchenko's later statements to the FBI regarding his equivocal belief that an anonymous caller was Chamber President-1 occurred on March 16, May 18, October 24, and November 16, 2017. None of these statements could have impacted the government's decision to obtain its first or second FISA warrants against Advisor-1, which were issued on or about October 21, 2016, and January 12, 2017, because Mr. Danchenko's statements were made months later, with the first charged statement occurring on March 16, 2017. Indictment at 2. Additionally, Counts Four and Five, which concern statements made to the FBI on October 24 and November 16, 2017, respectively, should be dismissed because they occurred after the government obtained its last FISA warrant against Advisor-1 on or about June 29, 2017, *id*., and, therefore, could not have impacted the government's decision to obtain *any* of the FISA warrants.[8]

---

[7] Which begs the question whether the grand jury relied on this impermissible theory of materiality in deciding to return the indictment.

[8] It should also be noted that Mr. Danchenko's statements calling into question U.K. Person-1's claim that Chamber President-1 was the source of information in the Company Reports that was

Finally, Mr. Danchenko's statements regarding his belief cannot be material because the email that the indictment now alleges is the smoking gun that proves Mr. Danchenko did not in fact believe he spoke with Chamber President-1 was given to the FBI by Mr. Danchenko at the same exact time he first told them about his potential communication with Chamber President-1. Had the government viewed that document as somehow inconsistent with Mr. Danchenko's belief, which it is not, Mr. Danchenko had simultaneously provided it with the information necessary to ask additional questions or to verify Mr. Danchenko's equivocal belief for what it was – speculation.

## CONCLUSION

WHEREFORE based on the foregoing reasons, Mr. Danchenko respectfully asks this Court to grant his motion and dismiss the indictment.

Dated: September 2, 2022

Respectfully submitted,

IGOR DANCHENKO
By Counsel

_____/s/_____
Stuart A. Sears (VSB 71436)
Danny Onorato (Pro Hac Vice)
SCHERTLER ONORATO MEAD & SEARS, LLP
555 Thirteenth Street, NW
Suite 500 West
Washington, DC 20004
Ph: 202-628-4199
Fax: 202-628-4177
ssears@schertlerlaw.com
donorato@schertlerlaw.com

---

included in the initial FISA applications was essentially ignored by the government in its subsequent FISA applications. *See* Office of the Inspector General for the U.S. Department of Justice, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (December 2019) at vi ("However, as we describe later, as the FBI obtained additional information raising significant questions about the reliability of the Steele election reporting, *the FBI failed to reassess the Steele reporting relied upon in the FISA* applications, and did not fully advise NSD or OI officials."). (Emphasis added).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of September, 2022, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.


       /s/
Stuart A. Sears (VSB 71436)
Danny Onorato (Pro Hac Vice)
SCHERTLER ONORATO MEAD & SEARS, LLP
555 Thirteenth Street, NW
Suite 500 West
Washington, DC 20004
Ph: 202-628-4199
Fax: 202-628-4177
ssears@schertlerlaw.com

25