IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 1:21-cr-00245-AJT |
| ) | |
| IGOR Y. DANCHENKO, ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT IGOR DANCHENKO'S REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE

The Special Counsel filed an Indictment that devotes 111 paragraphs and 39 pages to superfluous allegations but fails as a matter of law to support the actual false statements charges. Rather than directly confront the deficiencies in the Indictment or the arguments raised by Defendant Igor Danchenko in his Motion to Dismiss the Indictment, the Special Counsel seeks to muddy the waters in a cursory and disjointed opposition ("SCO Opposition") that confuses issues of law and fact, misstates legal standards, introduces extraneous evidence that is irrelevant to whether the Indictment actually states an offense, and sidesteps the significant legal impediments raised by Mr. Danchenko that warrant dismissal.

A literally true answer or a fundamentally ambiguous question cannot support a false statement charge pursuant to 18 U.S.C. § 1001(a)(2). In assessing the sufficiency of a false statement Indictment, literal truth and fundamental ambiguity are questions of law for the Court, not questions of fact for the jury. *United States v. Bronston*, 409 U.S. 352, 359 ("A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner"); *United States v. Good*, 326 F.3d 589 (4th Cir. 2003) (upholding grant of a motion to dismiss because "defendant's response to the question was literally true, and thus, her indictment charging a violation of Section 1001 was properly

1

dismissed"); *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012) ("The answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement."). For each alleged false statement, the prosecution must prove beyond a reasonable doubt that the defendant **knowingly** gave a materially *false* answer. *See* 18 U.S.C. § 1001(a)(2). Accordingly, when a false statement charge is premised on a literally true answer or a fundamentally ambiguous question, there is no triable issue of fact, and the count should be dismissed as a matter of law.

For the reasons detailed herein and in Mr. Danchenko's pending Motion to Dismiss the Indictment, the Special Counsel cannot circumvent or overcome the deficiencies of the Indictment. First, the Special Counsel cannot establish falsity because the statements Mr. Danchenko made to the FBI were literally true. Second, the Special Counsel cannot establish that any statement Mr. Danchenko made was material to a government decision. Third, the Special Counsel cannot salvage the Indictment by belatedly introducing extraneous and irrelevant information in a misguided and impermissible attempt to bolster the allegations in the Indictment. Accordingly, Mr. Danchenko respectfully requests that this Court dismiss the Indictment.

I. **MR. DANCHENKO TRUTHFULLY ANSWERED THE SPECIFIC QUESTIONS THE FBI ASKED AND THOSE TRUTHFUL ANSWERS CANNOT SUPPORT THE FALSE STATEMENT COUNTS.**

The Special Counsel misrepresents the facts while making a series of convoluted and disjointed arguments. As a threshold matter, the Special Counsel conveniently ignores that Mr. Danchenko truthfully answered the specific questions the FBI asked him. With respect to Count One of the Indictment alleging that Mr. Danchenko lied about whether he had "talked" to Charles Dolan, the Special Counsel contradicts itself by arguing both that the word "talked" is unambiguous but also that it should be interpreted broadly to have a new meaning to encompass other types of communications, including written communications. The Special Counsel

2

essentially argues that it should be able to charge a literally true statement as false because Mr. Danchenko omitted unrequested information that he should have known the FBI was interested in, even though the FBI agent asked a precise and narrow question about verbal communications and never asked Mr. Danchenko whether he had exchanged emails or other written communications with Dolan.[1] Next, the Special Counsel argues that it would be overly burdensome for the FBI to have to ask more precise questions or additional clarifying questions. However, details matter in any false statements case – details about exactly what the questioner asked and exactly how the defendant responded. The Special Counsel cannot conjure a false statement charge where Mr. Danchenko truthfully answered a precise and narrow question and the FBI agent failed to follow up with additional questions.

With respect to Counts Two through Five of the Indictment alleging that Mr. Danchenko lied when he speculated that an anonymous caller could have been Sergei Millian, the Special Counsel argues, based on nothing more than speculation and conjecture, that Mr. Danchenko must have mistakenly provided the FBI with the key evidence that the Special Counsel now intends to use to prove the alleged falsity of the statements. Finally, the Special Counsel illogically argues

---

[1] In response to Mr. Danchenko's motion to dismiss, the Special Counsel now seems to be pursuing a false statement by omission or concealment theory. *See* 18 U.S.C. § 1001(a)(1) ("falsifies, conceals, or covers up by any trick, scheme, or device a material fact"). But the Special Counsel charged Mr. Danchenko with making a false affirmative statement. *See* 18 U.S.C. § 1001(a)(2) ("makes any materially false, fictitious, or fraudulent statement or representation"). The Special Counsel cannot now pursue a charge it chose not to indict. Doing so would violate Mr. Danchenko's Fifth Amendment right to be indicted by a grand jury and would result in a fatal variance from the indictment. *See United States v. Ashley*, 606 F.3d 135, 141 (4th Cir. 2010) ("'When the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance— occurs.' [ ] To constitute a constructive amendment, the variance must in essence 'change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'"). (Internal citations omitted).

3

that literal truth is not a defense because Mr. Danchenko's statements were responsive to the FBI's questions even though the Special Counsel bears the burden to prove beyond a reasonable doubt that every statement charged in the Indictment is actually false. The Special Counsel's arguments are without merit and cannot salvage the legally insufficient Indictment.

### A. Mr. Danchenko's Statement that He Never "Talked" with Dolan About "Specific" Allegations Contained in the Company Reports Was a Literally True Answer to a Precise and Unambiguous Question.

    *i.  The Special Counsel Cannot Conjure a False Statements Indictment from Thin Air by Alleging that Mr. Danchenko Made a False Statement When He Truthfully Answered a Specific, Unambiguous Question but Did Not Proactively and Superfluously Answer a Question the FBI Never Asked.*

The FBI asked Mr. Danchenko a direct, unambiguous, and specific question - whether he had "talked with" Dolan about any information that ended up in the Company Reports. Mr. Danchenko truthfully responded that he never "talked" with Dolan about anything "specific" in the Reports, but that they had talked about "related" issues. "Talking" unambiguously refers to verbal communication through spoken words, not in writing. Mr. Danchenko's answer that he had never "talked" with Dolan about specific allegations contained in the Reports is literally true and responded directly to the precise question the FBI Agent asked. Importantly, FBI Agent-1 never asked whether Mr. Danchenko and Dolan exchanged emails or any other form of communications about information in the Company Reports. Notably, the Special Counsel does not allege that Mr. Danchenko did in fact "talk" with Dolan about specific information contained in the Reports.

Instead, the Special Counsel illogically argues that, when the FBI Agent used the precise and unambiguous term "talked," Mr. Danchenko should have overlooked the unambiguous and commonly accepted meaning of the term "talked" and assumed that the FBI Agent meant to ask about communications more broadly to include any form of communication. The Special Counsel, without citing any legal authority, argues that the word "talked" should have a new meaning in

4

this context because, according to the Special Counsel, the FBI would not have intentionally limited the scope of its question to only verbal communications. The FBI agent's subjective intent when he asked Mr. Danchenko whether he had "talked" with Dolan is irrelevant.

To determine whether a question is ambiguous, the focus is on the language of the question, not the subjective intent or understanding of the questioner. Courts assess whether and how a reasonable listener would have understood the words in the question. *Sarwari*, 669 F.3d at 407. The focus is inherently on the objective meaning of the words in the question. Here, the FBI asked whether Mr. Danchenko had "talked" to Dolan. This question is precise and unambiguous. Any person listening to the question would reasonably have understood the FBI Agent to be asking whether Mr. Danchenko had verbally communicated with Dolan, not whether he had communicated with Dolan in writing or in any other form. Mr. Danchenko honestly responded that he had not "talked" to Dolan.

Ironically, the Special Counsel's argument that the word "talked" should have a new meaning in this context would require Count One of the Indictment to be dismissed because the question would become fundamentally ambiguous. "A question is fundamentally ambiguous when it includes phrases about 'which men of ordinary intellect [would not] agree' or phrases that 'could not be used with mutual understanding by a questioner and answerer unless it were defined at the time." *See also United States v. Chujoy*, 207 F. Supp.3d 626, 655 (W.D. Va. 2016) (quoting *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986)). The following factors affect whether a question is fundamentally ambiguous: "(1) the inherent vagueness – or conversely, the inherent clarity – of certain words or phrases, (2) the compound character of a question, (3) the existence of defects in syntax or grammar in a question, (4) the context of the question and answer, and (5) the defendant's own responses to allegedly ambiguous questions." *Id*. (citing *United States v. Strohm*, 671 F.3d

1173, 1179 (10th Cir.2011) (citing Linda F. Harrison, The Law of Lying: The Difficulty of Pursuing Perjury Under the Federal Perjury Statutes, 35 U. Tol. L. Rev. 397, 404 (2003)). While a question that is only "arguably ambiguous" is presented to the jury, a question that is "fundamentally ambiguous" is "a question of law for the court." *Id*. (citing *Sarwari*, 669 F.3d at 407). Importantly, Mr. Danchenko reiterated the term "talked" in his answer, which limited his statement to its ordinary meaning referring to verbal communication by way of spoken words. By the Special Counsel's own objectively flawed logic, if the word "talked" should be interpreted using a new definition to encompass written communications, the question posed to Mr. Danchenko would be fundamentally ambiguous because the questioner and the listener would not have understood the word to have the same meaning. Therefore, Count One of the Indictment would have to be dismissed as matter of law because it would be premised on a fundamentally ambiguous question. *See Sarwari*, 669 F.3d at 407 ("The answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement.").

Similarly, the distinction between talking to Dolan about "related issues" but not "specific allegations" is vague without further questions by the FBI. *See Chujoy*, 207 F. Supp.3d at 655 (quoting *Lighte*, 782 F.2d at 375) ("A question is fundamentally ambiguous when it includes phrases about 'which men of ordinary intellect [would not] agree' or phrases that 'could not be used with mutual understanding by a questioner and answerer unless it were defined at the time.'"). On this point, the Special Counsel claims that "purported information that Danchenko obtained from Dolan concerning Manafort (and which appeared in the Steele Reports) was not a 'related issue[];' it was the issue being discussed in the relevant report." SCO Opposition at 8-9. This argument is misleading at best. The Special Counsel's argument suggests to the Court that Mr. Danchenko and the FBI were discussing the Manafort allegation when Mr. Danchenko made

6

the statement charged in Count One. That is not so. While it is true that Manafort's removal from the campaign may have appeared in a portion of a single Report, agents never at any point throughout Mr. Danchenko's eleven months of interviews directed Mr. Danchenko's attention to that information, never asked Mr. Danchenko to read that portion of the report in their presence, and never asked Mr. Danchenko to opine on the source of the information.[2]

Moreover, the FBI never asked Mr. Danchenko about emails or any other written communications with Dolan. Now, the Special Counsel argues that Mr. Danchenko should have understood that email communications would fall within the purview of the information that the FBI was interested in, despite the fact that the FBI never expressly asked about written communications.[3] The Fourth Circuit rejected that logic in *Good* when it concluded that a statement cannot be false where the defendant truthfully answers a question but does not provide information that is not requested. 326 F.3d at 592. In *Good*, the government alleged that the defendant falsely certified in a government application that she had never been convicted of certain listed crimes, which included "Theft" and "Dishonesty, Fraud, or Misrepresentation." *Id*. at 590. The defendant had been convicted of embezzlement but responded "No" when asked if she had been convicted of the listed crimes. The government argued that the defendant's statements were false because "embezzlement falls within the purview of disqualifying crimes of theft, fraud, dishonesty, and misrepresentation." In rejecting the government's argument, and upholding the grant of defendant's motion to dismiss, the Fourth Circuit explained,

---

[2] And that was for good reason. It was well-known and public information and not particularly relevant to what the FBI was investigating.

[3] In that sense, the Special Counsel's troubling belief about what is required of a voluntary interviewee should caution anyone against voluntarily meeting with the FBI. Not only will they be prosecuted for lying, they will also now be prosecuted for telling the truth but not offering additional information they should have known the FBI was apparently interested in but that the FBI failed to ask for.

> [t]here is no question, and we do not contend otherwise, that embezzlement is a felony *involving* dishonesty, fraud, and misrepresentations. . . But . . . [the defendant] was indicted for the statements that she made on the SIDA application and the language of that application controls. Embezzlement was not a crime listed on the application. The defendant has never been convicted of any of the crimes listed on the application. Therefore, her answers were literally true.

*Id*. at 592.

Like the defendant in *Good*, Mr. Danchenko was never asked whether he had email correspondence with Dolan. Rather, Mr. Danchenko was asked whether he had "talked" with Dolan, and he responded that they had never "talked" about specific allegations in the Company Reports. Mr. Danchenko's answer to that specific question was literally true and the government does not argue otherwise. Whether email correspondence between Mr. Danchenko and Dolan was within the "purview" of the information that the FBI sought is irrelevant to the Court's inquiry because the FBI never asked Mr. Danchenko about emails or any other written communications. The precise language used by the FBI and Mr. Danchenko controls, and, looking at that language objectively, Mr. Danchenko's answer was literally true in response to the actual question presented.

>> ii. *The Special Counsel illogically suggests that it would have been unduly burdensome for the FBI Agent to ask more precise questions or to ask additional clarifying questions.*

Next, the Special Counsel hyperbolically argues that it would be overly burdensome for the FBI Agent, presumably a trained investigator, to ask specific questions or ask follow-up clarifying questions:

> Indeed, such a rigid standard would completely override the purpose of Section 1001. . . Under the defendant's reading, in order to elicit truthful answers, the FBI would have been forced to inquire specifically if the defendant used any number of methods to communicate with Dolan – email, landline phone, cellular telephone, encrypted application, carrier pigeon, etc. Plainly, the law does not contemplate such particularity requirements in cases where the defendant (and any reasonable listener) clearly would understand the context of the question.

8

SCO Opposition at 7. However, this level of **"particularity" is exactly what the law requires**. *See Bronston*, 409 U.S. at 360 ("[T]he perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner – so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry."). Moreover, this is not a case of *omission*. *See* 18 U.S.C. § 1001(a)(1). The Special Counsel brought five counts alleging that Mr. Danchenko made affirmative false statements. *See* 18 U.S.C. § 1001(a)(2). And a literally true statement, even if it was misleading, must be dismissed as a matter of law. *Good*, 326 F.3d at 592.

The Special Counsel's apprehension about the FBI having to ask pointed questions is unfounded. While it is certainly true, as the Special Counsel has suggested, that the FBI could ask a dozen questions covering all of the different forms of potential communication including the use of carrier pigeons, it might be simpler going forward to merely ask whether an interviewee "had any communication in any form" with another individual. Broad catch-all questions are routinely included in FBI interviews. But, for whatever reason, the FBI agent tasked with interviewing Mr. Danchenko did not ask a broad catch-all question. Nor did the agent ask any follow-up questions "to pin [Mr. Danchenko] down." *Bronston*, 409 U.S. at 360. The agent only asked whether Mr. Danchenko and Dolan had "talked" about specific allegations contained in the Company reports. And the *only* truthful answer to that question was no. Indeed, it would have been a false statement had Mr. Danchenko answered yes to that question. This point cannot be overstated. It is not in dispute that the FBI agent asked Mr. Danchenko a "yes or no" question. And, according to the Special Counsel's logic, Mr. Danchenko have made a false statement regardless of how he answered – yes or no. To allow that Count to go forward would be a miscarriage of justice and would run afoul of well-established legal precedent.

9

To the extent that requiring this level of "particularity" in any way strains the investigative process, the Supreme Court decided this issue decades ago in favor of a defendant's Constitutional rights. "[T]he perjury statute *is not to be loosely construed*, nor the statute invoked simply because a wily witness succeeds in derailing the questioner – so long as the witness speaks the literal truth." *Bronston*, 409 U.S. at 360 (emphasis added); *see also Good*, 326 F.3d at 592 ("The principle articulated in *Bronston* holds true for convictions under Section 1001 and in this case today."). Here, the FBI could have asked broader or more specific follow-up questions if it wanted to know about email correspondence between Mr. Danchenko and Dolan related to the Dossier. It did not. As a result, Count One must be dismissed because Mr. Danchenko's answer was literally true or the question was fundamentally ambiguous.

### B. Mr. Danchenko's Equivocal and Speculative Statements About an Anonymous Caller Do Not Support the False Statements Alleged in Counts Two Through Five of the Indictment.

Regarding the four Millian-related counts, the Special Counsel conveniently ignores that every single *definitive* statement that Mr. Danchenko told the FBI regarding Millian was literally true. First, Mr. Danchenko told the FBI that he was in communication with Russian Media Company-1 and Russian Journalist-2. Second, Mr. Danchenko traveled to New York but did not meet or communicate with Millian. And third, Mr. Danchenko provided the August 24th email where he asked a Russian journalist to ask Millian to respond to him and described the August 18 email to the FBI during his January 25, 2017, interview. The indictment does not allege that any of the above information was false. Rather, Mr. Danchenko is indicted on four counts of affirmative false statements because the Special Counsel does not think that Mr. Danchenko genuinely believed that an anonymous call he received could have possibly been from Millian.

The Government's tactics here are meritless. Mr. Danchenko expressly said that he did not know who he talked to. While trying to be cooperative, he speculated that it could have been

10

Millian. Mr. Danchenko's statements about his "belief" were, at most, speculative and equivocal. *See* Indictment at 35-36 ("I probably spoke with him, but I don't know. . . I was under the impression it was him, because I talked to [] [Russian Media Company-1][t]o [Russian Journalist-2] . . . I assumed it would have been him . . . at least someone who I thought was him . . . [the anonymous caller] sounded like [the same person]"). The Special Counsel does not cite a single case that supports its view that a false statement charge can be brought based upon on such equivocal and speculative statements, and undersigned counsel is unaware of such a case before the Special Counsel chose to indict Mr. Danchenko. The Special Counsel wants this Court to ignore Mr. Danchenko's own statements – that he did not know who called him – and to allow a jury the opportunity to convict based on conjecture and speculation that Mr. Danchenko's belief was not genuine. The Special Counsel cannot possibly prove beyond a reasonable doubt that Mr. Danchenko subjectively knew who called him and purposefully stated otherwise. The impossibility of proving such subjective beliefs is precisely why speculative and equivocal answers cannot support a false statements charge.

### C. The Special Counsel Conveniently Ignores that the False Statements Statute Requires the Prosecution to Prove that Each Charged Statement was False.

The Special Counsel must prove that each charged statement was false. 18 U.S.C. § 1001(a)(2). The Special Counsel conveniently ignores this fact and, instead, tries to rewrite the standard for literal truth as inapplicable to responsive answers, ***even where the answers were literally true.*** The Special Counsel argues that the "literal truth defense applies where a defendant's answers are *both* non-responsive and literally true. . . Here, defendant does not dispute that his statements were responsive to questions posed by the FBI . . . On that basis alone, the literal truth defense is unavailable to the defendant" SCO Opposition at 9 (citing *Chujoy*, 207 F. Supp.3d at 655 (quoting *United States v. Strohm*, 671 F.3d 1173, 1185 (10th Cir. 2011))) (emphasis original).

11

The case cited by the Special Counsel is inapposite because Mr. Danchenko's statements were indisputably true. In *Chujoy*, the Court found that the defendant's answers "do not fit squarely into *Bronston's* literal truth defense" because the answers were responsive *and not indisputably true*.[4] *Id*. Here, every definitive statement regarding Millian was literally true. Similarly, Mr. Danchenko's answer that he had not "talked" with Dolan about specific allegations is indisputably true and not even contested.

While *Bronston* dealt with an answer that was non-responsive *and* literally true, the Special Counsel cannot build a false statements prosecution on answers that were both responsive and literally true. The Special Counsel's argument to the contrary would lead to absurd results. According to the Special Counsel's logic, a prosecutor would be able to charge any responsive statement as a false statement, even if the statement is indisputably true. This paradoxical logic would obliviate the statutory requirement that the prosecution must prove that a purportedly false statement was, in fact, false. Put differently, if the Court were to adopt the Special Counsel's argument, the false statements statute would criminalize true statements, as long as they were responsive. The false statements statute makes clear that the Special Counsel has the burden of proving the "falsity" of each statement beyond a reasonable doubt in any false statement prosecution. *See United Stated v. Race*, 632 F.2d 1114, 1116 (4th Cir. 1980) (listing "falsity" as an element of a false statement charge); *United States v. Hooker*, 1125, 1126 (1988) (finding that an indictment must be dismissed if it fails to list an essential element). And despite the Special Counsel's position, the Fourth Circuit has affirmed motions to dismiss criminal false statements

---

[4] It is worth noting that the Court in *Chujoy* nevertheless granted the defendant's motion for acquittal because there was insufficient evidence demonstrating that the answers were knowingly false.

charges when the underlying statements were both responsive and literally true. *See Good*, 326 F.3d. at 592.

II. **THE SPECIAL COUNSEL FAILS TO ALLEGE SUFFICIENT FACTS TO ESTABLISH THAT ANY OF THE ALLEGEDLY FALSE STATEMENTS CHARGED IN THE INDICTMENT WERE MATERIAL TO ANY GOVERNMENT DECISION.**

We recognize that materiality is a mixed question of fact and law ordinarily reserved for the jury. *See Untied States v. Gaudin*, 506, 509 (1995); *see also United States v. Garcia Ochoa*, 607 F.3d 371, 376 (4th Cir. 2010). However, under these circumstances, the Indictment fails to allege a theory that would allow any reasonable juror to conclude that any of the five statements that were charged were material to any government decision.

Regarding Count One, the Special Counsel's opposition claims that "[t]he defendant's sole argument appears to be that Mr. Dolan provided the defendant with information from public sources and thus his false statement could not be material." SCO Opposition at 13. The Special Counsel misstates the issue. Mr. Danchenko's statement to the FBI is immaterial because the information *contained in the Company Reports* was publicly available, not because a specific email from Dolan to Mr. Danchenko contained public information. The Indictment argues that, had the FBI known that the information contained in the Company Reports originated from Dolan, it may have questioned Dolan's credibility. Indictment at 3-4. As stated in Mr. Danchenko's Motion to Dismiss:

> The indictment fails to explain why PR Executive-1's credibility would affect in any way the veracity of public information that did not even originate from PR Executive-1 in the first place. Nor does the indictment explain why it was a material, false statement for Mr. Danchenko to fail to attribute public information as coming from PR Executive-1 rather than a range of public sources that were providing the same information. The indictment's logic on this point is, in a word, nonsensical. Perhaps more fatal to the government's materiality argument is that the government never, not once, asked Mr. Danchenko about the specific information regarding Campaign Manager-1 that was contained in the Company

13

> Report. Thus, it is difficult to understand how Mr. Danchenko's alleged failure to properly attribute public information about a topic of no interest to the government during the course of its investigation could have been material to any government decision. That is especially so when Mr. Danchenko did provide that he spoke to PR-Executive 1 about issues related to the information contained in the Company Reports and did raise concerns about PR Executive-1 and his connections to Russian officials, as well as his contacts with other Company Report sub-sources and his familiarity with U.K. Person-1.

Mr. Danchenko's Motion to Dismiss at 16. The Indictment claims that the FBI would have discredited the information contained in the Company Reports had it known that it came from Dolan, but, as the Indictment admits, Dolan was not the source of the public information ***contained in the Company Reports***. *See* Indictment at 16.

The Special Counsel also argues that the statement "was material because, as the Indictment plainly lays out, had the FBI known that Charles Dolan was a source for the Steele Reports, it is more likely that they would have (or should have) also interviewed Dolan . . ." SCO Opposition at 14. The Special Counsel goes on to argue that "[t]he fact that the FBI was aware that Dolan maintained some of these relationships and failed to interview Dolan is of no moment." *Id*. The Special Counsel fails to mention that the reason the FBI knew that Dolan maintained these relationships is because Mr. Danchenko told them. *See* Indictment at 18 ("[Dolan] uh [UI] what I would think would be easily played. Maybe. Uh, he's a bit naïve in his, um liking of Russia. . . In a later part of the conversation, DANCHENKO stated, in substance and in part, that [Dolan] had traveled on the October 'delegation' to Moscow; that [Dolan conducted business with Business-1 and Russian Sub-Source-1; and that [Dolan] had a professional relationship with Russian Press Secretary-1"). In fact, based on the information and sources that Mr. Danchenko shared with the FBI, the FBI actually recommended opening a full investigation into Dolan.

Next, the Special Counsel, through rank conjecture and speculation, tries to explain away the incredibly exculpatory fact that the key evidence the Special Counsel now intends to use to

14

prove the alleged "falsity" of Counts Two through Five was disclosed to the FBI by Mr. Danchenko himself. The Special Counsel acknowledges that Mr. Danchenko provided the August 24, 2016, email to the FBI but tries to argue that he "did *not* provide the FBI with the two additional emails that he sent to Millian, including an August 18, 2016 email . . ." The Special Counsel omits the fact that Mr. Danchenko told the FBI about these emails and offered to provide them. As discussed in Mr. Danchenko's Motion to Dismiss, these emails are consistent with and fully corroborate Mr. Danchenko's speculative and equivocal statements about his belief. The call was anonymous, *i.e.*, the caller did not wish to identify himself. Even if Mr. Danchenko had definitively known the identity of the anonymous caller, which he did not, it is perfectly logical for Mr. Danchenko to not "out" a source that wished to remain anonymous in his subsequent email correspondence with the same potential anonymous source.

The Special Counsel further argues that Mr. Danchenko "cites no law – nor could he – stating that a defendant's unintentional exposure of his own prior misstatements undermines their falsity or materiality." SCO Opposition at 17. However, the cases cited by the Special Counsel directly contradict and undermine its position. In *Chujoy*, the defendant was asked the following question: "After Chujoy's arrest in March 2015, did you ever receive any written communications where you were supposed to discuss any particular issues with Mr. Kwiatkowski?" Despite receiving a letter on June 3, 2015, the defendant in *Chujoy* answered "no." The defendant argued that the question was fundamentally ambiguous and that there was no evidence that she knowingly lied because she provided the government with the only evidence of falsity:

> ***[The defendant] notes that she turned over the June 3 letter – which is the only evidence of falsity for Statement One** – earlier in her October grand jury testimony. **She finds it inconceivable that a reasonable juror could conclude, beyond a reasonable doubt, that she gave a knowingly false answer when she voluntarily provided the government that same day with the very letter that gave rise to her perjury prosecution.***

> ***[The defendant's] arguments are well-taken***. . . Even assuming arguendo that Statement One can be interpreted as the government claims, the government must prove that [the defendant's] false statement was intentional, rather than the result of confusion or mistake. [*United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998)]. Yet, in this case, the evidence overwhelmingly shows that [the defendant's] answer in Statement One—even if technically false—was unintentionally so. The June 3 letter, which asks [defendant] to speak with Kwiatkowski about his interview with federal agents, is the only evidence showing that [defendant's] answer in Statement One is false. [The defendant] truthfully answered questions about this letter earlier in her grand testimony, readily acknowledged that Chujoy sent her letters from prison and agreed to provide those letters to the government. Gov't Ex. 27 74:1-79:22. . . ***It defies reasonable belief that [the defendant] would knowingly lie about the contents of the June 3 letter when she voluntarily provided the original***, unaltered June 3 letter to the government mere hours before. . .
>
> More to the point, the government offered no proof to the contrary. ***While issues of intent are typically resolved by the fact-finder, a jury may not rely on pure speculation to convict.*** As the Fifth Circuit aptly noted, "[e]specially in perjury cases, defendants may not be assumed into the penitentiary." *United States v. Brumley*, 560 F.2d 1268, 1277 (5th Cir.1977). ***The court could divine no evidence in the trial record, either from witness testimony or from [the defendant's] grand jury transcript, from which a reasonable juror could infer that [the defendant] knew that her answer in Statement One was false when she made it.***

207 F. Supp.3d at 652-53 (emphasis added). The Court in *Chujoy* found that "[w]hether framed in terms of ambiguous questions or evidence of knowing falsity, the trial record is simply insufficient for a reasonable juror to find, beyond a reasonable doubt, that [the defendant's] answer [] was perjurious." *Id*. at 653.

While the Court in *Chujoy* acquitted the defendant on the basis that her statement was not intentionally false and the question was ambiguous, the takeaway from the case is clear – no reasonable juror can infer that Mr. Danchenko made a materially false statement when the Special Counsel's key evidence of alleged falsity was provided to the FBI by Mr. Danchenko himself.

16

### III. THE SPECIAL COUNSEL CANNOT SAVE THE INDICTMENT BY RELYING ON EXTRANEOUS EVIDENCE NOT INCLUDED IN THE INDICTMENT.

Perhaps recognizing that the Indictment is legally insufficient despite devoting 111 paragraphs and 39 pages to information that is irrelevant to the actual false statement charges, the Special Counsel now references specific examples of evidence it intends to introduce at trial despite having omitted that evidence from the Indictment. This extraneous evidence is irrelevant to the decision before the Court – to determine whether the Indictment on its face states a legally cognizable offense. The Court must consider whether the Indictment itself is sufficient, and the Court must dismiss the Indictment if it fails to set forth sufficient facts to constitute a prosecutable offense. *See United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (A motion to dismiss under Rule 12 "is ordinarily limited to the allegations contained in the indictment."). Accordingly, the extraneous information relied upon by the Special Counsel has absolutely no bearing on the legal sufficiency of the Indictment itself. Nevertheless, the extraneous evidence is addressed below.

First, the Special Counsel references uncharged allegedly false statements made by Mr. Danchenko. The Special Counsel argues that "the defendant stated that information contained in a June 2016 Steele Report might have come from Sergei Millian." SCO Opposition at 9-10. The Special Counsel's misguided view on this issue is addressed in detail in Mr. Danchenko's opposition to the Special Counsel's motions *in limine*. To address the issue briefly here, Mr. Danchenko consistently told the FBI that he never definitively spoke or met with Millian at any time. Contrary to the Special Counsel's misrepresentation of Mr. Danchenko's statements, Mr. Danchenko told the FBI that he obtained information about the Moscow Ritz allegations similar to that contained in the Steele Report in early June 2016 from I.V., **not Millian**. The statement that the Special Counsel's opposition is referring to occurred when the FBI asked

17

Mr. Danchenko to speculate as to the identity of the individual Christopher Steele referred to as "Source D."

Contrary to the Special Counsel's explanation, Mr. Danchenko told the FBI that the source may have been "someone like" Millian before going on to explain that he did not know who "Source D" referred to: "I don't know, but the question is who, who was the person who organized Trump's trips to Russia? I don't know." May 18, 2017, Interview of Mr. Danchenko. The Special Counsel's brazen attempt to misrepresent the facts in this case should not be presented to the jury for the reasons provided in Mr. Danchenko's opposition to the Special Counsel's motions *in limine*. And these misrepresented facts are irrelevant to Mr. Danchenko's pending Motion to Dismiss the Indictment.

Next, the Special Counsel states that it intends to "introduce evidence which reflects that *every* phone call received by the defendant from July 21, 2016 through August 2016 on the *phone number that he provided* to Sergei Millian was from individuals other than Millian who were known to the defendant[.]" SCO Opposition at 10 (emphasis original). As the Special Counsel is well aware, Mr. Danchenko told the FBI that the anonymous caller may have contacted him through a "phone app." *See* March 16, 2017 Interview of Mr. Danchenko (Agent: "I know you had said . . . you thought it may have called you through an app or something [UI];" Danchenko: "yes;" Agent: "Some sort of app;" **Danchenko: "It's-it's one of these, um, probably WhatsApp or something like that;"** Agent: "Yeah the [UI] used that a lot."). The Special Counsel attempts to dismiss Mr. Danchenko's statements to the FBI, as "not supported by the evidence" because "at no time did the defendant inform Millian that he could be contacted on an internet-based application, to say nothing of the particular application Millian should utilize." SCO Opposition at 10, footnote 3.  Putting aside the unpersuasive argument that somehow Millian could not find

18

another way to contact Mr. Danchenko and was limited only to the contact information Danchenko provided him, the Special Counsel is simply wrong. Most widely used internet- and application-based programs are tied to phone numbers or email addresses and automatically recognize contacts, offering users opportunities to connect phone-to-phone or app-to-app. The anonymous caller could have utilized any of these programs or apps to call Mr. Danchenko using only his phone number. Further, the Special Counsel omits the fact that Millian told the Special Counsel's investigators that he used communication apps during the relevant timeframe.

Even if this extraneous evidence was relevant to the decision before the Court, which it is not, it does not save the Indictment because the Indictment, as written, does not support the charged offenses.

## CONCLUSION

For the reasons provided above this Court should put an end to the Special Counsel's unjust attempt to try and convict Mr. Danchenko for answering a question truthfully and for giving an equivocal and speculative answer, at the FBI's request, based solely on his expressly stated subjective belief. All five counts of the Indictment should be dismissed.

Dated: September 23, 2022

Respectfully submitted,

IGOR DANCHENKO
By Counsel

/s/
Stuart A. Sears (VSB 71436)
Danny Onorato (Pro Hac Vice)
SCHERTLER ONORATO MEAD & SEARS, LLP
555 Thirteenth Street, NW
Suite 500 West
Washington, DC 20004
Ph: 202-628-4199
Fax: 202-628-4177
ssears@schertlerlaw.com
donorato@schertlerlaw.com

19

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2022, I electronically filed a true and accurate copy of the foregoing reply with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

                                                /s/
                                      Stuart A. Sears (VSB 71436)
                                      Danny Onorato (Pro Hac Vice)
                                      SCHERTLER ONORATO MEAD & SEARS, LLP
                                      555 Thirteenth Street, NW
                                      Suite 500 West
                                      Washington, DC 20004
                                      Ph: 202-628-4199
                                      Fax: 202-628-4177
                                      ssears@schertlerlaw.com