IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 1:21-cr-245-AJT-1 |
| | ) |
| IGOR Y. DANCHENKO, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER**

The government has filed an omnibus Motion *in Limine* [Doc. No. 78] (the "Motion"), seeking to admit (1) three instances of uncharged conduct by Defendant Igor Y. Danchenko: (a) evidence relating to Danchenko's allegedly false statements regarding his sourcing of the Ritz-Carlton allegations; (b) evidence pertaining to Danchenko's allegedly false statement about disclosing his work for Christopher Steele ("Steele") and Orbis Business Solutions ("Orbis"); and (c) an email from Danchenko to a former employer, Cenk Sidar, supposedly encouraging Sidar to fabricate sources; (2) three emails from Sergei Millian ("Millian") to Dmitry Zlodorev ("Zlodorev") regarding Danchenko; (3) statements from Steele to the FBI about Danchenko's sourcing from Millian;[1] and (4) the existence of, as well as the facts and circumstances pertaining to, the FBI's counter-intelligence investigation into Danchenko. The government also seeks to prevent Danchenko from introducing any evidence or argument regarding political bias or vindictive prosecution. The Court held a hearing on the Motion on September 29, 2022, following which it took the Motion under advisement.

---

[1] At the hearing held on September 29, 2022, the government withdrew its motion to admit statements from Christopher Steele to FBI personnel from the Robert Mueller Special Counsel team on September 18 and 19, 2017. Accordingly, the Motion as to the Steele statements is **DENIED** as moot without prejudice.

Upon consideration of the Motion, the memoranda in support thereof and in opposition thereto, the arguments of counsel at the hearing, and for the reasons stated below, the government's Motion is **GRANTED** in part and **DENIED** in part.

## I. Uncharged Conduct

### A. Ritz-Carlton Allegations

The government seeks to admit evidence of Danchenko's uncharged false statements to the FBI regarding his sourcing of the Ritz-Carlton allegations. The government contends that the Ritz-Carlton evidence is admissible as direct evidence of the charged crime, or, alternatively, under Rule 404(b). In June 2016, Danchenko reported to Christopher Steele certain allegations regarding Donald Trump's alleged sexual activity at the Ritz-Carlton Hotel in Moscow. Those allegations, involving scandalous and salacious conduct, were reflected in a Steele Report, dated June 20, 2016. As stated in the Report, "Source D" (described as a close associate of Trump who had organized and managed his recent trips to Moscow) and "Source E" (described as a senior western member of the hotel staff) confirmed the Trump allegations. During his 2017 interviews, the FBI asked Danchenko about these allegations and the identities of Sources D and E, to which Danchenko allegedly made several false statements.

*First*, in a January 2017 FBI interview, Danchenko claimed to have sourced, in part, the Ritz-Carlton allegations while staying at the hotel in mid-June 2016 during a planning trip for a future business conference—a trip Charles Dolan had invited him to attend. Danchenko, however, later acknowledged in a separate interview that he did not stay at, but only visited, the Ritz-Carlton Moscow in June 2016. *Second,* during that same January 2017 interview, Danchenko told FBI agents that he inquired with staff about the rumors involving Trump's purported sexual activity at the hotel, and that the hotel staff did not deny the veracity of those rumors. Danchenko also told

2

the FBI in that same interview that he passed along to Steele the names of the hotel staff he spoke to. In a subsequent May 2017 FBI interview, Danchenko stated that he spoke with hotel management about the Ritz-Carlton allegations. *Third*, in that same May 2017 interview, Danchenko also indicated that Steele "could be referring to Sergei Millian" as Source D.

At trial, the Government intends to offer the testimony of the then-general manager of the Ritz-Carlton Moscow, Bernd Kuhlen, a German citizen, who will testify that he (1) was the only "western" member of hotel management in June 2016; (2) does not recall meeting or speaking with Danchenko in June 2016, or at any time; and (3) did not have knowledge of the Ritz-Carlton allegations at any time prior to the media's public reporting. Additionally, at trial, the Government expects to introduce evidence that (1) Charles Dolan and Steven Kupka (a Dolan acquaintance) received a tour of the Ritz-Carlton Presidential Suite (the site of the alleged salacious activity); (2) that Dolan and Kupka, not Danchenko, attended a lunch with the Ritz-Carlton general manager and other hotel staff during the June 2016 trip; and (3) that the sensational Trump-related rumors were not discussed at that lunch. Finally, the Government also seeks to show that Danchenko could not have truthfully thought that Source D was possibly "referring to Sergei Millian" given that Danchenko, by his own account, had no contact with Millian until, at the earliest, sometime in late July 2016—nearly a month after the June 20, 2016 Steele Report—when he received an anonymous phone call from a person he thought might be Millian. Through this evidence, the government seeks to "prove at trial that [Danchenko] falsely sought to attribute the Ritz Carlton allegations" to Kuhlen and Millian "as part of his work on the Steele Reports." [Doc. No. 78], at 8-9.

In response, Danchenko argues that he never told, and there will be no evidence that he told, the FBI that his sources for the Ritz-Carlton allegations were Millian, Dolan, or Kuhlen.

3

Instead, as he told the FBI in a January 25, 2017 interview, he first learned of the Ritz-Carlton Moscow allegations in early June 2016 when an individual identified as "I.V." told him about "a well-known story" regarding Trump's alleged salacious sexual activity at the hotel, and that he "reported Trump's unorthodox sexual activity at the Ritz[, to Steele,] as 'rumor and speculation' and that he had not been able to confirm the story." [Doc. No. 84], at 9-10. With respect to the "Source D" statement, Danchenko argues that his statement constitutes mere speculation invited by the interviewing FBI agent, not a definitive admission that he told Steele that Millian was one of his sources when reporting these allegations. [*Id.*] at 10-11.

Federal Rule of Evidence 404(b) prohibits admitting evidence of another "crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such "propensity evidence is excluded because it might 'overpersuade' a jury and cause them to 'prejudge one with a bad general record.'" *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997) (quoting *Michelson v. United States*, 335 U.S. 469, 475-76 (1948)). But the Rule allows the admission of evidence of other acts or crimes if used to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

However, "not all prior 'bad act' evidence is encompassed by Rule 404(b)." *United States v. McBride*, 676 F.3d 385, 396 (4th Cir. 2012). Instead, the rule is "only applicable when the challenged evidence is extrinsic, that is, 'separate' from or 'unrelated' to the charged offense." *United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019) (citation omitted). "In contrast, acts that are a part of, or 'intrinsic to, the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence.'" *United States v. Brizuela*, 962 F.3d 784, 793-94 (4th Cir. 2020) (quoting *Bush*, 944 F.3d at 195-96). When faced with "determining whether uncharged conduct is intrinsic

4

to the charged offenses," the Fourth Circuit has "consistently held that such [uncharged] conduct is intrinsic, and not barred by Rule 404(b)," when it (1) "arose out of the same [] series of transactions as the charged offense," (2) is "necessary to complete the story of the crime on trial," *see id.* (citations omitted), (3) is "inextricably intertwined" with the charged conduct, (4) is "part of a single criminal episode," or (5) was a "necessary preliminar[y] to the crime charged," *Bush*, 944 F.3d at 196 (citations omitted). Moreover, evidence is intrinsic "if it is necessary to 'provide context relevant to the criminal charges.'" *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (quoting *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007)).

Danchenko's allegedly false statements regarding his sourcing of the Ritz-Carlton allegations do not qualify as direct evidence. At bottom, the government has charged Danchenko with making five false statements about his sourcing for the Steele Reports pertaining to two sets of lies, *i.e.*, lying about Dolan's lack of contribution and/or involvement with the Reports and lying about his belief that he received a call and information from Millian. As the Court signaled at the hearing, the relevancy and probative value of the Ritz-Carlton allegations is questionable.

Through Kuhlen, for example, the government seeks to prove that Danchenko completely fabricated his sources to Steele on the Ritz-Carlton allegations and then lied about it to the FBI to keep Dolan off the FBI's radar. But that justification faces several obstacles. *First*, Dolan's role in these uncharged false statements is unclear. The government does not allege that Dolan *was* a source for Danchenko's Ritz-Carlton reporting, and therefore this evidence seemingly is not being used to prove the falsity of Danchenko's statement in Count I. While Dolan, in June 2016, received a tour of the presidential suite and had lunch with the hotel's general manager and staff, the government does not appear to intend to present evidence that Dolan told Danchenko about those

5

events, including meeting or speaking with Kuhlen.[2] Thus, the link between Danchenko's allegedly false statement about the Ritz and Dolan is a highly attenuated one. Perhaps recognizing this, the government instead proffers that this evidence goes to proving the materiality of Danchenko's Count I statement, not its falsity. But the proffered evidence relating to the Ritz-Carlton allegations bears little probative value in terms of materiality. The government contends that had Danchenko told the FBI that Dolan was a source it is more likely that it would have interviewed Dolan, in part, because of his proximity to Danchenko in June 2016. But that fact can be established separate and apart from trying to prove Danchenko lied about his Ritz-Carlton sourcing. The government can sufficiently establish at trial that Danchenko engaged in fact gathering for the Steele Reports in Moscow in June 2016, that Dolan was present in Moscow during that same time, and that the two met in Moscow, without getting into the purported false statements or the underlying details, which have an attenuated connection to the charged false statement. Additionally, and perhaps more importantly, proving up an uncharged false statement does not bear on the materiality of the charged false statement.

*Second*, the government fails to reference any evidence that Danchenko *told* Steele either that he met with Kuhlen or, more generally, a western member of the hotel staff. The government does not, by all indications, intend to call Steele as a witness; and in terms of what Danchenko told Steele, the jury will be left solely with the hearsay description in the Report itself, which Steele, not Danchenko, prepared. Why Steele characterized the sources for the Ritz-Carlton allegations as he did in the Report or, indeed, whether the listed sources, in fact, came from Danchenko are

---

[2] The government's position on the probative value of this evidence, aside from materiality, is unclear. The government at one point, characterizes Dolan as a "fact witness" because of his tour of the presidential suite and time at the Ritz-Carlton in general, but does not draw a clear line between Dolan's experiences and Danchenko's reporting to Steele. [Doc. No. 78], at 10. The Indictment strongly implies, however, that Danchenko used information learned from Dolan during the June 2016 Moscow planning trip in his reporting to Steele. [Indictment], ¶¶ 30-34.

subject to a significant degree of speculation. As such, the reference in the Report to those sources does not provide strong evidence that Danchenko informed Steele that he met with a western member of the hotel staff. Moreover, when asked by the FBI about "Source E" in his May 18, 2017 interview, Danchenko completely equivocated. *See* [Doc. No. 84], at 11 ("*Danchenko*: . . . I don't think it's just uh, I don't think [UI] one of the um, hotel managers. *Agent 1*: You think source E is? *Danchenko*: [ ] Somebody I met. . . . And I don't know who, who [Steele's] referring to."). The government seeks to prove that Danchenko never met with Kuhlen; and while that may be true, that evidence does not, given the circumstances, have much probative value concerning whether Danchenko lied to the FBI about his sourcing of the Ritz-Carlton allegations.

Accordingly, the Dolan-related Ritz allegations do not qualify as direct evidence as they are not "inextricably intertwined" or "necessary to provide context" to the relevant charge. Similarly, given the low probative value of these allegations, they are not admissible under Rule 404(b) as they are substantially outweighed by the danger of confusion and unfair prejudice.

While a slightly closer call, many of the same problems exist with respect to the admission of Danchenko's statement about Source D. The government essentially argues that it would be impossible for Millian to have been Danchenko's source for information in the June 20, 2016 Steele Report, if Danchenko, by his own account, had not meet with or had any contact with Millian before the late July 2016 anonymous call with someone he believed was Millian. Due to this temporal impossibility, the government posits, the jury could infer that Danchenko was lying about having a phone call with someone he thought was Millian, just as he had allegedly lied about Millian being his source for information in a June 2016 Report. But those inferences depend on a factual foundation not yet established. While the inferential leap the government would ask the jury to make would be significantly smaller if it was known that Danchenko provided the relevant

information to Steele, the government has not yet proffered any evidence that would establish that the information associated with Source D came from Danchenko. Nor is there any evidence that Danchenko provided any information attributable to Millian regarding the Ritz-Carlton allegations to Steele, or that Steele only, or almost entirely, used Danchenko as his source for the Reports.[3] Without that type of foundation, Danchenko's utterly equivocal answers lack the necessary link for the evidence to qualify as intrinsic and possess such low probative value that they are substantially outweighed by the danger of unfair prejudice. *See* [Doc. No. 84], at 11 ("*Agent 1*: [Y]ou think that maybe [Source] D could be Mil, Millian. *Danchenko*: Uh could, could be referring to Millian or some, someone like that. *Agent*: Okay. *Danchenko*: I don't know, but the question is who, who was the person who organized Trump's trip to Russia? I don't know.").

Therefore, the government's motion is **DENIED**, with leave to ask for reconsideration as to the admissibility of Danchenko's statements concerning Source D based on the evidence presented at trial.

B. **Steele and Orbis**

The government seeks to move into evidence Danchenko's allegedly false statement that he never revealed to friends or connections that he worked for Steele or Orbis. As alleged in the Indictment, on January 24, 2017, FBI agents asked Danchenko whether "his friends, associates, and/or sub-sources were aware that he" worked for Steele and Orbis. [Indictment], ¶ 83. In response, Danchenko stated that he "never mentioned" that he worked for Steele or Orbis, telling the FBI agents, "you [the FBI] are the first people" he had told. [*Id.*], ¶ 84. The government plans to introduce at trial evidence that Danchenko communicated and emailed with, among others,

---

[3] The Court appreciates that the government intends to introduce evidence establishing that Danchenko was Steele's primary source of information for the Steele Reports writ large. [Doc. No. 91], at 4. The proffer notwithstanding, the Court cannot assume at this point that those foundational gaps will be filled.

Dolan regarding his work for Steele and Orbis. The evidence the government intends to introduce includes (1) an April 29, 2016 email from Danchenko to Dolan, indicating that he passed along a letter to Steele on Dolan's behalf and would coordinate a meeting between Dolan and Steele; (2) a June 10, 2016 email from Dolan to a U.S.-based acquaintance discussing his efforts to assist Danchenko with obtaining a U.S. visa ("Monday night I fly to Moscow and will meet with a Russian guy who is working with me on a couple of projects. *He also works for a group of former MI 6 guys in London* who do intelligence for business." (emphasis added)); and (3) a January 13, 2017 email from Dolan to a U.S.-based person discussing a news article regarding Buzzfeed's publication of the Steele Reports ("I've been interviewed by the Washington Post and the London Times – three times over the last two days over the MI-6 Dossier on Trump and *I know the Russian agent who made the report* (He used to work for me)." (emphasis added)). The government also seeks to introduce evidence of communications Danchenko had with five additional individuals that indicate Danchenko disclosed to others his working relationship with Steele and Orbis.

The evidence pertaining to Danchenko's allegedly false statement about disclosure of his work for Steele and Orbis is admissible as it relates to Dolan. *See United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) ("Evidence is necessary, even if it does not relate to an element of a charged offense, when it furnishes part of the context of the crime." (quotation marks omitted)). At the hearing, Danchenko essentially conceded this point as well. However, the Court finds that evidence of communications Danchenko had with other individuals identified by the government, *see* [Doc. No. 91], at 8 n.4, is not admissible as direct evidence or under Rule 404(b).

Therefore, the government's motion is **GRANTED** in part and **DENIED** in part.

9

### C. February 24, 2016 Email to Cenk Sidar

The government seeks to introduce a February 24, 2016 email from Danchenko to his former employer Cenk Sidar, who was the managing partner of Sidar Global, a business intelligence firm that contracted with Danchenko to provide reports on various subject matters. In the email, Sidar asked Danchenko for recommendations to improve a company-prepared report. Responding to that email, Danchenko provided the following recommendation:

> Emphasize sources. Make them bold or CAPITALISED [sic]. The more sources the better. If you lack them, use oneself as a source ('Istanbul-Washington-based businessman' or whatever) to save the situation and make it look a bit better.

The government argues that this evidence is admissible under Rule 404(b). Under the government's theory of the case, Danchenko fabricated sources of information that he provided to Steele, including fabricating Millian as a source. Accordingly, the government seeks to introduce the Sidar email to prove Danchenko's common plan or absence of mistake or accident because it "demonstrates that the misattribution of sources was an intentional feature of his business intelligence work." [Doc. No. 78], at 17.

Evidence of prior bad acts under Rule 404(b) is admissible when it is (i) relevant; (ii) necessary in the sense that it is probative of an essential claim or an element of the offense; and (iii) reliable. *See United States v. Johnson*, 617 F.3d 286, 296-97 (4th Cir. 2010) (quoting *Queen*, 132 F.3d at 997). Also, the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice. *Id.* At trial, the government must prove that Danchenko made false statements to the FBI about the sources he used (Millian and Dolan) as part of his work on the Steele Reports. Though "other acts" can be admitted under 404(b), they must "be sufficiently related to the charged offense" in order to be relevant. *United States v. Hall*, 858 F.3d 254, 267 (4th Cir. 2017); *see also id.* at 296 ("[T]he government must identify each proper purpose for

10

which it will use the other acts evidence and explain how that evidence 'fits into a chain of inferences—a chain that connects the evidence to [each] proper purpose, no link of which is a forbidden propensity inference.'" (citation omitted)).

The government argues that the Sidar email is probative to show Danchenko's common plan or lack of mistake. However, it is "not enough for the proponent of the other-act evidence simply to point to a purpose in the 'permitted' list and assert that the other-act evidence is relevant to it. Rule 404(b) is not just concerned with the ultimate conclusion, but with the chain of reasoning that supports the non-propensity purpose for admitting the evidence." *United States v. Dillingham*, 320 F. Supp. 3d 809, 825 (E.D. Va. 2018) (quoting *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc)). The Sidar email, which is completely unrelated to the Steele reports, the FBI's investigation, any federal agency investigation, or any statements Danchenko made to federal officials, has limited connection to the charged offenses. The government also does not proffer any evidence, besides the text of the email (which arguably is taken out of context), that Danchenko intended to suggest to Sidar that Sidar should fabricate or misattribute sources or include false information in business intelligence reports, or that Danchenko himself follows such a practice. *Cf. Hall*, 858 F.3d at 267 ("The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act.").

Instead, the government appears to seek to use this email to paint Danchenko as having a dishonest character and thus a propensity to fabricate and falsify sources. Therefore, this email is inadmissible under Rule 404(b). *Cf. Dillingham*, 320 F. Supp. 3d at 825 (determining evidence should have been excluded where "it had no connection to the crimes charged other than to show the defendant's predisposition and 'bad character' and 'that on a particular occasion the [defendant] acted in accordance with [his] character" (quoting Fed. R. Evid. 404(b))). Setting aside

the lack of admissibility under Rule 404(b), the Court would also exclude the Sidar email under Rule 403 because its low probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *See* Fed. R. Evid. 403.

Therefore, the government's motion is **DENIED.**

## II. Millian Emails

Next, the government moves to admit three emails from Millian to Zlodorev as non-hearsay for the purpose of proving that Danchenko never received a call from Millian. On July 21, 2016, Danchenko sent his first email to Millian. Danchenko then later told the FBI that he received a call in late-July from someone he "believed" was Millian. On July 26, 2016, Millian sent an email to Zlodorev inquiring about Danchenko, writing, in part, "An email came from Igor. Who is that? What sort of person?" In August 2016, Danchenko sent follow up emails to Millian (August 18) and Zlodorev (August 24). Approximately four years later, in July 2020 and after Congress released a heavily redacted report of Danchenko's January 2017 interview with the FBI, only identifying Danchenko as Steele's "primary subsource," Millian sent two more emails to Zlodorev discussing Danchenko. At the time Congress released its report, Millian had been publicly reported to be a source for certain information in the Steele Reports, including information collected in "late July" 2016 involving the Trump Campaign's "conspiracy of cooperation" with Russian officials. *See* [Doc. No. 78], at 22. On July 19, 2020, Millian emailed Zlodorev, writing "I believe they've already found Steele's source: [internet address]. Do you remember such a person? Igor Danchenko?" The next day, July 20, Millian followed up with another email:

> I've been informed that Bogdanovsky travelled to New York with Danchenko at the end of July 2016; Danchenko, supposedly to meet with me (but the meeting didn't take place). Can you inquire with Bogdanovsky whether he remembers something from that trip and whether they touched upon my name in conversation, as well as for what reason Danchenko was travelling to NY? Steele, it seems, made Danchenko the fall guy, but Danchenko himself made several statements that were

12

difficult to understand, for example, about the call with me. Did he tell Bogdanovsky that he communicated with me by phone and on what topic? Thank you! This will clarify a lot for me personally. It's a convoluted story!

The government contends that all three emails are admissible non-hearsay because each email consists of a series of questions. The emails in question, however, contain much more than that. For instance, the July 26, 2016 email reads, in part, "An email came from Igor." Similarly, the July 20, 2020 email includes several assertions, including "I've been informed that Bogdanovsky travelled to New York with Danchenko at the end of July 2016; Danchenko, supposedly to meet with me (but the meeting didn't take place)" and "Steele, it seems, made Danchenko the fall guy, but Danchenko himself made several statements that were difficult to understand, for example, about the call with me." Those statements are hearsay. In response, the government argues that it is not offering those statements for the truth of the matter asserted. Instead, it contends that it is offering Millian's non-question statements pursuant to Rule 803(3) to prove Millian's state of mind at the time he sent the emails.

Rule 801 defines hearsay as a "statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). A statement is a "person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Rule 801 does not define "assertion," but the advisory committee notes clarify that "nothing is an assertion unless intended to be one." Fed. R. Evid. 801(a) advisory committee's note to 1972 amendment. In *United States v. Sinclair*, the Fourth Circuit, citing numerous other circuits, explained that "[a] question or inquiry is not a statement and therefore is not hearsay unless it can be *construed* as an intended assertion." 301 F. App'x 251, 253 (4th Cir. 2008) (citations omitted) (emphasis added); *see also United States v. Love*, 706 F.3d 832, 840 (7th Cir.

13

2013) (observing that "questions are not 'statements' and therefore are not hearsay" (collecting cases)). Therefore, the focus is on whether the declarant intended to make an assertion with their question. *See United States v. Torres*, 794 F.3d 1053, 1061 (9th Cir. 2015) ("Because there may be instances where a party attempts to admit hearsay by cloaking statements under the guise of a question, the focus of the inquiry should be on what the declarant intended to say, whether implied or directly asserted.").

In *Sinclair*, the out-of-court declarant asked a witness of a shooting several questions, including "what happened" and "who shot" the victim. 301 F. App'x at 253. The court admitted those questions as non-hearsay because they were only "requests for information" and could not be "construed as assertions." *Id.* In contrast, the Tenth Circuit overruled the district court's decision to admit a co-defendant's question as non-hearsay. *United States v. Summers*, 414 F.3d 1287 (10th Cir. 2005). In *Summers*, a co-defendant being arrested for a bank robbery exclaimed to police, "How did you guys finds us so fast?" *Id.* at 1298. In reversing the district court, the Tenth Circuit concluded that the statement should have been excluded because it "begs credulity to assume that in positing the question [the co-defendant] was exclusively interested in modern methods of law enforcement, including surveillance, communication, and coordination. Rather, fairly construed the statement intimated both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly." *Id.* at 1300.

Federal Rule of Evidence 803(3) provides that a hearsay statement is admissible if it is: "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." *See also United States v. Liu*, 654 F. App'x 149, 154 (4th Cir. 2016) ("Forward-looking statements of intent

14

are admissible, but backward-looking statements of memory are not. For this reason, statements describing a declarant's then-existing state of mind are admissible, but *statements about the declarant's reasons* for having that state of mind are inadmissible." (internal citations omitted) (emphasis added)); *United States v. LeMaster*, 54 F.3d 1224, 1231 (6th Cir. 1995) ("To be admissible under Rule 803(3) as an exception to the hearsay rule, the declarant must not have had an opportunity to reflect and possibly fabricate or misrepresent his thoughts." (citing *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992))).

      Applying these principles to the Millian e-mails, the Court concludes that the July 26, 2016 email is admissible in its entirety. The email's questions are very similar to those in *Sinclair* ("Who is that? What sort of person?") and thus qualify as non-hearsay. Furthermore, the hearsay statements in the email ("Dimitry, on Friday I'm returning from Asia. An email came from Igor.") are a combination of a forward-looking statement and a statement sufficiently imbedded in the question to allow their admission and are necessary for the question to be understood and help establish Millian's state of mind at the time he sent the email. Moreover, the referenced e-mail is not disputed and in fact, Danchenko relies on his sending a July 21, 2016 e-mail as a partial basis for his believing he had spoken with Millian. Accordingly, Millian's July 26, 2016 email is admissible.

      In contrast, the Court will exclude both of Millian's July 2020 emails. The Court must consider the changed circumstances against which those e-mails were sent. By July 2020, Millian (a former president of the Russian-American Chamber of Commerce) had already been "outed" as a purported source for the Steele Reports, and may have been aware as early as November 2016 that he had come to the attention of the FBI. Moreover, Millian directed his emails to Zlodorev—an employee of RIA Novosti, a Russian state-run media outlet. [Doc. No. 78], at 20 & n.4.

Accordingly, Millian certainly possessed motive and opportunity to misrepresent his thoughts, *i.e.*, convince an employee of a Russian-controlled company, or more generally, anyone who gained access or otherwise saw his emails, that he played no role in providing information about a potential conspiracy between Russian officials and the Trump Campaign. Accordingly, the hearsay statements in those emails are inadmissible. *See LeMaster*, 54 F.3d at 1231 ("[T]he declarant must not have had an opportunity to reflect and possibly fabricate or misrepresent his thoughts."). Furthermore, from the context of the emails, it can be reasonably construed that Millian's questions are meant to reaffirm his assertion that he never met or spoke with Danchenko. The questions are not simply benign requests for information, but rather reinforce Millian's implied assertion that the reports of his discussions with Danchenko are false and that he never spoke with Danchenko.

Finally, the July 2020 emails are cumulative of the point the government wants to make by way of these e-mails—that Millian never talked to Danchenko, as Danchenko claims he believed. There is little impact to the government in excluding these e-mails, particularly given the limited probative value either of these emails have with respect to the core issue of whether Danchenko believed he had spoken to Millian. For these reasons, Millian's July 2020 emails are not admissible as non-hearsay, under Rule 803(3)'s exception, or otherwise.[4] Therefore, the government's motion is **GRANTED** in part and **DENIED** in part.

### III. Counter-Intelligence Investigation

Both the government and Danchenko agree that the fact of a prior counter-intelligence investigation should be admitted at trial. Danchenko, however, wishes to exclude the details of the

---

[4] Additionally, the Court finds that the Millian July 2020 emails are inadmissible under Federal Rule of Evidence 807. "For a statement to be admissible under Rule 807, it must contain 'guarantees of trustworthiness.'" *Burgess v. Goldstein*, 997 F.3d 541, 560 (4th Cir. 2021) (citation omitted). Moreover, because Rule 807 is "a narrow exception" to the rule against hearsay, it "should be utilized only after much consideration and examination." *United States v. Dunford*, 148 F.3d 385, 392, 394 (4th Cir. 1998) (internal quotation marks omitted). The emails lack the necessary "guarantees of trustworthiness" as the government does not offer direct evidence that Millian actually wrote the emails, and, even if he did, Millian possessed opportunity and motive to fabricate and/or misrepresent his thoughts.

16

investigation. According to the government, in late 2008, Danchenko approached a colleague at a think tank in Washington D.C. who he thought might be entering the incoming Obama administration and have access to classified information. Danchenko purportedly told that colleague that he, Danchenko, had access to people who would be willing to pay money in exchange for classified information. The colleague passed along that information to the FBI. The FBI initiated a preliminary investigation, converting it to a full investigation after learning, in part, that Danchenko had previous contact with the Russian embassy and known Russian intelligence officers. In connection with that investigation, the FBI also learned that Danchenko expressed an interest in entering the Russian diplomatic service to become a Russian intelligence officer. The FBI closed the investigation in 2010 because it incorrectly believed that Danchenko left the country.

The Court will exclude the details of the investigation. The probative value of these unproven allegations, *i.e.*, Danchenko sought to facilitate the sale of classified information and that he had contact with Russian intelligence services, which would have to be established through multiple levels of hearsay, is of only marginal relevance in terms of proving the materiality of Danchenko's allegedly false statements. The evidence's low probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues.

Therefore, the government's motion as to the counterintelligence investigation is **GRANTED** in part and **DENIED** in part, subject to reconsideration at trial should the government demonstrate need for rebuttal.

### IV.   Political Bias

The government seeks to prevent Danchenko from presenting evidence or making arguments at trial that the present prosecution is politically motivated. Danchenko asks that he be

allowed to reserve the right to test the credibility, bias, motivation, and reliability of the government's witnesses. *See, e.g.*, *United States v. Safavian*, 2008 WL 5255534, at *1 (D.D.C. Dec. 12, 2008) ("[T]he Court generally agrees with the government that the questions of whether there has been vindictive or selective prosecution, why the government has decided to prosecute [the defendant] and not others, . . . are not matters properly presented to the jury. . . . On the other hand, . . . some questions in this case that touch on these matters also may go to the bias, prejudice or credibility of a particular witness."). Whether such evidence would be admissible cannot be determined at this time and the Court will rule on specific evidence if and when this type of evidence is sought to be presented at trial.

Accordingly, it is hereby

ORDERED that the Government's omnibus Motion *in Limine* [Doc. No. 78] is **GRANTED** in part and **DENIED** in part.

The Clerk is directed to forward a copy of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
October 4, 2022