```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,    )  Case 1:21-cr-245
                                 )
 4              Plaintiff,       )
                                 )
 5        v.                     )  Alexandria, Virginia
                                 )  October 11, 2022
 6  IGOR Y. DANCHENKO,           )  9:07 a.m.
                                 )
 7              Defendant.       )  Volume 1 (AM Session)
    _____)  Pages 1 - 85
 8

 9                   TRANSCRIPT OF TRIAL

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11          UNITED STATES DISTRICT COURT JUDGE

12                   AND A JURY

13
    APPEARANCES:
14
    FOR THE PLAINTIFF:
15
         JOHN DURHAM, ESQUIRE
16       MICHAEL T. KEILTY, ESQUIRE
         D. BRITTAIN SHAW, ESQUIRE
17       U.S. DEPARTMENT OF JUSTICE
         145 N Street, N.E.
18       Washington, D.C.  20002
         (203) 410-2641
19
    FOR THE DEFENDANT:
20
         STUART A. SEARS, ESQUIRE
21       DANNY ONORATO, ESQUIRE, PRO HAC VICE
         SCHERTLER, ONORATO, MEAD & SEARS
22       555 13th Street, N.W., Suite 500 West
         Washington, D.C.  20004
23       (202) 628-4199

24  THE DEFENDANT, IGOR Y. DANCHENKO, IN PERSON

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1                          **I N D E X**

2                                                      PAGE

3    Pretrial Hearing                                  3

4    Voir Dire                                         46

5    Jury Sworn                                        80

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The jury is not present.)

2            THE CLERK:  The court calls Criminal Case

3   2019-cr-245, *United States v. Igor Danchenko*.   This

4   case comes on for trial by jury.

5            Counsel, will you please note your

6   appearances for the record.

7            MR. DURHAM:  Good morning, Your Honor.  John

8   Durham for the United States.  At counsel table with me

9   are Assistant Special Counsel Michael Keilty and

10  Brittain Shaw, and at the rear table is Paralegal

11  Specialist Kori Arsenault.

12            We'd ask the Court's permission for the case

13  agent in this matter, Ryan James, with the FBI to be

14  present.

15            THE COURT:  All right.  Yes.

16            All right.  Welcome.

17            MR. DURHAM:  Thank you, Your Honor.

18            MR. SEARS:  Good morning, Your Honor.  Stuart

19  Sears and Danny Onorato on behalf of Mr. Danchenko, who

20  is present in the courtroom with us, and we have three

21  paralegals from our law firm, Charlie Tent, Grace

22  McMahon, and Matt Milzman.

23            We have no objection to the case agent

24  remaining in the courtroom.

25            THE COURT:  All right.  Welcome, Everyone.

1  We're here for trial.

2         I have a number of items I'd like to raise.

3  Before I do that, let me ask counsel:  Are there any

4  issues you want to raise, Mr. Durham?

5         MR. DURHAM:  Yes.  Thank you, Your Honor.

6         First, as the Court will recall, we were

7  given permission to file the government's witness list

8  under seal in this matter.

9         THE COURT:  Yes.

10        MR. DURHAM:  We'd ask at this point that be

11 unsealed.

12        THE COURT:  All right.  That will be

13 unsealed.

14        MR. DURHAM:  There are several matters that

15 we've had discussions with counsel about that may be

16 some of the same matters that Your Honor has, perhaps

17 not.

18        One is there's a motion *in limine* that was

19 filed.  Actually, there are several motions *in limine*

20 filed by counsel.  There's one remaining motion that

21 needs to be resolved, and that relates generally to the

22 failure of Mr. Danchenko to provide certain documents.

23        A second issue that we'll discuss with

24 counsel relates to the scope and testimony to be

25 permissible regarding the previous investigation of

1 Mr. Danchenko in connection with the counterespionage

2 case.

3        A third issue that we mentioned briefly to

4 counsel this morning -- we had received some

5 translations of documents from counsel as late as last

6 night or early this morning that we want to be heard

7 on.  Because similar to Your Honor's ruling on evidence

8 that the government had sought to present, as well as

9 hearsay, there are emails related to Mr. Zlodorev.

10 There are some emails that we understand the defense

11 would like to offer between Mr. Millian and

12 Mr. Zlodorev that, we think, are surely hearsay and are

13 not properly raised to the Court.

14        The last issue has to do with a particular

15 dossier report.  It's generally referred to and most

16 easily referred to as 2016/95.  In that connection,

17 that particular report relates to Source E, who is

18 identified as Sergei Millian, and the parties have open

19 issues relating to how much of that report should

20 probably be admitted.  So there's some consensus, but

21 there are still differences.

22        THE COURT:  All right.  What's the

23 government's exhibit number on that?

24        MR. DURHAM:  The government's exhibit number

25 is 109, Your Honor.

```
 1              THE COURT:  All right.

 2              MR. DURHAM:  I think I've covered it.

 3   Obviously, counsel will correct me if there are

 4   additional issues.

 5              Thank you.

 6              THE COURT:  All right.  Mr. Sears, anything

 7   you want to raise?

 8              MR. SEARS:  Your Honor, those are the issues

 9   we had discussed with the special counsel that we were

10   hoping to address today before the trial starts.  If

11   the Court wishes to hear argument on that, I can do

12   that.

13              I did want to raise another issue, which is

14   that we have a series of articles that were publicly

15   available back in July of 2016, May through July 2016.

16   We've marked them as exhibits.  We've provided them

17   previously to government counsel.  As Your Honor may

18   recall --

19              THE COURT:  What was the time period?

20              MR. SEARS:  May through July of 2016 -- or

21   through August, excuse me, May through August 2016.  I

22   can hand up a copy with the assistance of the court

23   security officer.

24              THE COURT:  All right.

25          (Documents are passed up to the Court.)
```

1          MR. SEARS:  As Your Honor may recall, the
2  allegations regarding Mr. Dolan stem around an email
3  that Mr. Dolan sent to Mr. Danchenko that contains some
4  information about information he purported to learn
5  from a friend about why Paul Manafort resigned from the
6  campaign that summer.
7          Through our own research and what, I think,
8  Mr. Dolan would say as well is that was all public
9  information when he provided it to Mr. Danchenko.  We
10  found a series of articles leading up to August 20,
11  which is when that email was sent, that go into every
12  detail that was in the email that Mr. Dolan sent.
13          So from a defense perspective, we want to
14  show that all of this information was, in fact,
15  publicly available.  We would like to admit those
16  articles.  There's actually not a lot of case law on
17  the admission of articles.  I do think the Court can
18  take judicial notice.
19          I don't think there's going to be a fight
20  over whether or not those articles were actually
21  published or not or available during that time frame.
22  We would not be offering them for the truth of the
23  matter asserted, just to show that that information was
24  publicly available leading up to that email whether it
25  was true or not.

1        If the Court determines that those articles

2   are relevant, we would seek to admit them through

3   stipulation, hopefully, or through the Court taking

4   judicial notice.  If we had to, we can call the

5   paralegal who went online and pulled the articles.  But

6   I think the bigger argument, my guess, is more about

7   relevance.

8            THE COURT:  All right.  Anything else on

9   that?

10           MR. SEARS:  So, Your Honor, there were two

11  exhibits that had been in the government's list of

12  exhibits for some time now.  And in the last week or

13  so -- this happens as you're gearing up for trial and

14  you start thinking more about what exhibits you're

15  going to use or not.  Two exhibits that we intended to

16  rely on that were government exhibits no longer appear

17  on the government's exhibit list.

18           I don't have the numbers because --

19       (Counsel confer.)

20           MR. SEARS:  There might be three, I'm told.

21  I'm not sure what the third one is, but I'm sure

22  Mr. Onorato can tell the Court.

23           One is Amtrak records.  These are records

24  that the government obtained through a subpoena that

25  show that Mr. Danchenko was, in fact, in New York from

1   July 25th to the 28th -- or from the 26th to the 28th,

2   which is the time when he was under the impression that

3   he was going to meet with whoever was the anonymous

4   caller.

5            We had a stipulation worked out that those

6   records would come in.  The government doesn't appear

7   to be offering them.  We would like to offer it.  I'm

8   not sure exactly who we would offer it through at this

9   point.  I haven't had a chance to talk to government

10  counsel about that.  I don't know what their position

11  would be, but I wanted to raise that.

12           THE COURT:  All right.

13           MR. SEARS:  There's also a July 28, 2016,

14  Facebook message that Mr. Danchenko sent to his then

15  wife at the time where he's in New York.  He sends a

16  photograph of some giraffes at the Bronx Zoo and says,

17  "Another meeting tonight."  And that was, from our

18  perspective, the night that he was supposed to meet

19  with Sergei Millian or the person he believed was

20  Sergei Millian.

21           The government is no longer seeking to admit

22  that.  We would seek to admit it through a case agent

23  or through stipulation.  We don't believe it's hearsay.

24  We believe it's the present state of mind exception

25  that shows plans.  This whole case is about what was in

1   his head at the time frame.  I can't think of any more

2   relevance than that document.  So we'd be seeking to

3   admit that as well.  I wanted to raise it now so we're

4   not dealing with it mid-trial, and there are some

5   logistics about who that would be coming through.  So I

6   just wanted to flag that as well.

7            THE COURT:  All right.

8            MR. ONORATO:  Your Honor, along those lines,

9   the government was seeking to introduce an email -- and

10  they still are -- on July 26 between Mr. Millian and

11  Mr. Zlodorev.  They had one more email in that chain

12  originally in their exhibits, and they've excised the

13  last email from that chain.  So as a rule of

14  completeness matter, we would like to show the jury

15  what Mr. Zlodorev told Mr. Millian about Mr. Zlodorev's

16  relationship with Mr. Danchenko at the time.  Because,

17  again, it goes to state of mind of Mr. Millian, not

18  offered for the truth but to explain the circumstances

19  about what happened here.

20           THE COURT:  All right.  I take it, Mr. Sears,

21  you've not had an opportunity to really talk to

22  Mr. Durham about these issues.

23           MR. SEARS:  Some of the issues we've

24  discussed today.

25           (Reporter clarification.)

1          MR. SEARS:  Others we have not.

2          MR. DURHAM:  Your Honor, I'm very confident

3  that we can work these out.  We can offer those same

4  exhibits --

5          THE COURT:  All right.

6          MR. DURHAM:  -- to obviate the problem.

7          THE COURT:  All right.  Great.

8          All right.  Let me just raise a couple of

9  items.  With respect to the jury, the jurors that are

10  coming in, does any party want me to consider any

11  further strikes for cause based on the questionnaires?

12          MR. SEARS:  We do, Your Honor.

13          THE COURT:  All right.

14          MR. SEARS:  Your Honor, Juror No. 59 is

15  Joseph Messina.

16          THE COURT:  Juror No. 59?

17          MR. SEARS:  Juror No. 59 as they were

18  numbered.

19          THE COURT:  All right.

20          MR. SEARS:  Mr. Messina on his

21  questionnaire -- on page 17, the question that was

22  asked, "Other than as a voter, are you now or have you

23  previously been actively involved in politics, for

24  example, fundraising, voter registration, candidate for

25  office, or candidate staff?"  He responded, "Yes," and

1  for the explanation provided, "I volunteered on

2  campaigns for Rick Santorum and George Allen in the

3  distant past."

4            We have done some research on Mr. Messina,

5  all open source, and we think that is just not a candid

6  statement.  He's been very involved in politics.  He

7  was a campaign manager for a Virginia republican just

8  recently.  I can hand up to the Court -- I also

9  provided this just now to government counsel --

10 everything we found on social media.

11            THE COURT:  All right.

12       (Documents are passed up to the Court.)

13            MR. SEARS:  From our perspective, because he

14 was not candid about that, it gives us concerns about

15 whether or not he maybe misrepresented that information

16 in order to not be struck for cause.

17            THE COURT:  All right.  Any others?

18            MR. SEARS:  Yes, Your Honor.  There's two.

19 No. 61, the last name is Mooney.  I flagged this one,

20 Your Honor.  I don't know that it's necessarily for

21 cause at this moment.  But Mr. Mooney referenced that

22 he wears hearing aids, and that was just something that

23 comes up from time to time.  We want to be mindful of

24 that.

25            THE COURT:  All right.

1          MR. SEARS:  The last one, Your Honor, is

2    No. 67, which is Mr. Osei, O-S-E-I.  He did note in his

3    questionnaire that he has difficulty with English, and

4    that's always a concern.  I think in this case in

5    particular, given some of the facts of the case, that

6    would be a concern for us as well.

7          THE COURT:  All right.  Mr. Durham, does the

8    government have any jurors it would like to talk about?

9          MR. DURHAM:  Thank you, Your Honor, yes.

10          We'd ask the Court to consider striking Juror

11    No. 26, Ms. Edmond, who indicates in response to a

12    question, "She has not heard of our case," but then she

13    states, and I quote, I hold biases against Donald

14    Trump, his administration, that may influence my

15    decision-making.

16          Now, we expect defense counsel to try to

17    avoid the sort of political overtone of these, but

18    somebody who says they hate Donald Trump probably would

19    not be a suitable juror.

20          THE COURT:  All right.

21          MR. DURHAM:  Juror No. 45, we raise that

22    because that juror indicated that because of some

23    deliverable deadlines, that might prevent him from

24    giving his full attention or being present for the

25    duration of the trial.  I don't know if that's a matter

 1   that comes to the Court's attention, but we'd raise it

 2   as a possible ground to be excused for cause.

 3              THE COURT:  All right.

 4              MR. DURHAM:  Juror No. 49 in answer to

 5   Question No. 37 indicated that he is on medication.

 6   This relates to his ability to concentrate.  He says he

 7   is on heart medication, blood pressure medication, and

 8   diuretics.  I don't know if that would make it

 9   difficult for him, but he does indicate that it might

10   affect his ability to concentrate.  Perhaps that's

11   something the Court could inquire about, if

12   appropriate.

13              THE COURT:  All right.

14              MR. DURHAM:  Your Honor was good enough to

15   include in the questionnaire questions related to use

16   of social media.  Some people, arguably, are addicted

17   to it at this point.

18              Juror No. 55 indicated that she would find it

19   difficult to stay off of social media and -- I think

20   she may be the only person who indicated that it would

21   be difficult to sit and concentrate or stay off of

22   social media.  We just raise that for the Court's

23   consideration.

24              THE COURT:  All right.

25              MR. DURHAM:  Juror No. 56 indicated that he

1 has a prepaid vacation, preplanned, prepaid vacation

2 the week of October 16th to the 22nd.  I think there's

3 a distinct possibility this matter does go into next

4 week.  So that may be another person that the Court

5 would want to consider striking for cause.

6                 If I could just have one moment, Your Honor.

7                 I think that may exhaust our list of folks

8 that we thought the Court might want to consider

9 striking.

10                THE COURT:  All right.

11                MR. DURHAM:  That's it.

12                Thank you very much, Your Honor.

13                THE COURT:  All right.  Mr. Sears.

14                MR. SEARS:  Your Honor, I omitted one from my

15 list.

16                THE COURT:  Yes.

17                MR. SEARS:  That's No. 50.  That is

18 Ms. Kargbo.  I don't know that she needs to be struck

19 for cause at this moment, but I do notice that she also

20 indicated that she has difficulty with English.  I

21 think she said that she's able to read, write, and

22 understand English, quote, with difficulty.

23                THE COURT:  All right.

24                MR. SEARS:  Other parts of the questionnaire,

25 at least from our perspective, look like she might not

1  have fully understood exactly what was being asked.  So

2  we would just raise her as someone to inquire about.

3           With regard to the jurors raised by the

4  special counsel, including the one who -- I don't think

5  she said she hated Donald Trump.  I think she said she

6  had a bias against the Trump administration.  I think

7  that's something the Court can inquire about before

8  making a determination whether or not she can be

9  impartial in this case.

10           THE COURT:  All right.

11           MR. SEARS:  With regard to 45, 49, and 55, we

12  think it would be appropriate for the Court to inquire

13  of those jurors for the reasons Mr. Durham stated.

14           With regard to 56, which is Mr. Legarda, we

15  would not be opposed to striking him for cause given

16  his prepaid vacation and not running the risk of

17  running into that.

18           THE COURT:  All right.  Well, I have a few

19  follow-up questions but nothing beyond the

20  questionnaire other than to ask if there's anything

21  that's changed about their answers, anything that may

22  have happened between now and then given a little more

23  information about the case and see if anyone wants to

24  amend anything they've said.

25           How much time for opening statement?

1          MR. DURHAM:  Your Honor, we've spoken with

2    defense counsel.  I think we both estimate around 25,

3    30 minutes if that's acceptable to the Court.

4          THE COURT:  All right.  That's fine.

5          All right.  That really covers what I have.

6          Let's get back into some of the issues you've

7    all raised with respect to the motions *in limine*.

8          Let's deal with the issue of the scope of

9    testimony with respect to counterintelligence.  The

10   Court has already made a preliminary ruling to a

11   certain extent on that.  What is the issue beyond the

12   issue that the Court has already ruled on in terms of

13   essentially timing, that we are going to let in the

14   fact but not the details of --

15         MR. DURHAM:  Yes, Your Honor.  Cognizant of

16   Your Honor's ruling, we've been in touch with counsel

17   to sort of plum the parameters of what would be

18   permissible, what would go beyond what the Court

19   contemplated.  That discussion really revolves around

20   what could the government either elicit by way of

21   testimony or open on relating to that investigation.

22         Our reading -- or maybe it was a misreading

23   of the Court's intent -- was that we were not to get

24   into matters relating to Mr. Danchenko having

25   previously solicited classified information or that

1   there was various informant information relating to

2   some of his conduct, etc.

3          But with regard to the fact that there was a

4   previous investigation, that investigation was closed

5   when the FBI mistakenly thought that Mr. Danchenko had

6   left the country, and it was unresolved.  We thought

7   that that was on the right side or the line that the

8   Court had cut.

9          Defense counsel indicated that they disagreed

10  with that view, that -- I don't want to speak for them.

11          THE COURT:  All right.

12          MR. DURHAM:  Just in broadbrush, I think

13  their view was that the government would not be

14  permitted to go beyond, "There was a previous

15  investigation."  So that's where the divide is on this.

16          THE COURT:  Okay.

17          MR. DURHAM:  I'm not certain what defense

18  counsel's view of the matter is this morning.  We

19  haven't had a chance to sit and talk about that, but

20  the government would intend to limit its comments to,

21  "There was an investigation.  The investigation was

22  closed because, again, the FBI mistakenly thought

23  Mr. Danchenko had left the country.  So it wasn't

24  resolved," or, in the alternative, "There was an

25  investigation that was conducted, and it wasn't

1    resolved," but not beyond that.

2              THE COURT:  All right.  Mr. Sears.

3              MR. SEARS:  Well, Your Honor, from our

4    perspective, it was resolved even if it was done on

5    terms that turned out not to be accurate.  The

6    problem --

7              THE COURT:  What's the difference between it

8    being resolved and it being closed based on his leaving

9    the country?

10             MR. SEARS:  I don't know that there is a huge

11   difference, Your Honor.  The problem is that it creates

12   the impression that there may have been more there and

13   they just never looked into it because he left the

14   country.

15             We've received in discovery a lot of

16   information from the agents who were involved in that

17   investigation, including the agent who will testify in

18   this case, that had doubts about whether that

19   investigation should have ever been opened in the first

20   place, whether it was based on any concrete

21   information.

22             I think -- I guess our position this

23   morning -- and it was last night as well -- is anything

24   beyond, you know, the point of the investigation kind

25   of gets mirky.  From our perspective, as we sit here

1  today, we think that it may just be best if we just

2  don't raise that counterintelligence investigation at

3  all, either side, and we have the trial without it.  It

4  was ten years before the allegations that occurred

5  here.  I don't think there's a need.

6          When I was thinking about the case and the

7  trial back when we were arguing this motion, I kind of

8  was in a different position than I am today.  At this

9  point, I think it creates problems.  If it comes in, it

10  creates problems either way, and I don't think it's

11  necessary for either party to kind of put on their case

12  or put on their defense in this case.

13          So we'd be asking today that to avoid the

14  issue entirely and the potential that there would be

15  any misapprehension about why it was closed and have

16  the juror speculating about whether there was something

17  more there than it was, it may just be better for

18  everybody that it doesn't come in at all.

19          THE COURT:  Mr. Durham, from your

20  perspective, what's the need for --

21          MR. DURHAM:  Thank you, Your Honor.

22          We, obviously, will follow whatever the Court

23  directs on this, but we do want to introduce the fact

24  that there was a prior investigation.  Because the

25  evidence will be that when Mr. Danchenko was identified

1  as Mr. Steele's primary subsource, Mr. Danchenko is

2  somebody that was already known, not just to the FBI

3  but to the witness who will testify in these matters,

4  Supervisory Intelligence Analyst Brian Auten.  We think

5  it is relevant because it does bring some additional

6  information to the floor which is relevant.

7          We're mindful of the Court's concern and

8  defense counsel's concern.  If the Court wants us to

9  limit our direct examination or comment on that to the

10  facts that there was a prior investigation, it was

11  closed when they mistakenly thought he had left the

12  country, we will limit it to that.

13          THE COURT:  Let me have the time line on

14  this.  When was it opened, and when was it closed?

15          MR. DURHAM:  That investigation was opened in

16  2009, and then it was closed in September 2010.

17          Just for the Court's background on it, the

18  FBI tracked -- or believed it was tracking

19  Mr. Danchenko's travels.  Then for the next, I believe

20  six or seven months, they thought he had left the

21  country; he didn't come back into the country.  As a

22  consequence, they closed the file.

23          THE COURT:  Right.  The first interviews

24  pertaining to the Trump campaign investigation were in

25  January of 2017?

```
 1              MR. DURHAM:  Yes, sir.  He was -- a three-day
 2  interview began on January 24, and it concluded on
 3  January 26.
 4              THE COURT:  All right.
 5              MR. DURHAM:  I would indicate to the Court
 6  that while we do not intend to get into this, unless
 7  there's no objection to it, Auten was emailing
 8  Baltimore, who was doing the investigation, in 2012.
 9  So they had -- Baltimore had the case open in 2009
10  going into 2010.  Mr. Danchenko was believed to have
11  left the country in September 2010.  The FBI was
12  looking at travel records, entering into the country
13  records for the next six or seven months.  They closed
14  the file.
15              Then Mr. Auten himself was inquiring about
16  Mr. Danchenko with the Baltimore office, who had opened
17  the file on Mr. Danchenko in 2012.  So when
18  Mr. Danchenko's name came up in December of 2016, he
19  was a person that was known to the FBI.  They
20  approached Mr. Danchenko in January of 2017, ultimately
21  interviewed him on the dates that Your Honor inquired
22  about.
23              THE COURT:  All right.  This would come up
24  with respect to your first witness?
25              MR. DURHAM:  It would certainly come up with
```

1  the first witness.  If the Court could rule on it, we'd

2  like to comment on it in opening.  We'll obviously give

3  the Court --

4         THE COURT:  All right.  I'll give you a

5  ruling before opening statement.

6         MR. DURHAM:  Thank you, Your Honor.

7         THE COURT:  All right.  What was the next

8  issue?

9         MR. DURHAM:  Maybe the next issue would be

10  the Court inquired about a particular government

11  exhibit.  Government Exhibit 109, in fact, relates to

12  the Steele dossier report 2016/95.  There's some

13  portions of the agreement between counsel but not

14  complete agreement as to which portions of that report

15  should be admitted as an exhibit in this case.

16         THE COURT:  All right.  Do you-all need to

17  talk about this among yourselves more?

18         MR. DURHAM:  I think we've discussed it at

19  some length.

20         THE COURT:  All right.  I'll have to look at

21  the report, and you will have to isolate for me the

22  portions of the report that are at issue.

23         MR. DURHAM:  What might be helpful to the

24  Court -- in looking at the report, we can describe --

25  and counsel, again, will correct me if I'm wrong.

1           Oh, I'm sorry.  You don't have a copy.

2       (Documents are passed up to the Court.)

3           MR. DURHAM:  So just by way of background,

4   Your Honor, this is a particular report that has in the

5   upper right-hand corner handwritten 8-29-16.  It makes

6   specific reference to Source E.  What might be helpful

7   to the Court in understanding the arguments of

8   counsel -- I think Your Honor will see that virtually

9   all of the information in this report is attributed to

10  Source E.  However, in the second page of the report,

11  in paragraph 6, the report makes reference to a

12  separate source with direct knowledge.  So all of it is

13  Source E with the exception, I think, of --

14          THE COURT:  Where is the reference that

15  you're referring to on the second page?

16          MR. DURHAM:  Yes.  Paragraph No. 6 says,

17  "Finally, regarding Trump's claimed minimal investment

18  profile in Russia, a separate source with direct

19  knowledge said this had not been for want of trying."

20          THE COURT:  That's what's at issue on this

21  report?

22          MR. DURHAM:  So that's some other source.

23  The parties are in agreement that paragraph 6 should

24  not go in.

25          THE COURT:  All right.

1            MR. DURHAM:  Now, separate from that, Your

2   Honor, in looking at the first page of the report, the

3   Court will note that the second bullet point

4   references, "Trump associate admits Kremlin behind

5   recent appearance of DNC emails on WikiLeaks as means

6   of maintaining plausible deniability."

7            Then with respect to paragraph 2 under the

8   detail, again, there are references to WikiLeaks.

9            So while the government is of the view that

10  this all comes from the same report and is attributed

11  to Source E, we are agreeable to redacting that second

12  bullet point under the summary and paragraph 2 because

13  the evidence will be -- assuming they would be relevant

14  and appropriate, the evidence will be that when

15  Mr. Danchenko was interviewed and asked about this

16  report, he had said that he didn't recall anything

17  being told to him by Source E concerning WikiLeaks.

18           We don't think that's dispositive because he

19  now indicates he has a failure of recollection.  But

20  that having been said, we were willing to compromise

21  and redact, again, that second bullet point and

22  paragraph 2 to just eliminate that issue.

23           We believe the balance of the report, all

24  which is attributable to Source E, is admissible, and

25  the testimony in evidence will be that when

1  Mr. Danchenko was shown this report by the agents when

2  he was being interviewed in January of 2017, he

3  identified or said that Source E looks like that's

4  Millian.   And he was the person that purportedly was

5  talking to Millian.

6            THE COURT:   All right.

7            MR. SEARS:   Your Honor, this is a recurring

8  problem in this investigation, is that the agents are

9  very careful about how they asked the questions and

10 confirm whether this information in this report, all of

11 it came from -- it may have come from Sergei Millian.

12 It may have come from someone Mr. Danchenko thought was

13 Sergei Millian because the reference to Source E --

14 some of the information in this report Mr. Danchenko

15 recalls coming up during the conversation with the

16 anonymous caller.   The problem is that the rest of it

17 does not.

18           So when he's saying Source E could be the

19 person I thought was Sergei Millian, it's because it

20 has some of that information he remembers from that

21 phone call, but he never says that the rest of the

22 information came from that phone call.   He never says

23 that.   They never asked him.

24           In fact -- and I can hand this up to the

25 Court as well -- the electronic, which is essentially a

1   302 of Mr. Danchenko's interviews in January -- when

2   he's first asked about this specific report on page 20,

3   the agent writes, "This report involves reporting from

4   Source E, reporting which Danchenko ties, at least in

5   part, to Sergei Millian."  Then he related the story

6   about the contact with Millian or the person he

7   believed to be Sergei Millian.

8           Then later, on a later date, in those first

9   three days in January, again, they ask him about that

10  report, and he says that Source E in the report sounds

11  like it is from his conversation.  So from our

12  perspective, there's a portion of that report that he's

13  attributing to the conversation he had with the

14  anonymous caller.

15          But the special counsel is seeking to

16  introduce this entire report to suggest that

17  Mr. Danchenko received all that information from the

18  person he believed was Source E, which he's never said.

19  He was never asked that specifically, and it's going to

20  create the impression, I think -- the argument is going

21  to be it couldn't have been one 10 to 15-minute phone

22  call because all of this information ended up in the

23  dossier.

24          Source E could have been a source directly to

25  Steele.  It could have been a source through other

1   subsources.  We just don't know, and the only part of
2   this report that Mr. Danchenko recognizes as being part
3   of his conversation is a very limited part.
4          THE COURT:  That's clear from his interview?
5          MR. SEARS:  I believe it's clear from his
6   interview.  The agent writes that at least in part --
7   and the only part they talk about -- and I can hand
8   this up to the Court.  It is flagged on page 20 and
9   page 37.
10      (Documents are passed up to the Court.)
11         THE COURT:  All right.
12         MR. SEARS:  So from our perspective,
13  Mr. Danchenko was never asked the question, "Well,
14  which parts?  Which parts are attributable to the phone
15  call or not?"  So it's going to create a misimpression
16  that all that information came from a phone call that
17  Mr. Danchenko had when he never said that.
18         THE COURT:  All right.  Mr. Durham.
19         MR. DURHAM:  Just briefly if I might, Your
20  Honor.
21         THE COURT:  Yes.
22         MR. DURHAM:  When the Court reviews the
23  pertinent portions of the report, the Court will see
24  for itself that this is being attributed by
25  Mr. Danchenko to Mr. Millian.  A couple of relevant

1   things.  Separate and apart from this report, Report

2   No. 95, we believe that the testimony from

3   Mr. Danchenko's handling agent, Special Agent Helson,

4   will be that he also talked to Mr. Danchenko about the

5   information contained in this report, and Mr. Danchenko

6   attributed it to Sergei Millian.  I don't want to

7   overstate that.  We'll have to see what the testimony

8   is.

9        THE COURT:  Right.

10       MR. DURHAM:  We expect that Helson will

11  testify that he discussed this with Mr. Danchenko and

12  that Mr. Danchenko identified this as the information

13  that came from Mr. Millian.

14       THE COURT:  All right.

15       MR. DURHAM:  It's quite clear that it is

16  clearly admissible.

17       Just for Your Honor's benefit, when the Court

18  looks at the discussion of this portion, the

19  information that begins -- I think counsel said it's

20  flagged.  So the Court obviously can find it, but it

21  begins at the bottom of page 19.

22       THE COURT:  Nineteen?

23       MR. DURHAM:  Yes, sir, Dossier Report 216/95.

24  Then it goes over to the top of page 21.

25       Most of the explanation is about this

1  purported anonymous call.  But read in context because
2  the bureau goes back to it -- the bureau agents go back
3  to it the next day.  So when Your Honor sees what I'm
4  sure counsel has tabbed as the second portion of the
5  report, which begins on page 35 and then onto 36 and
6  37, the Court can see the bureau inquired into it.  It
7  leaves little doubt that the information that's in this
8  report was attributed by Mr. Danchenko to Mr. Millian.
9          As you'll see, there's information in the
10 report related to WikiLeaks.  Because the defendant
11 doesn't acknowledge remembering that, we're agreeable
12 to taking that out.
13         THE COURT:  Well, it seems to me I will have
14 to rule on this within the context of the agent's
15 testimony and what kind of foundation you can lay that
16 links specific portions of this memo to what
17 Mr. Danchenko said or didn't say.  So I'll rule on it
18 within the context of his testimony.
19         MR. DURHAM:  Thank you, Your Honor.
20         THE COURT:  All right.  What else do we have?
21         MR. DURHAM:  Probably counsel will want to,
22 in the first instance, address their motion *in limine*
23 to try to exclude some information.
24     (Counsel confer.)
25         MR. DURHAM:  Counsel indicates it's fine for

1   us to go ahead if it's okay with the Court.

2           This is the context, Your Honor.  The

3   evidence in this case will show that there are two

4   series of emails that --

5           THE COURT:  These are the emails that you

6   want to get in that he didn't turn these over?

7           MR. DURHAM:  Exactly.

8           THE COURT:  Right.

9           MR. DURHAM:  Some of them relate to

10  Mr. Millian, his communications with Millian, email

11  communications, and then the second group deal with

12  emails that he had exchanged with Charles Dolan.  As we

13  understand the defendant's argument, at least in

14  part -- they say, "Well, this just goes to propensity."

15  It doesn't.  It has nothing to do --

16          THE COURT:  Well, I think their argument was

17  he was never specifically asked for them.

18          MR. DURHAM:  He was never specifically asked

19  for them.  But we believe that the evidence in the case

20  is going to establish that the agents had made

21  abundantly clear both in January 2017, when

22  Mr. Danchenko was interviewed, and then later when he

23  was meeting with Mr. Helson, who is the handling agent.

24          THE COURT:  Right.

25          MR. DURHAM:  It was made abundantly clear

1  that they were asking and seeking any and all

2  information that he had relating to dossier matters,

3  anything that corroborate them, any information there,

4  any of the sourcing and the like that was in there, any

5  of the sourcing and the like.  There was no

6  misunderstanding about what was being sought and asked

7  for.

8            Indeed, the evidence will show that with

9  regard to the January 2017 three-day interview, that

10  Mr. Danchenko did on his own produce a particular

11  email.  It's an email dated August 24, 2016, where he

12  had sent something to Mr. Zlodorev.  So I mean, in that

13  context, it's absolutely clear that the defendant knew

14  what the investigators were asking for and at least in

15  that instance he decided to produce one, but not all,

16  of the relevant emails.

17            THE COURT:  Do the emails -- I know they

18  pertain, in part, to whether he spoke with Millian.  Do

19  they relate to Dolan as well?

20            MR. DURHAM:  There's a separate series of

21  exchange with Mr. Dolan.  This will maybe help the

22  Court in perspective.  Millian emails, those were

23  taking place beginning on July 21, 2016, and then they

24  continue, if you include the one he did provide to the

25  FBI, through August 24, 2017.

1          The Dolan emails are a more limited period of

2    time.  They begin on August 19, 2016, and then just

3    continue through the next day, August 20.

4          THE COURT:  Right.  In terms of the substance

5    of the Millian-related emails, the one that he did turn

6    over, from your perspective, evidences that he had

7    never spoken to Millian.  Are the substance of the

8    other ones any different than that?

9          MR. DURHAM:  Yes, Your Honor.  What the

10   evidence will be relating to the Dolan emails is that

11   the bureau had made it clear on an ongoing basis that

12   they were interested in learning about any of the

13   sourcing for the dossier.

14         THE COURT:  All right.

15         MR. DURHAM:  And then, most particularly on

16   June 15, 2017, Mr. Danchenko is specifically asked

17   about Charles Dolan.  Because by that point in time,

18   the bureau investigators had developed information

19   relating to Mr. Dolan where they believed that

20   Mr. Dolan might be a source of information or might

21   have information pertinent to their investigation.

22         So on June 15, 2017, the Crossfire Hurricane

23   had merged into Mr. Mueller's investigation.  Those

24   investigators specifically asked Mr. Helson, the

25   handler, to ask Mr. Danchenko if he knew Charles Dolan.

1   And one of the alleged counts is that he said, "No,"

2   and --

3              THE COURT:  He knew of him.

4              MR. DURHAM:  That's open.

5              So those emails are directly pertinent to

6   proving up that account, that he, in fact, did have

7   communications with Dolan.  He did know that Mr. Dolan

8   had provided information.  Which two days later Dolan

9   provided the information to Mr. Danchenko on August 20,

10  2016.  Two days later that information shows up in a

11  dossier report, 2016/105.

12             THE COURT:  Right.  But you want to do more

13  than get the fact of these emails in; you want to get

14  in that he didn't turn them over?

15             MR. DURHAM:  That's correct.  That he

16  should've turned them over, and he didn't turn them

17  over.  It goes to his state of mind as to whether or

18  not he was answering the questions truthfully when they

19  were posed to him by Special Agent Helson.

20             THE COURT:  All right.  I understand.

21             MR. DURHAM:  Thank you, Your Honor.

22             THE COURT:  All right.  Anything more on

23  this, Mr. Sears?

24             MR. SEARS:  Your Honor, I understand the

25  significance of the arguments that special counsel is

1  trying to make in this case, and I'll try to put aside

2  why I don't agree that he had any obligation.  My

3  understanding of omission or false statement by

4  concealment is there has to be a duty to disclose.

5          THE COURT:  Their argument is it doesn't go

6  to the falsity; it goes to his intent.

7          MR. SEARS:  Right.  You're going to have to

8  see the facts, I guess, to some extent, Your Honor.

9          THE COURT:  Right.

10         MR. SEARS:  My concern is that the jury is

11 going to convict Mr. Danchenko for what he didn't

12 provide versus what he said.  He's on trial for what he

13 said, not for what he didn't provide.  That's going to

14 be complicated when half the evidence in this case is

15 going to be, well, he could've sent that email had he

16 wanted to even though he was never asked to provide

17 that information, even though he told them about it.

18 That's really the concern I have, is that the jury is

19 going to convict him on a theory that wasn't charged.

20         So in this context, I think the fact that

21 these were voluntary interviews, that they never asked

22 him for his phone, they never asked for his emails,

23 they never asked for anything.  He's voluntarily

24 providing things.  A lot of these emails he didn't even

25 have anymore.  They had been deleted beforehand.  So he

1  couldn't have provided them had he wanted to, but he

2  told them about it.  He told them about the July 18

3  email with Millian as well.  Again, I don't want to get

4  into the arguments of the case and argue the case now.

5          THE COURT:  Right.

6          MR. SEARS:  But under that context, I think

7  it's unfair, first of all, for Mr. Danchenko to be held

8  responsible for not turning over things.

9          THE COURT:  Are you objecting to the emails

10  themselves coming in?

11          MR. SEARS:  No.  I think they are relevant

12  for that reason.  Our concern, again, Your Honor is

13  that the jury is -- our concern really is that special

14  counsel is going to argue at some point potentially,

15  whether it's opening or closing, that by not turning

16  over things he wasn't specifically asked to turn over,

17  that goes to his guilt in this case.

18          It's a concern.  It's charging a false

19  statement case by affirmative representation but then

20  trying to backdoor a concealment theory, which would be

21  very difficult to prove in this case because there was

22  no duty to disclose.  That's an element on concealment.

23  Typically, it's an allocation where you're required to

24  disclose something in your background, questionnaire,

25  disclose a prior felony conviction, something along

1  those lines.

2          THE COURT:  All right.  I understand.

3          MR. DURHAM:  Just briefly, Your Honor?

4          THE COURT:  Yes.

5          MR. DURHAM:  I think -- counsel says there is

6  no -- well, whatever the defense view is on the need to

7  disclose this, the evidence will also include an

8  immunity agreement that was entered into by the

9  defendant with the government in which he was told

10  specifically that he agreed to make full and complete

11  disclosure of information.

12          But separate and apart from that, the

13  government does not intend to argue that the defendant

14  is guilty of the crimes of which he's charged because

15  he failed to disclose these.  Rather, that evidence is

16  evidence of the fact that he knowingly and willingly

17  made false statements, and it's evidence of what his

18  state of mind was and his intention not to tell the

19  truth on these matters.

20          THE COURT:  All right.  I think that covers

21  it.  I think that's all of the issues.

22          MR. DURHAM:  Let me see.  The only remaining

23  issue, as we had indicated, we recently received some

24  emails that the defense, as we understand it, intends

25  to offer at trial or to perhaps use in

1    cross-examination.  It's not absolutely clear.  That's

2    not through the fault of the defense.  It's not clear

3    on what the intention is.  Essentially, these emails

4    that we received either last night or this morning --

5              Was it last night?

6              MR. ONORATO:  It was 12:01.

7              MR. DURHAM:  So it was technically today,

8    Your Honor.  They were email exchanges that were in

9    Russian that have been translated, and they're between

10   where it involved Mr. Zlodorev and Mr. Millian.  Your

11   Honor might recall that we had offered some emails --

12   intended to offer some emails between those same

13   individuals.  There was an objection on the part of the

14   defense that it was hearsay and the like, and the Court

15   ruled those aren't admissible.  Now, here the defense

16   is.  They have emails between Zlodorev and Millian,

17   which we understand they want to offer as evidence in

18   this case.

19             We believe, for the same reason, it's pure

20   hearsay.  I don't know that they can lay any foundation

21   through any government witness, that the government

22   witnesses were aware of it, know anything about it, and

23   the like.  So before they're used in any way, offered

24   as an exhibit or somehow used in cross-examination

25   along the lines of are you aware of such and such,

1   which would be a fact not in evidence but suggesting to

2   the jury that there's something, that there ought to be

3   some proper basis established on the record for the use

4   of those documents.

5           THE COURT:  All right.

6           MR. ONORATO:  Thank you, Your Honor.

7           Your Honor, there were a number of documents

8   that the government does not have.  What I think makes

9   sense is for me to have a conversation with the special

10   counsel team about our use.

11           THE COURT:  All right.

12           MR. ONORATO:  But the information that's been

13   proffered, it's clear on the issue of materiality.  It

14   has nothing to do with proving the truth of the matter.

15   So, for instance, it's Mr. Millian boasting that he's

16   done deals with Mr. Trump for years in Russia.  It's

17   Mr. Millian providing his cell phone number to people,

18   the evidence that the government hasn't produced

19   otherwise, just to show that he had the ability to make

20   phone calls in this time frame.  So none of it is to

21   prove that there's truth to the issues, rather just to

22   go to the issue of materiality.

23           THE COURT:  How does that not go to truth?

24           MR. ONORATO:  So, Your Honor, it's fact.

25   Again, public documents that Mr. Millian has talked

1  about.  The government started investigating him based

2  upon his purported boasts about his connections to the

3  Trump campaign.

4          THE COURT:  The fact that he sent the email,

5  it goes to materiality, is separate and apart from what

6  he was saying?

7          MR. ONORATO:  Again, just to the agents.  The

8  agents are going to come in and say, "My goodness, had

9  I known that it wasn't Mr. Millian who was the

10 caller" -- because that's the theory, right.

11         THE COURT:  Right.

12         MR. ONORATO:  The government wasn't going to

13 shut down the investigation.  So you're right, Millian,

14 throw it out, garbage, not material.  They had so much

15 evidence about what Mr. Millian was doing in that time

16 frame that no matter what Mr. Danchenko said, they were

17 going to continue to investigate him based upon what he

18 was saying --

19         THE COURT:  So these are emails they had in

20 their possession?

21         MR. ONORATO:  They produced them to us.  I

22 had no idea they existed, and I'll talk it over with

23 special counsel.

24         THE COURT:  All right.

25         MR. DURHAM:  Thank you, Your Honor.  I think

 1  that exhausts the list.

 2              THE COURT:  All right.  Good.

 3              All right.  Well, what we'll do is we'll

 4  proceed in a few minutes with jury selection.  I'll

 5  rule on some of these issues.  I'll rule on the

 6  counterintelligence investigation issue before opening

 7  statement, and I think the other ones I'll take up

 8  within the context of the witnesses that they relate

 9  to.

10              All right.

11              MR. SEARS:  Your Honor --

12              THE COURT:  Yes.

13              Also, you may not have had a chance to think

14  about this, Mr. Durham, but what about these articles

15  they want to get in that shows all the information

16  about Manafort was public?  Do you want to think about

17  it?

18              MR. DURHAM:  I'll think about it.  My initial

19  reaction to it, Your Honor, is that if the defense can

20  establish somehow that these were matters that were

21  known to Mr. Danchenko, not just in general but they

22  were known to Mr. Danchenko -- because the evidence

23  will be that Dolan responded to the defendant's request

24  for any thoughts or rumors about Manafort.

25              Dolan responds saying that he reportedly had

```
1  had a drink with a GOP person and this is what he
2  learned.  And he attached the a political article to
3  that email.
4           As I indicated earlier, then two days later
5  essentially the information from Dolan shows up in the
6  report.
7           THE COURT:  Right.
8           MR. DURHAM:  So if the defense is going to
9  establish that Mr. Danchenko was aware of these
10 articles, then I think that there's a good argument for
11 their admissibility.  But absent proof that
12 Mr. Danchenko, who asked for more information from
13 Dolan, got information from Dolan and then information
14 shows up in the dossier, I don't see how these articles
15 are admissible in this proceeding.
16          THE COURT:  All right.
17          MR. SEARS:  Your Honor, our position on that
18 is that that information in that report, that single
19 paragraph in one of the company reports that were
20 issued that related to Mr. Manafort leaving the
21 campaign could have come from anyone because it was so
22 widespread.  I believe one of the agents will testify
23 that that information was everywhere.
24          Mr. Danchenko was never asked about that
25 paragraph in four years, never asked about the source
```

1   of that paragraph, never directly asked, "Where did you

2   get this information?"  He was never asked about that

3   report in its entirety in four years.

4           And so there's no evidence that Mr. Danchenko

5   claimed that he got that from some other source.  So

6   from our perspective, the fact that it's all over the

7   news for months leading up to that day shows that it

8   could have come from anyone.  He may have even

9   forgotten about it because it was everywhere.  You

10  might not know where you got that information from even

11  if it was from him, which I don't think they can

12  establish.

13          So for that reason, we think it's important

14  that the jury understands that this information was

15  everywhere at that time.  It supports Mr. Dolan's

16  testimony, which I think will be that it was all public

17  information at the time.

18          The article that Mr. Dolan links to in the

19  email to Mr. Danchenko is somewhat limited in the

20  information it has.  It doesn't really talk, as I

21  recall, about Mr. Lewandowski and Mr. Lewandowski's

22  ability to still be talking to President Trump and be a

23  little behind the scenes on getting Manafort axed from

24  the campaign.  These articles leading up to that week,

25  that's all they talk about.

1            So I think it's important that there was

2   other information out there about that fact that does

3   end up in the report could have come from another

4   source, not just --

5            THE COURT:  You don't want to use these

6   during your cross of Dolan or one of the agents or

7   during your case?

8            MR. SEARS:  So, Your Honor, from our

9   perspective, we would like to get it in through a

10  stipulation that they existed and argue it.  I think we

11  could cross Dolan about it.  We could cross Special

12  Agent Auten about it.  I don't know that they've seen

13  these specific articles so I don't know they could

14  necessarily say, "Oh, yes, I remember that."

15           I think it's evidence that we could admit

16  that when we do our closing argument, we can say this

17  information was widespread.  You heard from Mr. Auten

18  that he knew this information was public knowledge at

19  the time he heard from Mr. Dolan.  There were dozens of

20  articles.  That's how we would --

21           THE COURT:  You anticipate that kind of

22  testimony from those two witnesses?

23           MR. SEARS:  Yes, I do.

24           THE COURT:  All right.  The Court will deal

25  with it.

```
1            All right.  Anything else?
2            MR. DURHAM:  May I please, Your Honor?
3            THE COURT:  Yes.
4        (Counsel confer.)
5            MR. DURHAM:  We appreciate Your Honor's
6  willingness to try to resolve some of these things as
7  soon as possible.  I don't want to run afoul of
8  anything the Court is going to rule on or raise
9  concerns with the defense, but we did intend to include
10 in opening a reference to Mr. Danchenko's failure to
11 produce these emails.  I'm not going to argue on that.
12           THE COURT:  I'll give you some guidance on
13 that before opening.
14           MR. DURHAM:  Thank you, Your Honor.
15           THE COURT:  All right.  Anything else?
16           MR. DURHAM:  No, sir.
17           THE COURT:  All right.  Why don't we take a
18 short recess.  We'll bring up the jury.
19           Ladies and gentlemen, unfortunately, we're
20 going to need this space for the jury panel that's
21 coming in.  We have set up a remote video feed in
22 Courtroom 1000 that you will be able to see these
23 proceedings.  Once we select a jury, I'm sure there
24 will be room back here in the courtroom for you.
25           With that, we'll stand in a short recess.
```

1    (Recess from 10:01 a.m. until 10:27 a.m.)

2    (The jury is not present.)

3    THE CLERK:  The Court calls Criminal Case

4    2019-cr-245, *United States v. Igor Danchenko*.  This

5    case comes on for trial by jury.

6    Counsel, will you please note your

7    appearances for the record.

8    MR. DURHAM:  Good morning, Your Honor.  John

9    Durham for the United States.  At counsel table with me

10   is Assistant Special Counsel Michael Keilty, Assistant

11   Special Counsel Brittain Shaw.  At the rear table is

12   Paralegal Specialist Kori Arsenault, and then the case

13   agent in this matter, Supervisory Special Agent Ryan

14   James of the FBI.

15   THE COURT:  Welcome.

16   MR. DURHAM:  Thank you, Your Honor.

17   MR. SEARS:  Good morning, Your Honor.  Stuart

18   Sears on behalf of Mr. Danchenko, who is present in the

19   courtroom with me.  Along with me is Mr. Onorato.  We

20   also have three paralegals, Matt Milzman, Charlie Tent,

21   and Grace McMahon.

22   THE COURT:  Welcome to everyone.

23   Ladies and gentlemen, I'm Judge Trenga, and

24   on behalf of all the judges of the Eastern District, I

25   welcome you here to the courthouse.

1            We are going to begin by calling the role.
2    As you hear your name, please say "here" or "present."
3    Please try to remember the juror number that's
4    associated with your name, not the one on your summons
5    but the one that's associated when your name is called.
6    Because as we go through this process, I will ask some
7    questions.  And if you have to answer, I'll ask you to
8    identify yourself by your name and your number.
9            We'll begin with the role, please.
10           THE CLERK:  Ladies and gentlemen of the jury,
11   as I call your name, please stand, answer present, and
12   be seated as the next name is called.
13           Juror No. 1, Kyle Addie.
14           PROSPECTIVE JUROR ADDIE:  Here.
15           THE CLERK:  Juror No. 2, Brian Antol.
16           PROSPECTIVE JUROR ANTOL:  Present.
17           THE CLERK:  Juror No. 3, Terence Beck.
18           PROSPECTIVE JUROR BECK:  Present.
19           THE CLERK:  Juror No. 4, Betsy Bell.
20           PROSPECTIVE JUROR BELL:  Present.
21           THE CLERK:  Juror No. 5, Shailja Bhatia.
22           PROSPECTIVE JUROR BHATIA:  Present.
23           THE CLERK:  Juror No. 6, Jerome Bishop.
24           PROSPECTIVE JUROR JEROME BISHOP:  Present.
25           THE CLERK:  Juror No. 7, Raymond Bishop, Jr.

```
 1              PROSPECTIVE JUROR RAYMOND BISHOP:  Here.
 2              THE CLERK:  Juror No. 8, Kasey Borden.
 3              PROSPECTIVE JUROR BORDEN:  Here.
 4              THE CLERK:  Juror No. 10, Lucinda Brunson;
 5    Juror No. 10, Lucinda Brunson.
 6         (No response.)
 7              THE CLERK:  Juror No. 11, Catiria Bushnell.
 8              PROSPECTIVE JUROR BUSHNELL:  Present.
 9              THE CLERK:  Juror No. 12, Alicea Carimbocas.
10              PROSPECTIVE JUROR CARIMBOCAS:  Present.
11              THE CLERK:  Juror No. 13, Epifanio Clarin,
12    III.
13              PROSPECTIVE JUROR CLARIN:  Here.
14              THE CLERK:  Juror No. 14, Donald Connors, Jr.
15              PROSPECTIVE JUROR CONNORS:  Present.
16              THE CLERK:  Juror No. 15, Philip Cook.
17              PROSPECTIVE JUROR COOK:  Here.
18              THE CLERK:  Juror No. 16, Ian Cosio, I; Juror
19    No. 16, Ian Lucas Cosio, I.
20         (No response.)
21              THE CLERK:  Juror No. 17, Clare Cranshaw.
22              PROSPECTIVE JUROR CRANSHAW:  Here.
23              THE CLERK:  Juror No. 18, Sharita Crawford.
24              PROSPECTIVE JUROR CRAWFORD:  Present.
25              THE CLERK:  Juror No. 19, Paul Cross-Durrant.
```

1              PROSPECTIVE JUROR CROSS-DURRANT:  Present.

2              THE CLERK:  Juror No. 20, Mary Cruz.

3              PROSPECTIVE JUROR CRUZ:  Present.

4              THE CLERK:  Juror No. 21, Meghan Dahnert.

5              PROSPECTIVE JUROR DAHNERT:  Present.

6              THE CLERK:  Juror No. 22, Jennifer Dalrymple.

7              PROSPECTIVE JUROR DALRYMPLE:  Dalrymple,

8  here.

9              THE CLERK:  Juror No. 23, Max Daniel.

10             PROSPECTIVE JUROR DANIEL:  Present.

11             THE CLERK:  Juror No. 24, Samantha Davis.

12             PROSPECTIVE JUROR DAVIS:  Present.

13             THE CLERK:  Juror No. 25, Amy Dickinson.

14             PROSPECTIVE JUROR DICKINSON:  Here.

15             THE CLERK:  Juror No. 26, Adrienne Edmond.

16             PROSPECTIVE JUROR EDMOND:  Present.

17             THE CLERK:  Juror No. 27, Nathaniel Eom.

18             PROSPECTIVE JUROR EOM:  Here.

19             THE CLERK:  Juror No. 28, Marta Erceg.

20             PROSPECTIVE JUROR ERCEG:  Present.

21             THE CLERK:  Juror No. 29, Katherine Estes.

22             PROSPECTIVE JUROR ESTES:  Present.

23             THE CLERK:  Juror No. 30, Alan Evans.

24             PROSPECTIVE JUROR EVANS:  Present.

25             THE CLERK:  Juror No. 31, David Felton.

1              PROSPECTIVE JUROR FELTON:  Here.

2              THE CLERK:  Juror No. 32, Michael Fischer.

3              PROSPECTIVE JUROR FISCHER:  Present.

4              THE CLERK:  Juror No. 33, Chandler Fitch.

5              PROSPECTIVE JUROR FITCH:  Here.

6              THE CLERK:  Juror No. 34, Harold Flanagan.

7              PROSPECTIVE JUROR FLANAGAN:  Here.

8              THE CLERK:  Juror No. 35, Mohsen Fouda.

9              PROSPECTIVE JUROR FOUDA:  Here.

10             THE CLERK:  Juror No. 36, Kelsey Gallagher.

11             PROSPECTIVE JUROR GALLAGHER:  Present.

12             THE CLERK:  Juror No. 37, Joel Greene.

13             PROSPECTIVE JUROR GREENE:  Here.

14             THE CLERK:  Juror No. 38, Matthew Haber.

15             PROSPECTIVE JUROR HABER:  Here.

16             THE CLERK:  Juror No. 39, Christophe Hall.

17             PROSPECTIVE JUROR HALL:  Here.

18             THE CLERK:  Juror No. 40, Christophe Hammel.

19             PROSPECTIVE JUROR HAMMEL:  Here.

20             THE CLERK:  Juror No. 41, Paul Hamrick.

21             PROSPECTIVE JUROR HAMRICK:  Here.

22             THE CLERK:  Juror No. 42, Sarah Hendricks.

23             PROSPECTIVE JUROR HENDRICKS:  Present.

24             THE CLERK:  Juror No. 43, Richard Hooker.

25             PROSPECTIVE JUROR HOOKER:  Present.

1            THE CLERK:  Juror No. 44, Holliday Hurd.

2            PROSPECTIVE JUROR HURD:  Present.

3            THE CLERK:  Juror No. 45, Sumanth Jagga.

4            PROSPECTIVE JUROR JAGGA:  Present.

5            THE CLERK:  Juror No. 46, Melody Johnson.

6            PROSPECTIVE JUROR MELODY JOHNSON:  Present.

7            THE CLERK:  Juror No. 47, Valerie Johnson.

8            PROSPECTIVE JUROR VALERIE JOHNSON:  Present.

9            THE CLERK:  Juror No. 48, Raymond Johnson,

10  II.

11           PROSPECTIVE JUROR RAYMOND JOHNSON:  Here.

12           THE CLERK:  Juror No. 49, Edd Joseph.

13           PROSPECTIVE JUROR JOSEPH:  Present.

14           THE CLERK:  Juror No. 50, Nancy Kargbo.

15           PROSPECTIVE JUROR KARGBO:  Present.

16           THE CLERK:  Juror No. 51, Condence Keefe.

17           PROSPECTIVE JUROR KEEFE:  Present.

18           THE CLERK:  Juror No. 52, Kathleen Kelly.

19           PROSPECTIVE JUROR KELLY:  Here.

20           THE CLERK:  Juror No. 53, John Kiefer.

21           PROSPECTIVE JUROR KIEFER:  Present.

22           THE CLERK:  Juror No. 54, Hilda Layne.

23           PROSPECTIVE JUROR LAYNE:  Present.

24           THE CLERK:  Juror No. 55, Julia Leedy.

25           PROSPECTIVE JUROR LEEDY:  Here.

```
 1                THE CLERK:  Juror No. 56, Daniel Legarda.
 2                PROSPECTIVE JUROR LEGARDA:  Present.
 3                THE CLERK:  Juror No. 57, Adam Lewis; Juror
 4  No. 57, Adam Lewis.
 5       (No response.)
 6                THE CLERK:  Juror No. 58, Zakaria Mawloud.
 7                PROSPECTIVE JUROR MAWLOUD:  Present.
 8                THE CLERK:  Juror No. 59, Joseph Messina.
 9                PROSPECTIVE JUROR MESSINA:  Present.
10                THE CLERK:  Juror No. 60, John Michel.
11                PROSPECTIVE JUROR MICHEL:  Here.
12                THE CLERK:  Juror No. 61, John Mooney.
13                PROSPECTIVE JUROR MOONEY:  Present.
14                THE CLERK:  Juror No. 62, Anthony Moore.
15                PROSPECTIVE JUROR MOORE:  Present.
16                THE CLERK:  Juror No. 63, Alina, and I'll
17  spell your last name, N-H-O-U-Y-V-A-N-I-S-V-O-N-G.
18                PROSPECTIVE JUROR NHOUYVANISVONG:  Present.
19                THE CLERK:  How do you pronounce that,
20  please?
21                PROSPECTIVE JUROR NHOUYVANISVONG:  Nhouyvaniv
22  ong.
23                THE CLERK:  Thank you.
24                Juror No. 64, Kirstin Nickerson.
25                PROSPECTIVE JUROR NICKERSON:  Present.  Here.
```

1          THE CLERK:  Juror No. 65, James Nowotny.

2          PROSPECTIVE JUROR NOWOTNY:  Present.

3          THE CLERK:  Juror No. 66, Nancy Osborne.

4          PROSPECTIVE JUROR OSBORNE:  Present.

5          THE CLERK:  Juror No. 67, Joseph Osei.

6          PROSPECTIVE JUROR OSEI:  Present.

7          THE CLERK:  Juror No. 68, Melanie Padayachee.

8          PROSPECTIVE JUROR PADAYACHEE:  Padayachee,

9  present.

10         THE CLERK:  Thank you.

11         Juror No. 69, Stuart Pandza.

12         PROSPECTIVE JUROR PANDZA:  Present.

13         THE CLERK:  Juror No. 70, Michele Pecora.

14         PROSPECTIVE JUROR PECORA:  Here.

15         THE CLERK:  Juror No. 71, Pedro Permuy.

16         PROSPECTIVE JUROR PERMUY:  Here.

17         THE CLERK:  Juror No. 72, Krystyna Reign.

18         PROSPECTIVE JUROR REIGN:  Krystyna, present.

19         THE CLERK:  Thank you.

20         Juror No. 73, Roen Riehl.

21         PROSPECTIVE JUROR RIEHL:  Present.

22         THE CLERK:  Thank you.

23         Juror No. 74, Ann Saliski.

24         PROSPECTIVE JUROR SALISKI:  Present.

25         THE CLERK:  Juror No. 75, Susan Sanderson.

1          PROSPECTIVE JUROR SANDERSON:  Present.

2          THE CLERK:  Juror No. 76, Andrew Schober.

3          PROSPECTIVE JUROR SCHOBER:  Present.

4          THE CLERK:  Juror No. 77, Hadi Shakeri.

5          PROSPECTIVE JUROR SHAKERI:  Present.

6          THE CLERK:  Juror No. 78, Anquannet Skyler.

7          PROSPECTIVE JUROR SKYLER:  Present.

8          THE CLERK:  Juror No. 79, Carol Smith.

9          PROSPECTIVE JUROR SMITH:  Present.

10          THE CLERK:  Juror No. 80, Rohan Sobti.

11          PROSPECTIVE JUROR SOBTI:  Present.

12          THE CLERK:  Juror No. 81, Emma Stump.

13          PROSPECTIVE JUROR STUMP:  Present.

14          THE CLERK:  Juror No. 82, Gloria Thomas.

15          PROSPECTIVE JUROR THOMAS:  Present.

16          THE CLERK:  Juror No. 83, Malcolm Thompson.

17          PROSPECTIVE JUROR THOMPSON:  Present.

18          THE CLERK:  Juror No. 84, Marie

19  Toriello-Johnson.

20          PROSPECTIVE JUROR TORIELLO-JOHNSON:  Present.

21          THE CLERK:  Juror No. 85, Alexander Treadway.

22          PROSPECTIVE JUROR TREADWAY:  Present.

23          THE CLERK:  Juror No. 86, Enebish Uuganbayar.

24          PROSPECTIVE JUROR UUGANBAYAR:  Present.

25          THE CLERK:  Juror No. 87, Jake Valdez.

 1              PROSPECTIVE JUROR VALDEZ:  Here.

 2              THE CLERK:  Juror No. 88, Scott Valentin.

 3              PROSPECTIVE JUROR VALENTIN:  Present.

 4              THE CLERK:  Juror No. 89, Kathleen Van Dyke.

 5              PROSPECTIVE JUROR VAN DYKE:  Present.

 6              THE CLERK:  Juror No. 90 Alexis Wankowski.

 7              PROSPECTIVE JUROR WANKOWSKI:  Present.

 8              THE CLERK:  Juror No. 91, Fengrui Zhang.

 9              PROSPECTIVE JUROR ZHANG:  Here.

10              THE CLERK:  Is there any juror present whose

11 name I did not call?

12         (No response.)

13              THE COURT:  Thank you.

14              The clerk will issue a summons for those

15 persons whose names were called but did not appear.

16              THE CLERK:  Ladies and gentlemen of the jury,

17 will you please stand, raise your right hand, and

18 respond "I shall" after the oath is administered.

19         (The oath is administered.)

20              THE CLERK:  Thank you.  Please be seated.

21              THE COURT:  Thank you.

22              Ladies and gentlemen, as you know, you have

23 been summonsed as a prospective juror in the criminal

24 case of the *United States v. Igor Danchenko*.

25 Mr. Danchenko is seated to my right together with his

1  counsel, and the government is to my -- I'm sorry.

2  Mr. Danchenko is seated to my left along with his

3  counsel, and the government is seated to my right.

4       Twelve of you will be selected as jurors, and

5  four of you will be selected as alternates to any of

6  the twelve jurors who cannot complete their service.

7  But before we begin that selection process, I do want

8  to thank you for appearing here today to perform one of

9  the most important duties of citizenship.

10       I also want to emphasize the important

11  opportunity that you have to serve as a juror.  We are

12  one of the relatively few countries in the world that

13  have citizen juries even in criminal cases.  Juries are

14  made up of citizens, such as yourselves.  You are the

15  cornerstone of our criminal justice system and a vital

16  aspect of our democratic society and the system of

17  justice established through our Constitution.

18       For those of you who are selected, there will

19  be some inconvenience and perhaps even hardship, but I

20  think if you've ever served yourself or have spoken to

21  anyone that has served, you'll find it to be a

22  gratifying public service experience.

23       Each of you is qualified by law to sit as a

24  juror.  The question to be considered by the Court and

25  the parties is whether this case is the appropriate

1   case for your participation as a juror.

2            The selection process is intended to

3   accomplish two goals:

4            The first is to enable the Court to determine

5   whether any of you should be excused for cause, that

6   is, to determine if there's anything about your

7   knowledge of the case, the witnesses, the parties, or

8   the issues that would either affect your ability to be

9   impartial or cause an objective observer to conclude

10  that your ability to be fair and impartial might be

11  affected whether or not it is, in fact, affected.

12           Secondly, to enable counsel for the parties

13  to exercise their own individual judgment with respect

14  to what we call preemptory challenges, that is,

15  challenges for which no reason need be given.

16           At the end of this process, as I indicated,

17  twelve of you will be seated and sworn in as jurors.

18  You will deliberate following the close of all the

19  evidence.

20           In addition, four of you will be seated and

21  sworn as alternate jurors, who will hear all the

22  evidence as well and replace any of the other jurors if

23  he or she is unable, for whatever reason, to complete

24  his or her service.  The alternate jurors will be

25  excused at the end of the case before the jurors begin

1  deliberation.

2          I know each of you have completed the Court's

3  questionnaires, and I thank you for that.  It has

4  enormously helped in the selection process, and I'm not

5  going to repeat those questions here.

6          I will ask some limited follow-up questions.

7  If you need to answer "yes" to any of the questions,

8  please answer by raising your hand.  When you are

9  called upon, please stand and identify yourself by your

10  name and juror number.

11          If there are any follow-up questions that you

12  would prefer answering more privately at the bench, let

13  me know, and I will bring you forward and ask you in

14  that setting; although, it will be with counsel.

15          But before I ask any other specific

16  questions, I do want to ask whether any of you need to

17  correct or supplement or change any of the information

18  you gave in your questionnaires either due to changed

19  circumstances, refreshed recollections, or information

20  that you have since learned about this case that would

21  materially change your answers to the questionnaires.

22  Is there anyone that needs to make any supplemental

23  disclosures?

24          Yes.  Would you identify yourself, please.

25          PROSPECTIVE JUROR BELL:  Betsy Bell.  I'm

 1  Juror No. 4.

 2          THE COURT:  All right.

 3          PROSPECTIVE JUROR BELL:  I report to a CEO.

 4  I'm an executive assistant to a CEO, and he was a

 5  nominee for Trump for deputy administrator.  I also

 6  rented office space for the Trump campaign at one

 7  point.

 8          THE COURT:  All right.  Thank you for that.

 9          Anyone else?

10      (No response.)

11          THE COURT:  This, I'm sure, was implicit in

12  the questionnaires, but let me just for the record ask

13  you these questions:  Are any of you not 18 years old?

14      (No response.)

15          THE COURT:  Are any of you not citizens of

16  the United States?

17      (No response.)

18          THE COURT:  Have any of you not resided in

19  this area for more than a year?

20      (No response.)

21          THE COURT:  I'm now going to ask counsel for

22  the government to introduce themselves and the members

23  of their trial team.

24          Mr. Durham.

25          MR. DURHAM:  Thank you, Your Honor.

1            Ladies and gentlemen, my name is John Durham.

2   I'm special counsel with the Department of Justice.   I

3   will be prosecuting this case along with my colleagues,

4   Assistant Special Counsel Michael Keilty and Assistant

5   Special Counsel Brittain Shaw.   Also, at our counsel

6   table, the woman sitting in front of me is Paralegal

7   Specialist Kori Arsenault, and the gentleman at the

8   table is Supervisory Special Agent Ryan James of the

9   Federal Bureau of Investigation.

10            If you should know any of us, I would ask you

11  to bring that to the Court's attention.

12            THE COURT:   Thank you.

13            Do any of you know Mr. Durham or any of his

14  colleagues?

15      (No response.)

16            THE COURT:   Have any of you had any dealings

17  with the United States Attorney's Office in this

18  district?

19            PROSPECTIVE JUROR ANTOL:   Your Honor?

20            THE COURT:   Yes.

21            THE COURT SECURITY OFFICER:   Sir, would you

22  stand up and identify yourself.

23            PROSPECTIVE JUROR ANTOL:   Brian Antol, Juror

24  No. 2.   I'm a retired FBI employee, and I worked on

25  some counterterrorism cases that I had some interviews

1   and stuff down here.

2               THE COURT:  All right.  Thank you.

3               What is your juror number again, sir?

4               PROSPECTIVE JUROR ANTOL:  No. 2.

5               THE COURT:  All right.  Thank you.

6               Anyone else?

7               Yes.

8               PROSPECTIVE JUROR ERCEG:  Marta Erceg, Juror

9   No. 28.  I work for the Office of the Inspector

10  General, and on occasion we present cases to --

11       (Reporter clarification.)

12              PROSPECTIVE JUROR ERCEG:  My name is

13  Martha -- oh, the last part.  I work for the Office of

14  the Inspector General, and occasionally we present

15  criminal cases for prosecution to the Eastern District.

16              THE COURT:  Thank you.

17              Anyone else?

18              Thank you.  Yes, sir.

19              PROSPECTIVE JUROR FISCHER:  Juror No. 32.  I

20  also work for the Office of the Inspector General, and

21  I work in conjunction with the FBI.

22              THE COURT:  All right.  Thank you.

23              Anyone else?

24       (No response.)

25              THE COURT:  Thank you.

1          Mr. Sears, would you identify yourself and

2   your colleagues.

3          MR. SEARS:  Thank you, Your Honor.

4          Good morning.  My name is Stuart Sears.  This

5   is my law partner, Danny Onorato.  We are with the law

6   firm of Schertler, Onorato, Mead & Sears in Washington,

7   D.C.  We have the privilege of representing our client,

8   Igor Danchenko, who is a defendant in this case.  With

9   us here as well are our paralegal specialists, Matt

10  Milzman, Charlie Tent, and Grace McMahon.

11         Thank you.

12         THE COURT:  Do any of you know Mr. Sears,

13  Mr. Onorato, any of his colleagues, or Mr. Danchenko?

14      (No response.)

15         THE COURT:  Have any of you ever had any

16  dealings with Mr. Sears' and Mr. Onorato's law firm?

17      (No response.)

18         THE COURT:  Thank you.

19         In the questionnaires, you were told that the

20  government has accused Mr. Danchenko of making false

21  statements to agents of the Federal Bureau of

22  Investigation in connection with or related to the

23  government's investigation into whether individuals

24  associated with the Trump 2016 presidential campaign

25  coordinated activities with the Russian government.

1   All of you indicated there was nothing about the

2   subject matter or the nature of this case that would

3   make it difficult for you to hold the government to a

4   standard of proof beyond a reasonable doubt or to be

5   fair and impartial.

6          Let me just give you a little bit more

7   information.

8          More specifically, the government has alleged

9   that on June 15, 2017, Mr. Danchenko made a materially

10  false statement about whether he had talked to a man

11  named Charles Dolan about anything that showed up in

12  what's referred to as the Steele report, and on four

13  different occasions in 2017, he is alleged to have

14  falsely stated that he received an anonymous phone call

15  from a man he believed was named Sergei Millian.

16         With this additional information, is there

17  anyone here who thinks that they know anything about

18  this case beyond what you have previously disclosed or

19  that there's anything about the subject matter of this

20  case that you think would make it difficult for you to

21  be fair and impartial?

22         THE COURT SECURITY OFFICER:  Your Honor?

23         THE COURT:  Yes.

24         PROSPECTIVE JUROR BORDEN:  Casey Borden,

25  Juror 8.

```
 1            THE COURT:  All right.
 2            PROSPECTIVE JUROR BORDEN:  I don't know
 3   anything in particular, but my husband -- and I did
 4   disclose this -- in 2016 was director of oversight for
 5   the House of Representatives, and then he moved to the
 6   oversight committee in the House of Representatives
 7   where they were investigating the election.  So there
 8   is a chance, as things go on, that things may come back
 9   to me because we discussed it.  Right now, no.
10            THE COURT:  All right.  Thank you for that.
11            Anyone else?
12        (No response.)
13            THE COURT:  All right.  I'm now going to
14   identify for you persons who may be witnesses or
15   referred to in this case.  Please raise your hand if
16   you know or you think you know any of these
17   individuals:  FBI Supervisory Special Agent Amy
18   Anderson; FBI Supervisory Intelligence Analyst Brian
19   Auten; Charles Dolan; FBI Special Agent Kevin Helson;
20   Brittany Hertzog; FBI Supervisory Special Agent Ryan
21   James; and Sergei Millian.
22        (No response.)
23            THE COURT:  Thank you.
24            Mr. Danchenko is presumed to be innocent and
25   does not have to testify or offer any evidence.  Does
```

1  anyone believe that he or she would be unable to accept

2  this fundamental principle of our criminal justice

3  system?

4       (No response.)

5            THE COURT:  The government must prove

6  Mr. Danchenko's guilt beyond a reasonable doubt.  Does

7  anybody believe that he or she would be unable to

8  accept this fundamental principle of our criminal

9  justice system?

10       (No response.)

11            THE COURT:  The applicable law will be given

12  to you through instructions.  It will be your duty to

13  follow those instructions and to follow the law as I

14  give it to you whether or not you agree with it.  Is

15  there anyone here who, for whatever reason, does not

16  believe that he or she could follow the law as I give

17  it to you and put aside your own personal views as to

18  what the law should be?

19       (No response.)

20            THE COURT:  Is there anyone here who believes

21  that if you are seated to sit on this case, you have

22  any concern about your ability to render a verdict

23  solely on the evidence presented at the trial and the

24  context of the law as I will give it to you in my

25  instructions disregarding any other ideas, notions, or

```
 1   beliefs about the law that you may have encountered in

 2   reaching your verdict?

 3        (No response.)

 4            THE COURT:  All of you have been asked about

 5   whether service on this jury would impose an undue

 6   hardship, and all of you have indicated that you would

 7   be willing to serve.  Is there anyone here who believes

 8   that, for whatever reason, your situation has changed

 9   so that service would simply be too hard a hardship on

10   you at this time?

11            All right.  Anyone else?

12            I'll hear you at the bench.

13        (Conference at the bench, as follows:)

14            THE COURT:  All right.

15            MR. SEARS:  Your Honor, if I could just --

16   you had already stated, so I didn't want to interrupt

17   you.  I didn't hear Juror 9 called.  I don't know if

18   anybody else had a record of Juror 9.

19            THE CLERK:  Juror No. 9 was excused.  He had

20   COVID.

21            MR. SEARS:  That explains it.

22            THE COURT:  All right.  Good.

23            (Prospective Juror Stump approaches the

24   bench.)

25            THE COURT:  Come a little bit closer.
```

1   Identify yourself, please.

2             PROSPECTIVE JUROR STUMP:  My name is Emma

3   Stump.  I'm Juror No. 81.

4             THE COURT:  Yes.

5             PROSPECTIVE JUROR STUMP:  Anyway, what I

6   wanted to say is just depending on the overall length,

7   I will not be getting any compensation from my job.  It

8   wouldn't reflect well on me, and I think that would

9   really cause a lot of stress and would, like, take up a

10  lot of my mind space throughout the week and affect my

11  ability to be impartial.

12            THE COURT:  What do you do for a living?

13            PROSPECTIVE JUROR STUMP:  I work for a

14  government contractor up in Maryland.

15            THE COURT:  Well, the trial is expected to

16  last probably seven to ten days.  Do you think that

17  would impose too much of a hardship on you?

18            PROSPECTIVE JUROR STUMP:  Yeah.  I've got

19  five days covered, but that's it.

20            THE COURT:  All right.  I will consider that.

21            Thank you.

22       (Prospective Juror Stump exits the bench, and

23       Prospective Juror Fischer approaches the bench.)

24            THE COURT:  Yes, sir.  Your number?

25            PROSPECTIVE JUROR FISCHER:  Michael Fischer,

1    Juror No. 32.

2              THE COURT:  Yes.  Come a little closer.

3              PROSPECTIVE JUROR FISCHER:  I don't mind.

4              So my wife has metastatic Stage IV cancer,

5    and I'm her caregiver.  I just found out on Thursday

6    that I will not be getting paid for this, which is

7    strange because I work for a federal contractor.  But I

8    will not be.  So...

9              THE COURT:  All right.  I will consider that.

10             PROSPECTIVE JUROR FISCHER:  Thank you.  I

11   would just say it would be an honor either way.  I will

12   find a way to make it work, if necessary.

13             THE COURT:  All right.  I appreciate that.

14             PROSPECTIVE JUROR FISCHER:  It would be

15   awesome.

16             THE COURT:  Thank you.

17      (Prospective Juror Fischer exits the bench, and

18        Prospective Juror Cruz approaches the bench.)

19             PROSPECTIVE JUROR CRUZ:  Mary Cruz, Juror

20   No. 20.

21             THE COURT:  Yes.

22             PROSPECTIVE JUROR CRUZ:  My husband has to

23   have surgery on Monday, the 17th.  So I don't have

24   family close that would be able to provide

25   transportation to and from the surgery.

```
 1              THE COURT:  All right.  Is that the only
 2  conflict you would have?
 3              PROSPECTIVE JUROR CRUZ:  That's my only
 4  conflict, yes, sir.
 5              THE COURT:  Would that take up the whole day
 6  for you?
 7              PROSPECTIVE JUROR CRUZ:  We don't have a time
 8  yet.  They will call on Friday with the time for the
 9  surgery.  It will be between 8:00 and 3:00.  I just
10  don't know.
11              THE COURT:  All right.  Thank you.  I'll
12  consider that.
13              PROSPECTIVE JUROR CRUZ:  Okay.  Thank you.
14        (Prospective Juror Cruz exits the bench, and
15        Prospective Juror Carimbocas approaches the
16        bench.)
17              THE COURT:  Yes.
18              PROSPECTIVE JUROR CARIMBOCAS:  Alicea
19  Carimbocas, Juror No. 12.
20              THE COURT:  Yes.
21              PROSPECTIVE JUROR CARIMBOCAS:  I have an
22  interview on Friday at 10:30 that I can't postpone.  I
23  had an interview today.  It is the final step for a
24  regional manager position.
25              THE COURT:  This is on Friday at what time?
```

```
 1              PROSPECTIVE JUROR CARIMBOCAS:  At 10:30.

 2              THE COURT:  How long do you think that would

 3    take?

 4              PROSPECTIVE JUROR CARIMBOCAS:  Thirty

 5    minutes.

 6              THE COURT:  Okay.  All right.  Thank you.  I

 7    will consider it.

 8        (Prospective Juror Carimbocas exits the bench, and

 9        Prospective Juror Mooney approaches the bench.)

10              PROSPECTIVE JUROR MOONEY:  Good morning.  I'm

11    John Mooney, Juror No. 61.

12              THE COURT:  Yes, sir.

13              PROSPECTIVE JUROR MOONEY:  I still do not

14    believe I have a hardship, a disqualifying hardship,

15    but I want to make very clear what I said in my written

16    statement.  My wife is having her second knee replaced

17    on November 10.  If the trial is indeed two weeks,

18    there will be no problem.  But I have to do a dead stop

19    on the 9th because she needs constant care.

20              THE COURT:  Of November?

21              PROSPECTIVE JUROR MOONEY:  Right.

22              THE COURT:  No, it will not go that long.

23              PROSPECTIVE JUROR MOONEY:  Okay.

24        (Prospective Juror Mooney exits the bench, and

25        Prospective Juror Hurd approaches the bench.)
```

1              PROSPECTIVE JUROR HURD:   Hello.

2              THE COURT:   Yes.

3              PROSPECTIVE JUROR HURD:   My name is Holliday

4    Hurd, 44.

5              THE COURT:   Yes.

6              PROSPECTIVE JUROR HURD:   Sir, I'm extremely

7    interested in serving, but my husband has Stage IV

8    mesothelioma.  I don't -- I take him to all his

9    appointments, and I didn't know the timing.

10             THE COURT:   I understand.

11             PROSPECTIVE JUROR HURD:   I would still like

12   to try because I've -- my work situation, which I have

13   retired from, has never allowed me to be a juror.  So I

14   don't know what to say.

15             THE COURT:   It sounds like it's a difficult

16   situation for you, though.  Do you think you'd be able

17   to concentrate?

18             PROSPECTIVE JUROR HURD:   Oh, I could

19   certainly concentrate.  It is just the logistics.  We

20   have no family left.  Everyone in my family has died in

21   the last four years, and we have no family.

22             THE COURT:   I'm sorry to hear about that, and

23   I will consider that.  All right.

24             PROSPECTIVE JUROR HURD:   I still would like

25   to try.

```
 1              THE COURT:  All right.  Would you like to
 2   serve?
 3              PROSPECTIVE JUROR HURD:  I would love to
 4   serve.
 5              THE COURT:  All right.  Thank you.
 6         (Prospective Juror Hurd exits the bench, and
 7         Prospective Juror Edmond approaches the bench.)
 8              THE COURT:  Okay.
 9              PROSPECTIVE JUROR EDMOND:  Adrienne Edmond,
10   Juror 26.
11              THE COURT:  Yes.
12              PROSPECTIVE JUROR EDMOND:  So I had a
13   preplanned trip that will interfere with -- at the end
14   of the month, I will be going to the University of
15   South Carolina with my organization.  We have
16   everything planned for Thursday, the 27th, and Friday,
17   the 28th.  I do have documentation that I had booked
18   the trip.
19              THE COURT:  I can say with confidence we'll
20   be done by then.
21              PROSPECTIVE JUROR EDMOND:  We'll be done.
22   Okay.  If we'll be done, great.
23              THE COURT:  All right.  Thank you.
24         (Prospective Juror Edmond exits the bench, and
25         Prospective Juror Hall approaches the bench.)
```

 1          PROSPECTIVE JUROR HALL:  Good morning.

 2          THE COURT:  Good morning.

 3          PROSPECTIVE JUROR HALL:  Juror 39,

 4  Christopher Hall.  I apologize if this isn't the

 5  appropriate time.  I have a subpoena to be in Prince

 6  William County court tomorrow.  So I don't know if this

 7  was the time to bring this to your attention or not.

 8  Do you want to see it?

 9          THE COURT:  As a witness or --

10          PROSPECTIVE JUROR HALL:  As a witness, yes.

11  I just didn't know if this was the right time to bring

12  it up or not.

13          THE COURT:  That's your only conflict?

14          PROSPECTIVE JUROR HALL:  Well, I have more

15  conflicts, but I can work around that.  I didn't know

16  what took precedence.

17          THE COURT:  What is the nature of the -- is

18  it a hearing or a trial?

19          PROSPECTIVE JUROR HALL:  It's a trial.

20          THE COURT:  A trial.  In what court?

21          PROSPECTIVE JUROR HALL:  Prince William

22  County criminal, general district.

23          THE COURT:  General district.  Okay.  All

24  right.  Thank you.

25          A PROSPECTIVE JUROR:  Okay.  Thank you.

```
 1            (Prospective Juror Hall exits the bench, and
 2        Prospective Juror Reed approaches the bench.)
 3            PROSPECTIVE JUROR REED:  Hi.
 4        (Reporter clarification.)
 5            A PROSPECTIVE JUROR:  Juror No. 21.  I don't
 6   know what constitutes as a hardship.  I have four
 7   kiddos, and two of them are sick right now.  And they
 8   are all in sports.  It's every night of the week.
 9            THE COURT:  How old are they?
10            PROSPECTIVE JUROR REED:  All in elementary
11   school.
12            THE COURT:  All right.  We would be from 9:30
13   to, roughly, 6:00.  How does that impact your life?
14            PROSPECTIVE JUROR REED:  It takes over an
15   hour to get here.  I mean, I just felt that I needed to
16   share that.
17            THE COURT:  Do you want to be excused?
18            PROSPECTIVE JUROR REED:  Um, oh, I don't
19   know.  I don't know.
20            THE COURT:  All right.  Thank you.
21            PROSPECTIVE JUROR REED:  Uh-huh.
22            THE COURT:  I think that's it.  Let me go
23   back to the ones who were identified earlier.  I think
24   we have enough.  Unless you-all want me to individually
25   talk to some of these, I'm inclined to excuse all of
```

1  the ones identified.

2          MR. DURHAM:  That's fine.

3          THE COURT:  Well, except for the one woman

4  whose husband has cancer, but she says she wants to

5  serve.  I will give her that opportunity.

6          MR. DURHAM:  As a husband, I'm not sure --

7          THE COURT:  So I'm inclined to go ahead and

8  strike for cause all the ones that have been

9  identified.  We still have an ample number of jurors to

10 choose from.

11         MR. DURHAM:  That's fine for the government,

12 Your Honor.

13         THE COURT:  I'm going to ask one more

14 question, if there's anything else they can think of

15 that might affect your judgment.  Is there anything you

16 would like for me to specifically ask anybody?

17         MR. ONORATO:  Anything that you want to bring

18 to the Court's attention, just a catchall.

19         THE COURT:  Yes.

20         THE CLERK:  Judge, I just need to go over the

21 ones that were stricken.

22         THE COURT:  Nos. 59, 6, 67, 50, 26, 45, 49,

23 55, 56, 81, 32, 20, 12, 39, and 21.

24         MR. SEARS:  Your Honor, the only other -- I

25 don't know if the Court wants to ask the jurors whether

1    they have read anything since they filled out the

2    questionnaires, between then and now, or any other news

3    reports.  That was the only question --

4              THE COURT:  Well, I did ask them whether

5    anything had come to their attention that would affect

6    their judgment.

7         (Proceedings continued in open court, as follows:)

8              THE COURT:  Yes.  One final question:  Is

9    there anything that I haven't asked about that anyone

10   thinks would affect their ability to be a fair and

11   impartial juror in this case?

12        (No response.)

13             THE COURT:  Does anyone have reason to think

14   that, for whatever reason, even if it doesn't pertain

15   to what you've been asked about previously, would

16   affect your ability to serve as a fair and impartial

17   juror?

18        (No response.)

19             THE COURT:  All right.  Thank you.

20             We'll now proceed with jury selection.

21             THE CLERK:  Yes, Judge.

22             Ladies and gentlemen of the jury, as I call

23   your name, please come forward and have a seat in the

24   jury box as directed by the marshal:  Juror No. 83,

25   Malcolm Thompson; Juror Number 88, Scott Valentin;

1  Juror No. 25, Amy Dickinson; Juror No. 5, Shailja

2  Bhatia; Juror No. 1, Kyle Addie; Juror No. 53, John

3  Kiefer; Juror No. 61, John Mooney; Juror No. 35, Mohsen

4  Fouda; Juror No. 51, Condence Keefe; Juror No. 22,

5  Jennifer Dalrymple; Juror No. 60, John Michel; and

6  Juror No. 14, Donald Connors, Jr.

7       (Strikes taken.)

8            THE CLERK:  The following jurors are excused

9  with the thanks of the Court and may return to their

10 seats in the courtroom:  Juror No. 88, Scott Valentin;

11 Juror No. 53, John Kiefer; Juror No. 61, John Mooney;

12 Juror No. 22, Jennifer Dalrymple; Juror No. 14, Donald

13 Connors, Jr.; Juror No. 25, Amy Dickinson; Juror

14 No. 35, Mohsen Fouda; and Juror No. 1, Kyle Addie.

15           Ladies and gentlemen of the jury, as I call

16 your name, please come forward and have a seat in the

17 jury box as directed by the marshal:  Juror No. 82,

18 Gloria Thomas; Juror No. 78, Anquannet Skyler; Juror

19 No. 3, Terence Beck; Juror No. 33, Chandler Fitch;

20 Juror No. 84, Marie Toriello-Johnson; Juror No. 44,

21 Holliday Hurd; Juror No. 11, Catiria Bushnell; and

22 Juror No. 46, Melody Johnson.

23      (Strikes taken.)

24           THE CLERK:  The following jurors are excused

25 with the thanks of the Court and may return to their

1  seat in the courtroom:  Juror No. 46, Melody Johnson;

2  Juror No. 84, Marie Toriello-Johnson; Juror No. 44,

3  Holliday Hurd; Juror No. 33, Chandler Fitch.

4          Ladies and gentlemen of the jury, as I call

5  your name, please come forward and have a seat in the

6  jury box as directed by the marshal:  Juror No. 77,

7  Hadi Shakeri; Juror No. 7, Raymond Bishop, Jr.; Juror

8  No. 8, Kasey Borden; and Juror No. 18, Sharita

9  Crawford.

10      (Strikes taken.)

11         THE CLERK:  The following jurors are excused

12  with the thanks of the Court and may return to their

13  seats in the courtroom:  Juror No. 18, Sharita

14  Crawford; Juror No. 8, Kasey Borden.

15         Ladies and gentlemen of the jury, as I call

16  your name, please come forward and have a seat in the

17  jury box as directed by the marshal:  Juror No. 37,

18  Joel Greene; Juror No. 87, Jake Valdez.

19      (Strikes taken.)

20         THE CLERK:  Ladies and gentlemen of the jury,

21  as I call your name, please come forward and have a

22  seat in the jury box as directed by the marshal:  Juror

23  No. 17, Clare Cranshaw; Juror No. 90, Alexis Wankowski;

24  Juror No. 40, Christophe Hammel; and Juror No. 62,

25  Anthony Moore.

```
 1        (Strikes taken.)

 2            THE CLERK:  The following juror is excused

 3   with the thanks of the Court and may return to their

 4   seat in the courtroom:  Juror No. 17, Clare Cranshaw.

 5            Ladies and gentlemen of the jury, as I call

 6   your name, please come forward and have a seat in the

 7   jury box as directed by the marshal.

 8            THE COURT:  Hold on one minute.  Let me see

 9   counsel at the bench, please.

10        (Conference at the bench, as follows:)

11            THE COURT:  I'm sure I wasn't clear.  What I

12   envisioned happening was that we would have four people

13   brought in.  Each side would strike one of those.  Then

14   we would bring in another four, and each one would have

15   a strike so we'd end up with four.

16            Did somebody not strike?

17            MR. SEARS:  We did not strike.  We

18   misunderstood.

19            THE COURT:  Why don't you go ahead and

20   strike.  Then we'll bring another four, and each of you

21   get a strike.

22            MR. SEARS:  Got it.  Okay.

23            THE COURT:  All right.

24        (Proceedings continued in open court, as follows:)

25        (Strikes taken.)
```

1          THE CLERK:  The following juror is excused

2    with the thanks of the Court and may return to their

3    seat in the courtroom:  Juror No. 40, Christophe

4    Hammel.

5          Ladies and gentlemen of the jury, as I call

6    your name, please come forward and have a seat in the

7    jury box as directed by the marshal:  Juror No. 36,

8    Kelsey Gallagher; Juror No. 13, Epifanio Clarin, III;

9    Juror No. 75, Susan Sanderson; and Juror No. 31, David

10   Felton.

11        (Strikes taken.)

12        THE CLERK:  The following jurors are excused

13   with the thanks of the Court and may return to their

14   seats in the courtroom:  Juror No. 13, Epifanio Clarin,

15   III, and Juror No. 75, Susan Sanderson.

16        Will the defendant please stand and face the

17   jury.

18        Ladies and gentlemen of the jury, please

19   stand and raise your right hands and respond "I shall"

20   after the oath is administered.

21        (The oath is administered.)

22        THE CLERK:  Thank you.  Please be seated.

23        THE COURT:  Please be seated.

24        Ladies and gentlemen, we've now concluded

25   jury selection.  For those of you who have not been

1    selected, you're excused with the thanks of the Court.

2        (People exit.)

3            THE COURT:  Let me see counsel at the bench.

4        (Conference at the bench, as follows:)

5            THE COURT:  All right.  Any objections to the

6    composition of the jury as selected?

7            MR. DURHAM:  None, Your Honor.

8            MR. ONORATO:  No, Your Honor.

9            THE COURT:  I would normally break for lunch

10   at 1:00.  My thought is to have an early break for

11   lunch and then come back at 1:00, and we'll do

12   preliminary instructions and then opening statements.

13   All right.

14           MR. DURHAM:  Yes, Your Honor.

15           THE COURT:  Before we leave, I'll give you my

16   guidance on opening statements.

17           MR. DURHAM:  Yes, Your Honor.

18           MR. ONORATO:  Your Honor, I just would like

19   to inquire if the end of the day is at 6:00 today?

20           THE COURT:  Well, between 5:30 and 6:00

21   depending on how the evidence goes.

22           I will just go ahead and put on the record

23   now:  I don't want you to mention in opening statement

24   either the counterintelligence evidence or the failure

25   to produce evidence.  I'm not going to make a

1    definitive ruling right now.  I'm going to do it in the
2    context of witnesses when you present the testimony.  I
3    don't want that mentioned in opening statement.

4           I don't want it mentioned in opening
5    statement either about those public articles that you
6    have mentioned or any of these other emails that you've
7    mentioned.

8           MR. ONORATO:  Can I ask another question?

9           THE COURT:  Yes.

10          MR. ONORATO:  So I do have evidence -- from I
11   think it's Agent Auten -- that he was aware of the
12   public emails because he went through this material
13   when he was interviewed by the Office of Inspector
14   General, and he told them that he saw articles
15   generally.  So I won't talk about the specific ones but
16   that he was aware --

17          THE COURT:  You expect that to come out
18   through his testimony?

19          MR. ONORATO:  Absolutely.  I'm going to read
20   it to him.

21          THE COURT:  All right.

22          MR. KEILTY:  Your Honor, the next question --
23   so in opening, is it permissible to say the FBI didn't
24   receive any of these emails as opposed to talking about
25   he should have produced these emails?

```
 1          THE COURT:  I think you can say the FBI
 2  obtained these emails.
 3          MR. KEILTY:  They never obtained these
 4  emails.
 5          THE COURT:  Obviously, at some point, right?
 6  How did they get them?  Through a warrant?
 7          MR. DURHAM:  After a search warrant.  We did
 8  the search warrant.
 9          THE COURT:  Again, I'm not sure precisely how
10  this is going to play out until I hear the testimony.
11  I would say you obtained these emails.  They say what
12  they say.  All right.
13          MR. ONORATO:  Your Honor, I just want to let
14  the Court be aware of one other thing.  I'm a Type 2
15  diabetic.  I'm not making a call.  I am just monitoring
16  my sugar.
17          THE COURT:  All right.  We won't have you
18  arrested.
19          MR. DURHAM:  All right.  Good.
20          Thank you, Your Honor.
21      (Proceedings continued in open court, as follows:)
22          THE COURT:  Ladies and gentlemen, I'm going
23  to excuse you for what will be an early lunch.  But
24  before we do that, I want to give you some information
25  about how we are going to proceed in this case.  Our
```

1 normal trial day after today will begin at 9:30 in the

2 morning.  You should make arrangements to be here at

3 the courthouse by 9:15.  We'll adjourn at the end of

4 the day typically between 5:30 and 6:00 depending on

5 where we are in the evidence.  In the morning, we'll

6 have a break probably around 11:00.  We'll break for

7 lunch at 1:00, come back at 2:00.  We'll have a break

8 in the afternoon around 3:30.

9           If at any time anybody needs a break other

10 than these sort of standard breaks, just raise your

11 hand, and I will accommodate your request as best I

12 can.

13           When you come back from lunch, we are going

14 to begin with some preliminary instructions by me.

15 Then we'll have opening statement, and the government

16 will proceed with its case, following which the defense

17 will have an opportunity to present its case.  Then the

18 government will have an opportunity to put on any

19 rebuttal evidence.  We'll have closing arguments, and

20 you'll begin your deliberations.

21           I will tell you now what I will tell you

22 every time that I excuse you to the jury room and, that

23 is, do not talk about this case.  You know very little

24 about it, but don't speculate about what the case is or

25 is not.  You should not discuss the merits of the case

1   or any of the testimony until the close of the case

2   when you have heard all the evidence and the closing

3   arguments and all of you are together in the jury room

4   to begin your deliberations.

5          You will find in the jury room a phone.

6   That's purely for the purpose of allowing you to let

7   your family and employers know that you are going to be

8   occupied for a while.  It is not to conduct any

9   business or any social activities.

10         So with that, you are excused to the jury

11  room and for lunch, and we will reconvene at 1:00.

12      (The jury exits at 12:03 p.m.)

13         THE COURT:  All right.  Anything else before

14  we recess?

15         MR. DURHAM:  The government has nothing.

16         Thank you, Your Honor.

17         THE COURT:  All right.  The Court will stand

18  in recess until 1:00.

19         -----------------------------------
                    Time:  12:03 p.m.
20

21      I certify that the foregoing is a true and

22   accurate transcription of my stenographic notes.

23

24                              _____
                                        /s/
25                              Rhonda F. Montgomery, CCR, RPR

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599