86

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,     : Criminal Action No.
                                   :
5                     Plaintiff,   : 1:21-cr-245
                                   :
6              versus              : October 11, 2022
                                   :
7    IGOR Y. DANCHENKO,            :
                                   : Volume 1 (PM Session)
8                     Defendant.   : Pages 86 - 255
     ------------------------------x
9
                       TRANSCRIPT OF JURY TRIAL
10         BEFORE THE HONORABLE ANTHONY J. TRENGA
                  UNITED STATES DISTRICT JUDGE
11
                     A P P E A R A N C E S
12
     FOR THE GOVERNMENT:     DOJ-USAO
13                           JOHN DURHAM, AUSA
                             MICHAEL T. KEILTY, AUSA
14                           ADAM SMALL, AUSA
                             145 N Street, NE
15                           Suite 3e.803
                             Washington, D.C. 20002
16
     FOR THE DEFENDANT:      SCHERTLER ONORATO MEAD & SEARS,
17                           LLP

18                           STUART ALEXANDER SEARS, ESQ
                             555 13th Street, NW, Suite 500
19                           Washington, DC 20004

20                           DANNY ONORATO, ESQ. (DC-NA)
                             901 New York Avenue NW, Suite 500
21                           Washington, D.C. 20001

22

23
     OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
24                                    United States District Court
                                      401 Courthouse Square
25                                    Fifth Floor
                                      Alexandria, VA 22314

                                    —Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

                     EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

87

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Brian Auten

     Direct examination by Mr. Durham............ 56

EXHIBITS

On behalf of the Government:

                                               Admitted

Number 109A....................................... 94
Number 1205....................................... 107
Number 1206....................................... 115
Number 1207....................................... 115
Number 1208....................................... 115
Number 118........................................ 129
Number 1502....................................... 144

MISCELLANY

Preliminary matters.................................. 03
Preliminary instructions............................. 03
Opening statements................................... 16
Opening statements................................... 33
Certificate of Court Reporter........................ 170

-United States v. Danchenko-

88

1          **A F T E R N O O N   P R O C E E D I N G S**

2     (Court proceedings commenced at 1:11 p.m.)

3

4          THE COURT:  Anything before we bring out the jury?

5          MR. KEILTY:  Your Honor, I don't know if your

6     preliminary instructions will cover this, but one of the

7     jurors walked up to me and wanted to ask a question about

8     logistics, Where the jury room was, and I just ignored her.

9     Look, I'm usually rude to people, but I didn't want her to

10    think I was --

11         THE COURT:  All right.  Well, thank you for that.

12         I am going to read, with some minor additions,

13    agreed-upon jury instructions 1, 2, and 3 as preliminary

14    instructions.

15         Let's bring the jury out.

16         (Jury present.)

17         THE COURT:  Please be seated.

18         Ladies and gentlemen, as I mentioned, I'm now going

19    to give you some preliminary instructions, following which

20    we'll have opening statements.  What I say now is intended to

21    serve only as an introduction to the entire trial of this

22    case.  It is not a substitute for the detailed instructions on

23    the law, which I will give you at the end of the case and

24    before you retire to deliberate on your verdict.  It is only a

25    brief overview of the trial process.

─────United States v. Danchenko─────

89

1        Beginning with these preliminary instructions and

2   during the trial, you'll hear me use a few terms which you may

3   or may not be familiar with.  Let me now briefly explain some

4   of the most common to you.  You will sometimes hear me refer

5   to counsel.  Counsel is simply another way of referring to the

6   lawyers or the attorneys.  I will sometimes refer to myself as

7   the Court.  The prosecution and the defendant are sometimes

8   called the parties to this case.

9        When I sustain an objection, I am excluding the

10  evidence from this trial for good reason.  When you hear that

11  I have overruled an objection, I am permitting that evidence

12  to be admitted.  When we say, "admitted into evidence" or

13  "received into evidence," we mean that this particular

14  statement or this particular exhibit is not part of the trial,

15  and most importantly, may be considered by you in making the

16  decisions you must make at the close of the case.  Statements

17  or exhibits which are not admitted into evidence may not be

18  considered by you in reaching your verdict.

19       The term "burden of proof" or "sustaining its burden

20  of proof" means the obligations of proving its case in this

21  trial, the government's obligation to produce proof beyond a

22  reasonable doubt of the changes in the indictment that is

23  brought.

24       This is a criminal case commenced by the United

25  States, which I may sometimes refer to as the prosecution and

—————United States v. Danchenko—————

90

1  sometimes the government and sometimes the Special Counsel

2  against Igor Danchenko, to whom I may refer to as the

3  defendant.  The case is initiated by way of an indictment.

4  You should understand that an indictment is simply a charge by

5  the government to begin a case and that it is not in any sense

6  evidence of the allegations or statements it contains.  Igor

7  Danchenko, the defendant, has pleaded not guilty to the

8  indictment.  The defendant contends that he is not guilty.

9  The government has the burden or obligation to prove each of

10  the essential elements of the crimes charged in the indictment

11  to you beyond a reasonable doubt.  The purpose of this trial

12  is to determine whether or not the government can meet its

13  burden or obligation.

14          I instruct you that you must presume Mr. Danchenko,

15  the defendant, is not guilty of the crimes charged in the

16  indictment.  The crimes charged in the indictment are based on

17  Title 18 of the United States Code, Section 1001(a)(2), which

18  provides, in relevant part, as follows:  Whoever in any matter

19  within the jurisdiction of the executive branch of the

20  government of the United States knowingly and willfully makes

21  any materially false fictitious or fraudulent statements or

22  representations shall be guilty of an offense against the

23  United States.

24          To help you analyze the evidence as you hear it at

25  trial, I will give you now a preliminary summary of the

United States v. Danchenko

91

1    individual elements of the crimes charged which the government

2    is required to prove beyond a reasonable doubt.

3            In order to prove the crime of -- the crime charged

4    in Counts 1 through 5, the government must prove, one, the

5    defendant made a false, fictitious or fraudulent statement or

6    representation to the government as detailed in the count in

7    the indictment under consideration.  A false or fictitious

8    statement or representation is an assertion which is untrue

9    when made and which is known by the person making it to be

10   untrue; number two, in making the false, fictitious or

11   fraudulent statement, the defendant acted willfully, knowing

12   that the statement was false; third, the statement was made in

13   a matter within the jurisdiction of the executive branch or

14   the government of the United States; and, fourth, the

15   statement made by the defendant was material to the Federal

16   Bureau of Investigation.  A statement is material if it has a

17   natural tendency to influence or is capable of influencing

18   either a discreet decision or any other function of the

19   government agency to which it is addressed.

20           At the conclusion of the trial, after you've heard

21   all the evidence and after I've had an opportunity to confer

22   with the lawyers, I will give you the final and controlling

23   statement as to what the elements of the crimes are.  I'm

24   giving you this preliminary summary now to help you as you

25   hear the evidence and see the exhibits as the trial

──────United States v. Danchenko──────
92

1    progresses.

2         The trial will proceed in the following order:

3    First, the parties have the opportunity to make opening

4    statements.  The government may make an opening statement at

5    the beginning of the case.  The defendant may make an opening

6    statement following the opening statement of the government or

7    may postpone the making of opening statement until the close

8    of the government's case.  The defendant is not obligated to

9    make an opening statement.

10        What is said in opening statements is not evidence.

11   The opening statements simply serve as an introduction to the

12   evidence which the party making the opening statement intends

13   to produce during the trial.  Second, after the opening

14   statements, the government will introduce evidence which it

15   feels supports the charges in the indictment.  Third, after

16   the government has presented its evidence, the defendant may

17   present evidence, but is not obligated to do so.

18        The burden or obligation, as you will be told many

19   times during the course of this trial, is always on the

20   government to prove each and every element of the offenses

21   charged beyond a reasonable doubt.  The law never imposes on a

22   defendant in a criminal case the burden of calling any

23   witnesses, producing any exhibits or introducing any evidence.

24   A defendant is presumed to be innocent of the charges.

25        Fourth, after all the evidence has been received, in

──────United States v. Danchenko──────

93

1  other words, after all the witnesses have testified, after all

2  the evidence has been admitted, each party will be given the

3  opportunity to present argument to you in support of its case.

4  This is called closing arguments.  What is said in closing

5  arguments is not evidence, just as what is said in opening

6  statement is not evidence.  The closing arguments are designed

7  to present to you the theories and conclusions of the parties

8  as to what each feels the evidence has shown and what

9  inferences may be drawn from the evidence.

10        Fifth, after you've heard the closing arguments of

11  the parties, I will give you orally and in writing the final

12  instructions concerning the laws which you must apply to the

13  evidence received during the trial.  Those instructions will

14  be much more detailed than these I'm giving you now.  You will

15  then retire to consider your verdict.  Your verdict must be

16  unanimous.  All 12 of you must agree to it.  Your

17  deliberations are secret.  You will not be required to explain

18  your verdict to anyone.

19        Sixth, you must keep an open mind to both the

20  government and the defense during this trial.  As you know,

21  there are generally two sides to most stories, and you must

22  not make up your mind about any of the questions in the case

23  until you have heard all the evidence and all of the law which

24  you must apply to that evidence; in other words, until you

25  begin your deliberations.

─────United States v. Danchenko─────

94

1        Let me now talk about your duties as jurors, the

2   duty of the Court and the evidence.

3        Your assignment as jurors is to find and determine

4   the facts.  Under our system of justice, you are the sole

5   judges of the facts.  If at any time I should make any comment

6   regarding the facts or you think I am making some comment on a

7   piece of evidence, you're at liberty to disregard it totally.

8        It is especially important that you perform your

9   duty of determining the facts diligently and consciously for

10  ordinarily there is no means of correcting an erroneous

11  determination of facts by a jury.

12       On the other hand, and with equal emphasis, I

13  instruct you that the law, as given by the Court, and these

14  and other instructions constitute the only law for your

15  guidance.  It is your duty to accept and to follow the law as

16  I give it to you, even though you may disagree with the law.

17       You are to determine the facts solely from the

18  evidence admitted in the case.  This evidence consists of the

19  testimony of witnesses and the exhibits received.

20       Questions asked by the lawyers are not evidence.

21  For the evidence consists of the witnesses' answers to the

22  questions, not the questions themselves.

23       As I said earlier, statements and arguments of

24  counsel are not evidence.  Counsel, however, may enter into

25  agreements or stipulations of facts, which are not in dispute

──────United States v. Danchenko──────
95

1    in this case.  And when they do so, you may accept those facts

2    as established.

3         I may also tell you that I'm taking judicial notice

4    of certain facts, and you then may accept those facts as true.

5    It is always up to you, however, to decide what facts are

6    established by the evidence and what inferences are to be

7    drawn from the evidence.

8         The parties may sometimes present objections to some

9    of the testimony or the exhibits.  An obligation -- I'm

10   sorry -- an objection is the only proper method for requesting

11   the ruling from the Court concerning evidence.

12        It is the duty of a lawyer to object to evidence,

13   which he or she believes may not properly be received or

14   admitted, and you should not be prejudiced in any way against

15   the lawyer who makes objections or against the party he or she

16   represents.

17        At times, I may sustain objections or direct that

18   you disregard certain testimony or exhibits.  You must not

19   consider any evidence to which an objection has been sustained

20   or which I have instructed you to disregard.

21        Do not read any news accounts about this case in any

22   newspaper or on the internet, or watch any such news accounts

23   on television, or listen to any such news accounts on the

24   radio.

25        You must not consider anything you have read or

United States v. Danchenko

96

1  heard about the case outside of this courtroom, whether it

2  before or during the trial or during your deliberations.

3          Do not attempt any independent research

4  investigation about the matter.  Your decision in this case

5  must be based solely and exclusively upon the evidence

6  received during the trial, my final instructions, and not upon

7  anything else.

8          You may have heard the terms "direct evidence" and

9  "circumstantial evidence."  Direct evidence is generally the

10  testimony of a person who claims to have actual and direct

11  knowledge of a fact.  For example, the testimony of an

12  eyewitness who claims to have seen an event.

13          Circumstantial evidence is generally testimony of a

14  chain of facts, which may lead to a conclusion of some kind.

15  In any event, the law makes no distinction between direct

16  evidence and circumstantial evidence.

17          In considering the evidence here in the trial, you

18  should give it such weight or importance that you think it

19  deserves, whether it is called direct or circumstantial

20  evidence, and make the deductions and reach the conclusions to

21  which your experience and common sense lead.

22          In attempting to determine the facts in this case,

23  you may be called upon to judge the credibility of witnesses

24  who testify in the trial.  In deciding whether or not to

25  believe what a witness is -- what a witness has said, I

─────United States v. Danchenko─────

97

1    suggest that you consider the intelligence of the witness, the

2    ability of the witness to have seen or heard, what the witness

3    said was seen or heard, the ability of the witness to remember

4    what happened, any interest the witness may have in how this

5    case is decided, and whether the testimony is reasonable.

6            You are free to believe all of what a witness -- or

7    exhibits says, some of it or none of it.  I will address the

8    subject again after you've heard all the evidence in the

9    trial.

10           No statement, ruling, remark or comment, which I may

11   make during the course of this trial is intended to indicate

12   my opinion as to how you should decide the case or is intended

13   to influence you in any way in your determination of the

14   facts.

15           I may, for example, ask questions of a witness.  If

16   I do so, it is for the purpose of explaining matters, which I

17   feel should be brought out, and not in any way, to indicate

18   any opinion about the facts or to indicate the weight I feel

19   you should give to the testimony of the witness so questioned.

20           I may also find it necessary, for exhibit -- for

21   example, to admonish the lawyers.  And if I do, you should not

22   show prejudice towards the lawyer or the client of that lawyer

23   because I have found it necessary to correct him or her.

24           At times during this trial, it will be important for

25   me to confer privately with the lawyers and others about

─────── United States v. Danchenko ───────

98

1   various elements here and procedural issues.  During those

2   conferences, both here at the bench and in my chambers, it is

3   not my intention to hide anything from you, but simply to

4   determine how certain issues will be handled.  Please be

5   patient with us during such delays.  We're only taking care to

6   ensure that the trial is being conducted fairly and according

7   to the law.

8           At times, you will also be required to wait in the

9   jury room while I am required to hear and decide other matters

10  from other cases not contested -- not connected with this one.

11  These delays are unavoidable.  I do everything I can to keep

12  these interruptions to a minimum, but can never avoid them

13  entirely, so please be patient with us.

14          You are not to concern yourself in any way with a

15  sentence, which a defendant might receive if you should find

16  him guilty.  Your function is solely to decide whether the

17  government has sustained and carried its burden of proving the

18  charges to you beyond a reasonable doubt.  If, and only if,

19  you find the defendant guilty of the charges, it will become

20  the duty of the Court to pronounce a sentence.

21          The attorneys and the parties will not speak to you

22  because I've already instructed them.  They must not do so.

23  When you see one of the lawyers in the hallway, for example,

24  or he or she -- and he and she does not speak with you, don't

25  think that the lawyer is being rude or cold or unfriendly, but

United States v. Danchenko

1  that lawyer is simply doing what I've ordered all the lawyers

2  in this case to do.  It simply does not look appropriate for

3  one side or the other to be speaking with any of you no matter

4  how innocent or trivial that conversation, in fact, may be.

5           Until this case is submitted to you to begin your

6  deliberations, you must not discuss it with anyone at all,

7  even with your fellow jurors.  After it's submitted, you must

8  discuss the case only in the jury room with your fellow

9  jurors.

10          It is important that you keep an open mind and not

11  decide any issue in this case until the entire case has been

12  submitted to you and you have received the final instructions

13  of the Court regarding the law, which you must apply to the

14  evidence.

15          Please keep a few principles in mind as we begin the

16  trial.  First, again, your job is to decide all the factual

17  questions in the case; like who should be believed and who

18  should not be believed; how to decide all the legal questions

19  in the case, like what testimony or exhibits are received into

20  evidence and which are not received.  Please do not concern

21  yourself with the legal questions.

22          The defendant has pled not guilty, and is presumed

23  to be innocent of the crimes charged.  As such, the defendant

24  is not required to produce any evidence whatsoever.  By

25  bringing the indictment, moreover, the government has accepted

─────United States v. Danchenko─────

100

1  the responsibility of proving the guilt of the defendant to

2  each of you, unanimously, beyond a reasonable doubt.

3          Finally, do not discuss this case with anyone.  Keep

4  an open mind regarding each issue in the case until all the

5  evidence has been received.  At that time, I will be able to

6  give you the final and complete instructions, which you must

7  use to guide you in reaching your decisions.  Then and only

8  then, will you be fully prepared to begin your deliberations

9  and reach your verdict.

10          There's also been publicity about this case prior to

11  the beginning of this trial.  The statements contained some of

12  the accounts may, of course, not be accurate, and may have

13  come from individuals who will not be present in the

14  courtroom, therefore, cannot be seen or evaluated by the jury

15  like all other witnesses, and will not be examined or

16  cross-examined by either of the parties under oath.

17          You, of course, must lay aside and completely

18  disregard anything you have heard, or read or heard about the

19  case, outside of this courtroom because your verdict must be

20  based solely and exclusively on the evidence presented here in

21  the court in accordance with my instructions to you at the

22  close of the case about the law you must apply to the

23  evidence.

24          To rely upon anything you see or hear outside of the

25  courtroom in reaching your verdict is a violation of your oath

─────────United States v. Danchenko─────────

101

1   as a juror.

2          The Court is also permitting each of you to take

3   notes during the course of this trial, and you should have

4   notebooks by now.  You, of course, are not obligated to take

5   notes.  If you do not take notes, you should not be influenced

6   by the notes of another juror, and rely upon your own

7   recollection of evidence.

8          Notes are only an aid to your recollection.  You're

9   not entitled to any greater weight than actual recollections

10  or impressions of each juror as to what the evidence actually

11  is.  Note-taking must not be allowed to interfere with the

12  ongoing nature of the trial or distract you from what happens

13  here in court.

14         Notes taken by any juror, moreover, are not evidence

15  in the case and must not take precedence over the independent

16  recollections or the evidence received in the case.  And any

17  notes taken by any juror concerning this case should not be

18  disclosed to anyone other than a fellow juror, and should

19  remain in the jury room at the end of the day and not be

20  brought home with you.

21         So with those preliminary instructions, we will now

22  begin.  We'll have opening statements.

23         MR. KEILTY:  Thank you, Your Honor.

24                    **OPENING STATEMENT**

25         MR. KEILTY:  Good afternoon, ladies and gentlemen.

United States v. Danchenko

102

1   My name is Mike Keilty, and along with John Durham and

2   Brittain Shaw, we have the privilege of representing the

3   United States.

4           Before I begin, I just wanted to echo with what

5   Judge Trenga said to you, and thank you for your jury service

6   today.

7           Ladies and gentlemen, this is a false statements'

8   case, false statements that the defendant told to the FBI.

9   Lies that the FBI relied on in a historic investigation of

10  alleged collusion between United States citizens and the

11  Russian government.  Lies that the FBI relied on as it used

12  its powerful authorities to conduct national security

13  wiretaps.  Lies that the FBI should have uncovered, but never

14  did.

15          In September 2016, the FBI received a series of

16  reports from a former British intelligence officer by the name

17  of Christopher Steele.  Now, these reports contain allegations

18  that candidate Donald Trump and members of his campaign were

19  communicating with the Russian government.

20          Some of you may recall that these reports became to

21  be known in the media as the Steele dossier.  The evidence in

22  this trial will show that the Steele dossier would cause the

23  FBI to engage in troubling conduct that would ultimately

24  result in the extended surveillance of the United States

25  citizens.  And the defendant's lies played a role in that

─────United States v. Danchenko─────

103

1    surveillance.

2         You see, ladies and gentlemen, the evidence will

3    show that the defendant was the primary source of the

4    information contained in the Steele dossier.  And when

5    questioned by the FBI about the important parts of the

6    information he provided, he lied.

7         You see the FBI needed to know where the defendant

8    was getting his information.  They needed to know so they

9    could evaluate that information and vet that information.  So

10   agents asked him questions about his sources.  And in two

11   important respects, instead of telling the agents the truth

12   about that information and those sources, the defendant lied.

13        And what were those lies?  Well, there were two of

14   them.  First, he fabricated a source.  And second, he

15   concealed the source.  So let's talk about each one of those

16   lies in turn.

17        First, the evidence in this case will show that the

18   defendant lied to the FBI about a telephone call he claimed to

19   believe was from a man by the name of Sergei Millian.

20   According to this defendant, despite having no contact with

21   Mr. Millian, Mr. Millian allegedly told him about an exchange

22   of information between the Trump campaign and Russian

23   government officials.

24        The government is going to prove to you, through the

25   defendant's own words and phone records, that this call never

──────United States v. Danchenko──────

104

1   took place.  There simply was never a call.  And you will hear

2   testimony from FBI agents that the information that this

3   defendant provided, allegedly from Mr. Millian, ended up in a

4   surveillance warrant against a United States citizen.

5        And you'll hear testimony that had the defendant

6   been truthful about Mr. Millian, the FBI would have been

7   required to advise the Court about the misrepresentations that

8   they put in that surveillance application that a federal judge

9   signed against a United States citizen.

10        Now, in December of 2016, the FBI eventually figured

11  out that the defendant, a Russian citizen living in

12  Washington, right here in Washington across the river, was

13  Christopher Steele's primary source of information for his

14  dossier.  And you will learn, the evidence will show, that in

15  January of 2017, the FBI interviewed the defendant about his

16  role in the dossier.  And as part of that interview, you will

17  learn the defendant was provided with an immunity agreement.

18  The only requirements of that agreement, the only requirements

19  was that the defendant provide complete and truthful

20  information, that he not withhold any information, and that he

21  not attempt to protect any person through false information or

22  omission.  Those were the requirements of that immunity

23  agreement for the January 2017 interviews.  And you will hear

24  testimony that, in fact, the FBI did interview the defendant

25  for three straight days in late January of 2017.

————United States v. Danchenko————

105

1        You'll hear testimony that the defendant was

2   represented by a lawyer, that he spoke excellent English, and

3   that these interviews consisted of a free-flowing

4   conversation.  And you will learn that the evidence will show

5   that these FBI agents conducting these interviews had two

6   goals:  first, to identify the defendant's sources for the

7   Steele dossier; and, second, to corroborate or refute

8   information that was in the dossier.  Two goals:  Identify

9   sources, corroborate or refute information in the dossier.

10       But you will learn that one item in particular was

11  very important to the FBI, the identity of an anonymized

12  individual in the dossier known as Source E.  This is the

13  individual who allegedly told the defendant about the exchange

14  of information between the Trump campaign and Russian

15  officials.  This is the allegation that ended up in four

16  surveillance warrants against a U.S. citizen.  And the

17  evidence will show that the defendant told the FBI that Source

18  E was Sergei Millian.  And you will hear testimony that the

19  defendant told the FBI that he had never spoken to or met

20  Mr. Millian prior to reaching out to him on July 21, 2016, by

21  email.

22       You will learn that the defendant told the FBI that

23  he reached out to Mr. Millian on two separate occasions, that

24  he never received the response back from Millian; wrote to

25  him, never received a response.  The evidence will show that

Direct Examination - FBI Auld - 10/11/2022

United States v. Danchenko

106

1   the defendant told the FBI that despite getting no response

2   from Millian, that he received a phone call in late July 2016

3   from a Russian male who didn't identify himself, but who the

4   defendant claimed to believe was Sergei Millian.  The

5   defendant told the FBI that this call was either from a

6   cellular phone number or an internet-based app.  Now, the

7   defendant told the FBI that this call was a 10- to 15-minute

8   conversation.  And we'll show, the government will prove that

9   this call never happened.  There was never a call with Millian

10  or the person the defendant claimed to believe was Millian.

11          Now, during this call, again, Mr. Millian or the

12  person the defendant claimed to be Mr. Millian, allegedly told

13  the defendant that there was an exchange of information to

14  members of the Trump campaign and Russian government

15  officials, and that this exchange of information was being

16  facilitated by two Trump campaign figures.  Some of these

17  names may be familiar to you:  Paul Manafort and Carter Page.

18  The caller, who the defendant believed to be Millian, also

19  said that the Kremlin, the seed of the Russian government,

20  could help to get Trump elected.  Again, we will prove to

21  you -- and I'll go through the evidence in a second -- we will

22  prove to you that this call never happened.

23          The evidence will show that the defendant also told

24  the FBI that during this purported call, he agreed to meet

25  Millian in New York in late July 2016, but then Millian never

─────────────United States v. Danchenko──────────────

107

1    showed up for this supposed meeting.  Now, you'll hear

2    testimony that following the January 2017 interviews, a

3    decision was made in the FBI to make the defendant what is

4    known as a confidential human source, and you'll hear the term

5    CHS, confidential human source, and that is someone who gets

6    paid by the FBI to provide information, someone who gets paid

7    by the FBI to provide information.  And you'll hear testimony

8    that the defendant was engaged as a source by the FBI, in

9    part, to continue the FBI's efforts and to identify his

10   sources and to corroborate or refute the evidence contained in

11   the Steele dossier.

12          Now, you're also going to hear evidence and

13   testimony that the defendant provided other information about

14   other Russian matters, some of which I believe you'll hear

15   testimony was useful to the FBI.  But with respect to the

16   dossier information, the defendant was paid to identify his

17   sources, and the defendant was paid to provide evidence that

18   would corroborate the allegations in the Steele dossier.  But

19   the evidence will show that the defendant could not provide

20   any corroboration through any information he provided.

21          You will learn that during his meeting as a

22   confidential human source with the FBI, the defendant again

23   repeated his lies about his purported call with Sergei

24   Millian.  He repeated his lies on four separate occasions.

25   Ladies and gentlemen, we are going to prove to you, beyond a

─────── United States v. Danchenko ───────

108

1   reasonable doubt, that the defendant never received a called

2   from Sergei Millian.  We're also going to prove to you that

3   the defendant never received a 10- to 15-minute call from an

4   anonymous individual.  It's a fabrication, and we are going to

5   prove that to you.  How so?

6          First, we are going to show you the defendant's

7   emails with Sergei Millian and others from July and August of

8   2016.  These emails will make it abundantly clear to you that

9   there was never a call.  The defendant's very own words will

10  show that there was never a call to say nothing of a meeting

11  in New York which Millian supposedly skipped out on.  The

12  government will walk through these emails with Supervisory

13  Intelligence Analyst Brian Auten and FBI Special Agent Kevin

14  Helson.  You will get to see for yourself the defendant's own

15  words with Mr. Millian.  These emails will prove to you that

16  there was never a late July call, and these emails will prove

17  to you that there was never information passed by Mr. Millian

18  about the Trump campaign and the Russian government.

19          So without more, these emails will show there was

20  never a call with Millian, but there is more.  You're going to

21  see phone records.  The defendant's own phone records will

22  make it abundantly clear to you that he never received a call

23  from somebody he claimed to believe was Sergei Millian.  In

24  fact, the evidence will show that the defendant never received

25  a 10- to 15-minute call in late July from any unidentified

─────United States v. Danchenko─────

109

1    individual.  FBI Supervisory Special Agent Ryan James is going

2    to walk through those phone records with you in detail, and

3    you'll see there was never a call with any number associated

4    with Sergei Millian, and there was never a 10- to 15-minute

5    call with any anonymous unidentified individual.

6           Now, you will learn from FBI Special Agent Kevin

7    Helson -- now, Agent Helson is what was referred to as a

8    handling agent in the FBI.  So I told you that the defendant

9    was a source for the FBI.  Agent Helson was his handling

10   agent.  He conducted the interviews with the defendant during

11   their meetings.  And you will learn from Agent Helson that he

12   asked the defendant for phone records, explicitly asked the

13   defendant for phone records that could corroborate his call

14   with Sergei Millian.  The evidence will show that the

15   defendant produced nothing, no cell phone records, no records

16   of any internet apps such as WhatsApp, for example, or Signal

17   or Telegram, no records, none, from a purported call that took

18   place only six months before the interviews.

19          To that end, Agent James will also show you emails

20   that demonstrate that when the defendant did want somebody to

21   call him using an internet-based app, he would explicitly tell

22   that person which app to use.  And the evidence will show that

23   the defendant's initial email to Sergei Millian, his initial

24   reach-out on July 21, 2016, said nothing about the use of an

25   internet app.  The evidence will show that email simply

─────────── United States v. Danchenko ───────────

110

1    provided his cell phone number and an email.

2            Ladies and gentlemen, the evidence in this case will

3    plainly demonstrate to you that the defendant never received a

4    call from Sergei Millian or somebody that he claimed to be was

5    Sergei Millian.

6            So why were the defendant's false statements about

7    Sergei Millian important?  Why are we here?  Because they

8    related directly to the FBI's investigation of a U.S. citizen

9    by the name of Carter Page.  The evidence will show that the

10   information the defendant attributed to Sergei Millian partly

11   formed the basis for a surveillance warrant against Mr. Page,

12   a U.S. citizen.  You see, the FBI was investigating Mr. Page's

13   connections to the Russian government.  The evidence will show

14   as part of that investigation, the FBI wanted to secure what's

15   called a FISA warrant, F-I-S-A, Foreign Intelligence

16   Surveillance Act warrant.  A FISA allows the government to

17   monitor the calls and emails of a subject that they believe to

18   be acting at the direction of a foreign government.  They can

19   monitor the call in realtime and they can monitor the emails.

20   This is an incredibly powerful tool that the FBI has.

21           The evidence will show that the information the

22   defendant purported to receive from Sergei Millian about

23   Carter Page was put in the FISA application against Mr. Page.

24   And you will learn that on four separate occasions, a federal

25   judge approved that surveillance warrant in part because of

───────United States v. Danchenko───────

111

1    the defendant's lies and the information he attributed to

2    Mr. Millian.  Importantly, despite this surveillance, the

3    evidence will show that Mr. Page was never charged with any

4    crime.

5            Now, why was the lie important?  You will learn that

6    the FBI has an affirmative obligation to alert the Court about

7    any misrepresentations or errors that are contained in a FISA

8    warrant.  So if the defendant had been truthful about

9    Mr. Millian and the allegations he attributed to Millian, the

10   government would have been under an obligation to go to the

11   Court and tell the Court about the misrepresentations the

12   government had made in each and every one of those four FISA

13   applications.  Ladies and gentlemen, the government and the

14   FBI surveilled Mr. Page for nearly a year.  But that never

15   happened.  The FBI never corrected the error.  The FBI never

16   corrected the information that allegedly came from Sergei

17   Millian.  And, again, the FBI surveilled Mr. Page for a year,

18   in part, based on this defendant's lies.

19           The bottom line is that the evidence will show that

20   there was never a call with Sergei Millian.  There was never a

21   call with someone this defendant believed to be Sergei

22   Millian.  Emails will prove it and the phone records will

23   prove it, and those lies mattered.

24           Now, the defendant's lies against Mr. Millian form

25   the basis of Counts 2 through 5 of the indictment under review

Direct Examination of FBI Agent - 7/5/2022

—————United States v. Danchenko—————

112

1   by you.  So let's talk about another lie the defendant told

2   the FBI.  The evidence will show that on June 15, 2017, the

3   defendant concealed another source of information by telling

4   the FBI that he had never spoken to an individual by the name

5   of Charles Dolan about anything specific in the Steele

6   dossier.  The evidence will show that that was a lie.  The

7   defendant had, in fact, spoken with Mr. Dolan over email about

8   something very specific, and that item ended up in the Steele

9   dossier.  Indeed, in an August 19, 2016, email, the defendant

10  asked Mr. Dolan to provide information, truth, rumor or

11  allegation about Trump campaign manager, Paul Manafort.  And

12  the defendant told Mr. Dolan he was working on a very

13  important project against Donald Trump.  And you will learn

14  that the very next day Mr. Dolan delivered.  Mr. Dolan did

15  provide the defendant with information about Paul Manafort.

16  And that information that Mr. Dolan provided ended up in a

17  Steele report two days later.  You will see the defendant's

18  emails with Mr. Dolan, and you will see the Steele report that

19  reflects that information.  You will see both of those.

20  Decide for yourself whether that information Mr. Dolan

21  provided mirrors the information two days later that appeared

22  in the Steele dossier.

23          Ladies and gentlemen, you will get a chance to hear

24  from Mr. Dolan in this case.  So why was the defendant's lie

25  about Mr. Dolan important?  Again, like Mr. Millian, why are

Direct Examination of FBI Agent #7/05/2022

────United States v. Danchenko────

113

1  we here?  As an initial matter, you will learn that if the

2  defendant had been truthful about Mr. Dolan being a source for

3  the dossier, the FBI would have learned that Mr. Dolan was the

4  only current US-based source for the dossier.  And you will

5  hear testimony that had the FBI known that Dolan was a source

6  for this information, it's likely they would have taken

7  additional steps to further understand his role in the

8  dossier.

9       Now why is that?  Because even prior to the

10  defendant's lie about Mr. Dolan in June of 2017, the FBI had

11  more questions than they did answers on Charles Dolan.  First,

12  you will hear testimony that Dolan was present in Moscow with

13  the defendant in June of 2016 at the very time this defendant

14  told the FBI he was collecting information for the Steele

15  dossier.  And you'll see evidence that Mr. Dolan was also in

16  Moscow with the defendant in October of 2016 at a business

17  conference.

18       Second, you're going to learn that Mr. Dolan

19  maintained a business relationship with another individual who

20  the defendant used as a source for the Steele dossier.  Third,

21  you're going to learn that Dolan maintained relationships with

22  several senior Russian government officials which he had

23  garnered through his 20-something years as a public relations

24  professional.

25       And, finally, you will learn that Charles Dolan was

———United States v. Danchenko———

1    a long-time Democratic political operative who had worked on

2    every U.S. presidential campaign from Jimmy Carter to the

3    present.

4            To that end, with all that information, you will

5    learn the FBI requested that Agent Helson asked the defendant

6    about Charles Dolan.  And the evidence will show that on

7    June 15, 2017, Special Agent Helson asked the defendant

8    whether he had spoken with Mr. Dolan about anything, anything

9    specific in the dossier, and the defendant denied that he had

10   spoken with Mr. Dolan about anything specific in the dossier.

11           Ladies and gentlemen, this interview is recorded.

12   You're going to get to hear for yourself the defendant's lies.

13   And you will learn the context of Agent Helson's questioning

14   of the defendant.

15           Now, you're going to hear from four FBI witnesses

16   about Mr. Dolan.  And you will learn through each one of them

17   that they had questions about Charles Dolan.  And based on

18   those questions, you will learn that Supervisory Intelligence

19   Analyst Brian Auten and another FBI special agent, by the name

20   of Amy Anderson, that prior to the defendant's lie, the FBI

21   was trying to figure out what was Charles -- Charles Dolan's

22   role in the dossier.

23           What were his connections to the dossier?  We have

24   all this information, but what were his connections?  And you

25   will learn that that information and those connections

———United States v. Danchenko———

115

1   triggered the FBI to ask the defendant about Charles Dolan.

2   You're also going to hear from a former FBI intelligence

3   analyst by the name of Brittany Hertzog.  You will learn that

4   she was the analyst who conducted -- who collected information

5   from various FBI databases that demonstrated the defendant's

6   connection to Charles Dolan, his relationship to Charles

7   Dolan, and his relationship to another source of the

8   defendants.

9        The evidence will show that Ms. Hertzog, the former

10  FBI intelligence analyst, prepared a lengthy report about

11  these relationships; the defendant's relationship with Charles

12  Dolan, and Charles Dolan's relationship with Russian

13  government officials, and Charles Dolan's relationship with

14  another source of this -- from the dossier of this defendant.

15       Finally, you're going to hear from Special Agent

16  Kevin Helson, and I told you before, he was the defendant's

17  handling agent.  You will learn that Agent Helson had so much

18  interest in Charles Dolan that he asked permission to

19  interview Mr. Dolan, but you will learn that the FBI didn't

20  interview Charles Dolan.

21       Agent Helson will explain to you why the defendant's

22  lie was important and what steps the FBI may have taken if

23  this defendant had been truthful about Charles Dolan's role as

24  a source for this Steele dossier.

25       Now, the information about Charles Dolan relates to

─────United States v. Danchenko─────

116

1  Count 1 of the indictment.  Ladies and gentlemen, throughout

2  this case, you will hear testimony that the FBI often relies

3  on human sources when conducting investigations.  When those

4  sources lie, it corrupts the process and functions of the FBI.

5          You will learn that lies can cause the FBI to wield

6  their powers too aggressively, and you will also learn that

7  lies can cause the FBI to not act aggressively enough.  And

8  you will see examples of both -- both of those situations here

9  in this trial.  And you will learn that the FBI -- look, the

10 FBI should have taken certain actions in this case.  And the

11 evidence will show that if they had taken those actions, they

12 may very well have uncovered the defendant's lies.

13         Now, ladies and gentlemen, you've been asked to

14 decide a very simple case.  A lot of facts and a lot of

15 information, but ultimately, a simple case.  You've been asked

16 to decide whether the defendant lied to the FBI and whether

17 those lies could have affected the actions of the FBI.  This

18 case is about protecting the functions and integrity of our

19 government institutions.

20         Now, questions about what the FBI actually did or

21 failed to do in this case, are not something you have to

22 decide.  Rather, what you will be asked to do, indeed, what is

23 your duty to do, is to determine whether the defendant made

24 false statements to the FBI that either had the natural

25 tendency to influence the actions of the FBI or was capable of

Case 1:21-cr-00245-AJT   Document 113   Filed 10/12/22   Page 32 of 170 PageID# 668
Direct Examination of T.J. Auld - 10/11/2022

United States v. Danchenko

117

1    influencing the actions of the FBI.

2           At the end of this trial, Judge Trenga is going to

3    instruct you on the law.  Please listen to him very carefully.

4    The law the defendant is accused of violating is intended to

5    protect the government from both the real and potential

6    effects of materially false statements.

7           Importantly, it even covers material false

8    statements, whether or not they actually had any influence on

9    the government, and that makes sense.  By way of analysis, the

10   bank robber doesn't get a free pass simply because the

11   security guards were asleep.  You will hear evidence in this

12   case that the FBI should have done certain things, but they

13   simply didn't.

14          Now, after all the evidence is in, the government

15   will have a chance to speak with you again.  But between now

16   and then, please do three things:  First, please pay close

17   attention to the evidence, and I know you will, both at the

18   beginning of trial, all the way through the end of trial.

19   Second, please listen carefully to Judge Trenga's instructions

20   on the law.  They are really important.  And third, use your

21   common sense.  The same common sense that each and every one

22   of you as Virginians use every single day.

23          Ladies and gentlemen, unlike your cell phones, you

24   didn't check your common sense at that courtroom door.  If you

25   do all three of those things, the defendant will get a fair

─United States v. Danchenko─

118

1    trial, the government will get a fair trial, and I am

2    confident that each and every one of you will reach the only

3    conclusion that is consistent with both the facts and the law,

4    which is that the defendant is guilty as charged.

5              Thank you for your attention.

6              THE COURT:  Thank you.

7                        **OPENING STATEMENT**

8              MR. ONORATO:  May it please the Court and government

9    counsel.

10             Ladies and gentlemen of the jury, good afternoon.

11   Let me be crystal clear from the outset, Igor Danchenko is not

12   guilty.  Igor Danchenko committed no crime.  During the course

13   of the next few days, you're going to agree and conclude that

14   Igor Danchenko did not lie to the FBI.  Igor Danchenko did not

15   mislead the FBI.  And finally, the government has no evidence

16   to come into this courtroom and argue with a straight face

17   that the statements you're going to hear about are false.

18             Indeed, the evidence is going to show the exact

19   opposite.  His statements were truthful.  I want to repeat

20   myself.  The evidence is going to establish that Igor

21   Danchenko told government agents the truth when he was asked

22   about two simple things about the Steele dossier.  The first

23   is whether he had talked, talked -- so listen to that word

24   "talked" -- to a man named Charles Dolan about anything in the

25   Steele dossier.  He told the truth.

1          Second, he was truthful when he said that he

2     received an anonymous phone call in July of 2016, and he

3     formed the subjective belief that it could have been a person

4     from a named Sergei Millian, who, in context, that's who he

5     concluded it could have been.  The facts will show, not only

6     were his conclusions reasonable, but they are actually

7     probably correct.  And if that wasn't enough, the government's

8     theory of materiality in this case is nonexistent.

9          My name is Danny Onorato.  Along with my colleague

10    Stuart Sears, we represent Igor Danchenko.  Ladies and

11    gentlemen of the jury, I submit to you that after you hear the

12    evidence and you apply the law, as Judge Trenga will instruct

13    you, there is only one fair verdict that must be rendered on

14    all counts, and that is:  He is not guilty.

15          The story here is quite simple.  The harder part for

16    you will be how to figure out how the prosecution wants you to

17    conclude that he's guilty based on evidence that falls his

18    way.

19          Here are the basics:  Igor Danchenko was working as

20    a business analyst, he was put in touch with a fellow named

21    Christopher Steele, and the two had a business relationship

22    with Mr. Danchenko with work projects for Mr. Steele.

23          In late spring of 2016, Mr. Steele asked

24    Mr. Danchenko to get information related to the November 2016

25    presidential election.  Mr. Danchenko gave that information to

─────United States v. Danchenko─────

120

1   Mr. Steele, not knowing what Mr. Steele would do with that

2   information.

3          Six months later, some of that material provided by

4   Mr. Danchenko wound up -- wound up in what's called "the

5   Steele dossier."  Within two weeks of that document being

6   published, the FBI contacted him, and he voluntarily agreed to

7   meet with them.  So think about that.  He went in, and he met

8   with them voluntarily.

9          And I want you to consider a false statement, which

10  you heard about 10 minutes ago from Mr. Keilty.  He told you

11  that Mr. Danchenko was given immunity.  That's a lie.  He just

12  lied to you.  You look at Government's Exhibit 118 that

13  they're going to admit.

14         And I read to you, it says [as read]:  As a

15  preliminary matter, I must advise you that the government does

16  not intend by this letter to grant your client immunity from

17  prosecution.

18         And he just told you the opposite.  So you think

19  about that when you consider the government's case.

20         At every point in this trial, the evidence is going

21  to show that Mr. Danchenko did not lie.  With that in mind,

22  I'd like to give you a road map about what I'm going to talk

23  about, and I'll try to be brief.

24         So first of all, I'm going to give -- and it's on

25  your screens, I believe -- a brief overview of the charges of

1   the law, background about the Crossfire Hurricane case,

2   information about the meetings with Mr. Danchenko and the FBI

3   that formed the basis of the allegations.  I'm going to give

4   you some information about the tremendous and remarkable

5   service he provided to the United States of America, and then

6   I will conclude.

7           Number one, an overview of the charges and the law,

8   and as Mr. Keilty said, there are five counts.  And so, for

9   Count 1, you must decide simply whether the government can

10   prove, knowing that it was untrue, okay, that Mr. Danchenko

11   willfully, knowingly, and intentionally lied, and that those

12   lies were material when he told an FBI agent named Kevin

13   Helson that he had not, quote, talked with a man named Charles

14   Dolan about anything specific in the Steele dossier.  And I

15   want you to listen carefully to the evidence there.  The

16   evidence is going to support showing that Mr. Danchenko is

17   innocent.

18           In other words, Mr. Danchenko answered that question

19   truthfully.  And the law requires you to find him not guilty

20   based on that evidence.  In other words, a truthful statement

21   to an FBI agent simply cannot be false.  It cannot be a crime.

22   And that statement was not material or capable of influencing

23   any type of government investigation or decision, which the

24   judge will talk to you about later.

25           Counts 2 through 5 are likewise simple.  And they

─────United States v. Danchenko─────

122

1    are based on conversations with, again, Kevin Helson.  And

2    here is what the government is intending to prove:  Based on

3    the facts and circumstances that it was false when

4    Mr. Danchenko said that he believed -- he believed that he

5    received a telephone call from a person he identified from

6    Sergei Millian.

7            And what I heard Mr. Keilty say is they are going to

8    prove there was no phone call, and he said by cellular phone

9    records.  But I didn't hear him mention anything about phone

10   apps because the government doesn't have phone app records.

11   And what he also said is that Mr. Danchenko didn't come

12   forward and provide phone app records to the FBI.  Well, Judge

13   Trenga is going to tell you one thing, and it is the most

14   fundamental thing in the justice system.  He doesn't have a

15   burden of proof.  The special counsel does.  And they have the

16   burden of proving the phone call didn't occur.  He doesn't

17   have a burden of proving it did occur, and they can't do that.

18           And so, what Mr. Danchenko is going to tell -- what

19   you're going to hear from Mr. Danchenko, through the agents,

20   is that he came to that belief based upon common-sense facts.

21   Mr. Keilty told you to keep your common sense, and I invite

22   you to do that.  When you hear that evidence, you're going to

23   conclude that he is not guilty of the remaining counts.

24           Okay.  Backfire -- Crossfire Hurricane.  So I didn't

25   quite follow what Mr. Keilty's point was, but prior to July of

─United States v. Danchenko─

123

1   2016, a friendly foreign government warned the government that

2   a high-level policy person in Donald Trump's campaign named

3   George Papadopoulos suggestion -- suggested that Russian could

4   provide damaging information about Hillary Clinton and Barack

5   Obama.  Had nothing to do with Igor Danchenko.  And the

6   government's going to agree with that and the evidence is

7   going to show that.  Immediately, the government started to

8   investigate.

9          They did investigate Papadopoulos.  They did

10  investigate Manafort.  They did investigate Carter Page, and

11  they did investigate Sergei Millian, and that was in the

12  August of 2016.

13         Now, I think Mr. Keilty told you that the FBI didn't

14  even meet with Mr. Danchenko until January of 2017.  So

15  whatever the FBI did between August of 2016 and January of

16  2017, had nothing do with him, and it's irrelevant from this

17  case.

18         To sum it up, those investigations began completely,

19  and the undisputed evidence will show it, unrelated to the

20  opening Crossfire -- the opening of the Steele dossier

21  investigation, and unrelated to Crossfire Hurricane at the

22  time.

23         Now, information from the dossier did get passed

24  over to the government.  They did begin investigating it in

25  September of 2016.  And by December of 2016, they found out

─────United States v. Danchenko─────

124

 1    that Mr. Danchenko had been working with Mr. Steele.

 2            So let's turn to point No. 4, and this is where we

 3    start to talk about the interviews in 2017, Mr. Danchenko and

 4    the Government.  On January 10th of 2017, the Steele dossier

 5    was published on a website called BuzzFeed, and it became

 6    significant news at the time.

 7            Two days later, you are going to see evidence that

 8    two days later, FBI agents got together, and they said, we

 9    want to go talk to Igor Danchenko, but we want to make him a

10    confidential human source.  We want to work with Igor

11    Danchenko.  He didn't even know that at the time.

12            The evidence is going to show that this is the

13    background leading up to his meeting with the FBI from January

14    24th to January 26th.  He then corroborated with him

15    extensively for not one years, not two years, not three years,

16    but nearly four years, providing extraordinary cooperation to

17    the United States of America as a confidential human source.

18            The evidence will show that Mr. Danchenko was

19    stunned when he learned that portions of the information that

20    he gave to Mr. Steele were in the dossier.  He didn't write

21    anything in the dossier.  So the FBI asked him to meet, and he

22    went, and he met, and he was cooperative.

23            Nevertheless, when he went in that meeting, not

24    knowing exactly what he was going to be asked, he gave the FBI

25    truthful information.  And Mr. Keilty told you you'll hear

—United States v. Danchenko—

125

 1   from Brian Auten.  Brian Auten is an FBI Intel analyst, and he

 2   met with Mr. Danchenko along with another agent named Steve

 3   Somma for those three days.  The evidence is going to show

 4   that Auten is a supervisory intelligence analyst, and his role

 5   is to kind of connect the dots by making inferences.  That's

 6   important in probability calculations when he gets facts and

 7   he gets facts from witness interviews; he gets facts from open

 8   source, you know, newspaper articles that we all read every

 9   day, and that's going to be important related to the Dolan

10   count.  He gets information from intelligence reports as well.

11   He also told you that Mr. Danchenko told him the same thing,

12   Danchenko is likewise an analyst.

13          And so, analysts look at facts and reach

14   conclusions.  And the evidence is going to show that

15   Mr. Danchenko drew a reasonable belief based on facts and

16   circumstances presented to him with regard to Mr. Millian.

17          Agent Auten will tell you that the interview with

18   Mr. Danchenko was not, quote, designed to be a finished

19   intelligence product.  He will also tell you Steve Somma, one

20   of the other agents, said not to probe or ask a lot of

21   follow-up questions with Mr. Danchenko, because the purpose of

22   the meeting was to get him to cooperate.  And that reason is

23   simple, because you're going to hear evidence that the FBI has

24   problems recruiting sources with connections in that area of

25   the world, and it was important to get the cooperation of

Direct Examination of P.J. Auten - 10/12/2022

─────United States v. Danchenko─────

126

1   Mr. Danchenko.

2           FBI agent -- Analyst Auten will tell you that this

3   was not, quote, a major debriefing in his mind, and that Somma

4   said that they could follow up with him if they wanted to

5   later on.  With that backdrop, with that backdrop, over the

6   course of the next three days, Analyst Auten, and Agent Somma

7   did not ask -- now, listen to me when I say this -- they did

8   not ask a single question about what is called Report 105.

9   And when you heard Mr. Keilty talk about Charles Dolan, that's

10  what they were talking about.  It's going to be 105.  The

11  government believes that that has to do with Mr. Dolan.  You

12  heard me correctly.  In that three-day interview where he was

13  supposed to tell the truth, they didn't ask a single question

14  about that.

15          How could that be relevant in any investigation?

16  And there's an answer why that question wasn't asked:  Because

17  it was a widely-known open secret that that information was

18  all in the public domain.

19          Now, what are they going to focus this case on?  It

20  really relates to the Millian counts.  And although

21  Mr. Danchenko discussed that material on the 24th and 25th of

22  January, no charges stem from that interview.  They stem from

23  charges -- from meetings later on where he repeats the same

24  information.  So, really, you have to consider what happened

25  on the 24th and what Investigator Helson tells you later.

———United States v. Danchenko———

127

1      During this trial, you're going to hear and you're

2  going to see evidence that is going to eviscerate -- I say

3  eviscerate -- any claim that Mr. Danchenko was anything but

4  untruthful -- but truthful when he formed a subjective belief

5  that he received a phone call in July of 2016 from someone he

6  thought was Mr. Millian.  And the evidence will show that was

7  the only fair reading of what Mr. Danchenko believed at the

8  time.  The evidence is going to prove that he was -- he told

9  the government -- and no one is going to say, Hey,

10  Mr. Danchenko, who called you?  He didn't say, Sergei Millian

11  called me.  100 percent, a thousand percent, he said, Look, I

12  got an anonymous phone call.  He said I got an anonymous phone

13  call, I don't know who called me, but I'm connecting certain

14  facts, okay, facts known to him, facts that he told the FBI,

15  and I came to the conclusion that it probably could have been

16  Millian.  That's what I believe, okay.  So the answer to the

17  question was, I don't know who called me.  But, he speculated,

18  and he speculated not to hinder the investigation, but,

19  rather, to help it.  This information was designed to help the

20  agents.  So on those days, he spoke truthfully, in the

21  simplest and plainest terms, why he believed that call was

22  from Millian.

23      Here's what the FBI was told:  He said in May of

24  2016, a Russian journalist had a conversation with

25  Mr. Danchenko and that journalist said, Hey, you should talk

─────United States v. Danchenko─────

128

1  to Sergei Millian.  There's no evidence that Mr. Danchenko

2  even knew who he was in May of 2016.  There is going to be

3  undisputed evidence that evidence is not a lie, and it is, in

4  fact, true.

5          In May of 2016, that journalist asked a colleague of

6  his named Dmitri Zlodorev to see if Zlodorev could reach out

7  to Millian so that there could be a connection between

8  Mr. Danchenko and Mr. Millian.  Again, there is indisputable

9  evidence that that happened.  You're going to see concrete

10  evidence that those two facts occurred.

11          You're going the see concrete evidence that on July

12  21st, Mr. Danchenko sent an email to Mr. Millian, and he

13  requested an opportunity to meet with him in New York or

14  Washington, D.C.  Mr. Danchenko reminded Millian that he had

15  also sent him a LinkedIn message.  There is undisputable

16  evidence that that is true.  He did not lie.  Shortly

17  thereafter, Mr. Danchenko received an anonymous phone call,

18  had a discussion with someone for 10 to 15 minutes, as

19  Mr. Keilty said, and there was a discussion about potentially

20  meeting up in New York the following week.

21          Mr. Danchenko told the truth about that call.  And

22  remember when I talked about the burden shifting?  They have

23  to prove to you that a call was not completed via a mobile

24  app, you know, some type of mobile app that you use.  Because

25  the evidence is going to show if you want to be anonymous,

```
 1   because you're not sure if you want to meet with someone, why
 2   would you identify who you are if you're trying to feel that
 3   person out?  The evidence will show he didn't lie and they
 4   have the burden of proving he didn't get a call, and they
 5   can't do it.
 6            Now, Mr. Danchenko told the agents that he traveled
 7   to New York City, okay, in late July of 2016 with his
 8   daughter.  And guess what?  There are records from Amtrak that
 9   prove that on July 25th, he bought a train ticket after
10   getting the anonymous call; he traveled to New York City on
11   July 26th, and he remained there for two days.  That was the
12   truth, and that is a lie, and the government cannot disprove
13   that.
14            Now, one thing that we agree on is that when
15   Mr. Millian -- when Mr. Danchenko was in New York, Mr. Millian
16   didn't appear for the meeting.  Mr. Keilty told you that, and
17   I agree with him.
18            Now, the other thing that Mr. Danchenko told him is
19   that -- he said, Look, guys, after he didn't show up to that
20   meeting, I tried to pitch a real estate deal to Millian, so I
21   made up a real estate, I sent him an email in hopes that he
22   would contact me, and Millian never replied to them.  And he
23   actually gave that email to the government in July -- in
24   January of 2017.  The evidence is going to show that he told
25   the FBI the truth about everything.
```

────────── United States v. Danchenko ──────────

130

1          And based upon that evidence, Mr. Danchenko was not

2    incorrect in his subjective belief that the anonymous caller

3    could have been Mr. Millian.  Based on these facts and

4    circumstances, he formed the belief that it was probably

5    Millian who was the anonymous caller, but he never said it

6    definitely was.  And that's all the government hears.  He said

7    I'm not sure.  There are two different things.  He drew a

8    commonsense conclusion based on facts, and his subjective

9    commonsense belief cannot be false.  The evidence will show

10   that Mr. Danchenko represented those same facts to Agent

11   Helson over the course of four different meetings; and, again,

12   he's not guilty of those facts.

13          What you're going to find ironic, and it's going to

14   be one of the government's first witnesses, is that Brian

15   Auten, the Intel analyst, is going to say that Mr. Danchenko

16   after he was done with the debriefing, never thought that

17   Mr. Danchenko minimized or, rather, lied about who his sources

18   were from the dossier, okay.  He drew the opposite conclusion

19   and he met with them.  These guys didn't meet with him.

20   They've never met with him.  He's going to tell you, based on

21   his discussions with them, and his questions of him, he

22   believed he was truthful.  He drew the opposite conclusion

23   based on facts that the government is trying to prove.  His

24   impression was, Look, maybe Danchenko was minimizing his

25   relationship with this guy Millian, but not fabricating it.

─────United States v. Danchenko─────

131

1   Now, six years later -- now, six years later, playing Monday

2   morning quarterback, the special counsel wants to come in and

3   try to prove the exact opposite proposition which the evidence

4   doesn't support.  And listen to this, okay, when you hear the

5   evidence presented during the course of the July timeframe

6   that Mr. Danchenko himself was unaware of, you're going to

7   have a stronger belief and conclusion that the caller was

8   probably Mr. Millian, stronger than the one that he had at the

9   time.  The proof will be that he did not lie.

10          Now, with respect to Count 1, that's the Dolan

11  matter that they did not ask him anything about Number 105.

12  They're going to hear evidence that Special Agent Helson had

13  the most basic and rudimentary conversation with Mr. Danchenko

14  about Charles Dolan.  And that's what forms the basis of this

15  charge.  The evidence is going to be pretty simple.  Helson

16  asked Mr. Danchenko whether he, quote, talked to Mr. Dolan

17  about anything specific in the dossier, okay.  He asked him if

18  he talked about it.  Danchenko replied that he had not talked

19  to Dolan about anything specific, maybe just generally.

20  Nothing specific, maybe just generally.  That is it; nothing

21  more, nothing less.

22          Agent Helson never bothered to ask Mr. Danchenko a

23  simple clarifying question about, Wait a minute, when you

24  talked about something general about the dossier, what gives,

25  what was that?  Okay.  Never followed up on it.  Now, again,

─────────────── United States v. Danchenko ───────────────

132

1   some six years later, the special counsel team has come before

2   you with a convoluted theory based on the evidence, and

3   they're going to tell you, they're going to try to convince

4   you that that truthful answer is somehow false.  And their

5   so-called proof is that they have a, quote, written, written,

6   okay, a written email exchange between Mr. Danchenko and

7   Mr. Dolan in August of 2016 on a topic that appears widely

8   known in the press.

9        The evidence will show that their claim fails for

10  commonsense reasons.  First of all, the evidence will show

11  that when -- I'm talking right now; I'm not writing to you.

12  We will all agree with that.  And so, that would be a lie if I

13  said I'm writing to you.  But that's what the government is

14  going to try to prove to you in this case.  The special

15  counsel will try to get you to take the meaning of "talk" and

16  twist it into something that it is not.

17       And the questions weren't asked properly, and that's

18  not his fault, because the law, as you'll hear it, requires

19  them to be precise in terms of what they want to know.

20  Special Agent Helson did not ask him whether there was

21  communication.  And so, I'm going to invite you to do this,

22  because Mr. Keilty told you, Well, he was, you know,

23  cooperating with the government so he had an obligation to do

24  these things.  You see if they produce a contract -- you see

25  if they produce a contract with Mr. Danchenko where they say,

Direct Examination of I. Danchenko 10/11/2022

─────United States v. Danchenko─────

133

1   Mr. Danchenko, when we say did you talk to someone, I want to
2   know if you've ever emailed him, I want to know if you've ever
3   been to his house for dinner, everything else in the world, or
4   you just answer the question that's posed.  Because they don't
5   have evidence.  They don't have a piece of paper to state that
6   Mr. Danchenko's going to have the same understanding of what
7   they're asking.
8           Of course, the government cannot prove a plausible
9   or rational reason why there was no follow-up on this, and the
10  failure to simply follow up on that is not Mr. Danchenko's
11  fault.
12          Let's talk about Mr. Danchenko, what he did do with
13  the government and with Mr. Helson.  The evidence at trial is
14  going to show that Igor Danchenko courageously, loyally, and
15  honestly served the national security interests of the United
16  States for four years.  His accomplishments as an FBI source
17  are unparalleled.  And you're going to hear evidence to
18  support that.  These are going to come in the form of two
19  government witnesses.  Kelvin Helson will state that he
20  provided critical intelligence to the Russian government's
21  efforts to conduct influence operations in the U.S.  Brian
22  Auten agreed with this statement under oath.  One of the
23  upshots of Crossfire Hurricane was that the FBI built a
24  relationship with Igor Danchenko.  He provided the FBI into
25  insight into individuals, into areas it was otherwise lacking

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

134

 1  because of difficulty with which the FBI recruiting people

 2  from that part of the world.

 3          Agent Helson said that not only was he a productive

 4  source, but that information, when asked a question, was

 5  corroborated.  And -- if you bear with me for one second.

 6  When he was asked if that information was corroborated, and

 7  excuse my words, Mr. Helson said, and I apologize, [as read]:

 8  Holy shit.  This is actually real.  Helson observed that

 9  Danchenko was able to suck in a lot of information, process

10  it, and give it back.  I was like, wow, that's actually

11  important.

12          And lastly, on August 12th of 2019, Helson wrote in

13  a government report, and listen to this [as read]:

14  Mr. Danchenko's reporting will have serious national security

15  implications.  He is reporting on a top five threat within

16  your division to another government agent.  That is the man on

17  trial.

18          In sum, in order for this offset of Special Counsel

19  to prove this case beyond a reasonable doubt, you're going to

20  have to do the unthinkable, and something that is frankly

21  wrong.  The evidence will have you defy common sense, logic,

22  and reality; things that you can't do as jurors.

23          You would have to redefine the common sense,

24  everyday use of the word "talk."  Yes, they want you to

25  disregard the commonsense notion of what talking means, and

─────United States v. Danchenko─────

135

1   that is in a oral communication.  And they now want you to

2   find that "talking" means a writing.  They are wrong.

3          In order to convict Mr. Danchenko of Counts 2 to 5,

4   they want you to suspend reality.  They want you to become

5   mind readers, and they want you to go into Mr. Danchenko's

6   mind and how he interpreted facts that were presented to him.

7          Of course, the law doesn't let you rewrite the

8   dictionary with respect to Count 1.  And likewise, the

9   government cannot, six years later, sustain its burden of

10  proof that Danchenko's beliefs were real based on undisputed

11  evidence.

12         The facts, the law, and principles of fundamental

13  fairness are the pillars of our criminal justice system.  When

14  you apply the facts, the laws, and the evidence to this case,

15  there's simply only one verdict that you can unanimously reach

16  and that is a guilty -- or of -- that is a verdict that

17  Mr. Danchenko is not guilty of each and every charge.

18         Again, our jury system relies on you to do the right

19  thing and that's what we ask of you.  Thank you.

20         THE COURT:  Thank you, counsel.  Ladies and

21  gentlemen, we're going to take a 15-minute recess before we

22  begin with the first witness.  You're excused to the jury

23  room.  Please do not discuss this case among yourselves.

24         (Jury excused.)

25         THE COURT:  Who is the government's first witness?

─────United States v. Danchenko─────

136

1           MR. DURHAM:  Brian Auten, Your Honor.

2           THE COURT:  How long do you anticipate his direct

3   testimony to be?

4           MR. DURHAM:  I think that Mr. Auten's testimony,

5   direct and cross, is likely to consume at least the balance of

6   the day.

7           THE COURT:  All right.  All right.  Thank you.

8           MR. DURHAM:  Your Honor --

9           THE COURT:  Yes.

10          MR. DURHAM:  -- if I might be heard.  I'm not sure

11  how to remedy this, but Mr. Onorato felt it necessary to say

12  that the jury -- that the government lied and talked about

13  immunity agreement.

14          Now, Counsel has been provided with a copy of a

15  document dated January 24, 2017.  It's Government's

16  Exhibit 118.  It's signed by folks from the National Security

17  Division as well as the defendant.  And that document clearly

18  sets forth that the defendant was being provided information,

19  and was protected on provisions on Title 18, United States

20  Code, Section 6001, that section, which is immunity.

21          So for the defense counsel to stand here and tell

22  this jury that the government lied is highly inappropriate.

23  And I'll ask the Court to give instructions to the jury to

24  disregard that because it's untrue.

25          THE COURT:  I'll review the letter.  I'm going to

─────────────United States v. Danchenko─────────────

137

1    read this letter.  I will decide how to proceed on that.

2    Anything further?  All right.  Court is in recess.

3              (Recess.)

4              (Court proceedings resumed at 2:46 p.m.)

5              THE COURT:  All right.  I've looked through this

6    letter.  I think the jury does need to be told something.

7              What do you propose the jury be told, Mr. Durham?

8              MR. DURHAM:  The government would propose that

9    defense counsel stated that the government lied regarding an

10   immunity letter, and the evidence in this case will prove that

11   that's not the case.

12             And, in fact, Mr. Danchenko was given an immunity

13   letter pursuant to 18 U.S.C. Section 6001, so they should

14   disregard that comment by counsel because it's untrue.

15             MR. ONORATO:  May I be heard, Your Honor?

16             THE COURT:  Well, are you done, Mr. Durham?

17             MR. DURHAM:  Yes.

18             THE COURT:  All right.

19             MR. ONORATO:  Mr. Keilty gave the impression that

20   Mr. Danchenko believed he had immunity, and my reading of that

21   letter says that he doesn't have immunity --

22             THE COURT:  Well, it says he has use immunity.  He

23   doesn't have transactional immunity.  He has use immunity.

24   That's an immunity agreement.

25             MR. ONORATO:  Correct.  Well, in his mind, he can

───United States v. Danchenko───

138

1  still be prosecuted.  It's just that the government had to --

2          THE COURT:  Well, you didn't phrase it in terms of

3  what Mr. Danchenko thought.  You said the government lied

4  when --

5          MR. ONORATO:  It was --

6          THE COURT:  The government lied when -- when they

7  told the jury that they had provided him with an immunity

8  agreement.

9          It needs to be corrected.  I don't want to prejudice

10 Mr. Danchenko because of his counsel's improper remarks, and

11 I'm trying to think of what I should say.

12         MR. ONORATO:  Well, what I think is -- what I think

13 is fair is that -- there's a reading of the document by which

14 Mr. Danchenko did not believe that he was subject to.  I mean,

15 Mr. Keilty told the jury that he was not the -- he could not

16 be prosecuted.  And that --

17         THE COURT:  No, no.  He said he had an immunity

18 agreement.  All right.

19         All right.  I'm going to -- I'm going to tell the

20 jury.

21         MR. DURHAM:  Your Honor, I'm just briefly --

22         THE COURT:  Yeah.

23         MR. DURHAM:  Also briefly.  I know you don't want

24 nor do we want to hold the jurors up, but there are two

25 issues -- two additional -- not issues --

1          THE COURT:  Right.

2          MR. DURHAM:  I just seek direction of the Court.

3  One, the defense will settle it, and, one, to prevent the

4  government from raising questions relating to the defendant

5  not providing emails.

6          THE COURT:  Right.

7          MR. DURHAM:  Well, defense counsel --

8          THE COURT:  I know that they have very -- they have

9  an expansive view that may make all of that relevant.  I

10 understand that.

11         MR. DURHAM:  Okay.  So work through those --

12         THE COURT:  We'll pick it up when you present the

13 questions --

14         MR. DURHAM:  Yes, sir.

15         THE COURT:  -- to the witness.

16         MR. DURHAM:  And then, similarly, with respect to

17 the prior counter intelligence case, the defendant elected in

18 his opening to start talking about Mr. Danchenko's

19 contributions to the country.

20         THE COURT:  No, I understand.

21         MR. DURHAM:  And so, that clearly opens the door.

22         THE COURT:  I understand that point as well.

23         MR. DURHAM:  Thank you.

24         MR. ONORATO:  And, Your Honor, just briefly in

25 response.  The government knew these issues.  I mean,

Direct Examination of T. Auten  10/12/2022

─────United States v. Danchenko─────

140

1  Mr. Keilty actually knew that we were going to do this in

2  opening.  They never objected.  And so, I don't see how -- I

3  don't see how what -- what -- I don't see how that makes the

4  previous thing irrelevant, and then we turn it into a mini

5  trial.

6           THE COURT:  All right.  Let's bring the jury out.

7           MR. DURHAM:  Thank you, Your Honor.

8           (Jury present.)

9           THE COURT:  Please be seated.  Ladies and gentlemen,

10  before we begin, I want to -- I want to advise you on

11  something you heard during opening statement by Mr. Onorato,

12  by both the prosecutor and Mr. Onorato.  Mr. Keilty referenced

13  an immunity agreement that they had provided to Mr. Danchenko,

14  and Mr. Onorato characterized that as inaccurate and a lie.

15           As you will see from the document, the document --

16  that's -- Mr. Onorato's statement needs to be clarified, and

17  you need to be told that the agreement -- there's two things.

18  On the one hand, it does not provide what's called "total

19  immunity" from prosecution with respect to any crimes that may

20  be related to what they ask him about.

21           On the other hand, the agreement does, in fact,

22  provide an immunity to Mr. Danchenko from any prosecution

23  based on information that he provided.  It's typically called

24  "use immunity."  So while it didn't provide total immunity, it

25  does provide use immunity.  And you need to -- I wanted to

─────────United States v. Danchenko─────────

141

1    make that clarification for you.  All right.

2              MR. DURHAM:  Thank you, Your Honor.

3              THE COURT:  All right.  Call your first witness.

4              MR. DURHAM:  We will call Brian Auten, Your Honor.

5              THE COURT:  Agent Auten will come forward, please.

6              (BRIAN AUTEN, Government's witness, affirm.)

7              THE COURTROOM CLERK:  Thank you.

8              (Witness seated.)

9                         DIRECT EXAMINATION

10             MR. DURHAM:  May I proceed, Your Honor?

11             THE COURT:  Yes.

12   BY MR. DURHAM:

13   Q.   Sir, would you state your name for the record and spell

14   your last name.

15   A.   Brian James Auten, A-U-T-E-N.

16   Q.   Mr. Auten, I'm going to ask you be sure to keep your

17   voice up so that the jurors can hear your responses, okay?

18   A.   I will do that.

19   Q.   If I should ask you some question that is convoluted and

20   you don't understand, just let me know, and I'll rephrase it,

21   okay?

22   A.   Will do.

23   Q.   Will you tell the ladies and gentlemen of the jury how

24   you are employed?

25   A.   I work for the FBI as a supervisory intelligence analyst.

─────United States v. Danchenko─────

142

1  Q.   And for approximately how long have you been working for

2  the FBI?

3  A.   I have worked for the FBI since January of 2005.

4  Q.   Please explain, if you would, to the jurors what your

5  basic educational background is?

6  A.   So I have a bachelors of art in history.  I have a

7  masters degree in national security studies, and I have a

8  doctorate in international politics and strategics studies.

9  Q.   In order to become a intelligence analyst with the FBI,

10 did you require any training beyond those education

11 accomplishments?

12 A.   Not to get into the FBI, no.

13 Q.   Well, after you joined the FBI, did you receive any

14 specialized training?

15 A.   Yes, after I joined the FBI, I went for, in effect,

16 training down in Quantico.

17 Q.   And explain just briefly, if you would, to the jurors

18 what that training involved.

19 A.   So it was approximately -- I want to say 12-13 weeks of

20 training.  It covers anywhere from writing skills to

21 analytical method, learning the different tools, different FBI

22 authorities, and the like.

23 Q.   Just so the jurors have an understanding, is there a

24 difference between FBI Intelligence Analyst and an FBI Special

25 Agent?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Direct Examination of D. Auten 10/12/2022

─────United States v. Danchenko─────

143

1   A.   Yes.  They are two completely different job series.

2        An FBI Special Agent is most of what you see on

3   television with respect to carrying a badge, having a weapon.

4        An intelligence analyst is more of a supporting role

5   that bridges a lot of what the investigations are going on in

6   the field, and then what is going on within the Intelligence

7   Community as a whole.

8   Q.   Now, have you held more than one position within the FBI

9   since the time you first joined?

10  A.   I joined as a line analyst and then became a supervisor.

11  Q.   And describe, if you would, or explain to the jurors when

12  you started out as a line analyst and then when you became a

13  supervisory intelligence analyst?

14  A.   So I started as a line analyst in January of 2005.  I

15  stayed a line analyst until -- I believe it was July of 2015.

16  And in January of 2015, I became a supervisor.

17  Q.   Would you describe to the jurors, sir, generally

18  speaking, what is it that an analyst does and then what does a

19  supervisory analyst do?

20  A.   So an analyst will do any number of things.  It's looking

21  through case information, looking through information

22  collected by the special agents in the course and scope of an

23  investigation.  You'll hear people talking about "connecting

24  the dots."  An analyst is about trying to come up with

25  judgments that will assist the FBI in the Intelligence

─────United States v. Danchenko─────

144

1   Community and moving the FBI's mission forward.

2   Q.   All right.  Now, I want to begin, if I might, with asking

3   some background -- background questions, context to be of

4   assistance to putting some of your testimony in context.  All

5   right.

6           First of all, will you tell the ladies and gentlemen

7   of the jury where within the FBI, that is in its structure,

8   were you assigned in late July, early August of 2016?

9   A.   I was assigned in the Counterintelligence Division in the

10  FBI.

11  Q.   And at that time, would you have been serving as under

12  the acting role of the supervisory intelligence analyst?

13  A.   At that point in the middle of 2016, I was serving as a

14  supervisor.

15  Q.   Do you recall, sir, whether or not, at any point in time,

16  you became aware of an FBI investigation, which was code-named

17  Crossfire Hurricane?

18  A.   Yes.

19  Q.   How did you first become aware of that?

20  A.   I was told by my immediate -- actually, not immediate

21  supervisor, but a section chief by the name of Jonathan Moffa,

22  who talked to me about the case.  It was either the 1st or 2nd

23  of August in 2016.

24  Q.   And do you remember when Crossfire Hurricane was formally

25  opened by the FBI?

─────United States v. Danchenko─────

145

1  A.   Formally opened in a couple days before 1st or 2nd of --

2  of August 2016?

3  Q.   So it would be a fair statement that you got -- you were

4  assigned to Crossfire Hurricane within a matter of days with

5  it being opened?

6  A.   Correct.

7  Q.   And then, what, if any, role did you, yourself, play with

8  the Crossfire Hurricane investigation?

9  A.   So I was asked in August of 2016 to help lead the

10  analysts in the Crossfire Hurricane investigation at that

11  point.

12  Q.   Describe, if you would, to the ladies and gentlemen of

13  the jury, again, just by way of background, general

14  understanding, how was the Crossfire Hurricane team

15  structured?

16  A.   So the Crossfire Hurricane team was structured -- it was

17  an integrated combination of analysts and agents.  It was

18  structured whereby the -- the authority structure was done

19  both on the agent side and the analyst side, or one might say

20  the operational side and the analytical side.

21       The analysts -- the line analysts reported to me.  I

22  reported to, again, Jonathan Moffa was his name, who was a

23  section chief at the time, and then Jonathan Moffa reported up

24  to, at that point, it was Deputy Assistant Director Bill

25  Priestap.

─────United States v. Danchenko─────

146

1        And on the agent side, it was my operational

2   counterpart by the name of Joe Pientka.  Joe reported up

3   through Peter Strzok, who was DAD, and then up to Assistant

4   Director Priestap.

5   Q.   Okay.  And just for the jury, is a DAD a deputy

6   assistant --

7   A.   Sorry, yes, deputy assistant director, and AD is an

8   assistant director.

9   Q.   And, again, just in terms of context on a places matter,

10  was this investigation being done by a particular division of

11  the FBI?

12  A.   So it was -- dominantly, it was out of the

13  counterintelligence division, but it was being run out of

14  headquarters.

15  Q.   Okay.  So this wasn't out in the field office; this was

16  all being done at the Hoover building in Downtown Washington?

17  A.   That is correct.

18  Q.   And with respect to the reporting chain, you indicated

19  that Mr. Moffa and Mr. Strzok both reported to Bill Priestap?

20  A.   That is correct.

21  Q.   And then where did Mr. Priestap direct -- report?  I'm

22  sorry.

23  A.   Mr. Priestap would have reported to Deputy Director

24  McCabe, Andrew McCabe.

25  Q.   And then above that?

United States v. Danchenko

147

1   A.   It would have reported to the director, Director Comey.

2   Q.   Okay.  And to your personal knowledge, when this

3   investigation was going on, particularly in its beginning part

4   and continuing on from there, was this all being reported up

5   to the director?

6   A.   My understanding was yes, it was.

7   Q.   Okay.  Now, with regard to Crossfire Hurricane itself,

8   how would you describe it?  Was it an open file?  How did it

9   get opened?

10  A.   So Crossfire Hurricane, the best way I like to explain it

11  is what's called an umbrella investigation.  So you open up an

12  investigation based upon material that came in to us, to the

13  FBI; and out of that investigation, there were a number of

14  several investigations that were opened up out of it.

15  Q.   So it's kind of, as you say, the umbrella case?

16  A.   Correct.

17  Q.   And that was opened based on what?

18  A.   That was opened based on information that came from a

19  friendly foreign government.

20  Q.   And the investigation [sic] that came from the friendly

21  foreign government was, essentially, what?  Explain that to

22  the jurors so they have some understanding.

23  A.   Sure.  The friendly foreign government had provided

24  information that the Trump team had received the suggestion

25  that Russia could assist the Trump team to help with respect

──────United States v. Danchenko──────
                                                              148

1  to releasing information anonymously that would benefit both

2  the Clinton campaign and president --

3  Q.   Which team?

4  A.   Sorry.  Provided information for the Trump team that

5  would be detrimental to Hillary Clinton and to President

6  Obama.

7  Q.   Friendly foreign government with a suggestion of some

8  kind of suggestion?

9  A.   Yes.

10  Q.   And the FBI opened that up to say full investigation?

11  A.   That is correct.

12  Q.   From day one?

13  A.   Correct.

14  Q.   And then you made reference to -- I'm not sure if you

15  called them files subfiles -- how many files were opened under

16  that umbrella?

17  A.   So the umbrella investigation was opened, and then there

18  were four main files, four main investigations opened up under

19  the umbrella investigation.

20  Q.   Do you recall what those four files were?

21  A.   Who the individuals were?

22  Q.   Yes, sir.

23  A.   Yes.  One was Carter Page, one was George Papadopoulos,

24  one was Paul Manafort, and one was Michael Flynn.

25  Q.   And with respect to the information that caused Crossfire

—United States v. Danchenko—

149

1    Hurricane to be opened in the first sense, is that it's from

2    the friendly foreign government, do you recall whether or not

3    there was somebody who was reported to have talked about this

4    suggestion -- that was a suggestion?

5    A.   Yes.  The information from the friendly foreign

6    government indicated that George Papadopoulos had given that

7    information.

8    Q.   So he's one of the four files that were opened?

9    A.   That is correct.

10   Q.   Okay.  And describe or explain to the jurors, if you

11   would, what, if any, role that you played with respect to the

12   umbrella case or any of the four files under it.

13   A.   So for all of the investigation -- the umbrella

14   investigation as well as the four sub cases -- I was helping

15   to lead the analysts who were working together with the

16   special agents on those cases.

17   Q.   I asked you about the opening of Crossfire Hurricane, and

18   you said it was opened to a full investigation, correct?

19   A.   Correct.

20   Q.   Would you explain to the jurors, again, by way of

21   background, are there different levels at which the FBI will

22   open or look at particular matters?

23   A.   Yes.  There are really three levels.  You have what would

24   be considered a threat assessment, which would be, for lack of

25   a better term, a lower level of looking at something; and then

──────United States v. Danchenko──────

150

there are two kinds of what would be called predicated

investigations.  One type is a preliminary investigation, and

one type is a full investigation.

Q.   And in this regard as to files or subfiles, the four

subfiles, were those opened, to your recollection, as full or

preliminary or assessments?

A.   To my recollection, those were full.

Q.   All four opened immediately as full investigations,

correct?

A.   That is my recollection.

Q.   Okay.  So Carter Page would have been one of those?

A.   Correct.

Q.   Would you explain to the jurors, if you would, whether or

not, depending upon the level at which a matter is open, that

the bureau has the same investigative tools that it could use?

A.   No.  There are investigative tools that are allowed at

the full investigation that aren't allowed at the preliminary

investigation.

Q.   So with respect to all four of the subfiles, including

Mr. Page, those were all opened as full, correct?

A.   Correct.

Q.   Explain to the jurors, then, what tools, investigative

tools, the FBI had available at that time as a result of

opening a full investigation as opposed to some lesser level

of --

─────United States v. Danchenko─────

151

1   A.   With a full investigation, you are able to use the

2   Foreign Intelligence Surveillance Act, or FISA.

3   Q.   And are court authorized FISAs, essentially, the most

4   powerful tool that the FBI has available and --

5   A.   I would say one of.

6   Q.   So, again, by the way of background, and I need help in

7   explaining that, what is a FISA?  First of all, what does FISA

8   stand for?  That's an acronym, correct?

9   A.   Right, FISA is an acronym.  It stands for the Foreign

10  Intelligence Surveillance Act.

11  Q.   Is it a particular federal statute that lays out what can

12  and can't be done?

13  A.   Correct.

14  Q.   And then what kind of court authorization might be

15  required; is that a fair statement?

16  A.   Fair statement.

17  Q.   So in that connection, you said that this case was being

18  run out of the counterintelligence division of the FBI

19  headquarters, correct?

20  A.   Correct.

21  Q.   Does the FBI have a criminal division as well?

22  A.   Yes, it does.

23  Q.   So if the jurors, for example, have heard about wiretaps

24  or things of that sort, maybe T3s or the like, is that on the

25  counterintelligence side or is that on the criminal side?

---United States v. Danchenko---

152

1   A.   For a T3, or what would be called Title III or T3, that

2   was on the criminal side.

3   Q.   We're talking about counterintelligence where the FISA

4   statute issues, correct?

5   A.   That is correct.

6   Q.   Again, just for background for the jurors, with respect

7   to the FBI, can the FBI, on its own, just go start to surveil

8   people electronically without court authorization?

9   A.   No.

10  Q.   In getting authorization to do that, on the

11  counterintelligence side, to use the FISA tool, what does the

12  FBI have to do?

13  A.   The FBI has to determine probable cause and to be able to

14  go to the FISC, or the Foreign Intelligence Surveillance

15  Court.

16  Q.   And do you know, based on your own personal knowledge in

17  connection with Crossfire Hurricane, whether or not at any

18  point in time the FBI went to the FISA court to seek

19  permission, authorization to conduct any kind of FISA

20  surveillance?

21  A.   Yes.

22  Q.   What's the basis of your knowledge?

23  A.   I was on the team and I -- involved with providing

24  information that went into the application.

25  Q.   Now, I want to focus a little bit more narrowly at this

Direct Examination - J. Auten 10/12/2022

United States v. Danchenko

153

1   point and ask you about the Carter Page investigation,

2   specifically.

3          Do you recall, sir, whether you played any role in

4   the Carter Page investigation?

5   A.   I was supervising my analysts who were involved embedded

6   in doing analysis on -- for the Carter Page investigation, and

7   I'd also reviewed the footnotes and a bit of ad hoc review of

8   the application itself, and I -- there was involvement that

9   way.

10  Q.   Okay.  Now, you told the jurors that the investigation

11  started at the end of July; you got involved in the next

12  couple of days, correct?

13  A.   Correct.

14  Q.   Would you tell the ladies and gentlemen of the jury

15  whether or not the FBI, as relates to Carter Page, almost

16  immediately started work on trying to put together a FISA

17  application for Mr. Page?

18  A.   There was discussion fairly early on about giving the

19  FISA.

20  Q.   All right.  Before I ask the details of that, do you know

21  whether or not the FBI tried to put together information on

22  Mr. Papadopoulos that you mentioned, to do a FISA on

23  Papadopoulos?

24  A.   There was talk about a FISA on Mr. Papadopoulos as well.

25  Q.   And could they get there?

Direct Examination of - Auten - 7/19/2022

————United States v. Danchenko————

154

1   A.   No.

2   Q.   And how about you made reference to Mr. Manafort; do you

3   know whether or not the bureau made an attempt to put together

4   a FISA application on Mr. Manafort?

5   A.   I don't recall any discussion about a FISA for

6   Mr. Manafort.

7   Q.   How about Michael Flynn?

8   A.   No, I don't recall any discussion it was Michael Flynn

9   either.

10   Q.   Okay.  So worked on trying to put something together on

11   Papadopoulos; didn't go anywhere, correct?

12   A.   Correct.

13   Q.   And they worked on Carter Page?

14   A.   Correct.

15   Q.   Now, I want to ask you about the investigation related to

16   Carter Page prior to the date of September 19th, all right?

17   Do you recall whether or not September 19th of 2016 was a

18   significant date for the Carter Page investigation?

19   A.   Yes.

20   Q.   Now, what was it about September 19th that was of

21   significance based on your personal knowledge?

22   A.   That was the date that the Crossfire Hurricane team

23   received the information that is collectively known as the

24   Steele dossier.

25   Q.   Okay.  So prior to September -- prior to September 19th

─────United States v. Danchenko─────

155

1   of 2016, had the FBI been successful in putting anything

2   together for a FISA application on Carter Page or not?

3   A.   So the FBI had put material together, but had not

4   actually achieved the ability to go in front of the court

5   and -- and secure.

6   Q.   And that inability, in fact, was because they hadn't been

7   able to put together probable cause to go to a federal judge

8   to ask for a FISA warrant, right?

9   A.   That was my understanding.

10  Q.   So --

11          MR. ONORATO:  I'm just going to object.  The witness

12  doesn't have firsthand knowledge.  He's speculating and I

13  think you should strike that.

14          MR. DURHAM:  Well, I can clarify.

15  BY MR. DURHAM:

16  Q.   Is that based on your personal knowledge, prior to

17  September 19th, they had not been able to put it together?

18  A.   I am aware that they had not been able to go in front of

19  the court with anything.

20  Q.   Okay.  So September 19th arrives, and remind the jurors

21  what happened on September 9th [sic] of 2016?

22  A.   September 19th of 2016, the Crossfire Hurricane team

23  began to receive the reports that are -- some of the reports

24  that are collectively known as the Steele dossier.

25  Q.   Now, the jurors are going to hear -- the jury is going to

—United States v. Danchenko—

156

1   hear a lot about the Steele dossier.  Let me ask you, what

2   is -- what is that?  What's parochially known as the Steele

3   dossier?  Is it a single report?  Is it made up of many

4   reports?  Describe it to the jurors.

5   A.   It is a set of reports that were -- originated, came to

6   the FBI via a -- well, information that came to the FBI

7   originating from Christopher Steele's organization or

8   businesses -- or his business intelligence.

9   Q.   All right.  And let's drill down just a little bit on

10  that.  With respect to the Steele dossier, you made reference

11  to Christopher Steele, correct?

12  A.   Yes.

13  Q.   Is Christopher Steele a United States citizen?

14  A.   No, he is not.

15  Q.   Where is Christopher Steele from?

16  A.   He is from the U.K.

17  Q.   And with respect to Christopher Steele, is he an

18  associate of a particular business entity?

19  A.   Yes.

20  Q.   And what was that business entity?

21  A.   Orbis Business Intelligence.

22  Q.   And with respect to Orbis Business Intelligence, do you

23  know what kind of work they did?

24  A.   A number of things with respect to analysis, legal work

25  for banks, things of that sort.

─────────United States v. Danchenko─────────

157

1   Q.   All right.  Now, you told the jurors that the information

2   from the Steele reports, you say, started to come in, correct?

3   A.   Correct.

4   Q.   I'm going to drill down a little bit on that.

5           Did the FBI, to your personal knowledge, receive all

6   the Steele reports at the same time?

7   A.   No.

8   Q.   Describe to the jurors how they started to come in.

9   A.   So initially, they came in -- well -- the reports came in

10  early on, and then the Crossfire Hurricane team received them

11  later.  I believe there were two reports that came in to us at

12  that point.  And then, we started to receive other reports

13  across from other different entities.  Not just from -- not

14  just from sources, but from journalists and the like.

15  Q.   So let's get down a little bit more detail about that.

16          You've told the jurors that the reports didn't

17  initially come to the Crossfire Hurricane folks, correct?

18  A.   Correct.

19  Q.   How, based on your personal participation in the

20  investigation, did they first come in?

21  A.   My understanding is this actually comes from the IG

22  report.  And my understand -- sorry.

23  Q.   Okay.  You don't have to testify upon that report.

24  A.   Okay.  Okay.

25  Q.   Do you know whether or not, or at a point in time prior

─────United States v. Danchenko─────

158

1  to the Crossfire Hurricane team getting the reports, whether

2  some of those reports -- this just calls for a "yes" or "no."

3  A.   Right.

4  Q.   Had been received by anybody in the FBI?

5  A.   Yes.

6  Q.   Okay.  And do you know who that person was?

7  A.   Mike Gaeta.

8  Q.   And is Mike Gaeta someone that you worked with during the

9  course of the Crossfire Hurricane proceedings?

10 A.   Yes, for a time.

11 Q.   Well, at the time that Mike Gaeta got -- where is Mike

12 Gaeta located, if you recall?

13 A.   In Rome.

14 Q.   All right.  So do you have personal knowledge as to who

15 Gaeta got them from?

16 A.   Yes.

17 Q.   And who is that?

18 A.   That would be from Christopher Steele.

19 Q.   Okay.  So Christopher Steele visited Gaeta in Rome,

20 correct?

21 A.   Correct, yes.

22 Q.   And therefore, it takes some period of time to get from

23 Rome to the Crossfire Hurricane team?

24 A.   Correct.

25 Q.   And that's in September of 19th of 2016?

Direct Examination of FBI Agent #7/129/2022

────United States v. Danchenko────

159

1   A.   Correct.

2   Q.   Once those reports have been -- let me -- you also told

3   the jurors that some of the reports came in subsequent to the

4   initial reporting, correct?

5   A.   Correct.

6   Q.   Did you make reference to the reports having been given

7   to journalists?

8   A.   Yes.

9   Q.   What's the basis of your knowledge for that?

10  A.   Understood that they came from journalists, and I believe

11  that there was discussion among the team that some come in.

12  Q.   Okay.  With respect to what the FBI got directly from

13  Steele, did you, yourself, have occasion to see that

14  reporting?

15  A.   Yes.

16  Q.   And what, if any, involvement did you then have, sir, in

17  the preparation process relating to FISA application being put

18  together to cover Carter Page?

19  A.   So my analysts help to gather material, and to assist

20  with providing language for the application.

21  Q.   And once the -- once the Steele dossier reporting started

22  coming in, do you recall, sir, whether or not the FBI was able

23  to move ahead to put together a FISA application to submit to

24  a federal judge on the FISA court?

25  A.   The FISA was submitted after receipt of this deal

─────United States v. Danchenko─────

160

1   reporting, yes.

2   Q.   Do you recall, sir, whether or not any information from

3   the Steele reports were included in the FISA application that

4   now could move forward?

5   A.   Yes.

6   Q.   And what's the basis of your knowledge that the

7   information from the dossier reports were then included in the

8   FISA application?

9   A.   I've read the FISA applications.

10  Q.   All right.  Do you recall offhand, as you're here now,

11  when that FISA application was submitted to the FISA court?

12  A.   It was October 21st, I believe, 2016.

13  Q.   All right.  So, now, I want to focus your attention on

14  the period of time between September 19th and October 21st,

15  okay?

16        Let me ask you, sir, first, whether or not -- what,

17  if any, efforts you are personally aware of were undertaken by

18  the FBI to verify or corroborate any of the allegations that

19  were contained in those dossier reports that the FBI was

20  including in a FISA application on a United States citizen.

21  A.   Myself and my analysts were -- were busy attempting to go

22  through the material to look through FBI systems to determine

23  whether or not we could verify, corroborate, confirm, or

24  disconfirm the information in those reports.

25  Q.   And between September 19th of 2016 and October 21st, when

─────United States v. Danchenko─────

161

1    the FBI submitted the FISA application, were you able to

2    confirm or corroborate in any of the FBI system the very

3    serious allegations that were contained in dossier reports?

4    A.   No.

5    Q.   A separate part from the FBI checking its data banks, its

6    files, do you recall whether or not the FBI, to your personal

7    knowledge, inquired of other members of the Intelligence

8    Community to see whether any of those other members of the

9    Community might have information that would corroborate the

10   information in the dossier?

11   A.   Yes.

12   Q.   And to -- do you have any personal knowledge?

13   A.   I do.

14   Q.   And what can you tell the jurors about whether or not any

15   of the intelligence agencies that the FBI contacted for

16   corroborative information produced any corroborative

17   information?

18   A.   We did receive information back from a number of

19   different agencies.

20   Q.   Then, as to the information that you received back from

21   the agencies, did they corroborate the specificity of specific

22   allegations that were contained in the dossier reports?

23   A.   Not corroborating the specific allegations, no.

24   Q.   Do you have any personal knowledge whether or not between

25   September 19th of 2016 and October 21st of 2016, whether or

─────United States v. Danchenko─────

162

1  not any attempts -- this calls for a "yes" or "no" -- were any

2  attempts made by the FBI to meet with Christopher Steele to

3  try to vet this reporting that was in the dossier reports that

4  had been received up to that point in time?

5  A.   Yes.

6  Q.   What's the basis of your knowledge?

7  A.   I went to actually help to interview Christopher Steele.

8  Q.   Did you go alone or did you go with other persons?

9  A.   No, I went with other persons.

10  Q.   And who else did you go with?

11  A.   I went with Mike Varacalli, who is a special -- a

12  supervisory special agent.  I went with -- Mike Gaeta was

13  there, Special Agent.  Ben Guessford was there as well,

14  Special Agent, and myself.

15  Q.   And how about who is the actual applicant on the -- that

16  first initial FISA application, the October 21st?

17  A.   The actual affiant?

18  Q.   Yes, If you know.

19  A.   I believe his first name is Brandon.  I can't remember

20  his last name.

21  Q.   Okay.  At that time, bureau protocol of the affiant, the

22  person signing the thing, wasn't actually the most active

23  participant, correct?

24  A.   Correct.

25  Q.   Do you remember -- do you remember an individual by the

Direct Examination of FBI Agent Auten 10/11/2022

─────United States v. Danchenko─────

163

1    name of Steve Somma?

2    A.   Yes.

3    Q.   And who is Steve Somma?

4    A.   Steve Somma was one of the agents who was on the

5    Crossfire Hurricane team.

6    Q.   And did Somma go with you as well to meet with -- Mr.

7    Steele or not?

8    A.   No, he did not.

9    Q.   Okay.  So it was yourself, Mr. Varacalli, and Mr. Gaeta?

10   A.   Mr. Gaeta and then Mr. Guessford.

11   Q.   And Mr. Guessford.  Okay.

12        So when did that occur?

13   A.   The beginning of October 2016.

14   Q.   All right.  So several weeks before the application was

15   actually submitted?

16   A.   Correct.

17   Q.   Did you, yourself, have any particular focus for the

18   meetings that you had with Mr. Steele in early October of

19   2016?

20   A.   My main role was to ask about Christopher Steele's

21   sources, and any type of information that would help us to

22   understand and better understand and better corroborate the

23   material that we received.

24   Q.   Okay.  So to help the jury out here, you were interested

25   in the sources of the information, correct?

─────United States v. Danchenko─────

164

1   A.   Correct.

2   Q.   And you are interested in corroborative information?

3   A.   Correct.

4   Q.   Okay.  So any other focus other than those two generally

5   that you can recall?

6   A.   Other focus would be to, again, see if Mr. Steele could

7   provide any other information that would help to move this

8   case forward.

9   Q.   Let me ask you this first about corroborative

10  information.  When you and Mr. Varacalli, and Mr. Gaeta, and

11  Mr. Guessford met with Christopher Steele in early October of

12  2016, did Christopher Steele provide any corroborative

13  information for the information that was contained in his

14  reports, in the dossier reports?

15  A.   Not for the allegations, no.

16  Q.   Do you recall, sir, whether or not in that regard, if the

17  FBI when they met with Mr. Steele in early October of 2016,

18  offered Mr. Steele any type of incentive to provide

19  corroborative information?

20          MR. ONORATO:  Objection.

21          THE COURT:  Let me see counsel.

22          (Side bar.)

23          THE COURT:  What's the objection?

24          MR. ONORATO:  So the objection is they are going to

25  say -- I think the answer to the question is going to be they

---United States v. Danchenko---

165

1   offered him a million dollars or some extraordinary amount of

2   money.  They didn't provide proper information.  So --

3              MR. DURHAM:  Your Honor, this was offered because

4   Counsel clearly has indicated he's going to make an issue out

5   of what the agent, at various points in time, said to

6   Mr. Danchenko.  For example, in January and then with the LA

7   Times when Mr. Danchenko was meeting with Mr. Helson.

8              The government wants to present, in crystal clear

9   terms, to this jury that from the very beginning the FBI was

10  inquiring about any corroborative information, any source of

11  information, who the sub-sources were, what kind of

12  information or evidence they might have that is corroborative.

13  And it's all part of the particular pattern by the same

14  people.

15             THE COURT:  I'm going to let it in.

16             MR. ONORATO:  The only point to make, Your Honor, is

17  that why didn't they just ask Agent Auten whether he was of

18  (indiscernible) with Mr. Danchenko.

19             THE COURT:  I'm assuming Mr. Durham is going to get

20  to that.  I'm going to let it in.

21             MR. DURHAM:  Thank you, Your Honor.

22             (Open court.)

23  BY MR. DURHAM:

24  Q.   So, let me ask you again:  Do you recall whether or not

25  when you and the other FBI personnel met with Mr. Steele in

---Tonia M. Harris OCR-USDC/EDVA 703-646-1438---

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

166

1  early October and he wasn't able to provide any corroborative

2  information at all regarding the substantive claims in the

3  dossier, whether or not the FBI offered Mr. Steele some type

4  of incentive to be able to provide any corroborative

5  information of what was in those reports?

6  A.   Yes, it did.

7  Q.   And what was it -- tell the ladies and gentlemen of the

8  jury what it is that the FBI offered Mr. Steele for any

9  corroborative information.

10  A.   Mr. Steele was offered anywhere up to a million dollars

11  for any information, documentary, physical evidence, anything

12  of that sort which could help to prove the allegations.

13  Q.   At any time when you were overseas meeting with Steele in

14  early October, did he provide anything?

15  A.   He did not.

16  Q.   At any time after the October meeting with Mr. Steele and

17  after the million dollars-plus had been offered as an

18  incentive to provide corroborative information for what was in

19  those reports, did he provide any corroborative information?

20  A.   No.

21  Q.   You had indicated that a second principle purpose or

22  focus of the meeting was to try to identify the sourcing of

23  the information, correct?

24  A.   Correct.

25  Q.   Explain to the jurors why you and your colleagues were

─────United States v. Danchenko─────

167

1    interested in the sourcing.

2    A.   Well, the sourcing is important because the reports have

3    significant allegations, individuals who are mentioned in the

4    reports, and the key to be able to track back exactly whether

5    or not the information is accurate, true, whether or not the

6    individuals who are mentioned in the reports have the accesses

7    to actually have the information, whether it is in the

8    reports, etc.

9    Q.   And was the FBI -- well, let me retract and ask you

10   personally:  Were you personally only interested in drilling

11   down on, trying to get source of information in early October

12   of 2016, or was that a continuing concern on your part?

13   A.   That was a continuing concern.

14   Q.   How about your colleagues, were they similarly

15   continually interested in trying to develop source

16   information?

17   A.   Yes.

18   Q.   To the best of your ability, did you try to elicit or

19   learn from people that you were meeting with, talking to about

20   the dossier, what the sourcing was?

21   A.   Yes.

22   Q.   Any doubt in your mind about that?

23   A.   No.

24   Q.   Do you recall any instance in which you met with anybody

25   trying to develop information about the sourcing, where the

─United States v. Danchenko─

168

1   person seemed confused about what you were asking?

2           MR. ONORATO:  Your Honor, I'm going to object.

3           THE COURT:  I'm going to sustain that objection.  Go

4   ahead.

5   BY MR. DURHAM:

6   Q.   So you talked to Mr. Steele about sourcing.  Do you

7   recall whether or not Mr. Steele, in early October of 2016

8   provided you or your colleagues with the names of any of the

9   sources?

10  A.   Sources, no.

11  Q.   Do you recall, sir, whether or not he provided any

12  information at that time concerning the types of persons as

13  opposed to the persons' names?

14  A.   Yes.  There were source characterizations, but no source

15  names.

16  Q.   But not any of the sources themselves?

17  A.   No.

18  Q.   Did you learn in October of 2016 whether there were

19  multiple sources who were behind the information or who had

20  provided the information in the reports or if there was a

21  principle source?

22  A.   Our --

23          MR. ONORATO:  I'm going to object as to hearsay.

24  I'm not sure where this is going.

25          THE COURT:  Okay.  Go ahead.  Establish a

─────United States v. Danchenko─────

169

1    foundation.

2         MR. DURHAM:  Yes, Your Honor.

3    BY MR. DURHAM:

4    Q.   Without telling us what Mr. Steele may have said about

5    that --

6    A.   Okay.

7    Q.   -- do you recall, sir, after the meeting in early October

8    of 2016 with Mr. Steele, whether or not you and your

9    colleagues began to undertake any particular effort to try to

10   identify?

11   A.   Yes.  I would say that we were attempting to identify all

12   of the potential sources that we could file those reports.

13   Q.   And did you have any -- some understanding as to whether

14   there was a principle source?

15   A.   Eventually, yes.

16   Q.   Okay.  And what can you tell the jurors about that, that

17   is the sourcing of the dossier reports?  What can you tell the

18   jurors about what you were able to determine?

19   A.   Well, eventually, what we -- the FBI was able to

20   determine by late December of 2016 was that it was one

21   particular individual who was talking to other individuals for

22   material that were in the reports.

23   Q.   With respect to the October meeting with Steele before

24   the FBI applied to the FISA court for coverage on a United

25   States citizen, he had not provided any source information to

Direct Examination of -- Auten 10/11/2022

─United States v. Danchenko─

170

1  you other than maybe by position, not by name?

2  A.   Source characterizations, yes.

3  Q.   Let me ask you this:  With respect to your meeting with

4  Mr. Steele in early October of 2016, do you recall whether or

5  not the name Sergei Millian came up?

6  A.   Yes.

7  Q.   And how did that come up?

8  A.   Sergei Millian's name came up as --

9          MR. ONORATO:  Your Honor, I'm going to object.

10          THE COURT:  Overruled.  Go ahead.

11  BY MR. DURHAM:

12  Q.   With respect to Sergei Millian, whatever you learned from

13  Mr. Steele in October of 2016, what, if anything, did you and

14  your colleagues do regarding Sergei Millian?

15  A.   Out of what we learned from Steele or from -- or what

16  came up before --

17  Q.   Based on what you knew.  Let's not worry about hearsay

18  from Steele.

19  A.   No, no.  I mean --

20  Q.   What did you learn?

21  A.   Millian's name came up in the course and scope of the

22  investigation prior to us talking to Mr. Steele.

23  Q.   Okay.  So -- and this just calls for a yes or no.  Did

24  you have a -- in your meetings with Steele, did Sergei

25  Millian's name come up?

─United States v. Danchenko─

171

1    A.   Yes.

2    Q.   Okay.  So you discussed what you discussed with him, that

3    is, you discussed with Steele?  I'm not asking what Steele

4    said to you.

5    A.   Sergei Millian's name came up in the discussion.

6    Q.   All right.  Now, you told the jurors at this point no

7    corroborative information and no source information given up

8    by Steele.  Do you recall whether or not Mr. Steele provided

9    any other information to you about, not sources for the

10   dossier, but people who might be knowledgeable about some of

11   these matters relating to the Trump campaign and Russian?

12   A.   Yes.

13   Q.   Do you remember who any of those persons -- those names

14   were?

15   A.   Those names included Charles Dolan, Stephen Kupka, and

16   there was one other -- I can't remember, sorry.

17   Q.   If you heard it, would you know?

18   A.   Yes.

19   Q.   What about Greg Harley?

20   A.   Yes, Greg Harley, yes.

21   Q.   So Charles Dolan, Stephen Kupka, and Greg Harley?

22   A.   Yes.

23   Q.   All right.  But they weren't identified as sources?

24   A.   Correct.

25   Q.   Okay.  At the time that the FBI completed its visit with

─────United States v. Danchenko─────

172

1   Mr. Steele in October of 2016, had the FBI been able to

2   identify or confirm the identity of Steele's primary

3   sub-source -- Steele's primary source?

4   A.    No.

5   Q.    And the same question relating, not to the primary

6   source, but to the primary source's sub-sources; have you been

7   able to confirm the identity of any of those persons?

8   A.    No.

9   Q.    Now, you've told the jurors that the bureau, the FBI, had

10  not been able to corroborate information from the dossier

11  reporting, but some of it -- some of that information was

12  included in the FISA application, correct?

13  A.    Correct.

14  Q.    And what is the basis of your knowledge that this

15  uncorroborated information went into the FISA application?

16  A.    Again, I've read the applications.

17  Q.    Do you remember which portions of the reporting went into

18  the FISA application?

19  A.    I don't know if I could rattle off all, you know, each

20  and every -- each and every example or portion, but --

21  Q.    Fair enough.  I'm going to ask the court security

22  officer, if you would, to provide you with a binder.  I'd ask

23  you to take a look at what we've premarked as Government's

24  Exhibit 109 for identification.

25  A.    Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

┌─ United States v. Danchenko ─

173

1          MR. DURHAM:  May I just -- Your Honor, may I just

2    consult with counsel for a moment?

3          THE COURT:  Yes.

4          (Counsel confers.)

5    BY MR. DURHAM:

6    Q.   109, would it be a fair statement that there are a couple

7    different versions in there?

8    A.   Correct, yes.

9          MR. DURHAM:  Your Honor, this is the matter that

10   defense counsel and the government raised to the Court today.

11   Would it be helpful to the Court if we were to provide

12   additional copies to Your Honor?

13         THE COURT:  Yes.

14         MR. DURHAM:  Okay.  Your Honor, in looking at the

15   two versions -- Your Honor, we previously provided copies to

16   counsel, but I don't think they have it in their binder for

17   some reason, so we're trying to just get an additional copy if

18   the Court will bear with us.

19         THE COURT:  All right.

20         (A pause in the proceedings.)

21         MR. ONORATO:  So, Your Honor, this is a document

22   that we discussed this morning in terms of -- the Court made

23   the ruling before we go too further.

24         THE COURT:  Well, I'm not clear what role that it's

25   going to play for this witness.  Why don't you ask the

Direct Examination of D. Auten 10/12/2022

─United States v. Danchenko─

174

1   question.

2           MR. DURHAM:  Yes, Your Honor.

3   BY MR. DURHAM:

4   Q.   Sir, looking at Government's Exhibit 109 -- well, first,

5   look at the whole document.  Are you familiar with that

6   document?

7   A.   Yes, I am.

8   Q.   With respect to that document, what is it?

9   A.   It is one of the Orbis reports.  It's listed as company

10  intelligence report 2016/095.

11  Q.   Okay.  And with respect to that document that's in front

12  of you, does it contain information, number one, that was

13  subsequently taken and used in the FISA application that was

14  submitted to a federal judge on October 21st of 2016?

15  A.   Yes, I do recognize some of the language.

16  Q.   And with respect to the information that's contained in

17  Government's Exhibit 101, which, again, is dossier report

18  number 2016/095, are you familiar with that information, that

19  is, something that's normal to you from having used it

20  previously?

21  A.   What -- am I familiar with what's in this report?

22  Q.   Yes, sir.

23  A.   I am, yes.

24  Q.   Okay.  Do you recall, sir, and we're going a little bit

25  out of order here, but just to maybe set up a little bit more

─────United States v. Danchenko─────

175

1   of a stage, at some point in time, did you have occasion to

2   talk to Mr. Danchenko?

3   A.   Yes.

4   Q.   And with respect to the Government's Exhibit 109, did you

5   have occasion to show that to Mr. Danchenko?

6   A.   Not show it to Mr. Danchenko, but to discuss it with

7   Mr. Danchenko.

8   Q.   To -- I'm sorry.

9   A.   Not to show it to Mr. Danchenko, but to discuss it with

10  Mr. Danchenko.

11  Q.   Okay.  And at the time you talked with Mr. Danchenko --

12  and, again, we're skipping ahead a little bit here -- did

13  Mr. Danchenko have his own set of the Steele dossier reports?

14            MR. ONORATO:  I'm going to object.

15            THE COURT:  Sustained.  You need to lay a

16  foundation.  You need to lay a foundation.

17            MR. DURHAM:  Yes, Your Honor.

18  BY MR. DURHAM:

19  Q.   Were you -- were you -- at a subsequent time, you and a

20  colleague met with Mr. Danchenko, correct?

21  A.   Correct.

22  Q.   And you interviewed him?

23  A.   Correct.

24  Q.   At that time, when you personally interviewed him, this

25  would have been in January of 2017, we'll talk about it in

United States v. Danchenko

176

1   more detail shortly, but when you met with him, at that time,

2   did he have a copy of the dossier reports with him?

3   A.   My recollection is that he had a copy of it with him.

4   Q.   Right.  And with respect to the set of dossier reports he

5   had with him, to your recollection, maybe you recall, maybe

6   you don't, did he have -- were there markings, that is

7   handwritten markings, on the dossier reports?

8   A.   I recall that he had a document -- dossier with marks on

9   it.

10          MR. DURHAM:  We're off of 109, Your Honor.  There

11  are two versions -- I think there are two versions sort of

12  competing, redacted versions.

13          THE COURT:  All right.  I don't think we're there

14  yet with this witness.  I'm going to reserve on that -- on

15  that exhibit.

16          MR. DURHAM:  Okay.

17          THE COURT:  Let me see counsel at the bench.

18          MR. DURHAM:  Yes, Your Honor.

19          (Side bar.)

20          THE COURT:  At this point is that the recalls that

21  Mr. Danchenko had documents and the dossier with some writings

22  on it.  He hasn't specifically identified this document nor

23  has he identified any specific information that he reviewed it

24  from this document.  And I think that's necessary before this

25  document really becomes relevant.  All right.

──────United States v. Danchenko──────

177

1          MR. DURHAM:  Just to let the Court know where

2    government is going on this.  What we're principally

3    interested in, at this point, we'll get to later in his

4    testimony, broader than that.  What we are principally

5    interested in right now is the -- if I might --

6          THE COURT:  This is your version?

7          MR. DURHAM:  Is this information that we've

8    prepared.  That's the information I want to ask him about

9    right now.

10          THE COURT:  Okay.

11          MR. DURHAM:  Perhaps what we can do is we could

12    offer that version now --

13          THE COURT:  This one.

14          MR. DURHAM:  -- and then if we get to the second

15    part then --

16          THE COURT:  All right.  Let's do that.

17          MR. ONORATO:  My assumption is that you want to say

18    that this information went into the FISA.

19          MR. DURHAM:  FISA.

20          MR. ONORATO:  We have no objection to that.

21          THE COURT:  What I will do is I'll admit the

22    defendant's version and then if there's a proper foundation,

23    we'll supplement it.

24          MR. DURHAM:  Okay.  Maybe we will mark this as 109A

25    and we'll mark it 109B, if it's admitted later.

—————United States v. Danchenko—————

178

1          THE COURT:  That's fine.  All right.

2          MR. DURHAM:  Thank you.

3          THE COURT:  Should I hold on to those?  Are these

4  your copies or mine?

5               (Discussion off the record.)

6               (Open court.)

7          MR. DURHAM:  Perhaps if --

8          THE COURT:  Let me give these to you.  I put an A

9  next to the one you wanted to use.  That's admitted.

10          MR. DURHAM:  Your Honor, may I ask permission for

11  the court security officer to provide to the witness what

12  we've marked, with the Court's assistance, of course, as

13  Government's Exhibit 109A?

14          THE COURT:  Yes.

15          MR. DURHAM:  May I proceed, Your Honor?

16          THE COURT:  Yes.

17  BY MR. DURHAM:

18  Q.   Sir, looking at what's marked as Government Exhibit 109A.

19  Again, what is that?

20  A.   This is a company intelligence report 2016/095.

21  Q.   And with respect to the -- is that a complete copy or

22  does that have some information, which for now, is blacked

23  out?

24  A.   This is a redacted copy.

25  Q.   Okay.  With respect to what you're looking at,

---United States v. Danchenko---

179

1   Government's Exhibit 109A, can you tell ladies and gentlemen

2   of the jury whether or not it contains information which the

3   FBI then used in the Carter Page FISA application that was

4   submitted to a federal judge on October 21 of 2016?

5   A.   Yes, it does.

6           MR. DURHAM:  I'm going to offer 109A as an exhibit,

7   Your Honor.

8           THE COURT:  All right.  Without objection, 109A is

9   admitted.

10      (Government's Exhibit No. 109A admitted into evidence.)

11          MR. DURHAM:  All right.  With the Court's

12  permission, I'm going to ask that the court security officer

13  pull that up on the monitors for the jury.

14          THE COURT:  Yes.  Yes.  It may be published.

15          (Exhibit published.)

16  BY MR. DURHAM:

17  Q.   Now, Mr. Auten, the jurors can now see Government's

18  Exhibit 109A so they can read it.  But for purposes of the

19  written record --

20          MR. DURHAM:  Wondering if we could just have one

21  moment just see if we could maybe blow that up.  Court

22  security officer, could you blow that up for the jurors?

23  BY MR. DURHAM:

24  Q.   Okay.  So for our purposes here, the jurors can see it so

25  they can read for themselves, but for the written record, can

Direct Examination of D. Auten - 10/12/2022

─────United States v. Danchenko─────

180

1    you read into the record what 109 is, starting at the top.

2    A.    109 is Company Intelligence Report 2016/095.

3    Q.    And then, with respect to the next line, what the heading

4    is.

5    A.    [As read]:  Russia/U.S. Presidential Election:  Further

6    Indications of Extensive Conspiracy Between Trump's Campaign

7    Team and the Kremlin.

8    Q.    Now, there's a particular paragraph, it's Paragraph No. 1

9    in the document, that the jurors are seeing, correct?

10   A.    Correct.

11   Q.    And read that into the record, if you would.

12   A.    [As read]:  Detail 1, speaking in confidence to a patriot

13   in late of July 2016.  Source E, an ethnic Russian close

14   associate of republican US presidential candidate, Donald

15   Trump, admitted that there was a well-developed conspiracy of

16   cooperation between them and the Russian leadership.  This was

17   managed on the Trump side by the republican candidate's

18   campaign manager, Paul Manafort, who was using foreign policy

19   advisor, Carter Page, and others as intermediaries.  The two

20   sides had a mutual interest in defeating democratic

21   presidential candidate Hillary Clinton, whom president Putin

22   apparently both hated and feared.

23   Q.    Now, with respect to that information, what is that --

24   the information contained in Paragraph 1, was that information

25   incorporated in large part FISA application against Carter

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

181

1   Page?

2   A.   Yes, there were portions of it that were incorporated in

3   the FISA, yes.

4   Q.   And with respect to this report, had the FBI been able to

5   corroborate anything, any of that information?

6   A.   At that time, not corroborating the main allegations, no.

7   Q.   And, in fact, at that time, other than the dossier report

8   saying this, the FBI didn't have any evidence of that,

9   correct, nothing to corroborate that?

10  A.   Not that I recall, no.

11  Q.   Now, you were the person that had, probably, the most

12  knowledge about the materials matters at the time, correct?

13  A.   I don't know if I would say the most knowledge, I was one

14  of them that had knowledge.

15  Q.   Okay.  Do you recall, sir, whether or not, you told the

16  jurors that the dossier material came in and started to come

17  in on September 19, correct?

18  A.   Correct.

19  Q.   This information was included in the FISA application,

20  correct?

21  A.   Correct.

22  Q.   Do you recall, sir, whether or not this information, this

23  allegation, which had not been corroborated in any way when

24  the application was submitted in October, right, was that an

25  important part of the FISA application that was filed against

Direct Examination of Auten - 10/13/2022

─United States v. Danchenko─

182

1  the United States citizen Carter Page?

2  A.   So, I would not be in a position to make that assessment.

3  I'm not a lawyer so I wouldn't be able to judge with respect

4  to where this cuts with respect to probable cause.

5  Q.   Okay.  And my question was whether or not that played a

6  significant part.  I didn't ask you if it was -- what role

7  played in probable cause.

8         Was this an important piece of information that was

9  included in that application?

10  A.   Yes, it was.

11  Q.   And it was uncorroborated?

12  A.   Correct.

13  Q.   It was submitted to the -- with that information, that

14  the jurors are looking at 109A was submitted to a federal

15  judge in federal court, to the best of your knowledge, did the

16  FBI have any information in its data banks that was

17  corroborative of that assertion?

18  A.   Not to my recollection.

19  Q.   Now, I want to focus your attention even more

20  specifically, if I might, on certain parts of that.  You told

21  the jurors that in early October, you and the FBI had gone to

22  London, correct?

23  A.   Correct.  Can you go back again, please?

24  Q.   I'm sorry.  I said London.  You went overseas, correct?

25  A.   Correct.

Direct Examination of D. Auten - 7/13/2022

─────United States v. Danchenko─────

183

1  Q.   It was actually a city other than London?

2  A.   That is correct.

3  Q.   Okay.  And do you recall whether or not -- withdrawn.

4        You had told the jurors also that the name Millian

5  had come up when you were over there, correct?

6  A.   Correct.

7  Q.   Now, this just calls -- so that's yes, but you can't tell

8  us what Mr. Steele said, okay?  So I'm not asking you to tell

9  us what Steele said.

10        But will you tell the jurors whether or not the FBI

11  took some action -- I started to touch on this before -- once

12  you returned from overseas after having spoken to Mr. Steele.

13  A.   Yes, we continued to try and vet the material and

14  continue to do searches and the like, mining open source,

15  mining classified material to see if we can corroborate.

16  Q.   Okay.  Now, Sergei Millian in October of 2016, was that a

17  name that was familiar to you?

18  A.   Yes.

19  Q.   Was he a person, to your knowledge, who had interacted

20  with the FBI?

21  A.   Yes.

22  Q.   Do you recall, again, to your personal knowledge, whether

23  or not Sergei Millian had some type of a relationship --

24        MR. ONORATO:  Objection.

25        THE COURT:  Let me hear -- let me hear the question.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

———United States v. Danchenko———

184

1        MR. DURHAM:  Whether or not Mr. Auten has personal

2  knowledge if Mr. Millian had some type of relationship with

3  the FBI.

4        THE COURT:  All right.  Overruled, you may answer.

5  A.   Yes.

6  BY MR. DURHAM:

7  Q.   And what was that relationship?

8  A.   Mr. Millian, at one time, had been a source.

9  Q.   When you say "source," that's the same thing as

10  confidential human source, correct?

11  A.   That is correct.

12  Q.   In common parlance, might be known as an informant?

13  A.   In common parlance, yes.

14  Q.   And do you remember for how long Mr. Millian had been a

15  confidential human source for the FBI?

16  A.   I don't recall that.

17  Q.   Do you recall or do you know in German what the nature of

18  the assistance was that Millian provided?

19  A.   I know where he had provided the assistance.  I don't

20  know exactly what type of assistance it had been.

21  Q.   Okay.  So you know that he has helped as a CHS?

22  A.   Correct.

23  Q.   For a period of time?

24  A.   Correct.

25  Q.   And you said you knew where he was providing that

United States v. Danchenko

185

1   information?

2   A.   Correct.

3   Q.   And where was that?

4   A.   I believe it was the Atlanta -- the Atlanta field office.

5   Q.   Okay.  Do you know, again, personal knowledge, do you

6   know whether or not at some point in time Millian's status as

7   a CHS ended, he was closed?

8   A.   Yes.

9   Q.   And why was it closed, if you know?

10  A.   I believe it was closed because he moved out of the area

11  of responsibility for the Atlanta field office.

12  Q.   Now, with respect to Mr. Millian, you heard about Millian

13  from Steele, you knew he had a relationship with the bureau,

14  correct?

15  A.   Correct.

16  Q.   Do you recall whether or not Mr. Millian was involved

17  with any kind of -- with any particular business entity?

18  A.   Yes.

19  Q.   And what was that?

20  A.   It was the Russian American Chamber of Commerce, if I

21  recall correctly.

22  Q.   Okay.  So he's -- do you remember what his role was, his

23  position was?

24  A.   I want to say president, potentially.

25  Q.   So Mr. Millian was the president of the Russian American

─United States v. Danchenko─

186

1   Chamber of Commerce, correct?

2   A.   Yes.

3   Q.   And he had been a bureau informant?

4   A.   Yes.

5   Q.   With respect to Mr. Millian, do you recall, sir, whether

6   or not, again, your personal knowledge based on your personal

7   participation in these matters, if Mr. Millian had a

8   particular view of Mr. Trump?

9   A.   With respect to what I knew when?

10  Q.   Let's say in October of 2021.

11  A.   I don't recall whether I knew in October of -- whether I

12  knew he had a particular position on the president.

13  Q.   So this just calls for a yes or no:  At some point in

14  time, did you learn whether or not Mr. Millian had a

15  particular perspective on the Trump candidacy?

16  A.   Yes, at some point, I did.

17  Q.   And what was Mr. Millian's view; is he a supporter of

18  Mrs. Clinton, is he a supporter of Trump, he was someplace in

19  between?  What do you recall?

20  A.   I recall he was a supporter of Trump.

21  Q.   He was a Trump supporter, correct?

22  A.   Correct.

23  Q.   And he had been a bureau informant, correct?

24  A.   Correct.

25  Q.   Do you recall, sir, based on his name having come up when

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

187

1   you were overseas talking to Steele -- and I think you had

2   indicated some things that happened before that -- he was a

3   person of interest, correct?

4   A.   Correct.

5   Q.   Would you tell the ladies and gentlemen of the jury

6   whether or not -- again, to your personal knowledge -- whether

7   or not the bureau opened some file on Mr. Millian?

8   A.   Yes.

9   Q.   And was that a matter investigated by the Bureau?

10  A.   Yes.

11  Q.   And to your personal knowledge, was it at some point

12  closed?

13  A.   Yes.

14  Q.   Were any charges brought against Millian?

15  A.   No.

16  Q.   Was there any wrongdoing in terms of him assisting in the

17  interference in some way with the 2016 presidential election?

18  A.   No.

19  Q.   The -- Millian's name had been provided to you by Steele

20  in October, correct?

21  A.   Correct.

22  Q.   Do you know if Mr. Millian has dual citizenship?  Do you

23  know whether he does or he doesn't?

24  A.   I don't know offhand whether he does or doesn't.

25  Q.   Do you recall -- or do you know whether or not

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

188

1    Mr. Millian any longer resides in the United States?

2    A.    My understanding is that he doesn't.

3              MR. ^ :   objection.

4              THE COURT:  I'll let him answer.  Go ahead.

5    BY MR. DURHAM:

6    Q.    The Court said you can answer.

7    A.    My understanding is that he's currently residing outside

8    of the United States.

9    Q.    And do you know if he's been outside of the United States

10   for a number of years now?

11   A.    That is my understanding.

12   Q.    Okay.  Do you recall -- this just calls for a yes or no

13   as well, and then I'll ask you a follow-up question -- do you

14   recall, sir, whether or not -- again, to your personal

15   knowledge -- not what somebody told you, but to your personal

16   knowledge -- at any time after you had been meeting with

17   Mr. Steele, did you personally receive any information about

18   Millian supposedly having provided some of the information

19   contained in the Steele dossier reports?

20   A.    Could you clarify that, please?

21   Q.    Absolutely.  I'm sorry.  That was probably way too

22   convoluted.

23              Aside from Mr. Steele, all right -- after you've met

24   with Steele, your colleagues have met with Steele in early

25   October 2016 --

United States v. Danchenko

189

1    A.   Right.

2    Q.   -- where Millian's name came up, right, do you recall

3    whether or not you at any time received -- you personally

4    received information about Millian having purportedly provided

5    information that was contained in dossier reports?

6    A.   I don't recall that.

7    Q.   Do you recall whether or not you met with Mr. Danchenko

8    in January of 2017?

9    A.   Yes, I do recall that.

10   Q.   And did Mr. Danchenko raise Mr. Millian's name when you

11   met with him in January of 2017?

12   A.   Yes, he did.

13   Q.   But other than Steele and now Mr. Danchenko in January of

14   2017, do you recall anybody else saying that Mr. Millian was

15   somehow tied to the information that showed up in the dossier?

16   A.   Not to my recollection.

17   Q.   And if that were to have happened, somebody else was

18   talking about that, you would recall that, wouldn't you?

19   A.   I believe so, yes.

20   Q.   To your personal knowledge and recollection, was any of

21   the Millian information that was contained in that dossier

22   report 2016/095 included, not just the initial FBI submission,

23   FISA submission in October of 2016, but was it also contained

24   in subsequent applications submitted to a federal judge?

25   A.   Yes, it was.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

190

1   Q.   To continue surveillance on Carter Page, a United States

2   citizen, correct?

3   A.   Correct.

4          MR. DURHAM:  I'd ask that the court security officer

5   please show the witness Government's Exhibit 1205.  Oh, I'm

6   sorry you have the whole book.

7          THE WITNESS:  1205.

8   BY MR. DURHAM:

9   Q.   Do you have 1205 in front of you?

10  A.   I do, yes.

11  Q.   Do you recognize what 1205 is?

12  A.   Yes, I do.

13  Q.   What is Government's Exhibit 1205?

14  A.   It is a copy of the -- well, the first page is a copy of

15  the verified application to the Foreign Intelligence

16  Surveillance Court, dated October 21, 2016.

17  Q.   As you look at Government's Exhibit 1205, what's the

18  first page?

19  A.   The first page is listed as a verified application with a

20  docket number.

21  Q.   And do you recognize that form, that was ^ FISA

22  application ^  prepared and submitted to federal judges to

23  review, that's basically the format, correct?

24  A.   I do recognize this format, yes.

25  Q.   And then if you go through the balance of the pages,

1   would you tell us what they are?

2   A.   Yes.  Page 20 has -- it is redacted, but it has an

3   unredacted portion.

4   Q.   And with respect to the portion that's on page 20, do you

5   recognize it?

6   A.   I do recognize it, yes.

7   Q.   And do you know where that information came from?

8   A.   So the -- it is quoted in citing, which would have been

9   report 095.

10  Q.   Coming straight out of the Steele report, correct?

11  A.   There's language from that report in this, yes.

12  Q.   Okay.  And then what's the next page of 1205?

13  A.   Next one is an execution of -- or, sorry, a certification

14  page regarding the Carter Page FISA.

15  Q.   In this instance, who signed that?

16  A.   It is signed at the top by Director James Comey.

17  Q.   All right.  What's the next page?

18  A.   The next page is an approval form that is redacted in

19  part.

20  Q.   ^  this will be on signature or name?

21  A.   It only bears the name of the actual subject.

22  Q.   Okay.  And what's the next page?

23  A.   The next page is a signature page that would be the --

24  I'm not sure what you would call this, whether it was an

25  additional certification.  I can't recall exactly.

─United States v. Danchenko─

192

1   Q.   All right.  And then continuing.

2   A.   Continuing is, again, a page that has material -- there

3   are some lines here and the subject's name is on those.

4   Q.   Go on.  And what's the balance of Government's

5   Exhibit 1205?

6   A.   I'm sorry?

7   Q.   What's containing the balance, the additional pages of

8   1205?

9   A.   This would be the primary order and warrant.

10  Q.   And is that signed by a federal judge, the second to the

11  next page?

12  A.   Yes, that's correct.

13          MR. DURHAM:  Your Honor, the government -- with that

14  foundation laid, we would offer 1205.  I believe that the

15  parties have agreed that this is essentially redacted.  This

16  entire application.  It's pages that the witness has

17  identified.

18          THE COURT:  Any objection?

19          MR. ONORATO:  No, Your Honor.

20          THE COURT:  Without objection, Government's

21  Exhibit 1205 is admitted.

22  (Government's Exhibit No. 1205, was received into evidence.)

23          MR. DURHAM:  I would ask to put up Government's

24  Exhibit 1205.  And if you would, if you could blow up the top

25  half of the page for the jurors, and then we can go to the

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

193

1   bottom.

2   BY MR. DURHAM:

3   Q.   Sir, you had indicated or told the jurors that with

4   respect to 1205, this is the verified application, correct?

5   A.   Correct.

6   Q.   And all government work has numbers on it, so in this

7   instance, it's Docket Number 16-1182, correct?

8   A.   Correct.

9   Q.   And is this the copy of the application, the FISA

10  application, that was submitted to the FISA court on Carter

11  Page?

12  A.   Yes.

13  Q.   And you recognize this is what these forms typically look

14  like, correct?

15  A.   Correct.

16  Q.   I'd ask that you go to page -- it's the second to third

17  page, but it has page 20 -- and I'd ask that you blow it up.

18          And, again, the jurors can see this, but for the

19  written record, will you read into the record the portion of

20  the exhibit you were referring to?

21  A.   Yes.  It starts off with a parenthesis U, which stands

22  for unclassified.  According to information provided by

23  sub-source redacted.  There was a, quote, well-developed

24  conspiracy of cooperation between them, bracket, assessed to

25  be individuals involved in the Candidate 1's campaign and a

─────United States v. Danchenko─────

194

1   Russian leadership.  Sub-source redacted.

2   Q.   Closed quote?

3   A.   Closed quote.

4   Q.   That's taken right out of the report, isn't it?

5   A.   Yes.

6   Q.   Okay.  Can you Keep reading?

7   A.   [As read:]  Sub-source redacted reported that the

8   conspiracy was being managed by Candidate 1's then-campaign

9   manger, who was using, among others, foreign policy advisor

10  Carter Page as an intermediary.

11  Q.   Now, the jurors are looking at the first line where it

12  makes reference, According to information provided by

13  sub-source, and then it's redacted out, right?

14  A.   Correct.

15  Q.   It would be a fair statement that what's redacted out is

16  Source E?

17  A.   Well, sub-source --

18  Q.   Oh, I'm sorry, I'm sorry.  That's right, that would be

19  the primary source?

20  A.   Correct.

21  Q.   And you learned the primary source was who?  Steele's

22  primary sub-source was who?

23  A.   Well, eventually, we learned --

24       MR. ONORATO:  Your Honor, can we approach?

25       THE COURT:  Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

195

1        (Side bar.)

2

3        MR. ONORATO:  So the information is redacted.

4        THE COURT:  Right.

5        MR. ONORATO:  And the notion is that he's going to

6   try to prove that Steele said something about Danchenko for

7   the truth of the matter asserted.  I don't see why we need to

8   go beyond what the statement of the record is and that the

9   information that came from dossier 95 is within the document.

10        MR. DURHAM:  I have a more fundamental objection to

11   my question.

12        THE COURT:  Okay.

13        MR. DURHAM:  Which is I said "sub-source C" which is

14   Millian, Your Honor.  So I would sustain his objection, if I

15   were Your Honor.

16        THE COURT:  Okay.

17        MR. ONORATO:  You agree that it is E, is that the

18   idea?  Your position is that it's sub-source E?

19        THE COURT.  What's redacted?

20        MR. KEILTY:  I don't think it's sub-source E.

21        MR. DURHAM:  I'm pretty sure it's sub-source.

22        THE COURT:  All right.

23        MR. ONORATO:  Why don't we just say that the

24   language mirrors dossier 95 and then we move on.  I thought

25   you were going to go down with the primary source.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

196

1        THE COURT:  All right.  Good.

2        (Open court.)

3        MR. DURHAM:  Okay.  If we could just put that back

4    up, please, sir.

5    BY MR. DURHAM:

6    Q.   So we just got back on track here.  So the language that

7    you just read into the record for the jury -- well, the jury

8    can read it ^  for the written record -- that comes straight

9    out of the dossier 216/095 that the jurors have looked at

10   previously?

11   A.   There are portions of this that come from that, yes.

12   Q.   Does that portion also contain the dossier information

13   from 095?

14   A.   Yes.

15   Q.   095 relating to Carter Page's supposed role?

16   A.   Yes, it does.

17   Q.   On October 21, 2016, did the bureau have any information

18   to corroborate?

19   A.   At that point, no.

20   Q.   For the benefit of the jurors, was that FISA application

21   that was submitted to the FISA court and contained that

22   information relating to a well-coordinated conspiracy of

23   cooperation, was that granted by the Court based on what the

24   FBI had included in the application?

25   A.   The application was accepted by the Court in the totality

─────United States v. Danchenko─────

197

1  of what was in the application, yes.

2  Q.   And that happened, again, on what date?

3  A.   If I recall, it's October 21, 2016.

4  Q.   On October 21 of 2016, to your knowledge, was Carter Page

5  an American citizen?

6  A.   Yes.

7  Q.   Would you tell the ladies and gentlemen of the jury,

8  after the bureau had submitted the FISA application on Mr.

9  Page on October 21 of 2016, if there were additional

10  applications made to the FISA court to continue that coverage

11  on Mr. Page?

12  A.   Yes.

13  Q.   And do you recall how many additional applications were

14  submitted?

15  A.   There were three renewals.

16  Q.   Do you recall, based on your knowledge of this case,

17  whether or not the bureau continued to include that same

18  information that's on page 20 of the original -- of the

19  initial application and in the subsequent FISA applications?

20  A.   It was carried over into subsequent applications.

21  Q.   Do you recall, sir, what the dates of the subsequent

22  orders were?

23  A.   One was January of 2017, one was, if I recall correctly,

24  April of 2017, and then the other one was June of 2017.

25  Q.   Are there any documents that might refresh your

———United States v. Danchenko———

198

1   recollection as to the exact dates in those respective months?

2   A.   Sure.

3   Q.   I would ask you to take a look, if you would, sir, at

4   Government's Exhibit 1206, 1207 and 1208.  And see if that

5   refreshes your recollection as to when the additional FISA

6   applications were submitted and approved.

7   A.   The first renewal was on January 12 of 2017 per the date

8   stamp in 1206.

9   Q.   All right.  And if you would, in looking at -- while

10  you're going through it, just to be more expeditious about it,

11  would you indicate whether or not on that 1206, the

12  January 12, 2017, whether or not it contains the same language

13  relating to the -- the same language coming from the dossier

14  report 95?

15  A.   Yes, on Pages 21 and 22.

16  Q.   So that's one.  But you indicated there was one in April,

17  correct?

18  A.   Correct.  That's listed in 1207.

19  Q.   Does that refresh your recollection as to the date in

20  April?

21  A.   Yes, I believe this says -- it's the -- the time stamp is

22  hard to read, but I believe it is April 7th or some -- it's

23  difficult to read actually.

24  Q.   Perhaps if you just thumb through the document and get to

25  the signature page of the court's order, there will be more

United States v. Danchenko

199

1   clarity.

2   A.   Yes, it is date stamped the -- April 7, 2017.

3   Q.   And as to Government's Exhibit 1207, the April 7

4   submission, would you indicate or tell the jurors whether or

5   not, once again, that same dossier information is included?

6   A.   Yes, it is.

7   Q.   Now, what pages, again, are the April 7th?

8   A.   Pages 22 to 23.

9   Q.   And then you said there was some applications submitted

10  in June of 17.  Is there anything in Government's Exhibit 1208

11  that would refresh your recollection as to the exact date?

12  A.   Yes, the time stamp is very difficult to read, but on

13  Page 100, it lists a signature of the Deputy Attorney General

14  of the United States with the date of 6/29/17, and it is time

15  stamped on Page 20, 6/29/2017.

16  Q.   Okay.  And with respect then to the information coming

17  from the dossier report, is that also in the June 29

18  application?

19  A.   Yes, it is.

20  Q.   And on what pages?

21  A.   Page 24.

22       MR. DURHAM:  Your Honor, we would move 1206, 1207,

23  1208.  Again, these are redacted versions of the -- it has the

24  cover page and then the respected pages that Mr. Auten is

25  talking about.

United States v. Danchenko

200

1          THE COURT:  Any objection?

2          MR. ONORATO:  No objection.

3          THE COURT:  Without objection, Government Exhibits

4     1206, 1207, and 1208 -- is that correct -- are admitted.

5     (Government's Exhibits 1206, 1207 and 1208 were admitted into

6     evidence.)

7          MR. DURHAM:  Perhaps Ms. Arsenault could just

8     quickly show the jurors the first page of each of those

9     exhibits, and blow it up, and then show the respective pages

10    reflecting, the dossier report information.

11         THE COURT:  Yes.

12    BY MR. DURHAM:

13    Q.   Okay.  So that's the January 12 version, correct?  That's

14    1206.  That's identical language, correct?

15    A.   Correct.

16    Q.   And perhaps we can show the jurors.  Same language?

17    A.   Correct.

18    Q.   And then 1208 from June 29th.  Okay.  Same language?

19    A.   Same language.

20    Q.   At any point in time between October 21 of 2017 and

21    June 29 of 2017, aside from that information being in the

22    dossier report, the Steele dossier report, had the bureau been

23    able to corroborate that information?

24    A.   No.

25    Q.   At the end of the period of surveillances, October 21 of

—United States v. Danchenko—

201

1  '16, and then -- what was it -- a 90-day order in June, so

2  you're down another 90 days beyond that?

3  A.   Correct.

4  Q.   At the end of all of that surveillance with the FBI using

5  its most powerful investigative tool, was Carter Page charged

6  with any wrongdoing?

7  A.   No, he was not.

8  Q.   Now, I want to ask you:  During that same time period

9  October 21 of '16, through the Page investigation, to your

10 knowledge, does the FBI -- was it backed in its efforts to try

11 to corroborate or confirm the information in the report?

12 A.   I'm sorry.  I missed the first part of that.

13 Q.   Sure.  There's not a well -- let me ask it this way.

14       Between October 21 of 2016 and when the FBI

15 submitted its fourth FISA applications on a United States

16 citizen, did the FBI continue to try to corroborate

17 information?

18 A.   Yes, it did.

19 Q.   It was never able to -- it didn't corroborate.  That

20 information came from that dossier report, correct?

21 A.   Correct.

22 Q.   And is -- what efforts were taken by the FBI during that

23 period of time to try to corroborate that information?

24 A.   Multiple investigative steps, analysis, and the like.

25 Q.   You continued -- you said you had coordinated databases?

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

202

1   A.   Correct.

2   Q.   Nothing?

3   A.   Not confirming or corroborating that information, no.

4   Q.   You had said, prior to (indiscernible), the initial FISA,

5   that you talked to intelligence partners in the United States,

6   anything they provided that was corroborative with --

7   A.   Not corroborating -- excuse me.  Not corroborating that

8   information.

9   Q.   Would it be a fair statement that you and others made

10  additional trips to overseas to try to talk to Mr. Steele and

11  others to try to locate or identify corroborative information?

12  A.   Are you talking in general people going over -- I mean --

13  Q.   You, yourself, did you go over at all?

14  A.   I did go over.

15  Q.   And did -- were you able to get any corroborative

16  information through those efforts?

17  A.   No.

18  Q.   Now, I want to focus your attention not just on the --

19  trying to corroborate or finding corroborative information

20  during that period of time, you told the jury that when you

21  met with Steele in early October 2016, the second primary

22  focus of your effort was to try to identify sources.

23         It's important, you indicated, correct me if I'm

24  wrong, it's important to try to identify sources so they can

25  go to the sources and find out whether or not the information

———United States v. Danchenko———

203

1   is valid or not.  Fair statement?

2   A.   Fair statement.

3   Q.   Through your efforts to try to identify sources -- when I

4   say "your," I'm talking specifically to your participation in

5   the investigation -- did your efforts to identify sources of

6   the information whether it's contained in the various dossier

7   reports continue or did it stop?

8   A.   It continued.

9   Q.   Now, I want to ask you whether or not any of those

10  efforts bore fruit -- that just calls for a "yes" or "no"?

11  A.   Yes.

12  Q.   You mentioned before earlier to the jurors that at some

13  point in time, you succeeded in identifying Mr. Steele's

14  primary source, correct?

15  A.   Correct.

16  Q.   And tell the jurors whether or not you personally

17  participated in that effort or did somebody just tell you

18  that?

19  A.    No, I was able to personally identify.

20  Q.   And with respect to your personally identifying the

21  primary source of the Steele reporting, who did that person

22  turn out to be?

23  A.   Mr. Danchenko.

24  Q.   And when, if you recall, approximately or maybe with

25  specificity, when was it that you identified Mr. Danchenko as

─────United States v. Danchenko─────

204

1   Steele's primary source?

2   A.   If I recall correctly, we had a preliminary

3   identification on the 20th of December, 2016.

4   Q.   And did you continue those efforts?

5   A.   Yes.

6   Q.   And I'll cut to the chase.  Were you able to confirm

7   that, in fact, it was Igor Danchenko that was the primary

8   source for Steele?

9   A.   Yes.

10  Q.   Now, with respect to Igor Danchenko, was December of

11  2016 -- was that the first time that you had heard of someone

12  by the name of Igor Danchenko?

13         MR. ONORATO:  Your Honor, I'm going to object and

14  ask to approach.

15         THE COURT:  All right.  Let's do it.

16         (Side bar.)

17         THE COURT:  If he says, yes, what's your next

18  question?

19         MR. DURHAM:  The next question will be, "When had

20  you first heard of Igor Danchenko?"  And then we will intend

21  to carry out that there was, well, I should say by way of

22  background, this witness is personally involved in that

23  earlier investigation and we've counselled him not to say

24  anything about him pitching anybody for classified information

25  or what informants had said what he knows of those

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

———United States v. Danchenko———

205

1    counterintelligence investigation.  He knows that it was

2    closed and he knows why it was closed, but I'm not going to

3    inquire:  Why do you think he was a spy?  I might like to --

4             THE COURT:  I understand.  I'm going to postpone it

5    until I hear the cross.  And then on rebuttal we'll see what

6    he says.  All right.

7             MR. DURHAM:  So I get when the objection came

8    because I think I asked -- I asked the question is this the

9    first time you heard of Igor Danchenko.  So when -- I'm

10   trying -- can you just check to see what the question posed

11   was, where the objection was raised?

12            MR. ONORATO:  It may not have been the first time or

13   that's the impression I got and that's why I'm asking.

14            (Court reporter inquires of the Court.)

15            THE COURT:  I think I'll let you bring out that he

16   had previously heard his name.

17            And then your next question is, what, when; right?

18            MR. DURHAM:  I will follow whatever direction -- the

19   Court's direction.

20            THE COURT:  I understand.  And it complicates the

21   issue for me.  I'm going to hold off.  I'm going to hear what

22   the cross is, all right.  And when we come back, I'll allow

23   you to ask:  Whether you heard his name and in any one

24   context, I think, he can say in connection with --

25            MR. DURHAM:  What if I do this, Your Honor:  Have

Direct Examination of Auten   10/11/2022

—United States v. Danchenko—

206

1  you previously heard his name?  And he says "Yes," and so,

2  we'll come back to that later.

3           THE COURT:  Right.  I'm going to go ahead -- I'm

4  going to let you answer that question and then I'm going to

5  take a 20-minute break.

6           (Open court.)

7  BY MR. DURHAM:

8  Q.   Sir, let me -- just before the quick exit break here, let

9  me ask you, prior to December 2016, was Igor Danchenko a name

10 you were familiar with?

11 A.   Yes.

12           THE COURT:  Thank you, Mr. Durham.

13           Ladies and gentlemen, we're going to take a

14 20-minute recess at this time.  You're excused to the jury

15 room.  Please do not discuss this case among yourselves.

16           (Jury dismissed.)

17           THE COURT:  All right.  Court will stand in recess.

18           (Recess.)

19           (Court proceedings resumed at 4:42 p.m.)

20           THE COURT:  Anything before we bring the jury out?

21 All right.  Let's bring the jury out.

22           MR. ONORATO:  Your Honor, do you have an idea of

23 what time you're going to break this evening?

24           THE COURT:  Probably around quarter to 6:00.

25           (Jury present.)

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

207

1          THE COURT:  Please be seated.  All right.

2          Mr. Auten, you remain under oath.

3          Mr. Durham.

4          MR. DURHAM:  Proceed, Your Honor?  Thank you.

5    BY MR. DURHAM:

6    Q.   Mr. Auten, just before we took the afternoon break, you

7    had indicated that you personally identified Mr. Danchenko as

8    the primary source for Christopher Steele, correct?

9    A.   Correct.

10   Q.   And how did you do that?

11   A.   Through a number of searches through databases, a number

12   of making connections of existing material that we had.

13   Q.   But that didn't happen until December?

14   A.   That's correct.

15   Q.   And do you recall, sir, whether or not the FBI makes any

16   kind of a decision after you had identified the defendant as

17   the person who's the primary source, to approach him?

18   A.   Yes.

19   Q.   What can you tell the jurors about that?

20   A.   He was approached in mid-January 2017.

21   Q.   And is that something that you did or others did in the

22   first instance?

23   A.   Others did, but I was involved with communications about

24   it, et cetera.

25   Q.   Would you tell the juror what, if any, role that you

─United States v. Danchenko─

208

1   played, then, in connection with Mr. Danchenko being

2   interviewed in January of 2017?

3   A.   I was one of two individual FBI employees who interviewed

4   Mr. Danchenko in January of 2017.

5   Q.   So let's set the stage for that.

6           Do you recall how much earlier in January of 2017 it

7   was that agents approached Mr. Danchenko?

8   A.   I want to say it was mid-January.

9   Q.   All right.  And after he had been approached, what

10  happened next?

11  A.   There was some -- time had elapsed between the time that

12  he was approached and the time that we were able to have the

13  interview.

14  Q.   And do you know what was happening during that interim

15  period of time?

16  A.   I know there was some back-and-forth about how to set

17  that interview up.

18  Q.   All right.  And do you know who was involved in the

19  back-and-forth?

20  A.   From the FBI side, I believe it was, if my recollection

21  serves, the deputy assistant director at that time, Jennifer

22  Boone.

23  Q.   And then how about with respect to the intelligence side,

24  you were involved in it and --

25  A.   I was involved and Special Agent Steve --

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

—United States v. Danchenko—

209

1          (Court reporter clarification.)

2  Q.   So this poor lady has to take all this down, so if I can

3  just finish the question, it makes it easier to take it down,

4  okay?

5          So Mr. Moffa was involved, correct?

6  A.   Yes.

7  Q.   Okay.  And then above Mr. Moffa, do you know who else was

8  involved in this matter?

9  A.   People would have been briefed up above Moffa.

10 Q.   Do you know how far up in the bureau chain it went?

11 A.   I do not.

12 Q.   Now, with respect to the January interviews itself, do

13 you recall the date on which the interviews occurred?

14 A.   I believe the first interview occurred on the 24th of

15 January.

16 Q.   And was it one day or more than one day of interviews?

17 A.   It was three days of interviews.

18 Q.   And were they full days, part days?  What can you tell

19 the jury about that?

20 A.   If I recall correctly, they were part days.

21 Q.   And it gives us a sense, like, say it was, you know,

22 three mornings, three afternoons, it was more scattered than

23 that?  What's your best recollection?

24 A.   No.  My best recollection is that it was three

25 afternoons.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

United States v. Danchenko

210

1   Q.   Three afternoons.  So then January 24th, 25th, and 26th

2   of 2017, correct?

3   A.   Correct.

4   Q.   Now, you have told the jurors that you were one of two

5   people who were doing the interview; is that right?

6   A.   Two FBI employees, yes.

7   Q.   Okay.  So let me ask you these -- this series of

8   questions, then.  Since you were involved in setting this up,

9   did you have some kind of a game plan, that is what it is that

10  you were trying to elicit from Mr. Danchenko?

11  A.   We were there to go through to determine, you know, who

12  the sub-sources were in these reports and what he could tell

13  us about the reports in general.

14  Q.   All right.  You told the jurors earlier this afternoon

15  that when you worked through with Steele, you wanted to obtain

16  corroboration of the allegations, if you could, and you wanted

17  to do this sourcing, correct?

18  A.   Correct.

19  Q.   How about corroboration in January of 2017, are you

20  looking to corroborate some of the more serious or most

21  serious allegations in that dossier?

22  A.   Yes, if possible.

23  Q.   So same focus, what it is that you're trying to get out

24  of this session, correct?

25  A.   Correct.

─United States v. Danchenko─

211

1   Q.   Now, tell the ladies and gentlemen of the jury, you're

2   there and the second person, FBI personnel, was who?

3   A.   Special Agent Steve Somma.

4   Q.   Okay.  Tell the jurors what Mr. Somma's role was,

5   generally, in connection with Crossfire Hurricane and this

6   part of the investigation?

7   A.   Mr. Somma was the case agent that was handling, at this

8   point in time, the Carter Page investigation.

9   Q.   So you told the jurors that there were the four files,

10  that each of the four files had, essentially, a case agent or

11  a leader or somebody who's principally responsible on the

12  operations or special agent side?

13  A.   Correct, yes.

14  Q.   And that was Somma as related to Carter Page?

15  A.   At that time, yes.

16  Q.   Okay.  So you and Mr. Somma are there.  Anybody else

17  present?

18  A.   Yes.

19  Q.   Who was that?

20  A.   On each day, there was an individual from the Department

21  of Justice's National Security Division, or NSD.

22  Q.   Do you remember offhand who any of those persons were?

23  A.   The first day, it was David Laufman, and the second day

24  was last name of Scott; first name, I can't remember right

25  offhand.

─────United States v. Danchenko─────

212

1  Q.   Richard?

2  A.   Yes, that's it, Richard Scott.

3  Q.   Okay.  Do you recall whether there was anybody -- or,

4  obviously, Mr. Danchenko was there for this affair, correct?

5  A.   Correct.

6  Q.   So Mr. Danchenko, yourself, Mr. Somma, and then Mr. Scott

7  and/or Mr. Laufman, correct?

8  A.   Correct.

9  Q.   Anybody else there?

10  A.   Yes.

11  Q.   And who else was there?

12  A.   Mr. Danchenko's attorney.

13  Q.   Okay.  So Mr. Danchenko's represented by counsel; is that

14  correct?

15  A.   Correct.

16  Q.   And with respect to that session with his counsel

17  present, do you have a recollection as to whether or not there

18  was a letter -- an immunity letter that was signed by

19  Mr. Laufman, by the defendant, by the defendant's lawyer?

20  A.   I don't have a clear recollection of that letter.

21  Q.   What can you tell the jurors about it?  Do you remember

22  that there was a letter?

23  A.   I recall that there was a letter, yes.

24  Q.   And do you recall, sir, whether or not that was a

25  document that was uploaded into the bureau record file?

─United States v. Danchenko─

213

1   A.   Subsequently, it was uploaded into the bureau's record

2   file, yes.

3   Q.   I would ask that you take a look at Government's

4   Exhibit 118, please.  Do you have that?

5   A.   I do.

6   Q.   Looking at that, there are people who signed this,

7   correct?

8   A.   That is correct.

9   Q.   And who signed it on the back of page 2?

10  A.   On the back of page 2, it was signed by David H. Laufman,

11  who is listed as chief of the Counterintelligence and Export

12  Control Section of the National Security Division of DOJ.

13  Q.   And how about on the third page, who signed it?

14  A.   Third page, two individuals signed it.  Mr. Danchenko

15  signed and dated it, and Mr. Mark Schamel, who is listed as

16  his attorney signed and dated it.

17  Q.   Is there dates, handwritten dates there?

18  A.   1/24/2017 by both signatures.

19  Q.   And is that the date of the first interview with

20  Mr. Danchenko in January of 2017?

21  A.   Yes, that was the first date.

22  Q.   Oh, so he was present, correct?

23  A.   Correct.

24  Q.   He did have a lawyer with him, correct?

25  A.   Correct.

United States v. Danchenko

214

1   Q.   And do you remember that there was a letter -- you

2   can't -- you don't have the specific recollection of this

3   being the letter, correct?

4   A.   Correct.

5   Q.   But you recognize Laufman, Mr. Danchenko, and a lawyer,

6   correct?

7   A.   Correct.

8           MR. DURHAM:  We'd move 118 as a full exhibit, Your

9   Honor --

10          THE COURT:  All right.

11          MR. DURHAM:  -- subject to, if there's an objection

12  to connection, we'll put it on through a records custodian.

13          MR. ONORATO:  There's no objection.

14          THE COURT:  Without objection, 118 is admitted.

15  (Government's Exhibit No. 118, was admitted into evidence.)

16          MR. DURHAM:  Okay.  Then I'd ask, with the Court's

17  permission, for Ms. Arsenault to pull that letter up.

18          THE COURT:  Yes.

19          MR. DURHAM:  Ms. Arsenault, if you would, blow up

20  for the jurors on page 1, the top portion of that document.

21  BY MR. DURHAM:

22  Q.   And so, Mr. Auten, again, just for purpose of the written

23  record because the jurors can see this, what's the date of

24  this letter?

25  A.   January 24, 2017.

─United States v. Danchenko─

215

1   Q.   And who is the letter to?

2   A.   The letter is to Mr. Igor Danchenko.

3   Q.   In care of his lawyer?

4   A.   Correct.

5   Q.   And then it goes on -- would you read the first couple of

6   paragraphs into the record?

7   A.   "Dear Mr. Schamel, as you are aware, the Federal Bureau

8   of Investigation in coordination with the National Security

9   Division of the U.S. Department of Justice, collectively 'the

10  government', is conducting an investigation which we seek the

11  cooperation of your client, Igor Danchenko.  As a preliminary

12  matter, I must advise you that the government does not intend

13  by this letter to grant your client immunity from prosecution.

14  That is, the government will retain its right to prosecute

15  your client for all crimes of any nature that may have been

16  committed by your client.  We are, however, sensitive to your

17  concerns about your client's Fifth Amendment constitutional

18  right to remain silent and not to incriminate himself in any

19  criminal wrongdoing."

20  Q.   And then read on from there -- so you blow up the bottom

21  paragraph.

22  A.   "Accordingly, the government proposes the following

23  agreement:  One, your client agrees to supply complete and

24  truthful information and testimony to all persons in this

25  matter as well as in any other proceeding, including court

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

United States v. Danchenko

216

1  proceedings related to or the growing out of this

2  investigation.  Your client must answer all questions

3  concerning the subject matter of this investigation and must

4  not withhold any information.  Your client must neither

5  attempt to protect any person or entity through false

6  information or omission nor falsely implicate any person or

7  entity."

8  Q.   Okay.  You just -- stop there.  This document was signed

9  on January 24th, before you started interviewing

10  Mr. Danchenko, correct?

11  A.   I don't have a clear recollection of when it was signed

12  on the 24th.

13  Q.   Okay.  Well, with respect to the exhibit itself, the

14  first paragraph says [as read]:  Your client agrees to supply

15  complete and truthful information and testimony to all persons

16  in this matter as well as any other proceeding including court

17  proceedings related to or growing out of this investigation.

18        Now, am I reading the next part correctly?  [As

19  read]:  Your client must answer all questions concerning the

20  subject matter of this investigation and must not withhold any

21  information.

22        Did I read that that properly -- correctly?

23  A.   Yes.

24  Q.   And the next sentence says [as read]:  Your client must

25  neither attempt to protect any person or entity through false

─────United States v. Danchenko─────

217

1    information or omission or falsely implicate any person or

2    entity.

3            Did I read that correctly?

4    A.   Yes.

5    Q.   If you go to the next paragraph, would you read

6    Paragraph 2 into the written record, please?

7    A.   2, [as read]:  "In return for your client's cooperation

8    in this matter, the government agrees that your client shall

9    receive protections coextensive with and limited by those

10   conferred for testimony given pursuant to a compulsion order

11   issued under the provisions of Title 18 U.S. Code,

12   Section 6001, et seq.  That is such information or any other

13   information directly or indirectly derived from, it may not be

14   used directly or indirectly against your client in any

15   criminal case exception in a prosecution for perjury, for

16   giving a false statement, and/or for obstruction of justice

17   that may result from any statement, testimony, or other

18   information he provides pursuant to this agreement.  However,

19   if your client violates any terms or conditions of this

20   agreement, then the government reserves its right in its

21   discretion to avoid this agreement and use it -- use against

22   him in a criminal proceeding either directly or indirectly,

23   any information or testimony provided by him to law

24   enforcement authorities, the grand jury, or elsewhere during

25   the course of his cooperation in this matter."

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

———United States v. Danchenko———

218

1   Q.   Now, going back to the first page in the second

2   paragraph -- second numbered paragraph.  It reads [as read]:

3   In return for your client's cooperation in this matter, the

4   government agrees that your client shall receive protections

5   coextensive with and limited by those conferred for testimony

6   given pursuant to a compulsion order issued under the

7   provisions of Title 18 U.S. Code, Section 6001, et seq.

8            Correct?

9   A.   Correct.

10   Q.   Do you know, sir, whether or not Title 18 United States

11   Code, Section 6001, et seq., is the immunity provisions of the

12   federal statutes?

13   A.   I would not be able to rattle that off.

14            MR. DURHAM:  I would ask the Court to take judicial

15   notice of the fact that Title 18 of the United States Code,

16   Section 6001, et seq., relates to immunity.

17            THE COURT:  Counsel.

18            MR. ONORATO:  Your Honor, no objection subject to

19   clarification.

20            THE COURT:  All right.  Court will judicially note

21   that that section retains the judicial --

22            MR. DURHAM:  Thank you, Your Honor.  Does Your Honor

23   just give a brief instruction concerning what "judicial

24   notice" means?

25            THE COURT:  Yes.  Judicial notice means that the

─────United States v. Danchenko─────

219

1  Court has recognized the sufficient proof.  Its recognition

2  that this statute relates to judicial immunity.  You may

3  accept that without any further proof, but you should give it

4  such weight as you deem appropriate.

5  BY MR. DURHAM:

6  Q.   Okay.  I'm going to ask Ms. Arsenault that you would just

7  blow up as much they can so I'm sure I can read it, and I

8  think the jurors can read it.  Paragraph No. 1.

9         Now, sir, I know you previously read this, and the

10 jury has heard it twice now.  I want to ask you, though, about

11 your interview of Mr. Danchenko on January 24th and 25th and

12 26th of 2017.

13        With respect to what is contained in this letter, do

14 you recall, sir, what, if anything, you and/or Special Agent

15 Somma said to Mr. Danchenko and his counsel along the lines of

16 what's contained in this agreement, that is Mr. Danchenko had

17 to answer all questions concerning the subject matter of

18 the -- this investigation and must not withhold any

19 information.

20        Is that consistent or inconsistent with the

21 information that you personally were present or -- and giving

22 to Mr. Danchenko for those January interviews?

23 A.   I'm sorry.  I missed the latter part of that.

24 Q.   Sure.  What's contained in this letter, Government's

25 Exhibit 118 in Paragraph 1 concerning the requirement that

United States v. Danchenko

220

1   Mr. Danchenko must not withhold any information, and that

2   Mr. Danchenko must not attempt to protect any person or entity

3   through false information or omission, or falsely implicate

4   any person or entity, is that consistent with what you and

5   Somma made known to the defendant and his attorney was

6   expected in January of 2017?

7   A.   I don't have a clear recollection of what admonitions

8   were given to Mr. Danchenko at the beginning of the interview.

9   Q.   Okay.  Well, how about during the course of the

10  interview, what do you recall about what Mr. Danchenko's

11  obligations were or what the expectations were?

12  A.   I mean, the expectations we were there to talk about the

13  reports.  We were there to talk about his involvement with the

14  reports.  We were there to talk about the sub-sources.  And

15  the expectation was that that's what we would talk about.

16  Q.   Okay.  Now, I had asked you earlier this afternoon about

17  the three-day interview.  I've asked you questions -- remember

18  we had to jump ahead a little bit and asked about when

19  Mr. Danchenko was interviewed in January.  Specifically, I

20  asked you about the dossier reports.

21           Do you recall that?

22  A.   I do , yes.

23  Q.   And I think I had asked you, but I'll ask you again just

24  to be certain.  Did Mr. Danchenko bring anything to that

25  interview report with him?

United States v. Danchenko

221

1   A.   I recall that he had a copy of the reports.

2   Q.   And I believe I also asked you but will confirm, with

3   respect to those reports, those weren't yours, you didn't

4   provide those to him, he brought those on his own?

5   A.   That is correct.

6   Q.   And you saw there was at least some writing that was on

7   those dossier reports?

8   A.   That is my recollection, yes.

9   Q.   Explain to the jurors, if you would, sir, what process

10  you then follow -- when I say "you," you and Mr. Somma,

11  whether it was you asking the questions, Somma asking the

12  questions.  Explain to the jurors what process was for that

13  interview on January 24th?

14  A.   The January 24th interview, I believe Mr. Somma and I

15  went somewhat back and forth asking questions.  I believe we

16  started off by asking biographical information, and kind of

17  going through Mr. Danchenko's life, work history, et cetera.

18  Q.   Okay.  So when you first sat down with the defendant and

19  his lawyer, did you make any note as to whether or not

20  Mr. Danchenko spoke English?

21  A.   I don't recall making any note about him speaking

22  English.  My recollection is that it was clear he did speak

23  English.

24  Q.   Okay.  I mean, it was inartfully -- the question was

25  inartfully posed.

United States v. Danchenko

222

1        Does Mr. Danchenko speak English?

2  A.   He spoke English during that interview, so, yes.

3  Q.   And was he -- does he speak good English?

4  A.   To my --

5  Q.   Do you have any difficulty communicating with you?

6  A.   To my recollection, he spoke good English, yes.

7  Q.   All right.  But to your recollection, at any point during

8  the course of the three days of interview, did Mr. Danchenko

9  appear to be confused about what he was being asked?

10  A.   I don't recall that, no.

11  Q.   Would you -- describe for the jurors, sir, whether this

12  was a formal Q and A.  Like, for example, you're on the

13  witness stand and I'm asking you questions, and you're giving

14  answers or was the atmospherics different than that?

15  A.   The atmospherics were different.

16  Q.   Then describe those atmospherics to the jurors.

17  A.   It was sitting across the table from one another.  It was

18  much more of a conversational style of interview.  It was a

19  very typical interview that way.

20  Q.   And would you describe it as being free-flowing?

21  A.   I think free-flowing may be a bit -- I don't know if I

22  would call it free-flowing because we were asking questions

23  and Mr. Danchenko was answering questions.  And then that

24  might spur follow-on questions.  So but I wouldn't say it was

25  free-flowing.

—United States v. Danchenko—

223

1   Q.   Okay.  Did Mr. Danchenko appear to have difficulty

2   answering your questions or understanding your questions?

3   A.   Not to my recollection, no.

4   Q.   And was formal courtroom language being used or was it

5   colloquial, you know, as you say, conversational?

6   A.   It was conversational.

7   Q.   Do you recall, sir, based on the three days, again, as

8   you describe it, as they were really three half days, right,

9   or thereabouts?

10  A.   Yes.

11  Q.   Yes.  During that period of time, did you come to an

12  understanding of approximately how much of the information in

13  the dossier reports had been provided to Steele by Danchenko?

14  A.   We didn't have a good kind of percentage breakdown or

15  anything of that sort.  It was a sizable amount from what I

16  recall.

17  Q.   What can you share with the jurors about whether it was

18  significant portion of the information that that was contained

19  in all of these reports that Mr. Steele provided to the FBI,

20  and the FBI then used at least in the Carter Page

21  applications.

22  A.   So my recollection is that the way things were described

23  with respect to how Mr. Danchenko described the reports to us

24  during the interview was that it was his view that these

25  reports included some of his material, some of his analysis,

─────United States v. Danchenko─────

224

1   Mr. Steele's material, and then material that he wasn't able

2   to identify.

3   Q.   Okay.  I'm going to ask you to take a look, if you would,

4   sir, at Government's Exhibit 1502 for identification.

5   A.   Okay.

6   Q.   And do you recognize what that document is?

7   A.   This is a LinkedIn -- it looks like a LinkedIn message.

8   Q.   And does it identify who the LinkedIn persons are?

9   A.   Yes, it's from Igor Danchenko.

10  Q.   Okay.  And who is Mr. Danchenko communicating with in

11  that instance?

12  A.   I'm going to butcher the last name.  Anastasia

13  Gnezditskaia.

14  Q.   Why don't you do this?  Why don't you spell the name for

15  the court reporter?  It'll be a lot easier.

16  A.   From Mr. Igor Danchenko to Anastasia, A-N-A-S-T-A-S-I-A.

17  And it's Gnezditskaia, G-N-E-Z-D-I-T-S-K-A-I-A.  The date of

18  it is October 11, 2020.

19  Q.   October 11, 2020.

20              MR. DURHAM:  Your Honor, at this time --

21              MR. ONORATO:  I'm going to object to hearsay.

22              THE COURT:  I'm sorry.

23              MR. DURHAM:  We'll lay a foundation.  We haven't

24  moved it yet.

25              THE COURT:  All right.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

225

1        MR. DURHAM:  At this time, we would, Your Honor, ask

2    that the stipulation, which has been marked as Government's

3    Exhibit 1800 be admitted.  Specifically, it's a stipulation

4    between the parties relating to LinkedIn records.

5        THE COURT:  All right.  Do you want to read it in --

6    do you want to read it into the record?

7        MR. ONORATO:  Do they have a record -- I just

8    question its admissibility because it's from 2020.  It has

9    nothing to do with --

10       MR. DURHAM:  We'll tie it up.  We'll tie it up.

11   Don't worry.

12       THE COURT:  All right.  All right.

13       MR. DURHAM:  So the stipulation no objection?

14       THE COURT:  All right.  Do you want to read it into

15   the record?

16       MR. DURHAM:  Is that the Court --

17       THE COURT:  Yes.

18       MR. DURHAM:  -- will do it, the witness, or would

19   you prefer Counsel do it?

20       THE COURT:  You can read it.

21       Ladies and gentlemen, you're about to hear what's

22   referred to as "stipulation."  A stipulation is simply an

23   agreement between the parties as to what's contained in the

24   stipulation.  You may accept as adequate proof of what's

25   stated without any further proof, but it's ultimately up to

United States v. Danchenko

226

1  you whether or not to accept it and what weight to give it.

2          MR. DURHAM:  Thank you, Your Honor.

3          Ladies and gentlemen, the Government's Exhibit 18,

4  which Ms. Arsenault, I think, can put up on the monitor for

5  you.  I mean, 1800.  I'm sorry.

6          THE COURT:  Is it Exhibit 1800?

7          MR. DURHAM:  1800, yes, Your Honor.

8          THE COURT:  All right.

9          MR. DURHAM:  Okay.  This is in the matter of United

10  States versus Igor Y. Danchenko, Criminal No. 1:21-cr-245,

11  parenthesis, (AJT), close parenthesis.

12          [As read]:  It is hereby stipulated and agreed by

13  and between the undersigned parties that, if called to

14  testify, a records custodian from LinkedIn would testify as

15  follows:

16          Paragraph No. 1, Government's Exhibits 1500 and 1502

17  are true and accurate copies of the contents of the LinkedIn

18  account "Igor Danchenko" controlled by Igor Danchenko.

19          Paragraph No. 2, Government's Exhibits 1500 and 1502

20  are true and accurate copies of authentic business records of

21  LinkedIn that were made at or near the time of the acts and

22  events recorded in them by a person with knowledge and were

23  prepared and kept in the course of LinkedIn's regularly

24  conducted business activity.  And it was the regular practice

25  of LinkedIn to make such business records, and the source of

─United States v. Danchenko─

227

1   the information or the method and the circumstances of

2   preparation are trustworthy.  The parties stipulate to the

3   authenticity of Government's Exhibits 1500 and 1502.

4           Paragraph No. 4, This stipulation is admissible as

5   evidence at trial.

6           And it's dated today -- it's dated, Alexandria,

7   Virginia, October 11, 2022, and signed by Mr. Keilty and

8   Mr. Onorato.

9   BY MR. DURHAM:

10  Q.   Sir, with respect, then, to the Government's

11  Exhibit 1502, that's a LinkedIn message, correct?

12  A.   Correct.

13  Q.   Now, the date of the Government's Exhibit 1502, you

14  indicated was, again, what?

15  A.   It was October 11, 2020.

16  Q.   Okay.  So -- and I want to ask this:  You're talking

17  to -- you and Mr. Somma are talking to Mr. Danchenko in

18  January of 2017, correct?

19  A.   Correct.

20  Q.   At some point in time, do you recall, sir, whether or not

21  an entity known as BuzzFeed publicly published the dossier?

22  A.   Yes.

23  Q.   Do you recall -- that's based on your personal knowledge,

24  correct?

25  A.   That is.

─────United States v. Danchenko─────

228

1  Q.   This became a big deal, right, when BuzzFeed published

2  this stuff?

3  A.   Yes, it did.

4  Q.   At some point in time after January of 2017, when

5  Mr. Danchenko was being interviewed by you, do you recall

6  whether or not the fact that Mr. Danchenko was the primary

7  sub-source became public?

8  A.   Much later.

9  Q.   Right, like in 2020, right, in the fall of 2020?

10  A.   Maybe.  Maybe even the summer of 2020 or something of

11  that sort.

12  Q.   It was 2020 when it became publicly known that

13  Mr. Danchenko had been the primary sub-source, correct?

14  A.   Again, I don't have a clear recollection of the date, but

15  around that time.

16          MR. DURHAM:  We'd offer 1505, Your Honor, as a full

17  exhibit.

18          THE COURT:  Any objection?

19          MR. ONORATO:  Objection.  Can we approach?

20          THE COURT:  I'm sorry?

21          MR. ONORATO:  Objection.  Can be approach?

22          THE COURT:  Yes.

23          (Side bar.)

24          THE COURT:  What's the objection?

25          MR. ONORATO:  Sorry, Judge.  There hasn't been

United States v. Danchenko

229

1   adequate foundation laid that Mr. Danchenko had every single

2   page of (indiscernible) release of the Steele dossier, whether

3   he had reviewed it all at the time of the interview with Mr.

4   Auten.  And then, subsequently three years later having him

5   reviewed it and (indiscernible) statements, I don't see how

6   that's relevant.

7           THE COURT:  All right.  I'm going to admit it.

8           MR. DURHAM:  It's a statement against the party

9   opponent.

10          THE COURT:  Right.

11          MR. ONORATO:  It's an admission, but I guess the

12  problem is the time, right.  He doesn't know whether

13  Mr. Danchenko had read.  So the idea is that he didn't tell

14  you, at least 100 percent of it, and there's no proof that he

15  read 80 percent of it -- that he had every page of it.

16          THE COURT:  Well, this is a statement from a party

17  omission from Danchenko so I'm admitting it.

18          (Open court.)

19          MR. DURHAM:  Your Honor, the government will move

20  1502 as a full exhibit.

21          THE COURT:  All right.  Over objection, the

22  Government Exhibit 1502 is admitted.

23  (Government's Exhibit No. 1502, was admitted into evidence.)

24          MR. DURHAM:  Ms. Arsenault, if you would put it on

25  the screen.  The font is particularly small here, so whatever

———United States v. Danchenko———

230

1  you can do to blow it up so that -- maybe blow it up in

2  halves.  Okay.

3  BY MR. DURHAM:

4  Q.  Now, looking at Government's Exhibit 1502, essentially,

5  which is broken into two pieces, right, make it easier to

6  read, so the jurors can see this, but would you read it into

7  the record so the trial record is complete, sir?

8  A.  The content box?

9  Q.  Yes, sir.

10 A.  Yes.  "I collected some 80 percent of raw Intel and half

11 the analysis for the Chris Steele dossier."

12 Q.  Okay.  So I said yes to the content box.  Let's start at

13 the left on the first row.  Its broken up on the monitor, but

14 left of the exhibit itself.  There's a conversation --

15 A.  Conversation ID?

16 Q.  All right.  And then that appears to be not English under

17 that.  It looks like Russian or --

18 A.  I'm not exactly sure what that conversation ID

19 represents.

20 Q.  Okay.  But lots of letters and numbers, correct?

21 A.  Yes.

22 Q.  And then what's the next box?

23 A.  Conversation title.

24 Q.  Is that -- does that have information or no?

25 A.  That box is blank.

United States v. Danchenko

231

1   Q.   And who's this from?

2   A.   From Igor Danchenko.

3   Q.   And the profile URL reads how?

4   A.   [As read]: Https//wwwlinkedin.com/IN/, all one word, Igor

5   Danchenko.

6   Q.   So this is a similar profile -- this is a LinkedIn

7   account for Igor Danchenko, correct?

8   A.   That is what it seems, yes.

9   Q.   And it's to a particular person Anastasia and then a very

10   difficult name for some of us to pronounce, correct?

11   A.   Correct.

12   Q.   And then you told the jurors earlier, when we were laying

13   the foundation for this document, there's a particular date on

14   this, correct?

15   A.   Correct.

16   Q.   And, again, for the written record, since the jurors can

17   see it on the monitor, what's the date and time reflected in

18   that box?

19   A.   The date is October 11, 2020, and the time is 18:25:25

20   UTC.

21   Q.   And then there's a subject column, correct?

22   A.   Correct.

23   Q.   That's blank?

24   A.   Correct.

25   Q.   And then would you then read again what the content of

232

1    Mr. Danchenko's LinkedIn message to Anastasia is on

2    October 11th of 2020 at six- -- what is it?  18:25:25 --

3    6:25:25 p.m.?

4              What's his message, his own words?

5    A.   The content box reads, "Yes, I collected some 80 percent

6    of raw Intel and half the analysis for the Chris Steele

7    dossier and went through debriefings with the FBI on the

8    collusion matters, period."

9    Q.   So Mr. Danchenko's own words, he was responsible not just

10   for dossier report 95; he's responsible for 80 percent of what

11   showed up in the Steele dossier?

12             Is that what those words say?

13             THE COURT:  Sustained.  Objection sustained.

14             (Counsel confers.)

15   BY MR. DURHAM:

16   Q.   Oh, I'm sorry.  He was responsible for 80 percent of the

17   raw intelligence and half the analysis for the Christopher

18   Steele dossier, correct?

19   A.   Correct.

20   Q.   Those were his words?

21   A.   Those were his words.

22   Q.   Would that be consistent or inconsistent with the

23   impression or an understanding that you had from Mr. Danchenko

24   when you and Mr. Somma and others met with him in January of

25   2017?

─United States v. Danchenko─

233

1   A.   Again, we didn't have an understanding of a percentage or

2   anything of that sort of the material.  A large portion that

3   was Mr. Danchenko's, but Mr. Danchenko described the documents

4   as not only his work but others as well.

5   Q.   Sure.  This 20 percent of the raw intelligence that

6   wasn't his.  80 percent of it he claims is his, correct?

7   A.   In this, correct.

8   Q.   Okay.  Now, again, when you first met, sat down with

9   Mr. Danchenko in January of 2017, what was the focus of what

10  you were attempting to elicit from Mr. Danchenko?

11  A.   It was twofold.  We were trying to get corroboration as

12  well as understanding the sourcing.

13  Q.   Do you recall, sir, when you were going through the

14  interviews with Mr. Danchenko, were you and/or Mr. Somma

15  making use after use of the dossier reports?

16  A.   To my recollection, we didn't actually bring the dossier

17  reports with us.  We had notes that we had taken, if I recall

18  correctly.  But -- and there was some reasons for that I won't

19  get into, but --

20  Q.   Is that classification issues?

21  A.   There was some classifications issues involved, yes.

22  Q.   Okay.  So you didn't -- you didn't have your copies

23  actually there?

24  A.   To my recollection, no.  Well, to my recollection, either

25  that or we had the printout from the BuzzFeed material, but we

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

234

1   actually did not have the material that had been given to us.

2   Q.   Okay.  So just -- so you didn't bring what you, the FBI,

3   had gotten from Steele or the press or journalists that had

4   been leaked to, correct?

5   A.   Correct.

6   Q.   But you did bring BuzzFeed?

7            MR. ONORATO:  Objection, that's not the testimony.

8   A.   I don't recall whether or not we had notes or whether we

9   had the BuzzFeed material.

10  BY MR. DURHAM:

11  Q.   Okay.  Okay.  Fair enough.

12           But would it be the fair statement that you went

13  through those reports of the dossier with Mr. Danchenko?

14  A.   Yes.

15  Q.   And, in fact, you wrote that up, didn't you?

16  A.   Yes.

17  Q.   And when I say "you," I mean you wrote up the report

18  of --

19  A.   Correct.

20  Q.   -- that three-day interview?

21  A.   Correct.

22  Q.   And with respect to the reporting that you wrote up, will

23  you tell the ladies and gentlemen of the jury, you know, how

24  particularly careful you were about what was said and done

25  during that interview?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

235

1    A.   I believe I was very careful about what was said in that

2    interview and wrote up based upon my notes.

3    Q.   Okay.  Do you recall, sir, whether or not at some point

4    in time after that three-day interview in January of 2017

5    whether the bureau, whether the FBI, decided it was going to

6    approach Mr. Danchenko about becoming a confidential human

7    source?

8    A.   I recall that there was talk about that, yes.

9    Q.   So it's clear to the jurors, what, if any, role did you

10   play in that?

11   A.   I did not play a role in that.

12   Q.   All right.  And you described to the jurors that you

13   are -- you are the supervisory intelligence analyst, correct?

14   A.   Correct.

15   Q.   So bringing Mr. Danchenko on as a human source, that was

16   operations, that would be Special Agents?

17   A.   Yes, that is correct.

18   Q.   Do you know, however, whether or not -- based on personal

19   knowledge, do you know whether or not that happened, that is,

20   the FBI opened Mr. Danchenko as a confidential human source?

21   A.   Yes, I know that.

22   Q.   And with respect to the opening of Mr. Danchenko as a

23   confidential human source, let me withdraw that.

24           Even prior to actually approaching Mr. Danchenko in

25   January of 2017, that was the FBI's plan, wasn't it, to see if

United States v. Danchenko

236

1   they could get him -- bring him on as CHS?

2   A.   Yes, that was part of the thinking.

3   Q.   And you wanted to bring him on -- the bureau wanted to

4   bring him on for what purpose?

5   A.   To get as much information as we could to corroborate or

6   understand the sourcing of this material.

7   Q.   Right.  And, in fact, when this was all laid out -- when

8   this plan was all laid out to approach Mr. Danchenko, that was

9   the sole purpose to concentrate on the dossier, get

10  corroboration to do the sourcing?

11  A.   Yes.

12  Q.   Okay.  And so, he -- he's approached, and you recall one

13  way or the other what -- did he come on as a CHS or no?

14  A.   Yes, he did come on as a CHS.

15  Q.   Now, for the benefit of the jury, when Mr. Danchenko was

16  signed up as a confidential human source for the FBI, what was

17  the status of the Crossfire Hurricane investigation itself?

18  How was it staffed and how was it being run?

19  A.   So when Mr. Danchenko was brought on as a CHS, the

20  Crossfire Hurricane setup had changed from the first -- I like

21  to kind of break them down into Crossfire 1.0, Crossfire 2.0,

22  and Crossfire 3.0.

23         This was during, what I could call, Crossfire 2.0

24  which was approximately November 2016, December 2016 up

25  through March of 2017.

─United States v. Danchenko─

237

1   Q.   Okay.  And so, was it Crossfire Hurricane personnel that
2   wanted to deal with Mr. Danchenko as a CHS or was it others?
3   A.   My understanding, at the time, was that Mr. Somma might
4   be involved with that.
5   Q.   Okay.  And did it actually play out that way?
6   A.   Eventually, no.
7   Q.   Okay.  And tell the jurors what happened with respect to
8   the handling of Mr. Danchenko as a confidential human source
9   for the Federal Bureau of Investigation?
10  A.   Mr. Danchenko was subsequently a confidential human
11  source out of the Washington Field Office.  Mr. Somma had gone
12  back to New York.
13  Q.   Tell the -- he left -- Somma left Washington, went back
14  to New York, somebody else took over?
15  A.   Correct.
16  Q.   And that person who took over, do you recall who that
17  person was?
18  A.   That was Special Agent Kevin Helson.
19  Q.   Okay.  So Kevin Helson was assigned to the Washington
20  field office, correct?
21  A.   Yes.
22  Q.   And did he have a particular expertise or area in which
23  he worked?
24  A.   Yes.
25  Q.   And what was that?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

United States v. Danchenko

238

1   A.   Russian counterintelligence.

2   Q.   Okay.  So Helson comes on.  He's going to be the handler.

3   When he did take over -- he, Mr. Helson, did take over, was

4   the Crossfire Hurricane personnel -- were they cut out of this

5   or what was the relationship between Crossfire Hurricane, you,

6   Somma and company, and then Special Agent Helson?

7   A.   No, there was back-and-forth between Mr. Helson and Mr.

8   Helson's embedded analyst as well as the analyst on my team.

9   Q.   And, indeed, when this -- this arrangement was initially

10  set up, do you recall, sir, whether or not Helson was to pose

11  questions for Mr. Danchenko on behalf of the Crossfire

12  Hurricane people?

13  A.   In some cases, yes.

14  Q.   And what would be the typical basis on which the

15  Crossfire Hurricane people would provide questions that they

16  wanted to pose to Mr. Danchenko to answer?

17  A.   That was typically done via email.

18  Q.   Okay.  And then, what subject matters?  I mean, give the

19  jurors a feel for why you were feeding questions to Helson.

20  When I say "you," let me withdraw that.

21       Were you involved -- personally involved in that,

22  giving direction or questions to Special Agent Helson or is

23  that others that did that?

24  A.   I believe on occasion I was.

25  Q.   In fact, you were one of the principal contacts for

─United States v. Danchenko─

239

1    Helson, weren't you?

2    A.   One of.

3    Q.   Okay.  So you and your colleagues would pose questions

4    for Helson to ask Mr. Danchenko, correct?

5    A.   That is my recollection, yes.

6    Q.   And the questions that you were posing, when I say "you,"

7    your group, the Crossfire Hurricane group, were posing for

8    Mr. Danchenko, were those dossier specific, where it's

9    corroborative information you were looking for or sourcing

10   information?

11   A.   That is my recollection, yes.

12   Q.   Did you ever get any corroborating information back?

13   A.   Corroborating information on the --

14   Q.   From Mr. Danchenko and the dossier reports?

15   A.   Oh, with respect to the allegations in the dossier

16   reports?

17   Q.   Yes.

18   A.   No.

19   Q.   And, in fact, would it be a fair statement that members

20   of your team -- and then, going into director Mueller engaged

21   in this --

22            MR. ONORATO:  Your Honor, I'm just going to object a

23   little bit to the leading nature of the question.

24            THE COURT:  Yes, it is -- it is getting a little

25   excessive.

—United States v. Danchenko—

240

1   BY MR. DURHAM:

2   Q.   That's fair.  That's fair.

3           Do you recall, sir, with respect to the matter on

4   which this investigation was being carried out by the

5   Crossfire Hurricane folks, whether or not people were assigned

6   specific tasks?  That just calls for a "yes" or "no."

7   A.   Yes.

8   Q.   Do you recall, sir, what some of those tasks were?

9   A.   Yes.

10  Q.   What were some of those tasks?

11  A.   Well, the Crossfire Hurricane team was broken up into

12  specific areas of focus and so -- analysts and agents would

13  work on the specific cases involved, and also other related

14  aspects.

15  Q.   Okay.  Did you work with a Special Agent in the FBI by

16  the name of Amy Anderson?

17  A.   Yes.

18  Q.   And did she have a specific task when she came on,

19  whether it was Crossfire Hurricane at the time or it folded

20  into the Mueller matter?

21  A.   Yes.

22  Q.   What was her specific task?

23  A.   Her specific task dealt with validation of what we

24  call the dossier validation.

25  Q.   Right.  Tried to see if there's -- if you could prove

────────── United States v. Danchenko ──────────

241

1   anything in there was true or false, correct?

2   A.   Correct.

3   Q.   And how about an individual by the name of Brittany

4   Hertzog?

5   A.   Yes.

6   Q.   What was Ms. Hertzog's position with the bureau?

7   A.   She was an intelligence analyst.

8   Q.   And did she have a specific role?

9   A.   Yes, she was assisting Ms. Anderson on -- on validating

10  material from the dossier.

11  Q.   During the course, then, of the time that Mr. Helson --

12  the initial parts of Mr. Helson was working with

13  Mr. Danchenko, that foundation, would you feed questions to

14  Mr. Helson to put to Mr. Danchenko concerning sourcing for the

15  dossier?

16  A.   Yes.

17  Q.   And for any corroboration?

18  A.   Correct.

19  Q.   And other than posing questions about the dossier, do you

20  remember -- do you have any personal knowledge about anything

21  else that Crossfire Hurricane was giving to Special Agent

22  Helson to ask about?

23  A.   I don't recall any specifics regarding outside of dossier

24  verification at that time.

25  Q.   Okay.  Now, you told the jurors earlier, I think twice,

─────United States v. Danchenko─────

242

1   that in October, you and others had gone overseas to meet with

2   Steele as you were looking for -- the folks on these two

3   principal points.  And you mentioned --

4            MR. ONORATO:  Your Honor, I'm going to object to

5   asked and answered.

6            THE COURT:  Why don't you just give him some

7   background for his question.  Go ahead.

8   BY MR. DURHAM:

9   Q.   You mentioned Mr. Steele would not identify any of the

10  sources, but he did provide you with the name of Sergei

11  Millian, correct?

12  A.   That was one of the names he provided, yes.

13  Q.   During the January 2017 three-day interview with

14  Mr. Danchenko, do you recall whether you and the Agent Somma

15  inquired about Sergei Millian?

16  A.   Mr. Millian's name came up during the course of the -- of

17  the three-day interview.

18  Q.   And would you explain to the jury what, if anything, you

19  asked the defendant about Source E who appeared in the dossier

20  report 95?

21  A.   Yes.  We asked on report 95 as one of the topics of

22  conversation during that three-day interview.

23  Q.   Now, with respect to that matter, Source E Pearson

24  dossier report?

25  A.   In 95, yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

243

1   Q.   Do you recall, sir, whether or not during that

2   January 2017 interview whether there's -- what the discussion

3   was about Mr. Millian?

4   A.   My recollection is that we asked Mr. Danchenko.  This was

5   one of the reports we asked specifically about, and this is

6   where information came up regarding Mr. Danchenko telling us

7   about interactions with Sergei Millian.

8   Q.   Okay.  So I want to walk through this slowly, and I know

9   Your Honor wants to break about -- in about 15 minutes, and

10  we'll try to get to a proper point for that.

11          The first day of the interview is January 24, 2017,

12  correct?

13  A.   Correct.

14  Q.   Do you recall, sir, what, if anything, Mr. Danchenko told

15  you and Somma on January 24th concerning any contact with

16  Sergei Millian?

17  A.   So I believe it was the 24th that we discussed this

18  report, and at that time, Mr. Danchenko talked about how he

19  had received contact information for Mr. Millian brokered

20  through to Russian journalists in the Washington, D.C. area.

21  Q.   Okay.  And do you recall what, if anything, Mr. Danchenko

22  said about his own reaching out to Millian?

23  A.   My recollection is that he had attempted to reach out, I

24  think, once or twice and then had, at that point, turned

25  around and had had a 10- to 15-minute telephone call with an

244

1   individual who he thought was Sergei Millian.

2   Q.   Okay.  You said that you reached out once or twice.  Let

3   me be very particular about this.

4        Would it help you to see on a report you had

5   prepared on this?

6   A.   Yes.

7   Q.   I think this is -- I'm not sure if this is in your book

8   or not?  Is Government's Exhibit 100 in your book?

9   A.   Excuse me.  100?

10  Q.   Yes, Government's Exhibit 100.  I believe it is in your

11  book.

12       MR. DURHAM:  But I'd ask the Court's permission,

13  Your Honor, to have the court security officer just provide a

14  copy of relevant portions of the report to the witness.

15       THE COURT:  All right.

16  BY MR. DURHAM:

17  Q.   I'd ask you to take a look at that, and specifically for

18  the first interview, the January 24th of 2017, and see if that

19  refreshes the particulars of what Mr. Danchenko said about

20  this.

21  A.   Yes, it does.

22  Q.   Okay.  So the first time you talked to him about it on

23  January 24th, what was it that Mr. Danchenko said regarding

24  his reaching out to Millian?

25  A.    Mr. Danchenko on the 24th indicated that he had reached

245

1    out to Millian via email twice.

2    Q.    And did he indicate whether or not Millian ever

3    responded?

4    A.    He indicated he never received a response from the first

5    attempt.  But after the second attempt, he received a very

6    strange phone call from a Russian male, who he believed to be

7    Millian.

8    Q.    Okay.  And with respect to that strange phone call that

9    he said he had gotten -- it was a Russian male, is that what

10   you said?

11   A.    Yes.

12   Q.    Did the person identify himself?

13   A.    No.

14   Q.    Do you recall, sir, what, if anything, Mr. Danchenko told

15   you and Somma concerning what that person had to say?

16   A.    He said the two of them talked for a bit, and then they

17   tentatively agreed to meet in person in New York City at the

18   end of July.

19   Q.    Okay.  Well, we'll be very particular about that as well.

20   Did he say that they talked for a bit or did he talk -- tell

21   you approximately how long they spoke?

22   A.    The way I have it written down here in my -- in the

23   actual EC is that the two of them talked for a bit.

24   Q.    Okay.  And that call was -- did he say when that call was

25   received?

United States v. Danchenko

246

1   A.    Circulate July 2016.

2   Q.    So there are two emails, correct?

3   A.    Correct.

4   Q.    And on the 24th, did he indicate whether the anonymous

5   call came between the two emails or after the second email?

6   A.    He said after the second attempt.

7   Q.    And it was from an anonymous caller, according to

8   Mr. Danchenko?

9   A.    He said -- he said it was a Russian male who he believed

10  to be Millian, but who never identified himself.

11  Q.    Okay.  Did you, to the best of your recollection, go back

12  to that issue at any point after the 24th of January?

13  A.    Yes, we did.

14  Q.    All right.  And why did you do that?

15  A.    Personally, I can say I felt this to be a very strange

16  part of the interview, and so I believe we needed some

17  clarification.

18  Q.    And what did you find strange about it?

19  A.    It was peculiar that it was a -- what appeared to be a

20  short phone call.  It was unclear exactly how the information

21  that was in report 95 had come out of the very short phone

22  call like this, and so, I felt like we needed to get some more

23  clarification.

24  Q.    And so, do you recall who led the -- well, withdrawn.

25  So what did you do -- after the 24th, what did you do?

─────United States v. Danchenko─────

247

1    A.   So we went back to it in a subsequent interview.

2    Q.   And when you say "subsequent interview," which interview

3    was it?

4    A.   I believe it was the 25th.

5              MR. DURHAM:  I ask, again, Your Honor, permission to

6    have the court security officer provide the witness with a

7    document --

8              THE COURT:  Yes.

9              MR. DURHAM -- that might help him refresh his

10   recollection.

11             THE COURT:  Yes.

12             THE WITNESS:  Yes.

13   BY MR. DURHAM:

14   Q.   And does that refresh your recollection?

15   A.   Yes.

16   Q.   What was the date you raised it -- this issue or question

17   further on this point with Mr. Danchenko?

18   A.   It was the 25th.

19   Q.   The very next day?

20   A.   Correct.

21   Q.   And on the 25th, what did Mr. Danchenko say concerning

22   the call?

23   A.   Mr. Danchenko said that he had emailed Millian in either

24   June or July of 2016, but it was after Danchenko's trip, his

25   trip to Russia in June.  He didn't receive a response from

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

248

1   that email that says it was at that point that he had received

2   a telephone call from an unidentified Russian male.  He

3   thought it was Millian, but the individual never identified

4   himself, and said they talked for about 15 minutes, and then

5   arranged to meet together in New York City.

6   Q.   Okay.  So the first day he said that he sent two emails

7   and then they got this call, correct?

8   A.   Correct.

9   Q.   The second day you went back to it because you thought

10   the way it was presented it was peculiar, correct?

11   A.   Correct.

12   Q.   And now it was after the first email, correct?

13   A.   Correct.

14   Q.   And it was a 10- or 15-minute call?

15   A.   Correct.

16   Q.   And then he told you that they arranged to meet in New

17   York?

18   A.   Correct.

19   Q.   Do you recall, sir, whether or not, with respect to

20   Mr. Danchenko, did he share with you, to the best of your

21   recollection, that with respect to arrange and to meet in New

22   York, that he already had plans to -- that he was going to New

23   York the next week, did he share that with you?

24   A.   I don't recall that specifically being shared.

25   Q.   Well, was your impression that you thought that somehow

1   in this phone call they arranged to meet in New York as

2   opposed to Mr. Danchenko was going to be in New York the

3   following week?

4   A.   Yes, the way that I have it written up on Page 36

5   indicates that he -- Mr. Danchenko remembered they made plans

6   to meet in New York City, and that Mr. Danchenko had offered

7   to come up any time Mr. Millian was available.

8   Q.   So if it were the case that Mr. Danchenko was going to be

9   in New York anyway, that would be different than the way it

10  was conveyed to you on January 25th?

11  A.   The way -- I mean, this is the way it is conveyed.

12  Q.   Do you recall, sir, whether or not any time on January

13  24, 25 or 26, if Mr. Danchenko provided any documents to the

14  FBI?

15  A.   Yes, he did.

16  Q.   And what do you recall about that, what can you tell the

17  jurors about that?

18  A.   I recall on the second day, Mr. Danchenko -- so on the

19  25th, Mr. Danchenko brought a number of documents that we

20  walked through with him during the course and scope of the

21  interview.

22  Q.   Okay.  And do you recall, sir, whether or not after that

23  date, after January 26th, that lasted three days, did he

24  provide any additional documents that you recall?

25  A.   I recall there were text messages that were subsequently

─────United States v. Danchenko─────

250

1    provided.

2    Q.   Okay.  And did those come to you, to Somma or somebody

3    else?

4    A.   I believe those came -- I don't recall exactly who those

5    came to.

6    Q.   And do you remember with respect to a text message or an

7    email what -- who the parties were to the email?

8    A.   I believe the text messages and the parties involved a

9    woman by the last name of Podevadova, P-O-D-E-V-A-D-O-V-A.

10   Q.   Do you recall, sir, whether or not Mr. Danchenko provided

11   a document after the 26th, shortly after January 26th, an

12   email exchange that was in Russian?

13   A.   Yes.

14   Q.   Do you recall whether or not the bureau, at the time the

15   Crossfire Hurricane people, did they have that translated?

16   A.   I don't recall whether they did or not.

17   Q.   Do you recall ever learning that the exchange reflected

18   in that email was between Mr. Danchenko and a fellow by the

19   name of Zlodorev?

20   A.   Yeah, later on, yes.

21   Q.   How much later in time did you learn that?

22   A.   I don't have a recollection of exactly how much later.

23   Q.   And how did it come about that you learned that?

24   A.   I believe that email was uploaded to SENTINEL.

25   Q.   Okay.  For the jurors, SENTINEL is one of the FBI's

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

1  databases?

2  A.   Right.  SENTINEL is the system of record for the FBI.  So

3  if there are -- case information is uploaded for record

4  purposes into a system as known as SENTINEL.

5  Q.   Now, you told the jurors that the first day Mr. Danchenko

6  told you he had sent the two emails to Millian, no response.

7  And then he got the call, correct?

8  A.   Correct.

9  Q.   This next day, he tells you he sent one email, and then

10  he gets the call, correct?

11  A.   Correct.

12  Q.   Did he make any mention of when it was that

13  (indiscernible), the second email that was sent?

14  A.   No, on the second day, he did not indicate that.

15  Q.   Okay.  Let's take a look at Page 37, and see if that

16  refreshes your recollection.

17  A.   Oh, okay.  Yes.

18  Q.   Now, having looked at Page 37, tell the ladies and

19  gentlemen of the jury whether his -- his -- what he told you

20  about the contact with Millian remained consistent or was

21  inconsistent?

22  A.   I'm sorry.  Inconsistent with what?

23  Q.   With the first day.

24  A.   Okay.  So it was -- so what he said in the second day,

25  with respect to the number of emails, was not consistent.

─United States v. Danchenko─

252

1   Q.   All right.  And how so, why wasn't it consistent?

2   A.   The first day, he said he emailed twice.  The second day,

3   he said he emailed once.

4   Q.   And did he say with respect to the second email, the one

5   in September, not in July, not in August, the one in

6   September?

7   A.   Yes, on the second day, he talked about a follow-up email

8   with Millian in September.

9   Q.   Do you recall, sir, whether or not -- when you were

10  participating in this part of the investigation, if you ever

11  saw the emails that Mr. Danchenko said that he sent to

12  Mr. Millian?

13  A.   No, I don't recall seeing those.

14  Q.   If you had seen those at the time, that is what

15  Mr. Danchenko had actually said to Millian, you would remember

16  that, wouldn't you?

17  A.   Yes.

18  Q.   Have you subsequently seen them?

19  A.   Yes.

20  Q.   And you remember those?

21  A.   Yes.

22          MR. DURHAM:  Your Honor, this might be a good place

23  to break.

24          THE COURT:  All right.  I think so.  It's been a

25  long day.  We're going to go ahead and recess until tomorrow

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

253

1    morning.  We're going to start at 9:30.  So, again, please

2    make whatever travel arrangements necessary to try to get to

3    the courthouse around 9:15, and we'll try to begin at 9:30

4    promptly.

5              Again, please do not discuss this case either among

6    yourselves or with anyone outside the courtrooms.  Your

7    friends and family will no doubt be curious about how you've

8    spent your time today.  Simply tell them you're under

9    instructions from the judge not to discuss the case in any

10   fashion.

11             Also, don't communicate on any social media, whether

12   it's Facebook or LinkedIn, or any of those matters about what

13   you did today.  And also, please do not undertake any research

14   on your own about anything you may have heard here in the

15   courtroom that you may be curious about.  Simply isolate

16   yourself from outside sources or information about this case.

17   And that would include any TV or radio reports that you may

18   find yourself exposed to.  Just try to absence yourself from

19   those or remove yourself from those, if and when you find

20   yourself confronted with them.

21             So with those comments, I will excuse you until

22   tomorrow morning.

23             (Jury dismissed.)

24             THE COURT:  All right.  How much longer do you think

25   we have on direct?

─United States v. Danchenko─

254

1          MR. DURHAM:  I would say between an hour -- 60 or 90

2    minutes, Your Honor.

3          THE COURT:  All right.  All right.  Anything before

4    we recess?

5          MR. ONORATO:  No.

6          THE COURT:  All right.  I'll see counsel at

7    9 o'clock tomorrow.  All right.  Court stands in recess.

8

9          **(Proceedings adjourned at 5:44 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

1              CERTIFICATE OF REPORTER

2

3           I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus IGOR Y.**

8    **DANCHENKO,** Criminal Action No.: 1:21-cr-245, in said court

9    on the 11th day of October, 2022.

10          I further certify that the foregoing 170 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this October 12, 2022.

17

18

19

20

21          _____

22          Tonia M. Harris, RPR
            Official Court Reporter

23

24

25

                                                          255