1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3    UNITED STATES OF AMERICA,    )  Case 1:21-cr-245
                                  )
4                 Plaintiff,      )
                                  )
5         v.                      )  Alexandria, Virginia
                                  )  October 12, 2022
6    IGOR Y. DANCHENKO,           )  9:06 a.m.
                                  )
7                 Defendant.      )  Volume 2 (AM Session)
     _____)  Pages 256 - 414
8

9                       TRANSCRIPT OF TRIAL

10          BEFORE THE HONORABLE ANTHONY J. TRENGA

11             UNITED STATES DISTRICT COURT JUDGE

12                        AND A JURY

13
     APPEARANCES:
14
     FOR THE PLAINTIFF:
15
          JOHN DURHAM, ESQUIRE
16        MICHAEL T. KEILTY, ESQUIRE
          D. BRITTAIN SHAW, ESQUIRE
17        U.S. DEPARTMENT OF JUSTICE
          145 N Street, N.E.
18        Washington, D.C.  20002
          (203) 410-2641
19
     FOR THE DEFENDANT:
20
          STUART A. SEARS, ESQUIRE
21        DANNY ONORATO, ESQUIRE, *PRO HAC VICE*
          SCHERTLER, ONORATO, MEAD & SEARS
22        555 13th Street, N.W., Suite 500 West
          Washington, D.C.  20004
23        (202) 628-4199

24   THE DEFENDANT, IGOR Y. DANCHENKO, IN PERSON

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1                        **I N D E X**

2    WITNESS                 EXAMINATION                    PAGE

3    Brian Auten             Further Direct by Mr. Durham   283
                             Cross by Mr. Onorato           373
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The jury is not present.)

2            THE COURT:  Good morning.

3            MR. DURHAM:  Good morning, Your Honor.

4            MR. SEARS:  Good morning, Your Honor.

5            THE COURT:  Any issues?  I understand there's

6   something to talk about.

7            MR. DURHAM:  Thank you, Your Honor.  The

8   government had chatted with counsel last night, and

9   then we had sent an email to chambers.  We had

10  gotten -- the defense provided the government with a

11  series of exhibits just before arguments yesterday.  So

12  we had the opportunity to go through them last night

13  and discuss some of them with counsel.

14           The government's review of a number of these

15  exhibits -- in some instances, they're emails, the

16  thrust of which the Court has already ruled

17  inadmissible when the government was intending to offer

18  them.  So we don't understand what the legal theory is

19  for the admissibility of those.  We're questioning the

20  admissibility of those email messages or questioning

21  about email messages in which Mr. Danchenko is not a

22  party to it, nor is Mr. Auten.  And as I say, the Court

23  has already ruled, when the government had proposed

24  offering some of the same or similar emails, that they

25  were inadmissible.  So we wanted to raise that with the

1  Court because we don't want to have to go unnecessarily

2  to sidebar to discuss these things.

3          Counsel also had provided -- and I can just

4  do this by number to make it easier for the Court --

5  Defendant's Exhibit 404, which is an email from Brian

6  Auten to Mr. Moffa and Peter that's dated August 27,

7  2017.  The government doesn't believe that that is in

8  any way admissible.  There's no -- they won't be able

9  to lay some foundation, and it will be misleading to

10 the jury.

11         I think that this may have come up at an

12 early time, one of the early hearings before Your

13 Honor, but it has to do with some surveillance that the

14 bureau was doing on that date, and Millian showed up in

15 a car.  So I'm not certain what the relevance of that

16 is other than to mislead the jury.  The fact that the

17 bureau was surveilling one person, not Millian, and

18 Millian was in a car, when he was the president of the

19 Russian Chamber of Commerce, is completely irrelevant

20 to these proceedings.  It would lead to improper

21 conjecture on the part of the jury.  And in view of

22 that fact, it's inadmissible in the government's view.

23         The defense also provided somewhat out

24 context a document.  It's marked Defendant's

25 Exhibit 415.  Again, I don't believe that the defendant

1   is going to be able to establish, through this witness

2   or any other witness that we're aware of, any proper

3   foundation for the admissibility of a partial report.

4   There's no indication that the defense believes that

5   the witness even knows about it, and it's not connected

6   to anything in this case on its face.  Accordingly,

7   it's inadmissible.

8            Defense Exhibit 420 -- one of these emails I

9   referenced -- is the exact same email that had

10   previously been marked as Government's Exhibit 201.

11   The Court ruled as it did concerning admissibility

12   because of the defendant's objection.  So we pulled

13   that from the exhibit list, and now the defendant has

14   given us notice that he wants to put that before the

15   jury.  So we object to that for the same reasons that

16   the Court previously ruled, the same basis the Court

17   previously ruled on this.

18            There are a series of emails that counsel has

19   marked where there's no objection because the

20   government already intends to put those before the

21   jury.  So I don't think that there's going to be an

22   objection on the part of the defense to the

23   government's exhibits.  But to the extent that there

24   is, the relevant defense exhibits, which are the same

25   thing, Defense Exhibits 421, 421T, and I believe 422A,

1   which is the certification page.

2       (Counsel confer.)

3       MR. DURHAM:  And with respect to Defendant's

4   Exhibit 422B, it's an Amtrak record.  The government is

5   intending to put that in.  I think we had taken it off

6   of our list because we weren't sure as to its relevance

7   or importance, but we're perfectly willing to put that

8   in since we had previously intended to do that.

9       THE COURT:  All right.

10      MR. DURHAM:  Defense Exhibit -- Proposed

11  Exhibit 424 is identical to Government's Exhibit 1400.

12  So there's no objection to that because -- and,

13  presumably, the defense won't object to it.  So that

14  will come in.

15      Then the defendant has marked as Defendant's

16  Exhibit 426 a particular email.  I think it was taken

17  at the Bronx Zoo on July 28, 2016.  I just wanted to

18  alert the Court:  With respect to the defendant's offer

19  of those materials, there's a -- I'll say it's greatly

20  extended.  It's not a huge chain, but there are a

21  number of emails.  We don't believe the defendant is

22  going to be able to establish a foundation through this

23  witness for the admissibility of that.  He, Mr. Auten,

24  is not on the email exchange, and the defendant can't

25  offer his own self-serving statements unless he were to

1  testify.  And so we just wanted to alert the Court to

2  426 if the defendant does intend to offer that.  We

3  don't believe there's a proper evidentiary basis for it

4  to be admitted.

5          The defendant has Defense Exhibit 428, which

6  is a Facebook record, and 428T, which is a translation

7  of that Facebook record.  It's unclear to the

8  government how the defendant can get this record in

9  through Mr. Auten or any other witness.  But we wanted

10  to alert the Court that there's, I think, a significant

11  foundational problem for the defense.  That one does

12  involve the defendant and his self-serving statements

13  or his statements.  Out-of-court statements are not

14  admissible unless he were to, again, take the stand.

15          Then the defendant has marked as Exhibit 472

16  and 472T another communication.  The defendant is not

17  on the communication, and Mr. Auten is not on the

18  communication.  It's between Sergei Millian and

19  Mr. Zlodorev from July 10th of 2015.  So it's a year

20  earlier.  We don't believe that on its face it is in

21  any way relevant.  It's total hearsay, and it's

22  out-of-court statements.  There's no foundation -- a

23  proper foundation for it to be admitted.

24          Then the defendant has Defense Exhibit 476,

25  which appears to be an email from Mr. Millian to

1   Zlodorev in March of 2016.  So, you know, it's outside

2   the scope -- or the time period relevant to these

3   proceedings and has attached to it some pictures of

4   Mr. Millian with various individuals, including Donald

5   Trump from some undated time.  We don't see how that's

6   admissible in this proceeding.

7           477 is another email, this one from Millian

8   to Michael Cohen, the Trump organization.  Auten is not

9   on it.  The defendant is not on it.  It's from a time

10  period outside the scope of this indictment,

11  specifically March 15th of 2016.  So it would be

12  hearsay.  It's not a comment or statement.  It is some

13  kind of communication by a party opponent.

14  Accordingly, it is irrelevant.  We would ask the Court

15  not to permit questioning from the jury on these

16  matters.

17          The defendant has provided what he has

18  premarked as Defendant's Exhibit 480, 4-8-0, which is

19  an email, a LinkedIn message from Millian to George

20  Papadopoulos.  Unless the defendant is going to somehow

21  explain to the jury what Millian and Papadopoulos were

22  communicating about at this period of time, then the

23  Court should not permit it.  Papadopoulos and Millian,

24  as I think the defense knows from the discovery in this

25  case, were exchanging any number of emails or Facebook

1  exchanges or LinkedIn all about real estate, potential
2  real estate transactions.
3          And so what the defense would be asking the
4  jury to do is to draw some adverse inference that there
5  was something going on between Millian and Papadopoulos
6  that they really don't know about, but it certainly
7  sounds creepy.  Well, in fact, if you look at what the
8  communications were, as I say, between Papadopoulos and
9  Millian, they are all about real estate, potential real
10  estate investments.
11          THE COURT:  Before we go any further, is
12  Mr. Auten in the courtroom?
13          MR. DURHAM:  He is outside, Your Honor.
14          THE COURT:  Okay.  That's fine.  Thank you.
15          MR. DURHAM:  Yes, Your Honor.
16          So we believe that that's completely
17  inadmissible and, ultimately, would then sort of
18  descend into a mini trial about what Millian and
19  Papadopoulos were talking about or communicating about
20  in these exchanges, which we think is best avoided.
21          Defendant's Exhibit 481 and 481T is another
22  communication between Millian and some unknown person.
23  All you have is the AOL account name.  Again, Auten is
24  not on it.  The defendant is not on it.  It's
25  irrelevant to these proceedings and inadmissible in the

1    government's view.

2              Defendant's Exhibits 482 and 482T, similarly,

3    it's an email by Millian to Zlodorev.  Auten is not on

4    it.  The defendant is not on it.  There's not going to

5    be any evidence, to the government's knowledge, the

6    defendant had any knowledge of this.  Therefore, it is

7    inadmissible as being irrelevant and for lack of

8    foundation in these proceedings.

9              Defense Exhibit 483 is yet another

10   communication from Millian to another person, which,

11   again, absent some foundation for its admissibility,

12   should not come in.

13             And then Defense Exhibit 486 -- and I

14   apologize for taking the Court's time up.  We just got

15   these yesterday.

16             THE COURT:  That's fine.

17             MR. DURHAM:  486 is from Millian to

18   Papadopoulos.  Again, you know, its irrelevant to these

19   proceedings, but for the same reason, in the

20   government's view, it would be inadmissible unless we

21   want to get into evidence relating to what Papadopoulos

22   and Millian were doing at or about the time these email

23   exchanges were occurring.

24             And then, finally, Defense Exhibit 497, those

25   are the field notes of Brian Auten that were provided

1  to the defense along with the other discovery.  I don't

2  know that defense counsel intends to offer that.  So

3  that's probably not a live issue.

4          THE COURT:  All right.  Thank you.

5          MR. DURHAM:  Thank you, Your Honor.

6          THE COURT:  Mr. Onorato.

7          MR. ONORATO:  Your Honor, I'm going take a

8  couple of the issues, and Mr. Sears will take the

9  remaining.

10          THE COURT:  All right.

11          MR. ONORATO:  Thank you.

12          So, Your Honor, I'm going to start just with

13  the point of some of the communications that Millian

14  would have had and, if I can, direct the Court's

15  attention to 472T.  The whole import of that is that --

16          THE COURT:  Do I have these?

17          MR. ONORATO:  Your Honor, you do.

18          THE COURT:  All right.  Which one are we

19  looking at?

20          MR. ONORATO:  So it's 472T.  It's dated

21  July 15th of 2015.

22          THE COURT:  All right.

23          (Reporter clarification.)

24          MR. ONORATO:  So, Your Honor, the import of

25  that is pretty simple.  We don't want any information

1 beyond Mr. Millian having a new Moscow phone number.

2 The government's impression is that Mr. Millian

3 couldn't have communicated because he had turned off

4 his U.S. cell phone carrier in 2016, but it's clear

5 that Mr. Millian had access to other telephones and

6 telephone numbers to make calls.  And so I think it's

7 important for the jury to hear about that.

8           THE COURT:  But how does this get in?

9           MR. ONORATO:  So I'll cross-examine the

10 witness and see whether he knows about these facts.

11          THE COURT:  All right.

12          MR. ONORATO:  But I think that's important.

13          MR. DURHAM:  Your Honor, I'm going to ask

14 that the Court just inquire as to whether counsel has

15 some good faith basis to believe that Mr. Auten would

16 know about this email.

17          MR. ONORATO:  Not the email, just the phone

18 number, just that he had foreign phone numbers.  I

19 don't want to talk about the content of the email.

20          MR. DURHAM:  So, as I understand it, they're

21 not offering the email?

22          THE COURT:  Correct.  That's what I'm

23 hearing.

24          MR. ONORATO:  Just that fact.

25          THE COURT:  That's what I'm hearing.  All

1 right.

2          MR. ONORATO:  Just that fact, Your Honor.

3          MR. DURHAM:  I'm assuming, though, the

4 question -- is it going to be in the form of assuming

5 facts not in evidence?

6          THE COURT:  Well, we'll see what the question

7 is.

8          MR. ONORATO:  Okay.  476, the only thing that

9 I want to do is see -- ask him if he's seen photographs

10 of Mr. Millian with Mr. Trump.

11          THE COURT:  Asking Mr. Auten?

12          MR. ONORATO:  If he's seen photographs of

13 them and show him that photograph.  I'm not going to

14 produce the email, but I think that was widely on the

15 Internet and available.  And if he knows about it, he

16 knows about it.  And then if he does, I'll show it to

17 him and move it in.

18          THE COURT:  And what's the relevance of this?

19          MR. ONORATO:  Because Mr. Millian was on the

20 government's radar screen before the release of the

21 Steele report, and you're going to hear evidence that

22 there's what they call a tactical targeting package

23 that was prepared prior to the release of the Steele

24 report involving Mr. Millian and that Mr. Auten helped

25 prepare it and edit it and it had a lot of relevant

1 facts of the government's investigation of Mr. Millian

2 at that point.  And so it goes to the issue of

3 materiality that the government has raised.

4           THE COURT:  All right.

5           MR. ONORATO:  477, again, Mr. Millian is

6 sending an email to Mr. Cohen of the Trump organization

7 indicating that he has insider knowledge of what's

8 happening in Russia after ten years and talking about

9 wanting to connect on the policy team.  I'm going to

10 ask him questions about whether he knows those things

11 and see if this could refresh his recollection about

12 whether he knew those at the time.  Again, if he gives

13 me the answers, I'm good.  I understand what the

14 Court's concern is.

15           THE COURT:  And this goes to materiality?

16           MR. ONORATO:  Correct.

17           Now, Judge, this is where we're in the

18 critical juncture.  If you look at Defendant's

19 Exhibit 480 -- and if I could set the timeline for the

20 Court, the relevant time period is May of 2016 when

21 Mr. Danchenko has communication with the two reporters

22 about an introduction to Millian.  I understand that

23 the government is going to be showing evidence that

24 Mr. Millian's telephone number -- his 404 Atlanta

25 number was disconnected on July 14th.

1              On July 15th, he sends an email, a LinkedIn

2    message.  There's no dispute that that message was

3    sent.  It was kept in the ordinary course of business.

4    The government understands that.

5              And then I don't want any of the facts if

6    you'll look at the second page, but this is the

7    critical time frame when they're saying that he

8    couldn't have been using a device or a phone.  He says,

9    Please don't hesitate to contact me at (212) 844 --

10             THE COURT:  I'm sorry.  I'm looking at 480?

11             MR. ONORATO:  480.  Okay.

12             THE COURT:  I have a LinkedIn message from

13   Sergei Millian to --

14             MR. ONORATO:  Correct.  And then if you would

15   go to the second page of that -- Your Honor, I

16   apologize.  And if you go halfway down the page --

17             THE COURT:  Oh, I see the highlighted area.

18             MR. ONORATO:  Judge, I don't want anything

19   about the "Dear George," just that Mr. Millian was

20   telling people when his phone was disconnected to call

21   him or contact him at that phone number or his personal

22   email.

23             And then if you look, it was sent from his

24   iPad.  An iPad, of course, is a device that allows

25   FaceTime use, that he had communication devices in the

1  relevant time period here.

2            THE COURT:  But, again, how does this get in?
3  You're going to ask Mr. Auten about this?

4            MR. ONORATO:  What I would like the Court to
5  do -- so I think this is admissible because the
6  impression that the government left with the jury and
7  that they're going to leave with the jury is that
8  Millian was not communicating with anybody when he was
9  overseas by telephone or otherwise.  This contradicts
10  that.  If they'll stipulate that they know that he had
11  an iPad, if they'll stipulate that they know he used
12  WhatsApp, if they'll stipulate that they know that he
13  used Skype, if they'll stipulate that they know that he
14  gave someone his 212 number, none of this matters to
15  me.  Those are the only facts in that time frame.
16  Maybe the government can answer that question.

17            THE COURT:  Well, it's clearly hearsay.  So
18  how does it get past the hearsay objection?

19            MR. ONORATO:  Just that it's not for the
20  truth, Judge, just that the government is aware that
21  Mr. Millian had access to communication devices in the
22  relevant time period.

23            THE COURT:  Well, if that foundation is laid.

24            MR. ONORATO:  It's the truth.

25            THE COURT:  And you're going to try to get

1   this in through Mr. Auten?

2           MR. ONORATO:  I'm sorry?

3           THE COURT:  You're going to try to get that

4   fact in through Mr. Auten?

5           MR. ONORATO:  Yes.  And whether the

6   government in their preparation of him, right, did they

7   make you aware.  Because they're going to make it look

8   like Mr. Danchenko didn't give you this email, didn't

9   give you that email.  Are you aware that he had the

10  ability to make these calls back then?  That's fair.

11  That's just.  And I think without that, they have --

12          THE COURT:  But he'll answer that question

13  one way or the other.  How does that get this document

14  in?

15          MR. ONORATO:  Are you aware that Mr. Millian

16  was able to make telephone calls?  I mean, this is all

17  part of the government's investigation.

18          THE COURT:  Right.

19          MR. ONORATO:  We didn't have access to any of

20  it.  And for them to create the impression with this

21  jury that Mr. Millian could not make --

22          THE COURT:  I understand, but it gets to the

23  admissibility of these documents.

24          MR. ONORATO:  Again, I'm not looking for the

25  truth, just that he had access.  I'm not saying that he

1  called him from that number.  I'm not saying that he

2  did these things.  I'm just saying that he had access

3  to that material, and I think that's a fair point.

4          THE COURT:  But you don't get that from the

5  fact of the email.  You get that from the substance of

6  the email.

7          MR. ONORATO:  I get it from -- the fact of

8  the email does give it to me because he uses an iPad or

9  that he used an iPad, that he gives his phone number.

10  The government is going to introduce a record that is

11  connected to that phone number.  That's going to be

12  before the jury.  So they are going to have that.  And

13  the fact that he's telling people to call him on that

14  phone number, to me, it would be misleading if the jury

15  were not able to hear that, again, just to show access.

16  I'm not going to say that Millian --

17          THE COURT:  I'm going to have to hear the

18  testimony and what's brought out on direct.

19          MR. ONORATO:  Sure.

20          And then it goes to two other important

21  points, and I will bring up one more.  So my next

22  one -- and so I hear what the Court is saying.  I think

23  these are relevant not for the truth but Mr. Millian,

24  the same day, July 15th of 2016, when Mr. Danchenko

25  says that he made a phone call talking about Donald

1  Trump, he's telling a person -- and the government

2  knows this -- at the beginning of August, a meeting

3  with Trump and his people --

4          THE COURT:  What are you reading from?

5          MR. ONORATO:  I'm reading from 481T.

6          So 481T and 482T are virtually identical

7  where Millian is saying, "I'm meeting with Trump and

8  his people and I can create, raise questions about

9  Belarus," again, boasting about his connections to the

10 president's campaign.

11         The same thing with respect to 482.  These

12 are all -- Judge, the evidence is going to show that in

13 this time frame, this is when the telephone call is

14 occurring.  I can think of nothing more relevant, not,

15 again, for the truth of the matter asserted, but to

16 show that Millian was someone who was claiming to have

17 information about these topics that the government is

18 saying Mr. Danchenko reported that were false.

19         MR. DURHAM:  Your Honor, in reading --

20     (Reporter clarification.)

21         MR. DURHAM:  Yes, I'm sorry.

22         In reading 481T, I think the Court will find

23 it has nothing to do with the facts that we've

24 elicited.  In fact, it says nothing at all about what's

25 in Government's Exhibit Report 95.

```
 1          THE COURT:  All right.
 2          MR. DURHAM:  I mean, it's completely other
 3 information, and I should raise with respect to --
 4 since we just got these yesterday, we do have some
 5 translation differences as well.
 6          THE COURT:  All right.
 7          MR. ONORATO:  Judge, along the same lines
 8 with those two exhibits, it's 483, which I think is,
 9 frankly, more powerful.  It's in English.  It's on 426.
10 He's writing to someone, "Mark, Trump team reached out
11 to me a few weeks ago.  We started discussing Russia."
12 We started discussing Russia.  That coincides exactly
13 after Mr. Danchenko says, "On the 21st, I send him the
14 email and then before I leave to go on the Amtrak, I
15 get this anonymous call."  He leaves for Amtrak at 3:30
16 in the morning.  This is --
17          THE COURT:  I understand the relevance.  I'm
18 really trying to understand how you get past the
19 hearsay.
20          MR. ONORATO:  Again, not for the truth of the
21 matter.  I don't believe that Mr. Millian actually, you
22 know, had a conversation with the Trump people, but he
23 was telling people that.  And so these are all
24 important to show that when Mr. Danchenko -- and the
25 government, what did you do to investigate?  Are you
```

1  aware of these things?  Did you subpoena these records?

2  Will they change your mind as an analyst?  If the

3  government would have told you about these things,

4  would you conclude that that call -- he could not come

5  to the reasonable belief that that call happened.

6  That's the heart of the matter.  They have that

7  evidence, and it sounds like they want to conceal it

8  from the jury.  And that doesn't seem fair.

9            THE COURT:  I understand their theory.

10            MR. ONORATO:  And then 486, again, it's

11  August 5th, a time when his phone record is down that

12  he's giving out --

13            THE COURT:  There's no issue as to

14  authenticity, I take it.

15            MR. ONORATO:  No.  And, Judge, I'm not

16  looking to admit any of the content, and I don't really

17  care that it's with Mr. Papadopoulos.  It doesn't

18  matter to me.  Just that, again, he's Skyping with

19  people to show that he has access to the machine.  He

20  was Skyping with Mr. Papadopoulos, and there's a lot of

21  evidence about that.  But that's not really what I'm

22  concerned about.  I'm concerned about his access to the

23  communication devices.

24            And I think Mr. Sears is going to handle 426.

25            MR. SEARS:  I thought this exhibit was

1   resolved yesterday in argument when I raised the issue.

2            THE COURT:  Which exhibit is it?

3            MR. SEARS:  This is 426, Defendant's 426,

4   Your Honor.  I raised this yesterday morning along with

5   the Amtrak records.

6            THE COURT:  Right.

7            MR. SEARS:  The Facebook message by

8   Mr. Danchenko that is Exhibit 426 had been a government

9   exhibit until right before trial.  And from our

10  perspective, it's a crucial piece of evidence.  It's

11  not hearsay.  It falls under a very well known and long

12  existing hearsay exception even if the declarant is

13  available.  A present sense state of mind is an

14  exception to the hearsay rule.  It's 803(3).

15           And Mr. Danchenko's state of mind is the

16  issue in this case on four counts.  And that message

17  references a meeting that he believes he's having that

18  evening in the time frame when he's in New York,

19  presumably in his mind with the person he believes

20  could be Sergei Millian.  It's not hearsay.  How we

21  would get it in --

22           Yesterday the government said they would put

23  it in along with the Amtrak records.  Today it seems

24  like that's no longer the case.  But I do believe

25  they'll be calling a case agent at some point to talk

1 about investigative methods they use in collecting

2 information and that there's no issue with

3 authenticity.  We've stipulated to the authenticity of

4 their Facebook exhibits, and so I don't see how that

5 can be excluded from this trial.  It's a very clear

6 exception to the hearsay rule.

7         THE COURT:  Well, the question is whether the

8 present sense exception for forward-looking information

9 as an exception to the hearsay rule trumps the rule

10 against admissibility of exculpatory statements by a

11 defendant absent his testifying.

12         MR. SEARS:  Well, Your Honor, my reading of

13 the rule -- and I have the case -- the most famous case

14 on this point is the *Lentz* case, which is one of the

15 most famous cases in this courthouse.

16         THE COURT:  Right.

17         MR. SEARS:  My understanding of the case law

18 is that as long as it's at real time and reflects what

19 his intent or plan is in the very near future, it comes

20 in, and I think --

21         THE COURT:  I understand.

22         MR. SEARS:  Okay.  The other issue I wanted

23 to raise, Your Honor, which is not related to an

24 exhibit, is obviously Sergei Millian is a central

25 figure in this case, and he is not going to be here, as

1    I understand it.  And that's kind of a third rail in

2    this trial to some extent, and we've been very careful

3    about how we talked about that fact, about the fact

4    that he's not here.  I'm not asking for a missing

5    witness instruction, not jumping up and down in opening

6    statement about how he won't even be here, etc.

7              The government, however -- through the

8    questioning yesterday, he started to elicit information

9    from Mr. Auten about the fact that he's a dual national

10   and not here.  I think that's creating a misimpression

11   of the fact that it's not like he's been gone.  He

12   wouldn't cooperate.  He wouldn't agree to be

13   interviewed by the special counsel.  He wouldn't agree

14   to be interviewed by Congress.  He totally wanted

15   nothing to do with this investigation.

16             And I feel like the government has opened the

17   door somewhat to that because it's creating a

18   misimpression that he's gone and untouchable and no one

19   can talk to him.  And that's not really the history of

20   this case.

21             He's been given plenty of opportunities up

22   until just recently to be interviewed.  The FBI was

23   contacting him back there in 2017 via Skype.  We have

24   those messages, and he would decline to meet with them.

25   And we've stayed away from that.  And, obviously, if

1   you go into that, that does open the door to the fact

2   that he was interviewed more recently.

3          And so I just wanted to raise that issue for

4   the Court because I have a concern about that line of

5   questioning creating that impression, that it makes it

6   sound as if no one has been able to ever talk to him.

7   That's not really true.  They've been able to talk him.

8   He's just refused to talk to them until very recently.

9   And I don't know what to do with it at this point, and

10  I want to think about it some more.  But I want to flag

11  it for the Court and, frankly, flag it for the

12  government because I thought that that was starting to

13  encroach into an area that might be improper.

14          THE COURT:  All right.

15          MR. SEARS:  Thank you.

16          MR. DURHAM:  Your Honor, if I may.

17          THE COURT:  Yes.

18          MR. DURHAM:  Just to Mr. Sears' last point

19  and point of fact, to our knowledge, Mr. Millian is

20  outside the country.  We did talk to Mr. Millian.

21  Mr. Millian, as he has done in other ways previously,

22  says that he never called Mr. Danchenko and spoke to

23  Mr. Danchenko.  He's not willing to come back to the

24  United States because -- and this is his assertion,

25  that he's concerned for his physical safety.  He

1    indicates that his family has been threatened and the

2    like, and so he's not inclined to come back.

3            We had talked to him about the possibility

4    under the federal rules of doing some type of

5    deposition and whatnot.  We proposed that to counsel.

6    Understandably, counsel is not amenable to that.  But

7    nobody should be left with the impression that Millian

8    hasn't been willing to talk to us.  He certainly has

9    spoken to us.  He's told us what he's said, that he did

10   not have any conversation with Mr. Danchenko.  He

11   doesn't know Mr. Danchenko and the like.  He's simply

12   not willing to give up his current location and whatnot

13   for fear of his safety.  So that's to that point.

14           With respect to the question of present sense

15   impression, I'm not exactly sure how the defendant

16   establishes the evidence of -- I'm sorry, sense

17   impression or state of mind if the defendant doesn't

18   testify, which, of course, he has a constitutional

19   right not to do.  But I think that that in the normal

20   course would be how you would go about laying the

21   foundation for that.

22           THE COURT:  He wants the inference from the

23   statement in the email that he intends to --

24           MR. DURHAM:  That's what he wants.  He's

25   offering it for the truth --

1          THE COURT:  Right.

2          MR. DURHAM:  -- which is a pure hearsay

3    statement.

4          THE COURT:  Right.  But if it's truly a

5    forward-looking statement reflecting state of mind,

6    there's an exception for the hearsay rule; isn't it?

7          MR. DURHAM:  I don't think so, but I'll

8    research that.

9          THE COURT:  All right.  We'll look at that.

10         MR. DURHAM:  Yeah.

11         THE COURT:  All right.

12         MR. DURHAM:  Thank you, Your Honor.

13         THE COURT:  Do you intend to make any further

14   inquiry of Mr. Auten about Mr. Millian and where he is

15   or anything like that?

16         MR. DURHAM:  Not as to where he is.  In fact,

17   we've communicated through his counsel, but we don't

18   know exactly where he is.  We know he's outside the

19   country.

20         THE COURT:  All right.  Anything else?

21         MR. ONORATO:  No, Your Honor.

22         THE COURT:  I'll rule on these as they're

23   presented.

24         All right.  Let's bring the jury in.

25         (The jury enters at 9:39 a.m.)

1            THE COURT:  Please be seated.  Good morning.
2  We are now ready to proceed.
3            Mr. Auten will return to the witness stand,
4  please.
5            THE COURT SECURITY OFFICER:  He is on his way
6  in, Your Honor.
7            THE COURT:  Mr. Auten, you remain under oath.
8            THE WITNESS:  Yes.
9            THE COURT:  Mr. Durham.
10           MR. DURHAM:  Thank you, Your Honor.
11                 FURTHER DIRECT EXAMINATION
12  BY MR. DURHAM:
13  Q    Mr. Auten, again, I'm going to ask you to make
14  sure you keep your voice up so the jurors can hear you
15  and listen carefully to the questions and answers to
16  the best of your ability.  Okay?
17  A    Yes.
18  Q    I want to try and pick up where we left off
19  yesterday.  You had been asked a series of questions
20  relating to the interview that you and Special Agent
21  Somma had done with Mr. Danchenko in January 2017.  Do
22  you recall that?
23  A    I do.
24  Q    And the first date of January 24, 2017, you had
25  given the jurors your recollection of what it is that

1 Mr. Danchenko said the first day of the interview

2 relating to Mr. Millian and a certain purported call.

3 Do you recall that?

4 A    I do.

5 Q    Just to get everybody back on track, the first day

6 you had said that he had sent two emails, no response,

7 and then got an anonymous call from somebody speaking

8 with a Russian accent and it was male, correct?

9 A    That is correct.

10 Q    Do you recall, sir -- with respect to what it is

11 that Mr. Danchenko said, did he say what kind of

12 telephone facility he received the call on, that is, a

13 hard line?  A cell phone?  Do you recall?

14 A    My recollection is he said a call.

15 Q    Do you remember with any more specificity what

16 type of telephone device was involved or not?

17 A    I don't have a recollection as to what type of

18 telephone device.

19          MR. DURHAM:  Okay.  Can I have just one

20 moment, Your Honor?

21          Give me 100, please.

22          Could the court security officer see if the

23 witness has Government's Exhibit 100?

24          THE WITNESS:  I have a version.

25

1  BY MR. DURHAM:

2  Q    You have a version of it.

3       What you have in front of you is the portion

4  relating to Report 95, correct?

5  A    100, sorry.

6  Q    The excerpt you have relates to -- on page 19 --

7  starting on page 19 going to 20?

8  A    Yes, correct.

9  Q    And will you take a look at that and see if it

10 refreshes any recollections on either the 24th or the

11 25th, which then appears at 37 as to what kind of

12 device he purportedly received a phone call?

13 A    On page 20 -- this would have been the 24th -- it

14 says "phone call."

15 Q    All right.  And then on the 25th, does he give

16 further information on what kind of facility?

17           MR. ONORATO:  Can I object for a minute, Your

18 Honor?  Can we approach?

19           THE COURT:  I'm sorry?

20           MR. ONORATO:  Can we approach?

21           THE COURT:  Yes.

22           Are you ready to proceed?

23           MR. ONORATO:  Oh, I'm okay.

24           THE COURT:  All right.

25 BY MR. DURHAM:

1 Q    You have no recollection as to what kind of phone

2 it was that he supposedly received the call on?

3 A    No.

4 Q    And then on -- so he received this call, correct?

5 And then he went back to that issue -- well, let me

6 withdraw that.

7       Then that occurred in late July according to

8 Mr. Danchenko?

9 A    Yes.

10 Q    And then on the 25th, the next day, you -- so

11 we're getting towards the very end of the day -- you

12 had indicated that you said he had gotten -- he had

13 sent one email, correct?

14 A    Correct.

15 Q    And then he got a call?

16 A    Correct.

17 Q    And it was only at a later point in time in

18 September that he had sent a second email?

19 A    Correct.

20 Q    And, again, just to try to reorient folks, the

21 phone call that Mr. Danchenko said that he had received

22 lasted 10 to 15 minutes; that's what he said the second

23 day?

24 A    Correct.

25 Q    But, again, the meeting occurred toward the end of

1  July according to Mr. Danchenko?

2  A    Correct.

3  Q    To the best of your recollection, did you and/or

4  Special Agent Somma go back to this issue on the third

5  day of the interview, that is, on January 26?

6  A    My recollection is no.

7  Q    I'm sorry?

8  A    No.

9  Q    Do you recall, sir, yesterday you had told the

10 jurors that when Mr. Danchenko started to be paid as an

11 informant for the FBI, that you or members of the group

12 that you were working with would provide questions to

13 Special Agent Helson to pose to Mr. Danchenko at

14 various times on various subject matters relating to

15 the dossier?  Do you recall that?

16 A    Yes.

17 Q    And that's still your recollection?

18 A    Yes.

19 Q    Do you recall whether or not at any point in time

20 among the questions that you had given to Special Agent

21 Helson to ask of Mr. Danchenko, whether they related in

22 any way to Sergei Millian?

23 A    I believe at one point -- I want to say in April

24 or May or June of 2017 -- I had analysts who had sent

25 emails or an email to Mr. Helson asking sort of some

1  clarification regarding Source D and Source E.

2  Q    Okay.  And then with respect to your conversations

3  or interviews of Mr. Millian in January of 2017, what,

4  to the best of your recollection, was it that

5  Mr. Danchenko said relating to what the caller that he

6  claims to believe was Millian said?

7  A    I'm sorry.  What --

8  Q    Sure.  With respect to what Mr. Danchenko told you

9  and Special Agent Somma in the January interview, what

10  was it that Mr. Danchenko said he learned from this

11  anonymous caller?

12  A    So from the anonymous call, he had learned

13  about -- material about the relationship between the

14  Trump campaign -- I'd have to go back and -- if I can

15  refresh my memory, it would be helpful.

16  Q    Sure.

17  A    Sure.  Okay.

18       Looking on the 24th --

19            MR. ONORATO:  Your Honor, I'm just going to

20  object.  I don't know if the witness is testifying from

21  his memory or reading from the document.  He can

22  refresh his recollection.  I have no problem with that.

23            THE COURT:  Let's have the question and see

24  if he can answer.  And then if he needs to refresh his

25  recollection, we can proceed in that fashion.

1  BY MR. DURHAM:

2  Q     Having looked at your own report, does that

3  refresh your recollection in any way, sir, as to what

4  it is that the defendant told you and Special Agent

5  Somma in the January interviews concerning what this

6  purported anonymous caller had said?

7  A     He had talked about a relationship between -- with

8  the Trump campaign and Russia and issues involving, I

9  think, kind of whether or not there was any

10 relationship and a kind of -- I don't think he used the

11 term "well-developed conspiracy" in that, but it was

12 along those lines.

13 Q     Okay.  And then you reported that and recorded

14 that in the report in preparing the interviews,

15 correct?

16 A     That is correct.

17 Q     Now, do you recall yesterday you were asked a

18 question about whether or not Mr. Danchenko had

19 provided any document or documents relating to

20 Mr. Millian and this series of emails that he had

21 spoken to you about?

22 A     Correct.

23 Q     And can you tell the ladies and gentlemen of the

24 jury how many, if any, emails Mr. Danchenko provided to

25 the FBI?

1   A     Emails regarding the Millian?

2   Q     Yes.

3   A     The only thing I can think of is the Russian email

4   that we talked about yesterday that was uploaded to

5   Sentinel.

6   Q     Okay.  So he provided that email -- it's

7   actually -- do you recall whether it's a

8   back-and-forth.  I mean it's one email, but is it back

9   and forth?

10  A     No, it's actually back and forth.

11  Q     Is that in English or Russian?

12  A     My recollection is that it was uploaded as

13  Russian.

14  Q     Okay.  Aside from that document as it relates to

15  Millian and any exchanges he had, he, Mr. Danchenko,

16  had with Millian provided no other document?

17  A     Not to my recollection, no.

18  Q     At any point in time up until today, did you have

19  occasion to learn that, in fact, there were emails that

20  Mr. Danchenko had sent to Mr. Millian?

21  A     Until we -- until preparation for trial, no.

22  Q     All right.  So in context you were shown them

23  fairly recently, correct?

24  A     Correct.

25  Q     Mr. Millian had never provided those to you?  I'm

1  sorry.  Mr. Danchenko had never provided those to you?

2  A    Correct.

3  Q    I want to show you and ask you to take a look at

4  what is premarked -- what are premarked as Government's

5  Exhibits 204, 204T, 205, 205T.  What I don't think is

6  in your book is --

7       (Counsel confer.)

8            MR. DURHAM:  We are going to ask about 206.

9  With the Court's permission, I'd ask that Mr. Auten be

10  provided with a copy of -- oh, it's in the book.  I'm

11  sorry.  It is.

12  BY MR. DURHAM:

13  Q    206.

14  A    I see 205, 205T, 207 -- oh, 206T in the back, yes.

15  Q    Okay.  And while you're there, just so you can see

16  that it's in there, would you look also at Government's

17  Exhibit 115, sir?

18  A    That is here as well.

19  Q    Okay.  And 115T?

20  A    Yes, correct.

21            MR. DURHAM:  Your Honor, at this time, before

22  we continue with the examination of Mr. Auten, I would

23  ask that two stipulations between the parties be

24  admitted.

25            THE COURT:  All right.

1           MR. DURHAM:  Those being Government's

2  Exhibit 1801 and 1802.

3           MR. ONORATO:  No objection, Your Honor.

4           THE COURT:  All right.  1801 and 1802 are

5  stipulations that will be provided to the jury.

6           MR. DURHAM:  With the Court's permission,

7  could I publish these to the jury?

8           THE COURT:  Yes.  Again, ladies and

9  gentlemen, you're going to hear a statement that's been

10  agreed to by the parties.  You may accept it as

11  sufficiently proven anything that's stated in that

12  stipulation.  However, it's up to you as to what weight

13  or whether you accept it.

14           MR. DURHAM:  Thank you, Your Honor.

15           Ladies and gentlemen, Government's

16  Exhibit 1801, as the Court has indicated, is a

17  stipulation, and it reads as follows.  I put it in the

18  written record, and you also have it on your monitors

19  so you can follow it.

20           It is hereby stipulated and agreed, by and

21  between the undersigned parties, that if called to

22  testify, a records custodian for Google LLC would

23  testify as follows:

24           Paragraph 1:  Government's Exhibits 203, 204,

25  205, and 207 -- and I think counsel would stipulate 206

1  as well --

2          MR. ONORATO:  Correct.

3          MR. DURHAM:  -- are true and accurate copies

4  of the contents of emails from account

5  milliangroup@gmail.com.

6          Paragraph No. 2:  Government's Exhibits 203,

7  204, 205, 206 as agreed to, I believe, Your Honor, and

8  207 are true and accurate copies of authentic business

9  records of Google LLC that were made at or near the

10  time of the acts and events recorded in them by a

11  person with knowledge and were prepared and kept in the

12  course of Google LLC's regularly conducted business

13  activity.  And it was the regular practice of Google

14  LLC to make such business records and the source of the

15  information where the methods and the circumstances of

16  preparation are trustworthy.  The parties stipulate to

17  the authenticity of Government's Exhibits 203, 204,

18  205, and now 206 and 207.

19          Paragraph No. 4 of the stipulation is

20  admissible as evidence at trial, dated Alexandria,

21  Virginia, October 11, 2022, signed by counsel for the

22  government and for the defense.

23          Government Exhibit 1802 is a second

24  stipulation, and it reads as follows:  It is hereby

25  stipulated and agreed, by and between the undersigned

1  parties, that if called to testify, an interpreter with

2  expertise in translating Russian to English would

3  testify as follows:

4         Paragraph No. 1:  The government's exhibits

5  listed in Column A of Attachment 1 to this stipulation

6  contain true and accurate Russian to English

7  translations of the Russian written communication

8  identified in the corresponding row of Column B of

9  Attachment 1.  The parties stipulate to the

10  authenticity of the exhibits listed in Column A of

11  Attachment 1.

12         Paragraph No. 3:  This stipulation to

13  Attachment 1 is admissible as evidence at trial.

14         It's signed by government counsel and by

15  defense counsel.

16         And then the second page reads Attachment 1

17  to stipulation, and then the Columns A and B for the

18  respective exhibit numbers under them, including those

19  we just mentioned, Government's Exhibits 115, 115T,

20  204T, 204, 205T, 205, and 206 and 206T, 207T and 207.

21  The remaining items in the column we will offer

22  shortly, but the stipulation, again, stipulates to the

23  authenticity of these records for Government's

24  Exhibit 605T and Government's Exhibit 610T,

25  Government's Exhibit 610, Government's Exhibit 612T,

1   Government's Exhibit 612.

2   BY MR. DURHAM:

3   Q    So, Mr. Auten, with respect to what the jury just

4   heard, you understand that essentially these are

5   business records that are being offered and kept by

6   Google?

7   A    Yes.

8   Q    And then the translations are from the original

9   Russian into English?  You understand that?

10  A    I understand.

11  Q    So I want to ask you, if you would, sir, first,

12  with respect to Government's Exhibits 204 and 204T to

13  ask you to take a look at those.

14  A    Yes.

15  Q    Do you recognize what is currently marked as

16  Government's Exhibits 204 and 204T for identification?

17  A    Yes, I recognize these.

18  Q    And with respect to what's contained in

19  Government's Exhibit 204 and 204T prior to your being

20  shown these exhibits fairly recently, had you ever seen

21  these before?

22  A    No.

23  Q    So with respect to 204, just generically, what is

24  Government's Exhibit 204?

25  A    204 is an email from Mr. Danchenko to

1  milliangroup@gmail.com.  It's dated July 21, 2016, and

2  it is in Russian.

3  Q    And then the corresponding Government's Exhibit

4  204T, what is that?

5  A    It is a translation of the same email from

6  Mr. Danchenko to milliangroup@gmail.com on July 21,

7  2016.

8  Q    Now, you told the jurors that Mr. Danchenko had

9  told you and Somma that he had sent an initial email to

10  Mr. Millian, correct?

11  A    Correct.

12  Q    But you never received that from Mr. Danchenko?

13  A    Correct.

14          MR. DURHAM:  We would offer 204 and 204T.

15          THE COURT:  Any objection?

16          MR. ONORATO:  No.

17          THE COURT:  Without objection, 204 and 204T

18  are admitted.

19          MR. DURHAM:  I would ask Mr. Arsenault to

20  pull up 204.  Blow it up so the jurors can see it's in

21  Russian.

22          And then with respect to Government's

23  Exhibit 204T, would you pull that up and blow it up as

24  much as you can so that the jurors can read it.

25

1  BY MR. DURHAM:

2  Q    And is your monitor working, or do you have the

3  document in front of you?

4  A    My monitor is working.

5  Q    First, let me ask you again.  Now that the exhibit

6  is a full exhibit, what is Government's Exhibit 204T?

7  A    It is an email between Mr. Danchenko and

8  milliangroup@gmail.com, dated July 21, 2016.

9  Q    And then, again, the jurors can see this, but for

10 purposes of the written record, would you read this

11 into the record, sir.

12 A    Yes.  "Hello, Sergey!  Colleagues from RIA Novosti

13 gave me your contact information.  You spoke with

14 Dmitriy Zlodorev about Donald Trump and his trips to

15 Russia.  I wanted to ask you:  What projects was he

16 looking into or these were just image-building trips

17 for beauty contests?

18     "There's been a lot of speculation for months now

19 on this topic.  It would be interesting to chat about

20 this topic.  The question is from a construction

21 company from Switzerland.

22     "I think a political component exists, but it can

23 be counterbalanced.  Russian-Chinese cooperation is

24 also of great interest, the sanctions aspect included.

25 There are projects in Russia which are looking for

1  investors and equipment supplier.  Like many others in

2  Russia, they are looking at Asia, China and Hong Kong,

3  but they don't know how to approach.

4      "It's confidential of course -- I don't have any

5  relationship to the media, though of course I do have

6  acquaintances there.

7      "In any case, it would be interesting if and when

8  possible to chat with you by phone or meet for

9  coffee/beer in Washington or in New York where I will

10  be next week.  I myself am in Washington.  It is also

11  possible by email in Russian or in English.

12      "I sent you a request to LinkedIn -- there my work

13  is clearer.

14      "Sincerely, Igor."

15  Q    And then there's a signature block, correct?

16  A    Correct.

17  Q    Yesterday shortly before we broke I had asked you

18  some questions relating to what Mr. Danchenko had told

19  you concerning this call that he purportedly had

20  received and then plans were made to meet in New York.

21  Do you remember that?

22  A    I do.

23  Q    I think you had indicated -- what did you tell the

24  jury your impression was based on what Mr. Danchenko

25  told you regarding that meeting?

1   A     If I recall correctly, it was going to be -- after

2   the email and that there was plans to go up to New York

3   to meet with Mr. Millian.

4   Q     And do you recall, sir, then looking at

5   Government's Exhibit 204T?  It reads, does it not, "In

6   any case, it would be interesting if and when possible

7   to chat with you by phone or meet for coffee/beer in

8   Washington or in New York where I will be next week,"

9   correct?

10   A     Correct.

11   Q     To the best of your recollection, when

12   Mr. Danchenko is telling you about this purported

13   anonymous call, did he tell you that he had plans to be

14   in New York the next week, or was he telling you that

15   as a result of the call, he was going to go to New York

16   and meet with this caller?

17   A     It's my recollection that he did not say he

18   already had preexisting plans to go to New York.

19   Q     Okay.  Now, I want to focus your attention, if I

20   might, to the bottom portion, the signature block of

21   Government's Exhibit 204T.

22         MR. DURHAM:  I would ask Ms. Arsenault if

23   maybe we could blow that up a little bit larger for the

24   jurors.

25

1  BY MR. DURHAM:

2  Q     And that's on your screen, correct?

3  A     Correct.

4  Q     Will you read into the record that signature

5  block.

6  A     "Igor Danchenko, Business Analyst, Target Labs,

7  Incorporated, 8320 Old Courthouse Road, Suite 200,

8  Vienna, Virginia, 22182.  Office +1-703-891-5000.  Cell

9  +1-202-679-5323:  Igor@targetlabs.net."

10  Q     Is there anything anywhere in this document,

11  Government's Exhibit 204T, Mr. Danchenko's initial

12  outreach to Millian, that says anything about the use

13  of apps?

14  A     In the signature block, no.  And the only app I

15  believe that's mentioned is LinkedIn, which is the last

16  line of 204T in the letter.

17  Q     And LinkedIn isn't communication -- verbal

18  communication, correct?

19  A     Not to my knowledge, no.

20  Q     Right.  So nothing in here about contact me using

21  an app or anything of that sort?

22  A     According to the block, no.

23  Q     Okay.  I want to ask you, if you would, sir, to

24  take a look at what we have premarked as Government's

25  Exhibits 205 and then 205T.

1    A    Yes.

2    Q    And what is Government's Exhibit 205 -- what are

3    Government's Exhibits 205 and 205T?

4    A    205 is from -- well, it is a two-part thing.  It's

5    a forwarded message and with a response with the

6    forwarding message.  And so it is from Sergio Millian

7    to Dmitri Zlodorev.  The date is Tuesday, July 26,

8    2016, at 9:33 a.m.  And Exhibit 205, it is in Russian.

9    Q    And 205T?

10   A    205T is, again, a forwarded message, the July 21st

11   forwarded with a response.  It's from Sergei Millian at

12   milliangroup@gmail.com -- excuse me, Sergio Millian at

13   milliangroup@gmail.com to Dmitri Zlodorev on July 26,

14   2016.

15   Q    All right.  So Government's Exhibit 204T is the

16   email -- is an email from the defendant to Millian

17   dated July 21st, correct?

18   A    Correct.

19   Q    2016?

20   A    Correct.

21   Q    Government's Exhibit 205 and then 205T is then an

22   exchange between Millian and Zlodorev, correct?

23   A    Correct.

24   Q    And with respect to 205T, it has the date on it,

25   correct?

1  A     Correct.

2  Q     Signatures and whatnot or salutations and the

3  like; is that right?

4  A     That is correct.

5          MR. DURHAM:  We would offer 205 and 205T as

6  exhibits, Your Honor.

7          MR. ONORATO:  No objection.

8          THE COURT:  All right.  Without objection,

9  205 and 205T are admitted.

10          MR. DURHAM:  So let's -- if we might,

11  Ms. Arsenault, go to first Government's Exhibit 205.

12  Just blow that up, if you would, so that the jurors can

13  see that.

14  BY MR. DURHAM:

15  Q     And, Mr. Auten, would it be a fair statement that

16  Government's Exhibit 205, again, is in Russian?

17  A     Correct.

18  Q     But it's from Millian to Zlodorev, correct?

19  A     Correct.

20  Q     And the date, again, for the written record is

21  what?

22  A     July 26, 2016.

23  Q     Okay.  And then looking at Government's

24  Exhibit 205T, what is 205T?

25  A     205T is the English translation of that

1   interaction.

2   Q    Okay.  Will you read into the written record, as

3   the jurors follow, that what 205 -- well, let me

4   withdraw that.

5        When you look at the document itself, 205T, the

6   bottom part of the page, there's the email that

7   Mr. Danchenko sent to Millian on the 21st, correct?

8   A    Correct.

9   Q    And then at the top of Government's Exhibit 205T

10  is Millian now to Zloderev?

11  A    Correct.

12  Q    Five days later?

13  A    Correct.

14  Q    And would you read that into the record.

15  A    From:  Sergio Millian at milliangroup@gmail.com.

16       Sent:  Tuesday, July 26, 2016, 9:33 a.m.

17       To:  Dmitri Zlodorev.

18       Subject:  Forward:  Question about Trump, China.

19       Dmitriy, on Friday I'm returning from Asia.  An

20  email came from Igor.  Who is that?  What sort of

21  person?

22       Sergey.

23  Q    Now, with regard to that email from Millian to

24  Zloderev, you didn't have occasion to see that prior to

25  being shown this document recently?

1    A    No.

2    Q    With regard to Millian saying that on Friday he's

3    returning from Asia and the like, do you know whether

4    you or other members of your group had ever retrieved

5    Millian's travel records to see if he was even in the

6    United States on -- in the latter part of July 2016?

7    A    I don't recall that.

8    Q    Would it surprise you to learn that he wasn't even

9    in the United States?

10   A    I mean, he says he's in Asia.

11   Q    Okay.  Now, I want to turn your attention, if I

12   might, sir, to Government's Exhibit 207 and then

13   Government's Exhibit 207T.

14              THE COURT:  Are you moving into evidence 206?

15              MR. DURHAM:  Oh, I'm sorry.  Yes, Your Honor.

16              MR. ONORATO:  No objection, Your Honor.

17              THE COURT:  All right.  206 is admitted, and

18   206T is admitted as well.

19   BY MR. DURHAM:

20   Q    Do you have 207 and 207T in front of you, sir?

21   A    I do.

22              MR. DURHAM:  I got my emails out of order,

23   Your Honor.  So we move in 205.

24   BY MR. DURHAM:

25   Q    206 -- let me ask you to take a look at 206 and

1  206T.

2  A     Yes.

3  Q     I apologize for the confusion.

4        Do you recognize 206 and 206T?

5  A     I do.

6  Q     And with respect to 206, what is 206?

7  A     206 is an email between Dmitri Zloderev and Sergio

8  Millian on July 26, 2016, at 10:06 a.m.

9  Q     And 206 is in what language?

10 A     It is in Russian.

11 Q     And if you look at Government's Exhibit 206T, what

12 is 206T?

13 A     It is a translation of 206, again, an email from

14 Dmitri Zloderev dated Tuesday, July 26, 2016, to Sergio

15 Millian, and the subject is Re:  Forward:  Question

16 about Trump, China.

17            MR. DURHAM:  Okay.  We move 206 and 206T as

18 full exhibits, Your Honor.

19            THE COURT:  All right.

20            MR. ONORATO:  No objection.

21            THE COURT:  All right.  Admitted.

22            MR. DURHAM:  Now, if I might, just before we

23 go to 206, Ms. Arsenault, if you could, go to 205 and

24 blow up the header, the from, to, the date, and the

25 time.

1  BY MR. DURHAM:

2  Q    All right.  Would you read that into the written

3  record what the jury is reading now.  This is, again,

4  the sort of header on Government's Exhibit 205.  What

5  is the time and the date?

6  A    Sorry.  It disappeared.

7       The date and time is Tuesday, July 26, 2016,

8  9:33 a.m.

9  Q    Okay.  And then going now to 206, that was from

10 Millian to Zlodorev, correct?

11 A    That is correct.

12 Q    Now, you go to 206.  This is Zlodorev to Millian;

13 is that correct?

14 A    That is correct.

15 Q    What's the -- what are the time and date of this

16 exhibit, 206?

17 A    It is, again, July 26, 2016, 10:06 a.m.

18 Q    So like half an hour later Mr. Zlodorev responds

19 to Millian, correct?

20 A    Correct.

21 Q    And the jurors can read 206T, but would you read

22 it into the record, sir.

23 A    From:  Dmitri Zlodorev.

24    Sent:  Tuesday, July 26, 2016, 10:06 a.m.

25    To:  Sergio Millian.

 1      Subject:  Re:  Forward:  Question about Trump,

 2  China.

 3      Sergio, hello,

 4      Do you remember I said that a friend of my

 5  colleague wanted to get acquainted with you?  You gave

 6  permission to give your email.  The way I understand

 7  it, this is who this is.  He and I are not personally

 8  acquainted; though, he is, it seems, in my LinkedIn.

 9  And I didn't know what he wanted to talk about.  If I

10  remember correctly, he works at some think tank in

11  Washington.

12  Q    Okay.  That's July 26 of 2016, correct?

13  A    Correct.

14  Q    Had you seen that email prior to recent days?

15  A    No.

16  Q    Now, I'll ask you to take a look at Government's

17  Exhibit 207 and 207T.  What is 207, sir?

18  A    207 is an email from Mr. Danchenko on Thursday,

19  August 18, 2016, to milliangroup@gmail, as well as

20  sergio@russianamericanchamber.com.

21  Q    And with respect to Government's Exhibit 207, is

22  that in Russian or English?

23  A    It is in Russian.

24  Q    And 207T, is that in Russian or English?

25  A    207T is in English.

1  Q     Now, you have told the jurors that Mr. Danchenko

2  had told you he sent one email, correct?

3  A     Correct.

4  Q     And then the first day is only after the second

5  email that he received this purported call, correct?

6  A     Correct.

7  Q     The second day he said it was after the first

8  email?

9  A     Correct.

10  Q     In both instances, he said the call that he claims

11  to have perceived came in late July, correct?

12  A     Correct.

13  Q     The date of Government's Exhibit 207, 207T is

14  August 18, 2016, correct?

15  A     Correct.

16         MR. DURHAM:  We move 207 and 207T as full

17  exhibits, Your Honor.

18         THE COURT:  Any objection?

19         MR. ONORATO:  No objection.

20         THE COURT:  Without objection, 207 and 207T

21  are admitted.

22  BY MR. DURHAM:

23  Q     So let's start again with 207, and Ms. Arsenault

24  can pull up just the headers so we can see the time and

25  date and the like.

1      Would you read that into the record, sir, just the

2  header.

3  A    From:  Igor Danchenko.

4      Sent:  Thursday, August 18, 2016, 12:33 p.m.

5      To:  Milliangroup@gmail.com and

6  sergio@russianamericanchamber.com.

7      Subject:  I can try it, but I'm not -- it's in

8  Russian.

9  Q    The subject is in Russian, correct?

10  A    Correct.

11  Q    All right.  And the balance of the letter or --

12  I'm sorry, the email, 207, is in Russian?

13  A    Correct.

14  Q    I would ask you to take a look down at

15  Government's Exhibit 207T.  Again, the header is the

16  same, the date being what?

17  A    August 18, 2016.

18  Q    Now, with respect to the second email that

19  Mr. Danchenko said that he had sent to Millian, do you

20  recall whether or not the night of the first or the

21  second day he made reference to using some kind of a

22  ruse talking in the email about investments in Russia

23  or the like?

24  A    Yes, I recall that.

25  Q    If you need to refresh your recollection, please

1  do so.  But with respect to when he claims that that

2  second email had been sent, when was that?

3  A    I believe he said it was in September.

4  Q    But the subject matter was real estate or

5  investment and the like, correct?

6  A    Yes, correct.

7  Q    All right.  So I want, then, to ask you to read

8  along -- into the record -- the jurors obviously can

9  follow -- the email that Mr. Danchenko sent to the

10 Millian group email address on August 18, 2016.  Now, I

11 take it there's no disagreement that August 18, 2016,

12 is not late July of 2016, correct?

13 A    No disagreement.

14 Q    Okay.  So this email dated August 18, 2016, would

15 you read that into the record.

16 A    From:  Igor Danchenko.

17     Sent:  Thursday, August 18, 2016, 12:33 p.m. to

18 milliangroup@gmail.com and

19 sergio@russianamericanchamber.com.

20     Subject:  Question regarding land in the

21 Kaluzhskaya Oblast, short meeting in NY or DC.

22     Attachments:  Trubetskoye1.jpeg;

23 Trubetskoye2.jpeg; Trubetskoye3.jpeg;

24 Trubetskoye4.jpeg; Trubetskoye5.jpeg;

25 Trubetskoye6.jpeg; Trubetskoye7.jpeg;

1   Trubetskoye8.jpeg.

2       Hello, Sergey.

3       I wrote you several weeks ago.  We are contacts on

4   LinkedIn.

5       There is a proposal regarding a plot of land in

6   the Kaluzhskaya Oblast, not far from Novaya Moskva.

7   I'm attaching information in a separate letter.  My

8   lawyer friends are selling.  They have asked me more

9   than once to extend an offer to someone.  I thought

10  that it might be of interest to you or your contacts.

11      The registered land value is around 300 million

12  rubles and, therefore, the market value is a little

13  higher.  The intermediary's share can be factored into

14  the sale from the start.  I'm attaching eight JPEGs.

15      If there is opportunity and interest, let's meet

16  and chat about this and other projects.  The other

17  projects also envision investments at existing sites,

18  but it's production there.  And in some cases,

19  technology is needed and in others -- investment.

20  Rates in Russia are high.  You yourself know, so I'd

21  like to mull over some uncomplicated and profitable

22  scenarios.  Write, call.  My contact information is

23  below.  Sincerely, Igor.

24  Q    Read that into the record.

25  A    Igor Danchenko, Business Analyst, Target Labs

1  Incorporated, 8320 Old Courthouse Road, Suite 200,

2  Vienna, Virginia, 22182, +1-202-679-5323,

3  igor@targetlabs.net, igordanchenko@hotmail.com.

4  Q    Now, looking at this letter, the body of the

5  letter -- I'm sorry -- the body of the email itself, is

6  that consistent or inconsistent with what Mr. Danchenko

7  had said about another or a second outreach to Millian

8  talking about possible investments?

9  A    This appears to be consistent with that.

10  Q    In the last paragraph of this email dated

11  August 18, 2016, it states, "Write, call.  My contact

12  information is below."  Did I read that correctly?

13  A    That is correct.

14  Q    With respect to the body of the letter -- and I'll

15  get to the signature block in a moment.  But as to the

16  body of the letter, does Mr. Danchenko say anything

17  about any apps that he uses or the like?

18  A    No.

19  Q    And in looking at the signature block,

20  Mr. Danchenko was providing a telephone number, two

21  email addresses, correct?

22  A    Correct.

23  Q    An address?

24  A    Correct.

25  Q    Any reference to any kind of app?

1  A     No.

2  Q     And going to the top of the letter, now, this is

3  dated August 18, 2016, correct?

4  A     Correct.

5  Q     And he opens the letter -- the email by saying,

6  "Hello, Sergey.  I wrote you several weeks ago.  We are

7  contacts on LinkedIn," correct?  That's the way it's

8  written?

9  A     Correct.

10  Q     Is there anything in the body of this letter

11  about, you know, "I haven't heard from you when we were

12  supposed to meet in New York," or anything at all like

13  that?

14  A     No.

15  Q     Is there anything in this letter about "I'm

16  confused by your telephone call"?  Nothing like that?

17  A     No.

18  Q     This is just straight, "I wrote you several weeks

19  ago," period?

20  A     Correct.

21  Q     No reference to him having been contacted by

22  Mr. Millian, correct?

23  A     Correct.

24  Q     And this is August 18, 2016?

25  A     Correct.

1  Q     Next, I want to ask you to take a look at

2  Government's Exhibit 115.  Do you have 115 in front of

3  you?

4  A     I do.

5  Q     And 115T, do you have that in front of you?

6  A     Yes.

7  Q     With regard to Government's Exhibit 115, what is

8  it, sir?

9  A     115 is a copy of messages sent -- it looks like

10 from Dmitri Zlodorev to Igor Danchenko, as well as --

11 yeah, it looks like maybe back and forth.

12 Q     As to Government's Exhibit 115, is that document

13 written in English or some other language?

14 A     It is in Russian.

15 Q     Looking at Government's Exhibit 115T --

16 A     Yes.

17 Q     -- do you recognize what it is?

18 A     Yes.

19 Q     And what is 115T?

20 A     It is an English translation of 115.

21 Q     With respect to 115T, does it bear a date?

22 A     It does.  There were two dates on this.

23 Q     What are the dates?

24 A     The dates are 8/24/2016 -- it says 8/24/16,

25 8/25/16.

1   Q     With regard to the people whose names appear on

2   Government's Exhibit 115 and 115T, who are those

3   people?

4   A     Dmitri Zlodorev and Igor Danchenko.

5   Q     With respect to 115 and 115T, do you recall, sir,

6   your prior testimony that at some point in time at or

7   about the time of the January 2017 interviews of

8   Mr. Danchenko by yourself and Mr. Somma, he had

9   provided a document that got uploaded into the system?

10  A     Yes.

11  Q     And do you recall whether or not Government's

12  Exhibit 115 appears to be a copy of what Mr. Danchenko

13  had provided to the bureau?

14  A     That is correct.

15  Q     Now, with respect to Government's Exhibit 115T,

16  that's a translation of 115; is that correct?

17  A     That is correct.

18  Q     Tell the ladies and gentlemen of the jury whether

19  or not, to your knowledge, the bureau ever even

20  translated --

21            MR. ONORATO:  Objection to relevance.

22            THE COURT:  I'm sorry.  What's the question?

23            MR. DURHAM:  I didn't complete it, but the

24  question is whether or not to this witness' personal

25  knowledge the government translated -- the FBI

1    translated Government's Exhibit 115 at or about the

2    time it was received.

3              THE COURT:  All right.  I'll let him answer

4    that.

5    A    I'm not aware if it was translated.

6    Q    Looking at Government's Exhibit 115T, however, you

7    know that at some point it was translated, correct?

8    A    Correct.

9    Q    Do you know if that translation was done by the

10   bureau or others?

11   A    I don't know who did this translation.

12             THE COURT:  Has this been moved into evidence

13   yet?

14             MR. DURHAM:  I'm going to move it now.

15             THE COURT:  Is there any objection to 115?

16             MR. ONORATO:  No, Your Honor.

17             THE COURT:  All right.  115 and 115T are

18   admitted.

19             MR. DURHAM:  Thank you, Your Honor.

20             Now, Ms. Arsenault, if you would, just pull

21   up 115 by itself just briefly.

22   BY MR. DURHAM:

23   Q    Mr. Auten, looking at Government's Exhibit 115,

24   tell the jurors again what 115 is.

25   A    In Russian, messages back and forth with Dmitri

1  Zlodorev and Igor Danchenko.

2  Q    And this document was received sometime around the

3  time of the January 2017 interviews of Mr. Danchenko?

4  A    Sometime around there, yes.

5  Q    And Mr. Danchenko provided this document?

6  A    As far as I understand, yes.

7         MR. DURHAM:  And then, Ms. Arsenault, if you

8  would be so good as to pull up Government's

9  Exhibit 115T.  And if you could, start with the upper

10 two-thirds, upper portion, maybe a little bit more down

11 to the signature block.

12 BY MR. DURHAM:

13 Q    As the jurors are reviewing Government's Exhibit

14 115T at the top, will you read into the written record

15 the translation of the document marked Government's

16 Exhibit 115.

17 A    Do you want me to start from top to bottom, or do

18 you want me to start from the earlier email to the

19 later email?

20        MR. DURHAM:  Can I have just one moment, Your

21 Honor?

22     (Counsel confer.)

23        MR. DURHAM:  I think we're fine, Your Honor.

24 BY MR. DURHAM:

25 Q    If you would, read into the record the top part of

1  Government's Exhibit 115T.

2  A    The top says, Question concerning Sergey Millian,

3  meeting.  Dmitri Zlodorev to Igor Danchenko, 8/24/16,

4  details.

5      Igor, hello.

6      Sergey Millian asked me a couple of weeks ago who

7  Igor Danchenko is.  I had told him earlier, but he

8  apparently forgot.  At that time, he wrote to me from

9  South Korea.  The thing is that he, based on his own

10  words, now spends more time in Asia than in America.

11  Try to write to him once again.  I simply know that he

12  is constantly traveling and could actually have

13  forgotten.  And well, you and I could certainly meet.

14  Let's try in Washington.

15  Q    Now, that's a response by Zlodorev to

16  Mr. Danchenko who had written a little bit earlier,

17  correct, on the 24th?

18  A    Correct.

19         MR. DURHAM:  And then if Ms. Arsenault would

20  go to the middle portion of Government's Exhibit 115T.

21  BY MR. DURHAM:

22  Q    And if we could, read that into the record.

23  A    8/24/2016, 12:40, Igor Danchenko,

24  igordanchenko@hotmail.com.

25      Good afternoon, Dmitriy.

1          Aleksey Bogdanovskiy recommended that I get in

2    touch with Sergey Millian.  I've read your interviews

3    with him.  But for some reason Sergey doesn't respond.

4    I already both asked him about Trump and also proposed

5    a project in Russia.  What is your relationship with

6    him like?  Would you be able to ask him to reply to me?

7    I could call or write on LinkedIn, but until he

8    responds, I would not like to pester him.  By the way,

9    you and I are also contacts there.

10         It would also be very interesting for me to meet

11   with you.  There's always something to talk about.  I'm

12   in the center of Washington and sometimes in Manhattan.

13   Well, and in Moscow and London on short trips.

14         Thanks!

15         My contact information is below.  You can use

16   email or cell phone.

17         Vienna, Virginia 22182, +1-202-679-5323,

18   igordanchenko@hotmail.com.

19   Q    So now, looking at 115T, Mr. Danchenko had reached

20   out to Dmitri Zlodorev, right?

21   A    Correct.

22   Q    On August 24, 2016, at 12:40?

23   A    Correct.

24   Q    And he says to Zlodorev, "I've read your

25   interviews with him but for some" -- withdrawing.

1        It starts out that he, a particular person, had
2    recommended that I get in touch with Sergey Millian.
3    I've read your interviews with him, but for some
4    reason, Sergey doesn't respond.
5        Did I read that correctly?
6    A    Correct.
7    Q    Does it say anything there about he only called me
8    anonymously?
9    A    No.
10   Q    Does it say anything in there about, "Oh, I was
11   supposed to meet him in New York, but he didn't show
12   up"?
13   A    No.
14   Q    And with respect to the signature block or at the
15   bottom of that email sent at 12:40, what is the
16   information that Mr. Danchenko was providing in this
17   instance to Mr. Zlodorev?
18   A    He is providing a telephone number, as well as an
19   email address at hotmail.
20   Q    No applications or anything of that sort
21   mentioned?
22   A    No.
23   Q    Do you, sir, know, based on your own personal
24   knowledge, whether or not when Mr. Danchenko wanted to
25   talk to somebody on an app he would let them know that

1  he wants to talk to them on an app?

2  A    I have no knowledge of that.

3  Q    No knowledge?

4  A    No.

5  Q    Okay.  And then at the top of Government's

6  Exhibit 115T, Zlodorev responds to that email saying

7  that Millian had asked Igor Danchenko:  I told him

8  earlier, but he apparently forgot and then goes on.  He

9  travels a lot.  He's in South Korea and the like.

10 Correct?

11 A    Correct.

12 Q    And he urges -- tells Mr. Danchenko that he should

13 reach out to him again, but Millian is constantly

14 traveling?

15 A    Correct.

16 Q    And then let's go to the very bottom of

17 Government's Exhibit 115T and read into the record what

18 the jurors can see on the monitors.  This is dated

19 what?

20 A    This is dated 8/25/16.

21 Q    Okay.  So the next day?  This is the next day?

22 A    Correct.

23 Q    And it's from who to who?

24 A    It is Dmitri Zlodorev to Igor Danchenko.

25 Q    And how does it read?

1  A    Igor, hello.  Tomorrow I'm working from home and

2  beginning Monday on vacation.  Therefore, let's do it a

3  little later.  Parentheses, parentheses, parentheses,

4  period, Dimitri.

5  Q    Okay.  So then with regard to these emails that

6  you have now reviewed with the jurors, I want to ask

7  you whether or not it would have been significant or

8  important to you based on what you had indicated you

9  were looking for -- I withdraw that.  It's getting too

10  convoluted.

11       Yesterday you told the jury that in meeting with

12  Mr. Danchenko, there were two things that you were

13  interested in, correct?

14  A    Correct.

15  Q    One of them was corroboration of information in

16  the dossier?

17  A    Correct.

18  Q    And the second was sources of information?

19  A    Correct.

20  Q    With respect to the emails that the jurors have

21  just seen from Mr. Millian -- not to Zlodorev but to

22  Mr. Millian -- I'm sorry -- Mr. Danchenko to

23  Mr. Millian, the two, July 21st and August 18th, you

24  didn't get those from Mr. Danchenko; did you?

25  A    No.

1   Q      Would those have been significant to you?

2   A      Yes.

3   Q      Why would they have been significant to you?

4   A      It would help us to better understand exactly how

5   the course of information went that was in the reports

6   themselves.

7   Q      Would it have been of any import to you to know in

8   evaluating whether an anonymous call had come in to see

9   the content of the emails from July 21st and then

10  August 18th concerning Mr. Millian not having

11  responded?

12  A      Yes.  I mean, all of those emails would be very

13  helpful to understanding the full extent of

14  communications between the parties.

15  Q      And even with respect to the one that's dated

16  later, August 24, that was received from Mr. Danchenko,

17  in that one, it indicates that Millian had not

18  responded, correct?

19  A      Correct.

20  Q      Would it have been of any import to you to

21  translate and understand that in evaluating whether or

22  not what Mr. Danchenko was saying about a telephone

23  call was to be believed?

24  A      I'm not sure whether it was or was not translated,

25  but a translation would help.

1   Q     Well, it would be important; wouldn't it?

2   A     Yes, it would be important.

3   Q     Because if the written record in the defendant's

4   own words was that he never responded, wouldn't that be

5   of assistance in evaluating his reliability concerning

6   whether or not he had gotten this call he supposedly

7   had gotten?

8   A     It would be helpful, yes.

9   Q     Would it border on dispositive?

10         MR. ONORATO:  Your Honor, objection.

11         THE COURT:  Sustained.

12         MR. ONORATO:  Oh, no.  He can ask it.

13         THE COURT:  Go ahead.

14         MR. ONORATO:  No objection.

15      (Reporter clarification.)

16         MR. ONORATO:  It's withdrawn.

17         THE COURT:  All right.

18         MR. ONORATO:  It's withdrawn.  Ask it.

19         THE COURT:  Go ahead.

20  BY MR. DURHAM:

21  Q     Would that have been important to you?

22  A     Yes, it would have been important.

23  Q     And the other investigators?

24  A     Yes.

25  Q     Would it have the capacity or the ability to have

1  influenced steps taken or not taken by the FBI?

2  A    Possibly, yes.

3  Q    Possibly?

4  A    Well, again, I'm an analyst, not an investigator.

5  So in that sense, it would be very helpful from an

6  analytical side to understand the full extent of

7  communications between the parties.

8  Q    Sure.  As an analyst, if you knew that the

9  defendant had said in writing that he had never heard

10  from Millian, that would be important to you, wouldn't

11  it, in analyzing the rest of what Mr. Danchenko was

12  telling you and other people in the FBI?

13  A    Yes, it would.

14  Q    I want to move to a different area just to orient

15  you and the jury.

16       You had testified yesterday about a person by the

17  name of Charles Dolan, correct?

18  A    Correct.

19  Q    And as to Mr. Dolan, tell the jurors again when,

20  as best you recall, you first heard Charles Dolan's

21  name in connection with these matters?

22  A    My recollection is that during the meeting with

23  Mr. Steele in an overseas city --

24            MR. ONORATO:  Your Honor, I'm going to

25  object.

1          THE COURT:  Hold on.

2          MR. ONORATO:  It is all hearsay.

3          THE COURT:  Why don't you rephrase the

4    question.

5    BY MR. DURHAM:

6    Q    Let me see.  So don't tell us anything that Steele

7    said.  That would be hearsay, okay?

8    A    Okay.

9    Q    You told the jury yesterday that you had gone to

10   meet with Mr. Steele in the early part of October 2016,

11   correct?

12   A    Correct.

13   Q    And when you met with Mr. Steele -- and this just

14   calls for a yes or no -- Mr. Steele provided some

15   information?

16          MR. ONORATO:  Same objection, Your Honor.

17          THE COURT:  I'll let him answer that

18   question.

19          Go ahead.

20   A    Yes.

21   Q    You told the jury yesterday without objection that

22   among other things that you learned when you were there

23   was that there was some -- not names of sources.  But

24   there were information-related to sources, correct?

25          MR. ONORATO:  Objection.

1              THE COURT:  I'll allow this.  These are

2   simply facts that he received.  These are verbal facts

3   that he received.

4              Go ahead.

5   A     Sir, could you repeat the question?

6   Q     Sure.  Yesterday did you tell the jury that when

7   you were meting with Steele, that you had gotten

8   information relating not to the names of sources of

9   dossier but some characterizations of some of those

10  sources?

11  A     Yes, some source characterizations.

12  Q     And did you tell the jury yesterday that separate

13  and apart from sources, you had gotten three names from

14  Mr. Steele as to persons who might be knowledgeable?

15  A     Yes.

16  Q     Was Charles Dolan one of those names?

17  A     Yes.

18  Q     So I want to turn your attention, then, to

19  Mr. Dolan.

20             Do you recall, sir, whether or not during the

21  interviews that you were conducting with Mr. Danchenko

22  in January of 2017, whether or not you were -- you and

23  Mr. Somma were specific with the defendant as to your

24  interest in knowing the sourcing of the information in

25  the dossier?

1  A    Yes.

2  Q    You testified yesterday that with respect to what

3  Mr. Danchenko himself told you and Somma, that he was

4  responsible for -- and I think you said -- I don't want

5  to put words in your mouth -- about the majority or a

6  significant amount of the information, the raw

7  intelligence and the like, correct?

8  A    I think I said I couldn't put an actual percentage

9  to it, but it was a sizable amount.

10 Q    And then you remembered that we offered and we

11 submitted into evidence an exhibit of Mr. Danchenko's

12 LinkedIn message where he said he was responsible for

13 80 percent of the raw intelligence and 50 percent of

14 the analysis in the dossier, correct?

15 A    Correct.

16 Q    So with respect to Mr. Dolan, did you know, as

17 best you recall, in January of 2017, what, if any, role

18 Mr. Dolan may have had in connection with sourcing

19 information in the dossier?

20 A    My recollection is we didn't have an understanding

21 of that in January 2017.

22 Q    Do you recall between October of 2016, when you

23 had met -- you and others had met with Mr. Steele and

24 then January 24th, when you first met with

25 Mr. Danchenko, had Charles Dolan been a person that you

1 and your colleagues were looking into to see who this

2 individual might be?

3 A    Yes.

4 Q    And so had some information been developed on

5 Mr. Dolan --

6 A    Yes.

7 Q    -- by January 2017?

8 A    By January 2017, yes.

9 Q    With respect to the meetings that you had with

10 Mr. Danchenko in January of 2017, tell the ladies and

11 gentlemen of the jury whether or not at any point in

12 time when you were inquiring about sources of

13 information for the dossier, if Mr. Danchenko ever

14 raised the name Charles Dolan?

15 A    To my recollection, no.

16 Q    I mean, given your circumstances --

17          MR. ONORATO:  Your Honor, I'm going to

18 object.

19          THE COURT:  All right.  What's the question?

20 BY MR. DURHAM:

21 Q    Given your being here as a witness today, if

22 Mr. Danchenko had said anything to you and Mr. Somma in

23 January of 2017 about Charles Dolan, you would remember

24 that; wouldn't you?

25 A    I would, yes.

1 Q    Because Mr. Dolan was somebody who was of interest
2 to you and Mr. Somma and the other Crossfire Hurricane
3 people at that time, correct?

4 A    Correct.

5 Q    So he didn't say anything about Dolan?

6 A    No.

7 Q    Do you recall, Mr. Auten, whether or not as to
8 Charles Dolan -- whether or not Mr. Danchenko separate
9 and apart from talking about Mr. Dolan, did he provide
10 any documents or records to the bureau, to your
11 knowledge, relating to him and Mr. Dolan?

12 A    Not to my knowledge.

13 Q    By January of 2017, do you recall what information
14 the bureau was interested in relating to Mr. Dolan?

15 A    From my recollection, we had done some preliminary
16 looking, and it was at that stage -- I don't recall.
17 There was a lot being done.

18 Q    Okay.  So my next question, then, to your
19 recollection, did you or Mr. Somma raise Mr. Dolan's
20 name with Mr. Danchenko?

21 A    Not to my recollection, no.

22 Q    He didn't say anything to you about Dolan, and you
23 didn't raise it with him?

24 A    Correct.

25 Q    Subsequent to the January 2017 interviews with

1  Mr. Danchenko, do you recall whether or not additional

2  work was being done by the bureau relating to Charles

3  Dolan?

4  A     Not to my knowledge between that time.

5  Q     Okay.  I may have misspoke.

6  A     Okay.

7  Q     Between -- I'm sorry, after January of 2017.

8  A     After January 2017, yes, there was.

9  Q     Okay.  And explain that to the jurors.

10 A     So Mr. Dolan became of more interest around the

11 April, May, June period of 2017.

12 Q     And then with respect to Mr. Dolan, did you --

13 this just calls for a yes or no.  Did you develop

14 information, your personal knowledge, information

15 developed about Mr. Dolan's relationship with somebody

16 that Mr. Danchenko had identified as one of his sources

17 of information?

18 A     Yes.

19 Q     Now, when that happened, was the bureau interest

20 piqued or did it remain the same?

21 A     No, the interest was piqued after that.

22 Q     And do you recall, sir, whether or not, in

23 connection with Mr. Danchenko's interviews by you and

24 Mr. Somma in January of 2017, if you had learned about

25 or been told about a meeting at a conference that had

1 been held in Moscow known as the Young Presidents

2 Organization?

3 A    Yes.

4 Q    And did Mr. Danchenko say that he participated in

5 that?

6 A    Yes.

7 Q    Did he say anything about his relationship with

8 Charles Dolan in connection with that?

9 A    No.

10 Q    Did he say -- as best you recall, did

11 Mr. Danchenko disclose to you that he had been first in

12 Moscow in June of 2016?

13 A    I recall, yes, we went through his trips back and

14 forth to Russia.

15 Q    Did he say anything to you and Somma, when you met

16 with him in January of 2017, that one of the persons he

17 was meeting with in Moscow in June of 2016 was Charles

18 Dolan?

19 A    No.

20 Q    With respect to the YPO, the Young Presidents

21 Organization, a meeting that occurred in Moscow in the

22 early part of October 2016, do you recall whether

23 Mr. Danchenko said anything to you about him being with

24 Charles Dolan at that time?

25 A    I don't recall that, no.

1 Q     Do you recall if Mr. Danchenko did provide some

2 kind of an agenda of what that conference was about?

3 A     I can't remember if he provided the agenda.  I am

4 familiar that there is an agenda.

5 Q     You learned that Mr. Dolan was one of the persons

6 who was a panelist or a speaker?

7 A     That is correct.

8 Q     Okay.  But you developed -- learned that as you

9 were going along?

10 A     Yes.

11 Q     The point being in January, when you were looking

12 for sources of information of the dossier context,

13 Mr. Danchenko didn't say anything about Charles Dolan?

14 A     Correct.

15 Q     And at that point, your information concerning

16 Dolan himself was not fully developed; is that right?

17 A     Correct.

18        MR. DURHAM:  Can I have just one moment, Your

19 Honor?

20 BY MR. DURHAM:

21 Q     Okay.  Now, I had asked you yesterday and you told

22 the jurors that one of the primary focuses of the

23 meetings with Mr. Danchenko in January and earlier with

24 Steele, but with Mr. Danchenko in January was sources

25 and identifying the sources of the information,

1  correct?

2  A      Correct.

3  Q      Do you remember, sir, whether or not you had

4  pressed Mr. Danchenko in the January interviews to

5  disclose any and all information that he had relating

6  to the sources who were involved in the dossier?

7  A      Yes, I believe we emphasized that on the last day

8  of the interview or the set of interviews.

9  Q      Tell the jurors what your recollection is in that

10  regard.

11  A      My recollection is asking if there were any

12  additional individuals that we haven't talked about in

13  this interview that would be sources of information for

14  the dossier.

15  Q      And is that clear in your mind?

16  A      Yes.  I documented it in the EC.

17  Q      No doubt that you were asking Mr. Danchenko if

18  there were any other sources you can tell us about,

19  correct?

20  A      That's my recollection.

21  Q      Charles Dolan's name was not brought up?

22  A      No.

23  Q      To your recollection and knowledge, is

24  Mr. Dolan -- does he reside in the United States or

25  outside the country?

1  A    My understanding is he resides in the United

2  States.

3  Q    Okay.  I want you to take a look, if you would,

4  sir -- and I'm hoping they are in the binders.  I'm

5  sure they are -- at Government's Exhibit 712A, 712B,

6  713A, 713B, and 714.  Are those all --

7  A    They are all here.

8            MR. DURHAM:  Your Honor, there's another

9  stipulation the parties have entered into relative to

10 these records.

11           THE COURT:  Yes.

12           MR. DURHAM:  It's Government's Exhibit 1803.

13 We would move 1803.

14           THE COURT:  Yes.

15           MR. DURHAM:  Any objection?

16           As I understand it, there's no objection from

17 the defense, Your Honor.

18           THE COURT:  All right.

19           MR. DURHAM:  With the Court's permission, may

20 I publish Government's Exhibit 1803?

21           THE COURT:  Yes.

22           MR. DURHAM:  Okay.  It is hereby stipulated

23 and agreed, by and between the undersigned parties,

24 that if called to testify, a records custodian for

25 kglobal would testify as follows:

1          Paragraph No. 1:  Government's Exhibits 700,
2  701, 702, 703, 704, 705, 706, 708, 709, 710, 711, 712A,
3  712B, 713A, 713B, 714, 715, and 717 are true and
4  accurate copies of the contents of emails from account
5  charles.dolan@kglobal.com.
6          Paragraph No. 2:  Government's Exhibits 700, 701,
7  702, 703, 704, 705, 706, 708, 709, 710, 711, 712A,
8  712B, 713A, 713B, 714, 715, and 717 are true and
9  accurate copies of the authentic business records of
10  kglobal that were made at or near the time of the acts
11  and events recorded in them by a person with knowledge
12  and were prepared and kept in the course of kglobal's
13  regularly conducted business activity.  And it was the
14  regular practice of kglobal to make such business
15  records, and the source of the information or the
16  method and the circumstance of preparation are
17  trustworthy.
18          Paragraph No. 3:  The parties stipulate to the
19  authenticity of Government's Exhibits 700, 701, 702,
20  703, 704, 705, 706, 708, 709, 710, 711, 712A, 712B,
21  713A, 713B, 714, 715, and 717.
22          Paragraph No. 4:  This stipulation is admissible
23  as evidence at trial, dated Alexandria, Virginia,
24  October 11, 2022, signed by government counsel and
25  defense counsel.

1 BY MR. DURHAM:

2 Q    So, Mr. Auten, with respect to what the jurors

3 just heard, what we are going to look at here are

4 business records for kglobal, correct?

5 A    Correct.

6 Q    Do you know what kglobal was or is?

7 A    Yes.  Kglobal was, I believe, the consultancy that

8 Charles Dolan worked for.

9 Q    Okay.  So when we're looking at kglobal records,

10 these would have come from kglobal, and Mr. Dolan was

11 associated with kglobal, correct?

12 A    That is my understanding, yes.

13        MR. SEARS:  Your Honor, I apologize.  Can we

14 approach, please, on these exhibits?

15        THE COURT:  Yes.

16    (Conference at the bench, as follows:)

17        THE COURT:  All right.

18        MR. SEARS:  Your Honor, Mr. Dolan is mine.

19 Sorry.  I should have paid closer attention when

20 addressing whether this witness should be going over

21 these emails or not.  In our motion *in limine*, we

22 raised concerns about words and some of Mr. Dolan's

23 emails about Mr. Danchenko being KGB or a Russian

24 agent.

25        MR. ONORATO:  Your Honor --

1          MR. SEARS:  You just read a stipulation

2   discussing all of those emails.

3          MR. KEILTY:  We are not going to offer any of

4   them.

5          THE COURT:  Just authenticity.

6          MR. DURHAM:  So it's clear, the stipulation

7   raised the authenticity.  We are not offering -- I told

8   you we are not going to offer and we are not offering

9   the references in any of Mr. Dolan's emails and the

10  like to Mr. Danchenko's status as being too young to be

11  KGB.  But he thinks he might be -- we are not offering

12  any of that.

13         MR. SEARS:  I remember what he said.  I just

14  want to make sure you weren't offering because it

15  wasn't clear.

16         MR. ONORATO:  Then just to go back to my --

17  so you are going to show all of these documents, just

18  ask him questions about the contents but not

19  necessarily move them in?  So I am trying to understand

20  where you are going with these exhibits.  You are not

21  moving them into evidence?

22         MR. DURHAM:  We would like to.  If you are

23  going to object, you can.

24         MR. ONORATO:  We have a duty or

25  responsibility to see how they are relevant to this

1  witness.

2            THE COURT:  We will take it up when they are

3  offered.

4            MR. ONORATO:  Can I have a standing objection

5  to the introduction of those exhibits?

6            THE COURT:  You should object to a specific

7  exhibit when it is offered.  All right.  And then I

8  will rule on it.  Okay.

9            MR. ONORATO:  Thank you, Your Honor.

10            MR. DURHAM:  Thank you.

11       (Proceedings continued in open court, as follows:)

12            THE COURT:  All right, Counsel.

13            MR. DURHAM:  Thank you, Your Honor.

14  BY MR. DURHAM:

15  Q    Let's just get back on track here.

16       So, sir, have you had a chance to take a look at

17  those government exhibits that were referenced,

18  basically 712 through 714?

19  A    Yes.

20  Q    And with regard to those documents, prior to the

21  recent events in connection with this proceeding, had

22  you seen those before?

23  A    No.

24  Q    Had any of those been provided to you, produced to

25  you by Mr. Danchenko?

1  A      No.

2  Q      Do you know, based on your own personal knowledge,

3  whether or not there were, however, other documents

4  that were provided by Mr. Danchenko to the FBI during

5  the course of the three-day interview and thereafter?

6  A      During the three-day interview, yes.

7  Q      But you can say with certainty that these

8  particular exhibits, you were not provided with them by

9  Mr. Danchenko?

10  A      Correct.

11  Q      As to Government's Exhibit 712A for

12  identification, would you take a look at that.

13  A      Yes, I have it here.

14  Q      And with respect to Government's Exhibit 712A for

15  identification, what is 7A [sic]?

16  A      This is an email from Mr. Danchenko --

17  Q      I'm sorry, 712A.

18  A      712A is an email from Mr. Danchenko, Igor

19  Danchenko at igordanchenko@hotmail.com.  The date is

20  Friday, August 19, 2016, at 1:08 p.m.  It is to Charles

21  Dolan at charles.dolan@kglobal.com, and the subject is

22  Kosachev and Prikhodko.

23  Q      Now, is that document in English or Russian?

24  A      It is in English.

25  Q      That's in English?

1   A     Yes.

2   Q     And it's dated in August of 2016?

3   A     August 19, 2016.

4   Q     Okay.  With respect to Government's Exhibit 712A,

5   dated August 19, 2016, reading the content of that

6   document, would that document have been one that

7   Mr. Danchenko should have provided to you based on the

8   questions that you and Somma were asking him in January

9   of 2017?

10  A     My assessment is yes.

11  Q     Any doubt in your mind about that?

12  A     No.  My assessment would be yes.

13  Q     You were looking for sources, correct?

14  A     Correct.

15          MR. DURHAM:  We would move 17A [sic] as a

16  full exhibit, Your Honor.

17          THE COURT:  Any objection?

18          MR. ONORATO:  712A?

19          MR. DURHAM:  712A.

20          THE COURT:  Any objection?

21          MR. ONORATO:  No objection, Your Honor.

22          THE COURT:  Without objection, 712A is

23  admitted.

24  BY MR. DURHAM:

25  Q     So the jurors have 712A on the screen.  Is your

1  screen working?

2  A    Yes, it is.

3  Q    I would ask you, then, to read into the written

4  record what the jurors are looking at on 712A beginning

5  at the very top with the identifier read from the from

6  and the to.

7  A    From:  Igordanchenko@hotmail.com.

8       Date:  Friday, August 19, 2016, at 1:08 p.m.

9       To:  Charles Dolan, charles.dolan@kglobal.com.

10      Subject:  Kosachev and Prikhodko.

11      Hi, Chuck, here are best bios of two of the four.

12 Who were the others?

13      Could you please ask someone to comment on Paul

14 Manafort's resignation and anything on Trump campaign

15 off the record of course.  Any thought, rumor,

16 allegation?  I am working on a related project against

17 Trump.  I asked Greg three months ago, but he didn't

18 say much, although shared a couple of valuable

19 insights.

20      Thanks a lot.

21      Best, Igor.

22 Q    And then there's some information following,

23 correct?

24 A    Correct.

25 Q    So let's start at the very top.  I had asked you a

1  question about your familiarity with a conference that

2  was held in Moscow in October -- early October of 2016,

3  correct, the YPO?

4  A    Yes.

5  Q    And you told the jurors that with respect to the

6  YPO, you had learned from Mr. Danchenko that he had

7  some involvement in that, correct?

8  A    Correct.

9  Q    And so in the August 19, 2016, email, marked as

10 Government's Exhibit 712A, the very first part of it

11 is, "Here are two bios, two of the four," correct?

12 A    Correct.

13 Q    And then the attachment appears to be the bios and

14 some people?

15 A    Yes.

16 Q    Do you have any knowledge whether or not these

17 were people who were being vetted to be panelists or

18 whatnot at the YPO?

19 A    I know that now, yes.

20 Q    Okay.  But then the next paragraph states, "Could

21 you please ask someone to comment on Paul Manafort's

22 resignation and anything on Trump campaign?  Off the

23 record, of course!  Any thought, rumor, allegation?

24 I'm working on a related project against Trump.  I

25 asked Greg three months ago, but he didn't say much,

1  although shared a couple of valuable insights.

2       "Thanks a lot.

3       "Best, Igor."

4       Did I read that correctly?

5  A    Yes.

6  Q    With respect to Mr. Danchenko asking Mr. Dolan for

7  information -- I guess any thoughts, rumors,

8  allegations, not facts, but I guess thoughts, rumors,

9  allegations, do you recall whether or not he,

10 Mr. Danchenko, shared that information with you and

11 Mr. Somma?

12 A    Not anything with Mr. Dolan.

13 Q    To your knowledge, did he share that -- withdrawn.

14      Yesterday you had said, after Mr. Danchenko was

15 being used as a confidential human source, there was a

16 particular handling agent, correct?

17 A    Correct.

18 Q    And who was that handling agent?

19 A    Mr. Kevin Helson.

20 Q    And with respect to Mr. Helson, I think you had

21 indicated you provided information, questions to pose

22 to Mr. Danchenko, every once in a while?

23 A    Yes.

24 Q    To your knowledge and recollection, did

25 Mr. Danchenko provide any information to Helson prior

1   to your posing -- asking the posed questions about --

2   A    Not to my knowledge, no.

3   Q    But this was not shared with you?

4   A    No.

5   Q    Government's Exhibit 712A, correct?

6   A    Correct.

7   Q    I would ask you to take a look at Government's

8   Exhibit 713 -- I'm sorry.  Hold on one second.  I have

9   to do 712B.  Do you have 712B there?

10  A    I do.

11  Q    And what is 712B?

12  A    712B is -- there are actually two emails on the

13  page.  The bottom one is the email that we just went

14  over in 712A, and at the top is from Dolan, Charles,

15  Friday -- the sent is Friday, 8/19/2016, at 8:06 p.m.,

16  and it is to Igor Danchenko.  The subject is Re

17  Kosachev and Prikhodko.

18  Q    Does this appear to be the response from Mr. Dolan

19  to Mr. Danchenko's email from earlier that day?

20  A    Yes.

21  Q    And it's in English?

22  A    Yes.

23        MR. DURHAM:  We would move 712B as a full

24  exhibit, Your Honor.

25        THE COURT:  Any objection?

1          MR. ONORATO:  No objection.

2          THE COURT:  Without objection, 712B is

3    admitted.

4          MR. DURHAM:  So, Ms. Arsenault, if you would

5    be so good as to blow up the top part of 712B.

6    BY MR. DURHAM:

7    Q    Sir, would you read into the record, then, what

8    Mr. Dolan's response was to Mr. Danchenko's earlier

9    request for any thought, rumor, allegation relating to

10   Paul Manafort.

11   A    Reading from the top:

12        From:  Dolan, Charles.

13        Sent:  Friday, 8/19/2016, 8:06 p.m., GMT-00:00.

14        To:  Igor Danchenko.

15        Subject:  RE: Kosachev and Prikhodko.

16        Hi Igor,

17        The other two were Alexey Ulyukaev, Minister for

18   Eco Dev, and Iris Tutor, Ombudsman RF.

19        Let me dig around on Manafort.  Pretty sure the

20   new team wanted him gone ASAP and used today's NYT

21   story to drive a stake in his heart.

22        Charles H. Dolan, Jr., Senior Vice President.

23   Q    And then the kglobal and the like, correct?

24   A    Correct.  Kglobal connecting issues and brands to

25   passionate advocates, 202-445-0422,

1  http://kglobal.com/charles-dolan.

2  Q    Look at Government's Exhibit 712B.  This would

3  appear to be Mr. Dolan responding to the request for

4  information about Manafort?

5  A    Yes.

6  Q    It came from Mr. Danchenko?

7  A    Yes.

8  Q    Who in his earlier email said that he was working

9  on a project against Trump?

10 A    Yes.

11 Q    With respect to the questions that you and Somma

12 were asking Mr. Danchenko in January of 2017, would

13 Mr. Dolan's response to Mr. Danchenko's request for

14 information have been relevant?

15 A    Yes.

16 Q    Should it have been provided to you in your view?

17 A    In my view, in my assessment, yes.

18 Q    Again, did Mr. Danchenko provide other information

19 to the bureau in written form?

20 A    During the three-day interview, yes.

21 Q    And to your knowledge thereafter, when he was

22 brought on board as a confidential human source, did he

23 provide written documents of various kinds over time?

24 A    Yes, it was my understanding that he did.

25 Q    I want to turn your attention, then, to

1  Government's Exhibits 713A and 713B.  Do you have those

2  in a booklet in front of you, sir?

3  A     I do.

4  Q     Starting with Government's Exhibit 713A, what is

5  that?

6  A     713A has two emails on it.  It's in English.  It

7  has the email that we read earlier from Igor Danchenko,

8  Friday, August 19, 2016, at 1:08 p.m., to Charles

9  Dolan.  The subject is Kosachev and Prikhodko, and then

10  the top is Charles Dolan -- from Charles Dolan, sent

11  Saturday, 8/20/2016, 10:43 a.m., to Igor Danchenko.

12  And the subject is Re Kosachev and Prikhodko.

13  Q     And with respect to this document, it's in

14  English; is that correct?

15  A     That is correct.

16             MR. DURHAM:  We would move 713A as a full

17  exhibit, Your Honor.

18             THE COURT:  Any objection?

19             MR. ONORATO:  No objection.

20             THE COURT:  Without objection, 713A is

21  admitted.

22             MR. DURHAM:  Again, if we could -- just, if

23  you would, Ms. Arsenault, just show the bottom first so

24  the jurors can see that that's the email that was sent

25  by Mr. Danchenko to Mr. Dolan requesting the

1  information.

2          Okay, and then if you go to the top of

3  Government's Exhibit 13A [sic] and below that up for

4  the jurors.

5  BY MR. DURHAM:

6  Q    And, Mr. Auten, would you read into the written

7  record what the jurors are now seeing on their

8  monitors, Government's Exhibit 713A?

9  A    From:  Dolan, Charles.

10      Sent:  Saturday, 8/20/2016, 10:43 a.m. GMT-00:00.

11      To:  Igor Danchenko.

12      Subject:  RE:  Kosachev and Prikhodko.

13      Hi Igor,

14      I had a drink with a GOP friend of mine who knows

15  some of the players and got some of what is in this

16  article, which provides even more detail.  She also

17  told me that Corey Lewandowski, who hates Manafort and

18  still speaks to Trump, regularly played a role.  He is

19  said to be doing a happy dance over it.

20      I think the bottom line is that in addition to the

21  Ukraine revelations, a number of people wanted Manafort

22  gone.  It is a very sharp elbows crowd.

23  Q    And then below that, is there something that's

24  inserted?

25  A    Yes.  It's a URL link,

1  http://www.politico.com/story/2016/08/paul-manafort-fal

2  l-trump-campaign-227212.

3  Q    With respect to Government's Exhibit 713A, then,

4  do you recall back in August -- the latter part of

5  August in 2016 there was a -- a time came when Paul

6  Manafort was discharged as the campaign manager of the

7  Trump campaign?

8  A    I do recall that.

9  Q    And there was a fair amount of publicity

10  surrounding that, correct?

11  A    That is correct.

12  Q    There was a lot being written about it and the

13  like in the press and the news and the like, correct?

14  A    Correct.

15  Q    In this particular email exchange between

16  Mr. Danchenko and Mr. Dolan -- and there's, in fact, a

17  political article that was attached it indicates,

18  correct?

19  A    Correct.

20  Q    And the jurors are undoubtedly familiar with

21  Politico, but just for the record, what is Politico?

22  A    Politico is a news outlet.

23  Q    So there was a lot of information out there,

24  correct?

25  A    Correct.

1  Q    But in this instance, Mr. Danchenko had been

2  asking for thoughts, rumors, allegations and the like,

3  and then the response from Mr. Dolan is not just what's

4  in the public sector, right?  He's talking about a GOP

5  friend that provided him information; is that correct?

6  A    It says here that he had a drink with a GOP friend

7  who knows some of the players and got some of what was

8  in the article, yes.

9  Q    And in context, meaning there's some inside

10 information here?

11 A    That's how I would read this, yes.

12          THE COURT:  Thank you, Mr. Durham.

13          We're going to take our morning recess at

14 this time.  We will stand in recess until 11:30.  You

15 are excused to the jury room.  Please do not discuss

16 this case during the recess.

17     (The jury exits at 11:09 a.m.)

18          THE COURT:  Mr. Auten, do not discuss your

19 testimony during the recess.

20          The Court will stand in recess.

21     (Recess from 11:10 a.m. until    :        .m.)

22     (The jury is not present.)

23          THE COURT:  I've passed on to you the note

24 from the jury that we received, which really just is an

25 inquiry as to, as I understand it, whether there should

1  be some significance to the way someone is addressed in

2  these emails.  I'm not sure that there's anything to

3  respond to, but I'd like to hear from counsel.

4          Mr. Durham, do you have any --

5          MR. DURHAM:  First of all, thank you for

6  getting the note to us.  We discussed it briefly with

7  counsel.  I don't want to misstate any understanding,

8  but I think, as we read the note, it's one in the same

9  person.  The answer is yes.

10         MR. ONORATO:  (Nods head up and down.)

11         THE COURT:  Okay.  You read it as asking

12  Sergei versus Sergio is referring to more than one

13  person or one person?

14         MR. DURHAM:  It's one person.  I think if

15  Your Honor were to take a look at just as an example --

16  let me just get the government's exhibit.  If the Court

17  looks at Government's Exhibit 205T, the email address

18  at the top, it says Sergio and --

19         THE COURT:  Hold on.

20         MR. DURHAM:  It's a modified version, but I

21  think it's Sergio.  So I think that's what the juror is

22  asking -- juror or jurors are asking about.

23         MR. SEARS:  Your Honor, as I understand the

24  question, they don't seem to be asking whether it's the

25  same person but whether it implicates some sort of

1 relationship or special implication between the

2 parties.

3          THE COURT:  That's what I understood it to

4 suggest.  Whether when someone refers to someone as

5 Sergei versus Sergio, that that reflects some kind of a

6 closer, more knowledgable relationship.

7          MR. SEARS:  Stuart versus Stu or Tony versus

8 Anthony or something like that.

9          THE COURT:  Right.

10          MR. SEARS:  I think that's kind of maybe what

11 they're getting at.

12          THE COURT:  Right.

13          MR. SEARS:  I don't know that they're going

14 to hear any evidence about --

15          THE COURT:  Well, that was my thought.  I

16 don't know that there's anything to tell the jury other

17 than to pass on their inquiry to counsel for their

18 consideration.  At this point, they simply have to rely

19 on the evidence.  But to the extent it's interpreted as

20 whether that's one in the same person, I think I can

21 tell them that, that Sergio and Sergei is the same

22 person.  To the extent they have concerns other than

23 that, they will have to just await any further evidence

24 on it.

25          MR. DURHAM:  I mean, if it would be helpful,

1  we could ask Mr. Auten.  I'm not sure that he -- I know

2  he's not qualified to be a formal Russian translator,

3  but I know he does know some Russian.  He may be able

4  to speak to that, but I don't know.  I could ask him.

5            THE COURT:  I don't know that we should go

6  down that road.

7            All right.  I'll just tell the jury that I

8  passed it on to counsel for their consideration.  They

9  will have to await for the evidence to the extent

10  they're asking whether Sergei and Sergio is the same

11  person.  I can't tell them that it is.

12            Is that agreeable with counsel?

13            MR. SEARS:  Yes, Your Honor.

14            THE COURT:  All right.  Let's bring the jury

15  out.

16       (The jury enters at 11:50 a.m.)

17            THE COURT:  Please be seated.

18            I received your note, and I've discussed it

19  with counsel.  To the extent you're asking whether

20  Sergei versus Sergio, whether that's the same person, I

21  can tell you that it's referring to the same person.

22  To the extent you're asking whether usage of one name

23  versus the other reflects something about the nature of

24  the relationship between the people speaking, I've

25  given that to counsel for their consideration.  You

1  will just have to rely on the evidence as it comes in

2  with respect to that issue.

3          All right.

4          MR. DURHAM:  Thank you, Your Honor.

5          THE COURT:  Mr. Auten, you reman under oath.

6  BY MR. DURHAM:

7  Q    Mr. Auten, when we broke for the morning recess,

8  you had just identified and testified concerning

9  Government's Exhibit 713A.  I now want to turn your

10  attention to Government's Exhibit 713B.  That's in your

11  notebook; is that correct?

12  A    That is correct.

13  Q    And as to Government's Exhibit 713B, what is it?

14  A    713B is an email from Mr. Danchenko to Mr. Dolan.

15  It's dated 8-20-2016.  The subject is Ulyukaev,

16  U-L-Y-U-K-A-E-V, Titov, T-I-T-O-V, bios.

17  Q    And with respect to Government's Exhibit 713B,

18  does it appear to be a follow-up basically to 713A?

19  A    Yes, it appears so.

20          MR. DURHAM:  We move 713B as a full exhibit,

21  Your Honor.

22          THE COURT:  Without objection, 713B is

23  admitted.

24          MR. DURHAM:  I ask 713B be brought up.

25          Ms. Arsenault, if you could, just blow up the

1  first portion of the top part of that letter and make

2  it more legible.

3  BY MR. DURHAM:

4  Q    Is your monitor working, sir?

5  A    It does.

6  Q    All right.  So looking at Government's

7  Exhibit 713B, what is it?

8  A    It is an email from Mr. Danchenko to Mr. Dolan,

9  dated 8-20-2016, at 12:43 p.m.

10 Q    Again, just before we broke, you had identified

11 and testified about 713A where Mr. Dolan in an email is

12 telling Mr. Danchenko he had a drink with a GOP friend,

13 etc., correct?

14 A    Correct.

15 Q    And now this is the reply from Mr. Danchenko to

16 Mr. Dolan.  Would you read that into the record, sir.

17 A    From:  Igor Danchenko.

18     Sent Saturday, 8-20-2016, 12:43 p.m., GMT-00:00.

19     To:  Dolan, comma, Charles.

20     Subject:  Ulyukaev and Titov bios.

21     Dear Chuck, thank you for this.  Any additional

22 insights will be much appreciated.  It is an important

23 project for me, and our goals clearly coincide.  I've

24 been following the Russia trail in Trump's campaign.

25 It is there.  So what you read in the news is hardly an

1 exaggeration.  Some things are less dramatic while

2 others are more than they seem.  Here are two more bios

3 I put together for you.  Still don't know when I am

4 traveling next.  I shall keep you updated.

5      Cheers, Igor.

6 Q    With respect to Mr. Danchenko's reply to

7 Mr. Dolan, he writes in the second sentence, "It is an

8 important project for me."  Is that correct?  That's

9 what he writes?

10 A    Yes.  "It is an important project for me."

11 Q    Do you remember, when you were meeting with

12 Mr. Danchenko in January of 2017, if he indicated that

13 the work he was doing, anti-Trump work he was doing,

14 was a very important project for him?

15           MR. ONORATO:  Objection to the

16 characterization.

17           THE COURT:  Sustained.

18           Go ahead.  Rephrase it.

19 BY MR. DURHAM:

20 Q    Do you recall whether or not when you were

21 chatting with Mr. Danchenko in January 2017 if he

22 indicated that the work he was doing with Christopher

23 Steele was an important project for him?

24 A    I don't know if he characterized it as an

25 important project for him, but he characterized it as a

1   project that he was very busy with.

2   Q    With respect to the second part of that sentence,

3   "...and our goals clearly coincide," in context

4   Mr. Danchenko's and Mr. Dolan's goals?

5   A    That is how I would read that.

6   Q    Would it have been of value to the FBI to know

7   that Mr. Danchenko's goals and Mr. Dolan's goals

8   related to the Trump campaign coincided?

9           MR. ONORATO:  Objection, mischaracterizes the

10  evidence.

11          THE COURT:  Hold on.

12          MR. DURHAM:  I thought I read it correctly.

13  Should I repeat it to make sure --

14          THE COURT:  No. I've read it.

15          You can answer.  Go ahead.  Overruled.

16  A    Can you repeat the question, please?

17  Q    Sure.  Would it have been of value to you and your

18  colleagues to know, when you were interviewing

19  Mr. Danchenko, that his work for Christopher Steele was

20  an important project and that his goals coincided with

21  Dolan's goals?

22  A    I would say to the extent that if there was

23  anything in the dossier that Mr. Dolan had provided, it

24  would have been important for us to understand that his

25  goals and Mr. Dolan's goals coincided.

1    Q    Okay.  Now, you told the jury before we broke that

2    you and your colleagues had done some work on trying to

3    identify who Mr. Dolan was and so forth prior to

4    January 2017, correct?

5    A    Correct.

6    Q    But it wasn't far advanced at that point?

7    A    Correct.

8    Q    But later on it was; you did more work?

9    A    Correct.

10   Q    You became more interested?

11   A    Yes.

12   Q    And with respect to goals coinciding, let me ask

13   you this:  Did you determine whether or not Mr. Dolan

14   had any particular partisan persuasion?

15   A    Yes.

16   Q    And what was that?

17   A    Democratic.

18   Q    And how deeply involved in democratic politics was

19   Mr. Dolan, if you know, based on your own personal

20   participation in the investigation?

21         MR. ONORATO:  Objection to relevance.

22         THE COURT:  I'll let him answer.

23         Go ahead.

24   A    I understand he worked with various aspects of

25   democratic campaigns over the years.

1  Q    And when you say over the years, was it like two

2  or three years or a longer period?

3  A    My recollection is it was longer.

4  Q    Much longer?

5  A    For a while back.  I wouldn't be able to actually

6  specify how long back.

7  Q    In any event, it would have been valuable for you

8  to know that Mr. Danchenko's goals coincided with

9  Mr. Dolan's goals, correct?

10 A    Again, to the extent that it dealt with

11 corroboration and accuracy of the dossier, yes.

12 Q    Okay.  Now, I want you to turn your attention,

13 sir, to Government's Exhibit 714.  Do you have that?

14 A    I do have that, yes.

15 Q    Looking at Government's Exhibit 714, what is that?

16 A    That is an email from Mr. Dolan to Mr. Danchenko

17 sent Saturday, 8-20-2016, 2:00 p.m.  The subject is

18 saying regarding -- well, the subject is Re Kosachev

19 and Prikhodko.

20 Q    Okay.  And does this appear to be Dolan's response

21 then to Mr. Danchenko's email?

22 A    Yes, his email -- Mr. Dolan's email to

23 Mr. Danchenko on the 20th of -- yeah, the 20th of

24 August 2016.

25        MR. DURHAM:  We move 714 as a full exhibit,

1  Your Honor.

2          THE COURT:  Any objection?

3          MR. ONORATO:  No, Your Honor.

4          THE COURT:  Without objection, 714 is

5  admitted.

6          MR. DURHAM:  I'd ask Ms. Arsenault just to

7  blow up the top part of the exhibit.

8  BY MR. DURHAM:

9  Q    Is that then what the jurors are looking at as the

10 response from Mr. Dolan to Mr. Danchenko's note

11 thanking him for sending the information along?

12 A    Yes.

13 Q    It's short and sweet.  Would you read it into the

14 record so the record is complete.

15 A    Yes.  It's from Dolan, comma, Charles.

16      Sent:  Saturday, 8-20-2016, 2:00 p.m, GMT-00:00.

17      To:  Igor Danchenko.

18      Subject:  Re Kosachev and Prikhodko.

19      Thanks.  I'll let you know if I hear anything

20 else.

21      Charles H. Dolan, Jr., senior vice president,

22 kglobal.

23      Connecting issues and brands to passionate

24 advocates.

25 Q    Now, you just told the jurors that the exchange or

1  exchanges between Mr. Danchenko and Mr. Dolan would

2  have been valuable or important if you knew that any of

3  that information was sourcing information or sourced,

4  correct?

5  A     Correct.

6  Q     I want you to take a look, if you would, sir, at

7  Government's Exhibit 112.  Do you have 112 in front of

8  you.

9  A     I do, yes.

10  Q     With respect to Government's Exhibit 112, what's

11  that document?

12  A     That is a company intelligence report, Orbis

13  Report 2016/105.

14  Q     All right.  And as to the Government's

15  Exhibit 112, there are certain portions of it that have

16  been redacted out for these proceedings, correct?

17  A     That is correct.  It is partially redacted.

18  Q     As to the information that is contained in

19  Government's Exhibit 112 that you can read, does that

20  appear to be an accurate copy of the Steele dossier,

21  Report 2016/105?

22  A     From my recollection, yes.

23  Q     You told the jurors during the course of your

24  testimony yesterday and today that you reviewed various

25  reports, numbered reports with Mr. Danchenko in January

1  2017, correct?

2  A    Correct.

3  Q    Was Report No. 105 one of those that was reviewed

4  with Mr. Danchenko in January of '17?

5  A    I would have to refresh my memory on that.

6  Q    Okay.  Is there something that would help you

7  refresh your recollection?

8  A    My EC from --

9  Q    You're talking about Government's Exhibit 100?

10 A    Yes.

11        MR. DURHAM:  Okay.  With the Court's

12 permission, I'll ask the court security officer to

13 provide that to the witness.

14 A    There were a number of reports that we asked him

15 about, but I need to check whether 105 was one of them.

16        MR. DURHAM:  I think the parties would agree,

17 Your Honor, that this particular report, 2016/105, was

18 not contained in Mr. Auten's report and it was not

19 reviewed with Mr. Danchenko on January 2017.

20        MR. ONORATO:  Yes, Your Honor.

21        THE COURT:  All right.

22 BY MR. DURHAM:

23 Q    So just put it aside.

24 A    Okay.  Fair enough.

25 Q    Because in January 2017, you didn't know about

1  Mr. Danchenko's relationship with Dolan, correct?

2  A     In January 2017, no.

3  Q     And in that regard, had Mr. Danchenko told you

4  about his relationship with Mr. Dolan, do you think it

5  likely that you would have reviewed 105 at that time?

6  A     If Dolan had come up during the three-day

7  interview, we would have documented that Dolan had come

8  up.  I don't know whether it would have been with

9  respect to that particular report or whether it had

10 been just a general discussion of Dolan.  I'm not

11 exactly sure how that would have come up during the

12 conversation had it come up.

13 Q     Okay.  But you have no current recollection about

14 that, correct?

15 A     Correct.

16 Q     Now, you told the jurors earlier today that after

17 the January interviews that you had done, your

18 investigation continued, correct?

19 A     Correct.

20 Q     And I just want to -- for purposes of chronology,

21 I just wanted to step back for a minute.  You testified

22 to the jury yesterday that you first became involved in

23 Crossfire Hurricane shortly after its opening in July,

24 the end of July.  You started in early August 2016,

25 correct?

1   A     Correct.

2   Q     And then Crossfire Hurricane, that was the FBI's

3   investigation into these matters, correct?

4   A     Correct.

5   Q     And at some point in time -- I'm not going to ask

6   you when.  But would it be a fair statement that at

7   some point in time, the FBI investigation was taken

8   over by Director Mueller and Mr. Mueller's

9   investigators?

10  A     That is correct.

11  Q     Do you remember about when that happened?

12  A     I believe it was May 19th or somewhere around

13  there.

14  Q     Of?

15  A     2017.

16  Q     And then when Crossfire Hurricane transitioned

17  into Director Mueller's inquiry, did you remain with

18  the project, or did you go elsewhere?

19  A     No.  I remained and went with Special Counsel

20  Mueller.

21  Q     So it was a continuum for you; you just stayed

22  working in the same stuff?

23  A     Correct.

24  Q     Now, I want to then ask you:  In that connection,

25  at any point in time after January 2017, whether you

```
 1  were part of the Crossfire Hurricane group or had
 2  evolved into Mr. Mueller's inquiry, did you continue to
 3  be involved personally in matters relating to
 4  Mr. Danchenko and his sources?
 5  A    Yes.
 6  Q    Do you recall, sir, whether or not -- in that
 7  connection, whether Mr. Danchenko had ever advised the
 8  FBI that one of the sources of information was a woman
 9  whose last name was Galkina?
10  A    Yes.
11  Q    Olga Galkina?
12  A    Yes.
13  Q    Tell the jurors, if you would, sir, whether or not
14  if at any point in time after January 2017 you,
15  yourself, had occasion to participate in any direct way
16  with trying to run down information that was in the
17  dossier that was reported to have come from particular
18  sources.
19  A    Yes.
20  Q    And was Ms. Galkina one of those persons?
21  A    Yes.
22  Q    And was Ms. Galkina in the United States or
23  elsewhere?
24  A    Elsewhere.
25  Q    And with respect to Ms. Galkina, where was she
```

1  located?

2  A     She was located in Cyprus.

3  Q     Did you, yourself, ever have occasion to talk to

4  Ms. Galkina?

5  A     Yes, I did.

6  Q     With respect to -- and did you do that alone?

7  A     No.

8  Q     There were other folks with you?

9  A     Correct.

10 Q     And with regard to your talking to Ms. Galkina,

11 was there a particular focus of your inquiry of

12 Ms. Galkina?

13 A     We were looking, again, for the material that was

14 attributed to Ms. Galkina coming out of the January

15 2017 interviews.  We wanted to get a sense from

16 Ms. Galkina's own words or recollections, etc., exactly

17 how she was oriented with respect to her accessees and

18 whether or not the information was accurate.

19 Q     Okay.  And Galkina was a name that had been

20 provided to you by Mr. Danchenko?

21 A     That is correct.

22 Q     And as a general proposition, was Ms. Galkina's

23 information consistent with Mr. Dolan's information?

24             MR. ONORATO:  Objection.

25             THE COURT:  Well, I'm going to sustain the

1  objection.  I'm not sure he knew what the Dolan

2  information was.

3          MR. DURHAM:  Oh, I'm sorry.  I misspoke.  I'm

4  sorry.  I asked the question the wrong way.

5  BY MR. DURHAM:

6  Q    What in general was the information that

7  Ms. Galkina provided consistent with the information

8  that Mr. Danchenko had attributed to her?

9  A    I would say in general but not one-on-one

10 correspondence.

11 Q    And were there important parts of the interview

12 which were inconsistent?

13         MR. ONORATO:  I'm going to object.

14         THE COURT:  Let me see counsel.

15     (Conference at the bench, as follows:)

16         THE COURT:  All right.  What's the relevance

17 of this?

18         MR. DURHAM:  Yes, Your Honor.  What we

19 believe the testimony will be, if the Court permits,

20 Mr. Auten goes to Cyprus with others.

21         THE COURT:  When was that?  When did he go?

22         MR. KEILTY:  August 2017.

23         MR. DURHAM:  So he and others go, and they

24 interview Ms. Galkina in Cyprus.  Ms. Galkina gives

25 some information that's inconsistent with what

1   Mr. Danchenko had told the bureau.  As a result of some

2   of those inconsistencies by then the Mueller group,

3   Crossfire, they had questions that they then wanted to

4   have Mr. Helson pose to Mr. Danchenko.  So that's where

5   this is going.

6           MR. KEILTY:  Your Honor, parts of the

7   questions that the FBI asked Ms. Galkina related to

8   Mr. Dolan.

9           THE COURT:  All right.

10          MR. ONORATO:  This is literally propensity.

11  What Mr. Danchenko told about Galkina was not somehow

12  accurate.

13          THE COURT:  Right.  The point is that, based

14  on their conversations with Galkina, they asked Helson

15  to ask certain questions.

16          MR. ONORATO:  Correct.  That's simple.

17          THE COURT:  I think that's all you can --

18          MR. DURHAM:  You want me to cut to it that

19  way?

20          THE COURT:  Yes.  I don't think we need to

21  talk about inconsistencies or anything else.

22          MR. DURHAM:  Sure, Your Honor.

23      (Proceedings continued in open court, as follows:)

24          THE COURT:  Counsel.

25

1  BY MR. DURHAM:

2  Q    Let me go back.  Sir, so you, again, have told the

3  jury that you went to Cyprus with others and you

4  interviewed Ms. Galkina, correct?

5  A    That is correct.

6  Q    And would it be a fair statement that you were

7  interviewing Galkina about matters that Mr. Danchenko

8  had talked about?  Correct?

9  A    That is correct.

10 Q    And as to whatever was said by Ms. Galkina, as a

11 result of your interview with Ms. Galkina at the time,

12 did that cause you to take any actions?

13 A    Did it cause us to take any action?  Investigative

14 action or --

15 Q    When you came back to the United States --

16 A    Right.

17 Q    -- as a result of what you had learned, whatever

18 that was, from Galkina, do you recall, sir, whether or

19 not you and others, for example, posed questions or

20 gave questions to Kevin Helson to pose to

21 Mr. Danchenko?

22 A    Yes.

23 Q    And do you recall with respect to the subject

24 matter of the question or questions that you asked

25 Mr. Helson to pose to the defendant, what were those

1  about?

2  A    Those were about -- I think there were questions

3  about Mr. Dolan.  I believe there were questions about

4  other aspects of things that Ms. Galkina had talked

5  about that we wanted clarification on.

6  Q    With respect to the questions that you asked

7  Mr. Helson to ask of Mr. Danchenko, to your knowledge,

8  are those questions then put to Mr. Danchenko?

9  A    That is my understanding.

10  Q    Were you present for that?

11  A    I was not.

12  Q    So whatever they -- whatever the questions and

13  answers so forth were, you don't have any personal

14  knowledge?

15  A    I do not.

16  Q    And so if there was something that Mr. Helson

17  asked and whatnot, he would be the proper person to

18  testify about that, not you?

19  A    Correct.

20          MR. DURHAM:  Okay.  May I have just one

21  moment, Your Honor?

22          THE COURT:  Yes.

23  BY MR. DURHAM:

24  Q    Finally, let me ask you:  As a result of your

25  meeting in Cyprus with Ms. Galkina -- when you met in

1 Cyprus with Ms. Galkina, do you remember what you

2 personally were interested in inquiring of Galkina --

3 not what she said to you but what you said or others in

4 your presence -- Galkina's relationship with Mr. Dolan?

5 A    We did ask that question, yes.

6 Q    And were you able to get any information?

7 A    Very vague information to my recollection.

8 Q    When you were present, did she give any

9 information about Dolan?

10 A    I don't recall specifics.

11 Q    All right.  But in general, she didn't want to

12 talk about Dolan?

13 A    No.

14 Q    No?

15 A    No.  She seemed hesitant.

16 Q    She didn't want to talk?

17 A    That is what I recall.

18 Q    Okay.  So whatever the relationship was between

19 Mr. Dolan and Ms. Galkina led to further investigative

20 efforts?

21 A    Correct.

22         MR. DURHAM:  Okay.  Thank you, sir.

23         I have no further questions, Your Honor.

24         THE COURT:  All right.  Cross.

25         MR. ONORATO:  Thank you, Your Honor.

```
 1                    CROSS-EXAMINATION
 2 BY MR. ONORATO:
 3 Q    Good afternoon, Mr. Auten.
 4 A    Good afternoon.
 5 Q    I know that you've met with a lot of people in
 6 preparation for your testimony here.  Is that true?
 7 A    That is true.
 8 Q    Okay.  And there were a number of investigations
 9 that occurred with respect to the Crossfire Hurricane
10 matter, inquiries by the Senate, right?
11 A    Correct.
12 Q    And inquiries by the OIG of the Department of
13 Justice?
14 A    Correct.
15 Q    OIG stands for the Inspector General of the
16 Department of Justice, right?
17 A    Correct.
18 Q    And I want to try to go chronologically, but I'm
19 sometimes bad with it.  But on October 25, 2018, did
20 you meet voluntarily with people from the OIG?
21 A    Yes.
22 Q    Okay.  And the purpose of that was to discuss the
23 FBI's use of confidential human sources, correct?
24 A    Among other things, yes.
25 Q    And you were told at the beginning of that meeting
```

1  that you were not the subject or target of any review;

2  is that right?

3  A     That is correct.

4  Q     Okay.  And when you were there, all you wanted to

5  do is tell the truth with the information that you knew

6  at the time, right?

7  A     Correct.

8  Q     Okay.  Because you were told by the investigators

9  that if you made a false statement, you could be

10  prosecuted for that under 18 U.S.C. 1001, right?

11  A     That is correct.

12  Q     Okay.  So you understood that.  And while under

13  oath subject to --

14             THE COURT SECURITY OFFICER:  Counsel, they

15  cannot hear you.

16             MR. ONORATO:  Sorry.

17             THE COURT:  Do you have the microphone there?

18             Good.  All right.

19             MR. ONORATO:  Thank you, Judge, and I

20  apologize.  There's apparently construction.

21             THE COURT:  Keep your voice up a little.

22  BY MR. ONORATO:

23  Q     And while under oath subject to penalty of

24  perjury, you gave a number of positive statements

25  regarding Mr. Danchenko, correct?

1   A      Correct.

2   Q      And the same with respect to November 13, 2018?

3   Did you meet with similar OIG agents?

4   A      Yes.

5   Q      Okay.  Did you meet with them again on April 24,

6   2019?

7   A      Yes, I did.

8   Q      Did you meet with them again on April 26, 2019?

9   A      Yes, I did.

10  Q      And, hopefully, not as long as your testimony

11  today, but you would say that that lasted more than 20

12  hours; is that right?

13  A      That is correct.

14  Q      And when you made those positive statements about

15  Mr. Danchenko, you knew they were true, correct?

16  A      Correct.

17  Q      And we're going to cover those in a few minutes.

18         Separately, you prepared a 100-page written

19  affidavit or declaration, and you gave that to the

20  FBI's Office of Internal Affairs; is that correct?

21  A      That is correct.

22  Q      And did you prepare that?

23  A      I did.

24  Q      And did you sign it?

25  A      I did.

1    Q    And, again, subject to the same penalty of

2    perjury, right?

3    A    Correct.

4    Q    Okay.  And, lastly, you met with the investigators

5    from the U.S. Senate Judiciary Committee; is that

6    right?

7    A    That is correct.

8    Q    And you appeared voluntarily?

9    A    Correct.

10   Q    Again, a witness, not a subject or target, right?

11   A    Correct.

12   Q    And when you met with them, you had lawyers with

13   you, right?

14   A    I did, yes.

15   Q    And that's because Mr. Durham's team began an

16   inquiry into these matters; is that right?

17   A    That is correct.

18   Q    Okay.  And you have two very good lawyers, right?

19   A    Yes.

20   Q    Okay.  And one of them is named Brian Heberlig,

21   but he's not here today, right?

22   A    Correct.

23   Q    The other one is Pat Linehan?

24   A    Yes, correct.

25   Q    And they work for a major law firm in D.C --

1  A      Correct.

2  Q      -- called Steptoe & Johnson?

3  A      Correct.

4  Q      Mr. Linehan is actually in the courtroom with one

5  of his associates?

6  A      Correct.

7  Q      And whenever you met with the special counsel

8  here, were Linehan or Mr. Heberlig or some other person

9  from their law firm also with you?

10 A      Yes.

11 Q      Okay.  And when you met with the Senate Judiciary

12 Committee, you met with them for four or five hours,

13 right?

14 A      Correct.

15 Q      And you were asked to tell the truth because you

16 were told that if you lied to Congress, you could be

17 prosecuted?

18 A      Yes.

19 Q      And, again, you made positive statements about

20 Mr. Danchenko?

21 A      Yes.

22 Q      Okay.  Now, let's talk about your interactions

23 with the special counsel, which I will call the Durham

24 team.  Do you remember when you first met with them?

25 A      Yes.

1   Q     Does July 26 of 2021 sound fair?

2   A     Yes, it does.

3   Q     Okay.  And when you met with them for the first

4   time after you were meeting with people for 25 or 30

5   hours, did your status change from a witness to a

6   subject of an investigation?

7   A     Yes, it did.

8   Q     Okay.  And in your work for the FBI, has anyone

9   ever told you that you are a subject of a criminal

10  inquiry?

11  A     No.

12  Q     Was that scary?

13  A     Yes.

14  Q     Is that why you had two lawyers with you?

15  A     Yes.

16  Q     Two good lawyers?

17  A     Yes.

18  Q     Okay.  And when you met with them, you didn't

19  believe you did anything wrong, right?

20  A     Correct.

21  Q     And you told them that?

22  A     Correct.

23  Q     But yet they were telling you that you could

24  potentially face criminal prosecution here?

25  A     I don't recall them actually stating that during

1 the interview, but it was understood, as a subject of a

2 criminal investigation, that that was a possibility.

3 Q    And that was scary?

4 A    Yes.

5 Q    Okay.  Now, prior to your testimony today, how

6 many times did you meet with Mr. Durham and anybody on

7 his team?

8 A    I believe it was something like three or four.

9 Q    Okay.  Did you meet with them last week?

10 A    Yes.

11 Q    How many times did you meet with them to prepare

12 for your trial testimony?

13 A    I believe it was twice last week.

14 Q    Okay.  And prior to that, you met with them a

15 number of times in 2021; is that right?

16 A    Correct.

17 Q    Can I ask you this?

18 A    Sure.

19 Q    In your career, did you ever have meetings with

20 prosecutors from the Department of Justice?

21 A    Yes.

22 Q    In any of those other meetings with prosecutors of

23 the Department of Justice, did you bring not one but

24 two lawyers from a major Washington, D.C., law firm

25 with you?

1  A      No.

2  Q      Okay.  So this was different?

3  A      Yes.

4  Q      This was unusual?

5  A      Yes.

6  Q      How about any meetings with other agents?  You've

7  met with other agents before?

8  A      Yes.

9  Q      And prosecutors?

10 A      Correct.

11 Q      Did those agents ever bring lawyers with them to

12 those meetings?

13 A      No.

14 Q      Okay.  That would be odd, right?

15 A      Yes, it would.

16 Q      Okay.  Again, I'm not criticizing you because I

17 understand you have a right to have counsel because you

18 felt like you needed to be protected.  Is that right?

19 A      That is correct.

20 Q      Okay.  And despite what they told you about your

21 status as a subject, you told them the truth; is that

22 right?

23 A      That is correct.

24 Q      Okay.  And so I'd like to talk a little bit about

25 your work at the FBI if that's okay.  So we went

1  yesterday, and we covered that you have a doctorate

2  degree and are very well educated?

3  A     Yes.

4  Q     When I heard you testify and I heard a Russian

5  name come up, I heard you talk with an accent.

6  A     Well, I know how to pronounce some things, yes.

7  Q     How is that?

8  A     I've had two years of university level Russian, as

9  well as some refresher courses in Russian.

10  Q     And can you read a little bit of Russian?

11  A     It's rusty, but yes, a little bit.

12  Q     Enough to look at a document and get the gist of

13  what it's saying?

14  A     Sometimes, yes.

15  Q     Okay.  And you were hired by the FBI in 2005 or

16  2006?

17  A     2005.

18  Q     Okay.  And tell us -- because I want to

19  understand, and I think the jury wants to understand

20  this -- what is your role as an intelligence analyst?

21  A     So I was hired on in 2005 as an intelligence

22  analyst, a line analyst.  And like I said yesterday,

23  line analysts are busy reading different types of

24  classified and unclassified materials.  They are going

25  through the fruit of investigations to help both the

1  investigators in the field, as well as to help

2  headquarter's executives understand trends, understand

3  patterns, and the like.

4  Q    Okay.  And as an intelligence analyst, I'm

5  assuming you gather information from either witness

6  interviews --

7  A    Correct.

8  Q    -- from open sources?

9  A    Open sources, yes.

10  Q    So let's talk about an open source.  What is an

11  open source?

12  A    So an open source can be anything that is

13  available publicly.  A newspaper article could be open

14  source.  A journal article could be open source.  We

15  tend to break it down in terms of classified and

16  nonclassified.  But if it's out in the open, we tend to

17  call it open source.

18  Q    Okay.  We'll talk more about open source in a

19  minute, but I think Mr. Durham talked to you about

20  Politico.

21  A    Yes.

22  Q    Politico is open source?

23  A    Correct.

24  Q    So someone like myself, I could type in

25  information about, you know, whatever the topic is,

1  maybe find a Politico story, right?

2  A    Correct.

3  Q    Okay.  Of course, you have FBI databases that have

4  other information; is that right?

5  A    That is true.

6  Q    Okay.  I think yesterday there was a topic

7  discussed called "raw intelligence."

8  A    Yes.

9  Q    Okay.  So help the jury understand what is meant

10  by the term "raw intelligence."

11  A    So raw intelligence -- one way of thinking about

12  it is you are receiving -- exactly what you receive

13  from a source.  It might be raw.  It's not necessarily

14  gone through a process of being evaluated or assessed.

15  Q    So basically, not corroborated material, just raw

16  material, and then here it is.  And it's got to be

17  corroborated thereafter?

18  A    Correct.

19  Q    Okay.  So to go back to open source -- because I

20  still have some questions that I want to make it clear

21  to the jury.  So suppose I have a conversation with you

22  and I tell you that George Washington was the first

23  president of the United States, right?

24  A    Correct.

25  Q    It's fair to say that that would be open source

1  material?

2  A    Yes.

3  Q    That it's common knowledge?

4  A    Common knowledge.

5  Q    And that if you're citing that George Washington

6  is a president, you need not tell the world that I told

7  it to you because it's kind of well known?

8  A    You would not need to cite that.

9  Q    Same thing.  If I told you that Christmas Day

10  falls on December 25 of every year, you would agree

11  with me that it does, right?

12  A    Correct.

13  Q    And, again, you would not need to cite me as a

14  source for that because it's common knowledge, right?

15  A    True.

16  Q    Okay.  Let's talk about as an intelligence

17  analyst.  Is it fair to say that you try to make

18  analytical judgments about information that you

19  receive?

20  A    Yes.

21  Q    Okay.  And whether that information comes from a

22  confidential human source, which we talked about

23  yesterday, an open source --

24  A    Yes.

25  Q    -- or a combination of those, right?

1    A    Correct.

2    Q    Okay.  And you tried to assess whether the

3    information that you receive is more likely to be true

4    or false based on an examination of facts that you

5    receive, right?

6    A    That is correct.

7    Q    And, in fact, when you spoke to the inspector

8    general in August -- I'm sorry -- April 26, 2019, you

9    told them that you were making analytical judgments

10   based on your training, expertise, and career at the

11   bureau?

12   A    Correct.

13   Q    And I think you may have testified yesterday, but

14   I know you testified before that it was your job to

15   connect the dots and provide necessary and verified

16   intelligence and information needed to be verified in

17   investigations to the bureau.

18   A    Yes.

19   Q    Okay.  And that would help agents make good,

20   informed decisions about how they want to proceed; is

21   that right?

22   A    That is correct.

23   Q    All right.  Now, as an analyst, you have tools

24   that you utilize to help you make analytical judgments;

25   you would agree with me?

1    A    Yes.

2    Q    Okay.  And I'd like to show you for identification

3    two different charts.  So first is Defense Exhibit

4    No. 400.

5              MR. ONORATO:  It's not for the jury, just for

6    the witness.

7    A    I'm on 400.

8    Q    Okay.  Take a look at the document and please let

9    the jury know whether you are familiar with this

10   document.

11   A    I am familiar with this document.

12   Q    Okay.  Please tell the jury what that document is.

13   A    This is a breakdown of how the FBI judges

14   probability in terms of likelihood with respect to its

15   analytical judgments and assessments.

16   Q    In terms of probability and likelihood, is that

17   something that you rely on, that chart, in doing your

18   job as an FBI agent?

19   A    In part, yes.

20   Q    You were trained with respect to this chart,

21   correct?

22   A    Yes.

23              MR. ONORATO:  Okay.  Your Honor, I'd move in

24   Defense Exhibit No. 400.

25              THE COURT:  Any objection?

1              MR. DURHAM:  No objection.

2              THE COURT:  Without objection, Defense

3    Exhibit 400 is admitted.

4    BY MR. ONORATO:

5    Q     Likewise, with respect to Defense Exhibit

6    No. 401 -- please take a look at that.

7    A     I am looking at 401.

8    Q     What is that?

9    A     That is a number of statements in terms of how we

10   determine in the FBI whether something falls on a very

11   high confidence judgment, a medium confidence judgment,

12   or a low confidence judgment.

13   Q     When you say a high confidence judgment, medium

14   confidence judgment, or low confidence judgment, what

15   do you mean?

16   A     What I mean is that if you are going to assess

17   something, you want to know the confidence level of

18   your assessment.  And so there are aspects that you

19   would look at to determine how, you know, robust your

20   confidence would be in the assessment that you're

21   making.

22   Q     When you are assessing information, it would be

23   fair to say that facts are important for you to make

24   those two assessments based on 400 and 401?

25   A     Yes.

1   Q     And facts no matter where you get them, correct?

2   A     Correct.

3   Q     So if you have certain facts in January of 2016,

4   you would use those facts, correct?

5   A     Yes.

6   Q     And if you got facts today in court, you would use

7   those facts to do your job; is that right?

8   A     That is correct.

9   Q     Okay.  And is it fair to say sometimes you get

10  conflicting information about data?

11  A     Yes.

12  Q     And when that happens, sometimes you cannot make

13  an analytical judgment one way or another because both

14  sides or both pieces of information could be plausible?

15  A     That is correct.

16  Q     And so sometimes there are strong arguments

17  against a proposition, right?

18  A     Correct.

19  Q     And sometimes there are strong arguments for the

20  other side, right?

21  A     Correct.

22  Q     And in that scenario, you can't make a conclusion

23  because you're just getting the facts and you're trying

24  to figure them out?

25  A     Yes.

1  Q    Okay.  Now, given your background with respect to,
2  you know, analytics and, you know, your work history,
3  is it fair to say that you were assigned to the
4  Crossfire Hurricane investigation?
5  A    Yes.
6  Q    Now, a quick summary would be to say that
7  Crossfire Hurricane started because someone who was
8  represented to be a high-level Trump campaign official
9  and advisor, Mr. Papadopoulos, allegedly indicated that
10 the Russians would help leak damaging information to
11 the Clintons and Obamas, right?
12 A    They had received a suggestion that they could be
13 helped that way, yes.
14 Q    Again, that person was George Papadopoulos, right?
15 A    That is correct.
16 Q    Okay.  And the FBI opened an investigation on
17 July 31, 2016?
18 A    Yes.
19 Q    That was before you had any information regarding
20 the Steele dossier, right?
21 A    That is correct.
22 Q    That was before you even -- so you would agree
23 with me that the opening of that investigation had
24 nothing to do with the Steele information; it had
25 nothing to do with the initiation of Crossfire

1 Hurricane?

2 A     Correct.

3 Q     You would agree that the goal of Crossfire

4 Hurricane was to determine whether or not there was

5 truth to the allegation that a friendly foreign

6 government had provided the U.S. with respect to Russia

7 and collusion between the Trump administration?

8 A     That is correct.

9 Q     Now, a day or two after the opening, your

10 supervisor -- that was Jon Moffa?

11 A     That is correct.

12 Q     He said he was going to put together a team,

13 right?

14 A     Yes.

15 Q     And he said he wanted you to lead that team?

16 A     The analytical team, yes.

17 Q     He wanted you to lead that team because he knew

18 you did good work?

19 A     I believe so, yes.

20 Q     And he thought that you were knowledgeable on

21 Russian matters?

22 A     Yes.

23 Q     In fact, didn't you, before being assigned to

24 that, receive what they call the Director's Award at

25 the FBI?

1   A      I did.

2   Q      That's a prestigious award, right?

3   A      Yes.

4   Q      And that award is given to people who perform

5   exceptionally?

6   A      Yes.

7   Q      Was it Director Mueller who gave you your award?

8   A      No.  I believe that was actually under Comey.

9   Q      Director Comey.  Okay.

10         And so he assigned you to that team as a

11  supervisory counterintelligence agent on Crossfire

12  Hurricane, right?

13  A      Correct.

14  Q      And is it fair to say that you built a team of

15  diggers?

16  A      Yes.

17  Q      And the diggers would be people who would try to

18  get information, right?

19  A      Right.

20  Q      Okay.  Have you ever heard of the term "finished

21  intelligence report"?

22  A      I have.

23  Q      What is that?

24  A      A finished intelligence report is something that

25  is, number one, not raw.  Number two, it has been

1  evaluated, assessed.  And usually by finished, we mean

2  it's been published in some standardized format.

3  Q    It is fair to say at the beginning of Crossfire

4  Hurricane, your supervisor told you that Crossfire

5  Hurricane would not be -- would not produce finished

6  intelligence reports?

7  A    That is correct.

8  Q    Okay.  And that you would be analyzing travel

9  records, analysis, and other database information,

10  correct?

11  A    That is correct.

12  Q    Okay.  We're going to talk about travel records

13  later.

14      Is it fair to say that the majority of assignments

15  were given to your team by FBI agents?

16  A    I wouldn't say the majority of assignments given.

17  I think it was one of those things where we had

18  analysts embedded or working together with agents.  And

19  so it would be sort of an -- sometimes assigned,

20  sometimes organic.

21  Q    But your agents weren't saying, "Agent So and So,

22  we need to do X, Y, and Z"; the agents would say, "Hey,

23  I would like you to help me do X, Y, or Z"?

24  A    Yeah, oftentimes.

25  Q    Fair enough.

```
 1        So if an agent were to say to one of your
 2   supervisors, "Hey, can you get travel records for
 3   Sergei Millian," would they do that?
 4   A    Yes.
 5   Q    And if an agent said, "Hey, can you get travel
 6   records for Igor Danchenko," would they do that?
 7   A    Yes.
 8   Q    Okay.  Now, let's talk about your knowledge of
 9   Mr. Millian.  Before we cover your meeting with
10   Mr. Danchenko in January 2017, you were aware of
11   Mr. Millian; is that right?
12   A    That is correct.
13   Q    And, in fact, is it fair to say that in August of
14   2016 that the FBI had spotted Mr. Millian meeting with
15   an individual that the FBI was looking at?
16   A    Yes.
17   Q    So you are aware that he popped up on the FBI's
18   radar in August 2016, before the FBI had knowledge
19   about the Steele report, right?
20   A    Correct.
21   Q    Because that wasn't until September 2019, right?
22   A    Correct.
23   Q    I'm sorry.  September 19 of 2016?
24   A    Correct.
25   Q    So in 2016, in August, before Mr. Danchenko was
```

1  connected to the dossier or anything, the FBI had the

2  name Sergei Millian on its radar screen, right?

3  A     Correct.

4  Q     Okay.  And you knew a lot -- so once you got his

5  name, I'm assuming that the analytics team started to

6  do research on Mr. Millian.

7  A     Yes, it did.

8  Q     And one of the things that you did was that you

9  researched open source material, right?

10  A     Yes.

11  Q     Okay.  And would it be fair to say that

12  Mr. Millian had a huge open source presence in that

13  time frame discussing his connections to Donald Trump?

14  A     I believe, yes.

15  Q     Okay.  And would it be fair to say that

16  Mr. Millian was boasting about his business

17  relationships with Mr. Trump not only in Florida but

18  also in Russia?  Correct?

19  A     I don't recall exactly boasting or anything of

20  that sort, but I do believe I recall some connections

21  there.

22  Q     We talked about that.  Boasting is my word, but

23  discussing it; fair to say?

24  A     Yes, fair.

25  Q     Okay.  And you understood that he was the founder

1 president of the Russian-American chamber of commerce,

2 right?

3 A     Correct.

4 Q     And just going back to Crossfire Hurricane, in

5 August, when the information was out there publicly

6 that he's saying he has business connections to

7 Mr. Trump and all of those other things, that's a

8 reason why the FBI would want to take a further look at

9 him, correct?

10 A     One reason, yes.

11 Q     Correct, one of them.

12       And you knew that he resided in New York or

13 appeared in New York with some regularity?

14 A     Correct.

15             MR. ONORATO:  Your Honor, can we approach?

16             THE COURT:  Yes.

17       (Conference at the bench, as follows:)

18             THE COURT:  Yes.

19             MR. ONORATO:  In this area, I would like to

20 start to explore -- and I think Mr. Durham showed him

21 information to suggest that he had certain facts that

22 he wasn't aware of, whether they would have been useful

23 to him.  The conversations in the week of the alleged

24 phone call between Mr. Millian and Mr. Danchenko,

25 Mr. Millian is talking about meetings with the Trump

1  campaign and those things.  So I want to know if those

2  pieces of information would be referred to him.

3           MR. DURHAM:  Can you just repeat that?

4           MR. ONORATO:  Sure.  I'm sorry, John.

5           MR. DURHAM:  Yeah.

6           MR. ONORATO:  So when I mentioned this

7  morning that I want to introduce facts to him as an

8  analyst -- because there are -- he is talking about

9  he's having upcoming meetings with the Trump campaign

10  and team in July and August of 2016.  I want to know if

11  those were important facts for him to learn either back

12  then as an analyst or today as an analyst.

13          MR. DURHAM:  For what purpose?

14          MR. ONORATO:  For the purpose of

15  establishing, first of all, materiality and, second of

16  all, for him to make a conclusion that the information

17  was likely correct based upon the things that were out

18  there.

19          MR. DURHAM:  I don't think that goes to

20  materiality.  I mean, I know we can say it all goes to

21  materiality.

22          THE COURT:  Given the information that was

23  pretty wide-range, I'm going to allow you to get into

24  that.

25          MR. ONORATO:  Thank you.

1          THE COURT:  All right.

2          (Proceedings continued in open court, as follows:)

3          MR. ONORATO:  The Court's indulgence.

4    BY MR. ONORATO:

5    Q    So I would like you to look at what's been marked

6    as Defense Exhibit 483.  That's an English and Russian

7    version of that document.

8    A    So 483 I'm looking at?

9    Q    Yes.

10   A    This is an email.

11   Q    Oh, I'm sorry.  I apologize.  I want you to go to

12   481.  My apologies.

13   A    So 481.  Okay.

14   Q    And, again, I don't want to discuss whether the

15   information in this email is truthful, okay.  But it

16   purports to be an email from Sergei Millian, right?

17   A    481, yes.

18   Q    Okay.  And it purports to be sent on July 15 of

19   2016?

20   A    Correct.

21   Q    And it purports to be to someone named

22   bridgeusa --

23   A    @aol.com, yes.

24   Q    And the subject matter is Trump?

25   A    Trump, yes.

1  Q    Okay.  And do you remember when Mr. Durham asked

2  you questions about if you had certain facts, would

3  they have been material or helpful to you?  Right?

4  A    Yes.  Yes.

5  Q    Okay.  So in July 15 of 2016, again, the same time

6  frame that Mr. Danchenko allegedly received this

7  anonymous phone call, right?

8  A    Yes.

9  Q    If you had known that Mr. Millian was telling

10 people that he would be meeting with Trump and his

11 people, would that be significant to you?

12 A    Yes.

13 Q    Okay.  So I'm going to ask you to look at 4 -- and

14 that's what that email purports to say, that

15 Mr. Millian was going to be meeting with Trump and his

16 people?

17 A    It's in Russian.

18 Q    Did you look at --

19 A    I don't have the translation.  Hold on.  Sorry.

20 Q    You should.

21 A    Excuse me, yes.

22 Q    Okay.  So that would have been material and

23 important when evaluating whether the anonymous caller

24 could have been Mr. Millian?

25 A    Yes, this would have been helpful.

1  Q    Correct.

2      Did anybody from Mr. Durham's team ever show you

3  that document?

4  A    This is the first time I've seen this document.

5  Q    Okay.  Do you think, prior to your testimony on

6  the subject matter, it would have been helpful for

7  somebody on that team to show you that document?

8  A    I don't know who bridgeusa@aol.com is, but in

9  terms of anything with Millian, that would have been

10  helpful to see, yes.

11  Q    Right.  Because what you're trying to do is see

12  whether Millian had a conversation about Russia with

13  Mr. Danchenko, right?

14  A    Yes.

15  Q    Okay.  So let's go to the next document.  That's

16  482, again, the translated page.  It's also dated the

17  same day.  So it's July 15, 2016, but this time it's

18  from Millian to a person named Zlodorev, right?

19  A    Correct.

20  Q    And Zlodorev is someone that Mr. Danchenko

21  discussed with you in your January meetings, correct?

22  A    That is correct.

23  Q    In fact, he told you that Zlodorev was actually

24  the individual that put him in touch with Millian,

25  right?

1  A      That is my recollection, yes.

2  Q      Okay.  And it's fair to say, again, not whether a

3  meeting happened or it was truthful, but that Millian

4  was saying at the beginning of August, "I'm meeting

5  with Trump and his people.  I assume we will discuss

6  Russia."  Right?

7  A      Yes.

8  Q      And, again, that fact would be important for you

9  as an analyst, right?

10 A      Yes.

11 Q      And that's a document that Mr. Danchenko, of

12 course, was not copied on, right?

13 A      Correct.

14 Q      But did the special counsel show you that document

15 before today?

16 A      I have not seen this document.

17 Q      But you would agree with me those types of

18 discussions would be important and material for you to

19 analyze the situation when Mr. Danchenko is describing

20 his discussions with Millian?

21 A      Yes.  In terms of interactions with Millian, this

22 would have been helpful to have, yes.

23 Q      Thank you.

24         MR. ONORATO:  The Court's indulgence.

25

1  BY MR. ONORATO:

2  Q     Now, you also understand that when Crossfire

3  Hurricane opened -- I think you testified yesterday

4  that there were four people who the government was

5  looking at, correct?

6  A     Correct.

7  Q     Papadopoulus?

8  A     Correct.

9  Q     Paul Manafort, the former campaign manager?

10  A     Correct.

11  Q     Carter Page?

12  A     Correct.

13  Q     And the fourth?

14  A     Michael Flynn.

15  Q     And are you aware that -- I think Mr. Durham asked

16  you -- whether Mr. Page was ever charged or convicted

17  of a crime?

18  A     Yes, he did.  He asked me that.

19  Q     And what did you tell him?

20  A     No.

21  Q     What about the other three people?

22  A     Well, Mr. Manafort, yes.

23  Q     Was he convicted?

24  A     Yes.

25  Q     Next person?

1  A     Michael Flynn.

2  Q     Convicted?

3  A     Yes.

4  Q     Okay.  Next?

5  A     George Papadopoulos.

6  Q     Okay.  And?

7  A     Yes.

8  Q     So three of those four were convicted of crimes?

9  A     Correct.

10 Q     Based on the Crossfire Hurricane investigation?

11 A     As it went over to the special counsel's office,

12 yes.

13 Q     Okay.

14        THE COURT:  Mr. Onorato, are you offering 481

15 and 482?

16        MR. ONORATO:  I am, Your Honor.

17        THE COURT:  All right.  Over objection 481,

18 481T, 482, and 482T are admitted.

19        MR. DURHAM:  No objection, Your Honor.

20        THE COURT:  No objection?

21        MR. DURHAM:  No objection.

22        THE COURT:  All right.  Without objection,

23 those are admitted.

24        MR. ONORATO:  Your Honor, can I publish them

25 to the jury?

1            THE COURT:  Yes.

2            MR. ONORATO:  If you would, go to 481T, the

3    English.

4            MR. DURHAM:  Your Honor, could we just ask

5    the Court to give an instruction.  I think counsel is

6    offering it not for the truth.

7            THE COURT:  Yes.

8            Ladies and gentlemen, I've admitted two

9    exhibits you're about to see.  They are being admitted

10   solely as evidence of the fact of those statements, not

11   for the truth of what those statements say.

12   BY MR. ONORATO:

13   Q    Okay.  I know we've read them, but just for the

14   jury to see, that's when -- July 15, about a week or so

15   before Mr. Danchenko says that he got this anonymous

16   phone call, that Millian is telling people that he's

17   going to be meeting with the Trump folks, correct?

18   A    Correct.

19   Q    And just to the next exhibit.  And I'm not going

20   to do what Mr. Durham did and show every single word

21   and read everything.  We're just going to highlight it.

22   Okay.

23        Again, he's telling Mr. Zlodorev that he is

24   meeting with Trump and his people, correct?

25   A    Correct.

1  Q     And that's an important fact, right?

2  A     Yes.

3  Q     Okay.  So I think you testified yesterday to a

4  number of different phases of the Crossfire Hurricane

5  investigation.

6  A     Yes, I did.

7  Q     And I think I've read somewhere that you once

8  characterized the phase where you met with

9  Mr. Danchenko as spaghetti.

10 A     Yes, I did.

11 Q     Can you tell us what you mean by that term

12 "spaghetti" and what the investigation was like?

13 A     What I mean is that at that period of time, the

14 period circa December 2016 until about March 2017, many

15 of the cases had been -- initially, we had been very

16 centralized and in one area on one team working on the

17 Crossfire cases.  In the second period, that

18 centralization was removed, and a number of cases went

19 to different parts of the FBI, different field offices

20 and the like.  And so it meant that not only were the

21 cases in certain areas, but it meant that the reporting

22 chains in some cases were different as well than they

23 had been.

24 Q     Okay.  And so is it fair to say that there were a

25 lot of moving parts in the -- I'll call it the

1  spaghetti phase.

2  A     Yes, there were.

3  Q     And is it fair to say that there were a lot of

4  people employed by the United States government, the

5  FBI, working a lot of hours?

6  A     Yes.

7  Q     Okay.  And it's fair to say that you are one of

8  the people working a lot of hours, right?

9  A     Correct.

10 Q     And you did that because you wanted to do your

11 best, right?

12 A     Correct.

13 Q     You were trying to do your best information --

14 best job to get the data you needed to kind of help the

15 investigation, right?

16 A     Correct.

17 Q     And sometimes -- in hindsight, we can always say,

18 "Hey, you should have done X or Y or Z," right?

19 A     Yes.

20 Q     But at the time, you thought you were doing

21 everything that you needed to do that was important to

22 you?

23 A     Correct.

24 Q     Okay.  All right.  So we are going to talk in a

25 minute about how you got to meet Mr. Danchenko.  Okay.

1      But you were able to figure out Mr. Danchenko's

2 identity by doing what you do, and that is make

3 analytical judgments, right?

4 A     Correct.

5 Q     So you looked at data, correct?

6 A     Correct.

7 Q     You looked at travel records?

8 A     Correct.

9 Q     You looked at Facebook connections?

10 A     Correct.

11 Q     And you indicated that this guy is likely the

12 person that talked to Mr. Steele, right?

13 A     Correct.

14 Q     You figured that out on your own?

15 A     Correct.

16 Q     And that's because when -- the FBI met with

17 Mr. Steele, right?

18 A     Yes.

19 Q     And that was back when?  In October 2016?

20 A     Early October 2016.

21 Q     He did not want to tell you who his subsource was,

22 his primary subsource, right?

23 A     Correct.

24 Q     And the reason he didn't want to tell you his

25 primary subsource was that he was concerned about his

1   safety, right?

2   A     That's my recollection, yes.

3   Q     Okay.  And he was trying to protect Mr. Danchenko,

4   right?

5   A     Correct.

6   Q     And despite Mr. Durham asking you about the

7   million dollars that was offered to him, right?

8   A     Correct.

9   Q     The most important thing for him to do was not

10  jeopardize his safety?

11  A     I wouldn't say in the course and scope of our

12  discussion that it was articulated in terms of this is

13  more important than that.

14  Q     But he didn't take him up on the offer to tell you

15  who Mr. Danchenko was?

16  A     He did not provide the information that we said he

17  could provide to get him up to a million dollars,

18  correct.

19  Q     He did not?

20  A     He did not.

21  Q     So he was not motivated by a million dollars to

22  give up Mr. Danchenko's name, right?

23  A     That wasn't on offer to give up.

24  Q     But in terms of the, look, if you give up

25  Danchenko's name, somebody would give him a payout,

1 right?

2 A    No, it wouldn't have gone like that.

3 Q    So what is the import of the testimony yesterday?

4 I don't understand.

5 A    So the import of the testimony is that -- how I

6 would articulate that Mr. Steele was given --

7 basically, in the FBI, if you are out attempting to

8 recruit, let's say, an intelligence officer from a

9 foreign country and you might -- and I've actually

10 heard this pitched before to an intelligence officer

11 where if you have information that could lead to, for

12 example, a penetration of the American government, you

13 could -- if a successful prosecution occurs, you could

14 potentially earn up to a million dollars.

15     So this was very similar in terms of the pitch to

16 that.  If you are able to provide corroborating

17 information -- and I think we talked about my

18 recollection with respect to my testimony in the IG

19 report was that, you know, there were three so-called

20 buckets that were discussed with Mr. Steele.  And that

21 if there could be any corroborating information, any

22 documentary evidence, things of that sort that led to a

23 successful prosecution, Mr. Steele would be able to

24 earn potentially up to a million dollars.

25 Q    So you would agree with me that one of the most

1  important things -- your takeaway there is to know who

2  his primary subsource was, right?

3  A    That is correct.

4  Q    He didn't give you that?

5  A    He did not.

6  Q    And the predicate to that, of course, is to get

7  paid, you need to at least start by giving up your

8  primary subsource?

9  A    That would be one piece.

10  Q    Right.  He told you that he gathered information,

11  right?

12  A    Correct.

13  Q    That he couldn't corroborate it on his own, right?

14  A    Correct.

15  Q    That he'd need to talk to his primary subsource,

16  right?

17  A    Well, I recall him saying that he needs to talk to

18  him, but that would be the logical outlie if he's

19  getting information from a single source.

20  Q    Again, I don't want to go too far with it, but I

21  guess the predicate is he'd have to provide information

22  that would corroborate who Mr. Danchenko was to be able

23  to receive that reward?

24  A    Correct.

25  Q    Okay.  And he didn't provide that?

1  A     He did not.

2  Q     Because of his safety?

3  A     Yes, he did not provide it because of safety.

4  Q     Thank you.

5        So let's talk to the days leading up to your

6  meeting with Mr. Danchenko.  It was the government's

7  position from the outset that you wanted to convert

8  Mr. Danchenko to a confidential human source?

9  A     That's my recollection, yes.

10  Q    In fact, you said that in your affidavit that you

11  submitted, right, to the FBI?

12  A    Correct.

13  Q    Okay.  And there's an email that we're going to

14  show you, what's marked as 402 for identification.

15  A    I'm on 402.

16  Q    Okay.  And this 402 discusses -- are you copied on

17  that email?

18  A    I am, yes.

19  Q    Okay.  And so you're situationally aware of the

20  fact that the government developed what we call an

21  operations plan?

22  A    Yes.

23  Q    Okay.  And that was to figure out how to approach

24  Mr. Danchenko, right?

25  A    Correct.

1  Q     To get him to cooperate?

2  A     Correct.

3  Q     Okay.  Thank you.

4        Now, ultimately, there was an agreement to meet

5  with Mr. Danchenko from January 24 through January 26

6  of 2017, right?

7  A     Right.

8  Q     Okay.  And you were at the meeting?

9  A     Yes.

10 Q     And Steve Somma was at the meeting?

11 A     Correct.

12 Q     Okay.  And I think you testified yesterday that

13 Steve Somma would actually be the handling agent if you

14 were able to convert Mr. Danchenko to a confidential

15 human source.

16 A     I recall that that was the initial idea.

17 Q     Okay.  And you were subpoenaed to come to court

18 here today, right, by the government?  Did they

19 subpoena you?  Were you compelled to come here?

20 A     No.

21 Q     But if you didn't come to court today, would the

22 government come out and get you for not appearing at

23 trial?

24 A     I don't know exactly what the government would do

25 if I didn't appear here.

1  Q     But Mr. Danchenko wasn't subpoenaed to meet with

2  you; was he?

3  A     No, he was not.

4  Q     And you know what a subpoena is, right?

5  A     I do.

6  Q     A subpoena is kind of a compulsory process where

7  someone has to come and meet with you, correct?

8  A     Correct.

9  Q     And the FBI will sometimes ask a prosecutor, like

10 Mr. Durham's team, to subpoena evidence or witnesses to

11 grand juries to get information, right?

12 A     Correct.

13 Q     And no subpoena was done here, right?

14 A     Correct.

15 Q     Okay.  The outreach was voluntary, right?

16 A     Yes, it was.

17 Q     So Danchenko appeared voluntarily, and he met with

18 you over the course of three days, right?

19 A     Yes.

20 Q     And there were long sessions?

21 A     I recall, yes.

22 Q     Okay.  Because you wrote, you know, a very long

23 what we call a version of a 302, right?

24 A     We call it an EC, but yeah.

25 Q     A 302, it's just an internal FBI report, right?

1  A     Correct.

2  Q     Okay.  And it took you a while to write it because

3  you covered a lot of topics?

4  A     Correct.

5  Q     Okay.  And I think in your affidavit, you said you

6  were one of the people picked to do this because you

7  were involved in a lot of interviews in your career?

8  A     Yes.

9  Q     But, again, the primary purpose of the meeting was

10  to get him as a source for an investigation, right?

11  A     Well, no.  The primary purpose of the three-day

12  meeting was to obtain corroboration or information with

13  the idea also that that wouldn't necessarily be the

14  last time we might meet with him and to see if we could

15  bring him on as a source.

16  Q     Okay.  We might be saying similar things.  So let

17  me just double-check something.

18  A     Okay.

19           THE COURT:  Thank you, Counsel.

20           Counsel, we're going to go ahead and break

21  for lunch.

22           We're going to take our luncheon recess at

23  this time.  We'll reconvene at 2:00.  Please do not

24  discuss this case during the luncheon recess.

25           (The jury exits at 12:57 p.m.)

1            THE COURT:  Mr. Auten, do not discuss your

2    testimony during the recess.

3            The Court will stand in recess.

4            -----------------------------------

5                       Time:  12:58 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        I certify that the foregoing is a true and

22    accurate transcription of my stenographic notes.

23

24
                              _____
                                        /s/
25                            Rhonda F. Montgomery, CCR, RPR


Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599