1          EASTERN DISTRICT OF VIRGINIA
              ALEXANDRIA DIVISION
2
UNITED STATES OF AMERICA,    )  Case 1:21-cr-245
3                            )
                Plaintiff,   )
4                            )
        v.                   )  Alexandria, Virginia
5                            )  October 13, 2022
IGOR Y. DANCHENKO,           )  9:06 a.m.
6                            )
                Defendant.   )  Volume 3 (AM Session)
7  _____)  Pages 582 - 728

8                TRANSCRIPT OF TRIAL

9      BEFORE THE HONORABLE ANTHONY J. TRENGA

10        UNITED STATES DISTRICT COURT JUDGE

11                   AND A JURY

12

13 APPEARANCES:

14 FOR THE PLAINTIFF:

15      JOHN DURHAM, ESQUIRE
        MICHAEL T. KEILTY, ESQUIRE
16      D. BRITTAIN SHAW, ESQUIRE
        U.S. DEPARTMENT OF JUSTICE
17      145 N Street, N.E.
        Washington, D.C.  20002
18      (203) 410-2641

19 FOR THE DEFENDANT:

20      STUART A. SEARS, ESQUIRE
        DANNY ONORATO, ESQUIRE, *PRO HAC VICE*
21      SCHERTLER, ONORATO, MEAD & SEARS
        555 13th Street, N.W., Suite 500 West
22      Washington, D.C.  20004
        (202) 628-4199
23
THE DEFENDANT, IGOR Y. DANCHENKO, IN PERSON
24

25    COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

583

1                          **I N D E X**

2   WITNESS                   EXAMINATION                    PAGE

3   Charles Dolan, Jr.   Direct by Mr. Keilty          589
                         Cross by Mr. Sears           637
4                        Redirect by Mr. Keilty       654

5   Kevin Helson         Direct by Mr. Durham         658

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rhonda  F.  Montgomery    OCR-USDC/EDVA   (703)  299-4599

584

1          (The jury is not present.)

2              THE COURT:  Good morning.

3              MR. DURHAM:  Good morning, Your Honor.

4              MR. SEARS:  Good morning.

5              MR. ONORATO:  Good morning.

6              THE COURT:  Let me first report that one of

7   our jurors called in sick, and she's not appearing here

8   today.  I'm going to excuse her.  That would be Juror

9   No. 8., and she'll be replaced by the first alternate,

10  Juror No. 90.  All right.  And I've requested that she

11  be asked to take a COVID test, and we'll see what that

12  does.  Oh, I'm sorry.  She's Juror No. 51.  She was 8

13  on the sign-in list.

14              Juror No. 51, Ms. Keefe.  All right.

15              MR. SEARS:  I'm sorry.  Can you tell us again

16  which one is out and which one is replaced?

17              THE COURT:  Yes.  No. 90 will replace No. 51.

18              MR. SEARS:  Thank you, Your Honor.

19              THE COURT:  All right.  Any issues?

20              MR. SEARS:  Sorry to disappoint you, Your

21  Honor, but I don't think there really are.  There was a

22  stipulation yesterday that was read and discussed.  It

23  was Stipulation 1810 that related to whether or not

24  messaging app communications would appear on a phone

25  record.  I'm told that that was never formally

1    admitted.  We would move to admit it.  I assume there's

2    no objection since it's a stipulation.

3              MR. KEILTY:  No objection, Your Honor.

4              THE COURT:  All right.  1810 will be

5    admitted.

6              Just to clarify the record, also the other

7    stipulations, 1800, 801, 802, and 803 are admitted as

8    well.

9              MR. SEARS:  Your Honor, the only remaining

10   issue -- and I can hand this up to the court Security

11   Officer, if he would be so kind -- is yesterday

12   Mr. Onorato offered to admit Defendant's Exhibit 26,

13   which was a newspaper -- or an online article from *The*

14   *Bailey Beast* regarding Paul Manafort's departure from

15   the campaign and his relationship with Mr. Lewandowski.

16   It was not admitted yesterday because the version we

17   had in the courtroom did not have a date on it.  We now

18   have a date on it.  I've provided a copy to government

19   counsel.

20        (Documents are passed up to the Court.)

21              THE COURT:  All right.  Thank you.

22              That was previously admitted.

23              MR. SEARS:  It was admitted?

24              THE COURT:  Yes, it was admitted.  So we'll

25   just swap out this exhibit for the record.

1          MR. SEARS:  Thank you, Your Honor.

2          THE COURT:  All right.  Anything else?

3          MR. SEARS:  No.  My understanding, Your

4    Honor, is that this morning we'll begin with Mr. Dolan,

5    who I think both parties think will be a fairly quick

6    witness in legal terms, in lawyer terms quick.

7          Following that, I understand it may be

8    Special Agent Helson, who will be a lengthier witness

9    and probably take us into the afternoon, if not the

10   day.

11         My understanding is that there's three

12   government witnesses remaining after that, two of which

13   who may be fairly shorter, and then the last witness

14   would be the case agent, who would probably take a few

15   hours.  So it looks like we'll be well into testimony

16   tomorrow would be my guess.

17         Obviously, on our side, the lawyers are

18   always wondering how much time they're going to have to

19   put together closings.  And so I think our suggestion

20   to the Court would be, if the day plays out today as we

21   expect it will, whether the Court would allow us to

22   close on Monday.

23         We would ask, if the evidence is closed, if

24   we could make a Rule 29 motion on Friday before we go

25   into the weekend.  That's at least the defense's hope:

1   Assuming the case gets past a Rule 29, that we would be

2   able to close on Monday.

3             THE COURT:  All right.  Counsel.

4             MR. KEILTY:  The government would be fine

5   with that, Your Honor.

6             THE COURT:  All right.  From your

7   perspective, you would anticipate being able to finish

8   up your case by tomorrow?

9             MR. KEILTY:  Yes, Your Honor.  I think by

10  lunchtime tomorrow we'll be done with our case in

11  chief.

12            THE COURT:  All right.  That will give us

13  time for any motions, and we'll talk about the jury

14  instructions as well.  Having closings on Monday would

15  be fine.

16            MR. KEILTY:  Thank you, Your Honor.

17            THE COURT:  All right.  Anything further?

18            MR. SEARS:  No, Your Honor.

19            MR. KEILTY:  Nothing further, Your Honor.

20            THE COURT:  All right.  The Court will stand

21  in recess until the jury is available.

22        (Recess from 9:11 a.m. until 9:39 a.m.)

23        (The jury is not present.)

24            THE COURT:  Anything before we bring the jury

25  out?

1          (No response.)

2                THE COURT:  All right.  Let's bring the jury

3    out.

4          (The jury enters at 9:40 a.m.)

5                THE COURT:  All right.  Please be seated.

6                As I'm sure you've noticed, one of your

7    members is not with you today.  Ms. Keefe called in

8    saying she was not feeling well.  So I have excused

9    her.  I've asked her to provide more information, and

10   I'll share that with you as we receive it.  As a

11   result, Ms. Keefe will be replaced by Ms. Wankowski,

12   Juror No. 90.

13               All right.  Are you ready to proceed?

14               MR. KEILTY:  We are, Your Honor.

15               THE COURT:  All right.  Call your next

16   witness.

17               MR. KEILTY:  Your Honor, the government calls

18   Mr. Charles Dolan.

19               THE COURT:  All right.  Mr. Dolan will come

20   forward, please.

21               Good morning.

22               THE WITNESS:  Good morning, Judge.

23               MR. KEILTY:  May I proceed, Your Honor?

24               THE COURT:  Yes, please.

25

```
 1      CHARLES HALLIDAY DOLAN, JR., PLAINTIFF'S WITNESS,
 2                            AFFIRMED
 3                      DIRECT EXAMINATION
 4  BY MR. KEILTY:
 5  Q    Good morning.  Could you please state and spell
 6  your name for the record.
 7  A    Charles Halliday Dolan, Jr.
 8  Q    If you could, just spell that, please.
 9  A    C-H-A-R-L-E-S, H-A-L-L-I-D-A-Y, D-O-L-A-N, J-R.
10  Q    Thank you, Mr. Dolan.
11       Mr. Dolan, during the course of your testimony,
12  I'm just going to ask you to keep your voice up so that
13  the jury can hear you.
14  A    Yes.
15  Q    And I'm going to try and do the same thing.  And
16  I'd also ask you to just speak slowly.  We have a court
17  reporter who is taking down everything you're saying,
18  and I'm going to try and do the same thing.
19  A    Okay.
20  Q    Mr. Dolan, for the benefit of the jury, could you
21  please describe your educational background.
22  A    I'm a graduate of the University of Massachusetts
23  Amherst where I got a bachelor's degree in philosophy,
24  and then I got a master's degree at the John F. Kennedy
25  School at Harvard.
```

1  Q    Okay.  And following your graduation from Harvard,

2  were you employed?

3  A    I was.

4  Q    Can you please walk through your employment

5  history for the jury?

6  A    I was involved in the 1980 presidential campaign

7  for President Carter, reelection.  I was in St. Louis

8  running the St. Louis operations.  Subsequent to that,

9  I was a political consultant, ran a congressional

10 campaign.  Then I moved on.  I came to D.C. and was the

11 first executive director of the Democratic Governors

12 Association.

13 Q    Okay.  What is the Democratic Governors

14 Association?

15 A    It's an association of all the democratic

16 governors.  Its purpose was politics, policy, and

17 fundraising and the election and reelection of

18 democratic governors.

19 Q    Okay.  And following your work with the Democratic

20 Governors Association, what did you do next?

21 A    I joined the government relations firm of Cassidy

22 & Associates.

23 Q    And when you say "government relations," can you

24 just describe for the jury what that generally means?

25 A    Yeah.  It was -- we had two firms.  We also had

1   Powell Tate, and I was a liaison between the lobbying

2   operation and what we would call the public affairs

3   communications operation of Powell Tate.

4        (Reporter clarification.)

5           THE WITNESS:  Powell Tate, yes.  Jody Powell

6   and Sheila Tate.

7   BY MR. KEILTY:

8   Q    Following your work with Powell Tate, what did you

9   do next?

10  A    I then joined Ketchum Public Relations, which at

11  the time was one of the Top 10 PR firms in the world.

12  I'm not sure where it is today, but I was there.

13  Q    Okay.  And how long did you work for Ketchum,

14  Mr. Dolan?

15  A    As an employee, I was there for about eight years,

16  and then I was there for about another five as a

17  consultant.

18  Q    All right.  We'll return to Ketchum in a second.

19  But following your work with Ketchum, what did you do?

20  A    I went out on my own and essentially I've been

21  affiliated with several different firms, two or three

22  at the same time at times.

23  Q    Okay.  And is it fair to say that it's been a

24  similar kind of work as Cassidy?

25  A    Yes.  Well, it was more of the public relations

592

1   aspect, more of like the Powell Tate aspect.

2   Q     Understood.

3         You testified that you had worked on the 1980

4   President Carter campaign, correct?

5   A     Yes.

6   Q     Did you have occasion to work on any other

7   presidential campaigns?

8   A     Yes.  I've worked either as a paid advisor or as a

9   volunteer on every presidential campaign except for the

10  Obama campaign, democratic presidential campaigns.

11  Q     So all democratic campaigns?

12  A     Yes.

13  Q     Understood.

14        Mr. Dolan, you mentioned that you were employed at

15  Ketchum.

16  A     At?

17  Q     At Ketchum.

18  A     Yes.

19  Q     Again, for the jury, what is Ketchum?

20  A     Ketchum was a public relations firm that did

21  communications and press liaison.

22  Q     And during the course of your employment at

23  Ketchum, what, if any, type of projects did you work

24  on?

25  A     We did a lot of Fortune 100 companies, Delta Air

1  Lines, AT&T, that kind of thing.

2  Q    Okay.  Did you have occasion to work with any

3  international governments?

4  A    When I became a consultant, Ketchum brought me in.

5  They represented the Russian Federation.

6  Q    And do you recall approximately when that was,

7  Mr. Dolan?

8  A    The early 2000s.

9  Q    Okay.  And how long did that engagement last?

10  A    Four or five years.

11  Q    All right.  And what generally did that project

12  entail?

13  A    We worked on a number of things but mostly trying

14  to attract foreign investment into Russia.

15  Q    Okay.  And as part of your work with the Russian

16  Federation, what, if any, interaction did you have with

17  Russian government officials?

18  A    Well, we would have regular meetings -- or I

19  should say conference calls with the communications --

20  the press spokesperson for the president, Dmitry

21  Peskov.

22  Q    For the benefit of the jury, who is Dmitry Peskov?

23  A    He's the press spokesperson for the president of

24  Russia.

25  Q    And who was the president of Russia during this

1   time period?

2   A     Vladimir Putin.

3   Q     Did you have occasion to work with any other

4   Russian government officials during your time with

5   Ketchum?

6   A     We would, you know, have meetings occasionally

7   with the Russian ambassador, people at the embassy.

8   And when I would travel to Russia, we would have

9   meetings -- not myself directly, but we would have

10  meetings with various ministers.

11  Q     Okay.  You mentioned the Russian press secretary,

12  Mr. Peskov.  Did you have any personal interactions

13  with Mr. Peskov?

14  A     Yes.

15  Q     Can you tell the jury what those consisted of?

16  A     I would occasionally have meetings with him, just

17  myself, maybe once or twice a year and just talking

18  about the things that we were working on.

19  Q     Did you have a professional relationship with

20  Mr. Peskov?

21  A     Yes.

22  Q     As part of this project with the Russian

23  Federation, did you have occasion to travel to Russia?

24  A     Yes.

25  Q     Approximately how often did you travel to Russia?

1  A     Once or twice a year.

2  Q     All right.  And I'm sorry if you've already

3  testified about this, but approximately how long did

4  Ketchum's engagement with Russia last?

5  A     I'm not sure because it ended -- my relationship

6  with Ketchum ended before their relationship with

7  Russia ended.  So I'm not sure when that stopped.

8  Q     Approximately when did your relationship with

9  Ketchum end?

10  A     Four or five years approximately.

11  Q     So you worked with Ketchum on the Russian

12  Federation project for four to five years?

13  A     Yeah.

14  Q     Mr. Dolan, following your work with Ketchum, did

15  you have occasion to work with any other Russian

16  government officials outside of the G20 summit that you

17  talked about?

18  A     I'm sorry.  Other officials?  What do you mean?

19  I'm sorry.

20  Q     You testified that you worked with the Russian

21  Federation with Ketchum; is that correct?

22  A     Yes.

23  Q     And, again, what did that entail?

24  A     It was trying to attract foreign investment.

25  Q     Besides that particular project, as your work as a

1   public relations official or a representative, have you

2   ever worked -- besides that project, have you ever

3   worked --

4   A     Oh, I'm sorry.  I've worked with The Walt Disney

5   Company in Russia.

6   Q     I'm sorry.  That was an inartfully asked question.

7         For the benefit of the jury, what did you do with

8   respect to The Walt Disney Company?

9   A     Well, Walt Disney was seeking to get a -- first, a

10  cable television network and then to get a broadcast

11  license.

12  Q     Was that in Russia?

13  A     In Russia, yes.

14  Q     In connection with your work with Walt Disney, did

15  you have occasion to interact with Russian government

16  officials?

17  A     Yes.  I met with Dmitry Peskov and his deputy,

18  Alexander Smirnoff.

19  Q     Mr. Peskov, you testified, was the press

20  secretary?

21  A     Right.

22  Q     Mr. Dolan, turning your attention to early 2016,

23  were you employed?

24  A     2016, yes.

25  Q     Do you recall where you were employed?

1  A     I was at a public relations firm, kglobal.

2  Q     And what generally did -- was kglobal a similar

3  company to Ketchum?

4  A     Very similar.  The nature of public relations has

5  changed over time to more boutique firms.  So it was

6  more of a boutique firm.

7  Q     Is it fair to say it was a much smaller entity

8  than Ketchum?

9  A     Yeah.

10 Q     Mr. Dolan, do you know an individual by the name

11 of Igor Danchenko?

12 A     Yes.

13 Q     And how do you know Mr. Danchenko?

14 A     Well, we met through Fiona Hill, who was at the

15 Brookings Institute.  Mr. Danchenko was helping a

16 friend of his look for a PR firm.

17 Q     Okay.  And for the benefit of the jury, who is

18 Ms. Fiona Hill?

19 A     She was the head of the -- I believe European

20 studies at the Brookings Institute.

21 Q     Okay.  You testified that Mr. Danchenko was

22 looking for help with a PR firm; is that correct?

23 A     Yes.

24 Q     Was he himself looking for help?

25 A     No.  He was helping a former schoolmate friend of

1    his.

2    Q    Do you recall the name of that friend?

3    A    Olga Galacka (phonetic).

4    Q    Okay.  Could it be Ms. Galkina?

5    A    Galkina, sorry.

6    Q    Do you know who Ms. Galkina worked for?

7    A    A company called service.com.

8    Q    Do you know where they were located, Mr. Dolan?

9    A    In Cyprus.

10   Q    Did there come a time when you met with

11   Ms. Galkina?

12   A    Yes.

13   Q    And when was this?

14   A    I believe it was in March, April of 1916 -- 2016.

15   Q    1916.  You're looking pretty good.

16   A    Yeah.  I look pretty good for that age, huh?

17   Q    And what was the purpose of your meeting with

18   Ms. Galkina in March of '16?

19   A    We presented our credentials in terms of what we

20   could do for service.com and asked her about what it

21   was specifically that service.com hoped to accomplish

22   with their communications.

23   Q    Okay.  And where did that meeting take place,

24   Mr. Dolan?

25   A    At kglobal.

1  Q    And where was that?

2  A    In Washington, D.C.

3  Q    Okay.  Do you recall who attended this meeting

4  with Ms. Galkina at kglobal?

5  A    It would have been myself.  And it's been a while,

6  but it would have been whoever was doing technology

7  communication for us there, and Mr. Danchenko was there

8  as well.

9  Q    Okay.  Do you have an understanding of why

10 Mr. Danchenko was there?

11 A    I think he was just trying to help his former

12 schoolmate, yeah.

13 Q    Do you recall if anyone else was at the meeting

14 besides Mr. Danchenko?

15 A    Gregg Hartley was there.

16 Q    And who his Gregg Hartley?

17 A    Gregg Hartley is a prominent republican lobbyist.

18 We thought there might be a government relations play

19 in this.  It turned out there wasn't, but anyway.

20 Q    All right.  We'll return to this, Mr. Dolan, but

21 did kglobal ultimately do work with service.com?

22 A    Yes.

23 Q    All right.  And following your meeting with

24 Ms. Galkina and Mr. Danchenko in March, did you

25 continue to stay -- did you communicate with the

1  defendant?

2  A    Yes.

3  Q    How did you communicate with him?

4  A    A combination of phone calls, emails, and I

5  believe we had lunch or breakfast or two.

6  Q    Okay.  And what was the purpose of communicating

7  with Mr. Danchenko?

8  A    Well, it was taking a while for service.com to

9  make a decision, and I knew that he had a good

10 relationship with Olga.  So checking in with him.

11 Q    When you say "Olga," are you referring to

12 Ms. Galkina?

13 A    Yes.  Sorry.

14 Q    Mr. Dolan, did there come a time when you learned

15 how Mr. Danchenko was employed?

16 A    Yes.

17 Q    And what was your understanding of how he was

18 employed?

19 A    A political risk operation in London.

20 Q    And did you come to learn the name of that

21 operation?

22 A    Yes.

23 Q    And what was the name of that operation?

24 A    Orbis.

25 Q    And you testified that Orbis was based in London?

1  A     In London, yeah.

2  Q     Did there come a time when you learned who

3  Mr. Danchenko's bosses were at Orbis?

4  A     Yes.

5  Q     And how did you learn that?

6  A     He told me.

7  Q     And do you recall their names?

8  A     Christopher Steele and Christopher Burrows.

9  Q     Okay.  Did you have occasion to ever discuss with

10 the defendant a potential business deal between kglobal

11 and Orbis?

12 A     Yes.

13 Q     And tell the jury, Mr. Dolan, what that would

14 entail.

15 A     Well, it wasn't anything specific.  It was -- we

16 possibly would meet at some point, whether they were in

17 Washington or they might be in London, just to explore

18 potential opportunities together.

19 Q     Okay.  I'm going to ask the court security officer

20 to set the binder up there.

21       Mr. Dolan, I would ask if you would open your

22 binder to what's been marked for identification as

23 Government's Exhibit 702.

24 A     Yeah.

25 Q     Do you have that in front of you?

```
 1  A     I do.
 2  Q     All right.  And what is Government's Exhibit 702?
 3  A     It's an email from Igor Danchenko, dated
 4  4/29/2016, to me.
 5  Q     Okay.  And if you look below, do you see your
 6  email address?
 7  A     Yes.
 8  Q     Is that charles.dolan@kglobal.com?
 9  A     Yes.
10  Q     And that's your email address, correct?
11  A     Exactly -- was, yeah.
12  Q     All right.  And does this appear to be a true and
13  accurate copy of an email that you received from
14  Mr. Danchenko?
15  A     It does.
16            MR. KEILTY:  Your Honor, the government is
17  going to offer Government's Exhibit 702.
18            THE COURT:  Any objection?
19            MR. SEARS:  No objection.
20            THE COURT:  Without objection, Government's
21  Exhibit 702 is admitted.
22            MR. KEILTY:  Your Honor, I would ask that it
23  be published.
24            THE COURT:  Yes.
25
```

```
 1  BY MR. KEILTY:
 2  Q    Mr. Dolan, generally, what does this email from
 3  Mr. Danchenko entail?
 4  A    Do you want me to read it?
 5  Q    Yeah.  Why don't you read it into the record?
 6  A    All right.
 7       Good day Chuck,
 8       Thank you for a great lunch this past Wednesday.
 9  I have forwarded your letter to my --
10            THE COURT SECURITY OFFICER:  The monitors are
11  out.
12            THE COURT:  The monitors are not up?
13            THE COURT SECURITY OFFICER:  The four
14  monitors in the front are out.
15            THE COURT:  All right.  We'll proceed.  Sorry
16  for the inconvenience.  You'll have to use the side
17  monitors for those in the front.
18            THE COURT SECURITY OFFICER:  Maybe they just
19  need to be reset, Your Honor.
20            THE COURT:  Are they coming back on?
21            THE COURT SECURITY OFFICER:  It's not
22  receiving a signal, Your Honor.
23            THE COURT:  All right.  Let IT know.
24            All right.  We're going to proceed.
25            Again, ladies and gentlemen, you will have
```

1 this exhibit with you in the jury room.

2          MR. KEILTY:  Your Honor, I would just ask

3 Ms. Arsenault if she could just blow it up so the jury

4 can see it.

5          THE COURT:  That's fine.

6 BY MR. KEILTY:

7 Q    Getting back to Government's Exhibit 702,

8 Mr. Dolan, again, there is an email from Mr. Danchenko

9 to you dated April 29, 2016, correct?

10 A    Correct.

11 Q    Is it fair to say that about a month or so after

12 you met with Ms. Galkina and Mr. Danchenko?

13 A    Approximately, yes.

14 Q    Okay.  Could you slowly read the email into the

15 record.

16 A    Yeah.

17          "Good day Chuck,

18          "Thank you for a great lunch this past Wednesday.

19 I have forwarded your letter to my UK directors, Chris

20 Steele and Chris Burrows.  I'll make sure you gentlemen

21 meet when they are in Washington or when you are in

22 London.

23          "I didn't get my new passport this month what

24 means two things:  I am available for breakfast on

25 May 10 or 13 and I'll be in Russia in the first half of

1  June, definitely around the 12th.

2      "On venue:  There is this hotel Peter 1 across

3  from Central Bank.  I'll also ask my friend Anastasia

4  about it, perhaps introduce her to you in person if

5  you'll be interested.

6      "Have a nice weekend.

7      "Igor."

8  Q    If you look on the second line of the email,

9  Mr. Dolan, it says, "I have forwarded your letter to my

10 UK directors Chris Steele and Chris Burrows."  Do you

11 have an understanding of what that means?

12 A    Well, I had put together a letter talking about

13 our capabilities as a way of introduction to my firm.

14 Q    Is it your understanding that Mr. Danchenko

15 forwarded that letter to Mr. Burrows?

16 A    According to this, yeah.

17 Q    Did you ever, in fact, meet with Mr. Steele?

18 A    No.

19 Q    Did you ever, in fact, meet with Mr. Burrows?

20 A    No.

21 Q    And was there ever any business relationship

22 between kglobal and Orbis?

23 A    No.

24 Q    However, in connection with this potential

25 business relationship, did Mr. Danchenko ever provide

1  you with any materials from Orbis?

2  A    Yes.

3  Q    I'd ask you to look at what's been marked for

4  identification as Government's Exhibit 703.

5  A    Yes.

6  Q    What does this appear to be?

7  A    An email from Mr. Danchenko to myself.  Subject is

8  "Orbis Business Intelligence banking research sample."

9  Q    Okay.  Does this appear to be a true and accurate

10  email you received from Mr. Danchenko?

11  A    It does.

12          MR. KEILTY:  Your Honor, the government would

13  offer 703.

14          THE COURT:  Any objection?

15          MR. SEARS:  No objection.

16          THE COURT:  Without objection, 703 is

17  admitted.

18  BY MR. KEILTY:

19  Q    Mr. Dolan, would you please read this email into

20  the record.

21  A    "Dear Chuck,

22      "FYI.  Here is a sample byproduct of my due

23  diligence practice.  It is not a final version but a

24  good example of what I do in my frequent travels to

25  Moscow and London.  Confidential:  We don't post these

1    projects online but occasionally send to friends.

2          "Best, Igor."

3    Q    All right.  Mr. Dolan, just going back to the top

4    of that email, the email header, is there an individual

5    who is CC'd?

6    A    Yes.

7    Q    Who is that?

8    A    Gregg Hartley.

9    Q    Again, who is Mr. Hartley?

10   A    A prominent lobbyist in D.C.

11   Q    Does there appear to be an attachment to this

12   email?

13   A    Yes.

14   Q    And what is the attachment?

15   A    It's an intelligence briefing note on Kompromat

16   Nadzor in the Russian banking sector.

17   Q    Does this appear to be an Orbis document?

18   A    It does.

19   Q    Do you have an understanding of who prepared this

20   document?

21   A    Mr. anchenko.

22   Q    Did you have occasion to read this document?

23   A    I did.

24   Q    Did you have any impressions?

25   A    I wasn't quite sure what it was all about.

1  Q    Okay.  And following this -- this email is dated

2  April 29th, correct?

3  A    Correct.

4  Q    Following April 29th into May, did you have

5  occasion to continue to communicate with Mr. Danchenko?

6  A    I did.

7  Q    And why were you communicating with Mr. Danchenko?

8  A    I had been approached by the Young Presidents

9  Organization about setting up a conference in Moscow,

10  and I had suggested to the organizer that Mr. Danchenko

11  could be useful to us on this.

12  Q    Okay.  Before we get into that conference, during

13  this time period, May of 2016, were you also

14  communicating with Ms. Galkina?

15  A    Yes.

16  Q    And what were you communicating about?  What was

17  the topic of communication?

18  A    Finalizing a contract and a trip by myself to

19  Cyprus to meet with her boss.

20        (Reporter clarification.)

21  A    Finalizing the arrangements for a trip to Cyprus

22  to make a presentation to her boss.

23  Q    I apologize if you already testified to this, but

24  did kglobal ultimately sign a contract with

25  Ms. Galkina's company?

```
 1   A    Yes.
 2   Q    Okay.  All right.  Mr. Dolan, you testified that
 3   you had occasion to speak with the defendant about the
 4   YPO conference, correct?
 5   A    Yes.
 6   Q    What is your understanding of what YPO is?
 7   A    YPO is an organization of CEOs of various
 8   companies.  They go to these conferences in various
 9   capitals around the world for the purpose of learning
10   about business opportunities, also networking with one
11   another.
12   Q    Okay.  How did you get involved with YPO?
13   A    A friend of mine, Steve Kupka, is very involved in
14   and one of the leaders of it.  I'm not sure what his
15   title is in the organization.
16   Q    Who is Steve Kupka?
17   A    Steve is a Washington attorney.
18   Q    Understood.
19        And did there come a time when Mr. Kupka asked you
20   to be involved in YPO?
21   A    Yes.
22   Q    Did there come a time when Mr. Kupka asked you to
23   be involved in a particular aspect of YPO?
24   A    Yes.
25   Q    What was that?
```

1  A    Well, he wanted to organize a visit to Moscow, and

2  they organized -- well, we organized a conference

3  called Inside the Kremlin.

4  Q    And when was this conference to be held?

5  A    It was going to be held in October of 2016.

6  Q    And in Moscow?

7  A    In Moscow, yes.

8  Q    Do you have an understanding of why Mr. Kupka

9  wanted your involvement in YPO?

10  A    Because I have a fair amount of experience in

11  Russia.

12  Q    You testified it was intended to link up business

13  people in Russia; is that correct?

14  A    There would be some of that, but also to introduce

15  them to government officials in Russia.

16  Q    Okay.  Your testimony prior to this was that

17  you've had connections with Russian government

18  officials; is that correct?

19  A    Yes.

20  Q    Was that one of the reasons, if you know, why

21  Mr. Kupka asked you to participate?

22  A    Yes.

23  Q    And you testified that May of 2016 you approached

24  Mr. Danchenko, correct?

25  A    Approximately, yes.

1  Q     Again, why did you approach Mr. Danchenko?

2  A     Well, he speaks excellent English and obviously is

3  fluent in Russian and knows Russia as well.

4  Q     Okay.  Did Mr. Kupka have to clear Mr. Danchenko's

5  participation in YPO?

6  A     I believe he did.  The headquarters is in Dallas,

7  and I believe he cleared it with the organizers or the

8  appropriate people within YPO.

9  Q     All right.  And this conference in Moscow had a

10  particular name?

11  A     Inside the Kremlin.

12  Q     And was there a particular venue where this

13  conference was to be held?

14  A     The Ritz-Carlton.

15  Q     And where is that?

16  A     In Moscow.

17  Q     Okay.  Prior to the conference, what, if any,

18  preparations were made?

19  A     We did an advance trip in early June to look at

20  venues, not just the Ritz-Carlton but other hotels that

21  we would do dinners at, restaurants, and also meet with

22  certain government officials to see about setting up

23  meetings for the YPO folks.

24  Q     Okay.  And prior to that June trip to Moscow, were

25  any other preparations made?

1  A    We would have had conference calls and that sort

2  of thing, yeah.

3  Q    Okay.  Do you recall if you met with any Russian

4  government officials in the U.S.?

5  A    We would have met with -- yeah.  Myself and

6  Mr. Kupka would have met with the Russian ambassador,

7  Ambassador Kislyak, and the commercial attaché.

8  Q    Okay.  So you testified that you traveled to

9  Russia in June of 2016, correct?

10 A    Correct.

11 Q    Do you recall approximately the dates?

12 A    Roughly, the 13th, 14th, and 4 or 5 days after

13 that.

14 Q    And did you travel directly from the U.S. to

15 Moscow?

16 A    No.  I was in Cyprus first.

17 Q    Why did you go to Cyprus?

18 A    That was to make the pitch to service.com to see

19 about them hiring us.

20 Q    Okay.  And who did you meet with in Cyprus?

21 A    I would have met -- I met with Alexey Gubarev.  I

22 would have met with Nick DeVoss (phonetic) and various

23 other senior officials who were in the company.

24 Q    Did you have occasion to meet with Ms. Galkina?

25 A    Yes.

1  Q    And what were your interactions with Ms. Galkina?

2  A    It would basically have been talking about what we

3  could do for them with communications.

4  Q    Okay.  Do you recall where Mr. Danchenko was in

5  June of 2016?

6  A    My recollection is that -- he had told me, and I

7  think it was in that earlier email -- that he was going

8  to be in Moscow already.

9  Q    Okay.  Did you meet with Mr. Danchenko during your

10  June trip to Moscow?

11  A    Yes.

12  Q    What did you do?

13  A    My recollection is that we had lunch.

14  Q    Following your June trip to Moscow, did you return

15  directly to the United States?

16  A    Yes.

17  Q    And upon returning to the U.S., did you continue

18  to stay in touch with the defendant --

19  A    Yes.

20  Q    -- Mr. Danchenko?

21  A    Yes.

22  Q    And how did you communicate with him?

23  A    There would have been emails, phone calls, and

24  possibly a lunch or breakfast together.

25  Q    Okay.  And what generally were you talking about

1  with Mr. Danchenko?

2  A    The YPO conference at that point.

3  Q    All right.  Mr. Dolan, did you take any additional

4  trips in the summer of 2016?

5  A    Yes.  I returned to Cyprus.

6  Q    And why did you return to Cyprus?

7  A    We did what we call a resource inventory of the

8  company.  I had two other people with me, and we met

9  with senior executives to get what were their marketing

10  plans, why did they think they were different from

11  other companies, and how could we develop messaging for

12  them.

13  Q    Okay.  And did you -- who did you meet with on

14  this trip?

15  A    The same people as in the earlier trip.

16  Q    Including Ms. Galkina?

17  A    Yes.

18  Q    Now, with respect to Ms. Galkina, do you have a

19  recollection, if any, if you discussed the 2016 U.S.

20  presidential election?

21  A    Yeah.  Very superficially, but yes.

22  Q    All right.  And do you have a recollection, if

23  any, if you discussed Presidential Candidate Clinton

24  with Ms. Galkina?

25  A    Yes.

1  Q    And do you have an understanding of how

2  Ms. Galkina viewed Ms. Clinton?

3  A    Yes, very favorably.

4  Q    And approximately how long were you in Cyprus in

5  July?

6  A    Four or five days.

7  Q    Was Mr. Danchenko in Cyprus with you?

8  A    Not that I know of.  He wasn't with me, no.

9  Q    Okay.  And just turning back to your June trip to

10 Cyprus, was Mr. Danchenko with you?

11 A    No.

12 Q    Upon returning to -- did you return to the U.S.

13 from Cyprus in July?

14 A    Yes.

15 Q    And upon returning to the U.S., were you

16 continuing to plan for the YPO conference?

17 A    Yes.

18 Q    And did you continue to stay in touch with

19 Mr. Danchenko?

20 A    Yes.

21 Q    All right.  Mr. Dolan, I'm going to ask you to

22 look at -- it's in evidence as Government's

23 Exhibit 712A.  I can publish it if it's in evidence?

24         THE COURT:  Yes.

25         MR. KEILTY:  And, Ms. Arsenault, I'm going to

1  ask you to blow up the header, please.

2  BY MR. KEILTY:

3  Q    Mr. Dolan, could you just read the header

4  information that's blown out on your screen?

5  A    Sure.

6        From:  Igor Danchenko.

7        Date:  Friday, August 19, 2016, at 1:08 p.m.

8        To:  Charles Dolan.

9        Subject:  Kosachev & Prikhodko.

10 Q    All right.  Can you read --

11        MR. KEILTY:  Can you blow up the next

12 section, Ms. Arsenault.

13 A    Do you want me to read this?

14 Q    Yeah.  So read the next part.

15 A    Okay.

16        "Hi Chuck,

17        "Here are best bios of two of the four.  Who were

18 the others?"

19 Q    Let me just stop you there, Mr. Dolan.  Do you

20 have an understanding of what Mr. Danchenko is

21 referring to there?

22 A    As I recall, these were people that would be

23 speaking at our conference.

24 Q    At the YPO conference?

25 A    Yes, YPO.

1    Q    Understood.

2         Can you continue to read, please?

3    A    "Could you please ask someone to comment on Paul

4    Manafort's resignation and anything on Trump campaign?

5    Off the record of course!  Any thought, rumour,

6    allegation.  I am working on a related project against

7    Trump.  I asked Gregg three months ago but he didn't

8    say much although shared a couple of valuable insights.

9         "Thanks a lot!

10        "Best, Igor."

11   Q    Mr. Dolan, do you have an understanding of why the

12   defendant, Mr. Danchenko, would ask you this question?

13   A    Because I'm politically active.

14   Q    When the defendant was asking for any thought,

15   rumor, or allegation, what was your understanding of

16   that sentence?

17   A    I just thought he wanted to know what the

18   atmospherics were around the resignation.  I mean, that

19   was my understanding.

20   Q    Okay.  You've been in politics a long time; is

21   that correct?

22   A    Yeah.

23   Q    How long?

24   A    Since I was 16.

25   Q    Okay.  So I'm not going to ask how old you are,

1  but that's a long time.

2      Mr. Danchenko continues and says, "I am working on

3  a related project against Trump."  When Mr. Danchenko

4  says "related project," did you have any understanding

5  of what he was talking about?

6  A    I didn't pay that much attention to that to tell

7  you the truth.  But, you know, looking at it now, I can

8  only think that he may have thought that I was actively

9  involved in the campaign.

10          MR. SEARS:  Your Honor, I'm going to object

11  to speculation.

12          MR. KEILTY:  Understood.

13          THE COURT:  I sustain the objection.  I'm

14  going to strike the answer.

15          Go ahead.

16  BY MR. KEILTY:

17  Q    Mr. Dolan, were you working on a project against

18  Mr. Trump?

19  A    No.

20  Q    Mr. Dolan, do you have an opinion about former

21  President Trump?

22  A    Yes.

23  Q    What is that opinion?

24  A    Well, fairly negative.

25  Q    Okay.  Understood.

1        The email goes on to say, "I asked Gregg three

2   months ago but he didn't say much although shared a

3   couple of valuable insights."

4        Again, do you have an understanding of who Gregg

5   is?

6   A    Yes.

7   Q    And who is that?

8   A    A Washington lobbyist on the republican side.

9   Q    Okay.  Mr. Dolan, in your binder, I'm going to ask

10  you to turn to Government's Exhibit 712B, as in boy.

11  It should be in evidence.

12  A    Yep.

13       MR. KEILTY:  Your Honor, can we publish?

14       THE COURT:  Yes.

15       MR. KEILTY:  Ms. Arsenault, if you could,

16  blow this up, please.

17  BY MR. KEILTY:

18  Q    Mr. Dolan, starting with the header, could you

19  please read this email?

20  A    From:  Dolan, Charles.

21       Friday, 8/19/2016, 8:06 p.m.

22       To:  Igor Danchenko.

23       Subject:  Re:  Kosachev & Prikhodko.

24  Q    And the date is August 19, 2016, correct?

25  A    Yes.

1  Q    Is it fair to say that this is your reply to

2  Mr. Danchenko's email?

3  A    Yes.

4  Q    And it's later that day?

5  A    I gather, yeah.

6  Q    Okay.  Can you please read the rest of the email?

7  A    "Hi Igor,

8       "The other two were Alexey Ulyukaev, Minister for

9  Eco Dev and Iris Tutor, Ombudsman RF."

10 Q    Okay.  Let me stop you there.  Is that referring

11 to YPO business --

12 A    I think it is.  I'm not positive.

13 Q    -- if you know?

14 A    Yeah.

15 Q    Can you keep reading?

16 A    "Let me dig around on Manafort.  Pretty sure the

17 new team wanted him gone ASAP and used today's *New York*

18 *Times* story to drive a stake in his heart."

19 Q    Okay.  I would ask you to go to Government's

20 Exhibit 713A --

21 A    Yeah.

22 Q    -- in evidence.  It will be the next one.

23      Mr. Dolan, is this another email from you to

24 Mr. Danchenko?

25 A    Yes.

1 Q    And what's the date?

2 A    Saturday, 8/20/2016.

3 Q    And is this the next day obviously after

4 August 19?

5 A    Yeah.

6 Q    And could you read this email.

7 A    "Hi Igor,

8      "I had drink with a GOP friend of mine who knows

9 some of the players and got some of what is in this

10 article, which provides even more detail.  She also

11 told me that Corey Lewandowski, who hates Manafort and

12 still speaks to Trump regularly played a role.  He is

13 said to be doing a happy dance over it.

14      "I think the bottom line is that in addition to

15 Ukraine revelations, a number of people wanted Manafort

16 gone.  It is a very sharp elbows crowd."

17 Q    And then at the bottom, do you attach what appears

18 to be an article?

19 A    POLITICO, yep.

20 Q    Mr. Dolan, was this your reply to Mr. Danchenko's

21 question about Mr. Manafort?

22 A    Yes.

23 Q    And you begin the email with "I had a drink with a

24 GOP friend of mine" --

25 A    Right.

1  Q    -- "who knows some of the players and got some of

2  what's in this article."  Who is the GOP friend who you

3  had a drink with?

4  A    I actually got it off of cable news.

5  Q    So you never had a drink with a GOP friend?

6  A    No.

7  Q    Why is that in the email?

8  A    Why is it in there?

9  Q    Yeah.

10 A    Mr. Danchenko brought me some business.  And I

11 knew he did political risk analysis, and I thought I

12 would just embellish a bit to make it sound like his

13 contacts were good.

14 Q    Okay.  Did you tell Mr. Danchenko you were

15 embellishing?

16 A    No.

17 Q    Did you tell Mr. Danchenko that you got this

18 information off of cable news?

19 A    No.

20 Q    Okay.  And this GOP friend -- it says, "who knows

21 some of the players and got some of what is in this

22 article, which provides even more detail."  And then

23 she also tells you, "that Corey Lewandowski, who hates

24 Manafort and still speaks to Trump regularly played a

25 role."

1       Who does "she" refer to?

2   A    A woman that was on the cable news.

3   Q    Was that the GOP friend of yours?

4   A    Well, it was a GOP operative, yeah.

5   Q    Again, did you tell Mr. Danchenko about this?

6   A    No.  I just gave him the information.

7   Q    That you told him came from a GOP friend of yours?

8   A    Right.

9   Q    Now, you attached a POLITICO article to your

10  email; is that correct?

11  A    Yes.

12  Q    Are you aware of whether this POLITICO article

13  mentions Corey Lewandowski?

14  A    I can't remember.

15  Q    Could I refresh your recollection?

16  A    Yeah.

17  Q    It should be in your binder as Government's

18  Exhibit 1203.

19  A    Okay.

20  Q    Let me rephrase my question, Mr. Dolan.  I

21  withdraw that previous question.

22  A    Okay.

23  Q    Does this article say anything about Mr. Dolan

24  hating Mr. Manafort?

25  A    No, but it was pretty common knowledge at the

624

```
 1  time.
 2  Q    Okay.  But you told him, Mr. Danchenko, that you
 3  got that from a GOP friend, correct?
 4  A    That -- yes.
 5  Q    Okay.  All right.  Mr. Dolan, I would ask you to
 6  turn to Government's Exhibit 714.
 7       Have you got it?
 8  A    Yeah.
 9  Q    All right.  What is Government's Exhibit 714?
10  A    An email from myself to Mr. Danchenko.  It reads,
11  "Thanks!  I'll let you know if I hear anything else."
12  Q    Okay.  I gave you the wrong number.  So I would
13  ask you to look at Government's Exhibit 713 --
14  A    I thought you skipped one.
15  Q    -- 713B.
16  A    713B.  Okay.  Again, it's an email from Igor to
17  myself.
18       "Dear Chuck,
19       "Thank you for this.  Any additional insights
20  would be much appreciated.  It is an important project
21  for me, and our goals clearly coincide.  I've been
22  following the Russia trail in Trump's campaign.  It is
23  there so what you read in the news is hardly an
24  exaggeration.  Some things are less dramatic while
25  others are more than they seem.
```

625

```
 1        "Here are two more bios I put together for you.
 2   Still don't know when I am traveling next.  I shall
 3   keep you updated."
 4        "Cheers, Igor."
 5   Q    That bottom part where Mr. Danchenko says, "Here
 6   are two more bios I put together for you," does that
 7   relate to the YPO conference?
 8   A    Yes.
 9   Q    First of all, what is the date of this email?
10   A    8/20/2016.
11   Q    Is it your understanding that this is
12   Mr. Danchenko's reply to your email providing the
13   information about Manafort?
14   A    Yes.
15   Q    And Mr. Danchenko says, "Any additional insights
16   would be much appreciated," correct?
17   A    Right.
18   Q    Did you ever provide Mr. Danchenko with any
19   additional insights?
20   A    No.
21   Q    Then Mr. Danchenko says, "It's an important
22   project for me, and our goals clearly coincide."  Do
23   you have an understanding of when Mr. Danchenko says
24   "our goals clearly coincide," what he's referring to?
25   A    Well --
```

1          MR. SEARS:  Your Honor, I'm going to object

2   to speculation.

3          MR. KEILTY:  His understanding, Your Honor.

4          THE COURT:  I'm sorry?

5          MR. KEILTY:  I'm asking for his

6   understanding, Your Honor.

7          THE COURT:  I'll let him answer.

8          Go ahead.

9   BY MR. KEILTY:

10  Q    Yeah.  So do you have an understanding, if any, of

11  what Mr. Danchenko means when he says, "Our goals

12  clearly coincide"?

13  A    No.  I probably would have assumed that, you know,

14  he knew I would be a supporter of the Clinton campaign.

15  But I wasn't working on the campaign.  Quite frankly,

16  this would have been 1 of 40 or 50 emails I got that

17  day.  So no.

18  Q    Okay.  He continues, "I've been following the

19  Russia trail in Trump's campaign."  It continues, "It

20  is there so what you read in the news is hardly an

21  exaggeration.  Some things are less dramatic while

22  others are more than they seem."

23      Mr. Dolan, when Mr. Danchenko mentions an

24  important project, did you have an understanding, if

25  any, of whether Mr. Danchenko was working for anyone on

1  a particular project?

2  A    No.

3  Q    All right.  I'd ask you to turn to Government's

4  Exhibit 714.

5       You got it?

6  A    Yeah.

7  Q    Okay.  Can we just read this email into the

8  record, please?

9  A    "Thanks!  I'll let you know if I hear anything

10 else."

11 Q    And, Mr. Dolan, this is an email from you to

12 Mr. Danchenko, correct?

13 A    Yes.

14 Q    The same day as the last email, August 20th?

15 A    Yeah.  It looks like it, yeah.

16 Q    Okay.  And, again, did you tell Mr. Danchenko

17 anything else?

18 A    Not that I recall, no.

19 Q    Now, Mr. Dolan, you had met with the special

20 counsel on a number of occasions; is that correct?

21 A    Yes.

22 Q    And are you familiar with something called the

23 Steele dossier?

24 A    Yes.

25 Q    How are you familiar with the Steele dossier?

1   A    Well, my client, service.com, was named in it.  So

2   the day it came out on BuzzFeed, I was alerted to it

3   and saw it then.

4   Q    Okay.  And during your meetings with the special

5   counsel, were you shown certain reports for the Steele

6   dossier?

7   A    Yes.

8   Q    I'm going to show you what's in evidence now as

9   Government's Exhibit 112.  If you look -- first of all,

10  do you recall reviewing this particular Steele dossier

11  report?

12  A    Yes.

13  Q    Okay.  And if you look on the second page --

14          MR. KEILTY:  Ms. Arsenault, if you can, blow

15  up .3, and if you just pull it down a little further so

16  we can see the date.

17  BY MR. KEILTY:

18  Q    Mr. Dolan, what is the date of this particular

19  Steele dossier report?

20  A    August 22, 2016.

21  Q    Okay.  And when did you provide Mr. Manafort --

22  sorry.  Withdrawn.

23       When did you provide Mr. Danchenko with the

24  information about Mr. Manafort?

25  A    I have to go back and look.  August 20, 2016.

1  Q    So it's fair to say this report is two days later?

2  A    It appears to be.

3  Q    Okay.  Can you read .3 slowly, please, Mr. Dolan?

4  A    "Speaking separately, also in late August 2016, an

5  American political figure associated with Donald Trump

6  and his campaign outlined the reasons behind Manafort's

7  recent demise.  S/he said it was true that the Ukraine

8  corruption revelations had played a part in this but

9  also, several senior players close to Trump had wanted

10 Manafort out, primarily to loosen his control on

11 strategy and policy formulation.  Of particular

12 importance in this regard was Manafort's predecessor as

13 campaign manager, Corey Lewandowski, who hated Manafort

14 personally and remained close to Trump with whom he

15 discussed the presidential campaign on a regular

16 basis."

17 Q    Okay.  Again, that's dated August 22, 2016?  Yes?

18 A    Yeah.

19        MR. KEILTY:  Ms. Arsenault, I'm going to ask

20 if you could put up Government's Exhibit 713A and .3 of

21 112 side by side for the jury to look at.

22 BY MR. KEILTY:

23 Q    Okay, you see those on your screen, Mr. Dolan?

24 A    Yes.

25 Q    Okay.  And so if you look at .3, it says,

1  "Speaking separately, also in late August 2016, an

2  American political figure associated with Donald Trump

3  and his campaign," correct?

4  A    Yes.

5  Q    And then if you look to 713A, your email, it says,

6  "GOP friend," correct?

7  A    Yeah.

8  Q    Then if you look on .3, it talks about Corey

9  Lewandowski, who hated Manafort personally, correct?

10 A    Correct.

11 Q    And if you look at your email, you write, "who

12 hates Manafort," correct?

13 A    Correct.

14 Q    Then if you look at .3 of the dossier report, at

15 the bottom, it says, "and remained close to Trump with

16 whom he discussed the presidential campaign on a

17 regular basis."

18      Do you see that?

19 A    Yeah.

20 Q    Then turning to your email to Mr. Danchenko, it

21 says, "Manafort and still speaks to Trump regularly,"

22 correct?

23 A    Correct.

24 Q    Mr. Dolan, would you agree that the information

25 you provided to Mr. Danchenko is substantially similar

1   to what's in .3 of the dossier report?

2   A    Yes.

3   Q    Now, you testified that you attended the YPO

4   conference in October of 2016; is that correct?

5   A    Correct.

6   Q    And did Mr. Danchenko attend that conference?

7   A    Yes.

8   Q    And do you recall if any Russian government

9   officials attended that conference?

10  A    Yes.

11  Q    And following the YPO conference, did you return

12  to the United States?

13  A    Yes.

14  Q    And that would have been mid-October

15  approximately?

16  A    Yes.

17  Q    And following the YPO conference, upon your

18  return, did you have occasion to meet with

19  Mr. Danchenko?

20  A    Yes.

21  Q    Do you recall why you met with Mr. Danchenko?

22  A    Well, not exactly, but I would assume that we had

23  a lunch to thank him, and I also -- one day I was on my

24  computer, and I happened to be on Facebook and noticed

25  that he was at a park quite close to my house.  And I

1   was about to head to the Safeway to pick some things

2   up.  And he was with his daughter, and I stopped by to

3   say hello to the two of them.

4   Q    Do you recall if Mr. Danchenko ever had occasion

5   to visit the kglobal office?

6   A    He did, yes.

7   Q    What was -- tell the --

8   A    He had asked me to pick up some over-the-counter

9   pharmaceuticals for him, and he came by to pick those

10  up.

11  Q    Okay.  And where did you pick up those

12  over-the-counter pharmaceuticals?

13  A    In Moscow, yeah.

14  Q    So he asked you to buy over-the-counter pills in

15  Moscow?

16  A    Yeah.

17  Q    I'm going to ask you to look at Government's

18  Exhibit 1202 for identification.

19  A    Okay.

20  Q    What is Government's Exhibit 1202, Mr. Dolan?

21  A    This was the BuzzFeed report on the dossier.

22  Q    Okay.  And what is the date of this BuzzFeed

23  report?

24  A    January 10, 2017.

25  Q    Okay.  Do you recall reading this article?

1  A    Yeah.

2  Q    And what generally -- again, what generally is the

3  subject matter of this article?

4  A    Trump's ties to Russia.

5  Q    And does this article attach any particular

6  information?

7  A    Yes.  It would have had the dossier.

8  Q    Is it fair to say that the BuzzFeed article

9  attaches to the Steele dossier reports?

10 A    Yes.

11 Q    Do you recall reading this article?

12 A    Yes.

13 Q    And this article was published January 10,

14 correct?

15 A    Correct.

16        MR. KEILTY:  Your Honor, the government would

17 move in Government's Exhibit 1202.

18        THE COURT:  Any objection?

19        MR. SEARS:  Your Honor, if we could approach

20 on this briefly.

21        THE COURT:  Yes.

22    (Conference at the bench, as follows:)

23        THE COURT:  Yeah.

24        MR. SEARS:  I apologize I hadn't thought

25 about this before, that we had kept out a lot of the

634

1  dossier, but Mr. Keilty just confirmed he only intends

2  to introduce the first page of the article and redact

3  the remainder.

4           That was it.

5           THE COURT:  All right.  That's fine.

6      (Proceedings continued in open court, as follows:)

7           THE COURT:  All right.  Exhibit 1202 will be

8  admitted based on the parties' agreement.

9           MR. KEILTY:  Thank you, Your Honor.

10          Ms. Arsenault, could you just show the first

11 page of -- the first two pages are fine.  That's good.

12 Okay.

13 BY MR. KEILTY:

14 Q    And this is the BuzzFeed article, Mr. Dolan, that

15 we were just speaking about?

16 A    Yes.

17 Q    And the date is January 10 of 2017?

18 A    Yes.

19 Q    Turning your attention to the next morning,

20 January 11, 2017, do you have a recollection, if any,

21 of making any phone calls that morning?

22 A    Yes.

23 Q    Did you call a lot of people?

24 A    I got a lot of calls, and I called a few people

25 too, yes.

1  Q    Did you call the defendant?

2  A    Yes.

3  Q    And why did you call Mr. Danchenko?

4  A    Just -- I was curious to see if he knew where this

5  came from.

6  Q    Okay.  Why did you think the defendant might know?

7  A    The London operation and his connection with

8  Ms. Galkina, who had been fired by the company.

9  Q    When you say the "London operation," are you

10 referring to --

11 A    Christopher Steele and Burrows.

12 Q    Did you have any suspicions about the defendant's

13 role in the dossier?

14 A    I had some, yeah.

15 Q    Without telling us names, do you recall if you

16 spoke to anyone else about your suspicions about the

17 defendant's role?

18 A    Yes.

19 Q    Okay.  And what is your understanding, if any, on

20 January 11 of 2017, whether it was publicly known that

21 Mr. Danchenko was a source for the dossier?

22 A    Was?  I don't think so.

23 Q    Okay.  Now, finally, you testified that you had a

24 relationship with Ms. Galkina, correct?

25 A    Yes.  Well, a professional relationship.

1  Q    I'm sorry, professional relationship.

2  A    Yeah.

3  Q    And that was through service.com and kglobal,

4  correct?

5  A    Yes.

6  Q    What is your understanding, if any, of whether

7  Ms. Galkina was ever identified as a source for the

8  Steele dossier?

9  A    I've heard that she was.  I haven't seen any

10  actual reports, but I heard that she was.

11           MR. KEILTY:  One moment, Your Honor.

12           THE COURT:  Yes.

13  BY MR. KEILTY:

14  Q    Sorry.  You testified that you had a call with

15  Mr. Danchenko on the morning of January 11, correct?

16  A    Yes.

17  Q    And you had testified that you asked him about the

18  Steele dossier?

19  A    Yes.

20  Q    Do you recall what Mr. Danchenko said?

21  A    Well, I'm paraphrasing, but as I recall, he said

22  he wasn't sure; he'd check into it and get back to me.

23  Q    Did he ever get back to you?

24  A    No.

25           MR. KEILTY:  No further questions.

```
 1              THE COURT:  All right.  Cross.
 2                     CROSS-EXAMINATION
 3  BY MR. SEARS:
 4  Q    Good morning, Mr. Dolan.
 5  A    Good morning.
 6  Q    I think this will be brief.  Okay.
 7       So you testified on direct that your introduction
 8  to Mr. Danchenko was through Fiona Hill?
 9  A    Yes.
10  Q    And your understanding was the reason
11  Mr. Danchenko wanted to connect with you was so that he
12  could refer you to his childhood friend; so, perhaps,
13  he could do work for her company, correct?
14  A    Yes.
15  Q    And prior to that introduction through Fiona Hill,
16  had you known of Mr. Danchenko?
17  A    I think we may have met at Brookings, but I
18  couldn't -- I don't remember to tell you the truth.
19  Q    Okay.  Once he put you in touch with Ms. Galkina,
20  is it fair to say that you and Ms. Galkina talked
21  without Mr. Danchenko for the majority of your
22  relationship with her?
23  A    Yes.
24  Q    Okay.  And Ms. Galkina, through her work at
25  servers and that introduction, introduced you to
```

1   Mr. Gubarev?

2   A    Yes.

3   Q    And Mr. Gubarev ultimately became a client of

4   yours at kglobal, correct?

5   A    Correct.

6   Q    And I believe you testified that your first

7   meeting with Ms. Galkina in person was in the District

8   of Columbia in March of 2016.

9   A    Right.

10  Q    And there were several other people present for

11  that meeting?

12  A    Yes.

13  Q    You couldn't recall everybody, but Mr. Danchenko

14  was there?

15  A    As I recall, he was, yes.

16  Q    And this was the first time you were ever meeting

17  Ms. Galkina in person, correct?

18  A    Correct.

19  Q    And I believe you testified that your second

20  meeting with Ms. Galkina occurred in Cyprus.

21  A    I believe that's right, yes.

22  Q    And that was in June of 2016.  It was basically a

23  stop on your way to Moscow?

24  A    Yes.

25  Q    For the YPO advanced planning trip?

1  A    Yes.

2  Q    And Mr. Danchenko was not with you on that trip,

3  correct?

4  A    Correct.

5  Q    And I believe you testified on direct that in July

6  of 2016, you had another meeting with Ms. Galkina again

7  in Cyprus.

8  A    Yes.

9  Q    And Mr. Danchenko was not present for that

10 meeting?

11 A    Correct.

12 Q    In connection with the YPO conference, my

13 recollection of your testimony is that that conference

14 would be held at different capitols around the world?

15 A    It would be, yes.

16 Q    And this particular one in 2016, in October of

17 2016, Moscow had been chosen for that conference?

18 A    Yes.

19 Q    And because of your connections with Russia, your

20 experience with Russia, you were brought in to

21 participate in that conference?

22 A    Yes.

23 Q    And you had already met Mr. Danchenko by then,

24 correct?

25 A    Yes.

1   Q    And so you understood, as you testified, that he's

2   a Russian national, correct?

3   A    Correct.

4   Q    But he spoke pretty good English?

5   A    Yes.

6   Q    And so you decided that you would perhaps

7   incorporate him into the YPO planning because he could

8   have been assistance to that conference?

9   A    Correct.

10  Q    He didn't ask to be a part of that conference; you

11  asked him?

12  A    Correct.

13  Q    And you learned through your relationship with

14  Mr. Danchenko that he had a lot of contacts; is that

15  correct?

16  A    I'm sorry.  Say that --

17  Q    That he had a lot of contacts with people?

18  A    Yes.

19  Q    And he could help you find speakers for that

20  conference?

21  A    Yes.

22  Q    In fact, some of the emails we reviewed today on

23  direct were him providing you information, bios on

24  certain people that might be good to have as speakers

25  at the conference, correct?

1  A    Yes.

2  Q    Okay.  He also played a role in the conference by

3  helping with logistics?

4  A    Yes.

5  Q    Including a tour of the Duma, I think, something

6  along those lines?

7  A    Yes.

8  Q    And you testified that you were in Moscow for the

9  conference in October of 2016, correct?

10 A    Correct.

11 Q    Okay.  And Mr. Danchenko participated in that

12 conference as well?

13 A    Correct.

14 Q    He spoke at that conference; did he not?

15 A    Yes.

16 Q    Okay.  All right.  So let's just move on to the

17 dossier.  Okay.

18      So the time you were working with Mr. Danchenko on

19 the YPO conference and making connections to

20 Ms. Galkina, you had no idea that he was doing any work

21 that ultimately was going to end up in the Steele

22 dossier; is that fair?

23 A    Correct.

24 Q    Okay.  And the first time you ever saw the dossier

25 was on January 10, 2017, through the BuzzFeed article?

1   A    Yes.

2   Q    And you testified, I believe, that you suspected

3   that Mr. Danchenko could have been involved because of

4   his relationship to Ms. Galkina, correct?

5   A    Yes.

6   Q    Who you understood to have been implicated in

7   those reports, correct?

8   A    Yes.

9   Q    As well as your understanding that he had been

10  doing work for Orbis --

11  A    Yes.

12  Q    -- and Mr. Steele, who was also implicated in

13  those reports, correct?

14  A    Yes.

15  Q    But prior to that, you had no understanding or

16  reason to believe that Mr. Danchenko was working on any

17  sort of project like that?

18  A    Correct.

19  Q    And you read the reports when they were

20  released -- or a portion of the reports when they were

21  released by BuzzFeed on January 10, right?

22  A    Yes.

23  Q    And you were paying close attention to them

24  because your client, Mr. Gubarev, was very upset about

25  those reports; wasn't he?

1  A     Yes.

2  Q     Service.com was basically implicated as being

3  behind the hack of the Democratic National Committee,

4  right?

5  A     Correct.

6  Q     And when you read those reports back in January

7  10th of 2017, you didn't see anything in those reports

8  that you thought were attributable to information you

9  had provided anyone, correct?

10  A     I didn't recognize it at the time.

11  Q     Okay.  In fact, you were interviewed by the

12  special counsel's office in October -- August 31st of

13  2021, and during that interview, you told them that you

14  didn't see anything in the reports that was

15  attributable to you, correct?

16  A     I'm not sure about that, but yeah.

17  Q     Do you want to have your memory refreshed?

18  A     Sure.  Yeah.

19  Q     If you turn to Exhibit 250 in the defense book,

20  please, it's a somewhat lengthy document.  But you

21  should read as much of it or as little of it as you

22  need to refresh your recollection.  But I would point

23  you to page 8.

24  A     Page 8?

25  Q     Yes, of 250.

```
 1        Does that document start off with, "On August
 2   31st, 2021, Charles Halliday Dolan, Jr., was
 3   interviewed"?
 4   A    Page 8, yeah.  Okay.
 5   Q    Have you had a chance to review the top of page 8?
 6   A    I'm looking at it right now, yeah.
 7   Q    Once you've had to review --
 8   A    Manafort, Dolan stated that he did not see.  That
 9   one?
10   Q    Yeah.
11   A    Yeah.  And that's correct, yeah.
12   Q    Does that refresh your recollection that in August
13   of last year you told the special counsel at your first
14   interview that you still didn't see anything in the
15   dossier that you thought came from you?
16   A    Correct.
17   Q    Do you recall that after your August 31st
18   interview you were interviewed a second time by the
19   special counsel on September 7, 2021?
20   A    Probably, yeah.
21   Q    Does that sound accurate, within a week or two?
22   A    Yeah, it sounds accurate.
23   Q    Do you remember that in your second interview, for
24   the first time at any point since 2017, you suddenly
25   realized that you may have provided some information in
```

1   the dossier?

2   A     Probably.  I'm not positive.  I don't recall

3   everything I said in that meeting.

4   Q     Okay.  Well, do you remember them confronting

5   you -- well, you actually -- after the August 31st

6   interview, when you came back in September, you

7   actually brought some emails that you had found on your

8   own, your own email records, correct?

9   A     Okay, yeah.

10  Q     Okay.  And during that interview, you were being

11  pressured by the special counsel to say that the

12  information about Manafort came from you, correct?

13  A     I guess.  You know, it's been a while.

14  Q     Well, you were there?

15  A     Yeah.

16  Q     Did you feel like you were being pressured to say

17  that that information came from you?

18  A     I mean, I just -- the thing I remember is doing

19  the side by sides, and I agreed, yeah, they're very

20  similar.  That's what I recall.

21  Q     Right.  And do you recall that at some points in

22  your interview -- well, you had been told by the

23  special counsel that you were a subject of their

24  investigation, correct?

25  A     I don't recall.

 1  Q    Do you recall your lawyer having a conversation

 2  with these lawyers in your presence upset about the

 3  fact that they were terming you as a subject of the

 4  investigation?

 5  A    Vaguely, yeah.

 6  Q    Well, why don't you look at the same report I just

 7  showed you.

 8  A    50?

 9  Q    250, page 1, second paragraph.

10  A    Okay, 250.  You want me to look at the second

11  paragraph?

12  Q    Correct.

13  A    Okay.

14       Okay, yeah.  Yeah.

15  Q    And at the time of that August 31st first

16  interview with the special counsel, you had hired an

17  attorney to be there with you, correct?

18  A    Yes.

19  Q    Mr. Martin?

20  A    Yes.

21  Q    Mr. Martin is here in the courtroom today with

22  you?

23  A    Yes.

24  Q    And during that meeting, the special counsel's

25  office advised you that it would be a crime to lie to

1  them?

2  A     Yes.

3  Q     And they also advised you that you were a subject

4  of their investigation, correct?

5  A     Yes.

6  Q     Did you have an understanding of what a subject of

7  an investigation meant?

8  A     No, not in --

9  Q     Do you understand what a target of an

10 investigation is?

11 A     I don't know the difference.  My attorney would

12 tell me.

13 Q     Do you recall that your attorney was upset by that

14 characterization?

15 A     I recall that a discussion was going on between

16 the two of them, but I'm not familiar with these terms.

17 So...

18 Q     Do you also recall during your interview with the

19 special counsel that they actually at one point during

20 the interview reminded you of your obligation to tell

21 the truth?

22 A     Yes.

23 Q     Okay.  So, ultimately, on September 7th, you

24 indicated to the government after their questioning

25 that you -- the information you provided Mr. Danchenko

648

1  in that email looked similar to what was in the

2  dossier, correct?

3  A    Yes.

4  Q    But that information that you learned about, the

5  Manafort departure you got from news sources, correct?

6  A    Yes.

7  Q    You did not get it from a GOP friend?

8  A    Correct.

9  Q    Okay.  And Mr. Danchenko had asked you for

10  information about that issue over an email

11  communication, correct?

12  A    Correct.

13  Q    Okay.  And you actually didn't have any inside

14  information about that; did you?

15  A    No.

16  Q    But you read the newspaper?

17  A    Yes.

18  Q    You read online articles about politics, I assume.

19  A    Yes.

20  Q    And it's fair to say that whatever you think of

21  Mr. Trump, he attracts a lot of media attention; is

22  that fair?

23  A    Correct.

24  Q    And his campaign was attracting a lot of media

25  attention?

1  A      Correct.

2  Q      And the drama within the campaign?

3  A      And the drama.

4  Q      Within the campaign?

5  A      Yes.

6  Q      And I believe you testified to this already, but

7  it was common knowledge that Mr. Lewandowski hated

8  Mr. Manafort, correct?

9  A      Common, yeah.

10 Q      That was widespread news at the time you emailed

11 Mr. Danchenko?

12 A      Yes.

13 Q      In your email to Mr. Danchenko about that issue

14 and what you had read, you weren't breaking the news to

15 him on anything; were you?

16 A      No.

17 Q      And the information that you provided in that

18 email was completely sourced from public knowledge,

19 correct?

20 A      Yes.

21 Q      So Charlie Dolan was not the source of that

22 information, correct?

23 A      Correct.

24 Q      The newspapers and the press were the source of

25 that information, correct?

1  A    Correct.

2  Q    And that's the only exchange you ever had with

3  Mr. Danchenko about the campaign that you recall?

4  A    Yes.

5  Q    No in-person conversations about it?

6  A    No.

7  Q    No phone conversations about specific issues

8  regarding --

9  A    No.

10  Q    In fact, other than asking for general information

11  about the infighting in the campaign, Mr. Danchenko,

12  during your entire relationship with him, never asked

13  you for any inside scoop on the Trump campaign at all?

14  A    No.

15  Q    Or its connections to Russia?

16  A    Or what?

17  Q    Or its connections to Russia?

18  A    No.

19  Q    And when you were confronted with the email that

20  Mr. Keilty showed you where you provided information

21  about Mr. Manafort and Mr. Lewandowski, you had told

22  the government that you had not remembered that email

23  during your first meeting, correct?

24  A    Correct.

25  Q    And it wasn't until you were going through your

1  emails that you saw it and then you provided it to

2  them, correct?

3  A    Correct.

4  Q    It just didn't stand out to you in your memory,

5  correct?

6  A    Correct.

7  Q    Because it wasn't a big deal to you; was it?

8       And they didn't charge you with a false statement

9       for not remembering that email; did they?

10  A    No.

11  Q    You were asked some questions about language in

12  email communications with Mr. Danchenko and yourself

13  about this being an important project for Mr. Danchenko

14  and your goals coincide.  Do you remember that?

15  A    I remember the email, yeah.

16  Q    Do you remember being asked those questions?

17  A    Yeah.

18  Q    And I believe your testimony was it's because

19  you're a democrat?

20  A    Yeah.

21  Q    So it's reasonable to conclude that you might have

22  been against whoever the republican candidate was?

23  A    Correct.

24  Q    Is that fair?

25  A    Yes.

1  Q     And Mr. Danchenko was aware of your political

2  affiliations at that time; wasn't he?

3  A     Yes.

4  Q     In fact, when Mr. Danchenko sent you that email

5  asking for information about the infighting in the

6  Trump campaign, it was your impression at that time

7  that he might have been writing a book or something

8  along those lines, correct?

9  A     Writing a book?

10  Q     Writing a book.

11  A     My recollection is that he did political risk

12  analysis and was probably just getting it for a client.

13  It was one of 50 emails that day that I just -- you

14  know, I was trying to throw him a bone because he was

15  helpful to me.  I pulled that stuff together for him.

16  Q     Right.  You didn't want to just blow him off

17  because you were trying to get business from him,

18  right?

19  A     Yeah.

20  Q     And other than the introduction to Ms. Galkina and

21  the servers work and other than the planning around the

22  YPO conference, you had very little to no communication

23  with Mr. Danchenko, correct?

24  A     Correct.

25  Q     I think you mentioned you brought back some

1  medication from Moscow for him.  Correct?

2  A    Yes.

3  Q    And you had a random meeting with him in January

4  of 2017 when you realized he was right around the

5  corner from you?

6  A    Yes.

7  Q    And that was just a brief "hello" at the park?

8  A    Exactly.

9  Q    And after the January 11th call where you raised

10  the dossier with Mr. Danchenko, you haven't had any

11  contact with him at all, correct?

12  A    No.

13  Q    You're aware, Mr. Dolan, aren't you, that the

14  government was investigating you at some point?

15  A    Yes.

16  Q    You're aware that they issued search warrants and

17  subpoenas for your email communications?

18  A    Yes.

19  Q    You're aware that they issued subpoenas for your

20  phone records?

21  A    Yes.

22  Q    Your work email records?

23  A    Yes.

24  Q    Your Facebook records?

25  A    Yes.

1  Q     And I think you have already testified to this,

2  but even knowing everything that the government has

3  done to look into you, it's still your testimony today

4  that you've never talked to Mr. Danchenko about

5  anything that ended up in the dossier, correct?

6  A     Correct.

7            MR. SEARS:  Thank you.

8            No further questions.

9            THE COURT:  Any redirect?

10           MR. KEILTY:  Very briefly, Your Honor.

11           THE COURT:  All right.

12                    REDIRECT EXAMINATION

13  BY MR. KEILTY:

14  Q     Mr. Dolan, Mr. Sears asked you about our first

15  interview with you in August of 2021, correct?

16  A     Correct.

17  Q     And you told Mr. Sears that at that time you

18  didn't see anything that came from you in the dossier,

19  correct?

20  A     Correct.

21  Q     But we didn't show you your email that you sent to

22  Mr. Danchenko in that first interview; did we?

23  A     I don't think so.

24  Q     Okay.  And we met with you again, correct?

25  A     Correct.

1  Q    And that was in October?

2  A    I think so.

3  Q    All right.  And during that meeting, we did show

4  you that email, correct?

5  A    Yes, correct.

6  Q    And did you look at those side by side?

7  A    Yes.

8  Q    And you agreed that that information appeared to

9  come from you, correct?

10 A    Yes.

11 Q    And you testified today still that you believe

12 that information came from you?

13 A    Yes.

14 Q    Now, Mr. Sears asked you a number of questions

15 about open source material, correct?

16 A    Correct.

17 Q    And you testified that you, in fact, received some

18 of the information from -- that you sent to

19 Mr. Danchenko about Paul Manafort from cable news; is

20 that correct?

21 A    Correct.

22 Q    But in your August 20th email, you told

23 Mr. Danchenko that you received it from a GOP friend of

24 yours, right?

25 A    Correct.

1  Q    You didn't say anything about cable news?

2  A    No.

3  Q    What does Mr. Danchenko do for a living?

4  A    Political risk analysis was my understanding.

5  Q    Okay.  Do you have any understanding of whether

6  that involves open source research, or do you know?

7  A    I didn't have those kinds of details about what he

8  did.

9  Q    Okay.  When Mr. Danchenko on August 19th asked you

10 for any truth, rumor, or allegation about Paul

11 Manafort, you testified on direct that you thought that

12 was because you had political connections and you were

13 a former political insider; is that correct?

14 A    Correct.

15 Q    Do you think Mr. Danchenko was asking you to

16 Google open source research?

17          MR. SEARS:  Objection, speculation.

18          MR. KEILTY:  Withdrawn.

19 BY MR. KEILTY:

20 Q    In fact, when you responded to Mr. Danchenko, you

21 said, "Let me dig around," correct?

22 A    Correct.

23 Q    And then the very next morning you tell him about

24 this drink with a GOP insider, correct?

25 A    Correct.

1           MR. KEILTY:  No further questions.

2           THE COURT:  All right.  Thank you.

3           May the witness be excused?

4      (No response.)

5           THE COURT:  Mr. Dolan, you are excused.  Do

6  not discuss your testimony outside of the courtroom

7  with any other witness.

8           All right.  Who's the government's next

9  witness?

10          MR. DURHAM:  Kevin Helson, Your Honor.

11          THE COURT:  All right.  We are going to take

12 a 20-minute recess at this time.  You are excused to

13 the jury room.  Please do not discuss this case among

14 yourselves during the recess.

15     (The jury exits at 10:59 a.m.)

16          THE COURT:  All right.  The Court will stand

17 in recess.

18     (Recess from 11:00 a.m. until 11:23 a.m.)

19     (The jury is not present.)

20          THE COURT:  Anything before we bring out the

21 jury?

22          MR. DURHAM:  The government has nothing.

23 Thank you, Your Honor.

24          MR. SEARS:  No, Your Honor.

25          THE COURT:  All right.  Bring out the jury.

658

1          (The jury enters at 11:23 a.m.)

2               THE COURT:  All right.  Please be seated.

3               I understand Mr. Burns has shared with you

4    the information we've received on the excused juror.

5    If we receive any other information, we'll let you

6    know.

7               All right.  Call your next witness.

8               MR. DURHAM:  Thank you, Your Honor.  The

9    government calls Kevin Helson.

10              THE COURT:  All right.  Kevin Helson will

11   come forward, please.

12              MR. DURHAM:  May I proceed, Your Honor?

13              THE COURT:  Yes, please.

14         KEVIN HELSON, PLAINTIFF'S WITNESS, AFFIRMED

15                   DIRECT EXAMINATION

16   BY MR. DURHAM:

17   Q    Sir, would you state your full name for the record

18   and spell your name for the court reporter.

19   A    My name is Kevin Helson.  That's H-E-L-S-O-N.

20   Q    Sir, how are you employed?

21   A    With the Federal Bureau of Investigation.

22   Q    And for approximately how long have you worked for

23   the FBI?

24   A    For 20 years.

25   Q    Would you explain to the ladies and gentlemen of

1  the jury in what capacity you work for the FBI?

2  A    I'm a special agent assigned to the Washington

3  Field Office.   I work in the Russian

4  Counterintelligence Program there.

5  Q    Briefly explain, if you would, your educational

6  background.

7  A    I have a bachelor's degree in chemistry and

8  microbiology from Middle Tennessee State University,

9  and from there I started working for the Tennessee

10  Bureau of Investigation as a special agent forensic

11  scientist until 2002, when I came on board with the

12  FBI.

13  Q    And in coming on as an agent with the FBI, you

14  received some training?

15  A    I did.

16  Q    Describe that briefly.

17  A    Yeah.   At the beginning of -- or when I received

18  my employment, I was assigned to Quantico, Virginia,

19  where I had to take the special agent training, which

20  is a 16-week course.   Upon successful completion of

21  that training, I was assigned to the Washington Field

22  Office.

23  Q    And you have indicated that you're currently

24  assigned to a particular squad that works on a

25  particular area, correct?

1    A     That is correct.

2    Q     And the country is Russia?

3    A     Yes.

4    Q     And what kind of work do you do relating to

5    Russian matters?

6    A     Generally speaking, my job is to identify

7    individuals who are here under false pretenses,

8    typically as diplomats, and are working for the Russian

9    Intelligence Service and to thwart their activities,

10   which is targeted against the United States and its

11   citizens.

12   Q    I want to ask you to go back to 2016 and then into

13   2017.

14   A     Okay.

15   Q     Would you tell the jurors where you were employed?

16   A     I was at the --

17            THE COURT SECURITY OFFICER:  Could I get you

18   to speak up a little bit more, please.  Counsel is

19   having a problem hearing you.

20            THE WITNESS:  Sure, no problem.

21   A     In 2016, I was at the Washington Field Office

22   assigned to a Russian program as well.

23   Q     Okay.  So the jurors have heard testimony relating

24   to an investigation that the FBI was conducting in 2016

25   and 2017, which is generally known as -- now it's

1  referred to as Crossfire Hurricane.  You're familiar

2  with that term?

3  A    I am.

4  Q    As to Crossfire Hurricane, were you at any point

5  in time assigned as an agent working on the Crossfire

6  Hurricane team?

7  A    No.

8  Q    So if the jurors have heard that, you're not part

9  of that effort?

10  A    I am not.

11  Q    Okay.  But at some point in time, did you become

12  aware of the fact that there was some kind of

13  close-hold investigation that was being done by the FBI

14  that became known as Crossfire Hurricane?

15  A    Yes.

16  Q    Explain to the jurors just the sort of proximity

17  to people -- or how did you first hear about Crossfire

18  Hurricane, if you recall?

19  A    It would have been toward the end of 2016.  When a

20  special investigation like that is going, people will

21  disappear for a period of time as they were working on

22  that case.  But it was something that no one talked

23  about.  You just knew that there was a special

24  investigation going on.

25  Q    And at particular points in time, there was a fair

1    amount of public information that had come out relating

2    to the bureau conducting investigations, correct?

3    A    Correct.

4    Q    In fact, are you familiar with the fact or do you

5    recall whether in mid-September of 2016 there was an

6    article that was published by Yahoo News that quoted a

7    senior law enforcement person saying that the FBI was

8    investigating Carter Page?

9    A    I wasn't aware of it at the time.  I think I

10   became aware of it later.

11   Q    All right.  And there was also in that article

12   that there was some former western intelligence person

13   who had been providing information, correct?

14   A    Correct.

15   Q    And that turned out to be Christopher Steele?

16   A    Yes.

17   Q    But at the time, you just knew there was something

18   going on; you weren't a part of it?

19   A    I was not a part of it.

20   Q    You indicated that toward the end of 2016, you

21   became more aware of what was going on, but still, you

22   were not assigned to the project, correct?

23   A    Correct.

24   Q    I'm going to ask you, sir, whether or not at any

25   point in time you were asked or directed, as the case

1    may be, to participate in some way in the handling of a

2    person who had been developed as a CHS?

3    A    I was approached most likely -- I think it was

4    around the end of January 2017 -- by two members of the

5    Crossfire Hurricane team who had identified an

6    individual that they had just conducted a three-day

7    interview.  It was in the course of that three-day

8    interview they had learned that there was potential for

9    more information relative to the programs that I was

10   working.

11   Q    All right.  And in that connection, who were the

12   two individuals?

13   A    It was Steve Somma and Brian Auten.

14   Q    All right.  And Steve Somma, is he a special

15   agent, an analyst, or in some other capacity at the

16   bureau?

17   A    He is a special agent assigned to the New York

18   Field Office, I think.

19   Q    How about Brian Auten?

20   A    He's an SIA or a supervisor intelligence analyst

21   assigned to FBI headquarters.

22   Q    So if the jurors have heard from a witness by the

23   name of Brian Auten, who is a senior supervisor

24   intelligence analyst, that's one of the persons who

25   approached you?

1  A     Yes, that's the same one.

2  Q     Was Auten working out of the Washington Field

3  Office, or was he working out of headquarters at the

4  time as best you recall?

5  A     He worked out of headquarters.

6  Q     And yourself and your assignment working on

7  Russian matters, were you at headquarters, or were you

8  at the Washington Field Office?

9  A     I was at the Washington Field Office.

10  Q     So just as sort of dynamics there, you're brought

11  in to perform a particular task?

12  A     Yes.

13  Q     And who was it that actually gave you the tasking?

14  A     My supervisor.

15  Q     All right.  And was your supervisor at FBI

16  headquarters or the Washington Field Office?

17  A     The Washington Field Office.

18  Q     And what was the tasking that you were given?

19  A     To meet with and eventually open Mr. Danchenko as

20  a CHS, to get him to report on stuff that was of

21  interest to us.

22  Q     And just the kind of dynamics of the FBI, when

23  you're asked to do something like that, do you pretty

24  much --

25  A     Do it.

1  Q     -- do it?  So you got it, right?

2  A     Yes.

3  Q     So you've told the jurors that the best

4  recollection is it was sometime late January or, I

5  guess, maybe a little bit later that you were first

6  brought into the --

7  A     Yes.  It was late January, sometime in early

8  February.

9  Q     Okay.  And do you recall when you were first

10 brought into the circle of knowledge or information

11 here what it was that you were asked to do?

12 A     It would have been at the same time that they had

13 broached the topic of me opening him up as a CHS.

14 Obviously, they were interested in follow-up questions

15 with the dossier, which is what they were working on at

16 the time.  I was also interested in any information

17 that was not necessarily related to the dossier that

18 could be of use to the Russian counterintelligence at

19 Washington Field.  So those two kind of dynamics merged

20 into my primary objectives when I initiated the

21 relationship.

22 Q     And in that regard, will you tell the jurors

23 whether or not at the initiation of your mission or

24 your tasking here, whether either one of those two

25 prongs was to be the priority?  By that, I mean looking

1   at the dossier and trying to corroborate it as opposed

2   to other matters.

3   A     At the beginning, given the significant amount of

4   press attention, I understood that the dossier would be

5   kind of foremost priority until such time that no more

6   questions needed to be asked or answered, followed up

7   with anything that I would've used in my cases at the

8   Washington Field Office.

9   Q     Okay.  So that's how things are arranged or

10  structured, correct?

11  A     Yes, correct.

12  Q     Do you recall the first meeting that you had with

13  Mr. Danchenko?

14  A     I do.

15  Q     And was that an introductory kind of meeting?

16  A     Yes.  It was myself, Steve Somma, Mr. Danchenko,

17  and I believe Jason was there as well.

18  Q     Jason being?

19  A     Jason is the co-case -- or co-handler of the CHS

20  at the time.

21  Q     All right.  And that's Special Agent Ruehle?

22  A     That is correct.

23  Q     Jason Ruehle.

24        Okay.  Now, did you have any understanding, if at

25  all, as to where the three-day interview had occurred

1  in January of 2017?

2  A    I believe it was at Washington Field Office.

3  Q    Okay.  And that's over in the District of

4  Connecticut -- I'm from Connecticut -- District of

5  Columbia, correct?

6  A    Correct.

7  Q    So that's where that occurred.

8      Where did your initial introduction to the

9  defendant here, Mr. Danchenko, occur?

10  A    Washington Field Office as well.

11  Q    And was that -- describe, if you would, to the

12  jurors what the essence of that initial meeting was.

13  A    It was to kind of set the stage for future meets,

14  kind of give him an idea of what the objective was, to

15  readdress some issues or questions regarding the

16  dossier, as well as on topics of foreign-aligned

17  influence is probably the best way to describe it.

18  Q    Do you recall approximately how long that initial

19  meeting would've occurred -- or did occur?

20  A    Less than an hour.

21  Q    And at the time, do you recall whether

22  Mr. Danchenko was alone or he was accompanied by

23  anybody?

24  A    I don't recall.

25  Q    At any point in time, when you were meeting with

1  Mr. Danchenko, do you remember whether he had counsel

2  with him?

3  A     Not with me, no.

4  Q     Not with you.

5        So if he had counsel previously -- if he had

6  counsel, it was part of the January stuff, not with

7  you?

8  A     Correct.

9  Q     To the best of your recollection?

10 A     Yes, to the best of my recollection.

11 Q     Okay.  So now let me just ask you a few quick

12 questions about that initial meeting.  And do you

13 remember about the date on which that occurred?

14 A     It would have been sometime either late February

15 or early March.

16 Q     All right.  And in that regard, did you have the

17 occasion to talk yourself with Mr. Danchenko?

18 A     Yes.

19 Q     Okay.  Can you tell the ladies and gentlemen of

20 the jury, based on your own observations, whether he

21 appeared to be fluent in English?

22 A     Yes, he was fluent in English.

23 Q     All right.  Did you detect or note any

24 difficulties in understanding the English language?

25 A     No.

1  Q    Any recollection of having difficulties in

2  communicating with Mr. Danchenko?

3  A    No.

4  Q    Or his, in turn, communicating directly with you

5  or your colleague?

6  A    No.  No.

7  Q    No difficulties?

8  A    No difficulties.

9  Q    And after that initial introductory meeting, then

10 what happened next?

11 A    In situations like this, we move the relationship

12 or the meetings to off-sites in discrete locations on a

13 routine basis.

14 Q    Now, you have told the jurors that at least in the

15 beginning of the relationship, the priority was the

16 dossier, correct?

17 A    Correct.

18 Q    And at the time you were assigned this matter,

19 were you steeped in or did you know much about the

20 dossier?

21 A    No.

22 Q    With respect to questions to be asked of

23 Mr. Danchenko relating to the dossier, were those

24 typically matters that you would prepare or did others

25 provide you with matters that they were interested in

1    your asking about?

2    A    The general understanding that I had with

3    Crossfire Hurricane and ultimately what became the

4    Mueller Investigation was if you want questions asked

5    related to the dossier, I will ask them, but it's going

6    to be incumbent upon them to give those to me.

7         One of the objectives I also had was to keep

8    Mr. Danchenko talking about the dossier in the hopes

9    that if there was something that he did not recall

10   initially during the three-day interview, that more

11   discussion would cause him to remember new details,

12   provide new information, or contradict old information.

13   Q    And in that connection, was there, at least on

14   occasion, a pattern you would follow as a special

15   agent, not specifically Mr. Danchenko's case, about

16   going back to subjects multiple times?

17   A    Yes.  I find it's useful to do so, particularly if

18   you are looking for details, specific details that seem

19   more generic.  The more times people go back, they

20   recall new details.  Also, if they're lying, it's hard

21   to keep that lie straight through the course of

22   repeating a story.

23   Q    So with regard then to the dossier, were there

24   specific focuses of inquiry?  And by that, I mean

25   specific things that you were listening for.

1   A     Related to the questions that I would get from

2   either Brian or, I think, Amy, specific to Sergei

3   Millian, I think, was one, as well as Chuck Dolan.

4   Q     All right.  And as a general proposition, do you

5   recall whether or not you were specifically tasked to

6   determine whether or not you could elicit any

7   corroborating information from Mr. Danchenko?

8   A     Yes.  That kind of was the general understanding

9   as we're looking for anything -- any new information

10  that would help corroborate the allegations that were

11  in the dossier, which included the information that

12  came from his sub-sources.

13  Q     During the course of your relationship and dealing

14  with Mr. Danchenko, did he ever provide any

15  corroborating information of the sort of series of

16  allegations made in the dossier?

17  A     No.

18  Q     What about sourcing, that is, the sourcing of the

19  information that was contained in the various reports

20  of the dossier?  Was that a particular focus of yours,

21  or was that something others were dealing with?

22  A     It was what others were dealing with.  They would

23  feed questions for me to ask.

24  Q     And then you made reference to questions relating

25  to Mr. Dolan and Mr. Millian.  Those are examples?

1   A   Yes, those are examples.

2   Q   So that's how it worked?

3   A   Yes.

4   Q   Do you recall, sir, during the course of your

5   dealing with Mr. Danchenko, whether or not

6   Mr. Danchenko himself ever imparted any information to

7   you concerning how much of the dossier he was

8   responsible for?

9   A   For whatever reason, the number 80 percent sticks

10  in my head.  I can't remember or recall exactly him

11  saying that, but it was -- that was the number that --

12  it was a significant majority of the dossier.

13          MR. DURHAM:  Okay.  Now, I'm going to ask

14  that Ms. Arsenault pull up Government's Exhibit 1502,

15  which is already in evidence, I believe, Your Honor.

16          THE COURT:  Yes.

17          MR. DURHAM:  Ms. Arsenault, if you would,

18  pull it up.

19  BY MR. DURHAM:

20  Q   Looking at what has been marked in this case as

21  Government's Exhibit 1502, do you recognize that?

22  A   I've seen it because you showed it to me before.

23  Q   Okay.  That's where we're going.  Okay.

24      Okay.  You saw that at a particular point in time

25  when you were being prepared to testify, correct?

1   A    Correct.

2   Q    Prior to looking at this document, had you, if you

3   recall, already said that Mr. Danchenko said he was

4   responsible for, like, 80 percent of it?

5   A    Yeah.  I had that number in my head for some

6   reason.  I'm not for sure when.

7   Q    So as you testify here in front of the jury and

8   you say you have in your head 80 percent, it didn't

9   come from this document, correct?

10  A    It did not, no.  I didn't see this until you

11  showed me.

12  Q    And as to Government's Exhibit 1502 and the

13  content section, it reads, does it not, "Yes, I

14  collected some 80 percent of raw intel and half the

15  analysis for the Chris Steele dossier.  And went

16  through debriefings with the FBI on the collusion

17  matters," correct?

18  A    Correct.

19  Q    And that would be true, that he went through

20  debriefings with FBI on these matters?

21  A    Yes.

22  Q    Do you have any reason to doubt Mr. Danchenko's

23  statement that he was responsible for, at least as

24  reflected in the government's exhibit, 80 percent of

25  the raw intelligence and half the analysis in the

674

1  dossier?

2  A    No.

3  Q    Now, with respect then to the dossier, how

4  important was it to you, in carrying out your

5  responsibilities, to try to identify and disclose who

6  the sources of the dossier were?

7  A    It's kind of the core of why we're looking at the

8  information, that you want to try to source that

9  material regarding the allegations.  You've got to get

10  to the root of where it came from and look to see if

11  they actually have proof or is it just made up.

12  Q    Now, you've told the jury that, at least in the

13  initial part of the relationship, there was a priority

14  for the dossier and the like, correct?

15  A    Correct.

16  Q    But there are other matters that you also had an

17  interest in, wearing your Washington Field Office hat,

18  on Russian matters in general, right?

19  A    Yes.

20  Q    Do you recall, sir, learning whether or not, when

21  you were first brought into this matter, if

22  Mr. Danchenko was to be a paid informant, a paid CHS or

23  not?

24  A    That was never discussed.  It's usually based on

25  the type of information that he gives or she gives, any

1    source.

2    Q    In this regard, was the arrangement that

3    Mr. Danchenko would be paid for information?

4    A    That was pretty much -- we probably would do that

5    over time.  It was expected.

6    Q    Pretty much the first time you met with him, he

7    was paid money, correct?

8    A    Not the one at the Washington Field Office but the

9    one after.

10   Q    Right, not the introduction?

11   A    Yes, not the introduction.

12   Q    But the first time you sat down with your

13   colleague, Special Agent Ruehle, to talk to

14   Mr. Danchenko, he was paid money, correct?

15   A    Correct.

16   Q    And how much money was that?

17   A    I don't remember the total.

18   Q    Okay.

19   A    It was less than $3,000, I think.

20   Q    You sat down and talked to him, and he got $3,000

21   in cash, correct?

22   A    Yes.

23   Q    And then over the course of the relationship, were

24   monies paid out by the FBI to Mr. Danchenko?

25   A    Yes.

1  Q    Did you expect, as a special agent of the FBI and

2  as the handler for Mr. Danchenko, that when you were

3  paying him for information, that he was going to be

4  fulsome in his disclosures to you?

5  A    Correct.  As part of the process, we're obligated

6  to admonish at the beginning, and that includes being

7  as truthful and forthright as possible.

8  Q    Now, in that regard, let me ask you another

9  question related to that:  Did you have any

10 understanding as to whether or not Mr. Danchenko had

11 been essentially given an immunity letter?

12 A    I did not at the time.

13 Q    You were not aware of that?

14 A    No.

15         MR. DURHAM:  I want to ask that we have

16 pulled up -- which is a full exhibit, I believe, Your

17 Honor.  I just want to check.  It's Government's

18 Exhibit 118.

19         THE COURT:  Yes.

20         MR. DURHAM:  I'll ask Ms. Arsenault to pull

21 up 118 and, if you will, pull up paragraph numeral 1 on

22 the first page.

23 BY MR. DURHAM:

24 Q    For purposes of the record, let me just read that

25 paragraph:  "Your client agrees to supply complete and

1    truthful information and testimony to all persons in

2    this matter, as well as in any other proceeding,

3    including court proceedings, related to or growing out

4    of this investigation.  Your client must answer all

5    questions concerning the subject matter of this

6    investigation and must not withhold any information.

7    Your client must neither attempt to protect any person

8    or entity through false information or omission nor

9    falsely implicate any person or entity."

10         Did I read that correctly?

11   A    You did.

12   Q    Now, you have told the jurors that you don't think

13   you were aware of the fact that there was an immunity

14   agreement.  It doesn't matter, but you don't remember?

15   A    I don't, yeah.

16   Q    But with respect to what the defendant's

17   obligations were under the paragraph that I just read

18   into the record, is that consistent or inconsistent

19   with your understanding of what the defendant was

20   obligated to do as a CHS who was being paid for

21   information?

22   A    Tell the truth.

23   Q    And not withhold information?

24   A    And not withhold.

25   Q    Or provide false information or the like, correct?

1   A     Correct.

2   Q     You have told the jurors that the initial

3   introductory meeting took place in Washington, D.C.,

4   the Washington Field Office?

5   A     Correct.

6   Q     Do you recall, sir, not the specific location.   I

7   don't want to ask you about the specific location.   But

8   when you first met for substantive purposes to sit down

9   and talk with Mr. Danchenko about subject matters,

10  geographically, where did that occur?

11  A     Northern Virginia, Alexandria area.

12  Q     Okay.  So it would be here in the Eastern District

13  of Virginia?

14  A     Correct.

15  Q     Anything he had said back in Washington,

16  jurisdiction venue would be over there, correct?

17  A     Correct.

18  Q     But this meeting, the initial meeting, that had

19  occurred was here in the Alexandria area?

20  A     Correct.

21  Q     Okay.  Let me turn to that first meeting.  For the

22  benefit of the jurors, would you tell the jurors

23  whether or not at that meeting or any other meetings if

24  you had occasion to record the meeting.

25  A     I did.  It was, I think, three of the meetings

1  that I recorded, and the reason being was that -- the

2  fact that I didn't know that much about the dossier

3  going into this, I wanted to capture any and all

4  statements that were made, one, to help me understand

5  what it was that was being told, but also to collect a

6  record of what was actually being said.  If it was

7  something nuanced or some little small piece of

8  information, we would actually have a recording of

9  that.

10 Q    All right.  And so this first substantive meeting

11 is held, as I'll refer to it.  Do you remember the date

12 of that meeting?

13 A    It would be in March -- it's either March or

14 April.  April 4 I think was when.

15          MR. DURHAM:  Your Honor, I would ask that the

16 court security officer provide the witness with a

17 notebook of the exhibits.  Oh, he has it.

18 BY MR. DURHAM:

19 Q    Why don't you take an initial look-see at that.

20 A    Okay.

21 Q    And, for example, if you go to Government's

22 Exhibit, say, 150 or one of those -- 151.  I'm sorry.

23 A    This was March 16?

24 Q    March 16.  I think counsel just indicated we are

25 all in agreement it was March 16 of 2017.

1  A     Correct.

2  Q     So on that date, you met with Mr. Danchenko,

3  correct?

4  A     Correct.

5  Q     And was the backup or co-handler present as well?

6  A     Correct.  Yes, he was.

7  Q     And that occurred here in the Eastern District of

8  Virginia?

9  A     Yes.

10  Q     To the best of your recollection, do you recall

11  whether or not Mr. Danchenko was aware of the fact that

12  you were recording the meeting?

13  A     No, he wasn't.

14  Q     At least you didn't tell him that, correct?

15  A     Correct.

16  Q     Also, just as a preliminary, let me ask you

17  whether or not you, yourself, or your co-case agent or

18  handler in this matter, Mr. Ruehle, did he bring any

19  documents or records with you, reports and the like?

20  A     It would have been -- if we had brought anything,

21  it would have been the dossier report.

22  Q     And how about Mr. Danchenko?  Did Mr. Danchenko

23  bring anything with him?

24  A     I can't -- he would've probably brought documents

25  or stuff that he had printed out.  I can't remember,

1   though, exactly.

2   Q    Okay.  Well, I'm going to ask you to take a look,

3   if you would, inside the binder of exhibits.  You see

4   there's some CDs there?

5   A    Correct, yes.

6   Q    All right.  So I'm going to ask you to take a look

7   at initially, if you would, sir, at Government's

8   Exhibit 151.

9   A    Okay.

10  Q    That's one of the discs?

11  A    Yes.

12  Q    Okay.  And looking at Government's Exhibit 151,

13  the original CD, is there anything on that CD that's

14  yours?

15  A    Yes, my initials.

16  Q    Explain to the jurors, if you would, sir, why your

17  initials are on Government's Exhibit 151.

18  A    I listened to the recording that's on this disc

19  and confirmed it matches the transcript that's also

20  included, and I initialed it afterwards.

21  Q    And with regard to the recording itself, who is on

22  the recording?

23  A    It's myself and Mr. Danchenko.

24  Q    And 151, if you know -- well, let me withdraw that

25  and ask this question:  Did that meeting go on for a

1   while?

2   A      It did.

3   Q      Would you tell the ladies and gentlemen of the

4   jury whether or not all of the information that was

5   discussed in that meeting was specifically related to

6   the dossier, or were there other matters as well?

7   A      There were other matters.

8   Q      So as to Government's Exhibit 151 that you

9   initialed and listened to, that's just a small portion

10  of a larger conversation?

11  A      Yes, correct.

12          MR. DURHAM:  Okay.  We offer 151 as a full

13  exhibit and then offer Government's Exhibit 151T as an

14  aid to the jury, Your Honor.

15          THE COURT:  Any objection?

16          MR. SEARS:  No, Your Honor.

17          THE COURT:  Without objection, Exhibits 151

18  and 151T are admitted.

19          MR. DURHAM:  With respect to the matters

20  being prepared by Ms. Arsenault, we would offer also at

21  this time, Your Honor, Government's Exhibit 1811, which

22  is a stipulation relating to Government's Exhibit 150.

23          THE COURT:  All right.

24          MR. DURHAM:  If I might just read that?

25          THE COURT:  Yes.

1            MR. DURHAM:  Ladies and gentlemen,

2    Government's Exhibit 1811 reads as follows:

3            It is hereby stipulated and agreed, by and

4    between the undersigning parties, that:

5            Paragraph No. 1:  Government's Exhibit 150 is

6    a true and accurate copy of a recording of a meeting

7    between and among Igor Danchenko, Special Agent Kevin

8    Helson, and Special Agent Jason Ruehle on March 16,

9    2017.

10           Government's Exhibits 151, 152, and 153 are

11    true and accurate portions of Government's Exhibit 150.

12           Paragraph No. 3:  Government's Exhibits 151T,

13    152T, and 153T are true and accurate transcriptions of

14    Government Exhibits 151, 152, and 153.

15           Paragraph 4:  Government's Exhibit 160 is a

16    true and accurate copy of a recording of a meeting

17    between and among Igor Danchenko, Special Agent Kevin

18    Helson, and Special Agent Jason Ruehle on May 18, 2017.

19           Paragraph No. 5:  Government's Exhibits 161,

20    162, 163, and 164 are true and accurate portions of

21    Government's Exhibit 160.

22           Paragraph 6:  Government's Exhibits 161T,

23    162T, 163T, and 164T are true and accurate

24    transcriptions of Government's Exhibits 161, 162, 163,

25    and 164.

```
1             Paragraph No. 7:  Government's Exhibit 170 is
2    a true and accurate copy of a recording of a meeting
3    between and among Igor Danchenko, Special Agent Kevin
4    Helson, and Special Agent Jason Ruehle on June 15,
5    2017.
6             Paragraph No. 8:  Government's Exhibits 171,
7    172, and 173 are true and accurate portions of
8    Government's Exhibit 170.
9             Paragraph No. 9:  Government's Exhibits 171T,
10   172T, and 173T are true and accurate transcriptions of
11   Government's Exhibits 171, 172, and 173.
12            The parties stipulate to the authenticity of
13   Government's Exhibits 151 -- I'm sorry, 150, 151, 151T,
14   152, 152T, 153, 153T, 160, 161, 161T, 162, 162T, 163,
15   163T, 164, 164T, 170, 171, 171T, 172, 172T, 173, and
16   173T.
17            Paragraph No. 8:  This stipulation is
18   admissible as evidence at trial, signed by the parties.
19   BY MR. DURHAM:
20   Q    Okay.  That's a long-winded stipulation, the
21   background.
22        You have looked at, haven't you, the disc that has
23   been marked as Government's Exhibit 151, correct?
24   A    Correct.
25   Q    And then Government's Exhibit 151T is the
```

1  corresponding transcript?

2  A    Correct.

3  Q    And as to the corresponding transcript, what, if

4  anything, can you tell the jurors about it being a fair

5  transcription of what's on the audio tape itself?

6  A    It's a correct transcription of what was on the

7  audio.

8         MR. DURHAM:  Your Honor, I don't know if the

9  Court wanted to give an instruction to the jury as to

10 what's the evidence and what's the aid.

11        THE COURT:  Yes.  Ladies and gentlemen, you

12 will be receiving both the discs, as well as the

13 transcription.  To the extent there's any discrepancy,

14 you are to rely on the actual recording.

15        MR. DURHAM:  Thank you, Your Honor.

16        With the Court's permission then, we would

17 ask that Government's Exhibit 171T, the transcript, be

18 brought up and then Ms. Arsenault to play Government's

19 Exhibit 151.

20 BY MR. DURHAM:

21 Q    Okay.  Looking at the monitor --

22        MR. DURHAM:  And perhaps, Ms. Arsenault, if

23 you could, just expand it.

24        THE COURT:  We're listening to 151 and 151T?

25        MR. DURHAM:  151.  Maybe I'll go with the

1  three digits, 1-5-1 and 1-5-1-T.

2            THE COURT:  All right.  Because I think you

3  mentioned 171.  So 151 and 151T.  All right.

4            MR. DURHAM:  Ms. Arsenault, maybe you can

5  just blow up the first page.

6  BY MR. DURHAM:

7  Q    Your monitor is working; is it?

8  A    Yes.

9  Q    Okay.  So this is a recording that took place on

10  what date?

11  A    March 16, 2017.

12  Q    And does the document marked 151T accurately

13  reflect who the participants were?

14  A    Yes.

15  Q    And then the comments, just for the benefit of the

16  jurors, are there instances in these recordings where

17  something is muffled or you just can't make out what

18  the words are?

19  A    Yes.  A lot of the challenge with recording

20  something like this, you're going to get a lot of

21  unintelligible stuff in the background or something is

22  said that you can't make out.  So that's what

23  unintelligible is.

24  Q    Okay.  And then phonetics, maybe some of the

25  spellings aren't exactly right?

1  A    Yes.  That's usually occurring when names are

2  mentioned that you don't know how to spell.  So they

3  just phonetically spell it.

4       Then if more than one person is talking at the

5  same time, it can be very difficult to understand

6  what's being said.  So that's what the OV stands for.

7  Q    Just before I asked you to take a look at

8  Government's Exhibit 151 and 15T, I'd asked you whether

9  or not you and/or Special Agent Ruehle had brought

10 anything to the first session, and you indicated you

11 may have brought some materials, maybe the dossier.

12 A    Correct.

13 Q    Do you recall whether or not the defendant brought

14 anything with him?

15 A    I can't remember.  It may have been pieces of

16 paper or stuff that he had provided as far as, like,

17 communications.  I'm not for sure.  I can't recall.

18 Q    All right.  See if listening to Government's

19 Exhibit 151 and -- of course, we're using the

20 corresponding transcript -- 151T refreshes your

21 recollection in that regard.

22 A    Okay.

23      (Audio is played.)

24 BY MR. DURHAM:

25 Q    All right.  So having listened to that particular

```
 1  recording of part of the March 16 conversation, does
 2  that refresh your recollection as to --
 3  A    Yes.
 4  Q    -- whether or not Mr. Danchenko brought anything
 5  with him?
 6  A    Yes.  He had a copy of the dossier.
 7  Q    And do you recognize Mr. Danchenko's voice when he
 8  said, "Yeah, I mean, that's why I was, uh, made myself
 9  read.  You know, as -- as -- as I was preparing for the
10  meeting"?
11  A    Yes.
12  Q    He had the dossier with him?
13  A    Yes.
14  Q    To your recollection, was that the only time that
15  Mr. Danchenko had brought the dossier reports with him?
16  A    I don't believe so.
17  Q    He would usually have it with him when you were
18  asking about it?
19  A    Yes.
20  Q    And at the very beginning of this short portion of
21  the conversation, it reads "Yeah, so I mean I have
22  recorded -- I record some of these things just -- just
23  in case, you know, we ever need them."
24       You say, "Yeah.  Perfect."
25       And then he says, "For reference.  Ah -- there
```

1  were communications that I'm in touch with my, you

2  know, sources in all this."

3       Did I accurately read that?

4  A    Correct, you did.

5  Q    Does that refresh your recollection in any way,

6  sir, as to whether or not Mr. Danchenko had indicated

7  that he had records of sort and that he would record

8  things in case he needed them?

9  A    Yes.

10 Q    And when he said there, "For reference.  Ah --

11 there were communications that I'm in touch with my,

12 you know, sources in all this" --

13 A    Yes.

14 Q    -- do you remember him saying that?

15 A    Yes.  I remember we were talking generally

16 speaking.  He would say that and use communications as

17 the way he was communicating with them or use the word

18 "communication" as a verb.

19 Q    And was that significant to you, that he had

20 records and the like?

21 A    Yeah.  That is -- from a counterintelligence

22 perspective, that is the proof you're looking for for

23 when you're trying to confirm things.  Any kind of

24 communication like that would be relevant to what I'm

25 looking for.

1   Q    All right.  Tell the ladies and gentlemen of the

2   jury whether or not, during the course of the period of

3   time that you were working and you had Mr. Danchenko as

4   a CHS, whether or not he would, in fact, produce some

5   documents.

6   A    He would.  Essentially, I think in every meeting

7   there would be some level of documents, and then there

8   were also electronic drops as well that he was leaving

9   documents as well, a lot of screenshots, copies of

10  screenshots, that sort of thing.

11  Q    Just for the benefit of the jurors, who may not be

12  as familiar with how some of this works, when you say

13  an electronic drop box, what is that, and how did it

14  work in this instance?

15  A    In this instance, it was a way for Mr. Danchenko

16  to go into his computer or any other electronic device

17  and deposit information in a discrete area for me then

18  to come along and pull it off, or we also used

19  encrypted apps.

20  Q    Okay.  So now, with respect to your meeting on

21  March 16 with Mr. Danchenko, do you recall, sir,

22  whether or not -- on that first date, whether there

23  were any subject matters that you previously made

24  reference to the jury that came up?  That's a

25  convoluted question.  Let me ask it a different way.

1      Do you remember whether or not at that very first
2  meeting one of the items that was brought up was a
3  matter relating to Sergei Millian?
4  A     Yes.
5  Q     And with respect to Mr. Millian and information
6  relating to that, do you recall there was a specific
7  report in the dossier relating to information that
8  purportedly had come from Millian?
9  A     Yes.
10 Q     And if I told you the report was 2016/95, does
11 that sound right?
12 A     Yes, it does.
13 Q     Again, have you had occasion anytime recently to
14 look at that particular report?
15 A     Yes.
16 Q     In trial prep?
17 A     In trial prep.
18 Q     And with respect to Mr. Millian and Mr. Danchenko,
19 to the best of your recollection, back in March of
20 2017, was that a matter of particular interest?
21 A     Yes.  It was an issue that was raised even by
22 Brian and some of the other people on Crossfire
23 Hurricane.
24 Q     When you say Brian, are you referring to Brian
25 Auten?

1  A    Brian Auten, yes.

2  Q    And it was concern about that particular

3  reporting, and do you recall why there was concern?

4  A    It may not have come from the first initial

5  meetings, but as 2017 progressed, Brian had brought

6  that up to my attention saying, "Readdress the Sergei

7  Millian matter.  We have discrepancies."

8  Q    So let me ask you this to give a little preview

9  for the jurors:  Would it be a fair statement that that

10 particular part of Mr. Danchenko's statement to Auten

11 and Somma continued to be a matter that you and your

12 colleague would inquire about?

13 A    Yes.

14 Q    And was it brought up once or more than once after

15 March 16 to the best of your recollection?

16 A    More than once.

17 Q    You revisit it a few times, correct?

18 A    That is correct.

19 Q    But one of those dates, the initial date, was on

20 March 16 of 2017.  I'm going to ask you, if you would

21 now, sir, to take a look, again, in the folder at

22 Government's Exhibit 152 and then the corresponding

23 transcript, 152T.

24 A    Okay.

25 Q    And, first of all, looking at the CD, I'll ask you

1    the same questions that I did as to the previous.  This

2    comes from 150.  This is the clip, and 152 is a

3    portion.

4        (Counsel confer.)

5    BY MR. DURHAM:

6    Q    I'm going to ask you to look at 152 to see if you

7    recognize that in some fashion.

8    A    I do.  It has my initials on it.

9    Q    Similar to the one you previously identified?

10   A    Yes.

11   Q    And as to the recording that's on Government's

12   Exhibit 152, to your knowledge and recollection, is

13   152T an accurate transcription of what's on the

14   recording itself?

15   A    It is.

16       MR. DURHAM:  Your Honor, we would move

17   Government's Exhibit 152 as a full exhibit and the

18   transcript, 152T, as an aid for the jury.

19       THE COURT:  All right.  Without objection?

20       MR. SEARS:  Without objection.

21       THE COURT:  152T is admitted.

22   BY MR. DURHAM:

23   Q    Now, while Ms. Arsenault is getting that up on the

24   screen, I want to ask you, sir, whether or not you

25   recall if one of the matters that you were inquiring

1    into or you and your colleagues were interested in was

2    whether or not there was any record that would

3    substantiate or corroborate the statement by

4    Mr. Danchenko that an anonymous caller had called him?

5    A     The way to prove it would have been through either

6    toll records or the actual call from his phone.

7    Q     All right.  And in that regard, do you recall

8    whether or not Mr. Danchenko had been asked to provide

9    any toll records, telephone records?

10   A     Yeah.  We asked if he could go back and look and

11   see if he had the number on the date that he had

12   called.

13   Q     And what was the answer to that?

14   A     He didn't have it -- or he couldn't find it or

15   didn't have it.

16   Q     And do you recall whether there was some

17   discussion of possibly -- well, maybe an app that they

18   used, some kind of app?

19   A     Yes.

20   Q     Did you ask him to retrieve any app records that

21   he had as well?  Any telephone records or app records?

22   A     Any kind of communication like that would have

23   been relevant.

24   Q     Did he produce anything?

25   A     No.

1  Q     In your mind, to your recollection, did there seem

2  to be any confusion on Mr. Danchenko's part that you

3  were looking for any corroborative information, even

4  like a telephone record?

5  A     No.

6  Q     Okay.  He didn't produce any?

7  A     Correct.

8  Q     Now, in your capacity of being the handler for

9  Mr. Danchenko, was it your role to go then on your own

10 and look for that kind of record or not?

11 A     The fact that my relationship with Mr. Danchenko

12 is as a confidential human source, I am not legally

13 allowed to seek legal process on someone's

14 communications.  If someone is volunteering information

15 to the bureau, it's not enough probable cause for me to

16 issue those.  You need a predicated investigation on

17 which to do that, and we did not have that.

18 Q     So to the extent that Mr. Danchenko didn't produce

19 his own telephone records, it wouldn't fall on you in

20 your capacity to go look for those records?

21 A     Correct.

22 Q     Do you know whether or not the people of Crossfire

23 Hurricane went about trying to gather those records?

24 A     I do not.

25 Q     If they had bothered to do that, do you think you

1   would be aware of it in some fashion?

2   A     I would hope.

3            MR. DURHAM:  Okay.  Your Honor, we're going

4   to ask permission then to play Government's

5   Exhibit 152T.

6            THE COURT:  All right.  You may.

7            MR. DURHAM:  Thank you.

8        (Audio is played.)

9   BY MR. DURHAM:

10  Q    Now, let me ask you several questions about that

11  portion of the conversation that you had with

12  Mr. Danchenko on March 16.  The very first part of the

13  transcript reflects that you were making reference to

14  going back through some of this chart.  Does that

15  refresh any recollections as to what document or

16  documents you may have had with you?

17  A     It was an analyst notebook chart of various

18  individuals and how they were connected, a network of

19  subjects.

20  Q    I'm sorry.  I spoke over you.

21  A     It was just a network of subjects.

22  Q    Okay.  And are those subjects that had been

23  developed by the FBI either with Mr. Danchenko or based

24  on information that Mr. Danchenko had initially

25  provided?

1  A    Yes.  That chart was being developed based on the

2  reporting we were getting from him.

3  Q    Okay.  And so you have that with you, and you're

4  going to use that as something of an interview aid;

5  would that be a fair statement?

6  A    That is correct.

7  Q    And then with respect to references to these

8  various persons, Vorontsov (phonetic) and Abyshev

9  (phonetic) and Mila (phonetic), and I think you

10 initially said Millian or whatever.

11 A    Yes, Millian.

12 Q    You then go into a specific discussion about a

13 phone call, correct?

14 A    Correct.

15 Q    Do you remember whether or not on March 16 of 2017

16 if you had read any materials about that, that is, what

17 had been said concerning this call?

18 A    I don't recall if I had read the portion of the

19 three-day interview at that point -- I may have -- or

20 if I had had a discussion with either Brian or -- it

21 would have been Brian about the Sergei Millian call.

22 That's the scenario surrounding the call.

23 Q    Okay.

24 A    It was just enough for me to ask the question and

25 kind of probe to see if I would get any more new

1   information.

2   Q    Okay.  So you may have read what Auten and Somma

3   had written up about this?

4   A    Yes.

5   Q    And did you have some understanding at that point

6   then that Mr. Danchenko had said he had gotten this

7   anonymous call; he claimed to believe that it was

8   Millian and the like?

9   A    Yes.

10  Q    So you had that general background?

11  A    Yes, general background.

12  Q    So this is, best you recall, the first time that

13  you, as Mr. Danchenko's handler, inquired into this

14  particular part of the dossier reporting, the Millian

15  stuff?

16  A    Yes.  Yes.

17  Q    Okay.  You've told the jurors that you recorded

18  three conversations, as best you recall, with

19  Mr. Danchenko.  To be clear, were you always able to be

20  in a place or in a position to be able to do a

21  recording?

22  A    No.  Typically, outside it becomes a bit of a

23  challenge.

24  Q    All right.  And explain -- it may be obvious --

25  why sometimes it you're outdoors, for example, it's

1   difficult to record conversations where you get the

2   necessary clarity.

3   A    It essentially is going to pick up all the

4   surrounding noise, wind, and it doesn't even have to be

5   a hard wind.  It just becomes very difficult to listen

6   and hear.

7        In addition, the outdoor meets were meant to be as

8   quick as possible.  We were trying to keep our long,

9   in-depth conversations inside in a discrete manner.

10  Q    You told the jurors that right from the start,

11  arrangements were made for Mr. Danchenko to be able to

12  provide documents to you through an electronic drop box

13  of sorts?

14  A    Yes.

15  Q    Do you recall, sir, whether or not pretty much

16  from the start Mr. Danchenko was providing documents

17  and records to you as you had requested?

18  A    Yes.

19  Q    And describe, if you would, to the jurors your

20  request of Mr. Danchenko for records.  Were they

21  narrowly tailored, or were they broad sorts of

22  requests?

23  A    At the time, when we began, and for a period of

24  time throughout the relationship, it was fairly broad

25  with respect to the maligned influence.  We didn't know

1  a lot of stuff that was going on back in the day, and

2  Mr. Danchenko was providing a wide depth of

3  information.  In a lot of ways, we were just in receive

4  mode and taking in everything that we could get from

5  him and then allowing the Intelligence Division to

6  process that information and corroborate and confirm if

7  any of it was actually true or not.

8  Q    All right.  And then with respect to documents or

9  records relating to the dossier, did he provide any

10  documents that were corroborative of the dossier?

11 A    No.

12 Q    And between March of 2017 and at least the next

13 few months, was that, again, the priority of the

14 effort, was to try to collect information,

15 corroborative information, sourcing information from

16 the dossier?

17 A    Correct.  It was dependent on any questions I

18 would get from Crossfire Hurricane or the investigative

19 team, or if Mr. Danchenko wanted to talk about it, we

20 were encouraging that.  That slowly drifted off and

21 became less and less the topic of discussion as we went

22 forward.

23 Q    As a result of the meeting that you had on

24 March 16 of 2017 and your review of the Millian matter,

25 in your mind, was Mr. Danchenko fully aware of your

1  interest in Millian and that part of the dossier?

2  A    Yes.

3  Q    No question in your mind about that?

4  A    No.

5  Q    Did he provide anything to you by way of documents

6  or records relating to Millian on March 16?

7  A    No.

8  Q    Or at any time thereafter as best you recall?

9  A    Not that I recall, no.

10 Q    You told the jurors that there were three meetings

11 that were recorded.  I want to turn your attention to

12 the date of March 18 of -- I'm sorry -- May 18 of 2017.

13 I'll ask you whether or not you have a recollection of

14 that meeting, the date on which the second recorded

15 meeting occurred?

16 A    Yes.

17 Q    Let me ask you the same initial questions as

18 relates to that.  On May 18, 2017, when you met with

19 Mr. Danchenko, where were you located geographically?

20 I'm not asking where the meeting took place.

21 A    Northern Virginia, Alexandria area.

22 Q    Okay.  Again, in the Eastern District of Virginia?

23 A    Yes.

24 Q    So with respect to the second meeting that was

25 recorded, that being on May 18 of 2017, do you have a

1    general recollection of what occurred at that time on

2    that date?

3    A    It was -- I think it was -- we had another

4    debrief.  Is that --

5    Q    All right.  If you recall?

6    A    Yes.

7    Q    All right.  Do you recall, sir, whether or not

8    prior to May 18 of 2017, whether Mr. Danchenko, in

9    fact, had started providing some records via the

10   electronic drop box?

11   A    Yes.

12   Q    And that continued, correct?

13   A    Yes, that continued.

14   Q    Did there seem to be any confusion on

15   Mr. Danchenko's part about how the drop box worked or

16   how to get records to you?

17   A    No.

18   Q    Do you have any present recollection as to whether

19   or not the very day before you met with Mr. Danchenko,

20   that being May 18 of 2017, if he, in fact, had provided

21   documents via the electronic drop box?

22   A    He had.

23   Q    What's your best recollection, sir, as to what, if

24   anything, Mr. Danchenko told you early on in this

25   business relationship, whether he had lots of records

1  and business cards and the like?

2  A    That he kept business cards of pretty much all of

3  his contacts, and it was pretty robust.

4  Q    All right.  What, if anything, did that indicate

5  to you regarding Mr. Danchenko having records that

6  might be of interest to the FBI?

7  A    From a counterintelligence perspective, we would

8  want all of them.

9  Q    He knew that, correct, based on your interactions

10  with him?

11  A    Yes.

12  Q    I'll ask you to take a look at what has been

13  premarked as Government's Exhibit 162 and then the

14  corresponding transcript, 162T.  Do you have the disc

15  there of 162?

16  A    I do.

17  Q    And looking at Government's Exhibit 162, do you

18  recognize it?

19  A    I do.

20  Q    And how do you recognize it?

21  A    It has my initials on it.

22  Q    Would you tell the ladies and gentlemen of the

23  jury whether or not you've had occasion to listen to

24  162 and compare it against the transcript that is

25  premarked as Government's Exhibit 162T.

1  A    I did, and it's the exact -- it's an accurate

2  transcript of the recorded conversation on this.

3  Q    Okay.  Based on your own listening to the

4  recording and comparing it against the transcript, it's

5  accurate?

6  A    Yes.

7           MR. DURHAM:  We move 162 as a full exhibit,

8  Your Honor, and 162T as an aid to the jury.

9           THE COURT:  Without objection?

10          MR. SEARS:  No objection, Your Honor.

11          THE COURT:  Without objection, 162 and 162T

12 are admitted.

13 BY MR. DURHAM:

14 Q    All right.  So, again, just on the first page,

15 each one of these short transcripts have the same

16 information, date of the recording, who was present,

17 and the like, correct?

18 A    Correct.

19 Q    And have you checked those to determine their

20 accuracy?

21 A    Yes.

22          MR. DURHAM:  Okay.  With the Court's

23 permission, we would ask that Ms. Arsenault play

24 Government's Exhibit 162.

25          THE COURT:  All right.

1        (Audio is played.)

2   BY MR. DURHAM:

3   Q    Now, with respect to that recording, does that

4   refresh your recollection as to whether Mr. Danchenko

5   appeared to have records, business cards, and the like?

6   A    Yes.

7   Q    To the best of your recollection, did he produce

8   any kind of a business card or email traffic or

9   anything of that sort relating to -- to you concerning

10  the dossier?

11  A    I think he had given up a couple of emails from

12  Sergei Millian at some point.

13  Q    Did he give those to you, or had that been

14  produced back in January to Brian Auten and Steve

15  Somma?

16  A    I thought they were produced back in January.  But

17  he went through the email accounts that he knew, and I

18  remember recording that.

19  Q    Okay.  But no recollection of him producing

20  something to you from the dossier?

21  A    No.

22  Q    Okay.  But you know he did keep and maintain

23  records based on your conversations with him over time,

24  correct?

25  A    Correct.

1    Q    Okay.  Now, with respect to whatever Mr. Danchenko

2    had produced to the folks back in January, do you

3    remember whether you ever physically saw those items or

4    not?

5    A    I don't recall seeing those items.

6    Q    Okay.  You just knew about them?

7    A    I knew about them.

8    Q    Let me ask you, with respect to the meeting that

9    had occurred on May 18 of 2017, whether or not there

10   was any other discussion, to the best of your

11   recollection, at that time about Mr. Millian?  That is

12   on May 18 of 2017.

13   A    I thought there was, yes.

14   Q    I'll ask you to take a look at Government's

15   Exhibit 164 for identification and 164T for

16   identification and see if you recognize those items.

17   A    I do.

18   Q    And how do you recognize 164 for identification?

19   A    It has my initials.

20   Q    And with regard to 164T, did you compare what's on

21   the CD against the transcript?

22   A    I did.

23   Q    What can you tell the jurors about whether or not

24   the transcript is a reasonably accurate transcription

25   of what's on the CD clip marked Government's

1    Exhibit 164?

2    A    It is a reasonable transcription of what's on the

3    disc.

4    Q    And you've listened to that yourself, correct?

5    A    That is correct.

6              MR. DURHAM:  We would move Government's

7    Exhibit 164 as a full exhibit and 164T as an aid to the

8    jury, Your Honor.

9              THE COURT:  Without objection?

10             MR. SEARS:  No objection.

11             THE COURT:  Exhibits 164 and 164T are

12   admitted.

13             MR. DURHAM:  With the Court's permission, may

14   we play the recording?

15             THE COURT:  Yes.

16        (Audio is played.)

17   BY MR. DURHAM:

18   Q    Sir, with respect to that recording that you made

19   on May 18 of 2017, there's discussion in there, again,

20   relating to Mr. Millian, correct?

21   A    Yes.

22   Q    And what you had read in reports concerning

23   Mr. Danchenko's statements to your colleagues back in

24   January about the matter?

25   A    Yes.

1  Q    That is correct?

2  A    That is correct.

3  Q    So this is the second time -- at least the second

4  time that you've recorded, again, Mr. Danchenko where

5  you had gone back to this particular report, 95, and

6  tried to plum the depths of that; is that a fair

7  assessment?

8  A    Yes.

9  Q    In connection with your meeting on May 18,

10  Mr. Danchenko had provided two email addresses for

11  Millian, correct?

12  A    Correct.

13  Q    Do you remember whether he had talked to you about

14  how he had gotten those?

15  A    No.

16  Q    And are you familiar with any emails relating to

17  Mr. Millian's exchange with some RIA Novosti journalist

18  relating to how to get ahold of Mr. Millian?

19  A    Yes, the ones you showed me.

20  Q    Other than what we showed you --

21  A    No.

22  Q    Mr. Danchenko didn't produce any of that to you?

23  A    No.

24  Q    Will you tell the ladies and gentlemen of the jury

25  whether or not a fulsome understanding of who

1  Mr. Danchenko was talking to and how he got the Millian

2  email addresses would have been helpful?

3  A    Yes.

4  Q    Well, that would have been helpful to you?

5  A    (Nods head up and down.)

6  Q    Is that as to the dossier, as to the maligned

7  influence, or both?

8  A    I think both.

9  Q    And it turns out that he provided -- he,

10 Mr. Danchenko, was providing a telephone number that

11 begins with the area code 404, correct?

12 A    Correct.

13 Q    And it turns out that's an area code in the State

14 of Georgia?

15 A    That is correct.

16 Q    Did you ever learn whether or not Mr. Millian had

17 some association with the Georgia area?

18 A    Yes.

19 Q    And what can you tell the jurors about that?

20 A    I think he resided there at some point.

21 Q    Before he moved to New York?

22 A    Before he moved to New York.

23 Q    And you may or may not be aware of this.  Do you

24 know whether or not Mr. Millian had any formal

25 relationship himself with the FBI for a period of time?

1  A    I did not know that until trial prep.

2  Q    Okay.  So during the period that you were dealing

3  with Mr. Danchenko and whatnot, you did not know about

4  Millian's prior relationship with the FBI?

5  A    No.

6  Q    Okay.  At any point in time when you were dealing

7  with Mr. Danchenko, aside from a document that he had

8  provided to Mr. Auten and Mr. Somma back in January,

9  did he, Mr. Danchenko, bring to your attention anything

10 relating to emails or did he bring to you emails that

11 he had sent to Mr. Millian?

12 A    No.

13 Q    The jury has seen at least once, perhaps twice,

14 maybe more some email traffic that I want to go through

15 quickly with you just to establish for the record that

16 they were never provided to you.  Okay?

17 A    Okay.

18 Q    So I'm going to ask you, if you would, to quickly

19 take a look at what has been marked previously as a

20 full exhibit, Government's Exhibit 204.

21         MR. DURHAM:  I'll ask Ms. Arsenault to pull

22 that up on the screen.

23 BY MR. DURHAM:

24 Q    As I say, we will go through this quickly.

25         Is that on your screen?

1   A    Yes.

2           MR. DURHAM:  Okay.  So I'm going to ask if

3   Ms. Arsenault can blow up 204 so it's a bit easier to

4   read on the screen.

5   BY MR. DURHAM:

6   Q    Now, looking at Government's Exhibit 204, that's

7   an email from who to who?

8   A    It's from Igor Danchenko to

9   milliangroup@gmail.com.

10  Q    And what's the date?

11  A    July 21, 2016.

12  Q    And what's the subject matter?

13  A    Question about Trump, China.

14  Q    Now, you've indicated that you saw this email in

15  connection with trial prep, correct?

16  A    That is correct.

17  Q    Prior to being shown these by the investigators in

18  this particular matter, you had never seen them?

19  A    No.

20  Q    Mr. Danchenko had never provided them to you?

21  A    No.

22  Q    Have you had a chance, however, in pretrial prep

23  and whatnot to read the content of Government's

24  Exhibit 204?

25  A    Yes.

1   Q     With respect to what is said in this email from

2   Mr. Danchenko to the Millian Group, and particularly

3   reading down to the next to the last paragraph where it

4   says, "In any case, it would be interesting if and when

5   possible to chat with you by phone or meet for

6   coffee/beer in Washington or in New York where I will

7   be next week.  I myself am in Washington.  It is also

8   possible by email in Russian or in English."

9         Did I read that correctly?

10  A     You did.

11  Q     When you were dealing with Mr. Danchenko trying to

12  develop information relating to the sources, would this

13  have been something that would be important to you?

14  A     Yes.

15  Q     Why would knowing about this item be important to

16  you?

17  A     Sergei Millian was a sub-source of the dossier.

18  It would have provided context and relevance to what

19  his reporting was.

20  Q     So for the benefit of the jurors, if you're

21  looking at Sergei Millian, right, Millian could be a

22  source of the dossier, and you were plumbing for that?

23  A     Correct.

24  Q     On the other hand, Sergei Millian may be somebody

25  that the bureau would be interested in for different

1   purposes, correct?

2   A    Correct.

3   Q    And most particularly, if Sergei Millian himself

4   had been a bureau informant, you would want to know

5   that he, Mr. Danchenko, was communicating directly with

6   him in this fashion?

7            MR. SEARS:  Your Honor, I am going to object

8   to the leading nature.

9            THE COURT:  It is leading.  Sustained.

10  BY MR. DURHAM:

11  Q    Would it have been significant to you to know

12  about this email, the content of this email which was

13  sent by Mr. Danchenko to the Millian Group?

14  A    Yes.

15  Q    Now, earlier we had discussed with you and played

16  a recording that talked about apps.  Do you recall

17  that, that Mr. Danchenko was talking about Wickr or

18  WhatsApp and the like?

19  A    Yes.

20  Q    If you look at the bottom left-hand portion of

21  Mr. Danchenko's email to the Millian Group, would

22  you -- the jurors obviously can see it, but would you

23  state for the record whether or not there's any

24  reference at all to the use of apps of any sort?

25  A    No.

1  Q    And with respect Mr. Danchenko's request to chat

2  by phone and whatnot, is there any reference there

3  to --

4  A    No.

5  Q    -- the use of apps or the like?

6  A    No.

7  Q    Do you know, based on your own personal knowledge

8  throughout this investigation and most particularly

9  based on your interactions with Mr. Danchenko, whether

10 or not when Mr. Danchenko wanted to communicate with

11 somebody using an app he'd say so?

12 A    I think that -- yes.

13 Q    You've seen documents to that effect?

14 A    Yes.

15 Q    Okay.  I'm going to next ask you to take a look at

16 what is marked as -- previously as a full exhibit in

17 this matter -- Government's Exhibit 205.  Now, as to

18 Government's Exhibits 205 and 205T, do you recognize

19 that as email as well?

20 A    Correct.

21 Q    And this is from Sergei Millian to Dmitri

22 Zlodorev, correct?

23 A    Correct.

24 Q    And Mr. Danchenko is not on this email, correct?

25 A    Correct.

1    Q    But is Dmitri Zlodorev somebody that you would be

2    interested in knowing about?

3    A    Yes.

4    Q    And to some extent, Mr. Danchenko talked about how

5    he would get ahold of Millian, correct?

6    A    Correct.

7    Q    With regard to Mr. Danchenko having told the

8    bureau that he had gotten an anonymous call from

9    somebody in late July of 2017 -- I'm sorry -- 2016,

10   would it have been of any interest to know whether or

11   not Millian was even in the country in the latter

12   part -- or most of the latter part of July?

13   A    Yes.

14   Q    Do you know whether or not -- again, it wasn't

15   your responsibility to run that down, correct?

16   A    Correct.

17   Q    Do you know whether or not anybody in the

18   Crossfire Hurricane group ever ran down whether Millian

19   was even in the United States for most of the latter

20   part of July 2016?

21   A    I don't.  I don't know that.

22   Q    Okay.  I'd ask you to take a quick look at

23   Government's Exhibit 206 and, most particularly, 206T,

24   the translation.  With respect to Government's Exhibit

25   206T, again, Mr. Danchenko is not on the top part of

1 this exchange, correct?

2 A    Correct.

3 Q    And you look at the bottom of 206, that's the

4 email that we just looked at, 205, right, where

5 Mr. Danchenko is reaching out to the Millian Group and

6 the like?

7 A    Correct.

8 Q    With respect to this matter, would you want to

9 know and explore Millian's relationship, if any, with

10 Zlodorev?

11 A    Yes.

12 Q    Okay.  I'll ask you to take a look at Government's

13 Exhibit 207 and then 207T.  Looking at 207T, this is

14 from Mr. Danchenko to who?

15 A    The Millian Group.

16 Q    And it has two email addresses, correct?

17 A    Yes.  It's the milliangroup@gmail.com, as well as

18 sergio@russianamericanchamber.com.

19 Q    And then the date of this particular email?

20 A    Is August 18, 2016.

21 Q    And with respect to the content of this email from

22 the defendant to the Millian Group, August 18 of 2016,

23 would you just read the first sentence in that email.

24 A    It says, "I wrote you several weeks ago.  We are

25 contacts on LinkedIn."

1  Q    And with respect to your participation and your

2  role in this investigation relating to Mr. Danchenko,

3  would you want to have known that Mr. Danchenko had

4  written on August 18 of 2016, "I wrote you several

5  weeks ago.  We are contacts on LinkedIn"?

6  A    Yes.  There were communications.  Any

7  communications with Millian would have been relevant.

8  Q    Would it have been of any import to you that

9  Mr. Danchenko didn't say anything about an anonymous

10 call?

11 A    Yes.

12 Q    Or how about if it was, you know, where were you

13 in New York, I showed up, why didn't you, any reference

14 to that?  Would that have been of import to you?

15 A    Yes.

16 Q    What, if any, influence might that have had on how

17 you would have pursued matters related to Mr. Danchenko

18 and this information had you known this?

19 A    If that was known, then the way it was reported

20 could not have happened.  It would have allowed us to

21 go in and question more related to Sergei Millian's

22 contact.

23 Q    And then going to the bottom of Government's

24 Exhibit 207T, the last sentence in the last paragraph

25 reads, does it not, "Write, call.  My contact

1    information is below," correct?

2    A    Correct.

3    Q    Then there's a signature block.  I'll ask you the

4    same question:  Any reference in Mr. Danchenko's

5    signature block about contacting him on an app?

6    A    No.

7    Q    Does it reflect that he even has any apps?

8    A    No.

9    Q    Do you recall whether or not Mr. Millian and

10   Mr. Danchenko prior to this date had reportedly had

11   some kind of relationship?  Had they even spoken to

12   your knowledge?

13   A    No.

14   Q    Other than Mr. Danchenko saying he had gotten an

15   anonymous call sometime in late July of 2017, did you

16   come across any other information that Mr. Danchenko

17   and Mr. Millian had ever spoken?

18   A    No.

19   Q    Or ever had any contact other than an email that

20   Mr. Danchenko may have sent?

21   A    No.

22            MR. DURHAM:  May I have just one moment, Your

23   Honor?

24            THE COURT:  Yes.

25

1  BY MR. DURHAM:

2  Q    I want to just quickly, if I might, go back to --

3  not to belabor this point too much, but to go back to

4  204.  I asked you about information in there in the

5  last substantive paragraph, "if and when possible to

6  chat with you by phone or meet," etc.  I asked you

7  about that, correct?

8       Now I want to ask you about the beginning of that.

9  A    Okay.

10  Q    With respect to the substance of what it is that

11  Mr. Danchenko is telling Millian, do you read that as,

12  "Colleagues from RIA Novosti gave me your contact

13  information," etc., etc.

14       The second paragraph, can you read into the record

15  what it is that Mr. Danchenko is telling the Millian

16  Group in this email?

17  A    "There's been a lot of speculation for months now

18  on this topic.  It would be interesting to chat about

19  this topic.  The question is from a construction

20  company from Switzerland."

21  Q    So with respect to what Danchenko is telling or

22  conveying to the Millian Group or Millian himself, on

23  July 21, 2016, is that he, Mr. Danchenko, was asking

24  questions which were coming from a construction company

25  from Switzerland, correct?

1 A    Yes.

2 Q    To your knowledge, based on your interactions with

3 Mr. Danchenko, was he representing a construction

4 company from Switzerland who was interested in posing

5 questions to Mr. Millian?

6 A    I don't think so, no.

7 Q    Because that would be false?

8 A    Yes.

9 Q    That would be made up?

10 A    Yes.

11 Q    Okay.  Let me then go back, if I might, to these

12 emails in sequence.  I'd ask that you take a look at in

13 your book, if you would, what was already marked as a

14 full exhibit in this case, Government's Exhibit 115,

15 115, and then Government's Exhibit 115T, the

16 translation.

17          MR. DURHAM:  I believe, Your Honor, these are

18 both in as full exhibits.

19          THE COURT:  Yes.

20 BY MR. DURHAM:

21 Q    Do you have 115 in there?

22 A    I'm looking.  I don't see it in here.

23 Q    Okay.  Let me get you a copy -- oh, it's on the

24 screen.  The screen might work.  So with respect to

25 Government's Exhibit 115, do you recognize that?  Do

1  you remember having seen this at any point in time in

2  your interactions with Mr. Danchenko or your

3  colleagues, Mr. Auten and Mr. Somma?

4  A     No.

5  Q     And then the translation of 115, which is

6  reflected in Government's Exhibit 115T, any

7  recollection of having previously seen that

8  translation?

9  A     No, other than trial prep.

10  Q     You saw it in connection with these proceedings;

11  otherwise, you didn't see that?

12  A     No.

13  Q     So I would ask you to take a look, if you will, at

14  the bottom of Government's Exhibit 115T and essentially

15  the signature block there.  Would you state for the

16  record -- again, the jury can see this.  But with

17  respect to what Mr. Danchenko is providing in this

18  email, would you read into the record what it is.

19  A     It's his mobile number and his Hotmail account.

20  Q     And that's from a particular location?

21  A     Yeah, a particular location, Vienna, Virginia.

22  Q     All right.  So Vienna, Virginia, the telephone

23  number 1-202-679-5323, and then

24  igordanchenko@hotmail.com?

25  A     Correct.

1   Q    There's no reference to any kind of app there,

2   correct?

3   A    Correct.

4   Q    Or that Mr. Danchenko is letting people know, at

5   least in this signature block, that he has an app, that

6   they might reach him on an app, or anything of that

7   sort?

8   A    Correct.

9   Q    A fair statement?

10  A    Fair.

11  Q    Okay.  Now, with respect to the two emails that

12  you had looked at from the one being from July 21 of

13  2016 and then the second being from August 18 of 2016

14  from Mr. Danchenko to Mr. Millian, would you have

15  expected that you would be provided with those?

16  A    Yes.

17  Q    And even if you weren't provided with those, would

18  you expect that you would have gotten the content of

19  those emails in some fashion?

20  A    Correct.

21  Q    And you didn't?

22  A    I did not.

23  Q    If you had gotten those, what, if any, impact

24  would it likely have had on your approach to dealing

25  with Mr. Danchenko and Mr. Danchenko's information?

1    A    We would've went back and readdressed the

2    inconsistencies regarding Sergei Millian.

3    Q    But that didn't happen here?

4    A    No.

5    Q    I want to next turn your attention to another

6    group of documents which have not yet been moved into

7    evidence.  I'd ask you to take a look at what's in your

8    book as Government's Exhibits 610 and 610T.  Do you

9    have those, sir?

10   A    I do.

11   Q    And with respect to 610 and 610T, I believe you

12   had indicated that you had been provided some documents

13   over time by Mr. Danchenko, correct?

14   A    Correct.

15   Q    And you thought that at least in some of them they

16   reflected that Mr. Danchenko would let people know when

17   he wanted them to communicate over a particular app,

18   correct?

19   A    Correct.

20   Q    And in looking at 610, is that in Russian or is

21   that in English?

22   A    So 610 is in Russian.

23   Q    And 610T, is that a portion of 610 in English?

24   A    Yes.

25   Q    And related to 610T, would you indicate whether or

1  not there's any reference in there as to the use of

2  apps?

3  A     Yes.

4  Q     Does it say who the author is?

5  A     It is Igor Danchenko.

6          MR. DURHAM:  Your Honor, we would ask that

7  Government's Exhibit 1805, which is another

8  stipulation, be admitted.

9          THE COURT:  All right.

10          MR. SEARS:  No objection, Your Honor.

11          MR. DURHAM:  Can I publish it to the jury?

12          THE COURT:  Yes.

13          MR. DURHAM:  Ladies and gentlemen, this

14  stipulation reads as follows:

15          It is hereby stipulated and agreed, by and

16  between the undersigned parties, that if called to

17  testify, a records custodian from Facebook Inc. would

18  testify as follows:

19          Paragraph 1:  Government's Exhibits 605, 610,

20  611, and 612 are true and accurate copies of the

21  contents of the Facebook account ID 571738146

22  controlled by Igor Danchenko.

23          Paragraph 2:  Government's Exhibits 605, 610,

24  611, and 612 are true and accurate copies of authentic

25  business records of Facebook that were made at or near

1  the time of the acts and events recorded in them by a

2  person with knowledge and were prepared and kept in the

3  course of Facebook's regularly conducted business

4  activity.  It was the regular practice of Facebook to

5  make such business records, and the source of the

6  information or the methods of the circumstances of

7  preparation are trustworthy.

8            Paragraph 3:  The parties stipulate to the

9  authenticity of Government's Exhibits 605, 610, 611,

10  and 612.

11           Paragraph No. 4.  This stipulation is

12  admissible as evidence at trial.

13           It's dated Alexandria, Virginia, October 11,

14  2022, signed by the parties.

15           And, Your Honor, if I could have just five

16  more minutes before we break for lunch?

17           THE COURT:  Yes.

18  BY MR. DURHAM:

19  Q    Referring to Government's Exhibit 610T, I would

20  ask that that be pulled up on the monitors for the jury

21  and for you.

22      Oh, I'm sorry.  I didn't move it.  Let me move it

23  first.

24           THE COURT:  All right.  It's admitted.

25           MR. SEARS:  Your Honor, I just wanted to

 1  raise one point.  It sounds like the significance of

 2  the document is the top half of the document.  It's not

 3  clear to me whether the bottom half text, the

 4  government is seeking to admit that.

 5           MR. DURHAM:  I'm not worried about the

 6  bottom.  If you want it off, we can just --

 7           MR. SEARS:  Just the top half.

 8           THE COURT:  All right.  We can just admit the

 9  top half of the document.

10           MR. SEARS:  Thank you, Your Honor.

11           THE COURT:  610 and 610T, the top half is

12  admitted.

13           MR. DURHAM:  Thank you, Your Honor.

14  BY MR. DURHAM:

15  Q    Okay.  So, sir, looking at Government's

16  Exhibit 610T -- what the exhibit looks like when the

17  jury gets it -- read into the written record, if you

18  would, sir, what the jurors are now looking at in this

19  exhibit.

20  A    The first part is from Olga Galkina.  It says,

21  "Call me in exactly 15 minutes."  It gives the number

22  35799898937.  "It is regarding Chuck [PH] and me."

23           Then Igor Danchenko responds, "I will try.  If I

24  can get through directly.  Possibly, through Viber or

25  WhatsApp."

1    Q    All right.  So, in this instance, Mr. Danchenko is

2    telling Olga Galkina that he'll try to call her

3    directly or possibly using an app, right?

4    A    Correct.

5    Q    And is this an instance that -- you know, one of

6    the instances in which he tells people he's going to

7    use an app?

8    A    Yes.

9    Q    And asking in that context, there's a reference in

10   that from Ms. Galkina.  She wants to talk about Chuck.

11   During your participation in this investigation, did

12   you ever become aware of an individual by the name of

13   Charles, Chuck Dolan?

14   A    Yes.

15   Q    I'll ask more about that after the luncheon

16   recess.  But with respect to Dolan and Mr. Danchenko

17   and Ms. Galkina, they were all associated; were they?

18   A    Yes.

19              THE COURT:  All right.  Thank you, Counsel.

20              Ladies and gentlemen, we're going to recess

21   now for our luncheon break.  We'll reconvene at 2:00.

22   You're excused until then.  Please do not discuss this

23   case during the recess.

24        (The jury exits at 1:00 p.m.)

25              All right.  Agent Helson, do not discuss your

1   testimony during the luncheon recess.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  The Court will stand in recess.

4           ------------------------------------
                        Time:  1:01 p.m.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          I certify that the foregoing is a true and
22
     accurate transcription of my stenographic notes.
23

24
                                    /s/
25                       Rhonda F. Montgomery, CCR, RPR


       Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599