<pre>
 1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION

 3  UNITED STATES OF AMERICA,   )  Case 1:21-cr-245
                                )
 4             Plaintiff,       )
                                )
 5       v.                     )  Alexandria, Virginia
                                )  October 14, 2022
 6  IGOR Y. DANCHENKO,          )  9:00 a.m.
                                )
 7             Defendant.       )  Volume 4 (AM Session)
    _____)  Pages 896 - 1043
 8

 9                   TRANSCRIPT OF TRIAL

10         BEFORE THE HONORABLE ANTHONY J. TRENGA

11           UNITED STATES DISTRICT COURT JUDGE

12                     AND A JURY

13
    APPEARANCES:
14
    FOR THE PLAINTIFF:
15
         JOHN DURHAM, ESQUIRE
16       MICHAEL T. KEILTY, ESQUIRE
         D. BRITTAIN SHAW, ESQUIRE
17       U.S. DEPARTMENT OF JUSTICE
         145 N Street, N.E.
18       Washington, D.C.  20002
         (203) 410-2641
19
    FOR THE DEFENDANT:
20
         STUART A. SEARS, ESQUIRE
21       DANNY ONORATO, ESQUIRE, PRO HAC VICE
         SCHERTLER, ONORATO, MEAD & SEARS
22       555 13th Street, N.W., Suite 500 West
         Washington, D.C.  20004
23       (202) 628-4199

24  THE DEFENDANT, IGOR Y. DANCHENKO, IN PERSON

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
</pre>

1                                    **I N D E X**

2   WITNESS                  EXAMINATION                        PAGE

3   Kevin Helson             Further Redirect by Mr. Durham 904

4   Brittany Hertzog         Direct by Mr. Keilty            937
                             Cross by Mr. Onorato            958
5                            Redirect by Mr. Keilty          960

6   Amy Anderson             Direct by Ms. Shaw              964
                             Cross by Mr. Onorato            987
7                            Redirect by Ms. Shaw            996

8   Ryan James               Direct by Mr. Durham            998

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (The jury is not present.)

2             THE COURT:  Good morning.

3             Any issues we need to deal with?

4             MR. DURHAM:  Your Honor, may it please the

5    Court.  There was one issue that I've alerted counsel

6    to.  I think Your Honor will recall that yesterday,

7    during Mr. Helson's cross-examination, the defense

8    elected to ask him certain questions, which we believe

9    clearly open the door for the admission of what we had

10   premarked in the case as Government's Exhibit 900.

11            The Court might recall that on a pretrial

12   basis, we had filed a motion *in limine* with respect to

13   the admissibility of a particular email that had been

14   sent by Mr. Danchenko to his then employer -- or it was

15   a work relationship there, a fellow by the name of

16   St. Sidar.  And I think the Court will recall that, in

17   connection with that email, one of the things that was

18   contained in it, it was bullet point 4, was if you --

19   the more sources you have, the better.  If you're

20   lacking for sources, essentially make it up, make

21   yourself a source, and so forth.

22            The Court in its pretrial ruling was not

23   going to permit that to come in based on there being no

24   record at that point.  At least that's how the

25   government understood it.  So, of course, consistent

1   with the Court's ruling, we have not gone there with
2   any of our witnesses.  We didn't ask yesterday's
3   witness, Mr. Helson, about it.  But the defense elected
4   to ask Mr. Helson questions which clearly go to that
5   exact point, not just whether or not Mr. Danchenko had
6   made things up, but he would make things up relating to
7   sourcing.
8            I think Your Honor will recall that there was
9   an exchange on cross-examination between counsel and
10  Mr. Helson where counsel was quoting from a prior IG
11  investigation or statement that Special Agent Helson
12  had given.  And he asked him, "Didn't you tell the IG
13  that you didn't think that Mr. Danchenko was the sort
14  of person that would make things up," and I forget.  I
15  think the last part was either because he was being
16  pressured by Steele -- to satisfy Steele, but it was
17  words to that effect.
18           Now, the import of that testimony, of course,
19  on the jury is this witness doesn't think that
20  Mr. Danchenko would make things up relating to
21  sourcing, and Government's Exhibit 900 is in the
22  defendant's own words.  It's at a point in time that is
23  relevant to these proceedings, and it is crystal clear,
24  in the government's view, that it is admissible at this
25  point.

1          We thought it was admissible beforehand, but
2   of course, Your Honor, ruled on that question.  But the
3   defense, having elected to open that door -- we
4   respectfully submit that we should be permitted to
5   introduce Government's Exhibit 900 wherein the
6   defendant makes the statement specifically -- just for
7   the Court's recollection, emphasize sources, make them
8   bold or capitalized, the more sources the better.  If
9   you lack them, use one's self as a source, parentheses,
10  Instanbul-Washington-based businessman or whatever,
11  close the parentheses, to save the situation and make
12  it look a bit better.
13          In the government's view, there could be no
14  clearer piece of evidence that ought to be permitted to
15  come in given what the defendant elected to do in light
16  of his success and having the Court exclude it, at
17  least the government's initial testimony.
18          THE COURT:  All right.  Mr. Sears.
19          MR. SEARS:  Your Honor, first of all, that
20  email predates anything relevant to this case by
21  months.  In our view, we did not open the door to that
22  email.  The question posed to Agent Helson was whether
23  he would make up any information or facts, not sources.
24  So I don't think it's directly relevant to the question
25  we asked.  We don't think that the door has been open

1  to that email.  I think it is entirely prejudicial.

2  I's unrelated to this case.  This witness has never

3  seen that email.  So we think it is still improper to

4  be admitted in this trial.

5         THE COURT:  Anything else on this?

6         MR. DURHAM:  May it please the Court.  With

7  respect to counsel's comment relating to timing is

8  precisely the point that this statement or this email

9  that Mr. Danchenko sent to Mr. Sidar is in relatively

10  close proximity to a lot of this reporting.  The date

11  the email was sent was February 24th of 2016.  So it's

12  certainly not attenuated in time.  It is entirely

13  relevant within a relevant time period.

14     (Counsel confer.)

15         MR. DURHAM:  As my colleague points out, Your

16  Honor, at the time Mr. Danchenko, of course, is working

17  for Mr. Steele.

18         THE COURT:  All right.  I'll consider this a

19  motion for reconsideration.  The Court excluded the

20  email on a number of grounds.

21         First, it was unclear to the Court -- and I

22  thought it was speculative whether you could draw the

23  inferences that the government would draw from that

24  email.  We know nothing about whether Mr. Sidar was, in

25  fact, in a position to be a source and whether he

1   simply, because he was generating the report, chose not

2   to.  So I think it would be speculative to know that he

3   simply could not have been a source for whatever was

4   being talked about, and that's part of the problem.  We

5   have just no context for what information is being

6   proposed and what Mr. Sidar's relationship or lack of

7   relationship to that information would be.

8            Secondly, the Court concluded that, given the

9   fact that the email is unrelated to any FBI

10  investigation and does not deal with any of the issues,

11  it would be admitted primarily for evidence of

12  propensity.

13           So on those grounds, the Court denied the

14  motion, and the Court does not think anything that

15  occurred during the examination would have opened the

16  door for this or essentially neutralized or negated the

17  Court's prior basis for excluding the email.  So the

18  motion to have this admitted is denied.

19           All right.  Is there anything further?

20           MR. DURHAM:  The government has nothing

21  further.

22           Thank you, Your Honor.

23           MR. SEARS:  No, Your Honor.

24           THE COURT:  All right.  You have about a half

25  an hour with Mr. Helson?

1            MR. DURHAM:  Yes, Your Honor.

2            THE COURT:  All right.  And then we have --

3            MR. DURHAM:  Then Brittany Hertzog and then

4   Ms. Anderson and then Special Agent James.

5            THE COURT:  Ms. Anderson was an analyst?

6            MR. DURHAM:  Ms. Hertzog was a former FBI

7   analyst.  Ms. Anderson is a special agent currently

8   assigned as an --

9        (Reporter clarification.)

10           MR. DURHAM:  ALAT, A-L-A-T.

11           THE COURT:  I assume the testimony of any of

12  these witnesses is not going to be cumulative of what

13  we've already heard from the other witnesses.

14           MR. DURHAM:  That's correct, Your Honor.

15           THE COURT:  All right.  As soon as the jury

16  is ready, we'll begin.

17           MR. SEARS:  Thank you, Your Honor.

18           THE COURT:  The Court stands in recess.

19       (Recess from 9:18 a.m. until 9:34 a.m.)

20       (The jury is not present.)

21           THE COURT:  Ready to proceed?

22           MR. DURHAM:  Yes, Your Honor.

23           THE COURT:  Is Mr. Helson here?

24           MR. DURHAM:  He is in the hallway, yes, Your

25  Honor.

```
 1              THE COURT:  All right.  Let's bring him in.
 2         (Mr. Helson enters.)
 3              THE COURT:  All right.  Let's bring the jury
 4    in.
 5              THE COURT SECURITY OFFICER:  Yes, sir.
 6         (The jury enters at 9:35 a.m.)
 7              THE COURT:  Please be seated.
 8              Good morning.  We're ready to proceed.
 9              Let me just give you a sense of where I think
10    we are.  It's my hope and expectation that we'll be
11    able to complete the evidence today.  There will be
12    some matters that we'll need to take up.  But then on
13    Monday, we would complete the case and have jury
14    instructions and closing arguments.  So hopefully, you
15    can begin your deliberations on Monday, if not Tuesday.
16              Mr. Durham.
17              MR. DURHAM:  Thank you, Your Honor.
18              THE COURT:  Mr. Helson, you remain under
19    oath.
20              THE WITNESS:  Yes, sir.
21                   FURTHER REDIRECT EXAMINATION
22    BY MR. DURHAM:
23    Q    Mr. Helson, I just want to pick up on a few of the
24    things you were asked on cross-examination yesterday.
25    Okay?
```

1  A    Okay.

2  Q    Do you recall, sir, during the cross-examination

3  you were asked certain questions relating to Mr. Dolan

4  having known or having a relationship with Mr. Peskov,

5  and you were asked did Mr. Danchenko tell you about the

6  fact that Dolan and Peskov had a relationship.  Do you

7  remember questions along those lines?

8  A    I remember the question about Dolan -- I was told

9  about Dolan knowing Peskov, yes.

10 Q    Okay.  Now, in that regard, just so the record is

11 clear in that regard, prior to June 15th of 2017, okay?

12 A    Okay.

13 Q    That would be the third recording?

14 A    Yes.

15 Q    Had Mr. Danchenko ever mentioned in any way

16 Charles Dolan to you?

17 A    No, sir.

18 Q    And prior to June 15th of 2017, if you know,

19 personal knowledge, had investigators actually started

20 to put together information relating to Mr. Dolan?

21 A    I did not know that.

22 Q    Did you determine afterward or do you know now as

23 a result of matters that your colleagues, in fact, had

24 put together information --

25          MR. SEARS:  Your Honor, I'm going to object

1   on the basis that that would be hearsay.

2              THE COURT:  Well, why don't you rephrase the

3   question.

4              MR. DURHAM:  Yes, Your Honor.

5   BY MR. DURHAM:

6   Q    Do you know Special Agent Amy Anderson?

7   A    I do, sir.

8   Q    Were you dealing with Ms. Anderson, Special Agent

9   Anderson, on an ongoing basis relating to these

10  matters?

11  A    Yes, sir.

12  Q    Do you know Brittany Hertzog?

13  A    I do.

14  Q    And who is Ms. Hertzog?

15  A    She was an analyst at headquarters that was

16  assigned to Mr. Mueller's investigative team.

17  Q    Do you recall whether you had any interactions

18  with Ms. Hertzog or not --

19  A    I did.

20  Q    -- related to these matters?

21  A    Yes.

22  Q    Reflecting on your interactions with Special Agent

23  Anderson and Ms. Hertzog, do you recall, sir, whether

24  or not, in fact, prior to June 15th of 2017, the Bureau

25  had put together some information relating to Mr. Dolan

1  and Peskov?

2  A     They had -- after I started talking with

3  Ms. Hertzog and Amy Anderson, they were working on some

4  project or some report that involved Mr. Peskov and

5  Dolan.

6  Q     In that regard, what is your recollection, sir, as

7  to how was it that on June 15th of 2017, you posed

8  questions to Mr. Danchenko about Mr. Dolan?

9  A     As I recall, that came -- those questions came

10 from Ms. Anderson.

11 Q     And then with respect to those questions coming

12 from Special Agent Anderson, they were specific as to

13 Charles Dolan, correct?

14 A     Correct.

15 Q     And Mr. Danchenko's knowledge of matters?

16       MR. SEARS:  Your Honor, I'm going to object

17 to the leading nature of the question.

18       THE COURT:  It is leading, but let's move it

19 on.

20 BY MR. DURHAM:

21 Q     What did the questions have to do with, sir?

22 A     Had he talked to Dolan about the dossier or did --

23 did he talk to Dolan about the dossier.

24 Q     On June 15th of 2017, what would be the

25 understanding, based on your prior meetings with

1   Mr. Danchenko, as to what it was that the FBI was

2   trying to learn regarding the dossier?

3   A     It was to identify all sources of the dossier and

4   anything and everything that we could get on those

5   sources.

6   Q     And as of June 15th of 2017, nothing had been said

7   to you by Mr. Danchenko about Dolan?

8   A     No, sir.

9   Q     So on June 15, 2017, with respect to the questions

10  that you posed to Mr. Danchenko about Dolan, those came

11  from the other investigators, correct?

12          MR. SEARS:  It is leading again, Your Honor.

13          THE COURT:  It is.  Sustained.

14  BY MR. DURHAM:

15  Q     Who did those questions come from?

16  A     It came from the Mueller investigative team,

17  particularly Ms. Anderson.

18  Q     And in asking those questions, that is, questions

19  relating to Charles Dolan, what was the purpose?  What

20  was the intent behind those questions?

21          MR. SEARS:  Your Honor, I'm going to object.

22  The question came from Special Agent Anderson, not from

23  Mr. Helson.

24          THE COURT:  Overruled.  Go ahead.

25

1  A    It was to identify the relevant contacts that he

2  had had with Dolan.

3  Q    And in that connection, did Mr. Danchenko provide

4  any information to you concerning the dossier and

5  Mr. Dolan?

6  A    No, sir.

7  Q    If Mr. Danchenko had disclosed to you, "Yeah,

8  Dolan gave me information that went into the dossier,"

9  would that have been important to you?

10  A    Yes, sir.

11  Q    Now, counsel also asked you some questions on

12  cross-examination yesterday that you -- the question

13  was asked and you kind of adopted it.  The question was

14  essentially -- and Mr. Auten never asked Mr. Danchenko

15  about the report number, which was 2016/105.  It was

16  the Manafort report.

17  A    Okay.

18  Q    He asked you if Auten asked him about that, and

19  you said no or you adopted the question no.

20      Do you recall, sir, whether or not -- in the

21  three-day interview in January of 2017 whether or not

22  Mr. Danchenko was, in fact, asked questions and there

23  was reporting in the report about the Manafort part of

24  the dossier?

25  A    I didn't recall that, no.

1  Q    All right.  Do you recall it now?  Well, let me

2  withdraw that.

3      I'd ask you to take a look at Government's

4  Exhibit 100.  It's just for identification in the

5  record now.  You are free, of course, to look at the

6  entirety of it, but I would direct your attention most

7  particularly to pages 11 and 12 to see if that

8  refreshes your recollection as to whether or not

9  Mr. Danchenko is, in fact, asked questions relating to

10 Paul Manafort and the like in January 2017.

11            THE COURT SECURITY OFFICER:  Counsel, I

12 believe 100 was returned to you because it wasn't

13 admitted earlier.

14 BY MR. DURHAM:

15 Q    It's in the pocket.

16 A    Oh, thanks.

17            THE COURT SECURITY OFFICER:  Thank you.

18 A    Is there a particular page?

19 Q    Pages 11 and 12, but look through it as you want.

20     Does that refresh your recollection, sir, as to

21 whether, in fact, Mr. Danchenko had been asked about

22 the Manafort matters back in January of 2017?

23 A    Yes.  Under Section 4, it clearly shows --

24 Q    You're not supposed to read from the document.

25 But does that refresh your recollection that he was, in

1  fact, asked about these matters back in January?

2  A    Yes.

3  Q    So when you answered the question no, he wasn't

4  asked questions about that by Auten --

5            MR. SEARS:  Your Honor, may we approach

6  briefly?

7            THE COURT:  Yes.

8            MR. SEARS:  I apologize.

9       (Conference at the bench, as follows:)

10           MR. SEARS:  Your Honor, Mr. Durham's question

11  has created the impression, I think, that the Manafort

12  discussion, as referenced in that report, was about

13  Report 105.  My question was very specific about

14  whether he had ever been shown that specific report.

15  It is true that Paul Manafort came up during

16  discussions.

17           THE COURT:  In January?

18           MR. SEARS:  In January.  But just about his

19  relationship with Ukraine, not about his resignation

20  from the campaign or any of those issues.  I'm

21  concerned about the impression he's giving to the jury

22  because of the way the questions were asked.  It is

23  redirect.

24           THE COURT:  On cross, he said that he wasn't

25  aware of --

1           MR. SEARS:  Whether or not he had ever been

2    shown that report.

3           THE COURT:  So the report itself?

4           MR. SEARS:  The report itself.

5           THE COURT:  Right.  And this shows that he --

6           MR. DURHAM:  That he, the defendant, had been

7    asked questions about essentially --

8           THE COURT:  About Manafort.

9           MR. DURHAM:  -- about what's in -- what's in

10   105.

11          MR. KEILTY:  It's generally about --

12   actually, the title of the section of the report says

13   Election Related Reporting About Paul Manafort.  Then,

14   Your Honor, it goes on to talk about that the defendant

15   quietly asked around to some D.C. friends, which is --

16          MR. DURHAM:  D.C. based.

17          MR. KEILTY:  D.C.-based friends about Paul

18   Manafort, which obviously is relevant.

19          THE COURT:  In terms of this witness, what do

20   you want to bring out?  That he knew that there had

21   been questioning about Manafort?

22          MR. DURHAM:  That, in fact, there had been

23   questioning about Manafort by Auten.

24          THE COURT:  That he knew that?  I mean, that

25   would be the only relevance, right?

1           MR. DURHAM:  No.  That when he answered the

2  questions from defense counsel about Auten not having

3  done certain things, that was not completely accurate.

4           THE COURT:  No.  But I thought on cross, the

5  point was that he had not seen the actual memo from

6  Dolan.  Right?

7           MR. SEARS:  He had not seen the actual

8  report, the specific report that they were questioning

9  him about that Dolan was responsible.

10          THE COURT:  That was in the Steele report,

11 that he hadn't seen that.

12          MR. SEARS:  No witness has testified that he

13 ever saw that report.  I'm concerned the way the

14 question was posed about the report specifically and

15 now we are going into Manafort generally is creating a

16 false impression.

17          MR. KEILTY:  It also leaves the jury with the

18 impression, Your Honor, that Paul Manafort was --

19          THE COURT:  No.  I understand.  I think you

20 need to make clear what he knew and what he didn't know

21 since you've gotten into this.  Make clear whether he,

22 in fact, had seen the -- when he said he hadn't seen

23 it, is he talking about the report, or is he talking

24 about simply subject matter of Manafort?  All right.

25          MR. ONORATO:  Judge, just to be clear,

1  Mr. Auten said they didn't talk about Report No. 105.

2  He is the one who wrote the report.  So his

3  understanding of what he was asked about doesn't make

4  sense other than Mr. Manafort's name was discussed.

5  The Crossfire Hurricane was open on four people,

6  including Mr. Manafort.

7         MR. SEARS:  It is just the way the

8  questioning was perceived.

9         THE COURT:  All right.

10        MR. DURHAM:  I don't want to ask a question

11 I'm not permitted to ask.  So maybe --

12        THE COURT:  Well, I think you need to clarify

13 what it is he knew and didn't know.

14        MR. DURHAM:  "He" being this witness?

15        THE COURT:  This witness.

16        Is that the point you wanted to make?  That

17 he was aware there had been discussion in January that

18 mentioned Manafort, but I think his testimony on cross

19 was that he had never seen the actual report section of

20 the --

21        What is it?  105?

22        MR. SEARS:  105.

23        MR. DURHAM:  Right.  I think the key there is

24 the question was asking about the defendant.  He asked

25 this witness whether Auten had shown the -- I'm trying

1   to remember -- was shown the report to Mr. Danchenko,

2   and this witness just adopts that and says, "No, he

3   hadn't."  He doesn't know that.

4              MR. SEARS:  The question, Your Honor, was,

5   "As you sit here today, can you say with any certainty

6   whether Mr. Danchenko has ever seen Report 105"?

7   That's when he said no.

8              THE COURT:  All right.

9              MR. SEARS:  I don't think any witness can say

10  that because he never asked about this specific report.

11             MR. ONORATO:  There's no reference to 105 in

12  that --

13             THE COURT:  If you want to get into it, you

14  have to clean it up; otherwise, you can just move on.

15             MR. DURHAM:  Yes, Your Honor.

16      (Proceedings continued in open court, as follows:)

17             MR. DURHAM:  May I proceed, Your Honor?

18             THE COURT:  Yes.

19  BY MR. DURHAM:

20  Q    Sir, I just asked you questions relating to the

21  information that's contained in a particular report,

22  correct?

23  A    Correct.

24  Q    Now, with respect to the report that you've

25  reviewed, do you have any independent knowledge about

1    what was or was not asked of Mr. Danchenko by Mr. Auten

2    and Mr. Somma about particular reports?

3    A    About this particular report that I'm looking at?

4    Q    Correct, independent knowledge.

5            MR. SEARS:  Your Honor, can we clarify what

6    report he's looking at right now?

7    A    It is the three-day interview of Mr. Danchenko.

8    Q    The three-day interview report of Mr. Danchenko.

9    Do you have any independent knowledge of what it was

10   that was discussed with Mr. Danchenko by Auten and

11   Somma?

12   A    No.

13   Q    So with respect to yesterday's questioning by

14   counsel about, well, what Auten what may or may not

15   have done, you don't have any independent knowledge of

16   that?

17   A    No.

18   Q    You were asked a question yesterday that you

19   adopted -- you were asked a question about, well, the

20   defendant didn't know that Steele's reports were going

21   to the FBI, and you said yes.  Do you have any

22   independent knowledge of that?

23   A    No.

24   Q    That's just what the defendant told you, right?

25   A    Yeah.

1   Q     So when you told the jury that he, Mr. Danchenko,

2   didn't know that they were going to the FBI, you don't

3   know that to be the case?

4   A     I had no other knowledge that suggested that, no.

5   Q     Right.  There's no independent evidence of any

6   sort, correct?

7   A     Yes, correct.

8   Q     And then you had told the jurors yesterday that

9   with respect to the defendant, you were asked a

10  question about, "Well, the defendant told Steele that

11  it was all rumor and speculation," and you said yes.

12  Do you have any independent knowledge that that's what

13  Mr. Danchenko, in fact, told Steele?

14  A     It was what Danchenko had told me that he had told

15  Steele.

16  Q     Right.  And with respect to Mr. Steele, do you

17  have -- do you recall whether or not Mr. Steele had

18  been a long-time confidential source for the FBI?

19  A     I do now.

20  Q     And with respect to Mr. Steele, do you know

21  whether or not Mr. Steele had some prior involvement in

22  intelligence matters?

23  A     Yes.  He was a former MS6.

24  Q     And with respect to Mr. Steele, did the FBI use

25  information that was provided by Mr. Steele in a FISA

1  affidavit on a U.S. citizen?

2  A    Yes.

3  Q    So with respect to Mr. Steele, you were asked

4  questions yesterday relating to a particular event that

5  occurred on September 22.  Do you remember you met with

6  Mr. Danchenko on September 22?

7  A    Yes, sir.

8  Q    And in connection with the meeting on

9  September 22, tell the ladies and gentlemen of the jury

10 whether or not that was just a matter of days after FBI

11 agents, to your knowledge, had gone over and spoken to

12 Steele in London.

13 A    It was a couple of days after that they had went

14 over and spoke with Mr. Steele in London.

15 Q    And with respect to the meeting, then, on

16 September 22nd of 2016 -- yeah, 2016 -- do you recall,

17 sir, whether or not there were conflicts between what

18 Steele told the FBI and what Mr. Danchenko is telling

19 you?

20 A    Yes.

21 Q    And that's what was being explored that day,

22 correct?

23 A    Correct.

24 Q    And on another occasion, do you recall whether or

25 not you were asked to pose any questions stemming from

1  an interview that had been done with Olga Galkina?

2  A    Correct, yes.

3  Q    And with respect to the interview that had been

4  done with Galkina, were you provided questions that you

5  were supposed to pose to Mr. Danchenko?

6  A    Yes.

7  Q    And why were those questions being posed to

8  Mr. Danchenko?

9  A    Because there were inconsistencies between her

10 story and his.

11 Q    And with respect to Ms. Galkina, do you know

12 whether or not she had been disclosed by Mr. Danchenko

13 as one of his sources for information that was in the

14 dossier?

15 A    Yes.

16 Q    And so there were inconsistent statements from

17 Steele and Galkina and Danchenko?

18 A    Correct.

19 Q    And that's why you were posing questions on those

20 occasions to Mr. Danchenko, correct?

21 A    Yes.

22 Q    Do you recall, sir, whether or not there was

23 independent evidence to show that Mr. Danchenko told

24 Steele that it was all rumor and speculation?

25 A    I didn't see any independent evidence other than

1    what he told me.

2    Q    So your testimony yesterday on cross-examination

3    is only based on what the defendant told you?

4    A    Correct.

5    Q    And that was inconsistent with what others had

6    told you?

7    A    Yes.

8    Q    Not you -- had told the FBI?

9    A    Yes.

10   Q    Now, I want to move to another area.  You had

11   indicated or testified yesterday to certain matters

12   relating to Mr. Danchenko telling you about a trip and

13   being involved with Mr. Dolan in October of 2016.  Do

14   you remember the questions surrounding that?

15   A    Yes.

16   Q    And October of 2016 is when the YPO conference

17   took place in Moscow, correct?

18   A    Correct.

19   Q    Did Mr. Danchenko tell you about his having been

20   in Moscow in June of 2016?

21   A    No, he did not tell me that.

22   Q    Did he tell you anything about his having met with

23   or seen Mr. Dolan in Moscow in June of 2016?

24   A    No, sir.

25   Q    Do you recall, sir, whether or not you ever

1  learned the dates on which Mr. Danchenko was in Moscow

2  in June of 2016?

3  A     I learned of it later.

4  Q     And do you remember:  When you learned at a later

5  point in time he had been in Moscow in June of 2016,

6  did you talk to him about that?

7  A     No.

8  Q     Do you have any current recollection as to when he

9  was in Moscow in June of 2016?

10  A     Where he was at?

11  Q     No.  When, when in June.

12  A     I think it was -- I can't remember the exact date.

13  Q     All right.  I would ask that you take a look at

14  Government's Exhibit 605T and see if that refreshes

15  your recollection.  We can pull it up on the screen.

16  That might be easier.

17  A     June 14.

18  Q     In looking at now 605, do you recognize that

19  picture from yesterday?

20  A     Yes, sir.

21  Q     And do you now have a refreshed recollection as to

22  when it was that Mr. Danchenko was in Moscow in June of

23  2016?

24  A     June 14.

25  Q     All right.  So he's there at least on the 14th of

1  June?

2  A    Correct.

3  Q    And, now, with respect to the person who's in the

4  photograph with Mr. Danchenko, do you know who that

5  person even is?

6  A    I do.

7  Q    And who is that?

8  A    Chuck Dolan.

9  Q    Now, do you recall, sir, whether or not at any

10 point in time you learned from Mr. Danchenko that he

11 had been in Moscow in June?

12 A    I don't know that I got it from him.  It may have

13 been from Brian or someone from Special Counsel.

14 Q    Do you recall, sir, whether or not you ever

15 learned when Mr. Danchenko left Moscow?

16 A    No.

17 Q    Or where he went after leaving Moscow?

18 A    No.

19         MR. DURHAM:  I'd ask Your Honor, if we might,

20 to have the witness take a look at Government's

21 Exhibit 606T, please.

22         THE COURT:  All right.  That's admitted.

23         MR. DURHAM:  That should be in the book, but

24 I think Your Honor has it as well.

25         THE COURT:  Yes.

 1  BY MR. DURHAM:

 2  Q    It's under 606.

 3  A    I don't have a 606 in here.

 4        MR. DURHAM:  May I just have a moment to get

 5  him a copy, Your Honor?

 6        THE COURT:  Yes.

 7  BY MR. DURHAM:

 8  Q    I'll ask you to take a look at and read through

 9  the entirety of 606.  It is about a page and a third

10  perhaps.

11        THE COURT:  Is 606 in evidence?

12        MR. DURHAM:  606, not yet, Your Honor.

13        THE COURT:  All right.

14        MR. SEARS:  Your Honor, I can tell the Court

15  that we are not going to object to the admission of

16  this exhibit.  There is a portion that we believe

17  should be redacted.  I have told the government that.

18  I don't think they have an issue with that.

19        MR. DURHAM:  We agree.

20        THE COURT:  All right.  Subject to the

21  parties' agreement as to the redaction, 606 and 606T is

22  admitted.

23  BY MR. DURHAM:

24  Q    Have you read through that, sir?

25  A    Yes, sir.

1  Q    With respect to this document, do you recall --

2  does that refresh any recollections on your part as to

3  when it is that Mr. Danchenko left Moscow in June?

4  A    It would have been two days after that, 6/16.

5  Q    And with respect to where Mr. Danchenko went when

6  he left Moscow, is there anything in 606T that

7  refreshes your recollection as to where --

8  A    He went to London.

9  Q    And with respect to that item, does it reflect

10 what, if anything, he did in London on June 18th of

11 2016?

12 A    He gave a report.

13 Q    He's in Moscow.  He leaves on the 16th, and on the

14 18th, he reports that he had given a report?

15 A    Correct.

16 Q    In London?

17 A    In London.

18          MR. DURHAM:  We would move 606T as a full

19 exhibit.

20          MR. SEARS:  No objection, Your Honor.

21          THE COURT:  It's admitted.

22          MR. DURHAM:  Can I just have one moment so we

23 can do that one quick redaction?

24          THE COURT:  Yes.

25          MR. DURHAM:  So I would ask, then, that 606T

```
 1  be brought up on the monitor so that the jurors can see
 2  it.
 3           Okay.  It's up there.
 4  BY MR. DURHAM:
 5  Q    Now, sir, looking at 606T, would you indicate to
 6  the jurors how it is that you determined that
 7  Mr. Danchenko left Moscow on June 16th of 2016?
 8  A    He -- the initial report starts out at 6/16, when
 9  he was reaching out to Galkina, and then on the 6/18
10  document -- or 6/18 line, that was just blown up, you
11  can see he's in London at that point.
12  Q    All right.  So in looking at Government's Exhibit
13  606T, it reflects entries beginning on June 16th of
14  2016, correct?
15  A    Correct.
16  Q    This is a Facebook entry on Mr. Danchenko's
17  account?
18  A    Yes, sir.
19  Q    And then if you look at the very last entry on
20  that document, 606T, would you read into the record
21  what the jurors are now reading, who the author is,
22  when it was sent and what the body is?
23  A    The author is Igor Danchenko.  It was sent on
24  6/18/2016, and the body states, "I already gave a
25  report.  I drove around England.  I am walking around
```

1   London but my mood is so-so.  Although, everything

2   seems to be wonderful."

3   Q    Now, with respect to London, would you tell the

4   ladies and gentlemen of the jury, to your knowledge,

5   where was Orbis located?

6   A    In London.

7   Q    And where was Christopher Steele located?

8   A    In Orbis-- in London.

9   Q    Do you recall, sir, what the very first Orbis

10  report date was?

11  A    It was going to be close at that time.  I don't

12  recall the exact.

13          MR. DURHAM:  I'd ask that Ms. Arsenault bring

14  up just for counsel and for the defendant Government's

15  Exhibit 17A for identification.

16  BY MR. DURHAM:

17  Q    Have you looked at that?

18  A    Which one was it?

19  Q    17A -- oh, I'm sorry, 117A.

20          THE COURT:  117?

21          MR. DURHAM:  117, yes, Your Honor.  I think

22  both copies were provided to the Court earlier.

23  A    Yes.

24  Q    Looking at 117A for identification in its

25  entirety, does that refresh any recollections as to

1 when the very first Steele dossier report was dated?

2 A    June 20, 2016.

3 Q    So that would have been two days after the entry

4 on 606T that Mr. Danchenko said he had just given his

5 report?

6 A    Yes, sir.

7 Q    At any point in time, to the best of your

8 recollection, did Mr. Danchenko ever tell you that he

9 had been in Moscow with Mr. Dolan, he left Moscow, went

10 to London, made a report, and then the report showed up

11 two days later?

12 A    No, sir.

13 Q    Would that have been of value to you?

14 A    Yes.

15 Q    And would it have been pretty significant to you

16 with respect to trying to identify sources, a source of

17 information and the like?

18 A    Yes.

19 Q    But that was not disclosed to you?

20 A    Correct.

21 Q    Based on your -- by June 15th of 2017, you've been

22 dealing with Mr. Danchenko for not days or weeks but

23 for months, correct?

24 A    Yeah, about three months or four months.

25 Q    In your mind, was there any possibility that

1   Mr. Danchenko didn't understand this kind of

2   information concerning sourcing should be disclosed to

3   you?

4   A      No.

5   Q      But it wasn't?

6   A      Correct.

7   Q      Now, I want to move to another part of yesterday's

8   cross-examination.  You were asked some questions by

9   Mr. Sears relating to the fact that Mr. Danchenko had

10  spoken with you on June 15th.  You had asked him about

11  his knowledge of Charles Dolan.  He responded as he

12  responded, and then you asked him a question relating

13  to, you know, had you talked to Dolan about anything in

14  the dossier?  I mean, you recall that general area?

15  A      Yes.

16  Q      And you were then asked questions by counsel:  Did

17  you ever follow-up on the questions, and you said no.

18  And then you were asked a general question concerning

19  whether or not you had defined the word "talk" or

20  "talked" to Mr. Danchenko.  Do you recall those general

21  questions?

22  A      Yes, sir.

23  Q      Now, let me ask you.  They said in the context of

24  the June 15th interview that you were doing and the

25  prior meetings that you had had and recorded of

1  Mr. Danchenko, what was the point of asking him

2  questions?  What is it you were trying to get to?

3  A    It was to get information about all the sources of

4  the dossier.  That was a general understanding.

5  Q    And that was the context in which questions, not

6  just on June 15th, were asked but other dates as well?

7  A    Yes.

8  Q    When you asked Mr. Danchenko whether he had talked

9  to Mr. Dolan about anything in the dossier, what was

10 the context in which you asked him the question?

11 A    Most of my questions, unless directed by Special

12 Counsel Mueller's investigative team was open ended.

13 We were looking for any and all information.

14 Q    Now, you were asked some questions yesterday as

15 well concerning travel records.  Do you remember

16 counsel asking you if you had been shown any Amtrak

17 records?

18 A    Yes, sir.

19 Q    And had you been shown any Amtrak records when you

20 were being interviewed as a witness?

21 A    Not that I recall.

22 Q    When you were being interviewed in connection with

23 these matters, were you working as part of the

24 investigative team or not?

25 A    Not.

1  Q    Did you have any expectation that investigators

2  were going to show you all the evidence that they had?

3  A    No, sir.

4  Q    You were -- if the situations were reversed, are

5  you going to show a potential witness all of the

6  evidence that you have?

7  A    No, sir.

8  Q    So with respect to the Amtrak travel records, do

9  you know now how those even play into this case?

10 A    No.

11 Q    Let's assume that those records reflect -- and the

12 records are in evidence -- that Mr. Danchenko went to

13 New York on July 25th, took a train up to New York.

14 Let's assume that's what the jury has seen, okay?

15 A    Okay.

16 Q    You have seen the email that Mr. Danchenko sent to

17 the Millian Group four days prior to that on July 21st,

18 correct?

19 A    Correct.

20 Q    And in that email -- we can pull that up.

21         MR. DURHAM:  Ms. Arsenault, can you just pull

22 that up so that the witness can see it?

23 BY MR. DURHAM:

24 Q    And in looking at what has already been marked in

25 this case, the July 21st, 2016, email --

1          MR. DURHAM:  If you could, scroll down a bit,

2   please.

3   BY MR. DURHAM:

4   Q    In the last paragraph, it reads, does it not, "In

5   any case, it would be interesting if and when possible

6   to chat with you by phone or to meet for coffee/beer in

7   Washington or in New York where I will be next week."

8   Did I read that correctly?

9   A    Yes, you did.

10  Q    And with respect to that email, you were asked --

11  or the fact that there were Amtrak records, you were

12  asked some questions.

13       Let me ask you this:  Are you aware of or did it

14  ever come to your attention that Mr. Danchenko had

15  plans, even prior to July 21st of 2016, to be going to

16  New York the next week?

17  A    I think that came up in our conversations.

18          MR. DURHAM:  I would ask that Government's

19  Exhibit 901 be brought up.

20  BY MR. DURHAM:

21  Q    The date of this email is what, sir?

22  A    July 18, 2016.

23  Q    And it's from who?

24  A    Igor Danchenko.

25  Q    To a Cenk Sidar?

1  A    Yes.

2  Q    And with respect to what Mr. Danchenko is telling

3  Mr. Sidar in that email, is there anything in there

4  relevant to plans that he had relating to traveling to

5  New York?

6  A    He said he has plans.  He may be going to New York

7  in the second line.

8  Q    That was before he even sent the email to the

9  Millian Group?

10 A    Correct.

11 Q    Now, let me turn to just a couple of other matters

12 briefly.

13      You were asked questions yesterday by counsel

14 relating to Mr. Dolan and some of the reports that you

15 had written.  With respect to Mr. Dolan and what

16 Mr. Danchenko told you about Dolan, do you recall, sir,

17 whether or not Mr. Danchenko had anything to say

18 negative about Chuck Dolan before your folks had gone

19 over to talk to Steele in September of 2017?

20 A    No, sir.

21 Q    It was only after your folks had gone over to talk

22 to Steele that he started saying negative things about

23 Dolan?

24 A    Correct.

25 Q    Now, I want to ask you, in response to -- or in

1  relation to questions that were asked of you by counsel

2  yesterday -- and I think this is the final topic that

3  I'm going to touch on here.

4  　　　You were asked some questions by Mr. Sears

5  relating to the report that you had written relating to

6  October 24th of 2017.  That's Government's Exhibit 102.

7  That's probably in your booklet there.

8  　　　Do you have 102?

9  A　　Yes, sir.

10  Q　　So you were asked some questions about that.  And,

11  in particular, you were asked a question about the date

12  in which the report was written as opposed to the date

13  of contact.

14  A　　Correct.

15  Q　　These questions related specifically to that

16  question.  Do you recall, sir, how it was that you went

17  about preparing the report of October 24th, 2017?

18  A　　Typically, in the same situation here, is after I

19  meet with the source, I come back and put it in a

20  special system where it is then approved by my

21  supervisor and the assistant special agent in charge

22  before it's submitted into the system.  And then it

23  goes live with Special Counsel Mueller's team.

24  Q　　And in that regard, I want to ask you:  With

25  regard to the October 24th of 2017, memo, were there

1  certain things in that you had in quotes?

2  A     Yes.

3  Q     And why did you put them in quotes?

4  A     Because that's what he said.

5  Q     And how can you be certain that that's what he

6  said?

7  A     This meeting was -- in part, it was a direction

8  from the Mueller investigative team bringing up the

9  discrepancies in the Sergei Millian matter, and they

10  wanted me to go back specifically to ask the questions

11  and get his response.  And so that's why we did it the

12  way -- I wrote it the way we wrote it, is to capture

13  and note the actual response.

14  Q     In that connection, sir, do you recall whether or

15  not Mr. Danchenko at that time gave the same or

16  somewhat different description of the number of

17  contacts that he had had with Sergei Millian?

18  A     It was a different number.

19  Q     So remind the jurors, if you would:  In the

20  initial contacts that you had with Mr. Danchenko, how

21  many times did he say he had had contact with Millian?

22  A     One time.

23  Q     And was that consistent?

24  A     Up until this moment.

25  Q     And in that connection to -- based on what you

1    were being provided by way of information and the

2    questions to ask, did you have an understanding as to

3    whether he had previously said to others there was only

4    one contact?

5    A    Yeah.  I believe that was what had been told to

6    me:  It was a one call, one-time event.

7    Q    On October 24th of 2017, this was a multiple sort

8    of exploration of the same subject matter, correct?

9    A    Yes, sir.

10   Q    Why do you do that?

11   A    It is -- as I had said before, I think I testified

12   yesterday that we often will ask the same question over

13   and over because the more times someone repeats it, if

14   there's any inconsistencies or they're lying, they will

15   mess up at some point or contradict themselves.

16   Q    Now, was there a contradiction on October 24,

17   2017, regarding what the defendant said to the FBI

18   regarding contacts with Millian?

19   A    The number of contacts, yes.

20   Q    And what was the contradiction?

21   A    It was the number of times, two versus one -- or a

22   couple versus one.

23   Q    So the record is clear and the jurors understand,

24   what were his exact words relating to the number of

25   times?

936

1  A     "How many times did you meet face to face with

2  Sergei Millian?"

3      ID stated, "I did not meet with him ever in

4  person:   I believe I spoke to him on the phone a couple

5  of times.  At least someone who I thought was him."

6  Q     Okay.  And that was the first time you heard about

7  a couple of calls?

8  A     Yes.

9  Q     And that came from the defendant?

10 A     That did.

11             MR. DURHAM:  Thank you, sir.  I have no

12 further questions.

13             Thank you.

14             THE COURT:  Special Agent, you're excused.

15 Do not discuss your testimony outside of the courtroom

16 with any other witness.

17     (The witness stands aside.)

18             THE COURT:  The government will call its next

19 witness.

20             MR. KEILTY:  Your Honor, the government calls

21 Brittany Hertzog.

22             THE COURT:  All right.  Brittany Hertzog will

23 come forward, please.

24             MR. KEILTY:  May I proceed, Your Honor?

25             THE COURT:  Please.

937

```
 1        BRITTANY HERTZOG, PLAINTIFF'S WITNESS, AFFIRMED
 2                    DIRECT EXAMINATION
 3   BY MR. KEILTY:
 4   Q     Good morning.
 5   A     Good morning.
 6   Q     How are you today?
 7   A     Good.  How are you?
 8   Q     Good.
 9         Could you please state and spell your name for the
10   record, for the court reporter.
11   A     Brittany Hertzog, B-R-I-T-T-A-N-Y, H-E-R-T-Z-O-G.
12   Q     Okay.  Thank you, Ms. Hertzog.
13         Throughout the course of your testimony, I'm just
14   going to ask that you keep your voice up, just speak
15   slowly, and I'll try and do the same.  Okay?
16   A     Okay.
17   Q     All right.  Ms. Hertzog, could you walk through
18   your educational background for the benefit of the
19   jury.
20   A     I went to George Mason University to get an
21   undergraduate degree in government international
22   relations.  I attended Wharton at the University of
23   Pennsylvania to receive a master's in business
24   administration.
25   Q     Okay.  And following your graduation from Wharton,
```

1   are you employed?

2   A     I am.

3   Q     And how are you currently employed?

4   A     I currently work for NASDAQ.

5   Q     What do you do for NASDAQ?

6   A     I lead the global ethics team.

7   Q     The global ethics team?

8   A     (Nods head up and down.)

9   Q     Okay.  And prior to graduate school, were you

10  employed?

11  A     I was.

12  Q     And tell the jury how you were employed.

13  A     I was an intelligence analyst for the Federal

14  Bureau of Investigation.

15  Q     Okay.  And when did you join the FBI, Ms. Hertzog?

16  A     In 2008.

17  Q     And when did you eventually leave the FBI?

18  A     2019.

19  Q     And that's when you went to graduate school?

20  A     Correct.

21  Q     You said you were an intelligence analyst at the

22  FBI.  Can you tell the jury what an intelligence

23  analyst does at the FBI?

24  A     An intelligence analyst looks at information and

25  tries to identify trends, patterns, and investigative

1   next steps.

2   Q    Okay.  And is there a difference between an

3   intelligence analyst and a special agent at the FBI?

4   A    Yes.

5   Q    And briefly describe those differences to the

6   jury.

7   A    An intelligence analyst typically looks at the

8   information and does critical thinking; whereas, an

9   agent is more operational in that they talk to people.

10  They have law enforcement capabilities.

11  Q    Okay.  Did you receive any training to become an

12  intelligence analyst at the FBI?

13  A    I did.

14  Q    Tell the jury what kind of training.

15  A    Upon on boarding at the FBI, I went to Quantico

16  where I was trained in the Intelligence Basic Course,

17  IBC.

18  Q    And throughout the course of your career at the

19  FBI -- which was 11 years; is that correct?

20  A    Correct.

21  Q    -- did you receive additional trainings?

22  A    I did.

23  Q    And following your graduation, Ms. Hertzog, from

24  Quantico, were you assigned to a particular unit at the

25  FBI?

```
 1   A      I was assigned to the --

 2          (Reporter clarification.)

 3              THE WITNESS:  Sorry.

 4   BY MR. KEILTY:

 5   Q      Could you repeat your answer?

 6   A      Oh, I was assigned to the Directorate of

 7   Intelligence.

 8   Q      The Directorate of Intelligence?

 9   A      Yes.

10   Q      What generally is the Directorate of Intelligence?

11   A      The Directorate of Intelligence is a function at

12   FBI headquarters that looks at intelligence collection

13   and analysis across the FBI.

14   Q      Okay.  You just testified that that's located at

15   FBI headquarters?

16   A      Correct.

17   Q      Is that right across the river in Washington?

18   A      It is.

19   Q      Okay.  Ms. Hertzog, did you have a particular

20   focus throughout your 11 years at the FBI?

21   A      My primary focus was Russian counterintelligence.

22   Q      And at a very high level, what does that entail?

23   A      It entails monitoring national security threats

24   regarding Russian intelligence officers, specifically

25   espionage.
```

1  Q    Ms. Hertzog, turning your attention to the summer

2  of 2017, were you assigned to any particular unit at

3  the FBI?

4  A    I was assigned to Special Counsel Mueller's

5  Office.

6  Q    For the benefit of the jury, tell them what

7  generally was the scope of Special Counsel Mueller's

8  investigation?

9  A    Special Counsel Mueller's investigation was

10 established to conduct a full and thorough

11 investigation into Russian government efforts to

12 interfere in the 2016 U.S. presidential election,

13 including connectivity between members of the Trump

14 campaign and Russian government officials, as well as

15 any matters that arose from that investigation.

16 Q    Can you tell the jury the circumstances of how you

17 came to join Special Counsel Mueller's team?

18 A    I had spoken with my former supervisor at the

19 time, Supervisory Intelligence Analyst Brian Auten.  He

20 had asked if I wanted to come work for him again, and I

21 said I would be okay with that.

22 Q    Understood.

23     And what, generally, was your role with the

24 Special Counsel Mueller's team?

25 A    I was primarily initially to focus on looking into

 1    reports that the FBI had received on Russian matters.

 2    Q    All right.   Did those reports have a particular

 3    name?

 4    A    We referred to them typically as the Steele

 5    dossier.

 6    Q    Now, as a member of Special Counsel Mueller's

 7    team, was there a chain of command?

 8    A    Yes.

 9    Q    Can you describe the chain of command that you

10    worked with?

11    A    I reported directly to SIA Brian Auten.   Above him

12    was Special Counsel Mueller.   There were horizontal

13    chains of reporting as well.   So there was an attorney,

14    a supervisory special agent, and then head of FBI

15    personnel.

16    Q    Okay.   So you had occasion to work with special

17    agents as well, correct?

18    A    Correct.

19    Q    And who were some of the special agents that you

20    worked with with Special Counsel Mueller?

21    A    I worked with Supervisory Special Agent Amy

22    Anderson and Supervisory Special Agent Joe Nelson.

23    Q    You testified a minute ago that part of your role

24    on the Special Counsel's team was to look into the

25    Steele dossier; is that correct?

1   A      Correct.

2   Q      Are you familiar with the name Christopher Steele?

3   A      I am.

4   Q      And who is Christopher Steele?

5   A      Christopher Steele was a former British

6   intelligence officer who at the time, I believe, was

7   engaged in contracting work.

8   Q      All right.  And how did you become familiar with

9   Mr. Steele?

10   A      When I reported to the Special Counsel's Office,

11   SCO, I had received background information on the

12   investigation up until that point.

13   Q      And, Ms. Hertzog, are you familiar with an

14   individual by the name of Igor Danchenko?

15   A      I am.

16   Q      And what's your understanding of who Mr. Danchenko

17   is?

18   A      My understanding of who Mr. Danchenko is is he was

19   a primary source for a number of the reports.

20   Q      And that's the Steele reports?

21   A      Correct.

22   Q      Do you recall who identified Mr. Danchenko as

23   being the source of these reports?

24   A      I believe my SIA, Brian Auten, had identified him

25   through various pieces of information.

1  Q    Okay.  And at the time you were on Special

2  Counsel -- which let's get a date.  Approximately when

3  did you join Special Counsel Mueller's team?

4  A    I believe it was July of 2017.

5  Q    Okay.  Or right around there?

6  A    Around that time.

7  Q    At that point, did you have an understanding of

8  whether the FBI had interviewed Mr. Danchenko?

9  A    I don't recall exactly when, but at some point, I

10 became aware that they had interviewed Mr. Danchenko.

11 Q    All right.  You testified that, again, one of your

12 jobs was to look into the Steele dossier?

13 A    Correct.

14 Q    What exactly does that mean, "look into the Steele

15 dossier"?

16 A    As an intelligence analyst, we were trying to

17 identify the sourcing for the claims in the dossier

18 and, specifically, the national security threat with

19 regards to the Russian influence piece.

20 Q    So is it fair to say sourcing the dossier was one

21 of your objectives?

22 A    Yes.

23 Q    And in particular -- I mean, it's fair to say

24 there was a lot of dossier reports, correct, a fair

25 number?

1   A    Yes.

2   Q    And a lot of names appeared in those dossier

3   reports?

4   A    Correct.

5   Q    Did you learn that there were a number of

6   different sources that the defendant relied on?

7   A    Yes.

8   Q    Did you have a particular focus on any of those

9   sources?

10  A    There were a number of sub-sources that were

11  identified for investigative next steps.

12  Q    Okay.  And did you have a particular individual

13  that you focused on?

14  A    Yes.  There was an individual named Olga Galkina

15  who was -- when I was assigned to SCO, was my primary

16  focus initially.

17  Q    What is your understanding of who Ms. Galkina was?

18  A    Ms. Galkina was an associate of Mr. Danchenko who

19  lived in Cyprus at the time.  She was a Russian

20  national, and she had worked for -- I believe it was

21  servers.com, which was referenced, I believe, in the

22  dossier.

23  Q    Okay.  What, if any, steps did you take to

24  investigate Ms. Galkina?

25  A    I reviewed a number of documents in FBI holdings

1  and databases.

2  Q    All right.  And you testified that Ms. Galkina was

3  located in Cyprus; is that correct?

4  A    Correct.

5  Q    And you testified that your understanding was that

6  Ms. Galkina was a source for the dossier?

7  A    Correct.

8  Q    Ms. Hertzog, are you familiar with an individual

9  by the name of Charles or Chuck Dolan?

10 A    I am.

11 Q    And what's your understanding of who Mr. Dolan is?

12 A    Mr. Dolan, to my understanding, having reviewed

13 FBI databases, had connectivity to both Mr. Danchenko

14 and Ms. Galkina.

15 Q    So your testimony is that you learned about

16 Mr. Dolan through the various FBI databases?

17 A    I believe information was provided to me as

18 background when I on boarded with SCO, and I became

19 aware of more information as I researched.

20 Q    Okay.  And was there -- did there come a time when

21 you learned that Mr. Dolan had a relationship with

22 Mr. Danchenko?

23 A    Yes.

24 Q    And did there come a time when you learned that

25 Mr. Dolan had a relationship with Ms. Galkina?

1   A    Yes.

2   Q    Did you conduct open source record checks on

3   Mr. Dolan?

4   A    I did.

5   Q    And what, if anything, did you learn about those

6   open source record checks?

7   A    I identified through open source record checks

8   that Mr. Dolan was a former public relations executive

9   at kglobal and Ketchum, as well as he had held former

10  leadership positions with the Democratic Governors

11  Association, as well as former President Clinton's

12  Virginia election campaign.

13  Q    And in connection with his work with Ketchum,

14  what, if anything, did you learn?

15  A    I learned that he had ties to Russia and had

16  worked on Russian public relations matters.

17  Q    Did there come a time when you learned whether

18  Mr. Dolan worked with anybody in particular in the

19  Russian government?

20  A    Yes.

21  Q    Who was that?

22  A    I identified that he had worked with Dmitry Peskov

23  in the Russian government.

24  Q    Who's Dmitry Peskov?

25  A    Dmitry Peskov is the Russian presidential

1  administration press secretary.

2  Q    And was that an important fact for you?

3  A    It was.

4  Q    Why?

5  A    In that position, he would have -- he was a

6  long-time ally and close confidant to Russian President

7  Vladimir Putin, and in that position, he would have

8  likely overseen Russian propaganda and disinformation

9  campaigns.

10  Q    So it was an important fact for you that Mr. Dolan

11  had a relationship with Mr. Peskov, correct?

12  A    Correct.

13  Q    You testified that Mr. Dolan -- let me back up.

14       You testified that Mr. Dolan had a relationship

15  with Ms. Galkina, correct?

16  A    Correct.

17  Q    Did you do any travel record checks on Mr. Dolan?

18  A    I did.

19  Q    And what did you learn?

20  A    I learned that Mr. Dolan had traveled to Cyprus

21  and had also traveled to Russia.

22  Q    And with -- did you review FBI databases with

23  respect to Mr. Dolan?

24  A    I did.

25  Q    And what, if anything, did you learn about his

1  relationship with Ms. Galkina?

2  A    I learned that he had had a business relationship

3  with Ms. Galkina, had visited her in Cyprus, and had

4  spent time with her.

5  Q    Do you recall how many times he visited her in

6  Cyprus approximately?

7  A    I don't recall the exact number.  I believe it

8  was --

9  Q    More than once?

10 A    More than once, yes.

11 Q    Was that an important fact for you?

12 A    Yes.

13 Q    And why was that an important fact?

14 A    Ms. Galkina was a sub-source for the Steele

15 dossier, and as such, his connectivity with her was of

16 importance.

17 Q    You testified that travel record checks -- through

18 travel record checks you learned that Mr. Dolan had

19 been in Moscow?

20 A    Correct.

21 Q    Do you recall when that was?

22 A    I believe he had been in Moscow multiple times,

23 and I believe that it was approximately June, the

24 summer of 2016, as well as October 2016.

25 Q    And did there come a time when you learned that

1  Mr. Danchenko and Mr. Dolan were in Moscow together?

2  A    Yes.

3  Q    How did you learn that?

4  A    I learned it through research and FBI databases.

5  Q    All right.  And was that an important fact to you?

6  A    It was.

7  Q    Tell the jury why that would be an important fact.

8  A    It was an important fact because Mr. Danchenko was

9  identified as being a source for the Steele dossier,

10  and connectivity between Mr. Dolan and Danchenko was

11  important, especially considering Mr. Dolan's

12  connectivity to Dmitry Peskov.

13  Q    So it's fair to say that Mr. Dolan was of interest

14  to you as an FBI analyst?

15  A    Correct.

16  Q    Do you recall if anyone else on the Special

17  Counsel's team had an interest in Mr. Dolan?

18  A    Yes.

19  Q    Who was that?

20  A    My coworker, Supervisory Special Agent Amy

21  Anderson.

22  Q    And what was Amy Anderson's role in the FBI?

23  A    Amy Anderson's role, she is an agent -- do you --

24  FBI or SCO?

25  Q    What type of FBI agent was Agent Anderson?

1  A    She was a counterintelligence analyst as well --

2  sorry, agent.

3  Q    Got you.

4      Without getting into any of the conversations that

5  you had with Ms. Anderson, did you speak with her about

6  Charles Dolan?

7  A    Yes.

8  Q    Was it your understanding that she was also

9  interested in Charles Dolan?

10  A    Yes.

11  Q    Do you have a recollection of whether you had an

12  interest in interviewing Mr. Dolan?

13  A    Yes.

14  Q    Why would you want to interview Mr. Dolan?

15  A    I was concerned about a national security threat,

16  especially as it related to Mr. Dolan's connectivity to

17  the sources and sub-sources of the dossier, as well as

18  his connectivity to any Russian government officials.

19  Q    Okay.  Do you have an understanding of whether

20  other individuals on the Special Counsel wanted to

21  interview Mr. Dolan?

22  A    Sorry.  Could you repeat the question?

23  Q    Sure.

24      Do you have an understanding, if any, of whether

25  there were other individuals on Special Counsel

```
 1  Mueller's team who wanted to interview Mr. Dolan?
 2  A    I have an understanding of various positions of
 3  other members of the team.
 4  Q    Okay.  And what were some of those positions?
 5  A    Some of the positions were to not investigate
 6  Mr. Dolan.
 7  Q    And what were some of the other positions?
 8  A    Some of the other positions -- I believe I'm not
 9  entirely sure where certain people stood but --
10           MR. SEARS:  Your Honor, I am just going to
11  object because it sounds like she's speculating.
12           THE COURT:  Go ahead.
13  BY MR. KEILTY:
14  Q    Ms. Hertzog, did you want to interview Charles
15  Dolan?
16  A    I did.
17  Q    Did you want to take additional investigative
18  steps against Mr. Dolan?
19  A    I did.
20  Q    Do you have an understanding of whether Special
21  Agent Anderson shared those concerns?
22  A    She did.
23  Q    Do you have an understanding of whether the FBI --
24  withdrawn.
25           Do you have an understanding of whether
```

```
 1  Supervisory Intelligence Analyst Auten shared those
 2  concerns?
 3  A     I believe he shared those concerns.
 4  Q     And are you aware of whether the FBI or Special
 5  Counsel's team, in fact, ever did interview Mr. Dolan?
 6  A     To the best of my knowledge, nobody at Special
 7  Counsel's team interviewed Mr. Dolan.
 8  Q     Do you think that was a mistake?
 9          MR. ONORATO:  Objection.
10          THE COURT:  Sustained.
11  BY MR. KEILTY:
12  Q     Ms. Hertzog, are you familiar with an individual
13  by the name of Kevin Helson?
14  A     I am.
15  Q     And what's your understanding of who Kevin Helson
16  is?
17  A     Kevin Helson was the Washington Field Office agent
18  who was the handler for Mr. Danchenko.
19  Q     And what is a handling agent?
20  A     A handling agent is an agent that works with
21  confidential human sources and manages the
22  relationship.
23  Q     Is it your understanding that Mr. Helson was
24  meeting with Mr. Danchenko?
25  A     Yes.
```

1  Q    All right.  Do you have an understanding of

2  whether Agent Helson had investigative interest in

3  Mr. Dolan?

4  A    I do.

5  Q    Now, in connection with -- you testified that

6  you -- as part of your duties on the Special Counsel,

7  you reviewed various FBI databases; is that correct?

8  A    Correct.

9  Q    And you reviewed various databases related to

10 Ms. Galkina; is that correct?

11 A    Correct.

12 Q    In connection with that review of those databases,

13 did you prepare any type of report?

14 A    I did.

15 Q    What type of report was that?

16 A    I prepared a report that outlined her connectivity

17 with Russian government officials, other Russians of

18 interest, as well as Mr. Danchenko as it related to the

19 Steele dossier.

20 Q    Okay.  Did Mr. Dolan appear in that report?

21 A    He did.

22 Q    Did he feature fairly prominently in the report?

23 A    He did not.

24 Q    Did he appear in various sections of your report?

25 A    He appeared at least in one section.  I don't

1  recall if he appeared more than once.  He may have.

2  Q    And do you recall what that section was, what that

3  related to?

4  A    I believe that section related to -- well, I

5  believe that he was referenced in relation to his

6  visits with Ms. Galkina in Cyprus, as well as the

7  visits to Moscow.

8  Q    Okay.  You testified that was an important fact

9  for you, correct?

10 A    Correct.

11 Q    At FBI, you generally file your reports somewhere?

12 A    I do.

13 Q    Can you explain to the jury how FBI personnel file

14 their reports?

15 A    There is typically a case file that is on a

16 specific investigation.  A memo to that case file is

17 called an electronic communication.  It is typically

18 filed in the bureau's case management software,

19 Sentinel.

20 Q    Sentinel is just the computer program that the FBI

21 uses to file stuff; is that correct?

22 A    Correct.

23 Q    And you testified that you would normally file

24 something in its case file; is that correct?

25 A    Correct.

1  Q     You've prepared this electronic communication on

2  Ms. Galkina, correct?

3  A     Correct.

4  Q     And you filed it onto Sentinel?

5  A     I did.

6  Q     How many case files did you file it into?

7        (Reporter clarification.)

8  A     I serialized it to three case files.

9  Q     When you say "serialize," does that just mean you

10  uploaded it to three different case files?

11  A     Correct.

12  Q     Is there a reason why you serialized it in three

13  separate case files?

14  A     I wanted others to see it who had the authority to

15  take action.

16  Q     Okay.  Why don't you explain to the jury what that

17  means.

18  A     We had been instructed at SCO not to take further

19  action on the matter involving Mr. Dolan and

20  Mr. Danchenko's relationship, and I believed it needed

21  to be actioned.

22  Q     So by filing it in three different case files, who

23  were you hoping would see it?

24  A     I serialized it to one case file that I believed

25  would be reviewed by Washington Field Office, FBI

1  headquarters, and the Inspector General.

2  Q    And for the benefit of the jury, to your

3  knowledge, what is generally the inspector general?

4  A    The inspector general looks at matters -- sorry.

5  Are you asking specifically that or just the inspector

6  general?

7  Q    Just generally, what the inspector general does,

8  to your knowledge.

9  A    To my knowledge, the inspector general reviews

10 Department of Justice agencies to ensure that actions

11 are being taken appropriately.

12 Q    Okay.  So you wanted the inspector general to see

13 your report on Ms. Galkina, correct?

14 A    Correct.

15 Q    And that's because Mr. Dolan's name was in it,

16 correct?

17 A    Yes.

18 Q    And you thought Mr. Dolan was an important

19 individual?

20 A    I believed that -- yes.

21 Q    And did you believe that further investigative

22 steps should have been taken on Mr. Dolan?

23 A    Yes.

24 Q    If you had known that Mr. Dolan was a source for

25 the dossier, would that have been an important fact for

1    you?

2    A    Yes.

3    Q    Why is that?

4    A    As an analyst, we are trained to understand

5    sourcing and where it comes from, specifically, any

6    biases or motivations for that information, so that we

7    can understand how to weigh that information.

8              MR. KEILTY:  Okay.  No further questions.

9              THE COURT:  All right.  Mr. Onorato.

10             MR. ONORATO:  Very, very briefly, Your Honor.

11             THE COURT:  Yes.

12                      CROSS-EXAMINATION

13   BY MR. ONORATO:

14   Q    Good morning, Ms. Hertzog.

15   A    Good morning.

16   Q    My name is Danny Onorato, and I am one of

17   Mr. Danchenko's lawyers.

18        We have never had an opportunity to speak before

19   today; is that right?

20   A    Correct.

21   Q    You have met with the Special Counsel team a

22   number of times; is that right?

23   A    Correct.

24   Q    Somewhere between, let's say, two and five?

25   A    I would say that's correct.

1  Q    Okay.  Now, when you met with the Special Counsel,

2  you were represented sometimes not by one but by two

3  lawyers; is that right?

4  A    Correct.

5  Q    And those lawyers are what we call *pro bono*

6  lawyers, meaning that they're working for you for free?

7  A    Correct.

8  Q    And you felt like you needed to have lawyers with

9  you in your meetings with Special Counsel; is that

10 right?

11 A    I wanted somebody to represent my interests, yes.

12 Q    Right.  And one of them is in court here today; is

13 that right?

14 A    Correct.

15 Q    Now, you've never met Mr. Danchenko; am I correct

16 about that?

17 A    Correct.

18 Q    All right.  And I just want to ask you really one

19 simple factual question about your work as an analyst:

20 Do you think that it's important that Corey Lewandowski

21 hates Paul Manafort to Russian interference?

22 A    I don't believe that that specific information is

23 necessarily critical.  I think that, as it ties back to

24 any potential Russian government actions against the

25 United States, it could play a part in that.

1  Q    Sure.  But if you read in the *New York Times*

2  that -- or you saw on CNN that Corey Lewandowski hates

3  Paul Manafort, that's really not something that you

4  would consider a national security threat, right?

5  A    Correct.

6             MR. ONORATO:  No further questions.

7             THE COURT:  Any redirect?

8             MR. KEILTY:  One question, Your Honor.

9                    REDIRECT EXAMINATION

10 BY MR. KEILTY:

11 Q    Mr. Onorato just asked you about whether you would

12 think it was important whether Corey Lewandowski

13 provided information about -- that Corey Lewandowski

14 hated Paul Manafort, correct?

15 A    Correct.

16 Q    Would it be relevant to you if you had known that

17 a Trump insider had provided that information that was

18 eventually put in a Russian-linked dossier against

19 Mr. Trump?

20 A    Sorry.  Could you repeat it?

21 Q    Sure.

22      Would it be relevant to you if that information

23 actually had come from somebody the dossier claimed to

24 be a Trump insider and the dossier was a Russian

25 related -- related to Russia and Donald Trump's

1  connections to Russia?  Correct?

2  A    Correct.

3  Q    So would it have been relevant to know in that

4  dossier that that information came from a Trump

5  insider?

6  A    Yes.

7            THE COURT:  All right.  Ms. Hertzog, you're

8  excused.  Do not discuss your testimony outside of the

9  courtroom with any other witness.

10     (The witness stands aside.)

11            THE COURT:  The government will call its next

12 witness.

13            MR. ONORATO:  Your Honor, could we please

14 approach for one second?

15            THE COURT:  Yes.

16     (Conference at the bench, as follows:)

17            THE COURT:  Yeah.

18            MR. ONORATO:  Your Honor, it's my

19 understanding that this witness' testimony will be

20 virtually identical to the witness we just heard.  I

21 object to it being cumulative.

22            THE COURT:  Well, I'll have to wait until

23 after we hear -- who is it?

24            MS. SHAW:  It's Amy Anderson, Your Honor.

25            THE COURT:  All right.

1           MR. KEILTY:  One of the differences is she's

2     an FBI special agent.  She had a different role.

3           THE COURT:  I understand.  We are not going

4     to hear the same testimony?

5           MR. KEILTY:  You will see some different

6     testimony for sure.

7           THE COURT:  Let's keep it to what we haven't

8     already heard.

9           MR. DURHAM:  The testimony is going to be

10    very short.

11          THE COURT:  All right.

12       (Proceedings continued in open court, as follows:)

13          MS. SHAW:  Your Honor, may we approach one

14    more time?

15          THE COURT:  Yes.

16       (Conference at the bench, as follows:)

17          MS. SHAW:  I was just informed by one of the

18    agents that she hasn't arrived yet.  I had a split

19    second.  So I don't have a representation to make about

20    why.  I know that she's -- this isn't like she's

21    absconded.  She should be here.  It's just a matter of

22    traffic, I imagine.

23          THE COURT:  How about your other witness?  Is

24    that person available?

25          MR. DURHAM:  Well, that one is the final

1  witness.  Would the Court just consider taking its

2  morning break?

3          THE COURT:  Yes, I will do that.

4          MS. SHAW:  Thank you.

5      (Proceedings continued in open court, as follows:)

6          THE COURT:  Ladies and gentlemen, we're going

7  to take our morning break a little earlier.  We will

8  stand in recess until approximately 11:15.  You are

9  excused to the jury room.  Please do not discuss this

10  case among yourselves during the break.

11      (The jury exits at 10:50 a.m.)

12          THE COURT:  All right.  The Court will stand

13  in recess.

14      (Recess from 10:50 a.m. until 11:22 a.m.)

15      (The jury is not present.)

16          THE COURT:  Are we ready to proceed?

17          MS. SHAW:  Yes, Your Honor.

18          THE COURT:  All right.  Let's bring out the

19  jury.

20      (The jury enters at 11:22 a.m.)

21          THE COURT:  Please be seated.

22          The government will call its next witness.

23          MS. SHAW:  The United States calls Special

24  Agent Amy Anderson.

25          THE COURT:  All right.  Special Agent

1    Anderson will come forward, please.

2         AMY ANDERSON, PLAINTIFF'S WITNESS, AFFIRMED

3                      DIRECT EXAMINATION

4    BY MS. SHAW:

5    Q    Good morning, Agent Anderson.

6    A    Good morning.

7    Q    If I could have you please state your full name

8    and spell your last name for the record, please.

9    A    Yes.  My name is Amy Anderson, A-M-Y,

10   A-N-D-E-R-S-O-N.

11   Q    Okay.  I just want to remind you to keep your

12   voice up so that the jurors can hear you.  We will try

13   to talk at a slower pace so the lady who is taking down

14   all of our words can do so.

15        Also, if there's any question I'm not clear on,

16   please just let me know.

17              THE COURT SECURITY OFFICER:  Counsel, I'm

18   sorry.  You are going to have to speak up.  They cannot

19   hear you in the box.

20              THE COURT:  I think the jury is having

21   trouble hearing you.

22   BY MS. SHAW:

23   Q    Agent Anderson, how are you employed?

24   A    I'm a special agent with the FBI.

25   Q    How long have you worked at the FBI?

1   A    I entered on duty in 2010, so 12 years.

2   Q    And what's your current assignment at the FBI?

3   A    I'm currently assigned as an assistant legal

4   attaché at the U.S. Embassy in Ottawa, Canada, at the

5   legat office.

6   Q    Prior to joining the FBI, did you obtain any

7   educational degrees?

8   A    Yes.  I have a Bachelor of Science with a double

9   major in international marketing and french, a master's

10  in french literature, and I completed my coursework for

11  a PhD in french linguistics.

12  Q    If you could, just walk us through your various

13  roles that you've had at the FBI in terms of your first

14  assignment and any specialties that you had.

15  A    Okay.  My first assignment was at the San Diego

16  Division.  I have worked counterintelligence my entire

17  career.  So I started in San Diego for four years.  I

18  took a voluntary transfer to New York City in 2014.  I

19  worked counterintelligence matters in New York City

20  until 2016 when I was promoted to a supervisory special

21  agent at FBI headquarters where I worked in the

22  Counterintelligence Division, Counterespionage Section.

23       I went to work at the Special Counsel -- Crossfire

24  Hurricane which became the Special Counsel in -- I'm

25  sorry -- in April of 2017 until January of 2018, at

1   which time I transferred back to FBI headquarters,

2   still in Counterintelligence Division.

3        In December of 2019, I transferred to New Orleans,

4   again, to work counterintelligence matters, and in

5   January of 2022, this year, I moved -- or was promoted

6   to ALAT in Ottawa.

7   Q    And just for the jury, what does ALAT stand for?

8   A    ALAT is assistant legal attaché.  It's a

9   supervisory special agent position overseas.  We do

10  liaison work.

11  Q    And you mentioned that you had worked in the field

12  of counterintelligence.  Were there any particular

13  areas of the world that you focused on with respect to

14  counterintelligence?

15  A    Yes.  My main focus throughout my career has been

16  Russian counterintelligence matters, as well as

17  espionage and insider threat.

18  Q    You mentioned you're a special agent.  How does

19  that differ in terms of the kind of things that you do

20  versus an intelligence analyst?

21  A    Agents generally work the operational matters, and

22  analysts are the backbone of what we do as far as being

23  well versed in database checks and gathering the

24  intelligence to help the agents make the decisions as

25  far as, for example, who to interview, interview

1  questions, sources, and that sort of thing.

2  Q    All right.  So I'm going to turn your attention to

3  April of 2017.  I think you mentioned that you were

4  assigned to a certain investigation at the FBI.

5  A    Yes.

6  Q    And what investigation was that?

7  A    In April 2017, I was assigned to the Russian

8  Investigation, also known as Crossfire Hurricane.

9  Q    And you mentioned that you -- you had called it

10 the Russian Investigation or Crossfire Hurricane.  Just

11 very briefly, if you could, tell the jury what your

12 understanding of what that was supposed to look at.

13 A    Yes.  We were assigned to look at what was going

14 on with potential links to Russian governments and the

15 Trump presidential campaign.

16 Q    And how did you come to be assigned to Crossfire

17 Hurricane?

18 A    My supervisor asked me to go over.

19 Q    All right.  Were you assigned to a particular team

20 within Crossfire Hurricane?

21 A    Yes, the Russia team.

22 Q    And what was your initial assignment -- or what

23 were you first tasked to do when you joined Crossfire

24 Hurricane?

25 A    I was assigned to attempt to validate the Steele

1  dossier.

2  Q    And just very briefly, what was your understanding

3  of what the Steele dossier was?

4  A    The Steele dossier was a collection of reports put

5  together by Christopher Steele, who was a former MI6

6  British intelligence agent that had to do with various

7  individuals related to the Trump campaign and their

8  ties to Russia.

9  Q    And you mentioned that you were asked to look into

10 the Steele dossier.  What specifically were you asked

11 to do?

12 A    I was asked to either verify the reporting or

13 determine that it was not accurate.

14 Q    And from a counterintelligence agent's

15 perspective, your perspective, why was that important

16 for you to do?

17 A    There was a lot of reporting out there that we

18 needed to determine if it was true or not.  For

19 counterintelligence matters, it was important to

20 determine if there was compromising information on our

21 officials, anything that a foreign government could use

22 against us.

23      Also, the Russian government was and continues to

24 spread quite a bit of misinformation, and it was

25 important for us to know what was true within those

1  reports and what might have not been true.

2  Q    And you mentioned misinformation from the Russian

3  government.  In your experience as a

4  counterintelligence agent focusing on Russia, can you

5  just very briefly explain to the jury what you mean by

6  Russian misinformation and the purposes behind it as

7  you understand them?

8  A    Sure.  Misinformation would generally be any

9  information that would be put forth, for example, by

10 the Russian government -- it could be by anyone -- that

11 is misleading on purpose, something that they're

12 putting out there in order to sew discord amongst the

13 public, the intelligence communities, or anyone who had

14 access to that information.

15 Q    So you previously mentioned that you --

16 analysts -- did you work with any analysts at Crossfire

17 Hurricane?

18 A    I worked with quite a few analysts at Crossfire

19 Hurricane.

20 Q    Did Crossfire Hurricane ever become another

21 investigation?

22 A    Yes.  It became the Special Counsel with Director

23 Mueller.

24 Q    All right.  When you joined that investigation,

25 did your role change at all?

1  A    Not initially.

2  Q    All right.  What was your initial -- who were you

3  initially working with in that role at the Special

4  Counsel's investigation?

5  A    When I first arrived at the Special Counsel, I

6  worked with Supervisory Intelligence Analyst Brian

7  Auten, as well as quite a few other intelligence

8  analysts, Stephanie LaParre, Iva Drasinover.  We had a

9  team that was working the dossier in particular.

10  Q    Did you work with someone by the name of Brittany

11  Hertzog?

12  A    I worked with Brittany a little bit later.  She

13  came in not at the very beginning but maybe a month

14  after, a month or two.

15  Q    And in terms of who you reported to at the Special

16  Counsel's office, if you could, just tell us who you

17  reported to.

18  A    Technically, I reported to Supervisory Special

19  Agent Joe Nelson.

20  Q    Are you familiar with the name Igor Danchenko?

21  A    I am.

22  Q    And who is Igor Danchenko?

23  A    He was a source that was run out of the Washington

24  Field Office by Special Agent Kevin Helson.

25  Q    And how did you become familiar with

1   Mr. Danchenko?

2   A     Through Brian Auten and Kevin Helson.

3   Q     All right.  And are you familiar with the name

4   Olga Galkina?

5   A     I am.

6   Q     And how did you become aware of Ms. Galkina?

7   A     Through database checks that Ms. Hertzog was

8   conducting within the scope of what we were looking at

9   with regard to the dossier.  We began looking into

10  Ms. Galkina to see if she may have information related

11  to the Steele reporting.

12  Q     All right.  And do you know what, if any,

13  relationship Ms. Galkina had to Mr. Danchenko?

14  A     Yes.  They, I believe, were friends.  They knew

15  each other.

16  Q     So in terms of Ms. Galkina, what sort of steps did

17  you and your team take with respect to investigating

18  her role?

19  A     We conducted database checks, and we eventually

20  went to Cyprus to interview her in person.

21  Q     Okay.  In the course of looking into Ms. Galkina,

22  did you identify any individual that was connected to

23  both Ms. Galkina and the defendant, Igor Danchenko?

24  A     Yes, we did.

25  Q     And who was that?

1  A     His name was Charles Dolan.

2  Q     And how did you learn of the connection between

3  Mr. Dolan to Ms. Galkina and the defendant?

4  A     I believe it was also database checks, and

5  Ms. Galkina did tell us that she knew him -- both of

6  them.

7  Q     And learning of Mr. Dolan's connection to the two

8  individuals, what did you do with respect to Mr. Dolan?

9  Did you look into him?

10  A     I wanted to look into him.

11  Q     Did you -- at this point in the investigation --

12  so prior to going to Cyprus, as you mentioned, to see

13  Ms. Galkina, did you do any open source research

14  concerning Mr. Dolan?

15  A     I did.

16  Q     And what, if anything, did you learn?

17  A     We learned that Mr. Dolan had previously been

18  employed with a PR firm, Ketchum, that did work for the

19  Russian government, in particular managing a PR

20  campaign for the Kremlin.

21  Q     And did you learn whether or not Mr. Dolan had any

22  connections to Dmitry Peskov?

23  A     I did.

24  Q     And who is Dmitry Peskov?

25  A     Dmitry Peskov is President Putin's press

1  secretary.

2  Q    As a counterintelligence agent, would it be

3  significant to you to know about that connection and an

4  individual involved in the investigation?

5  A    Yes.

6  Q    And why is that?

7  A    In the course of validating the Steele dossier,

8  one of the goals would be to determine who had access

9  to the information from the reports, to determine who

10 those sources were, and anyone who had a connection to

11 the Kremlin directly would have been extremely

12 important to know.

13 Q    In terms of the research that you did into

14 Mr. Dolan before traveling to Cyprus, did you determine

15 where he was located?

16 A    We did.

17 Q    And without, obviously, giving an address or

18 anything like that, do you know where he is located?

19 A    He is in the D.C. area.

20 Q    Was he in the Commonwealth of Virginia?

21 A    Possibly.

22 Q    All right.  So before we get in -- excuse me.

23 Before we go to your interview of Ms. Galkina, in terms

24 of the Special Counsel team, did you have the

25 understanding whether anyone else shared your interest

1  in Mr. Dolan?

2  A    Yes.

3  Q    And who else was that?

4  A    Brian Auten, Brittany Hertzog.

5  Q    And do you know somebody by the name of Agent

6  Helson?

7  A    I do.

8  Q    And what was his role, as you understand it, with

9  respect to Mr. Danchenko?

10  A    Agent Helson was the handler for Mr. Danchenko.

11  Q    And did you have direct contact with

12  Mr. Danchenko?

13  A    I did not.

14  Q    And just briefly explain to the jury how it might

15  work.  If you wanted to get information from

16  Mr. Danchenko, how would you go about getting that?

17  A    I would speak to the source handler.  So in this

18  case, I would speak to Agent Helson, and we would

19  discuss what might be interesting for us to know.  And

20  then he would go and speak to his source.  We do that

21  for reasons of source safety, so that not everyone

22  knows who our sources are.

23  Q    All right.  And you've told us that prior to going

24  to Cyprus, you had done this research into Mr. Dolan.

25  You knew of the connection between the defendant and

1  Ms. Galkina and Mr. Dolan.  At that time, did you

2  direct -- not direct, request that Agent Helson inquire

3  of the defendant about Mr. Dolan?

4  A    I did.

5  Q    And what, if any, information did you learn?

6  A    I don't recall learning anything about Mr. Dolan

7  from Mr. Danchenko.

8  Q    All right.  So what then did you determine to do

9  next?

10  A    At that point, we were going to -- I'm sorry.

11  Just to clarify, this is after Cyprus?

12  Q    Let's talk about Cyprus.  At some point, you said

13  you went to Cyprus to interview Ms. Galkina.  About

14  when was that?

15  A    It was approximately August of 2017.

16  Q    Did you go by yourself or with others?

17  A    No.  I went with SIA Brian Auten, as well as one

18  other agent from the Washington Field Office because he

19  spoke Russian.

20  Q    All right.  Again, the purpose of that trip -- if

21  you could, tell the jury what your goals were for

22  interviewing Ms. Galkina.

23  A    Our goal, again, was to determine the sources of

24  each Steele report.  We believed that Ms. Galkina was a

25  source of the Steele reporting.  Therefore, we wanted

1   to interview her directly to determine which reporting

2   came from her and then motives and any information we

3   could glean from her directly regarding that reporting.

4   Q     And how many days did you spend in Cyprus, if you

5   can recall?

6   A     I believe it was three, three or four.

7   Q     And did you interview with her all days?

8   A     Yes, we did three days.

9   Q     And would you characterize Ms. Galkina as

10  forthcoming with her information about her role with

11  the dossier and any information in it?

12  A     She seemed mostly forthcoming.

13  Q     You said mostly forthcoming.  Was there a

14  particular area that she was not forthcoming about?

15  A     Yes.  She was hesitant in telling us about

16  Mr. Dolan.

17  Q     All right.  Let's start with the beginning of

18  these interviews.  When you began interviewing

19  Ms. Galkina, did you specifically ask her about

20  Mr. Dolan or not?

21  A     We did.

22  Q     And if you could, how did she react when you asked

23  her about Mr. Dolan the first time?

24  A     She did not want to speak about him.

25  Q     All right.  And did you continue to ask her about

1   Mr. Dolan every day of the interviews?

2   A    We did.

3   Q    And did there come a time when you directly asked

4   Ms. Galkina whether Mr. Dolan had a connection with the

5   information in the dossier?

6   A    Yes, the last day.

7   Q    All right.  And can you describe for the jury how

8   Ms. Galkina reacted when you asked her directly about

9   that?

10  A    She was slightly hesitant, and I was -- we were in

11  a car, and I had my sunglasses on.  And she asked me to

12  remove my sunglasses so she could look me directly in

13  the eye before she confirmed that it was Mr. Dolan.

14           MR. ONORATO:  I object.  May we approach?

15           THE COURT:  Yes.

16       (Conference at the bench, as follows:)

17           THE COURT:  Can you read back the question.

18       (Question read.)

19           THE COURT REPORTER:  Would you like the

20  answer read?

21           THE COURT:  Perhaps you can refresh me.

22           MS. SHAW:  Sure.

23           THE COURT:  What was asked of Galkina?

24           MS. SHAW:  So she was asked --

25           THE COURT:  On the last day?

1          MS. SHAW:  On the last day, she is confronted

2  with Mr. Dolan as a source for the information in the

3  dossier.

4          THE COURT:  Okay.

5          MS. SHAW:  What I was planning to elicit --

6  she was going to bring out -- she was verbally

7  commanded by Ms. Galkina to remove her sunglasses.

8  Then the state of mind of Ms. Galkina.  I'm not going

9  to -- whatever she said.

10          MR. ONORATO:  So it's hearsay.

11          THE COURT:  Isn't this all out there?

12          MR. ONORATO:  No, no, because Dolan said he

13  wasn't a source of the dossier, right.

14          THE COURT:  Right.

15          MR. ONORATO:  Now Galkina is giving

16  information to Mr. Danchenko but not telling him that

17  it came from Mr. Dolan.  How does that tie into --

18  there's no proof that Mr. Danchenko was aware of that.

19          THE COURT:  Right.

20          MR. ONORATO:  So it is going to mislead the

21  jury.

22          THE COURT:  But her confirmation would be

23  hearsay; wouldn't it?

24          MS. SHAW:  Her confirmation would be hearsay.

25  What I intended to elicit was the "take off your

1   sunglasses and look me in the eyes," and then I was

2   going to ask a question, you know, "What, if anything,

3   did you do after you confronted her," and then get into

4   the steps that the agent took.

5           THE COURT:  Okay.  I'm going to strike her

6   last answer on the confirmation, and then you can pick

7   it up from there.

8           MS. SHAW:  But keep in the sunglasses

9   removal?

10          THE COURT:  Yes.

11          MS. SHAW:  Okay.

12          MR. ONORATO:  Very good.

13          THE COURT:  All right.

14      (Proceedings continued in open court, as follows:)

15          THE COURT:  All right.  I'm going to strike

16  the witness' answer of everything after she took off

17  her sunglasses.  So you should disregard any answer

18  after that.

19          MS. SHAW:  Yes, Your Honor.

20  BY MS. SHAW:

21  Q   So without telling us what Ms. Galkina said, what,

22  if anything, did you do after confronting Ms. Galkina

23  with that information?

24  A   After we concluded the meeting, I went back and

25  spoke with Brian Auten about what had happened.

1  Q    And what, if any, materials or reports did you

2  prepare upon returning from Cyprus?

3  A    Oh, we prepared a report of the interviews that

4  occurred.

5  Q    And did you compile anything addressing the

6  information that you had compiled, you and Ms. Hertzog

7  had compiled on Mr. Dolan?

8  A    Yes, I did.

9  Q    And was the -- what was the purpose of that

10 compilation or memo generally speaking?

11 A    Generally speaking, I compared -- I compiled the

12 reports into what we could call an opening

13 communication to open an investigation.

14 Q    And in terms of opening an investigation, does

15 that allow you to take investigative steps?

16 A    It does.

17 Q    So prior to the opening for -- oh, would one

18 investigative step be sending out subpoenas, for

19 example?

20 A    That would be an investigative step.

21 Q    And this is generally speaking?

22 A    (Nods head up and down.)

23 Q    And would an investigative step be doing an email

24 search warrant --

25 A    Yes.

1  Q    -- for example?

2  A    (Nods head up and down.)

3  Q    And would an investigative step be interviewing a

4  witness?

5  A    Yes.

6  Q    All right.  So with respect to Mr. Dolan and this

7  memo that you've written, what, if anything, did you do

8  with the memo?

9  A    I submitted it to my supervisors.

10 Q    And when you say your supervisors, who were your

11 supervisors that you submitted this to?

12 A    It would have been SSA Joe Nelson as an immediate

13 approver.

14 Q    And what, if anything, happened after you

15 submitted this memo?

16 A    It sat for approximately three or four weeks.

17 Q    And what, if anything, did you do after three or

18 four weeks?

19 A    I was told to close -- well, it was never opened.

20 So I was told it was not going to be opened.

21 Q    And who told you that?

22 A    Joe Nelson.

23 Q    Were you given any specific reason why it was not

24 to be opened?

25         MR. ONORATO:  Objection.

```
 1              THE COURT:  Sustained.
 2   BY MS. SHAW:
 3   Q     So based on your experience and what you've
 4   learned so far in the investigation, did you believe
 5   that further investigative steps were warranted with
 6   respect to Charles Dolan?
 7   A     I did.
 8   Q     And we just reviewed a bunch of general
 9   investigative steps, subpoenas, email warrants, and
10   then interviewing.  Would all of those things be steps
11   that you would have taken if you had been allowed to
12   pursue this avenue?
13   A     They all would have been steps that we would have
14   considered taking once the investigation was open.
15   Q     And would those have been important steps to you
16   as a counterintelligence agent?
17   A     Yes.
18   Q     If you had learned in June 2017 that Mr. Dolan had
19   given the defendant information that ultimately ended
20   up in the dossier, would that have been important to
21   you?
22              MR. ONORATO:  Your Honor, objection.  It
23   misstates the evidence.
24              THE COURT:  Rephrase the question.
25   BY MS. SHAW:
```

1  Q    If you had learned in June 2017 that Mr. Dolan had

2  a connection to the defendant and information Mr. Dolan

3  provided to the defendant appeared in the dossier,

4  would that have been important to you to know?

5  A    Yes.

6  Q    Would that have affected your investigation?

7  A    Yes.

8  Q    How?

9  A    I believe -- it's hard to say at this point, but I

10 believe we would have taken --

11         MR. ONORATO:  Your Honor, I'm going to just

12 object if she's speculating.

13         THE COURT:  Sustained.

14 BY MS. SHAW:

15 Q    And if you had known that Mr. Dolan had provided

16 the defendant information that he made up, would that

17 have been important for you to know?

18 A    Yes.

19 Q    Why?

20 A    The job at that time was to determine if the

21 statements made in the dossier were valid or not.  So

22 knowing that there were misstatements, if that was

23 accurate, then that would have been very important to

24 know and part of my job.

25 Q    And in June of 2017, if you had known that

1  Mr. Dolan was connected to the defendant, knowing that

2  he has a connection to Peskov, would that have been

3  important for you to know?

4  A    Yes.

5  Q    Why?

6  A    Anyone that had a direct connection to Peskov was

7  interesting and would have been important for us to

8  know.

9  Q    And in June of 2017, if you had known that

10 Mr. Dolan knew that the defendant was looking for rumor

11 or *innuendo*, working on a project against Trump, would

12 that have been important for you to know?

13 A    Yes.

14 Q    And why is that?

15 A    Because, again, we were trying to determine the

16 validity of the dossier, and if anyone had any kind of

17 different motives or knew that something wasn't true,

18 then we would've needed to know that.

19 Q    And in your experience as a Russian

20 counterintelligence agent, would knowing that someone

21 who was looking for rumors or allegations on an

22 American presidential candidate be of interest to some

23 Russian actors, such as Mr. Peskov?

24 A    Yes.

25 Q    Now, at this time in June of 2017, did you have

1   any U.S.-based sub-sources for the dossier identified?

2   A    Mr. Danchenko.

3   Q    But beyond the defendant?

4   A    No.

5   Q    And if you can recall, generally, where were the

6   other sub-sources located?

7   A    They were overseas.  We were aware of Ms. Galkina,

8   who was in Cyprus.

9   Q    So would Mr. Dolan have been the first sub-source

10  that was located in the United States?

11  A    Yes.

12  Q    Do you know if the FBI -- I'm sorry.  When I say

13  FBI, do you know whether anyone on the Special Counsel

14  Mueller's investigation or Crossfire Hurricane ever

15  interviewed Mr. Dolan?

16  A    I am not aware of that.

17  Q    Do you know if anyone on Crossfire Hurricane or

18  Special Counsel Mueller's team ever issued a subpoena

19  for documents regarding Mr. Dolan?

20  A    Not to my knowledge.

21  Q    Did they ever subpoena any phone records?

22  A    For Mr. Dolan?

23  Q    Yes.

24  A    Not to my knowledge.

25  Q    Are you aware of -- beyond what you did by

1   traveling to Cyprus and then writing the memo -- of

2   anything the Special Counsel's office did with respect

3   to Mr. Dolan?

4   A     No.

5   Q     And with respect to the memo that you indicated

6   you drafted concerning investigative steps for

7   Mr. Dolan, what, if anything, happened to that memo?

8   Do you know?

9   A     It was deleted.

10  Q     And do you know who deleted it?

11  A     I did.

12  Q     And why did you delete it?

13  A     If we weren't going to open the case, it couldn't

14  sit in our Sentinel system and, therefore, would just

15  need to be deleted.

16  Q     And sitting here today, do you have any -- do you

17  know why you were not permitted to move forward with

18  the investigation?

19          MR. ONORATO:   Objection.

20  BY MS. SHAW:

21  Q     Do you have personal knowledge of why you were not

22  permitted to move forward with interviewing Mr. Dolan?

23  A     I do not.

24          MS. SHAW:   Thank you.

25          THE COURT:   All right. Mr. Onorato.

```
 1                    CROSS-EXAMINATION

 2  BY MR. ONORATO:

 3  Q     Good afternoon, Ms. Anderson.

 4  A     Good afternoon.

 5  Q     We have never met before; have we?

 6  A     No, we have not.

 7  Q     Okay.  That's probably good for you.

 8        I know that you've met with the Special Counsel on

 9  a number of occasions.  Is that correct?

10  A     That is correct.

11  Q     Would it be fair to say somewhere between two to

12  five times?

13  A     That's correct.

14  Q     You were represented by a lawyer?

15  A     Yes, I am.

16  Q     His name is Larry Burger?

17  A     Yes, that's correct.

18  Q     I'm assuming Mr. Burger was either on the

19  telephone or with you at some of those meetings.

20  A     Yes.

21  Q     Is Mr. Burger here with you today?

22  A     He is not.

23  Q     But you consulted with him prior to coming in

24  today?

25  A     Yes.
```

1  Q    Okay.  And I'm not going to give you a hard time,

2  but I know you took an oath to tell the truth today.

3  Right?

4  A    Yes.

5  Q    You understand that if you say something false,

6  that would be subject to penalty of perjury, right?

7  A    Yes.

8  Q    I think Ms. Shaw asked you a number of questions.

9  I am just going to show that your recollection could be

10  off, not to say that you're intentionally lying, okay.

11  But Ms. Shaw asked you that it would be important for

12  you to know the relationship between Ms. Galkina and

13  Mr. Danchenko and Mr. Dolan in June of 2017, right?

14  A    Yes.

15  Q    Okay.  I want you to look at Defense Exhibit

16  No. 103?

17            THE COURT SECURITY OFFICER:  Counsel, what

18  number?

19            MR. ONORATO:  103.

20  BY MR. ONORATO:

21  Q    Have you had a chance to look at that?

22  A    Generally.

23  Q    Okay.  Do you recall asking Mr. Helson to have a

24  conversation with Mr. Danchenko to get information for

25  you?

1  A    We did speak multiple times with Agent Helson

2  regarding asking questions of Mr. Danchenko, yes.

3  Q    Right.  And you would agree that this is an

4  interview memorandum prepared from an interview with

5  Mr. Danchenko, correct?

6            THE COURT:  Counsel, this is not in evidence,

7  I don't believe.

8            MR. ONORATO:  It is not.  I'm going to try to

9  move it in, Your Honor.

10            THE COURT:  All right.

11  BY MR. ONORATO:

12  Q    But you would agree that, based on questions that

13  you asked --

14            THE COURT SECURITY OFFICER:  Counsel, the

15  jury cannot hear you.

16            MR. ONORATO:  I apologize.

17  BY MR. ONORATO:

18  Q    You would agree that, based on questions you had

19  asked of Agent Helson, he spoke to Mr. Danchenko about

20  Mr. Danchenko's knowledge of Mr. Dolan in June of 2017,

21  right?

22  A    It would have been myself or potentially Brian

23  Auten.

24  Q    Okay.  I'll ask you to look at the second page of

25  Defense Exhibit No. 102 for a moment.

990

 1      Do you see that?

 2   A    I do.

 3   Q    Does that document refresh your memory:  Did you

 4   prepare those questions for Agent Helson?

 5   A    I can't recall if I prepared these.

 6   Q    Okay.  Okay.  But turning back now to 103, it

 7   appears that there was a conversation between Agent

 8   Helson, right?

 9   A    Yes.

10   Q    And Agent Helson, as you said, was Mr. Danchenko's

11   handling agent, right?

12   A    Correct.

13   Q    And you were not allowed to directly talk to

14   Mr. Danchenko because of the separation rules, correct?

15   A    Correct.

16   Q    And so you had to rely on Helson to ask questions

17   for you, right?

18   A    Yes.

19   Q    And he did that when you asked him to, right?

20   A    To my knowledge.

21   Q    Yeah.  And then -- I'm sorry.  What kind of

22   special agent are you?

23   A    Currently?

24   Q    No, back then.

25   A    A supervisory special agent.

1  Q    So in 2017 in June you were a supervisor?

2  A    Yes.

3  Q    So as a supervisor, when you ask someone to get

4  you information, you would then get the information and

5  try to utilize it, right?

6  A    Yes.

7  Q    Okay.  And so you know that Mr. Danchenko did tell

8  him, despite what Ms. Shaw asked you, that in June of

9  2017, Mr. Danchenko described the relationship between

10 Ms. Galkina and Mr. Dolan, right?

11 A    I would have to read this.

12 Q    Read it.  Read it.  See if it refreshes your

13 memory.

14 A    I'm sorry.  Could you re-ask the question?

15 Q    Sure.  So you knew that Mr. Danchenko described

16 that he knew Mr. Dolan to Agent Helson in June of 2015,

17 right?

18      (Reporter clarification.)

19          MR. ONORATO:  Oh, '16, I'm sorry.

20 A    According to this document.

21 Q    In 2017, I apologize.

22 A    Seventeen.

23          MR. ONORATO:  Your Honor, I'm going to move

24 that into evidence.

25          THE COURT:  Any objection?

```
 1              MS. SHAW:  No, Your Honor.

 2              THE COURT:  All right.  Exhibit 103 is

 3   admitted.

 4              MR. ONORATO:  May we publish it?

 5              THE COURT:  Yes.

 6   BY MR. ONORATO:

 7   Q    And this is going to cover every question -- and I

 8   think there are probably five or six of them -- by

 9   Ms. Shaw about the basis of information that would have

10   helped you in June had you known the information, okay?

11   A    Okay.

12   Q    So it's fair to say that you knew that

13   Mr. Danchenko had known him for about 11 years at that

14   time, right?

15   A    Yes.

16   Q    But got to know him more personally in the last

17   couple of years, right?

18   A    Right.

19   Q    And he referenced that October 2016 conference,

20   right?

21   A    Yes.

22   Q    And he referenced that he lives in Moscow, right?

23   A    Right.

24   Q    And tell the ladies and gentlemen of the jury who

25   Vladimir Putin is.
```

1  A      Who Vladimir Putin is?

2  Q      Yeah.

3  A      He is the president of Russia.

4  Q      And do you know who his press secretary was?

5  A      Yes.

6  Q      Okay.  And who was his press secretary?

7  A      Dmitry Peskov.

8  Q      Okay.  And are you aware that Mr. Danchenko in

9  June, despite what Ms. Shaw asked you and despite what

10 you told her, actually described that Mr. Dolan knew

11 the press secretary of Vladimir Putin?  Right?

12 A      According to this document, yes.

13 Q      Yeah.  And it came from Mr. Danchenko, right?

14 A      Yes.

15 Q      Okay.  And so you said that if you knew there was

16 a connection back in June of Mr. Peskov and Mr. Dolan,

17 that would be significant, right?

18 A      Yes.

19 Q      And you knew it in June, right?

20 A      Yes.

21 Q      And when you testified, you weren't trying to lie;

22 were you?

23 A      I was absolutely not trying to lie.

24 Q      You weren't trying to lie, no.

25         But you know that that trip to Cyprus where you

1  met with Galkina was actually set up by Mr. Danchenko;

2  he helped broker that meeting, right?

3  A      He did.

4  Q      Okay.  And he knew that you were going to talk

5  about the topics that he covered with Agent Helson and

6  that you'd be talking about those, right?

7             MS. SHAW:  Objection, Your Honor.  There's no

8  basis for him to be talking about what Mr. Danchenko

9  knew what she was going to be doing in Cyprus.

10             THE COURT:  Restate the question.

11 BY MR. ONORATO:

12 Q      The FBI, with knowledge of the relationship

13 between Dolan and Galkina, asked Mr. Danchenko to help

14 arrange a meeting so those topics could be explored,

15 right?

16 A      Yes.

17             MR. ONORATO:  Okay.  The Court's indulgence

18 for one moment.

19 BY MR. ONORATO:

20 Q      You would agree with me that when you tried to

21 open this case, you know -- and I don't know what you

22 call it in the EC about Mr. Dolan -- that a lot of the

23 information came as a result of your meeting that he

24 brokered with Ms. Galkina, right?

25 A      Some of it did.

1    Q    Right.  But for him making that introduction, you

2    wouldn't have gotten that information, right, because

3    Galkina wouldn't have met with you, right?

4    A    For some of it.

5    Q    I'm talking about the Galkina portion of it.

6    A    Yes, that would be accurate.

7    Q    And you know that Mr. Danchenko also provided

8    other information that you used to put into that

9    report, correct?

10   A    Honestly, I would need to look at the report again

11   to determine exactly where everything came from --

12   Q    Sure.

13   A    -- but that would make sense.

14   Q    Right.  It would make sense that the information

15   that's in Defense Exhibit 103 would have been part of

16   the intelligence that you put into that report?

17   A    Yes, it's possible.

18   Q    Okay.  And I just want to ask one final question

19   because I think you talked about Russian

20   misinformation.  Correct?

21   A    Correct.

22   Q    Do you think it could be Russian misinformation

23   that Corey Lewandowski hated Paul Manafort back in July

24   of 2016?

25   A    I honestly don't remember that specific

 1  allegation.  Anything could be Russian misinformation.

 2  Q    Sure.

 3  A    It's possible.

 4  Q    But I'm asking you.  If you heard from me, "Corey

 5  Lewandowski hates Paul Manafort," would you then run

 6  and open up an espionage investigation based on that

 7  fact?

 8  A    No.

 9           MR. ONORATO:  Okay.  I have no further

10  questions.

11           THE COURT:  Any redirect?

12           MS. SHAW:  Briefly, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MS. SHAW:

15  Q    So defense counsel was asking about Defendant's

16  Exhibit 103.  Did you prepare this document?

17  A    I did not.

18  Q    Did you attend this interview?

19  A    I did not.

20  Q    With respect to this document, does it say

21  anything in here about Mr. Dolan being a possible

22  source of information --

23  A    It does not.

24  Q    -- to the dossier?

25  A    No.

1  Q    And in terms of -- he asked you about Mr. Manafort

2  and Lewandowski.  With respect to knowing whether

3  someone passed false information that contained

4  allegations -- not the Lewandowski part but somebody

5  made up that they were an insider or had inside

6  information, in the course of looking at Russian

7  interference, as you did in the Special Counsel's

8  investigation, would that have been important to you?

9  A    Yes.

10            MS. SHAW:  I have nothing further.

11            THE COURT:  All right.  Thank you.

12            Special Agent, you're excused.  Do not

13  discuss your testimony outside of the courtroom with

14  any other witness.

15       (The witness stands aside.)

16            THE COURT:  The government will call its next

17  witness.

18            MR. DURHAM:  Supervisory Special Agent James,

19  Your Honor.

20            THE COURT:  All right.  Special Agent James

21  will come forward.

22            MR. DURHAM:  Your Honor, could I just ask the

23  court security officer to provide these documents?

24            THE COURT:  Yes.

25            MR. DURHAM:  Thank you, sir.

```
 1              THE COURT SECURITY OFFICER:  Yes, sir.
 2           RYAN JAMES, PLAINTIFF'S WITNESS, AFFIRMED
 3                      DIRECT EXAMINATION
 4  BY MR. DURHAM:
 5  Q    Sir, would you state your name for the record and
 6  spell your last name.
 7  A    Sure.  Ryan James, J-A-M-E-S.
 8  Q    And, sir, how are you employed?
 9  A    I'm a special agent with the FBI.
10  Q    And how long have you been a special agent with
11  the FBI?
12  A    Since August of 2009.
13  Q    Will you go backwards a little bit.  Would you
14  describe or explain to the jurors what your basic
15  educational background is.
16  A    Sure.  I have a Bachelor of Science in finance,
17  and then I have a master's in business administration.
18  Q    And after you graduated from college and had your
19  degrees, what, if anything, did you do?
20  A    Sure.  I worked at an investment firm in Chicago
21  and then became a police officer and then to the FBI
22  Academy.
23  Q    When was it that you first went to the academy?
24  A    It was in the summer of 2009.
25  Q    And what did you do at the academy?  What was the
```

999

1    training that you went through?

2    A    It's the basic FBI agent training where we learn

3    law, FBI procedure, defensive tactics, firearms, kind

4    of how to manage an investigative case, the FBI

5    internal systems, to case manage a case, that type of

6    thing.

7    Q    When you finished up at the Quantico Training

8    Academy, you would then be a first office agent as it's

9    sometimes referred to?

10   A    Yes.

11   Q    And what's a first office agent?

12   A    So that's the term that you get when you graduate

13   the academy, and it's the first office you're assigned

14   to.

15   Q    And where were you first assigned?

16   A    New Haven, Connecticut.

17   Q    And how long were you in New Haven, Connecticut?

18   A    So I was there from late '09 to September of 2018.

19   Q    And then in September of 2018, where did your

20   assignment bring you?

21   A    I became a supervisory special agent in the

22   Jackson, Mississippi, field office.

23   Q    And with respect to your role as a supervisory

24   special agent in Jackson, do you have a particular

25   portfolio or area that you're responsible for

1   supervising?

2   A     Yes.

3   Q     And what is that?

4   A     So currently I supervise a squad of agents that

5   investigate public corruption and civil rights

6   violations.

7   Q     Would you tell the ladies and gentlemen of the

8   jury whether or not you had taken any additional

9   assignments here in the Washington area, first at the

10  Hoover Building headquarters?

11  A     Yes.

12  Q     And what, if any, assignment did you receive

13  there?

14  A     So in February 2021, I was assigned to the

15  Inspection Division of the FBI.

16  Q     And what were you doing in the Inspection

17  Division?

18  A     In the Inspection Division, the role that I had is

19  that we did audits of field offices and investigations

20  that were conducted from those particular field

21  offices.  And if there is an agent involved shooting,

22  we look at those matters as well.

23  Q     And did you complete that assignment?

24  A     Not fully, no.

25  Q     And why not?

1  A    I mean, about May of 2021 I started working on

2  this investigation.

3  Q    In that regard, sir, would you tell the ladies and

4  gentlemen of the jury whether or not you, yourself,

5  have had occasion to get involved in some of the

6  underlying records relating to these matters?

7  A    Yes, I have.

8  Q    Now, the jury has heard testimony -- a reference

9  has been made to certain Amtrak records.  Do you recall

10 that?

11 A    Yes.

12 Q    In connection with the Amtrak records, do you

13 know, sir, whether or not those were retrieved in the

14 first instance by folks working on the investigation

15 you're now assigned to?

16 A    Yes.

17 Q    So anything that the jury has seen came from

18 efforts by you and your colleagues?

19 A    Correct.

20 Q    With respect to other matters, telephone records,

21 for example, do you recall, sir, whether or not toll

22 records and the like were retrieved in connection with

23 this investigation?

24 A    Yes, they were.

25 Q    And how were those retrieved?

1  A    By legal process, subpoena, search warrants,

2  similar type ways.

3  Q    With respect to those documents, tell the ladies

4  and gentlemen of the jury whether you personally have

5  been involved in sorting through those records.

6  A    Yes, I have.

7  Q    Travel records, the travel records relating to

8  Sergei Millian was brought to the jury's attention.

9  Who obtained those records?

10  A    Our team did.

11  Q    To your knowledge, had anybody gotten those

12  before?

13  A    No.

14  Q    The jury has heard testimony relating to a number

15  of telephone numbers involved with a fellow by the name

16  of Sergei Millian.  Would you tell the jury, sir,

17  whether or not you have any knowledge about records and

18  information being retrieved concerning Sergei Millian.

19  A    Our team requested legal process on some of his

20  numbers that we've identified that belong to him.

21  Q    When you say legal process, just so the jurors

22  have an understanding of that, what kind of legal

23  process would typically be involved in getting those

24  records?

25  A    In this particular case, subpoenas.

1  Q    All right.  And in addition to subpoenas, do you

2  know if Facebook records and the like were retrieved

3  using the leal process?

4  A    Yes.

5  Q    And what kind of legal process was used to obtain

6  those records?

7  A    Those would be via search warrants.

8  Q    And as to those records that were obtained either

9  by way of subpoena or by way of search warrants, did

10 you have any personal participation and understanding

11 of those records?

12 A    Yes.

13 Q    And would you -- how would you characterize your

14 familiarity with the travel records, the phone records,

15 and the like?

16 A    I'm familiar with the records and the contents of

17 them.

18 Q    And how about with respect to Facebook records

19 that were retrieved?

20 A    The same.  I'm familiar with the contents and the

21 returns that we've gotten from those search warrants.

22 Q    All right.  So, for example, if we were to pull up

23 Government's Exhibit 607 --

24         MR. DURHAM:  I'll ask Ms. Arsenault, with the

25 Court's permission, to do that.  I think 607 would be

1004

1  in the Court's binder.  So 607 is a full exhibit in

2  this case that the jury has seen.  So I would like to

3  bring it up, Your Honor.

4            THE COURT:  Yes.  Is it in evidence?

5            MR. DURHAM:  It is in evidence.

6            THE COURT:  All right.

7  BY MR. DURHAM:

8  Q    607, how was that recovered or obtained?

9       (Counsel confer.)

10           THE COURT:  We don't have 607.

11           MR. ONORATO:  It is a defense exhibit.

12           THE COURT:  Which defense exhibit?

13           MR. ONORATO:  Exhibit 426.  So we should

14  probably pull up 426 since that's the one that was

15  admitted.

16           MR. DURHAM:  Well, then we would move 607

17  since this witness is familiar with 607.

18           MR. ONORATO:  It's the same document.  So we

19  moved it in our case, but we have no objection to the

20  jury seeing it twice.  It's just a document.

21           THE COURT:  All right.  Government's

22  Exhibit 607 is in.

23           MR. DURHAM:  If you could, just pull that up,

24  please, Ms. Arsenault.

25

1 BY MR. DURHAM:

2 Q    Looking at 607, which the jury has previously

3 seen, how was that obtained?

4 A    So that would be obtained through Facebook through

5 a search warrant.

6 Q    And were there other Facebook records that were

7 obtained as well?  I mean, it wasn't just this

8 document, correct?

9 A    Correct.

10 Q    Now, let me start, if I might then.  With regard

11 to the records in this matter, you've told the jurors

12 that among those records that you obtained were travel

13 records for Sergei Millian, correct?

14 A    Yes.

15 Q    And with respect to Millian's travel records, how

16 would you describe them?  Were they plentiful or there

17 was one or two?  What's your best recollection as to

18 Millian's travel records?

19 A    I would say he frequently comes in and out of this

20 country.

21 Q    Based on your review of all the travel records,

22 has he been in the country anytime recently?

23 A    No.

24 Q    I'm going to ask you to take a look at

25 Government's Exhibit 1400.

1   (Counsel confer.)

2   MR. DURHAM:  Looking at 1400, I think counsel

3   and I are in agreement that this is our exhibit number.

4   BY MR. DURHAM:

5   Q   Looking at Government's Exhibit 1400, is that a

6   record that you retrieved?

7   A   Yes.

8   Q   And just for the understanding of the jurors, with

9   respect to the information that's contained in 1400,

10  which I will ask about in more detail shortly, is that

11  just a portion of all the records you obtained relating

12  to Millian's travel?

13  A   Yes.

14  Q   And as to telephone records, would you indicate to

15  the ladies and gentlemen of the jury what telephone

16  records -- specific telephone records that you obtained

17  relating to Mr. Millian.

18  A   We obtained all the records possible for the phone

19  numbers that we had identified for Mr. Millian.

20  Q   All right.  With regard to those records, did you,

21  yourself, personally do something with the records?

22  A   Yes.

23  Q   And what was it that you did?

24  A   So based off of the returns that we got from the

25  subpoena, we -- and I compiled a summary chart of what

1  we believe is relevant information from the phone

2  records into an Excel spreadsheet.

3  Q    Now, the jury has heard testimony in this case

4  that on a particular date -- and specifically July 21

5  of 2016 -- there was an email that was sent by

6  Mr. Danchenko to the Millian Group.  Do you recall that

7  testimony?

8  A    Yes.

9  Q    And you are familiar with that underlying email,

10 correct?

11 A    Yes.

12 Q    Would you tell the ladies and gentlemen of the

13 jury whether you learned, during the course of your

14 participation in this investigation, that the

15 defendant, Mr. Danchenko, had told FBI personnel that

16 he had gotten an anonymous call from a particular

17 person after he had sent that email and another

18 occasion after he had sent a second email?  Are you

19 familiar with that?

20 A    I'm familiar with that, yes.

21 Q    Do you recall, sir, when it was that Mr. Danchenko

22 said that he had received this purported call from an

23 anonymous caller?

24 A    Yes.

25 Q    When was that?

1  A      Late July of 2016.

2  Q      Armed with that information, that the initial

3  email was sent on July 21 of 2016, and then he had told

4  the FBI he had received this anonymous phone call in

5  late July, what, if anything, did you do with respect

6  to Mr. Millian's telephone numbers and his tolls?

7  A      So what we did is we took the defendant's toll

8  records and compared from July 20 -- and on this chart

9  to about August 30 -- and looked at the defendant's

10 phone records and compared if there were any numbers

11 that were on the defendant's phone records that we had

12 identified from Mr. Millian.

13 Q      All right.  Now, let me take one step back and put

14 this in chronology.  Do you recall, sir, with respect

15 to the Millian telephone records, how many separate

16 lines had been subpoenaed for his toll records?

17 A      Three.

18 Q      And which numbers were those?

19 A      So I don't have them committed to memory, but I'll

20 do the prefix.  There's a 404 number which the

21 defendant had and gave to Mr. Helson.  There's a 212

22 number, and there's a 917 number.

23 Q      Why were those the three numbers that were

24 initially reviewed?

25 A      Because two out of the three were known to us at

1 the time, and they're from the same carrier, which was

2 Verizon.

3 Q    So it's clear to the jurors, with respect to the

4 404 number, is this a hard line phone or a cellular

5 phone?

6 A    A cell phone.

7 Q    And the area code 404 and so forth, what were you

8 able to determine as to that area code?

9 A    I believe that is in Atlanta.

10 Q    And then 212 was another number?

11 A    Yes.

12 Q    Okay.  And with respect to that phone, is that a

13 phone that was active in the summer of 2016?

14 A    Yes.

15 Q    And did you review those toll records?

16 A    Yes.

17 Q    You said there was a 917 area code, correct?

18 A    Correct.

19 Q    What were you able to determine as to that

20 telephone number?

21 A    It appeared that that number was assigned to an

22 iPad.

23 Q    Okay.  And did you look at whatever records were

24 available by way of subpoena or search warrant there?

25 A    Yes.

1    Q    And when you did that review, looked at those

2    records, was that the end of your inquiry?

3    A    No.

4    Q    As a result of your individual efforts, do you

5    know, sir, or can you tell the jury whether or not you

6    looked for any additional telephone numbers that were

7    associated in any way with Mr. Millian directly?

8    A    Yes.

9    Q    And what did you do?  Explain to the jurors what

10   you, yourself, did in trying to examine that question.

11   A    So the jury has heard a lot about FBI databases.

12   So what I did is I searched our vast FBI databases for

13   any other phone numbers at any point in time that we,

14   the FBI, had associated with Mr. Millian.  And once

15   those numbers were identified, I compared those, again,

16   to the defendant's toll records.

17   Q    Again, so it's clear, did you do that yourself?

18   A    Yes.

19   Q    You were assisted by others, but was that your

20   work?

21   A    Yes, I did that.

22   Q    Now, I want to then start with the following:

23   Assuming that the email that the jury has seen is

24   accurate is the date -- that's July 21 of 2016,

25   correct?

```
 1  A    Yes.
 2           MR. DURHAM:  I want to ask that Government's
 3  Exhibit 1400, which I believe is in evidence already,
 4  Your Honor, be pulled up.
 5           THE COURT:  Yes, you may.
 6  BY MR. DURHAM:
 7  Q    Now, looking at that document, explain to the
 8  jurors what the information shows -- well, withdrawn.
 9       Let me ask first:  What's a TECS record?
10  A    It's a record that shows an individual's entry and
11  exit out of the country.
12  Q    All right.  So when any of us come in and out of
13  the United States, there's a record that's generated,
14  correct?
15  A    Yes.
16  Q    And as to Government's Exhibit 1400, would this be
17  a portion of all the records that you reviewed in
18  connection with Mr. Millian's travel?
19  A    Yes.
20  Q    And is there a particular reason why these entries
21  on Government's Exhibit 1400 were prepared by you?
22  A    Yes.
23  Q    And why was that?
24  A    Because that's right near the date of the July 21
25  email that's been referenced here.
```

1012

1   Q    So in this regard, can you tell from these records

2   whether or not Sergei Millian was in the United States

3   on July 21, 2016?

4   A    I can tell, yes.

5   Q    And was he or was he not in the country?

6   A    He was not.

7   Q    And how do you know that from this record?

8   A    So if you look at the top column, you see Sergei

9   Millian's name.  And if you go to maybe three boxes to

10  the right, you'll see the date and time in Eastern.  It

11  says 7/14/16.  And then if you kind of go over maybe

12  four or five more boxes, it will say status, on board.

13  And if you go over two more boxes, you will see the

14  depart location and arrival location.  And the depart

15  location says JFK.  So that would be JFK Airport in New

16  York.  And that ICN is the arrive location.  I believe

17  that's a Korean airport.

18  Q    Okay.  The ICN is the international code for South

19  Korea?

20  A    Yes.

21  Q    All right.  So according to these official

22  records, he left the country, then, on July 14 at

23  basically midnight, 00:00, right?

24  A    Yes.

25  Q    And then with regard to the date of July 21, 2016,

1  and then to later in the month, do these records

2  reflect how long he was out of the country at that

3  time?

4  A     Yes.

5  Q     And when -- well, walk the jurors through that

6  record.

7  A     So following the same pattern, if you go to the

8  second kind of box down -- and under the date and time,

9  you will see the 7/27/2016 entry.  And then, again,

10 going over about five or six boxes, you will see the

11 status, on board.  And then two more over, you see that

12 the departure location is -- that BKK is Bangkok, and

13 he arrives to the JFK Airport the 27th.

14 Q     All right.  So he arrives on July 27, 2016, at

15 21:47 hours, correct?

16 A     Yes.

17 Q     And in nonmilitary time, that would be what time

18 p.m.?

19 A     9:47.

20 Q     At 9:47 p.m., he comes back into the country on

21 the 22nd of July, correct?

22 A     Yes.

23 Q     Now, you indicated that you had obtained some

24 other records relating to Mr. Millian.  The jury has

25 heard testimony relating to a 404 number associated

1014

1   with Mr. Millian, correct?

2   A    Yes.

3   Q    Did you make it your business to go about trying

4   to retrieve any pertinent records relating to that 404

5   number?

6   A    Yes.

7   Q    And tell the jurors what was done in that regard.

8   A    So once we had that number associated with

9   Mr. Millian, we subpoenaed that particular cell phone

10  company for records that they had available.

11  Q    All right.  I would ask you to look at your

12  booklet at what is premarked as Government's

13  Exhibit 503 for identification.

14       Do you have that in front of you?

15  A    Yes.

16  Q    And what is 503 for identification?

17  A    It's part of the subpoena return from Verizon.

18  Q    And what does that portion of the return relate

19  to?

20  A    A particular phone number, the 404 number, for

21  Mr. Millian.

22  Q    And is there any information relevant to the time

23  frame that we're talking about --

24  A    Yes.

25  Q    -- July 2016 in there?

1  A    Yes.

2  Q    So he's out of the country, as you say, from the

3  14th.  He comes back at 9:47 on the 27th.  As to 503,

4  does that reflect the status of Mr. Millian's 404

5  number at any overlapping time?

6  A    It does.

7           MR. DURHAM:  We would move 503 as a full

8  exhibit, Your Honor.

9           THE COURT:  Any objection?

10          MR. SEARS:  No objection.

11          THE COURT:  Without objection, Government

12 Exhibit 503 is admitted.

13 BY MR. DURHAM:

14 Q    Explain to the jurors, if you would, sir,

15 generally speaking, what is the information that's

16 contained in Government Exhibit 503?

17 A    So this multipage document categorizes as notes,

18 and it gives you information on the status of a

19 particular phone number or account.

20 Q    Does it do that chronologically?

21 A    Yes.

22 Q    All right.  So turning to the last page of that

23 record, there are certain portions that are

24 highlighted, correct?

25 A    Yes.

1   Q     Who caused those to be highlighted?

2   A     Our team did.  We did.

3   Q     And why was it that those particular entries were

4   highlighted?

5   A     Because that, again, July and August 2016 time

6   frame is relevant to our investigation here.

7   Q     And looking at the very bottom entry, what was

8   there about that particular entry that was of

9   investigative interest?

10  A     The entry here indicates that the 404 number was

11  suspended on July 14, 2016.

12  Q     And what's the date that Mr. Millian left the

13  country?

14  A     On that same date.

15  Q     And then there's a second entry highlighted,

16  correct?

17  A     Yes.

18  Q     And why was that of import to you?

19  A     That indicates that that 404 number was

20  reconnected on August 8.

21  Q     So would it be a fair statement, at least

22  according to the records, that Millian's 404 number,

23  which the defendant had, was not in operation between

24  July 14, 2016, until it's reconnected on August 8?

25  A     Yes.

1  Q    Now, I want to ask you separate and apart from the

2  Millian numbers, which I'll come back to, the jury has

3  heard testimony relating to a Charles Dolan.  Do you

4  recall that?

5  A    Yes.

6  Q    Now, did you, to the best of your knowledge and

7  recollection, have occasion to look at any records,

8  telephone records, toll records relating to Mr. Dolan

9  and Mr. Danchenko being in touch?

10  A    Yes.

11  Q    On the phone?

12  A    Yes.

13  Q    And in that connection, I'm going to ask you to

14  look in the binder at Government's Exhibit 1604, 1604

15  for identification.

16  A    Yes.

17  Q    Do you recognize what's contained in 1604?

18  A    Yes.

19  Q    And what is 1604?

20  A    So this is a chart that I helped prepare that

21  summarizes communication between Mr. Dolan's cell phone

22  and Mr. Danchenko's cell phone.

23  Q    And from what period of time -- what period of

24  time is covered in this particular summary?

25  A    This summary chart starts in March of 2016 and

1  ends January 2017.

2  Q    Would you tell the ladies and gentlemen of the

3  jury first:  Why did you begin with the date of

4  March 8, 2016?

5  A    You know, again, a relevant time period for our

6  investigation.

7  Q    And why is it ended at January 11, 2017?

8  A    This was the last communication between the two

9  based on our records.

10         MR. DURHAM:  We would move 1604 as a full

11  exhibit, Your Honor.

12         THE COURT:  Any objection?

13         MR. SEARS:  No objection.

14         THE COURT:  Exhibit 1604 is admitted.

15  BY MR. DURHAM:

16  Q    Now, looking at Government's Exhibit 1604, again,

17  why don't you just for the benefit of the jurors

18  describe how you prepared this summary chart.

19  A    This was, again, prepared based off of the records

20  from Mr. Dolan's cell phone account.  And it, again,

21  summarizes the ingoing and outgoing calls between

22  Mr. Danchenko and Mr. Dolan.

23  Q    And so you -- then looking at this information

24  contained on Government's Exhibit 1604, there's a

25  particular column that describes the date and another

1   for the time, the duration, and the like, correct?

2   A    Yes.

3   Q    These times are in Eastern Standard Time?

4   A    Correct.

5   Q    Would you tell the ladies and gentlemen of the

6   jury:  When the records are actually received, do they

7   come in Eastern Standard Time or in some other fashion?

8   A    It varies by carrier.  I think these were in

9   Greenwich Mean Time.  So we have to convert them.

10  Q    Explain to the jurors how you convert from

11  Greenwich Mean Time to Eastern Standard Time.

12  A    So the best way to do this is there's a variety of

13  open source websites that allows you to punch in times

14  and dates, and it will automatically convert the time

15  back or front for you.

16  Q    Okay.  And in that connection, did you, yourself,

17  however, manually ensure that the conversion was

18  correct?

19  A    Yes.  Yes.

20  Q    So looking then at Government's Exhibit 1604,

21  what, if any -- well, withdrawn.

22       Does this contain only some or all of the

23  exchanges between the Dolan number and the Danchenko

24  number for the period of time reflected?

25  A    I believe the total from March to January.

1   Q     Okay.  And then you had told the jurors that you

2   ended the chart, and the last entry -- what's the date

3   of the last entry?

4   A     January 11, 2017.

5   Q     And as to that phone call, who placed the call;

6   that is, who was calling who?

7   A     It's an outgoing call from Charles Dolan to

8   Mr. Danchenko.

9   Q     On the 11th.  And does it tell you what time it

10  was?

11  A     Yes.

12  Q     And what time was the call placed?

13  A     It's at 9:45 in the morning -- 9:47 in the

14  morning.  Excuse me.

15  Q     And then what was the duration of that call?

16  A     Four minutes and five seconds.

17  Q     And you had told the jurors that after that, based

18  on your examination of all the toll records, there are

19  no additional calls from Dolan to Mr. Danchenko or

20  Mr. Danchenko to Mr. Dolan, correct?

21  A     That's correct in our holdings, yes.

22  Q     Now, that last date that's on the chart, 1604, of

23  January 11, 2017, was there any significance to that

24  date to the best of your recollection?

25  A     Yes.

1  Q    What was significant about January 11 of 2017?

2  A    I believe the day before, on January 10 of 2017,

3  BuzzFeed produced the article that contained the Steele

4  dossiers.

5  Q    And with respect to then the next morning, the

6  jury heard testimony that Dolan called Mr. Danchenko to

7  inquire about this, that record reflects that such a

8  call was placed?

9  A    Yes.

10  Q    And it lasted for a little bit over four minutes?

11  A    Yes.

12  Q    Now, you have told the jurors that you had also

13  made it part of your effort to retrieve information

14  from Facebook, correct?

15  A    Yes.

16  Q    The jury has seen a couple of times now what is

17  Government's 1604 or the defense's corresponding

18  number.  But this is the Facebook entry showing

19  giraffes, correct?

20  A    Yes.

21          MR. DURHAM:  I would just ask that 607 be

22  pulled up so I can ask time and date questions.

23  BY MR. DURHAM:

24  Q    Okay.  Now looking at 607, who is the author of

25  this particular Facebook record?

1    A     Igor Danchenko.

2    Q     And when was it sent?

3    A     That's July 28, 2016.

4    Q     And what was the time?

5    A     So this record reflects 20:23 UTC time.

6    Q     Now, in July of 2016, how did UTC time convert to

7    Eastern Standard Time or east coast time?

8    A     You would have to subtract four hours from this

9    record to get the Eastern Time.

10   Q     So if we're looking at what time it was in New

11   York on July 28, 2016, that this was sent, what time

12   would it be?

13   A     4:23:45.

14   Q     So 4:23 in the afternoon, correct?

15   A     Yes.

16   Q     And this is a particular Facebook entry that talks

17   about spending the day at the zoo, the message from L,

18   another meeting tonight, and so forth, correct?

19   A     Yes.

20   Q     Now, that was admitted early in the trial, but I

21   want to show you what has not yet been marked as a full

22   exhibit, Government's Exhibit 618 for identification.

23   Look in your book, if you would, sir, at 618.

24   A     Yes.

25   Q     And as to 618, do you recognize that document?

1  A    Yes.

2  Q    And how do you recognize that document?

3  A    It's part of the Facebook return that we got from

4  Facebook for our search warrant.

5  Q    And as to 618 for identification, to the best of

6  your knowledge, is that a business record of Facebook

7  that was obtained pursuant to legal process by you and

8  your colleagues?

9  A    Yes.

10        MR. DURHAM:  We would offer Government's

11 Exhibit 618 as a full exhibit.  It would indicate there

12 were some redactions that have been made by agreement

13 of counsel.

14        THE COURT:  All right.  Any objection?

15        MR. SEARS:  No, Your Honor.

16        THE COURT:  Without objection, 618 is

17 admitted.

18 BY MR. DURHAM:

19 Q    Okay.  Now looking at 618 --

20        MR. DURHAM:  I'm going to ask that

21 Ms. Arsenault just bring the top part of the document

22 up, and then we can scroll down through it.

23 BY MR. DURHAM:

24 Q    So the jurors obviously can see this.  For

25 purposes of the written record, what is it that is

1   reflected in Government's Exhibit 618?

2   A    So this is the portion of the Facebook business

3   record that corresponds to the Facebook story page

4   where you could post kind of your time line on what

5   you're doing for a particular day.

6   Q    All right.  Are you familiar with Facebook and the

7   storyline?

8   A    I don't have Facebook.

9   Q    With respect to what is occurring here on

10  Government's Exhibit 618, that is what's being

11  reflected.  What are those?  Are those -- do you know

12  what those are?

13  A    These are -- to the best of my understanding,

14  these are entries that Mr. Danchenko is posting himself

15  to his Facebook page about these particular locations.

16  Q    And the date involved is what?

17  A    This first one on the screen is July 27, 2016.

18  Q    All right.  And so then events are occurring.

19  They are being posted on July 27 of 2016, correct?

20  A    Yes.

21  Q    And then does it continue into the next day?

22  A    Yes.

23  Q    And that would be, obviously, July 28 of 2016,

24  correct?

25  A    Yes.

1  Q    And with respect to what's being posted or

2  reflected there, there is an entry at the bottom of the

3  page, right, at 22:40:43 hours?

4  A    Yes.

5  Q    And just so the record is clear, what's the date?

6  A    This is July 28, 2016.

7  Q    And what is the time?

8  A    It's 22:40 UTC time.  So you have to subtract four

9  hours from that to Eastern Time.

10 Q    So what time would that be Eastern Standard or

11 east coast time?

12 A    6:40.

13 Q    6:40 p.m.?

14 A    Yes.

15 Q    Can you read into the record where it is that the

16 posting reflects where Mr. Danchenko was at that time?

17 A    Igor Danchenko is at Umpire Rock.

18 Q    And do you know where Umpire Rock is?

19 A    I know it's a location in New York City.

20 Q    Okay.  And what is the message that is posted at

21 6:40 p.m. on July 28 of 2016?

22 A    It says exhausted, fever, worked on, light rain

23 redacted, has secret energy reserves, three more hours

24 to the train, hope I won't pass out.

25 Q    With respect to this entry at 6:40 p.m -- so the

1  first entry -- I'm sorry -- the 607, the picture of the

2  park, is 4:23 p.m., correct?

3  A    Yes.

4  Q    And it talks about what it talks about, including

5  another meeting tonight, correct?

6  A    Correct.

7  Q    And by 6:40 p.m., Mr. Danchenko is on Facebook

8  record, reflects exhausted, fever, work done, correct?

9  A    Correct.

10 Q    Now, did you see here any reference to any meeting

11 where somebody didn't show up?

12 A    No.

13 Q    Is there any other Facebook entry that you had

14 seen reviewed or what have you for July 28 anytime

15 during the day where Mr. Danchenko posted that somebody

16 didn't show up at a meeting?

17 A    No.

18 Q    Or anytime thereafter where he had posted in July

19 of 2016 that somebody didn't show up at a meeting?

20 A    No.

21 Q    But he does say his work was done at 6:40 on that

22 day?

23 A    Correct.

24 Q    With respect to Umpire Walk, do you know if that's

25 in Central Park in the city?

1   A      I'm going to have to take your word for it.

2   Q      Okay.  You don't know that.  So don't take my word

3   for it.  But you don't know that?

4   A      No.

5   Q      Okay.  Now, you've told the jury that you had also

6   undertaken an effort to try to assemble telephone

7   records relating to Mr. Danchenko's phone and then

8   anything associated with Sergei Millian; is that a fair

9   statement?

10  A      Yes.

11  Q      I want you to take a look at what are going to be

12  marked as 1603 -- is marked as 1603 for identification

13  now.

14      Tell the jury whether or not you recognize the

15  information that's contained in Government's

16  Exhibit 1603 for identification.

17  A      I do.

18  Q      And how do you recognize the information on 1603?

19  A      It's a chart that I helped prepare.

20  Q      All right.  When you say you helped prepare it,

21  who is the final person who ensured the accuracy of the

22  information contained in it?

23  A      Me.

24  Q      Okay.  And as relates to 1603, sir, does it cover

25  a particular period of time?

1  A    Yes.

2  Q    What's the period of time?

3  A    So this is July 20, 2016, through August 30, 2016.

4  Q    And to the best of your knowledge and ability, are

5  all of the numbers and subscribers and the like that

6  are contained in this chart taken from a larger volume

7  of records that you reviewed in order to prepare it?

8  A    Yes.

9  Q    And as to these entries, do these reflect any and

10  all incoming calls to Mr. Danchenko's telephone number

11  for the period of July 20, 2016, through the end of

12  August of 2016?

13  A    Yes.

14  Q    And why did you pick that time frame?

15  A    July 20 was the day before the initial email to

16  Mr. Millian, and we continued it through August because

17  August was the month of the August 18 email, the second

18  email to Mr. Millian.

19  Q    Okay.  The second email was the 18th, and it

20  continued to the end of the month?

21  A    Correct.

22          MR. DURHAM:  We would move 1603 as a full

23  exhibit, Your Honor.

24          THE COURT:  Any objection?

25          MR. SEARS:  No, Your Honor.

1          THE COURT:  Exhibit 1603 is admitted.

2   BY MR. DURHAM:

3   Q    All right.  Now, looking at Government's

4   Exhibit 1603 --

5          MR. DURHAM:  I would ask Ms. Arsenault just

6   to blow up the top.

7          MS. SHAW:  Your Honor, could we approach for

8   one second?

9          THE COURT:  All right.

10      (Conference at the bench, as follows:)

11         MS. SHAW:  I apologize, Your Honor.  I

12  should've brought this to the Court sooner.  It didn't

13  dawn on me until I saw the exhibit go up on the screen.

14  There's a lot of other individual's phone numbers on

15  this exhibit.  I just have concerns about publishing

16  that to the jury.

17         MR. KEILTY:  Your Honor, they are being

18  redacted right now.

19         MR. ONORATO:  Judge, I am sure we probably

20  did the same thing.  We will go through before we

21  finally submit any evidence to the jury to make sure

22  everything is proper.  It's just an oversight.

23         THE COURT:  All right.  Good.

24      (Proceedings continued in open court, as follows:)

25         MR. DURHAM:  Your Honor, I'm in agreement

1  with counsel that we just don't want to reflect numbers

2  in the public record.  So we're just redacting those

3  out before we proceed.

4           THE COURT:  Yes.

5  BY MR. DURHAM:

6  Q    While that's being done, Special Agent James, let

7  me ask you some preliminary questions.  In putting

8  together the information that's reflected on this

9  chart, Government Exhibit 1603, what type of

10 information did you take into consideration?

11 A    So to compile the chart, we used open source

12 information to try to identify phone numbers.  We used

13 our returns that we got from different accounts to try

14 to identify phone numbers, again, mainly the

15 defendant's emails and social media accounts alike.

16 Q    So would it be a fair statement that with regard

17 to this chart, a lot of these numbers were identified

18 out of the defendant's Hotmail contacts?

19 A    Yes.

20 Q    And those had been retrieved by way of legal

21 process?

22 A    Yes.

23 Q    Do you know if prior to you and your colleagues

24 retrieving that information, if anybody had gone and

25 retrieved it?  Do you know?

1   A    I do know.  No, they didn't.

2   Q    Okay.  So you got this information from subpoenas,

3   part of the legal process, right?

4   A    Yes.

5   Q    That legal process produced the Hotmail account

6   contact list of Mr. Danchenko himself, correct?

7   A    Yes.

8   Q    And then you used open source information --

9   A    Yes.

10  Q    -- in assembling the data that's in 1603?

11  A    Yes.

12         MR. DURHAM:  So now pulling up 1603 with the

13  Court's permission?

14         THE COURT:  Yes.

15         MR. DURHAM:  And looking at this document, I

16  want to go -- why don't we go to, say, the top third,

17  Ms. Arsenault, so that we can enlarge it a bit.

18  BY MR. DURHAM:

19  Q    So walk the jurors through what they're currently

20  seeing in the various dates, telephone numbers, and how

21  it was that you were able to establish the information

22  contained in this chart.  Again, these are all incoming

23  numbers to the Danchenko number, right?

24  A    Yes.

25  Q    It doesn't have whoever he was calling; it's

1  numbers that came into Mr. Danchenko's telephone number

2  over the particular period of time?

3  A    Yes.

4  Q    All right.  So walk the jurors through.  The first

5  date, July 20, 2016, explain how you do that.

6  A    So, again, this information was gathered from the

7  subpoena returns from the defendant's cell phone

8  number, and we compiled this chart.  You can see the

9  columns starting at the top:  "On," "At" corresponding

10 to the time -- if there was a location, there would be

11 a location added there -- the "To/From" number which

12 has the last four redacted from the incoming caller,

13 and the "User" of that particular device, a

14 "Destination," meaning it's an incoming call, and then

15 the duration where it says "Mins."  That's the duration

16 of the call.  Then the "Source" column is how we, our

17 team, identified the particular user of the phone

18 that's making the incoming call.

19 Q    All right.  So on July 20 at 2016, at 12:55 p.m.,

20 there was an incoming call -- or there's a call coming

21 in from 904-399-6795, Telemarketer, etc., right?

22      (Counsel confer.)

23 Q    And that's open source information?

24 A    Yes.

25 Q    So anybody could go onto the Internet or whatever

1   and get that, correct?

2   A    Yes.

3   Q    And then let's do the second entry without making

4   the mistake I did where we've xed out some of the

5   numbers.  Tell us about the second number, July 22,

6   2016.

7   A    So that particular entry, again, is from the

8   defendant's billing records, and that particular phone

9   number, the 202-445-redacted, belonged to Charles

10  Dolan.  It was incoming, six minutes, and the source

11  for us to identify that caller was from Mr. Danchenko's

12  Hotmail contacts list.

13  Q    Which you had obtained through legal process?

14  A    Yes.

15  Q    All right.  And then the next two entries,

16  similarly, right, you've got the user for that number

17  and then how you got it.  Those are all from the

18  contact list, correct?

19  A    Yes.

20  Q    Including the 7/22/16 call at 7:32 from Olga

21  Galkina, which was an incoming call to Mr. Danchenko,

22  correct?

23  A    Yes.

24  Q    Now, if you skip down a little bit beyond that,

25  there's an open source call on July 25 at 10:40,

 1  correct -- I'm sorry, not 10:40, at 4:40?

 2  A    Yes.

 3  Q    And the particular number involved, again, open

 4  source?

 5  A    Yes.

 6  Q    Same thing, you can just -- anybody can go find

 7  that on the Internet?

 8  A    Yes.

 9  Q    I want to turn your attention, as you go through

10  this -- if you look at 7/29 --

11            MR. DURHAM:  And if Ms. Arsenault could, pull

12  that up.

13  BY MR. DURHAM:

14  Q    And this would be at 1:40 a.m.  There's a call

15  from 301-603-3471.  It says it's unavailable, correct?

16  A    Yes.

17  Q    Explain to the jurors that unavailable number.

18  What does that mean?  What effort did you undertake to

19  get that number?

20  A    So, again, if we couldn't find anything on

21  Mr. Danchenko's collective accounts that we either

22  subpoenaed or search warrant for that particular number

23  or we ran open source checks for that number or we

24  searched FBI databases for that number and if it all

25  kind of came up empty, we tried to identify the

1  provider for that particular account back in 2016.

2  Then we would try to subpoena that particular provider.

3      In this particular case, we couldn't really

4  identify a company that had that phone number back in

5  2016, and we identified where it currently sits as of

6  today, but not back in 2016.

7  Q    Was there a reason -- withdrawn.

8      As to that particular call, what was the duration

9  of the call?

10 A    One minute.

11 Q    What can you tell the jurors about how most of

12 these telephone companies or carriers treat phone calls

13 where it reflects one minute?

14          MR. SEARS:  Your Honor, I'm going to object.

15 That should come from a carrier, not from the agent.

16          THE COURT:  I'll let him answer if he knows

17 based on his experience.

18 A    So my experience, based on the records that I

19 looked at for Mr. Danchenko, these are bill reprints,

20 which means these are directly the calls that

21 Mr. Danchenko was charged for.  So if the call was 45

22 seconds or 4 seconds, they round up to the minute.  So

23 it's one minute.  That's why they're all rounded off.

24 Q    So with regard to this particular case, how long

25 did Mr. Danchenko say that the purported call from an

1   anonymous person lasted?

2   A      Fifteen minutes.

3   Q      And so that particular entry that I referred to as

4   being unavailable, that is at 7/29/2016, at 1:40 a.m.,

5   and that was at most a minute, correct?

6   A      Correct.

7   Q      And as you then look down the list, they're

8   scanned on the list.  There are calls that are coming

9   in from any number of people that the jury has heard

10  about, Christopher Steele and the like, correct?

11  A      Yes.

12  Q      And then you get down to a particular call on

13  August 2, 2016, at 7:24 p.m., a particular redacted

14  telephone number, the calling number, and it says

15  T-Mobile.  What does the T-Mobile reflect?

16  A      That's an indication that we subpoenaed T-Mobile

17  for that particular number and they had a subscriber

18  back in 2016 for that particular phone number.

19  Q      Okay.  And then, again, as you scan down, there

20  are a couple of other instances in which a number

21  wasn't available, right?  There's one on August 8,

22  2016, at 2:40 p.m., Inteliquent-Twilio, right?

23  A      Yes.

24  Q      What's the situation with that one?

25  A      The exact same that I described in the last

```
 1  unavailable number where we couldn't find the carrier
 2  back from 2016.
 3  Q    But the duration of that call was how long?
 4  A    One minute.
 5  Q    And then, again, scanning down, there's an entry
 6  on August 10 of 2016, at 8:10 p.m., from a particular
 7  telephone number where the user is unavailable.  But
 8  then it does say, T-Mobile records purged.  What can
 9  you tell the jurors about that entry?
10  A    So we were able to identify that that was a
11  T-Mobile number, but T-Mobile indicated to us that they
12  didn't have records on that particular number dating
13  back to 2016.
14  Q    What was the date -- I'm sorry.  What was the
15  duration of that call?
16  A    Two minutes.
17  Q    So that call had to be more than a minute, less
18  than two minutes?
19  A    Yes.
20  Q    Okay.  And then continuing down -- I think this is
21  maybe the last one -- on August 12, 2016, at
22  10:56 a.m., there was a particular incoming call where
23  simply there was no availability of any number, period,
24  right?
25  A    Yes.
```

1  Q    What's the very next entry?

2  A    An international number from a United Kingdom area

3  code -- country code.

4  Q    So on August 12, 2016, at 10:56 a.m., there's an

5  incoming call that lasts four minutes, correct?

6  A    Yes.

7  Q    And then immediately there's the same date at

8  11:00.  So four minutes later there's a 41-minute call,

9  international call coming in from the United Kingdom?

10  A    Correct.

11  Q    Beyond that, every one of these incoming calls are

12  accounted for based on your explanation to the jury how

13  you were able to identify it, correct?

14  A    Yes.

15  Q    Now, you told the jurors that among other things

16  that were subpoenaed were three telephone lines that

17  were active in 2016 for Millian, correct?

18  A    Yes.

19  Q    But I think you also told them that you had looked

20  for any other number that may have been in FBI

21  databases that would tie in some fashion to Millian,

22  correct?

23  A    Yes.

24  Q    And did you compare all of those numbers to any

25  calls going into Mr. Danchenko's telephone number?

1  A    Yes.

2  Q    And the jury saw a particular record that will be

3  in evidence reflecting the fact that Millian was

4  providing his new Moscow number.  Do you remember that?

5  It was a plus-45 telephone number?

6  A    Yes.

7  Q    Did you also check that number against any

8  incoming calls to Mr. Danchenko's telephone line?

9  A    Yes.

10  Q    And what can you tell the jurors about that?

11  A    We didn't identify any known numbers for Sergei

12  Millian making an incoming call to Mr. Danchenko.

13  Q    All right.  So in sum, with respect to

14  Government's Exhibit 1603, you examined every incoming

15  call during this time frame?

16  A    Yes.

17  Q    To his phone, correct?

18  A    Yes.

19  Q    You identified every incoming call, who the caller

20  subscriber was with the exceptions of the

21  unavailability, right?

22  A    Yes.

23  Q    Those unavailabilities were like minute calls.  I

24  think one was two minutes.  Correct?

25  A    Yes.

1   Q     Was there any incoming call to Mr. Danchenko's

2   telephone between July 20, 2016, and the end of August

3   of 2016 from a number in any way associated with Sergei

4   Millian?

5   A     No.

6   Q     Now, there's been testimony and records relating

7   to testimony -- and I think there's a record relating

8   to discussion or reference to apps.  Do you recall

9   that?

10  A     Yes.

11  Q     Now, perhaps the jury is all familiar with this,

12  but with respect to these apps, based on your training

13  and experience --

14        Let me just step out of that for a minute.  Just

15  so the jurors know, you, yourself, is this the first

16  time you've ever assembled this kind of data?

17  A     No.

18  Q     How long have you been doing this type of thing?

19  A     Since as long as I've been in the bureau.

20  Q     And so the task of sifting through these various

21  records is something you're very familiar with?

22  A     Yes.

23  Q     Okay.  Now, let me ask you about testimony or

24  references to apps.  In general, tell the jurors:  With

25  respect to these phone applications, what are they

1  designed to do?

2  A    So in general, the communication apps are used or

3  can be used to kind of hide or anonymize the

4  communication between two parties.

5  Q    Okay.  I think a number of witnesses during the

6  course of the trial have been asked, you know, how many

7  apps there are.  Tell the ladies and gentlemen of the

8  jury, based on your experience working at the FBI doing

9  this kind of thing, are there a few, or are there a lot

10  of apps out there?

11  A    There's a lot.  I mean dozens.

12  Q    In that connection, if I have an app on my cell

13  phone -- say I have whatever, that I have Wickr, which

14  I don't.  But if you had some app on your phone, can I

15  just call you and you'd get that phone call?

16  A    In order for App 1 to connect to App 2, the same

17  app on the phone, both parties usually need to have

18  that app active for that to work.

19  Q    All right.  Otherwise it just doesn't go through

20  in your experience?

21  A    Right.

22  Q    So with respect to your participation in this

23  investigation, you have seen the emails that

24  Mr. Danchenko had sent Mr. Millian's Millian Group,

25  correct?

1  A    Yes.

2  Q    Any reference to using apps?

3  A    No.

4  Q    Did you see any reference at all to Mr. Danchenko

5  requesting that Millian reach him on an app?

6  A    No.

7  Q    So you would have to know that -- even if you were

8  going to do that, you would have to know the respective

9  app, right?

10  A    Right.

11  Q    And in this connection, you don't know of any

12  instance -- any evidence where Mr. Danchenko requested

13  that Millian reach him on an app?

14  A    Correct.

15  Q    Do you know whether or not, however, the FBI folks

16  with Crossfire Hurricane had asked Mr. Danchenko to

17  produce any records relating to a call on his phone?

18  A    Yes.

19  Q    And was anything produced?

20  A    No.

21  Q    Were any app records produced of any kind by

22  Mr. Danchenko in response to requests for relevant

23  records?

24  A    Not regarding Sergei Millian.

25           MR. DURHAM:  Thank you, sir.

1043

1    I have no further questions, Your Honor.

2    THE COURT:  All right.  Ladies and gentlemen,

3  I think we'll take our luncheon recess at this time.

4  You're excused until 2:00.  Please do not discuss this

5  case among yourselves during the luncheon recess.

6    (The jury exits at 12:56 p.m.)

7    THE COURT:  How long do you think you'll be,

8  Mr. Onorato?

9    MR. ONORATO:  So Mr. Sears is going to --

10    THE COURT:  Mr. Sears, how long do you think

11  you'll be?

12    (Reporter clarification.)

13    MR. ONORATO:  There may be no questions

14  unless I talk him into questions.

15    THE COURT:  All right.  We'll stand in

16  recess.

17    ------------------------------------
                        Time:  12:56 p.m.
18

19

20

21

22    I certify that the foregoing is a true and

23   accurate transcription of my stenographic notes.

24
                                   /s/
25                    Rhonda F. Montgomery, CCR, RPR