415

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3  ----------------------------x.
                                :
 4  UNITED STATES OF AMERICA,   : Criminal Action No.
                                :
 5                  Plaintiff,  : 1:21-cr-245
                                :
 6           versus             : October 12, 2022
                                :
 7  IGOR Y. DANCHENKO,          :
                                : Volume 2 (PM Session)
 8              Defendant.  : Pages 415 - 581
    ----------------------------x

 9
                    TRANSCRIPT OF JURY TRIAL
10       BEFORE THE HONORABLE ANTHONY J. TRENGA
                  UNITED STATES DISTRICT JUDGE
11
                    A P P E A R A N C E S
12
    FOR THE GOVERNMENT:     DOJ-USAO
13                          JOHN DURHAM, AUSA
                            MICHAEL T. KEILTY, AUSA
14                          DEBORAH SHAW, AUSA
                            145 N Street, NE
15                          Suite 3e.803
                            Washington, D.C. 20002
16
    FOR THE DEFENDANT:      SCHERTLER ONORATO MEAD & SEARS,
17                          LLP

18                          STUART ALEXANDER SEARS, ESQ
                            555 13th Street, NW, Suite 500
19                          Washington, DC 20004

20                          DANNY ONORATO, ESQ. (DC-NA)
                            901 New York Avenue NW, Suite 500
21                          Washington, D.C. 20001

22

23
    OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
24                          United States District Court
                            401 Courthouse Square
25                          Fifth Floor
                            Alexandria, VA 22314
```

─United States v. Danchenko─

416

                    TABLE OF CONTENTS
1                    TRIAL WITNESSES

2

    On behalf of the Government:
3
    Brian Auten
4
            Cross-examination by Mr. Onorato.......... 429
5           Voir Dire by Mr. Durham................... 464
            Cross-examination by Mr. Onorato.......... 468
6           Redirect examination by Mr. Durham........ 524

7                         EXHIBITS

8   On behalf of the Government:
                                              Admitted
9
    Number 12........................................ 444
10  Number 112....................................... 552
    Number 403....................................... 468
11  Number 426....................................... 515
    Number 901....................................... 574
12  Number 1300...................................... 498
    Number 1400...................................... 513
13
    On behalf of the Defendant:
14                                            Admitted

15  Number 26........................................ 447
    Number 420T...................................... 502
16  Number 422A - B.................................. 498
    Number 424....................................... 513
17  Number 486....................................... 477
    Number 497....................................... 458
18
                         MISCELLANY
19
    Preliminary matters.............................. 417
20  Certificate of Court Reporter................... 581

21

22

23

24

25

                ─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
                    EASTERN DISTRICT OF VIRGINIA

┌─────────────────────────────────────────────────────────────┐
── United States v. Danchenko ──

417

1          **A F T E R N O O N   P R O C E E D I N G S**

2    (Court proceedings resumed at 2:05 p.m.)

3              (Witness seated.)

4              THE COURT:  Anything we need to do before we bring

5    the jury out?

6              MR. ONORATO:  Your Honor, one -- one matter.  I

7    don't know what the government --

8              MR. SEARS:  Your Honor, the witness is on the stand.

9              THE COURT:  All right.  If you would excuse

10   yourself to the -- we'll call you back in.

11             (Witness excused.)

12             MR. ONORATO:  And just out of an abundance of

13   caution, I know we discussed introduction of the email

14   regarding Mr. Danchenko being in New York City on July 28th,

15   and I plan on asking the witness about that.

16             THE COURT:  All right.  Do you want to say anything

17   more about this?  I've looked at it.

18             MR. DURHAM:  Defense counsel has provided a case --

19   actually read it.

20             THE COURT:  Right.

21             MR. DURHAM:  United States versus Lentz, L-E-N-T-Z,

22   which is cited at 282 F.Supp 2d 399, 2002 case.

23             As we understand it, the defense has suggested that

24   607 is admissible under present -- let me just see it.  I want

25   to make sure that I state it correctly.  Present state of mind

─United States v. Danchenko─

418

1    exception to the hearsay rule.  If the Court looks at

2    Government's Exhibit 607, the Court will find that it says

3    nothing about the defendant's intent.

4              THE COURT:  I'm trying to find it.  It's 607?

5              MR. DURHAM:  Yes, sir.  I'm not sure if that's the

6    defense number.  I think that's the government's number, 607.

7    Do you have a different number?

8              Does Your Honor have the defense book?

9              THE COURT:  I do.

10             MR. ONORATO:  It should be 428, Judge.

11             THE COURT:  428.

12             MR. ONORATO:  426, sorry.

13             MR. DURHAM:  426, Your Honor.

14             (A pause in the proceedings.)

15             As Your Honor will see, there's nothing in that

16   exhibit that speaks to intent.  Indeed, when you read the

17   content of the exhibit, it's not -- it's not at all clear if

18   it's even being talked about if it's a meeting referring to I

19   saw message from "L" in my blocked contacts.  Dozens of

20   messages there.

21             It doesn't say who is supposed to be at what

22   meeting.  It certainly doesn't say the defendant had any

23   intent to go to any meeting.

24             And so we don't believe that under the applicable

25   case law that it's in any way admissible.  If you look to --

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

419

1   and this is with respect to the Lentz case that the defendant

2   has cited, too -- and I just want to get the exact page

3   reference when I have a moment, Your Honor.

4           (A pause in the proceedings.)

5           MR. DURHAM:   411.   So *Lentz* is cited at

6   282 F.Supp. 2d 399 and F. 411.   The Court stated that the

7   statement must be limited to a declaration showing the

8   declarant's state of mind and not the factual occurrence

9   engendering that state of mind.

10          Now, here you don't even have the first part.   The

11  document the defendant is talking about doesn't have any

12  declaration showing the declarant's state of mind.   It doesn't

13  say he -- he's going to any meeting.

14          And in the context of the email, it appears to refer

15  to preceding portion of the message, which there were -- saw a

16  message from "L" blocked contacts.   Dozen of messages there.

17  Another meeting tonight.   That doesn't, as I say, speak to

18  defendant's intent.   It doesn't say he's going to any meeting

19  and what would be -- now, what would happen is the defendant

20  would be trying to infer under a hearsay exception rule.   It

21  doesn't apply here, something that doesn't -- doesn't connect

22  up.

23          I mean, if the defendant were to testify, you know

24  he could testify, I guess, or try to testify to these matters,

25  but this document, in and of itself, is not admissible under

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

United States v. Danchenko

420

1    the hearsay rules.

2         THE COURT:  All right.  Mr. Onorato, you wan to.

3         MR. ONORATO:  Mr. -- Stuart will do it.

4         THE COURT:  I'm sorry, Mr. Sears.

5         MR. SEARS:  Your Honor, I think Mr. Durham is

6    reading the rule a little too narrowly.  And I'll just read

7    the rule itself.  It's Rule 803.3.

8         THE COURT:  Right.

9         MR. DURHAM:  (As read):  "Then existing mental,

10   emotional, or physical condition, a statement of the

11   declarant's then existing state of mind, emotion, sensation or

12   physical condition, parenthesis, (such as intent, plan,

13   motive, design, mental-feeling pain, and bodily health, but

14   not including a statement of memory or belief to prove the

15   fact remembered or believed unless it relates to the

16   execution, revocation, identification, or terms of declarant's

17   will)."

18        And I think the only fair reading of this message --

19   and Mr. Durham is free to argue that jury shouldn't view the

20   way that we think they should or that they would -- is that he

21   has a meeting that night, that he's in New York.  There's a

22   picture from the Bronx Zoo.  And largely from the defense side

23   of this case, that is evidence of him planning to meet with

24   somebody in New York that night, which we think is the

25   anonymous caller, who he believed was Sergei Millian.

─────United States v. Danchenko─────

421

1          There's also a reference in this email to meeting

2   with Chris.  Thanks to his reporting, he's meeting with Chris

3   the following day.  We all know Chris is a likely reference to

4   Chris Steele.  So I think it's pretty obvious what he's saying

5   in this message.

6          I think under the rules, under Lentz -- and I can

7   read from Lentz, I know Your Honor has already read it -- but

8   (As read):  "A statement is admissible whenever the

9   declarant's intention itself is a distinct and material fact

10  in the chain of circumstances.  Such a statement of intent is

11  admissible under the state of mind exception to the hearsay

12  rule to promote an inference of the declarant's future

13  conduct."

14         So I think it falls right within the rule, Your

15  Honor, and I would ask the Court to allow us to admit it and

16  question Mr. Auten about it and potentially other witnesses --

17         THE COURT:  So it's just the -- the first page of

18  426?

19         MR. SEARS:  Just -- just the first page, Your Honor.

20         MR. DURHAM:  Your Honor, the government would

21  encourage the Court also to read the literal language of

22  803.3.  (As read):  "Statement of declarant's then existing

23  state of mind such as motive, intent or plan."  Well, does

24  this email talk about the defendant's motive, intent or plan?

25  No.

──────United States v. Danchenko──────

422

1          THE COURT:  Well, it talks about another meeting

2    tonight -- another meeting tonight.

3          MR. DURHAM:  Pardon me.

4          THE COURT:  It references another meeting tonight,

5    which is probably --

6          MR. DURHAM:  Right.  He'll say, I'm going to another

7    meeting tonight.  I intend to go to another meeting tonight.

8    My motive isn't to go to another meeting tonight.  My plan --

9    in fact, you don't even know in context what the meeting is --

10   if it has anything to do with New York or it's Washington

11   or -- you just don't know.

12         It might -- more likely would have to do with what

13   he said previously, whoever the messages were from "L,"

14   whoever "L" might be.

15         THE COURT:  Right.  Right.

16         MR. DURHAM:  The lack of clarity as to what it even

17   means --

18         THE COURT:  All right.

19         MR. DURHAM:  It ought to say that it doesn't fit

20   within the exception.

21         THE COURT:  Right.

22         MR. DURHAM:  Perhaps it's some clear evidence of

23   intent, motive or plan.

24         THE COURT:  All right.  I've looked at this.  The

25   Rule 803.3 does allow, as an exception to the hearsay rule,

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

─United States v. Danchenko─

423

1    any statements of a declarant's then existing state of mind

2    including plan.  Here, the only arguable plan that's

3    referenced is another meeting tonight.  Everything else is

4    historical memory for the most part.

5           And I do agree with Mr. Durham that the email does

6    not sufficiently evidence a relevant intent or a plan.  It's

7    not identified what the meeting is or for what purpose, and I

8    think to let that in will just allow too much -- too much

9    speculation.  So I am going to --

10          MR. ONORATO:  And just if I can --

11          THE COURT:  Yes.

12          MR. ONORATO:  See, this is the backup plan.  So not

13   for the truth of the matter, but the effect on him.  So the

14   same thing that Mr. Durham was doing with all of his

15   witnesses, you know, during the relevant time period that --

16   would that, you know, be something that you would consider as

17   an agent?

18          So, again, you can instruct the jury it is not to

19   prove that there was a meeting, but just a relevant

20   consideration for this witness.

21          MR. DURHAM:  Your Honor, if I understand --

22          THE COURT:  Yeah.

23          MR. DURHAM:  -- what counsel is suggesting, he's

24   going to ask this witness, who knows nothing about this,

25   whether that would affect him.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Cross-Examination of Brian Auten 10/13/22

─United States v. Danchenko─

424

1          THE COURT:  Right.

2          MR. DURHAM:  I mean, I don't think that's a proper

3   question to pose to this witness.  Now, defense may want to

4   put on evidence.  But you can't do it through this witness,

5   who has no idea about any of this, and then suggest in your

6   question and facts not in evidence.  That will be improper.

7          THE COURT:  Well, to a certain parallel, what you

8   did with the witness, you showed him documents he had never

9   seen before and asked that if he had seen -- if he had had

10  that information would it have affected his judgement, how

11  does that differ from what they want to do?

12         MR. DURHAM:  We had put in -- because with respect

13  to Mr. Auten --

14         THE COURT:  Yes.

15         MR. DURHAM:  -- Mr. Auten had direct involvement in

16  those matters.  He had interviewed the defendant,

17  Mr. Danchenko, he had participated in the actual

18  investigation.

19         And so, in that context, he, Mr. Auten, had known

20  about these emails, would have affected his investigation --

21         THE COURT:  Right.

22         MR. DURHAM:  -- is different than asking Mr. Auten

23  about inadmissible piece of information to see if that

24  otherwise inadmissible piece of information would have

25  affected his outcome.  I think pragmatically is that, okay,

─────United States v. Danchenko─────

425

1  how would this work?  Counsel is going to ask a question that

2  is improper because the Court has ruled the evidence out.

3          He's going to include in his question something the

4  Court has ruled as inadmissible, knowing that what the answer

5  is going to be, simply to get that in front of the jury, that

6  will be -- the government would object to that being an

7  improper question.  If he can establish that Mr. Auten somehow

8  knew about this, that's --

9          THE COURT:  Well, but again, getting back to your

10  questions of Mr. Auten -- I can't remember precisely the

11  documents -- but they certainly weren't in evidence otherwise.

12          It's just a fact that he showed them the document

13  and asked him if that information in that document was known

14  to him, would that have affected his -- his analysis.

15          Why -- again, why is this different?

16          MR. DURHAM:  Because in this -- in this respect, can

17  I just have one moment?

18          THE COURT:  Yeah.

19          (Counsel confers.)

20          MR. DURHAM:  As Mr. Keilty points out, Your Honor,

21  because in former situation involving Mr. Auten, the emails

22  were admissible because they were defendant's statements and

23  relevant and admissible on that basis.

24          That's not the case with respect to this document.

25  They can't get it in through Auten.  The others come in

────United States v. Danchenko────

426

1  through Auten because he was the person -- participant and

2  they were statements of the defendant.

3          THE COURT:  I'm trying to remember.  Were all the

4  statements, statements of the defendant?  I can't remember.

5          MR. DURHAM:  I believe that's the case.  This will

6  be the exception, Your Honor.  The Court will recall that the

7  government, at pre-trial, had indicated they wanted to -- we

8  wanted to put in certain emails that involve --

9          THE COURT:  Right.

10          MR. DURHAM:  -- Mr. Millian and Mr. Zlodorev.  There

11  were objections that were raised by counsel on hearsay

12  grounds, and the Court ruled on that.

13          Subsequently, counsel wanted -- we agreed with

14  counsel, that the July 26, 2016 email, which was otherwise not

15  coming in, should come in.  So I know that was an exception.

16          But other than that, I think it is all defendant's

17  statements.

18          (A pause in the proceedings.)

19          MR. ONORATO:  Your Honor, one other point that I

20  think is relevant.

21          THE COURT:  Yeah.

22          MR. ONORATO:  Mr. Durham, makes a big deal.  Well,

23  didn't you think that if he had given you this information,

24  given this -- that information.  You know, this is in

25  Mr. Danchenko's possession.  He didn't even think it was

Cross-Examination of _B_ Auten   10/13/22

---United States v. Danchenko---

427

1  material at the time because nobody disbelieved the fact

2  that -- they -- well, you never met with Mr. Millian.  He

3  never had a chance to say, Hey, guys, you need to know about

4  this email.

5          So the impression of the jury is that Mr. Danchenko

6  didn't do what they asked him to do.  And I think I'm going to

7  cover a major point as to why that the government didn't bring

8  out on direct, but it's clearly relevant and germane.  It's

9  the central issue in this case.

10          The government has evidence in its possession that

11  is, frankly, Brady or exculpatory.  And what they're telling

12  this Court is -- and this was co-marked as Government Exhibit

13  607 until Friday night, so we relied on this to be used by

14  them.

15          And, again, I don't want to say that it's truthful

16  that there was a meeting, just a statement of intent, because

17  there was no meeting.  He told them there was no meeting, and

18  this supports that notion.  And there's going to be evidence

19  that he left New York City later that night in a window where

20  that meeting could have taken place.

21          MR. DURHAM:  The issue is that it is not admissible

22  under the rules of evidence.  And the defense --

23          THE COURT:  Well, I'm not sure -- I'm not sure

24  that's dispositive, though, as far as what importance he would

25  have attached to it, had he known of it.  I understand your

─────── United States v. Danchenko ───────

428

1   point.

2          MR. DURHAM:  But the point is -- Your Honor had

3   observed earlier -- you don't know what's even being talked

4   about here.  You don't know whether it's a meeting that

5   Mr. Danchenko is supposed to intend, that he was invited to,

6   if it relates to the L messages.  You just don't -- you don't

7   know if it is a meeting involving other people that he'll get

8   information on down the road.  It just -- it is unclear and it

9   just invites speculation on the part of the jury.

10          So to incorporate that same information in a

11   question would be, respectfully, inappropriate.

12          MR. ONORATO:  And, Your Honor, I just have one more

13   point to make.

14          It's almost as if Mr. Danchenko would be omniscient,

15   right?  I mean, to have his state of mind where I have a

16   meeting tonight and then he leaves New York, you know, five or

17   six hours later, and knowing that he's going to be sitting in

18   this courtroom and, my god, he's so lucky this email exists

19   and they want to suppress the fact -- not that it happened,

20   but that was part of the intent from the agent who they

21   said -- you believe he's now lying because we showed you a

22   couple of emails you haven't seen.

23          THE COURT:  This was previously a proposed

24   Government Exhibit?

25          MR. ONORATO:  Yes.  Government's Exhibit 607.

Cross-Examination of B. Auten   10/12/22

─────United States v. Danchenko─────

429

1           MR. DURHAM:  It had been, Your Honor.

2           THE COURT:  Yeah.  All right.  I understand both

3    sides.  I'm going to allow you to simply ask Mr. Auten if --

4    before actually getting into the substance of it or admit it,

5    if he had seen this would this have -- something he would have

6    wanted to know and would have assisted his -- his analysis.

7    And we'll see what he says.

8           MR. ONORATO:  Thank you, Your Honor.

9           THE COURT:  All right.  All right.  Let's bring in

10   Mr. Auten.  Before we begin, the jury asked what time we would

11   adjourn on Friday and I've told Mr. Burns to let them know

12   we'll stop at 5 o'clock on Friday.

13          All right.

14          (Witness seated.)

15          THE COURT:  All right.  Bring the jury in.

16          (Jury present.)

17          THE COURT:  All right.  Please be seated.  We're

18   ready to proceed.  Mr. Auten, you remain under oath.

19          Mr. Onorato.

20          MR. ONORATO:  Thank you, Your Honor.

21                     CROSS-EXAMINATION

22   BY MR. ONORATO:

23   Q.   Good afternoon, Mr. Auten.

24   A.   Good afternoon.

25   Q.   Mr. Auten, before we broke, I think I was asking you a

─United States v. Danchenko─

430

1   question about whether the plan was to get Mr. Danchenko on

2   board as a source prior to having a meeting with him.

3   A.   Yes.

4   Q.   And is that true?

5   A.   Yes.  Part of the plan.

6   Q.   Okay.  I want to turn your attention to the content of

7   the meeting with Mr. Danchenko, but I want to ask you a

8   question.  When you met with the special counsel, did they

9   give you any instruction about how to answer questions,

10  meaning don't guess, don't speculate, just answer the question

11  that's asked, and nothing more?

12  A.   Something along those lines with respect to, you know,

13  tell the truth, don't -- you know, answer the question, listen

14  to the question.

15  Q.   Right.  And so they asked you, for instance, if I were to

16  ask you a question, just answer it and don't give me a

17  different answer.  Just answer the question that's posed,

18  right?

19  A.   Correct.

20  Q.   All right.  And you testified before the United States

21  Senate subcommittee, right?  Judiciary committee, I should

22  say.

23  A.   Judiciary committee, yes.

24  Q.   Right.  And that was back on October 29th of 2020, right?

25  A.   Correct.

─────United States v. Danchenko─────

431

1   Q.   And do you remember being instructed as follows by the

2   U.S. Senate?

3          We want your answer to our questions in the most

4   complete and truthful manner as possible.  So we'll take our

5   time.  If you don't honestly know an answer to a question or

6   don't remember it, it is best not to guess.

7          Do you remember that?

8   A.   I do remember that, yes.

9   Q.   Okay.  And so you were, likewise, you know, instructed to

10  do the same things here, correct?

11  A.   Correct.

12  Q.   All right.  Now, when you met with Mr. Danchenko, you

13  never gave him a similar instruction about guessing, did you?

14  A.   I don't remember any type of admonition in that way.

15  Q.   Okay.  And the one reason that people encourage you not

16  to guess about things is because we can have

17  misunderstandings, right?  Because we don't know what your

18  personal knowledge is based upon what you're trying to deduce,

19  right?

20  A.   Yes, that is correct.

21  Q.   Okay.  And in a few minutes we're going to talk about

22  what exactly Mr. Danchenko told you.  But to be clear, he

23  never said, with 100 percent certainty, that the anonymous

24  caller or the caller who didn't identify himself was Sergei

25  Millian, right?

─────United States v. Danchenko─────

432

1   A.   That is correct.

2   Q.   100 percent true, right?

3   A.   Correct.

4   Q.   Now, what he did kind of contradicts the guidance that

5   Mr. Durham's team gave you about guessing, right?

6   A.   Yes.

7   Q.   He was trying to guess, right?

8   A.   Well I don't know if he was trying to guess but he

9   indicated during it that he wasn't sure.

10  Q.   Right.  But he was saying I think -- I believe he was

11  couching it to show that it was not a factual statement,

12  right?

13  A.   That is my recollection.

14  Q.   Okay.  And that's the -- that contradicts the advice the

15  Senate gave you.  They said, "If you don't remember the answer

16  to a question, do not guess, do not speculate," right?

17  A.   Correct.

18  Q.   Okay.  And you understand that at the end of the day,

19  after you talked to Mr. Danchenko, that he was trying to be

20  helpful to you by giving you facts known to him as to why he

21  formed the belief that it could have been Mr. Millian?

22          MR. DURHAM:  Objection to the form of that question,

23  Your Honor, because its asking this witness to answer on what

24  Mr. Danchenko was thinking.

25          THE COURT:  He's asked for his understanding.  You

─United States v. Danchenko─

433

1   can answer, go ahead, if you have one.

2   BY MR. ONORATO:

3   Q.   Right?

4   A.   Could you repeat the question, please.

5   Q.   Sure.  You understand that Mr. Danchenko gave you some

6   facts, right, because he was trying to help you as opposed to

7   hinder you by saying, "I don't know, but it could have been

8   Mr. Millian," right?

9   A.   That was my understanding during the interview, yes.

10  Q.   Okay.  Now, you would agree with me -- and I think you

11  had written this in your affidavit -- that, to you, the

12  three-day interview with Mr. Danchenko was not what you

13  considered to be a, quote, major debriefing, your affidavit on

14  Page 84?

15  A.   Yeah, I would agree with that.

16          (Court reporter clarification.)

17          THE WITNESS:  I agree.

18  BY MR. ONORATO:

19  Q.   Okay.  Again, you didn't consider it a major debriefing,

20  right?

21  A.   Correct.

22  Q.   Okay.  Now, after the second day -- and you had

23  discussions with your colleague, Mr. Somma, right?

24  A.   Yes.

25  Q.   And I think in your affidavit you said, "Look, I wanted

———Cross-Examination of ——— B——— 10/13/22

———United States v. Danchenko———

434

1   to focus on certain report numbers," right?

2   A.   Yes.

3   Q.   But Somma said, "We don't need to get everything," right?

4   A.   That is my recollection, yes.

5   Q.   Okay.  And that's in your affidavit, right?

6   A.   Yes.

7   Q.   And when you wrote that affidavit, it was under penalty

8   of perjury, right?

9   A.   Correct.

10  Q.   And so Somma was telling you, "Listen, you don't have to

11  get anything from Danchenko during these interviews," right?

12  A.   That wasn't how it was articulated.  It was more

13  articulated in a way that this isn't going to be our first

14  bite of the apple.

15  Q.   Right.  But what I mean is you didn't ask a lot of things

16  because Somma said, "We're going to have plenty of time later

17  to talk to Danchenko"?

18  A.   There was much more that we could have asked during the

19  interviews, yes.

20  Q.   Right.  And, in fact, talking about one of those things,

21  I think Mr. Durham talked -- and we'll talk about it again --

22  but 105 never came up, right?

23  A.   Correct.

24  Q.   Okay.  And that's one of the things you could have talked

25  about, right?

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

435

1   A.    Yes.

2   Q.    And you wanted to focus on the things that seemed

3   important at the time, right?

4   A.    Correct.

5   Q.    And whether Corey Lewandowski hated Paul Manafort

6   probably wasn't the biggest thing on your mind right then,

7   right?

8   A.    For those -- the reports that we covered were the reports

9   that were most, I think, in front of us at the time with

10  respect to the information --

11  Q.    Right.

12  A.    -- we wanted to get.

13  Q.    Right.  Now, the FBI didn't ask for Mr. Danchenko's email

14  password during that meeting, did they?

15  A.    Not to my recollection, no.

16  Q.    Okay.  They didn't ask to give him the cell phone, right?

17  They didn't say, "Give us your cell phone, we're going to look

18  through it," right?

19  A.    No.

20  Q.    Okay.  Could have asked him for those things.  You would

21  agree?

22  A.    Could have, yes.

23  Q.    Right.  And that's common, right?  The FBI commonly, when

24  they interview witnesses -- or they say, "Hey, can we have

25  your email password or can we have your phone so we can look

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Case 1:21-cr-00245-AJT   Document 122   Filed 10/15/22   Page 22 of 167 PageID# 1287
Cross-Examination of Auten by Mr. Durham   10/12/22
─United States v. Danchenko─
436

1   at it, you know, to try to get information that you might not
2   be able to get," right?
3   A.   I'm not sure how common that is in a voluntarily
4   interview to ask for a cell phone or an email password at
5   that -- in those situations, but it does happen, yes.
6   Q.   Right.  And -- but there was nothing to prevent, I guess,
7   you or Agent Somma from saying, "Hey, Mr. Danchenko, can we
8   have that information, because it would really assist us if we
9   had your phone," right?
10  A.   Yeah, I don't recall that being asked.
11  Q.   Right.  Nobody did.
12          Okay.  And, of course, the FBI is in control of the
13  interview, right?
14  A.   Yes.
15  Q.   Right.  Because today, when I'm asking you questions
16  before the jury, I have to ask you the questions to get the
17  information I need to present to the jury.
18          You would agree with that, right?
19  A.   I would agree with that.
20  Q.   Because if I would say to you, "Mr. Auten, tell us
21  everything you know about the case," and I sat down, right?
22  A.   Right.
23  Q.   How would I know that everything -- how would you know
24  that everything that I wanted you to tell the jury would get
25  covered, right?

─United States v. Danchenko─

437

A.   I would not.

Q.   Right.  And that's because my job is to be effective and
ask questions of the witness, like Mr. Danchenko, right?

A.   Yes.

Q.   And he answered the questions the 24th, the 25th, and the
26th that he was asked, right?

A.   As I have documented in there, we asked questions and he
answered those questions.

Q.   Okay.  And, again, 105 never came up, right?

A.   Correct.

Q.   And the reason -- and there's a reason probably why 105
did not come up -- you would agree with me that the material
contained in No. 105 is from what we call open source
information?

A.   I believe some of it is derived from open source, yes.

Q.   Right.  Okay.  Well, you know the POLITICO article was
there, right?

A.   Yes.  The length of the POLITICO article, yes.

Q.   Okay.  And you would agree that it appears that a lot of
that material came from that POLITICO article, right?

A.   Well, if I recall, the individual that said they had
given the information said that it was, in part, used in the
article.

Q.   Okay.  And so, what I would like to do is direct your
attention to a meeting you had with the OIG, the Office of

Cross Examination of _ B_ 10/12/22

─────United States v. Danchenko─────

438

1   Inspector General, back on April 26 of 2019, okay?

2   A.   Okay.

3   Q.   When you met with the OIG, they actually asked you

4   questions about Section 105 of the dossier, okay?

5   A.   Okay.

6   Q.   And you said, and this is my quote (As read):  "The

7   paragraph in 3 in this report, coming from an American

8   political figure, again, this looks just like general

9   discussion of campaign in-and-outs."

10          So, again, you could have a situation where, on a

11   more nefarious side, someone's taking open source material and

12   laundering it.  Making like it's coming from -- look like it's

13   coming from a source, period, right?

14   A.   Correct.

15   Q.   You also stated, "On a less nefarious side, actually said

16   that he's talking to somebody, but they're talking to someone

17   about something that's already out there," right?

18   A.   Correct.

19   Q.   And "already out there" is the material that's in the

20   open source, right?

21   A.   Correct.

22   Q.   Like the *POLITICO* matter, right?

23   A.   Yes, the *POLITICO* information would be open source.

24   Q.   Okay.  I'm going to show you Defense Exhibit No. 12 for

25   identification.

United States v. Danchenko

439

1   A.   I'm sorry, 4 -- 412?

2   Q.   Number 12.

3   A.   Number 12.  Oh, okay.

4   Q.   Take a look at that.

5   A.   Yes.

6   Q.   Are you familiar, generally, with the content of that

7   email being in the open source back then?

8   A.   I'm not sure if I was -- again, I'm -- at this point,

9   yes, when I became clear on that, I'm not positive.

10  Q.   Sure.  Well, I'm going to -- I'm going to read something

11  to you, okay?

12  A.   Okay.

13  Q.   And in your OIG testimony that we've just discussed.

14  A.   Yep.

15  Q.   You were asked the question relating to Mr. Lewandowski

16  and Mr. Manafort, and you said (As read): "For 3" -- talking

17  about this paragraph -- "it may just have been general, kind

18  of, Lewandowski hating Manafort.

19        "I would have to go back and look, but I imagine it

20  would have been a number of news stories at the time about the

21  tension between those two."

22        And then, the OIG investigator said, "I found those,

23  yeah."

24        You said, "Yeah, yeah."

25        And then he said, "All right."

─────United States v. Danchenko─────

440

1         So that would be some minimal corroboration, at

2    least part of that paragraph.  And you said, "Right, if you go

3    to the scenario that they actually did this -- get this from a

4    source, so the less nefarious angle, then other news stories

5    around the time would corroborate some of this.

6         If you go off the scenario that this was washed,

7    then it's actually news stories or potentially the news

8    stories that are actually crafting this."  Right?

9    A.   Right.

10   Q.   Mr. Ryan said, "I saw those stories.  That's what I was

11   looking at prior for the -- and they are out there.

12        And you said, Sure, right?

13   A.   Correct.

14   Q.   Meaning that all of this stuff was in the open, right?

15   A.   There is -- yes.

16   Q.   And that -- the date of that email that you're looking at

17   is the, what, 12th?

18   A.   This is August 14th, 2016.

19   Q.   August 14th.  Okay.

20   A.   It's a Twitter.

21   Q.   It's a Twitter.

22   A.   Am I right?

23   Q.   Yeah, it's a Twitter.  August 14th?

24   A.   Yes, August 14, 2016.

25   Q.   Okay.  And Mr. Durham asked you questions, and I think on

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────Cross-Examination of B. Dolan    10/12/22─────
─────────United States v. Danchenko─────────

441

1   the Mr. Dolan exhibit, he showed you the response with the
2   *POLITICO* article about hating Mr. Manafort.  That was on the
3   20th, right?
4   A.   I would have to go back and look.
5   Q.   Sorry?
6   A.   I would have to go back and look.  I don't --
7   Q.   Okay.  So let's get that government exhibit.  What
8   government exhibit is it, 12?  I think it's admitted into
9   evidence.  We can just publish it.
10          THE COURT:  Do we know which one it is?
11          MR. ONORATO:  713.
12          THE COURT:  713A?
13          MR. ONORATO:  A.
14          THE COURT:  Yes.
15  BY MR. ONORATO:
16  Q.   And so, if you're looking at 713A --
17          THE COURT:  Before you -- let me just say something
18  I intended to tell you.
19          All these exhibits that are being admitted, you will
20  have in the jury room during your deliberations.  So -- all
21  right.
22          MR. ONORATO:  Thank you, Your Honor.
23  BY MR. ONORATO:
24  Q.   Okay.  So it appears that Mr. Dolan replies on
25  August 20th of 2016, right?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

442

1   A.   Yes.

2   Q.   Okay.  And you would agree with me that in that email,

3   Mr. Dolan writes:  Corey Lewandowski, comma, who hates

4   Manafort and who still speaks to Trump on a regular played a

5   role.  Right?

6   A.   Correct.

7   Q.   Okay.  And so, on the document I showed you, which is a

8   Tweet from July 12th, back on that day, was an open source

9   material, 2016, right?

10   A.   Correct.

11   Q.   And so, when people Tweet, it's available to the public,

12   right?

13   A.   Correct.

14   Q.   And so you can Google and you can find out what are

15   people saying on Twitter about this topic, right?

16   A.   Correct.

17   Q.   Okay.  And, in fact, the President used to communicate by

18   Tweet all the time back in the day, right?

19   A.   Correct.

20   Q.   Okay.  And so, this user is saying that -- can you find

21   anyone -- read what it says in there.

22   A.   It says (As read):  "Find something to hate as much as

23   Corey Lewandowski hates Paul Manafort."

24   Q.   Wow.  That seems pretty strong, right?

25   A.   Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Cross Examination of FBI Agent - 10/12/22

─United States v. Danchenko─

443

1   Q.   And that would be reflected in what happened six days

2   later in an email from Mr. Dolan, right?

3   A.   Yes.

4   Q.   Okay.  And when you were talking under oath before the

5   senate, you were saying that you saw things like that in the

6   public domain, right?

7   A.   Things like --

8   Q.   Those types of -- that type of information about

9   Lewandowski hating Manafort in open source material.

10  A.   Was it senate testimony or was it --

11  Q.   Oh, I'm sorry.  OIG, I apologize.  OIG.

12  A.   OIG testimony, yes.

13  Q.   Yeah.  Okay.  Thank you.  And I'm going to show you one

14  other document.

15           And so this --

16           THE COURT:  Are you moving in 14?

17           MR. ONORATO:  Yes, Your Honor.

18           THE COURT:  Any objection?

19           MR. DURHAM:  Have you seen that -- which document

20  counsel --

21           THE COURT:  It was 14, the Tweet.

22           MR. ONORATO:  Was it 14 or was it 12?  It was 12,

23  Judge.

24           THE COURT:  Oh, I'm sorry, 12.

25           MR. ONORATO:  It was 12.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Cross-Examination of [Illegible] by [Illegible] 10/13/22

——United States v. Danchenko——

444

1      MR. DURHAM:  No objection.

2      THE COURT:  Without objection, 12 is in.

3   (Defendant's Exhibit No. 12 was admitted into evidence.)

4      MR. ONORATO:  Okay.  So Defense Exhibit 26 -- oh,

5   someone to publish that just for the jury.

6   BY MR. ONORATO:

7   Q.   So, again, just to be clear, Defense Exhibit 12 is from

8   someone named Roland Scahill and that line is (As read):

9   "Find something to hate as much as Corey Lewandowski hates

10  Paul Manafort," right?

11  A.   Correct.

12  Q.   Okay.  And you would agree with me that that looks --

13  appears to be in the public domain six days before Mr. Dolan

14  writes the same thing to Danchenko, right.

15  A.   Correct.

16  Q.   Okay.  And you would agree with me that that has

17  absolutely nothing to do about collusion in Russia, which is

18  the whole point that Crossfire Hurricane was opened, right?

19  A.    That particular issue with respect to the relationship

20  between Corey Lewandowski and Paul Manafort, no, that is not a

21  Russian collusion angle.

22  Q.   Okay.  I'm going to get you to August 19, 2016.  It's

23  Defense Exhibit 26.  2016, Defense Exhibit 26.

24  A.    This is *The Daily Beast* article?

25  Q.   Yes.  So *The Daily Beast* published on August 16, 2016 at

─────United States v. Danchenko─────

445

11:52 a.m.

1

2  A.   I have it here.

3  Q.   Okay.  And I want to direct your attention -- and I

4  apologize because I don't know which paragraph it is -- but

5  there's a line where it says (As read):  "But for reasons that

6  continue to confuse campaign insiders, Trump -- but Trump, for

7  reasons that always continue to confuse campaign insiders,

8  always had a fondness for Lewandowski.  And the two have even

9  continued to talk after his firing and subsequent second life

10  as a CNN contributor."

11        Do you see that?

12  A.   I'm trying to find it right now.  Yep, got it.

13  Q.   Okay.  Right --

14  A.   Yeah.  It starts with "when he was hired in March," is

15  the third paragraph.

16  Q.   Yeah.

17  A.   It's the third up from the bottom.

18  Q.   Again, along the same lines of what you told the -- what

19  you told the inspector general, it was open source material on

20  these topics, right?

21  A.   Yes, with respect to -- I mean, this talks about, you

22  know, Manafort and -- Manafort and Lewandowski, and Trump

23  having a fondness for Lewandowski, and that Manafort pushed

24  Lewandowski out, yes.

25  Q.   They're continuing to talk, right?

United States v. Danchenko

446

1   A.   Yes.

2          THE COURT:   Counsel, where is the publication date

3   referenced on here?

4          MR. ONORATO:   So my paralegal will get a copy with a

5   date, Your Honor.

6          THE COURT:   All right.   We should have that.

7   BY MR. ONORATO:

8   Q.   Okay.   And so, those are things that are open source,

9   right?

10  A.   That's correct.

11  Q.   Okay.   And you would agree with me that if you would have

12  picked up, you know, Google on August 20th at 7:00 a.m.,

13  right?

14  A.   Okay.

15  Q.   You could have found those two critical facts that

16  Mr. Dolan apparently tells Mr. Danchenko, you know, later that

17  day, right?

18  A.   If you went on to Google that day and looked things up,

19  you could probably find something that is either similar or

20  same.

21  Q.   Right.   Those two things, right?

22  A.   Which two things are you talking about?

23  Q.   The hating -- the hating, right?

24  A.   Yeah.

25  Q.   Do you want to call it "the hating"?

─────United States v. Danchenko─────

447

1   A.   Okay.

2   Q.   And I'm going to call it the advising, the talking, the

3   communicating with the President even though he's been fired?

4   A.   Yes, I would agree with that.

5   Q.   Okay.  All in the open source?

6   A.   I would agree you would be able to find something like

7   that in open source, yes.

8   Q.   Okay.

9            THE COURT:  Again, are you offering 26?

10           MR. ONORATO:  Yes, Your Honor.

11           THE COURT:  You need to move these in.

12           MR. ONORATO:  With the -- with the -- with the proof

13   of the date.

14           THE COURT:  All right.  Any objection?  Without

15   objection, Exhibit 26 is in.

16   (Defendant's Exhibit No. 26 was admitted into evidence.)

17   BY MR. ONORATO:

18   Q.   Okay.  And I would expect the content of what we just

19   read to the jury has nothing to do with the opening of

20   Crossfire Hurricane, right?

21   A.   No.

22   Q.   Okay.  And, again, it says, just for the record, when he

23   was hired in March, (As read):  "Manafort succeeded in taking

24   over control of the campaign from Corey Lewandowski, a novice

25   operative who served as Trump's campaign manager, despite

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

448

1    never having run a presidential race.  By 20 of June, Manafort

2    had pushed Lewandowski out completely.  But Trump, for reasons

3    that continue to confuse campaign insiders, always had a

4    fondness for Lewandowski, and the two have continued to talk

5    even after his firing and subsequent second life as a CNN

6    contributor."

7            Do you see that?

8    A.   Yes.

9    Q.   Okay.  So when you look at what Mr. Durham showed you in

10   the Government's Exhibit about the POLITICO article and those

11   paragraphs, there is not a state secret in what -- what Mr.

12   Dolan sent to Mr. Danchenko, right?

13   A.   Not a state secret.

14   Q.   Not a state secret.  Not the nuclear code, right?

15   A.   No.

16   Q.   Nothing that, you know, my -- she's now 18 years old --

17   but my 18-year old daughter couldn't figure out that day if

18   she wanted to look for this, right?

19   A.   That would be an open source, so correct.

20   Q.   Right.  And if the content of that material was

21   significant to the FBI, right, you have analysts, you have a

22   team, right?

23   A.   Yes.

24   Q.   And you can get -- you can mobilize your team, because

25   you're supervising them, and say, "Guys, I need everything

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─United States v. Danchenko─

449

1   about Paragraph 105 when you get there," right?

2   A.   Correct.

3   Q.   And when you did, it would have been pretty anticlimactic

4   because it's all open source, right?

5   A.   I would anticipate it would be a lot of open source

6   material there, yes.

7   Q.   Okay.  Okay.  So now we're going to transition to the

8   discussions that you had with Mr. Danchenko between July 24th

9   and July 26th of 2017.

10  A.   January?

11  Q.   Or January.  I want to say July because that's important

12  too.

13          All right.  So, first of all, I think your testimony

14  yesterday was that you thought that the interaction was

15  strange between Millian, the person he believed to be Millian,

16  and Mr. Danchenko.

17  A.   I thought that that interaction, as described, was

18  peculiar and strange, yes.

19  Q.   Right.  And before you thought they were peculiar,

20  Mr. Danchenko told you, on the 24th, is that he thought what

21  happened was strange, right?

22  A.   I do recall that, yes.

23  Q.   Right.  Because when you write a 302 or your memo, you

24  write what the witness tells you, right?

25  A.   Correct.

─United States v. Danchenko─

450

1   Q.   Okay.  And you would agree that his characterization was,

2   "Guys, this is strange," and that's what you wrote in that

3   report?

4   A.   I believe that's how I characterized it.

5   Q.   Okay.  So you agree with him when he said, "This was

6   strange."

7        You said, "You know what, he's right.  This seems

8   strange," right?

9   A.   He characterized it as strange.  I think my

10  characterization of strange might not be the same

11  characterization of strange.

12  Q.   Okay.  But you used the same word?

13  A.   Used the same word, yes.

14  Q.   So you can use the same word, and sometimes people can

15  interpret the word differently is what you're telling me.

16  A.   Yes.

17  Q.   Okay.  And the only way for you to know that is to ask a

18  follow-up question and say, "Hey, when you say 'strange,' this

19  is what I think and this is what you think," right?

20  A.   Right.

21  Q.   But you never did that?

22  A.   I don't recall asking him to define what he meant by

23  strange in that.

24  Q.   Very well.  But he told you that he got information from

25  a person who did not identify himself, correct?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

451

1   A.   Correct.

2   Q.   Okay.  And, again, I'm not giving you a hard time because

3   you didn't ask a lot of probing questions on that day because

4   you were just trying to break the ice with him to see if you

5   can get him to work with you.  Somma said you'd have more time

6   to work with him, right?

7   A.   Correct.

8   Q.   Okay.  But I do want to try to correct something about

9   what you testified about this morning.  Okay?

10  A.   Okay.

11  Q.   And you prepared to testify with Mr. Durham and his team,

12  right?

13  A.   Yes.

14  Q.   Okay.  And I think he asked you to look at Government

15  Exhibit 100.

16  A.   Yes.

17  Q.   Okay.  And when he asked you to look at Government

18  one- -- Exhibit 100, I think you may have answered that he did

19  not mention a call app on Page 20, right, in response to his

20  questions?

21  A.   Yes.

22  Q.   Okay.  Well, do me a favor.  Look at Page 20 and then 21,

23  And see if that refreshes your memory the first day about what

24  Mr. Danchenko told you.

25  A.   I apologize.  Yes, it basically says -- would you like me

Cross-Examination by Mr. Sears 10/12/22

────United States v. Danchenko────

452

1   to read it?

2   Q.   Yeah.

3   A.   Okay.  I'll start at the middle of -- middle of the last

4   paragraph of Page 20.

5           (As read):  "The two of them talked for a bit and

6   the two of them tentatively agreed to meet in person in New

7   York City at the end of July.  At the end of July, Danchenko

8   traveled with his daughter to New York but the meeting never

9   took place and no one ever called Danchenko back.  Altogether,

10  he had only a single phone call with an individual he thought

11  to be Millian.  The call was either a cellular call or it was

12  a communication through a phone app."

13  Q.   I'm sorry, what did you just say?

14  A.   "Or it was a communication through a phone app."

15  Q.   Okay.  So remember when Mr. Durham asked you questions

16  this morning, right?

17  A.   Yes.

18  Q.   Did he omit -- ask you to look at page 21 to see what

19  Mr. Danchenko told you that day?

20  A.   I don't think he was omitting.  I think I --

21  Q.   Okay.  And did you intentionally omit, intentionally tell

22  the jury something wrong, right?

23  A.   No.

24  Q.   But the import of the testimony was that, no, he never

25  mentioned in that first meeting it could have been a phone

———United States v. Danchenko———

453

```
 1  app, right?
 2  A.   Correct.
 3  Q.   And now we all know that that's false, right?
 4  A.   Correct.
 5  Q.   So he did mention a mobile app?
 6  A.   That is correct.
 7  Q.   Okay.  Now, he also told you he traveled, right?
 8  A.   Yes.
 9  Q.   Okay.  And did you ask him for his travel records?
10  A.   I don't recall asking for his travel records.
11  Q.   Okay.  And you didn't ask him for how he traveled, right?
12  A.   I think we talked about how he traveled.
13  Q.   Did he tell you that it was via Amtrak?
14  A.   I think we were talking about overseas trips, so...
15  Q.   Okay.  I'm sorry, I'm focusing specifically with respect
16  to the Millian matter.
17  A.   Oh, I apologize.
18  Q.   Yeah.
19  A.   I don't recall exactly whether by car or train.  I think
20  by train.
21  Q.   Okay.  Now, prior to you coming into court today and
22  testifying before the ladies and gentlemen of the jury, did
23  anybody from the special counsel's team, the FBI, ever show
24  you Mr. Danchenko's travel records?
25  A.   Which travel records are we talk --
```

```
 1   Q.   For the Amtrak.

 2   A.   For the Amtrak?

 3   Q.   The trip to see Mr. -- who he believed to be Mr. Millian.

 4   A.   I don't recall seeing Amtrak travel records.

 5   Q.   Okay.  We'll talk about that in a minute.

 6        Now, before we get into more specifics, I want to

 7   talk about Mr. Millian for a minute in that timeframe.  Let's

 8   say from between July 14th of 2016 --

 9   A.   Okay.

10   Q.   -- into August of 2016.

11        First of all, do you walk around with a cell phone

12   every day?

13   A.   Most days, yes.

14   Q.   Okay.  And do you use it every day?

15   A.   Pretty much.

16   Q.   All right.  And so one of the things -- and I apologize

17   to Judge Trenga -- that I don't like about this courthouse is

18   that I'm away from my cell phone all day because I'm married

19   to it.  Okay?  I use it all the time, right?

20   A.   Right.

21   Q.   I'm assuming you do too, right?

22   A.   I do, yes.

23   Q.   And for most Americans and most people, you need your

24   phone to know what's going on in your life and to communicate

25   and all kinds of things, right?
```

─────United States v. Danchenko─────

455

1  A.   Yes.

2  Q.   And so a day without a cell phone is almost impossible,

3  right?

4  A.   Yes.

5  Q.   And a day without being able to communicate with someone

6  in this day and age is almost impossible, right?

7  A.   Yes.

8  Q.   Okay.  Now, you don't think that Mr. Millian was capable

9  of making a phone call between July 14th or August 1st of

10  2016, right?

11  A.   I believe he -- again, I don't know what Mr. Millian's

12  communication -- communication apparatus or anything of that

13  sort was --

14  Q.   Sure.

15  A.   -- during that time, so I don't know how I would answer

16  that.

17  Q.   Sure.  Well, but you know that most people can't go a day

18  without using a cell phone or Skype, right, or FaceTime, or

19  WhatsApp, but there are a lot of different mobile apps that

20  people use, right?

21  A.   Correct.

22  Q.   And as an investigator, you know that, right?

23  A.   Correct.

24  Q.   And I think Mr. Danchenko told you that this could -- was

25  likely from a phone call or a mobile app, right?

Cross-Examination of Brian Auten  10/12/22

--United States v. Danchenko--

456

1   A.    Correct.

2   Q.    I want to show you, do you remember taking notes?

3   A.    I do.

4   Q.    Okay.  And I would like you to look at defense exhibit --

5          MR. ONORATO:  I don't know if the Court has a copy

6   of 497.

7          THE COURT:  Which one?

8          MR. ONORATO:  497.  I'm not sure if the Court has a

9   copy of it.

10         THE COURT:  I don't.

11         MR. ONORATO:  Okay.  I apologize to the board.

12         THE WITNESS:  I have my notes in front of me.

13  BY MR. ONORATO:

14  Q.    Okay.  And just for the record, again, we're at --

15  they're not page-numbered, but it's Defense Exhibit 497, and

16  it's Bates-stamped SCO350067270.  Okay?

17         And those appear to be -- but I don't want you to

18  just agree with me -- the interview notes from your first

19  conversation with Mr. Danchenko.  So that's on July 24th -- or

20  January 24th.  I keep saying July.

21  A.    Yeah.

22  Q.    Okay.  I want you to look at the middle of the page.

23  A.    Yes.

24  Q.    And he said to you, which you wrote down at the same time

25  and it looks like you underlined it, "Either cell phone or an

Cross Examination of _ BY _ 10/12/22

—United States v. Danchenko—

457

1   app," with an underscore, right?

2   A.   That is correct.

3   Q.   Those are your handwritings, right?

4   A.   That is my handwriting, yes.

5   Q.   And when he wrote "app," the instant is that it's

6   probably an app because you're emphasizing "app," right?

7   A.   I don't necessarily know if I was emphasizing, but I did

8   draw a line under it, yes.

9   Q.   And you would agree that when you draw a line under

10  something that's generally -- one of the reasons you do it is

11  you want to emphasize --

12  A.   It can be one of the reasons, yes.

13  Q.   Right.  Okay.

14         THE COURT:  On what page of the document is that?

15         MR. ONORATO:  Your Honor, it's Bates-stamp 270 as

16  the last Bates.

17         THE COURT:  270.

18         MR. ONORATO:  Yeah.

19         THE COURT:  Thank you.

20  BY MR. ONORATO:

21  Q.   Okay.  And so despite Mr. Durham asking you about the

22  phone call and that he didn't say app on the first day, not

23  only did your 302 or your report say that, but these notes

24  have an indication that he not only said either cell phone or

25  app, but you underlined app in your notes?

1    A.   That is correct.

2              MR. ONORATO:  Your Honor, I would like to move into

3    evidence 67270 -- just that page of 497.

4              (Court reporter clarification.)

5              MR. ONORATO:  So it's SCO350067270.

6              THE COURT:  Any objection?

7              MR. DURHAM:  No objection.

8              THE COURT:  Without objection.

9              MR. ONORATO:  And that's in Defense Exhibit No. 497,

10   just that one page.  And may we publish it, Your Honor?

11             THE COURT:  Yes.

12             MR. ONORATO:  Okay.

13   (Defendant's Exhibit No. 497 was admitted into evidence.)

14             (Exhibit published.)

15   BY MR. ONORATO:

16   Q.   All right.  And just to show the jury what you were

17   looking at, right?

18   A.   Right.

19   Q.   So, again, despite the testimony this morning, that

20   Mr. Danchenko did not mention a phone app, just to highlight

21   it for you, right?

22   A.   Correct.

23   Q.   And so that's the correct testimony, right?

24   A.   Yes.

25   Q.   And whether it was Mr. Durham's question or whether it

Cross-Examination of ██████   10/11/22

United States v. Danchenko

459

1    was your misunderstanding, you did not intentionally leave the

2    jury with the impression, right?

3    A.    Correct.

4    Q.    That he didn't say that on the first day, right?

5    A.    Correct.

6    Q.    But you would think as lawyers in the case that we should

7    know the general state of the evidence?

8    A.    Correct.

9    Q.    And could correct that for you, right?

10   A.    Correct.

11   Q.    And Mr. Durham didn't take any steps to correct your

12   wrong answer, did he?

13   A.    I don't recall him correcting that.

14   Q.    Okay.  But now, I'm correcting it, right?

15   A.    You are correcting it.

16   Q.    And now, this is true and accurate, right?

17   A.    Yes, it is.

18   Q.    Okay.  So I'm going to show you -- well, Defense

19   Exhibit 354.

20            Do you see that on the screen?  Oh, I'm sorry.

21   A.    Yes, this is 354.

22   Q.    Okay.  Do you recognize that document?

23   A.    This looks like it is from -- enter the date and the

24   individuals involved.  This looks like it is maybe linked

25   messages back and forth between individuals and special

1    counsel.

2    Q.   Yep.  And I think Mr. Durham asked you questions about

3    some colleagues of yours, right, and I think one of them is

4    Brittany Hertzog?

5    A.   Brittany Hertzog, yes.

6    Q.   Okay.  And she's one of the people who eventually got put

7    on the team and was doing investigative work, right?

8    A.   Correct.

9    Q.   Okay.  When you look at that document, does it suggest to

10   you in the top that there are -- U.S. government, Brittany

11   Hertzog, has listed a number of phone numbers purporting to be

12   from Sergei Millian?

13   A.   Yes, there are a number of phone numbers that are

14   redacted in this document.

15   Q.   Correct.  And they are blacked out, but you can see that

16   it lists that he has a number of phone numbers, right?

17   A.   Correct.

18   Q.   Okay.  And did special counsel ever talk to you about how

19   many phone numbers that it became aware of that Mr. Millian

20   may have had in this timeframe?

21   A.   I don't recall that.

22   Q.   Okay.  And you know that Mr. Millian traveled between the

23   United States and Russia and other places back in 2015 and

24   '16, right?

25   A.   I do recall that, yes.

1   Q.   Okay.  Do you recall becoming aware that he had a Moscow

2   number?

3   A.   I don't know if I knew that or not.

4   Q.   Okay.  But the special counsel didn't ask you to analyze

5   any of Mr. Danchenko's foreign phone numbers or anything like

6   that, did they?

7   A.   Mr. Danchenko's or Mr. --

8   Q.   Mr. Millian's?

9   A.   Again, sitting here right now, I don't recall any of

10  that.

11  Q.   Okay.  The special counsel -- how about this special

12  counsel, either special counsel, but particularly the Durham

13  team?

14  A.   I'm not aware if they analyzed Sergei Millian's emails --

15  or telephone numbers or not.

16  Q.   And they didn't ask you to do that?

17  A.   No, they did not ask me to do that.

18  Q.   Okay.  Now, as an analyst, right, when we're talking

19  about whether a phone call could have been made or an app call

20  could have been made, would it have been material for you to

21  know that he had numerous phone numbers at that time?

22  A.   At the time that we had the interview?

23  Q.   At the time you had the interview, but --

24  A.   Right.

25  Q.   At the time -- whenever point in time you want to know if

─────United States v. Danchenko─────

462

1  Mr. Millian made a phone call, right?

2  A.    Right.

3  Q.    So if the relevant timeframe is July of 2016.

4  A.    Yep.

5  Q.    Today it would be relevant for you to know how many phone

6  numbers he had, right?

7  A.    Correct.

8  Q.    Okay.  Nobody discussed with you the amount of phone

9  numbers that he's had, right?

10  A.    Not in -- no.

11  Q.    In preparation for your testimony here, right?

12  A.    No.

13  Q.    Okay.  I'm going to show you what's been marked as

14  Defense Exhibit 152T.

15         THE CSO:  Counsel, what was the number?

16         MR. ONORATO:  152T.

17         Oh, I'm sorry.  Government's Exhibit 152T.  My

18  apologies.  My apologies.

19         THE WITNESS:  I'm sorry.  What number?

20         MR. ONORATO:  152T.

21         THE WITNESS:  152T.  I have a 1205, 1 -- I'm

22  actually not seeing that in this one -- 205T.

23  BY MR. ONORATO:

24  Q.    We'll move on because we'll make the point a little bit

25  later.

Cross-Examination of [B]... 10/14/22

—United States v. Danchenko—

463

1  A.   Okay.

2  Q.   Are you aware that Mr. Millian in August of 2016 happened

3  to get on the FBI's radar screen?  Again, we've talked about

4  the surveillance, right?

5  A.   Correct.

6  Q.   And that the FBI took other investigative steps with

7  regard to Mr. Papadopoulos where it became aware substantial

8  connections between Mr. Papadopoulos and Mr. Millian?

9  A.   I do recall that.

10  Q.   Okay.  And so, I'm going to ask you to look at another

11  Exhibit, 405.

12        THE CSO:  Counsel?

13        MR. ONORATO:  Yep.

14        THE CSO:  Number?

15        MR. ONORATO:  405.

16        I'm sorry, it's 403.

17        THE WITNESS:  Yes, I have 403 in front of me.

18        MR. ONORATO:  Okay.  Take a look at that.

19        THE WITNESS:  Yes.

20  BY MR. ONORATO:

21  Q.   And what is 403?

22  A.   403 is a copy of intelligence memo, dated 15th of May,

23  2017, and it marks Facebook contact between -- then it has

24  basically both individuals redacted.

25  Q.   Okay.  And then, if you look on -- at the -- first of

Cross-Examination of _____ by Mr. Durham 10/13/22

United States v. Danchenko

464

1  all, have you seen this intelligence report?

2  A.   I do recall seeing this, yes.

3  Q.   Okay.

4        MR. ONORATO:  Your Honor, I'm going to move

5  Defendant's 403.

6        THE COURT:  Any objection?

7        MR. DURHAM:  Can I just voir dire on the, um, on

8  the --

9        THE COURT:  Yes.

10                       VOIR DIRE

11 BY MR. DURHAM:

12 Q.   Sir, looking at Defendant's Exhibit 403, you said you've

13 seen that before, correct?

14 A.   403, I believe I have seen this before, yes.

15 Q.   Okay.  And with respect to 403, that's a product that's

16 put together by contact between Mr. Millian and

17 Mr. Papadopoulos, correct?

18 A.   Correct.

19 Q.   And you are familiar with that, correct?

20 A.   I believe I have seen this before, yes.

21 Q.   And do you remember what Papadopoulos and Millian were

22 involved in that generated these numbers?

23 A.   I don't recall exactly what they were involved in, but it

24 was --

25 Q.   But was it pretty much they were involved in real estate

─United States v. Danchenko─

465

1  or investment discussions over a long period of time?

2  A.   That, I don't recall exactly.

3  Q.   Well, how about generally?  Do you generally refer --

4  recall that Papadopoulos and Millian were involved in

5  discussions about real estate projects and the like?

6  A.   In January of...

7  Q.   Well, this whole period that's reflected in Defendant's

8  Exhibit 403.

9  A.   Yeah, again, I don't know if I -- I don't know if I can

10 speak to that at this point.

11 Q.   Well, you -- you were the analyst -- that supervisory

12 analyst, correct?

13 A.   Yes.

14 Q.   Did you recall, sir, what it was that Mr. Millian was

15 involved in, the kind of investments?

16 A.   Yes, he was involved in investments and the like.

17 Q.   Right.

18 A.   But I don't know if I can speak to, at this point, these

19 phone records being tied to any real estate deals or anything

20 of that sort.

21 Q.   Right.  So all of these records have shown there was

22 contact between the two of them, correct?

23 A.   Correct.

24 Q.   And did you know that Millian was involved in the energy

25 sector as well?

Cross-Examination of B. Auten   10/12/22

─United States v. Danchenko─

466

1   A.   Yes, correct.

2   Q.   And did you know that Papadopoulos was talking about

3   getting involved in the energy sector in the Middle East?

4   A.   Yes, I did know that.

5   Q.   Does that refresh any recollection as to whether or not

6   the contact between Millian and Papadopoulos had to do with

7   energy and other investments?

8   A.   Again, I am familiar with both of those things.  I don't

9   know if that is what this document was actually written for.

10  Q.   Okay.  And there's nothing in this document that tells

11  you what it is about, correct?

12  A.   No.  Gmail talks about -- there are a couple of

13  references on -- it's not -- it's Bates Number -- last Bates

14  number is 105262.

15  Q.   Uh-huh.

16  A.   And there are two paragraphs that talk about another

17  individual involved with energy.

18  Q.   Right.  This is all about business, correct?

19  A.   Again, I don't know if all of this is about business.  I

20  know that there are paragraphs in here involving energy.

21  Q.   Okay.  So one can tell from this is that they were

22  involved in exchanges of emails or the like, correct?

23  A.   Correct.

24  Q.   And it appears it has to do with energy, correct?

25  A.   It might , yes.  Again, there are a lot of -- there are a

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

467

1   lot of communications on here.

2   Q.   Yes.

3   A.   So I would not be able to state with any substance that

4   these are all involving energy issues.

5   Q.   You can't say that because the document doesn't tell the

6   jury what it's about, other than that it, at least it has

7   partially to do with energy?

8   A.   Correct.

9   Q.   Between Millian and Papadopoulos, correct?

10  A.   That's what it appears, correct.

11  Q.   So it would be unreasonable to conclude anything or draw

12  any conclusions from this other than Papadopoulos and Millian

13  were involved in investments in the energy sector, right?

14  A.   I don't know if I can say that it follows necessarily

15  from this, that all of these things deal with that.

16  Q.   That wasn't my question, though.

17  A.   Okay.

18  Q.   My question was:  It would be unreasonable to conclude

19  from this document anything other than they were at least

20  involved in talking about -- the energy sector, correct?

21  A.   I would say that from this document there may --

22  Q.   Uh-huh.

23  A.   -- there are likely communications within this list of

24  communications dealing with energy, though I cannot say,

25  analytically speaking, that all of these deal with energy.

Cross-Examination of ___ B____   10/13/22

─────United States v. Danchenko─────

468

1   Q.   Fair enough.  You know that Millian was involved in the

2   energy sector and real estate?

3   A.   I do recall that.

4   Q.   And Papadopoulos is involved in the energy sector and

5   real estate?

6   A.   I recall that.

7   Q.   And so this document doesn't have anything to do, from

8   looking at it on its particulars, anything to do with Russia

9   and Russia collusion and the like, correct?

10  A.   So the only thing that this has is -- it has a list of --

11  most of it is a list of communications between the two

12  parties, dates, times.

13  Q.   Okay.

14         MR. DURHAM:  I have no objection to it, Your Honor.

15         THE COURT:  All right.  Without objection, 403 is

16  admitted.

17  (Government's Exhibit No. 403 was admitted into evidence.)

18  (Cross-examination continues.)

19  BY MR. ONORATO:

20  Q.   Okay.  And I'm glad that Mr. Durham took five minutes of

21  my examination with you to talk about something I didn't want

22  to ask you about, okay?  I don't care if they were talking

23  about going to the beech or vacation.  It's not relevant to --

24         MR. DURHAM:  Your Honor, the government is going to

25  object to counsel speaking about what he cares about.

———United States v. Danchenko———

469

```
 1              THE COURT:  Well, there's been a lot of that on both

 2    sides.

 3              MR. ONORATO:  I apologize.

 4    BY MR. ONORATO:

 5    Q.   So the import of that document is that you were

 6    investigating Mr. Papadopoulos after Crossfire Hurricane,

 7    right?

 8    A.   In Crossfire Hurricane, yes.

 9    Q.   Right.  But you got --

10    A.   And special counsel.

11    Q.   Right.  And then Mr. Millian was also being investigated,

12    right?

13    A.   Correct.

14    Q.   And so, the import of that is that there's communication

15    between Papadopoulos and Millian, and the FBI was documenting

16    that because it was important, right?

17    A.   Correct.

18    Q.   Okay.  It doesn't -- I don't care about the contents of

19    what they were discussing, just the fact that there was this

20    relationship that you needed to explore, right?

21    A.   Correct.

22    Q.   Okay.  And when Mr. Durham talked to you about

23    Mr. Millian's business interest, were you aware that he was

24    telling a lot of people that he was actually doing real estate

25    deals for -- business deals with Donald Trump at the same
```

─United States v. Danchenko─

470

1   time?

2   A.   You mean Mr. Millian?

3   Q.   Yeah, in the August timeframe, in 2016?

4   A.   I don't have a clear recollection of that.

5   Q.   Okay.  Did the special counsel team ever tell you that

6   Mr. Millian was in possession of an iPad on the 14th of July

7   of 2016?

8   A.   You mean -- sorry.

9   Q.   When I say "special counsel," I'm only going to refer to

10  Mr. Durham.  Okay?

11  A.   Thank you.  I -- I don't believe I've known about an

12  iPad.

13  Q.   Okay.  And do you know that with an iPad Apple has a

14  program called FaceTime, right?

15  A.   Correct.

16  Q.   Okay.  And you can FaceTime people, right?

17  A.   Correct.

18  Q.   And you can FaceTime people without using a telephone

19  carrier, right?  It's Internet based.

20  A.   Correct.

21  Q.   Okay.  And if I FaceTime you today, there would be no

22  record on my Verizon bill to say that I FaceTimed you today

23  because it's Internet based, right?

24  A.   That is my understanding, yes.

25  Q.   Okay.  Did the special counsel tell you that on July 14th

Cross Examination of B F Agent 10/12/22

United States v. Danchenko

471

1   of 2016 that he was telling someone to call him at area code

2   (212) 844-9455?

3   A.   I don't believe I'm familiar with that.

4   Q.   Okay.  And that's the time frame when Mr. Danchenko told

5   you that he received a communication from him, right?

6   A.   What was the date again?

7   Q.   July 15th, I'm sorry, of 2016.

8   A.   Yes, that would have been around the same time period.

9   Q.   Okay.  And would that have been important for you, as an

10  analyst, to know that Mr. Millian had access to FaceTime or

11  telephone in that period of time?

12          MR. DURHAM:  I'm sorry, could I just ask for the

13  date again?  I missed the date.  What date is that?

14          MR. ONORATO:  July 15th.

15          MR. DURHAM:  July 15th.

16          MR. ONORATO:  15th.

17          MR. DURHAM:  Okay.

18  BY MR. ONORATO:

19  Q.   Can you look at Defense Exhibit 480, please.

20  A.   480.

21          THE COURT:  480?

22          MR. ONORATO:  Yes, sir.

23  BY MR. ONORATO:

24  Q.   Okay.  Take a look at that.

25  A.   Yes.

1    Q.   First of all, does it appear to be a LinkedIn message

2    between George Papadopoulos and Mr. Millian?

3    A.   Yes, it does.

4    Q.   And the date of that is July 15th of 2016, right?

5    A.   Correct.

6    Q.   Okay.  And just -- it appears to be an email that

7    LinkedIn is sending to Mr. Millian, correct?

8    A.   Yes.

9    Q.   Okay.  And I'm just going to direct your attention to a

10   specific portion of the second page.  Okay?

11   A.   Yes.

12        MR. ONORATO:  And, Your Honor, I'm not going to talk

13   about the --

14        THE COURT:  All right.

15   BY MR. ONORATO:

16   Q.   Okay.  Millian writes to George -- do you see where it

17   says, "To George"?

18   A.   Yes.

19   Q.   Okay.  So that's Millian sending a comment to

20   Mr. Papadopoulos, right?

21   A.   Correct.

22   Q.   Okay.  And I want to direct your attention to the bottom

23   of the highlighted portion where it says, "Please do not

24   hesitate to contact me at (212) 844-9455."

25   A.   I see that, yes.

Cross-Examination of ... by ... 10/13/22

┌─ United States v. Danchenko ─┐

473

1   Q.   Okay.  And do you see in the last line it says, "Sent

2   from LinkedIn for iPad"?

3            Okay?

4   A.   Yes, I see that.

5   Q.   Okay.  And so in this timeframe Mr. Millian is saying on

6   the 15th that Mr. Papadopoulos can call him at that phone

7   number that we discussed, right?

8   A.   Correct.

9   Q.   Okay.  And so do you know that the 212 area code is from

10  New York?

11  A.   Yes.

12  Q.   Okay.  And that's where Mr. Millian lived, right?

13  A.   Correct.

14  Q.   Okay.  And you also sent an iPad -- a message from an

15  iPad, right?

16  A.   Correct.

17  Q.   And, again, that's a device that you can FaceTime people

18  from that we all know, right?

19  A.   Yes.

20  Q.   And the one that doesn't leave a record or footprint on a

21  device, right?

22  A.   In terms of a record on a device.

23  Q.   I mean a -- with a cell phone carrier, like Verizon or

24  Sprint or AT&T.

25  A.   Correct.

─────United States v. Danchenko─────

474

1  Q.   Okay.

2       MR. ONORATO:  And, Your Honor, we're going to just

3  move to introduce -- I'm not going to publish it to the

4  Jury -- just a limited portion of that.

5       THE COURT:  What portion?

6       MR. ONORATO:  Just the phone number and then the

7  fact that it was sent from an iPad.

8       THE COURT:  All right.  Is there an objection?

9       MR. DURHAM:  No, Your Honor.

10      THE COURT:  All right.  Without objection, the

11 limited portion identified of 480 is admitted.

12 (Defendant's Exhibit No. 480 was admitted into evidence.)

13      MR. DURHAM:  Can I just talk with counsel for a

14 moment, Your Honor?

15      THE COURT:  Yes.

16      (Counsel confers.)

17 BY MR. ONORATO:

18 Q.   And, again, I was just trying to be careful.  And the

19 email also says that you can contact me here and you can leave

20 what we call a voicemail, right, at the 212 number?

21 A.   Yes.  It says, "Please leave a VM" -- he says he is

22 currently on a business trip to Asia, please leave a VM.

23 Q.   Okay.  Perfect.

24      MR. DURHAM:  The government has no objection to the

25 presentation as long as it includes --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

475

1          (Court reporter clarification.)

2          MR. DURHAM:  No objection to it being admitted to

3    counsel's offer, so long as it includes, "Please do not

4    hesitate to contact me at the number or my personal email,

5    milliangroup@gmail.com.  Best regards, Sergei Millian.  P.S.,

6    I'm currently on business trip to Asia.  Please leave a VM."

7          THE COURT:  All right.

8          MR. DURHAM:  With context to voicemail.  We have no

9    objection to --

10          THE COURT:  All right.  That will --

11          MR. DURHAM:  Oh, I'm sorry.  Then it says, "Sent

12    from LinkedIn iPad."

13          No objection, so long as it's all included.

14          THE COURT:  All right.  So the sentencing beginning,

15    "Please do not hesitate," through the end of that paragraph

16    will be admitted.

17          MR. ONORATO:  Thank you.

18    BY MR. ONORATO:

19    Q.   Now, if you look at the first page of that document --

20    again, you discussed it real -- previously.  But he gets that

21    in the form of an email, right?

22    A.   Yes.

23    Q.   Okay.  Okay.  So an email was sent to him and then that's

24    where the message was attached?

25    A.   Yes.

─────United States v. Danchenko─────

476

1    Q.    Are you aware that Mr. Millian was proposing setting up

2    Skype calls from August of 2016?

3    A.    I don't know if I was aware of that or not.

4    Q.    Okay.  So I am going to show you Defense Exhibit 486.

5    Take a look at that.

6    A.    I see that.

7    Q.    Okay.  Now, as an analyst, would it be important for you

8    to know that in the timeframe of August of 2006 Mr. Millian

9    had yet another way to communicate through an app, this time

10   Skype?

11   A.    Yes.

12   Q.    Okay.  And that's dated August 5th of 2016, correct?

13   A.    Correct.

14           MR. ONORATO:  And I don't want to move in any of the

15   content of the email subject to -- I know that Mr. Durham may,

16   but if there's portions of it, I just want to introduce -- I

17   just want to introduce it for the fact that he has a Skype ID,

18   there's other material in there, and I have no objection to

19   add it --

20           THE COURT:  All right.  Any objection to 486?

21           MR. ONORATO:  And it will be redacted just to

22   reflect that he communicated via Skype, subject to

23   Mr. Durham's wishes.

24           THE COURT:  Okay.

25           (Counsel confers.)

Cross-examination of F.B.I. Agent 10/13/22

─United States v. Danchenko─

477

1        MR. DURHAM:  No objection, so long as the entire

2   document comes in.

3        THE COURT:  All right.  The entire document will be

4   admitted.  Defense Exhibit 486.

5   (Defendant's Exhibit No. 486 was admitted into evidence.)

6        MR. ONORATO:  So can we publish that to the jury?

7        THE COURT:  Yes.

8        (Exhibit published.)

9   BY MR. ONORATO:

10  Q.   So, again, this is George Papadopoulos, right?

11  A.   Yes.

12  Q.   The same person that the government opened Crossfire

13  Hurricane about, right?

14  A.   Yes.

15  Q.   And he's communicating with Mr. Millian, correct?

16  A.   Correct.

17  Q.   And he said, "My pleasure to initiate energy dialogue

18  with you," and he provides a Skype ID, right?

19  A.   Correct.

20  Q.   And then at the bottom of the document Mr. Papadopoulos

21  replies, "I want to introduce you to my" -- oh, I'm sorry, I

22  may have it backwards.

23       But he writes, "I want to introduce you to my

24  friend, Sergei Millian, the president of the chamber of

25  commerce.  Let's set up a Skype call tomorrow or Sunday,"

─United States v. Danchenko─
478

1   right?

2   A.   Right.  It looks like it's a brokered introduction.

3   Q.   Right.  It's just -- right.  It's just an introduction,

4   right?

5   A.   Right.

6   Q.   Similar to what Mr. Danchenko said that he was introduced

7   to Mr. Millian by Mr. Zlodorev, right?

8   A.   Correct.

9   Q.   Okay.  And in that there is a discussion about using

10  another way to communicate that, again, would not leave a

11  record on my Verizon cell phone bill, right?

12  A.   Are you talking about the Skype here?

13  Q.   Correct.

14  A.   Correct.

15  Q.   Okay.  Thank you.

16          Are you aware that when Mr. Danchenko spoke to the

17  FBI he told them that he used, in this timeframe, WhatsApp,

18  Viper, FaceTime, Wickr, and Telegram?

19  A.   I think it would depend on what time frame you are

20  talking about talking to the FBI.

21  Q.   Sure.  But between, let's say, January, when you met with

22  him, and call it July, after he's meeting with Mr. Helson.

23  A.   I don't know if I would be able to rattle off all of

24  those different things.

25  Q.   Sure.  Some of them?

─United States v. Danchenko─

479

1   A.   Some of them.

2   Q.   Okay.  And, again, those apps -- whether it's one, two,

3   three, four, or five of them -- do not leave records on my

4   Verizon cell phone bill, right?

5   A.   I do not believe so.

6   Q.   Okay.  And Mr. Danchenko told you that likely got that

7   call from mobile app, right?

8   A.   He said either phone call or an app.

9   Q.   Right.  And prior to today, did you see any of the emails

10  that I just showed you?

11  A.   No, I don't believe I've seen -- I did not see these in

12  preparation for trial.

13  Q.   Were you aware that he had a 212 number prior to today?

14  Did you discuss with the special counsel that 212 number?

15  A.   I don't recall discussing the 212 number with special

16  counsel.

17  Q.   Did you discuss that he could have used FaceTime to

18  communicate because he had an app in that timeframe --

19  A.   I don't recall discussing --

20  Q.   -- or an iPad?  Sorry.

21  A.   Sorry.

22  Q.   An iPad?

23  A.   An iPad?

24  Q.   Yup.

25  A.   I don't recall that, no.

Cross-Examination of Brian Auten 10/12/22

─United States v. Danchenko─

480

1   Q.   So they never asked you that question?

2   A.   Not to my recollection.

3   Q.   Okay.  And they never asked you if the -- did you ever

4   discuss the importance that Skype can be used to communicate

5   with somebody and make a call that way, right?

6   A.   I don't recall discussing the importance of Skype.

7   Q.   Okay.  So they never discussed those things, right?

8   A.   Not to my recollection.

9   Q.   All right.  Now, these things would all be relevant to

10  you to try to determine whether Mr. Danchenko could have

11  received contact from someone.  I'm not saying it's

12  Mr. Millian, right?

13  A.   Are you talking about assessing that now or assessing

14  that at the time --

15  Q.   Any time.

16  A.   -- or any time?

17  Q.   At any time, right?

18  A.   Any time, yes, it would be helpful.

19  Q.   Right.  And so any time meaning that you were preparing

20  to testify after meeting with the government, right?

21  A.   Correct.

22  Q.   The whole point of this trial is to determine whether it

23  was reasonable for him to hold that belief, right?

24  A.   Correct.

25  Q.   And so would it be important for you to know that the guy

─────United States v. Danchenko─────

481

1  that he said he could have gotten the call from was actually

2  using these messaging apps that Mr. Danchenko said he used?

3  A.   Yes, that's important.

4  Q.   Okay.  And they never talked to you about that?

5  A.   Not to my recollection, no.

6  Q.   Okay.  Now, I want to talk about some of the positive

7  statements -- well, first of all, let's just talk about

8  commonsense investigation, right?

9       If I want to remain anonymous and I call you, do you

10 think I'm going to use a phone number that you can trace to

11 me?

12 A.   I would say typically in situations where one wants to

13 remain anonymous, one goes into -- basically attempts to do

14 things that you can't trace back.

15 Q.   Right.  And the whole point is that someone might not

16 identify themselves because they don't want you to know for

17 certain who you might be, right?

18 A.   That's one possibility, yes.

19 Q.   And sometimes you get phone calls that are blocked,

20 right, and there might be a telemarketer so I'm not going to

21 take it because I don't want to get that call, right?

22 A.   Correct.

23 Q.   Okay.  Or it could be those people who call me up and say

24 I haven't paid my taxes and it's the IRS, and if I don't send

25 them 100 bucks, there's going to be a warrant.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Cross Examination of ___ B ___ 10/13/22

—United States v. Danchenko—

482

1    You're familiar with that scam, right?

2    A.   I'm not -- yes.

3    Q.   Okay.  But there are no records because people can

4    disguise phone numbers and make calls that won't come back to

5    their phone bills, right?

6    A.   Yes, that is correct.

7    Q.   Happens to all of us, right?

8    A.   That is correct.

9    Q.   Okay.  And let's talk about some of the things you said

10   about Mr. Danchenko when you testified in other places.  Okay?

11          So when you testified before the Senate, you said

12   the information from the interview that the primary

13   sub-source --

14          And we can agree that Mr. Danchenko is the primary

15   sub-source?

16   A.   Yes, we can.

17   Q.   -- provided details used to identify sub-sources in the

18   Steele -- referenced in the Steele reports, which assisted the

19   investigation.

20   A.   I would agree with that.

21   Q.   Okay.  And you were asked, and you said, On the whole you

22   did not see any reason to doubt -- and I'm quoting -- the

23   information the primary sub-source provided about who he

24   received information from, which was the supervising intel

25   analyst's focus, right?

────United States v. Danchenko────

483

```
 1   A.    Correct.
 2   Q.    And so when you made that statement under oath before the
 3   Senate, you didn't think he was lying to you that he had
 4   contact with Mr. Millian, right, or believed -- not that he
 5   did, that he believed?
 6   A.    I -- I have no reason to doubt that he believed he was
 7   talking to Mr. Millian based upon what he told us in the
 8   interview.
 9   Q.    Okay.  I'm sorry.  Once more, can you please repeat that
10   to the jury?
11   A.    I don't have any basis to -- at the time to believe
12   that --
13   Q.    You have no basis to doubt that he believed those facts,
14   right?
15               MR. DURHAM:  Objection, Your Honor.  That is not the
16   witness testimony.
17               THE COURT:  All right.
18               MR. DURHAM:  The witness testimony was at the time.
19               THE COURT:  Right.  Ask the question again.
20               MR. ONORATO:  Yep.
21   BY MR. ONORATO:
22   Q.    So you testified -- what's the date of your Senate
23   testimony?
24               445, can you take a look at that.
25   A.    445.  Do you have a page number?  Sorry.
```

Cross-Examination of B. Auten  10/13/22

─United States v. Danchenko─

484

1   Q.   I'm sorry.  Defense 445.

2   A.   Yes.

3   Q.   Page 182.

4        And what's the date that you give that testimony?

5   A.   October 29, 2020.

6   Q.   Okay.  So just so I'm clear, so we are now more than

7   3 1/2 years, okay, so 3 1/2 years away from the initial

8   meeting with Mr. Danchenko, right?

9   A.   Correct.

10  Q.   Okay.  3 1/2 years later you -- and I want you to read

11  what you said on 182, starting with "On the whole."

12  A.   Starting with Line 9?

13  Q.   Yes.

14  A.   (As read):  "I believe the primary sub-source was being

15  truthful about who his sub-sources were.  I don't think he was

16  fabricating sub-sources."

17  Q.   Thank you.

18  A.   Do you want me to go on?

19  Q.   Well, I want you to go to the portion where it says, "On

20  the whole."

21        182, Line 3.

22  A.   Line 3.

23        MR. DURHAM:  Your Honor, I'm going to object to

24  counsel asking the witness to refresh his recollection.  He's

25  not supposed to be reading from the documents.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Cross-Examination - By Mr. Onorato

―United States v. Danchenko―

485

BY MR. ONORATO:

Q.   So do you remember being -- do you remember giving the following answer:

           (As read):  "On the whole, you did not see any reason to doubt the information the primary sub-source provided about who he received information from, which was the supervisory intel's analyst focus."

           Right?

A.   Yes.  That is from my -- that's from my OIG testimony.

Q.   Right.  But you said it under oath, subject to penalty of perjury?

A.   Correct.

Q.   And it's true?

A.   Correct.

Q.   And it's true today?

A.   Correct.

Q.   Okay.

           MR. ONORATO:  Excuse me one second, Your Honor.  May I consult with Mr. Sears?

           THE COURT:  All right.

           (Counsel confers.)

BY MR. ONORATO:

Q.   And you gave that testimony 3 1/2 years after you met with Mr. Danchenko, right?

A.   That is correct.

Cross-Examination of Igor Danchenko 10/12/22

─────United States v. Danchenko─────

486

1   Q.   Okay.  And the only thing that changed between then and

2   today is that the special counsel told you that you were a

3   subject of an investigation in terms of, you know, what

4   conclusions may have or not have based on your interactions

5   with them, right?

6             So for -- strike that.

7             You gave that testimony before you received a

8   subject letter or being told you were a subject, right?

9   A.   I'm not exactly sure whether or not this preceded that or

10  whether it came before that or not.

11  Q.   But either way, whether you're a subject letter or not,

12  you stand by your testimony?

13  A.   I do stand by my testimony, yes.

14  Q.   Okay.  And, again, that testimony was given under oath,

15  subject to penalty of perjury, right?

16  A.   Correct.

17  Q.   Okay.  All right.  And I want to start talking now about

18  the event.  Okay.  So we already covered that he never said,

19  Mr. Danchenko, that the unidentified caller was 100 percent

20  Mr. Millian, right?

21  A.   Correct.

22  Q.   He said he believes it, right?

23  A.   Correct.

24  Q.   And that's what you wrote?

25  A.   Correct.

—United States v. Danchenko—

1  Q.   He told you that he reached out to a journalist named

2  Alexey Bogdanovsky -- and I'm going to butcher the name --

3  right?

4  A.   Correct.

5  Q.   All right.  And that's true, isn't it?

6  A.   That is what he told us, yes.

7  Q.   Okay.  And that -- that journalist put him in touch with

8  Zlodorev, right?

9  A.   That is what he told us, yes.

10  Q.   Okay.  And that Bogdanovsky suggested to Danchenko that

11  he should talk to Millian about topics related to Russia,

12  right?

13  A.   Correct.

14  Q.   And that he told Danchenko to reach out to Zlodorev

15  because Millian was a person Zlodorev and the news

16  organizations were talking to?

17  A.   Correct.

18  Q.   Okay.  Danchenko told you he discussed meeting Zlodorev

19  in person but it didn't happen, right?

20  A.   Correct.

21  Q.   He told you that reached out to Millian twice, right, at

22  that first meeting?

23  A.   Yes.

24  Q.   Via email -- I think that's what Mr. Durham asked you --

25  right?

—United States v. Danchenko—

488

```
 1   A.   Correct.

 2   Q.   All right.  And he said he got no response from the

 3   first, right?

 4   A.   Correct.

 5   Q.   Okay.  Then he said he reached out a second time, right?

 6   A.   Yes.

 7   Q.   Okay.  And this is what he said, quote, Things got

 8   strange, right?

 9   A.   Quote, Things got strange, yes.

10   Q.   And he got the unidentified call, right?

11   A.   Yes.

12   Q.   All right.  And, again, we've covered this, but it was

13   never 100 percent that he was making -- this is important,

14   because Mr. Danchenko is an analyst, right, by trade?  He does

15   kind of intel work, analyst work, right?

16   A.   That is correct.

17   Q.   And he told you the information he gave to Steele was a

18   combination of Steele's conclusions or analytical judgments,

19   but, more importantly, Mr. Danchenko's analyst conclusions,

20   right?

21   A.   Yes, that was --

22   Q.   Similar to what you do in government -- Defense Exhibit

23   400 and 401, those charts --

24   A.   Yes.

25   Q.   -- that you get information and then you try to make
```

————United States v. Danchenko————

489

```
 1   conclusions, right?

 2   A.   Correct.

 3   Q.   And so he's telling you that his belief was based on his

 4   analyst judgments in realtime based upon what he was hearing

 5   and what the information he knew, right?

 6   A.   I'm sorry, based --

 7   Q.   Based upon his -- where he got the unidentified caller,

 8   right?

 9   A.   Uh-huh.

10   Q.   The background that he got from the two journalists,

11   right?

12   A.   Right.

13   Q.   That's what he was basing his judgment on, right?

14   A.   That's what he told us, yes.

15   Q.   And there's nothing wrong about someone like

16   Mr. Danchenko trying to make an analyst conclusion, right?

17   A.   No.

18   Q.   Okay.  But he told you that it was from a Russian -- he

19   also told you that the conversation was in Russian, right?

20   A.   I recall that, yes.

21   Q.   So he was talking Russian.  So obviously I couldn't talk

22   in Russian because I don't speak Russian, but the caller was

23   talking in Russian, right?

24   A.   Yes.

25   Q.   And they talked a bit and they tentatively agreed to meet
```

─United States v. Danchenko─

```
 1   in New York City at the end of July, right?

 2   A.   Yes.

 3   Q.   And he told you he traveled to New York City, right?

 4   A.   Yes.

 5   Q.   He showed up, but nobody every called him back, right?

 6   A.   Yes.

 7   Q.   And he told you that -- again, that it was likely through

 8   a cellular communication or a mobile app, right?

 9   A.   Correct.

10   Q.   All right.  That's the first day.  Let's talk about the

11   second day.

12          Now, there you were asking some more questions,

13   right?

14   A.   Yes.

15   Q.   And he said, "Look, I learned about the guy, Millian,

16   from the journalist," right?

17   A.   Yes.

18   Q.   And he said, "I should talk to him," right?

19   A.   Correct.

20   Q.   And Danchenko told you a little bit more.  He said, "Look

21   I actually met in person with Bob Labosky (ph), and we're

22   Facebook friends," right?

23   A.   I don't recall the Facebook friends part of that, but

24   they met, yes.

25   Q.   Sure.  And so they went to a Thai restaurant?
```

—United States v. Danchenko—

491

1    A.   I do recall the Thai restaurant.

2    Q.   Yep.  And it was near Labosky's office near 17th or 18th

3    and K --

4    A.   Yes.

5    Q.   -- in D.C., right?

6    A.   Yes.

7    Q.   And he said, when he met with him, that he did not want

8    to ask Labosky targeted questions, right?

9    A.   I do recall that, yes.

10   Q.   Okay.  And the reason why is because, when you're trying

11   to gather intelligence, you don't want people to know what

12   your motive is, right?

13   A.   Correct.

14   Q.   Right.  And so when -- Danchenko was like, "Look, I'm

15   putting on kind of a thing where I'm just kind of, you know,

16   not letting him know what I'm trying to do here, I'm kind of

17   being cagey because that's what he has to do in his job,"

18   right?

19   A.   Correct.

20   Q.   Okay.  So he told you that Danchenko never met with

21   Zlodorev, right?

22   A.   I would have to be refreshed on that.

23   Q.   Okay.  So if we can go to Page 2 of Defense Exhibit 100.

24   A.   January 25th.  Do you have a page?

25   Q.   So I think the discussion is between -- I think we

—United States v. Danchenko—

492

1   covered 35.  So look at the top of 36.

2   A.   Yes.  Got it.

3   Q.   Just read the end of the first paragraph and see if that

4   refreshes your memory.

5   A.   Yes, it does.

6   Q.   Okay.  And so he told you that he never met with

7   Zlodorev, right?

8   A.   That is correct.

9   Q.   Okay.  And he told you that he emailed Millian either

10  late June or July of 2016?

11  A.   Correct.

12  Q.   And he said he did not get a response from the email?

13  A.   Correct.

14  Q.   Those are all things that he told you?

15  A.   Yes.

16  Q.   And then he said, "Things got strange," right?

17  A.   That is correct.

18  Q.   And he told you he got, in July of 2016, a call from the

19  unidentified Russian guy, right?

20  A.   Yes.

21  Q.   Okay.  And he thinks it was Millian, right?

22  A.   Yes.

23  Q.   But he never identified himself as Millian?

24  A.   That is correct.

25  Q.   And they talked for about 10 or 15 minutes, right?

—United States v. Danchenko—

493

A.   That's correct.

Q.   And they agreed to meet together in New York City?

A.   That is correct.

Q.   Okay.  And he said that he remembered they made points to
meet in New York and Danchenko offered to come up any time
Millian was available, right?

A.   Yes.

Q.   And so Danchenko was saying, "Look, unidentified caller,
I'll come up whenever you can," right?

     He didn't suggest a date.  The unidentified caller
said, "I'll come up whenever you're available," right?

A.   Yes.

Q.   But that person would not commit to a specific time,
right?

A.   Correct.

Q.   And so Danchenko said, "Look, I'm going to be in New York
for a couple of days, so, you know, let's try to do it then,"
right?

A.   Correct.

Q.   Okay.  And, again, in his role, when he needs to meet
with people, he will say things, right, because if he's going
to be available on Tuesday, say, "Oh, I'm just going to happen
to be in town Tuesday," right?  It's that kind of thing.
That's what he's telling you, that I'm making myself available
to have a meeting with this person, right?

Cross-Examination of _____ by Mr. _____ 10/13/22

──United States v. Danchenko──

494

1          MR. DURHAM:  The government is going to object to

2    counsel testifying as to what his client is thought or saying.

3          THE COURT:  Well, what -- what he understood.  Go

4    ahead.  You can answer.

5    BY MR. ONORATO:

6    Q.   The gist of it is, right?

7    A.   I don't know if I understood that this was some sort of

8    a -- for lack of a better term, a kind of potential -- I don't

9    know whether or not what he was talking about was I have to

10   make it sound like I'm available all the time --

11   Q.   Sure.

12   A.   -- or whether or not he was -- you know, he could be up

13   there.

14   Q.   Sure.  But you understand that people who do things like

15   Danchenko does -- do will sometimes pretend that they'll be

16   somewhere so there's opportunity created for a meeting, right?

17   A.   Yes.

18   Q.   No-brainer, right?

19   A.   Yes.

20   Q.   Okay.  And that you knew that the visit would be at the

21   end of July?

22   A.   Yes.

23   Q.   Okay.  And let's talk about some more things

24   Mr. Danchenko told you.  Okay?

25          He told you, right -- and this is in 302 -- that he

─────United States v. Danchenko─────

495

1   spoke to Zlodorev and Millian said, "Who the hell is

2   Danchenko," right?

3   A.   Right.

4   Q.   And that he told him that it would be hard for him to

5   reach out because he would be in South Korea, right?

6   A.   In China or South Korea.

7   Q.   Or China.  Right.

8        And that was after he showed up in the meeting and

9   Millian wasn't there, right?

10  A.   Yes.

11  Q.   Okay.  And that -- he said that he tried to follow up

12  with Millian once more in September of 2016, right?

13  A.   Correct.

14  Q.   All right.  And Mr. Durham told you this -- and I don't

15  know if you think it is material, but he said it was in

16  September of 2016, right?

17  A.   Correct.

18  Q.   Okay.  But the email was actually in August of 2016,

19  right?

20  A.   Correct.

21  Q.   But the contents of the email was that Mr. -- I think you

22  said he created a ruse, right?

23  A.   Yes.

24  Q.   And that's what Mr. Danchenko told you?

25  A.   Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

496

1   Q.   Okay.  So that's consistent, right?

2   A.   That is consistent.

3   Q.   And even though he didn't give you that email, he's

4   giving you information that's been corroborated with the

5   evidence that the special counsel introduced, right?

6   A.   Correct.

7   Q.   Okay.  He told you that there was a land investment

8   project, right?

9   A.   Yes.

10  Q.   And that he said that he and Millian actually became

11  friends on LinkedIn, which was before August of 2011, right?

12  A.   Yes.

13  Q.   All in that email, right, or in that meeting, right?

14  A.   Yes.

15  Q.   Okay.  And you said that after -- after the 10- to

16  15-minute conversation, there was no other phone conversations

17  between him and Millian, right?

18  A.   That is my understanding, yes.

19  Q.   Okay.  Now, I'm going to show you -- never mind.

20        Okay.  Now, I'm going to show you some other

21  information to see if you think it is relevant.  So let's look

22  at Defense Exhibit 422A and B.

23             (A pause in the proceedings.)

24             (Counsel confers.)

25  BY MR. ONORATO:

─United States v. Danchenko─

497

```
 1  Q.   Okay.  Well, did -- let me ask you this:  Did the special

 2  counsel ever tell you that they subpoenaed Mr. Danchenko's

 3  Amtrak travel records for this time frame?

 4  A.   I don't recall them saying that.

 5  Q.   Okay.  They never showed you that on July 25th,

 6  approximately 5:00 or so in the evening, that Mr. Danchenko

 7  bought train tickets to go to --

 8            MR. DURHAM:  Your Honor, the government is going to

 9  object to the form of the question.  I think the witness has

10  indicated he doesn't know anything about it.  Counsel knows

11  we're going to move those exhibits.

12            THE COURT:  All right.  Do you have the exhibits?

13            MR. ONORATO:  I do.

14            THE COURT:  Let's move them in.  All right?

15            MR. ONORATO:  Move them in?

16            THE COURT:  Yes.

17            MR. ONORATO:  Okay.  So I'm going to introduce

18  Defense Exhibits 422A and B, which I think might be

19  cross-marked as Government's Exhibit 1400, if I'm not

20  mistaken.  1300.  1300.

21            THE COURT:  All right.  Defense Exhibits 422A and B

22  are admitted, as are Government Exhibit 1300.  Is that what it

23  is?

24            MR. ONORATO:  Yeah.  And they are the same, Judge.

25            THE COURT:  All right.
```

─────United States v. Danchenko─────

498

1   (Government's Exhibit No. 1300 and Defendant's Exhibit 422A-B

2   was admitted into evidence.)

3           MR. ONORATO:  Your Honor, I would like to publish

4   those to the jury.

5           THE COURT:  Yes.

6           (Exhibit published.)

7   BY MR. ONORATO:

8   Q.   All right.  So take a look in the top where we talk

9   about -- where it indicates that on Page 2, where it talks

10  about the history of their transactions, okay.

11          And it appears, if you're looking at the line, that

12  there was a train ticket purchased departing Washington, D.C.,

13  going to New York, and the train is leaving at 3:57 a.m. on

14  July 26th, right?

15  A.   Correct.

16  Q.   Okay.  And that the return trip was 10:05 p.m. on

17  July 28th, right?

18  A.   Correct.

19  Q.   Okay.

20          MR. ONORATO:  And, Charlie, if you go down.

21  BY MR. ONORATO:

22  Q.   On the 25th, it looks like the ticket was purchased at

23  5:56 p.m., right?

24          (Counsel confers.)

25  BY MR. ONORATO:

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

499

1   Q.   All right.  So the tickets appear to be purchased, from

2   the timeline, July 25th, right, at 5:56 p.m.?

3           And it appears that the traveler is going to travel

4   at 3:47 a.m. the next morning, right, just several hours

5   later, right?

6   A.   Correct.

7   Q.   Okay.  And I think Mr. Durham asked you some questions,

8   you know, didn't Mr. Danchenko say that this was preplanned

9   travel?

10          Do you remember those questions?

11  A.   I do recall those questions, yes.

12  Q.   Okay.  And just being an analyst, right, let's assume I

13  got a phone call from an anonymous person, right, and we

14  talked about meeting in New York in a couple days, right?

15  A.   Right.

16  Q.   And I buy a ticket at 5:00 in the evening, and I leave at

17  3:00 in the morning, right?

18  A.   Right.

19  Q.   That doesn't seem like preplanned travel based on that

20  type of scenario, right?

21  A.   If we're talking about this, this doesn't look to be

22  preplanned.

23  Q.   Right.  It looks like it was pretty impulsive to buy at

24  5:56 or whatever, and you're leaving at 3:00 the next morning,

25  right?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

500

1   A.   Correct.

2   Q.   Okay.  And then, you're coming back on the 28th late at

3   night, right?

4   A.   Yes.

5   Q.   Okay.  But the special counsel never showed you those,

6   right?

7   A.   I don't recall going over those with special counsel.

8   Q.   Okay.  Now, do you think it will be material to you if

9   you knew Mr. Danchenko actually went to New York during this

10  timeframe?

11  A.   Yes.

12  Q.   Right.  It would corroborate that he was going to New

13  York because he believed there was a meeting?

14  A.   Right.

15  Q.   Okay.  And I want to walk you through -- and these are

16  Government Exhibits -- sorry.  It's going to take me a second.

17          MR. ONORATO:  Judge, would this be an okay time to

18  take five minutes, take the afternoon break?

19          THE COURT:  All right.  We'll take an early

20  afternoon break.

21          Ladies and gentlemen, we'll stand in recess until a

22  little after 4 o'clock.  You're excused to the jury room.  Do

23  not discuss this case among yourselves during the break.

24          (Jury dismissed.)

25          THE COURT:  Mr. Auten, do not discuss your testimony

—United States v. Danchenko—

501

1    during the break.  The Court will stand in recess.

2              (Recess.)

3              (Court proceedings resumed at 4:05 p.m.)

4              THE COURT:  You ready for the Court to bring out the

5    jury?

6              (Jury present.)

7              THE COURT:  Please be seated.  Counsel.

8              MR. ONORATO:  Thank you, Your Honor.

9              THE COURT:  Mr. Auten, you remain under oath.

10   BY MR. ONORATO:

11   Q.   So, Mr. Auten, we're going to go back in time for a

12   second.

13             Do you remember when you met with Mr. Danchenko he

14   told you about the introduction to Mr. Millian through Mr.

15   Zlodorev?

16   A.   Yes.

17   Q.   Okay.  So I'm going to show you what's been marked as

18   Defense Exhibit 2 -- 420T?

19             THE CSO:  I'm sorry, Counsel, which exhibit?

20             MR. ONORATO:  420T.

21             THE WITNESS:  I'm on 420T.

22   BY MR. ONORATO:

23   Q.   Okay.  420T appears to be an email from Dmitri Zlodorev,

24   right?

25   A.   Yes.

Cross-examination of B. Auten 10/12/22

——United States v. Danchenko——

502

1   Q.   And to Sergei Millian, right?

2   A.   Correct.

3   Q.   And the date of that email is May 26 of 2016, right?

4   A.   Correct.

5   Q.   And the gist of the email is that Mr. Zlodorev is asking

6   Mr. Millian whether he could introduce Igor Danchenko to him,

7   right?

8   A.   Yes, that's what it appears to be.

9           MR. ONORATO:  Okay.  Your Honor, I'm going to move

10  into evidence Defense 4230T.

11          MR. DURHAM:  Well, Your Honor, this is a document

12  that the Court may recall pretrial we wanted to use.  We were

13  precluded from using it.

14          THE COURT:  Right.

15          MR. DURHAM:  Now, defense counsel wants to introduce

16  it.  So I guess --

17          THE COURT:  It sounds like you may ultimately --

18          MR. DURHAM:  I guess they had some objection, but

19  they previously objected to our putting it in.

20          THE COURT:  I understand.  Well, it looks like

21  you're ultimately going to get your way on this one.

22          MR. DURHAM:  Yes, Your Honor.

23          THE COURT:  So 420T is admitted.

24          MR. DURHAM:  Thank you.

25  (Defendant's Exhibit No. 420T was admitted into evidence.)

———United States v. Danchenko———

```
 1   BY MR. ONORATO:
 2   Q.   Okay.  Did anyone from the special counsel's office ever
 3   show you 420T?  Take a look at it.
 4   A.   I did not see this with special counsel.
 5   Q.   So is this the first time today that you're seeing?
 6   A.   I believe so, yes.
 7   Q.   Okay.  And you would agree with me, if you look at the
 8   bottom, he's writing, Sergei, (As read):  "My colleagues have
 9   an acquaintance, Igor Danchenko, who works here in consulting.
10   Through them, he requested I find out if it was okay to get in
11   touch with you.  If I understood correctly, it is about Trump
12   and Russia, can I give him your contact information."  Right?
13   A.   Correct.
14   Q.   Okay.  And, again, you've never seen that before, right?
15   A.   Not to my recollection, no.
16   Q.   Okay.  But when you met with Mr. Danchenko in January of
17   2017, he told you that Mr. Zlodorev, right?
18   A.   Yes.
19   Q.   Made the introduction to Mr. Millian for him, right?
20   A.   Yes.
21   Q.   So that would be true, right?
22   A.   Correct.
23   Q.   You now have evidence to corroborate that, right?
24   A.   Correct.
25   Q.   And to be clear, the special counsel never showed you
```

─────United States v. Danchenko─────

504

1   that corroboration, right?

2   A.   I have not seen this document.

3   Q.   Okay.  I'm going to show you now -- that -- that the

4   major email now -- and I think it's been admitted.  If it is

5   not, it's 204T.  Okay.  Can you look at Government's

6   Exhibit 204T?

7   A.   204T, I'm looking at it.

8   Q.   Okay.  And that would be the email that Mr. Durham showed

9   you July 21st, and that, kind of, starts off with the strange

10  phone call, right?

11          So the timeline is late May, right, where there's an

12  introduction?

13  A.   Right.

14  Q.   Which is Mr. Danchenko told you?

15  A.   Yes.

16  Q.   And then, he said in, kind of, late June or late July he

17  reached out to Millian, right?

18  A.   Correct.

19  Q.   Okay.  And so this is reach out, right?

20  A.   This is -- this is a July 21st --

21  Q.   Yep.

22  A.   -- 2016, Igor Danchenko to milliangroup@gmail.com.

23  Q.   Okay.  And what I want you to focus on, right, is that he

24  said (As read):  "It would be interesting if it were possible

25  to chat with you by phone or meet for coffee/beer in

Cross-Examination by Mr. Durham 10/13/22

United States v. Danchenko

505

1  Washington or New York where I'll be next week."  Right?

2  A.   Right.

3  Q.   "I am, myself, in Washington."  So he's giving him

4  alternatives as to where the meeting could take place, right?

5  A.   Correct.

6  Q.   Okay.  I want you to focus on the last line of the email,

7  please.

8  A.   Yes.

9  Q.   He said (As read):  "I sent you a request to LinkedIn.

10  There my work is clearer."  Right?

11  A.   Correct.

12  Q.   And so remember before when I introduced an email from

13  Mr. Papadopoulos to Mr. Millian?

14  A.   Yes.

15  Q.   That came in the form of an email, didn't it?

16  A.   Yes, it did.

17  Q.   And so this is, you know, him saying that I sent you a

18  previous email, the LinkedIn email.  And then I'm sending you

19  an email on July 21st, correct?

20  A.   I think it's sending a request on LinkedIn.

21  Q.   Right.

22  A.   So I think that might be a little different than an

23  actual email, but it's a request.

24  Q.   But when you get a request, it comes via email, right?

25  A.   Yes, that does.

─United States v. Danchenko─

506

1   Q.   Correct.   Okay.

2          Now, we're now back on the Amtrak records, which is

3   Defense 422A.   And these are in already.

4          You're good?

5   A.   I'm on, yes.

6   Q.   Okay.   And, again, so after the email on the 21st, he

7   told you, Things got weird, I got a phone call, right?

8   A.   Yes.   He said, After email, things got weird.

9   Q.   And then he said after he got the phone call, he went to

10  New York, right?

11  A.   Yes.

12  Q.   Okay.   And so, as an analyst, assuming that what he's

13  telling you is true, if you look, it would appear that

14  somewhere between the 21st and the 25th when the ticket was

15  purchased, that this alleged phone call could have taken

16  place, right?

17  A.   That is a possibility, yes.

18  Q.   Okay.   And then like we discovered before that there was,

19  kind of, a hasty, you know, you buy it at five o'clock or

20  five -- six o'clock, and you leave at 3:00 in the morning to

21  go to New York City, right?

22  A.   Yes.

23  Q.   Okay.   And so, again, the special counsel never showed

24  you that, right?

25  A.   No, I don't recall seeing that.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

507

 1   Q.   Okay.  But you now understand that there's corroboration

 2   not only for the May reach out with Zlodorev, right?

 3   A.   Correct, there's an email.

 4   Q.   Okay.  The 21st, there's an email and then a LinkedIn

 5   email, right?

 6   A.   Correct.

 7   Q.   Okay.  And now, you've got travel records to corroborate

 8   that the government is now shown you, right?

 9   A.   That -- the travel records, yes.

10   Q.   Okay.  Now, this is critical.

11        Now -- Mr. -- so we are going to look at -- I think

12   it's Government's Exhibit 206.

13        Okay.  Do you have that in front of you?

14   A.   I do.

15   Q.   Okay.  So Mr. Danchenko's email is at the bottom of 206,

16   correct?

17   A.   Correct, July 21st.

18   Q.   All right.  At 9:33 a.m., Mr. Millian writes (As read):

19   "Dmitri, on Friday, I'm returning from Asia.  An email came

20   from Igor.  Who is that?"  Right?

21   A.   Right.

22   Q.   Now, if you look at the time, it's 9:33 a.m., right?

23   A.   Correct.

24   Q.   Okay.  And Mr. Danchenko, if you look at the Amtrak

25   records, was supposed to arrive at 7:24 a.m., right?

─United States v. Danchenko─

508

1   A.   Hold on.

2   Q.   Sorry -- I should -- 206 -- so if you look at the top.

3   Departing 3:57 a.m., arrive in New York City --

4   A.   Sorry, yes.

5   Q.   Okay.  And you would agree with me that 9:33 a.m. would

6   suggest -- I'm not saying it happened that way -- that

7   Mr. Danchenko was already in New York City for his meeting,

8   right?

9   A.   That -- if he took the reservation and took the trip up,

10  yes.

11  Q.   Right.  And it would seem awfully coincidental, right,

12  that at the same time he's traveling to New York that Millian

13  happens to be, you know, reaching out about Mr. Danchenko,

14  right?

15  A.   Yeah, this happens five days after the emails, so yeah.

16  Q.   Right.  And it happens when he had just got to New York

17  City, right?

18  A.   Right, but I'm not sure that we can like articulate a

19  one-to-one correspondence with that, given the fact that -- I

20  mean, he's -- Sergei Millian has sent an email to Dmitri, but

21  I don't know whether or not that is tied to Mr. Danchenko

22  being in New York --

23  Q.   I'm not either.  I'm not saying that it was, right?

24  A.   Okay.

25  Q.   But I'm saying that, as an analyst, right?

─────United States v. Danchenko─────

509

```
 1   A.   Right.

 2   Q.   That if somebody traveled to New York City?

 3   A.   Right.

 4   Q.   And then -- and anticipated there's a meeting?

 5   A.   Right.

 6   Q.   And then the person -- again, the government is claiming

 7   that there was no anonymous phone call, right?  And that it

 8   could not have been Mr. Millian, right?

 9   A.   Right.

10   Q.   Now, if Millian, of all the people in the world to be

11   thinking about Mr. Danchenko for a meeting, just happens to be

12   doing some due diligence on Mr. Danchenko at that time, right?

13   A.   Yes.

14   Q.   Okay.  And look at the reply from Mr. Zlodorev.  That's

15   your 10 o'clock, right?

16   A.   Yes.

17   Q.   All right.  Now, let's talk about common sense, right?

18   So if you and I know each other and someone who put us in

19   touch says, "Hey, what do you think about Auten?"

20            And I said, "Look, Auten, I don't even know the

21   guy," right?  Or I say, "Auten is the best.  You should talk

22   to Auten," right?

23            There's two different ways that I could endorse you

24   if someone wants to meet you, right?

25   A.   Sure.
```

Cross-Examination by Mr. Durham                              10/12/22

─────────────United States v. Danchenko─────────────

510

1   Q.   Okay.  Let's take a look at that email.

2              He says, (As read):  Do you remember a colleague of

3   mine wanted to get acquainted --

4              But he said a friend of a colleague wanted to get

5   acquainted, right?

6   A.   Correct.

7   Q.   You gave me permission to give email, right?

8   A.   Correct.

9   Q.   The way I understand it, this is who he is, right?

10  A.   This is who this is, yes.

11  Q.   Okay.  Then who he is is someone that I'm not personally

12  acquainted with, right?

13  A.   Yes, that sounds about right.

14  Q.   I don't know the guy, right?

15  A.   Yeah.  The way I understand it, this is who it is.

16  Q.   Yeah.  We're not personally acquainted, although he might

17  be on my LinkedIn, right?

18  A.   Yes.

19  Q.   And I don't know what he wants to talk about, right?

20  A.   Correct.

21  Q.   And I think he works at some think tank in Washington,

22  right?

23  A.   Correct.

24  Q.   Okay.  Now, by my examples, that doesn't sound like a

25  glowing endorsement that you really should be connecting with

Cross-Examination of ... B ... 10/15/22

———United States v. Danchenko———

511

1   this guy, because he is saying, "I don't really know him,"

2   right?

3           One way to read it.

4   A.   That is one way to read it, yes.

5   Q.   Okay.  Now, Mr. Danchenko told you that he showed up at

6   the meeting, right, to New York City, wanted to meet with

7   somebody, the unidentified caller, right?

8   A.   Correct.

9   Q.   And that person did not appear, right?

10  A.   Correct.

11  Q.   Now, are you aware -- and I'm going to mark it as Defense

12  Exhibit 424.  It is cross-marked as Government Exhibit 14 --

13  or 1400.

14          Okay.  So just another data point for you.  Do you

15  see it?

16  A.   Sorry.  424?

17  Q.   Yup.  Should be like a Customs and Border Patrol record.

18  A.   This is a CBP?

19  Q.   Yep.

20  A.   Yes.

21  Q.   Okay.  And did anybody from the special counsel's office

22  talk to you about this?

23  A.   I did not go over this with the special counsel's office.

24  Q.   Okay.  Would it be relevant to you if it appeared that

25  Mr. Millian was going to arrive at John F. Kennedy airport in

Cross-Examination - B. Auten 10/13/22

─United States v. Danchenko─

512

1   New York City either -- and I don't know the date so I'm not

2   going to pretend that I do -- but either on July 27th or

3   July 28th of 2016?

4   A.   Yes, it would be relevant.

5   Q.   Okay.  And you would agree, again, that the timeline

6   that's set up is that there is a discussion about meeting.

7   There's not a definite plan, right?

8   A.   Correct.

9   Q.   But Danchenko travels to New York City, right?

10  A.   Correct.

11  Q.   And lo and behold, lo and behold, Mr. Millian is actually

12  in New York City, either late on the 27th or sometime on the

13  28th -- I don't know that -- I don't know how to read that

14  record.  I'll be honest with you -- right?

15  A.   Yes.

16  Q.   It would appear that Millian was in New York, right?

17  A.   If -- I mean, if this record is --

18  Q.   Is accurate, right?

19  A.   -- accurate, then it says 7-27-2016 in this record.

20  Q.   And it appears that it's at 2147, right?

21  A.   Correct, 2147.

22  Q.   Okay.  And that's, by my time, 9:47 p.m.?

23  A.   Yes.

24        MR. ONORATO:  So, Your Honor, can we introduce this?

25        THE COURT:  Any objection?  Without objection,

—————United States v. Danchenko—————

513

424 --

        And it's Government Exhibit 1400?

        MR. ONORATO:  Yes, Your Honor.

        THE COURT:  All right.

        -- are admitted.

(Government's Exhibit No. 1400 and Defendant's Exhibit No. 424

were admitted into evidence.)

Q.   Okay.  And what we were discussing -- and it is not clear

to me from the record, but it does appear that Mr. Millian, if

the record is somehow accurate, is somehow either arriving in

New York around the time of the 27th or 28th of 2016, right?

A.   Yes, 7-27-2016.

Q.   Okay.  And that fact, is that an important fact to you,

as an analyst, to know that Millian could have been in New

York in that period of time?

A.   Yes, that would be important.

Q.   Right.  And you have no evidence to know that

Mr. Danchenko, when he was telling the story, had access to

the TSA records to show that he would be in New York in that

general timeframe, right?

A.   No.

Q.   Okay.  But that's critical, right?

A.   It's important, yes.

Q.   All right.  All right.  And I'm going to show you Defense

Exhibit 426.

Cross-Examination - by Mr. Onorato - 10/13/22

United States v. Danchenko

514

```
 1   A.   Facebook record?

 2   Q.   Yes.

 3        MR. ONORATO:  And, Your Honor, I'm not going to

 4   enter the exhibit at this point, subject to the Court's

 5   ruling.

 6   BY MR. ONORATO:

 7   Q.   So does that appear to be a Facebook message authored by

 8   Mr. Danchenko?

 9   A.   I'm sorry, which message?

10   Q.   The first page.

11   A.   Just the first page.

12   Q.   I'm just going to focus on the first page, nothing else.

13   A.   Yes, that's what it appears to be.

14   Q.   Okay.  And that post appears to come at the 28th of 2016?

15   A.   Correct.

16   Q.   Excuse me one second.

17        (Counsel confers.)

18   BY MR. ONORATO:

19   Q.   And do you see that at 7-28-2016?

20   A.   I do.

21   Q.   And it says twenty- --

22        THE COURT:  Don't say -- ask him if this is

23   information.

24        MR. ONORATO:  I'm sorry.

25   BY MR. ONORATO:
```

─────United States v. Danchenko─────

515

1   Q.   Is there information on the document to suggest that

2   the --

3           THE COURT:  Well, that would be -- that he would

4   have wanted to know.

5           MR. ONORATO:  Oh.

6   BY MR. ONORATO:

7   Q.   Would you want to know this information in terms of

8   determining whether they are not -- there could have been a

9   meeting between an unidentified caller?

10  A.   Yes.

11  Q.   Okay.

12          MR. ONORATO:  Your Honor, can I move it in?

13          THE COURT:  Yes.  Over objection --

14          MR. ONORATO:  Thank you.

15          THE COURT:  -- 426 is admitted.

16  (Government's Exhibit No. 426 was admitted into evidence.)

17  BY MR. ONORATO:

18  Q.   Can I ask you a question?  Do you understand what UTC

19  time is?

20  A.   I do.

21  Q.   Okay.  Can you explain to the jury what UTC time means?

22  A.   UTC time is universal time.  It allows people to

23  basically be able to sync time across time zones.  And so UTC

24  at this point -- I'm not sure.  It's usually a -4 or -5 from

25  the Washington, D.C., area.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Cross-Examination - C. Pientka 10/13/22

———United States v. Danchenko———

516

1  Q.   And so assuming that this message was posted in New York

2  City where Mr. Danchenko was at the time, are you saying it

3  would be -4 or -5

4  A.   Somewhere along there -4, -5 -6, somewhere around there.

5  Q.   Let's call it minus four.

6  A.   Okay.

7  Q.   If it's -4, so if we're at 8:23 p.m. -- because I'm bad

8  with military -- and we subtract four, it's 4:23?

9  A.   4:23 p.m.

10 Q.   Okay.  And then if we subtract 5, then it goes to 3:23,

11 right?

12 A.   Correct.

13 Q.   And if it goes to 6, then it's 2:23, right?

14 A.   Correct.

15 Q.   But somewhere in that ballpark between 2:23 and 4:23,

16 Mr. Danchenko makes a post.  And I want to focus on the third

17 line of that post.  Can you highlight that?

18         Okay.  What does that say?

19 A.   (As read):  "Another meeting tonight."

20 Q.   Okay.  And Mr. Danchenko was posting at some point in the

21 afternoon from New York City that he had another meeting

22 tonight between 2:23 and 4:23 p.m., depending on how you

23 interpret UTC time, right?

24 A.   Correct.

25 Q.   Okay.  And I think -- and he told you that he went to New

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

517

1  York City for the purpose of having a meeting, right?

2  A.   Correct.

3  Q.   Okay.  And the special counsel never showed you this

4  exhibit, I take it?

5  A.   I have not seen this.

6  Q.   And so you've never been aware before today that

7  Mr. Danchenko professed in the evening hours on the 28th that

8  he believed he had a meeting at the time?

9  A.   No.  This is the first I am seeing this.

10 Q.   Okay.  And would you say that's material to your

11 consideration as to whether there's a probability that would

12 support the fact of his belief that it could have been

13 Millian, that he had a meeting, first of all --

14 A.   Right.

15 Q.   It's corroborative that he thought he had a meeting,

16 right?

17 A.   Correct.

18 Q.   Okay.  And that it would also corroborate that it could

19 be Millian because you saw Millian's travel records, right?

20 A.   It is the possibility that it could be Millian.

21 Q.   Okay.  And he never said to you it was definitely

22 Millian, right?

23 A.   On the phone call, no, he never said it was definitely

24 Millian.

25 Q.   And when he talked to you he never said it was definitely

1   Millian, right?

2   A.   Correct.

3   Q.   But we've got these interesting circumstances, you would

4   agree, that you got to reach out to Millian on the 21st,

5   right?  He just happens to fly into New York City at or about

6   the time that Danchenko said that he had a meeting, right?

7   A.   Correct.

8   Q.   Those would be relevant considerations, right?

9   A.   Yes.

10  Q.   Okay.  And, again, the first time you're hearing about

11  it?

12  A.   Correct.

13  Q.   Okay.  Now, are you aware that Mr. Danchenko communicated

14  with people using WhatsApp?

15  A.   I don't know specifically if I knew WhatsApp.

16  Q.   But he told you a mobile app, right?

17  A.   Yes.

18  Q.   Okay.  I'd like to show what's already been agreed to by

19  the parties.  It's Defense Exhibit 1810.  It's a stipulation.

20  And I'd like to read that into the record, if I could.

21          THE COURT:  All right.  What number is it?

22          MR. ONORATO:  It's 1810, Your Honor.

23          THE CSO:  Your Honor, there's no 1810.  That's your

24  stipulation.

25          THE COURT:  I think we're up to 1804.

┌─────────────── United States v. Danchenko ───────────────┐

519

1            MR. ONORATO:  I'm sorry.

2            THE COURT:  What number is it?

3            MR. ONORATO:  Your Honor, I have it as 1810.

4            THE COURT:  All right.  If that's the way it's

5    marked --

6            MR. ONORATO:  It's a Government Exhibit.  I'm sorry,

7    it's a Government's Exhibit.

8            THE WITNESS:  Okay.

9            MR. ONORATO:  Okay.  And I apologize to the court

10   security officer for making --

11           THE COURT:  It's Government Exhibit 1810?

12           MR. ONORATO:  Yes.

13           THE COURT:  All right.

14           MR. ONORATO:  All right.  And, Your Honor, if I

15   could just read it into the record.

16           THE COURT:  Yes.

17           MR. ONORATO:  Okay.  So the stipulation for 1810

18   says that (As read):  "It is hereby stipulated and agreed by

19   and between the undersigned parties as follows:  Records of a

20   cellular telephone company contained information, including

21   but not limited to, subscriber information, and records of any

22   mobile telephone calls made or received on that telephone

23   company's network.  In this case, cellular telephone company

24   records of Verizon, Sprint, and AT&T shows subscriber

25   information and toll records for certain relevant phone

───────United States v. Danchenko───────

520

1    numbers and certain relevant periods of time.  Calls made via

2    Internet-based applications, for example, WhatsApp, Viber,

3    Wickr or Skype, would not appear in records of a cell --

4    cellular telephone carrier."  And it's signed by both parties.

5              THE COURT:  All right.  Thank you.

6              MR. ONORATO:  Okay.

7    BY MR. ONORATO:

8    Q.   Now, you testified before the senate that you thought --

9    you testified a few minutes ago that at the time you made

10   those remarks to the senate you believe he was being truthful,

11   right?

12   A.   Correct.

13   Q.   And it's fair to say that you see evidence introduced

14   today that the special counsel never showed you that make it

15   appear that it could have been Millian more likely, right?

16   A.   I don't know if I would say more likely, but the

17   possibility exists --

18   Q.   Right.  It would be a stronger inference because these

19   are new facts about his whereabouts, right?

20   A.   Right.

21   Q.   About the fact that there was actually communication

22   inquiring about Mr. Danchenko at the same time, right?

23   A.   Correct.

24   Q.   And then, Mr. Danchenko's expression of his realtime

25   intention to meet with someone that night, right?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

———United States v. Danchenko———

521

1   A.   Correct.

2   Q.   Okay.  And I want to go back to the Amtrak records

3   quickly.

4            (A pause in the proceedings.)

5   BY MR. ONORATO:

6   Q.   Okay.  And you'll see that on the 28th in the late

7   evening hours, it appears approximately 10 o'clock.

8            MR. ONORATO:  And, Charlie, could you highlight the

9   relevant portion?

10   BY MR. ONORATO:

11   Q.   That the return trip for Mr. Danchenko is to depart New

12   York City at 10:05 p.m., right?

13   A.   Correct.

14   Q.   Okay.  And that's after either the 2 o'clock, 3 o'clock

15   or 4 o'clock meeting that he was going to have later that

16   night according to the evidence that you saw, right?

17   A.   According to Facebook posts, yeah, this would be after

18   that.

19   Q.   And isn't it true that Mr. Danchenko told you that the

20   meeting never took place?

21   A.   Correct.

22   Q.   But he told you about all of those events, right?

23   A.   Yes.

24   Q.   The meeting -- and now you've seen that everything he

25   told you on July 24th with respect to that time period has

Cross-Examination - T. Helson    522

—United States v. Danchenko—

522

1    been corroborated?

2    A.   I'm sorry -- January?

3    Q.   January -- I'm so sorry.

4    A.   Okay.

5    Q.   January 2017 -- has been corroborated?

6    A.   I would say, yes, I've seen evidence here that would

7    suggest corroboration.

8    Q.   Corroboration.  For all the things he said, right?

9    A.   For the things he said about the conversation, and about

10   Millian, and things of that sort.

11   Q.   Okay.  So -- correct.

12        MR. ONORATO:  Your Honor, almost finished.  I'm just

13   double-checking my outline.

14        (A pause in the proceedings.)

15   BY MR. ONORATO:

16   Q.   Oh, I do want to talk about one other thing.

17        So Mr. Durham kind of made a big deal about it this

18   morning, that Mr. Danchenko didn't provide this information to

19   you, right, back in 2017?

20   A.   Correct.

21   Q.   Do you remember on the third day of your interview that

22   you actually had a conversation with Mr. Danchenko where he

23   told you that he had deleted all of his communications

24   regarding these topics except he believed that he had a

25   communication with Mr. Zlodorev?

─────United States v. Danchenko─────

523

1   A.   I believe that is written in the record.

2   Q.   Right.  That's what's written in the record, correct?

3   A.   Correct.

4   Q.   Now, did Mr. Durham, prior to coming in today and asking

5   about that before the jury, ever ask you about that before the

6   jury, ever ask you whether Mr. Danchenko told you he had

7   deleted the emails that he said should have been produced back

8   in January of --

9   A.   I'm sorry.  Could you rephrase that question, please?

10   Q.   Sure.  Sure.

11        Did Mr. Durham ever ask you whether you knew that

12   the material that he asked you about this morning had been

13   deleted when you met with him in 2017?

14   A.   No.

15   Q.   No.

16   A.   No.

17   Q.   This morning, he didn't ask you that, right?

18   A.   No, he did not.

19   Q.   Okay.  But you would agree that you discussed that and he

20   told you that a lot of the material had been deleted, correct?

21   A.   Yes, correct.

22   Q.   Right.  And so, I can't give you something that's not in

23   my possession, right?

24   A.   That is correct.

25   Q.   But if he could have given you those things back in

─────United States v. Danchenko─────

524

1   January of 2017, it would seem much more apparent that

2   everything he told you was truthful, right?

3   A.   Yes.

4   Q.   I want to direct your attention to a few more things that

5   you testified about.  And I get confused because you testified

6   in many places, so I don't recall whether it was the senate or

7   the OIG.

8          But is it fair to say you were asked a question and

9   your reply to the question was something as follows, that one

10   of the best things that came out of the Crossfire Hurricane

11   investigation was that the government got to work with Igor

12   Danchenko?

13   A.   I believe there was something in my OIG testimony that

14   was similar to that.

15   Q.   Right.  And you agreed with that statement, correct?

16   A.   I -- yes, I said that statement.  I agree with that

17   statement.

18   Q.   Okay.  And one of the reasons why -- well, excuse me one

19   second.

20          (Counsel confers.)

21          MR. ONORATO:  Your Honor, I have nothing further.

22   Counsel --

23          THE COURT:  Any redirect?

24          MR. DURHAM:  Yes, thank you, Your Honor.

25                  REDIRECT EXAMINATION

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

—United States v. Danchenko—

525

BY MR. DURHAM:

Q.   Mr. Auten, I want to begin here.  Mr. Onorato asked you a
number of questions relating to, for example, whether you had
done any analysis of some of these documents.

          Do you recall questions, generally, along those
lines?

A.   If I had done personally some of this analysis.

Q.   Right.  So the jury understands, were you working with
this special counsel team?

A.   I was working with the special counsel team, yes.

Q.   You're talking about with Mr. Mueller, correct?

A.   Correct.

Q.   All right.  The one counsel is asking specifically about,
the current investigation, you were not part of that team,
correct?

A.   No, I was not part of that team.

Q.   You were -- when you were questioned, it was all as a
witness, correct?

A.   Correct.

Q.   So do you know whether or not, in fact, there were people
who were working in the investigation who were analyzing these
phone records?

A.   Your investigation?

Q.   Yes.

A.   No, I don't know if you had people working those --

─United States v. Danchenko─

526

1  looking at those records or not.

2  Q.   Okay.  Well, let's talk about Crossfire Hurricane.  Did

3  the people in Crossfire Hurricane ever bother to analyze those

4  records, for example, toll records, telephone records?

5  A.   I would have to go back and take a look.  I don't know

6  exactly the details what was analyzed when on Crossfire

7  Hurricane.

8  Q.   Sure.  Did people at Crossfire Hurricane, or to your

9  knowledge, did they ever try to recover the records of

10  Mr. Danchenko?

11  A.   That, we would have to talk to somebody on the

12  investigative side of things --

13  Q.   Well, you were in the middle of this, right?

14  A.   Right.

15  Q.   You were working hand and glove with the special agents,

16  right?

17  A.   Right.

18  Q.   To your recollection, did you guys even bother to go look

19  at the phone records?

20  A.   To my recollection, the phone records were not pulled.

21  Q.   Then how about the travel records, did you guys even

22  bother to look at the travel records?

23  A.   The travel records for whom?

24  Q.   Well, I'll say for Mr. Millian.

25  A.   I'm not sure if travel records were pulled or not.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Redirect Examination - G. Auten - 10/13/22

United States v. Danchenko

527

1   Q.   Or, for example, the Amtrak records?

2   A.   I don't recall pulling the Amtrak records.

3   Q.   You did none of those things, right, the best of your

4   recollection?

5   A.   Again, you'd have to talk to somebody on the

6   investigative side, but sitting here today, I don't recall

7   pulling those records.

8   Q.   It would all have to be reconstructed, would that be a

9   fair statement, based on what you know and you recall?

10  A.   Reconstructed by whom, I'm sorry?

11  Q.   Well, not by your group, correct?

12  A.   Correct.

13  Q.   And so, would it come as a surprise to you that you

14  weren't being shown documents that you all didn't even pull or

15  look at or evaluate?

16  A.   I don't know if I would -- I guess if -- I would say that

17  for preparation for this -- in -- it's always helpful to see

18  as many documents as possible, but you may have your reasons

19  for -- no.

20  Q.   Sure.  You looked at your documents, correct?

21  A.   Correct.

22  Q.   Things that you had written, correct?

23  A.   Correct.

24  Q.   Notes that you had taken, correct?

25  A.   Correct.

United States v. Danchenko

528

```
 1   Q.   Whatever information Mr. Danchenko provided, correct?

 2   A.   Correct.

 3   Q.   But all of those were shown to you?

 4   A.   Correct.

 5   Q.   All the documents that the jury has seen today -- and

 6   yesterday, that are introduced, you saw all of those

 7   Government Exhibits previously, correct?

 8   A.   That is correct.

 9   Q.   Do you know whether or not in the normal course, before a

10   jury is ever seated and whatnot, there's litigation that goes

11   back and forth with respect to what's admissible and what's

12   not admissible?

13   A.   I am familiar that that happens on occasion, yes.

14   Q.   Do you know whether or not in this case, for example, we

15   had to litigate what was going to be admissible or not

16   admissible?

17   A.   I do not know that.

18   Q.   Well, the sum of what the jury maybe saw today was

19   objected to previously?

20   A.   You had made a comment about that a little bit earlier,

21   so I'm familiar with that.

22   Q.   Okay.  Well, with that background that you weren't a part

23   of the current investigation.  Let me begin where Mr. Onorato,

24   start out.

25              He was asking you about being represented by
```

─────United States v. Danchenko─────

529

1   counsel, correct?

2   A.   Correct.

3   Q.   And with regard to your being represented by counsel, you

4   initially hired counsel, not in connection with this

5   investigation, right?

6   A.   Which investigation are you talking about?

7   Q.   This current investigation.

8   A.   Actually, I -- I brought counsel on for --

9   Q.   Senate judiciary?

10  A.   Well, it was even before that.

11  Q.   Even before that.

12  A.   Yeah.

13  Q.   Senate judiciary was back in 2020, right, October of

14  2020?

15  A.   Correct.

16  Q.   And you had gotten counsel before that, right?

17  A.   Yes.  I believe --

18  Q.   So -- I'm sorry.

19  A.   I believe your office reached out earlier than that.

20  Q.   Okay.  You had gotten counsel early on --

21  A.   Yes.

22  Q.   -- right?

23  A.   Yes.

24  Q.   And at the time that you had gotten counsel, it would be

25  a fair statement that the conduct that you and others who are

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

1   involved in the Crossfire Hurricane investigation was under

2   close scrutiny and review by the Inspector General's Office?

3   A.    Absolutely, yes.

4   Q.    And in that connection, the Inspector General's Office

5   evaluated an issue of scathing report on Crossfire Hurricane

6   in connection with the Carter Page --

7            MR. ONORATO:  Object to the characterization.

8            MR. DURHAM:  Withdrawn.

9            THE COURT:  Sustained.  Go ahead.

10  BY MR. DURHAM:

11  Q.    Do you recall that there was a reporter that the OIG had

12  written concerning the Carter Page FISAs?

13  A.    Yes.

14  Q.    And how would you characterize that report?

15  A.    The report was quite extensive and it discussed

16  characterizing a number of errors and omissions.

17  Q.    And with respect to the errors and omissions, were they

18  tick-tacky kinds of omissions or were they significant

19  omissions and errors that had been committed?

20  A.    I believe the OIG described them as significant.

21  Q.    And then with respect to the investigation done by the

22  OIG, separate and apart from that, would it be a fair

23  statement that you and your colleagues were under

24  investigation by the inspection division by the FBI?

25  A.    Yes.

─United States v. Danchenko─

531

1   Q.   And would it be a fair statement that your conduct in

2   connection with that is, you, yourself, based on the

3   investigation done by the inspection division of the FBI, have

4   some issues, correct?

5   A.   I -- be a little bit more specific.  I'm sorry.  I

6   don't -- I have issues?

7   Q.   Isn't it, in fact, true that you've been recommended for

8   suspension as the result of the conduct?

9   A.   It is currently under appeal.

10  Q.   So you had counsel for a variety of matters, correct?

11  A.   Correct.

12  Q.   Including when you came in and we wanted to chat with

13  you, correct?

14  A.   That is correct.

15  Q.   So if the impression was given to the jury that you had

16  counsel because -- only because you're coming and talking with

17  us, that would be an incorrect impression, correct?

18  A.   No.  I had counsel for a number of issues, correct.

19  Q.   Okay.  Now, Mr. Onorato had asked you a question along

20  those same lines about, well, did -- were you told that you

21  were a subject of an inquiry?

22        Do you recall that?

23  A.   I do recall that, yes.

24  Q.   Okay.  Now, with respect to the inquiry, would it be a

25  fair statement that the inquiry just didn't have to do with

─────United States v. Danchenko─────

532

1  this matter, but it also had to do with Crossfire Hurricane or

2  what was and wasn't done with respect to Carter Page's FISAs?

3  A.   Yes, that is my understanding.

4  Q.   Okay.  And so the jury understands, as notion of subject,

5  do you recall -- do you know what the subject means, that is

6  what the definition of the subject is for Department of

7  Justice purposes?

8  A.   So the subject would be somewhere between a witness and a

9  target, is my understanding.

10 Q.   Okay.  So do you recall having been told that under the

11 Department of Justice definition of subject is somebody's

12 whose conduct falls within the scope of what's being looked

13 at?

14 A.   I don't know if I have been given that exact definition.

15 Q.   Right.  But that when counsel asked about that, that's --

16 it's in that context, right?

17 A.   Correct.

18 Q.   And do you know, based on your years of experience with

19 the FBI, that there's an obligation on the part of prosecutors

20 to tell a person, or a person's attorney in this case, whether

21 their witness is a subject or a target?

22 A.   Yes.

23 Q.   Okay.  This is not -- this is somehow unusual.  That's

24 the protocol, isn't it?

25 A.   In some cases it is the protocol, yes.

Redirect Examination - G. Papadopoulos 10/15/22

—United States v. Danchenko—

533

1  Q.   Okay.  Now, there were a number of questions that defense

2  counsel asked you that you -- well, there were a number of

3  questions that counsel asked you that I want to probe a little

4  bit more deeply.

5        Mr. Onorato asked you or made reference to George

6  Papadopoulos and said -- and said -- incorporated in his

7  question, that George Papadopoulos was a high level advisor to

8  the Trump Campaign, and you said yes.

9        Well, tell the ladies and gentlemen of the jury with

10  respect to George Papadopoulos, how old was George

11  Papadopoulos in the 2016 election?

12  A.   I want to say Papadopoulos was in his 30s.

13  Q.   How about 28?  Does that refresh your recollection?

14  A.   It could be around 28.

15  Q.   And was he such a high level advisor that he still had on

16  his resume that he was in a student UN panel?

17  A.   No, that was on his resume.

18  Q.   Right.  So this person that you agreed to was a high

19  level advisor to Trump, the Trump Campaign, was a 28-year old

20  who still had on his resume that he was a UN -- a student UN

21  person?

22  A.   I would say that part of my articulation of that deals

23  with the fact that Mr. Papadopoulos was part of the small

24  group of advisors that were named, I believe, in March of

25  2016.

──────United States v. Danchenko──────

1   Q.   Right.

2   A.   For the president -- for the former president.

3   Q.   With respect to high level advisor, you don't have any

4   idea whether Papadopoulos even, you know, had occasion to talk

5   to Trump, do you?

6   A.   Well, he was at the meeting that -- that was announced --

7   Q.   He was at one meeting --

8           MR. ONORATO:  Can the witness finish his question --

9   his answer?

10          MR. DURHAM:  Sure.

11          THE COURT:  Yeah, go ahead.  Finish your answer.

12          THE WITNESS:  I would say he was at the meeting

13   where his advisors were announced, and I believe it was either

14   early/mid-March or late March of 2016.

15   BY MR. DURHAM:

16   Q.   There's a photo op at the end of March where Mr. Trump,

17   at the time, is announcing people who are going to be advising

18   on foreign policy, correct?

19   A.   Correct.

20   Q.   And, in fact, with respect to Mr. Papadopoulos, isn't it,

21   in fact, true that, as to Papadopoulos, what the FBI thought

22   it was more -- of more interest in Papadopoulos was his

23   relationship to Middle Eastern countries, not to Russia?

24   A.   Actually, I would argue that it was a combination of

25   both.  I think --

─────United States v. Danchenko─────

535

1   Q.   And I -- I'm sorry.

2          THE COURT:  Go ahead.  Finish your answer.

3          THE WITNESS:  I think I've asserted in testimony

4   that it was a both and.

5   BY MR. DURHAM:

6   Q.   And with respect to Mr. Papadopoulos in June and July,

7   particularly July when information came in you referenced

8   earlier in your cross-examination from the friendly foreign

9   government --

10  A.   Yes.

11  Q.   -- Paragraph 5 --

12  A.   Yes.

13  Q.   -- that was a suggestion of a suggestion, correct?

14  A.   That was a suggestion of an offer, I believe, yes.

15  Q.   All right.  And with respect to that, you've read

16  Paragraph 5, haven't you?

17  A.   I have, yes.

18  Q.   And with respect to Paragraph 5 and Papadopoulos, would

19  it be a fair statement that the friendly foreign government

20  indicated that he did not -- "he" being Papadopoulos -- did

21  not seem to be informed or well informed in Russia?

22  A.   I don't recall whether or not the friendly foreign

23  government articulated that.

24  Q.   Okay.  Now, counsel asked you a question about

25  Mr. Millian coming on the radar some time, I think, in August

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

───United States v. Danchenko───

536

1   of 2016, right?

2   A.   Correct.

3   Q.   Sergei Millian name came on the radar scene in August of

4   2016, correct?

5   A.   Correct.

6   Q.   So in August of 2016, there is some information -- tell

7   the ladies and gentlemen of the jury, if you recall in August

8   of 2016, if you knew that Sergei Millian was a person who is a

9   Trump supporter?

10              MR. ONORATO:  Objection to relevance.

11              THE COURT:  Overruled.  Go ahead.

12              THE WITNESS:  Sorry.

13              THE COURT:  You may answer.

14   BY MR. DURHAM:

15   Q.   Overruled.  You can answer.

16   A.   Okay.  Sorry.

17              Yes, I believe I -- we did know that around August.

18   Q.   Right.  And not only was Mr. Millian a Trump supporter,

19   but he was a vocal supporter, wasn't he?

20   A.   I recall that, yes.

21   Q.   Right.  Did you find it at all peculiar -- you and your

22   colleagues find it at all peculiar that somebody who is an

23   avid Trump supporter would be calling somebody he had never

24   met and talked to before to provide negative information about

25   the Trump campaign?

─────United States v. Danchenko─────

537

1   A.   I would say, in this case, you don't know.

2   Q.   Well, let's say that as the evidence in this case --

3   withdrawn.

4        You saw the email from July 21st of 2016, correct?

5   A.   Correct.

6   Q.   Appear to be the first contact Mr. Danchenko made or

7   attempted to make with Millian, correct?

8   A.   Correct.

9   Q.   They didn't know one another.

10  A.   Correct.

11  Q.   So would you find it peculiar that somebody who had never

12  spoken to Millian, Millian never spoken to him, would be

13  telling somebody he doesn't know about a, quote,

14  well-developed conspiracy of cooperation, between The Trump

15  Organization and Russian leadership?

16  A.   I mean, I would say that is peculiar, yes.

17  Q.   That is very peculiar, right?

18  A.   Yes.

19  Q.   Almost unbelievable, wouldn't you say?

20  A.   I don't know if I would say "unbelievable," but I would

21  say "peculiar."

22  Q.   Well, what was the evaluation of you and your colleagues

23  at the time?

24  A.   Of?

25  Q.   Of whether or not it made any sense, whatsoever, that

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

————United States v. Danchenko————

538

1    somebody that had never spoken with Mr. Danchenko and vice

2    versa, Danchenko had never spoken with Millian, would call him

3    up out of the blue and start providing information, negative

4    information as to the Trump campaign in a well-developed

5    conspiracy?

6    A.   So, as I testified earlier, that I found that the entire

7    Millian thing to be quite peculiar in our three-day interview.

8    And I think it was my estimation at the time that there may

9    have been actually more communication with Millian.  And that

10   there was minimization going on.

11   Q.   Okay.  And did you find out that, in fact, there was no

12   other communication?

13   A.   Correct.

14   Q.   Now, I want to turn to a different area.

15        Counsel had asked you a question directed from

16   Defendant's Exhibit 482.

17   A.   Yes.

18   Q.   So this is from Sergei Millian to Zlodorev on July 15,

19   2016, correct?

20   A.   Yes.

21   Q.   Okay.

22        MR. DURHAM:  Can you do that just a little larger?

23   BY MR. DURHAM:

24   Q.   Now, I think that Mr. Onorato asked you whether we had

25   shown you this, and you said you haven't seen it, right?

────United States v. Danchenko────

539

1   A.   I don't recall seeing this.

2   Q.   Okay.  So you've seen it now, right?

3   A.   Yes.

4   Q.   And so, with respect to this document, does that say

5   anything other than or suggesting anything other than that

6   Millian was a Trump supporter?

7   A.   No.  (Inaudible)  No, what it -- what it says here is

8   that Sergei Millian is meeting with Trump and his people.  (As

9   read):  "He can raise a question about Belarus when they give

10  me a position in his circle.  I'll need to slow down the

11  Consulate in Georgia.

12  Q.   Right.  Not that he was anti-Trump -- was going to be

13  passing information to Mr. Danchenko that was derogatory as to

14  Mr. Trump, correct?

15  A.   Correct.

16  Q.   I want to move to another piece.  And I know there are a

17  lot of these, and we're getting late, but I want to turn to

18  Mr. Onorato's question about the money that was offered to

19  Mr. Steele to provide information.

20          Now, Mr. -- defense counsel asked you questions

21  about --

22          THE COURT:  Before we go on, I just want to be sure

23  that 420 -- 482T has been admitted.

24          It has been admitted, correct?

25          MR. DURHAM:  Yeah, I think we can jointly move it,

─────United States v. Danchenko─────

540

1   Your Honor.

2           THE COURT:  Yeah.  Yeah.  Thank you.

3           MR. DURHAM:  Thank you.

4   BY MR. DURHAM:

5   Q.   Do you remember questions about the money that had been

6   offered to Mr. Steele, correct?

7   A.   Yes, I do.

8   Q.   And I'm interested in asking these questions, counsel's

9   question is kind of -- assumed that the million dollars was

10  being offered for the name of the primary sub-source.  That is

11  not true, correct?

12  A.   That is correct.

13  Q.   In fact, what the FBI was offering Mr. Steele a million

14  dollars for was any information that they -- he could provide

15  that would be corroborative of what was in the dossier,

16  correct?

17  A.   Yes, it was up to a million dollars for information that

18  could corroborate the dossier that would lead to a potential

19  prosecution.

20  Q.   And do you recall, sir, whether it was up to a million

21  dollars or, say, you know, seven figures or more?

22  A.   At this point, I don't know whether or not they said up

23  to a million or seven figures.

24  Q.   But as posed by Counsel to you, it wasn't a million

25  dollars to give up the name of this primary -- of this primary

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────────────United States v. Danchenko─────────────

1   source, correct?

2   A.    That is correct.

3   Q.    And with respect to providing any information that was

4   corroborative that was in the dossier, it was not forthcoming

5   from -- from Mr. Steele, was it?

6   A.    No.

7   Q.    Counsel had asked you some questions that I think -- this

8   is shortly after the luncheon break, so some time around

9   2 o'clock -- relating to Mr. Danchenko said, I think and I

10  believe, that it was Sergei Millian.

11          Did you understand in that context that he,

12  Mr. Danchenko, was telling you that the information in the

13  dossier report 2016/95, that the jury has seen a portion of

14  that information, was information that he, Mr. Danchenko, had

15  gotten from Millian?

16          MR. ONORATO:  Objection.

17          THE COURT:  What's the objection?

18          MR. ONORATO:  Foundation.  Can we approach?

19          THE COURT:  Yes.

20          (Side bar.)

21          (Discussions held before court reporter arrived.)

22          THE COURT:  -- asking what Mr. Danchenko was telling

23  him, right.

24          MR. DURHAM:  Yes.

25          MR. ONORATO:  The record doesn't support the fact

────United States v. Danchenko────

542

1    that everything from Source E was Millian.  Special counsel on

2    their direct was supposed to go through --

3              THE COURT:  No, but this question was just simply in

4    your conversation with Danchenko, you understood X.

5              MR. DURHAM:  Correct.

6              THE COURT:  Right.

7              MR. ONORATO:  You understood X, but he wants to

8    argue.  He wants to use it to argue why.

9              THE COURT:  Well, he can argue something else.  But

10   in terms of the question, I'm going to allow it.

11             MR. ONORATO:  Okay.  And just in terms of scope, I

12   didn't ask a single question about the substance of the

13   conversation.

14             THE COURT:  You asked what he understood.  You asked

15   what he understood Danchenko was saying and you got him to say

16   -- he admitted that he just thought it might be, he wasn't

17   sure, he wasn't this, and going back over that.

18             MR. ONORATO:  Just in terms of the content, I never

19   talked once about the content of the conversation, just who

20   the source was.  I mean --

21             THE COURT:  All right.  This all relates to what

22   Danchenko said.

23             MR. DURHAM:  I just -- so while we are here.  Your

24   Honor might recall that the exhibit was marked as Government

25   Exhibit 109A.  You agreed, okay, let's see where the

─────United States v. Danchenko─────

543

1   cross-examination goes before the decision is made as to

2   whether the rest of the information in that exhibit can come

3   in.

4           THE COURT:  Okay.

5           MR. DURHAM:  We think that, based on the

6   cross-examination, we should be able to now submit the fuller

7   version should be admitted.

8           THE COURT:  But he hasn't tied the rest of that

9   document to Danchenko, has he?

10           MR. ONORATO:  No.  And on his direct he didn't --

11           THE COURT:  I'm not going to let the rest of that

12   in.  All right.

13           MR. DURHAM:  I don't want to violate the Court's

14   instruction.  May I inquire about?  I'm not going to --

15           THE COURT:  No, I think just what his -- that one

16   paragraph does come in.  And he didn't get into it, so, I'm

17   not going to let you get back into it.  All right.

18           (Open court.)

19           MR. DURHAM:  Proceed, Your Honor?

20           THE COURT:  Yes, please.

21   BY MR. DURHAM:

22   Q.   So, again, sir, with respect to the dossier report

23   2016/95, right?

24   A.   Yes.

25   Q.   And the information that was gleaned from there and put

─────────United States v. Danchenko─────────

544

1  in Carter Page FISA applications, what was your understanding

2  as to who Mr. Danchenko was saying that information came from?

3  A.   We were not clear at that point.

4  Q.   What was -- what was it that he told you?

5  A.   He told us that he had received a telephone call from a

6  Russian male who he assumed to have been or believed to have

7  been Sergei Millian.

8  Q.   Right.  So when he -- Mr. Danchenko told the FBI he

9  received this call from somebody he believed to be Millian,

10  isn't it, in fact, true that you took that to mean that that

11  information from the report had come from Millian based on

12  what the defendant told you?

13  A.   No.  I think we believed at the time that we weren't

14  clear and that we would have other opportunities to talk to

15  him about that as well.

16  Q.   Okay.  So what you are telling this jury is that you all

17  then took information from the affidavit or from the dossier

18  report and put it in an application to a Fiske and you

19  thought --

20       MR. ONORATO:  Objection.  I don't think this witness

21  ever said he put any information in any FISA application.

22       THE COURT:  Well --

23       MR. DURHAM:  He testified that he participated in

24  its preparation.

25       THE COURT:  Overruled.  Go ahead, if you can answer.

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────

Redirect Examination - S. Somma - 10/13/22

────United States v. Danchenko────

545

BY MR. DURHAM:

Q.   Is that what you're telling the jury?

A.   Again, as an analyst, I am not involved in putting
together the application in a FISA.

Q.   You looked and reviewed that FISA application, didn't
you, sir?

A.   Which FISA application are we talking about?

Q.   Sure.  The one on October 21, 2016.

A.   I believe I testified that for that application I looked
at it on an ad hoc basis and I also reviewed the footnotes.

Q.   Right.  And you looked at each one of the FISA
applications marked as an exhibit, Government's Exhibit 1205,
1206, 1207, and 1208?

A.   In preparation for this, yes.

Q.   Right.  And each one of those affidavits or applications
had had that information in there, correct?

A.   That is correct.

Q.   And you, yourself, had sat with Mr. Danchenko and
Mr. Somma and elicited information about that Report No. 95
from Mr. Danchenko, correct?

A.   That is correct.

Q.   And then the FBI, you, and your colleagues went ahead and
used that information, right?

A.   Again, I would ask what you're talking about in terms of
"used that information."

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

546

1   Q.   You put it in a FISA application.

2   A.   It was continued on in the FISA application.

3   Q.   I'm not sure the distinction you're making.  That

4   information was taken and put in the FISA application, right?

5   A.   Yes, it was.

6   Q.   Take a look at Page 37, if you would, of Government's

7   Exhibit 100.

8   A.   Sorry, Page 37?

9   Q.   Yup.

10  A.   Okay.

11  Q.   And the second full paragraph, beginning of that.

12          MR. ONORATO:  Your Honor -- I'm sorry.

13          THE WITNESS:  Yes.  The one that starts with

14  "Altogether"?

15  BY MR. DURHAM:

16  Q.   Yes.

17  A.   Yes.

18  Q.   And read that.

19  A.   Yes.

20          (As read):  "Altogether, Danchenko and the person he

21  believed and still believes to be Millian had one 10-,

22  15-minute conversation.  Danchenko says that, quote, Source E

23  in report 2016/95 sounds like it is from this conversation.

24  During the phone call he remembers making" --

25  Q.   That's far enough.

Redirect Examination - S. Auten 10-13-22

—United States v. Danchenko—

547

1   A.   Okay.

2   Q.   So you had written at the time that Mr. Danchenko had

3   told you that he believed that this was Mr. Millian and the

4   one -- the 10- to 15-minute conversation, correct?

5   A.   Correct.

6   Q.   And that Source E in that report, which the jury has

7   seen, came from this conversation with Millian?

8   A.   He sounded like it had come from the conversation, yes.

9   Q.   Yeah.  And then you-all took it and put it in the FISA

10  application?

11  A.   Again, I would -- I would -- the "you-all" there I would

12  have issue with.

13  Q.   Okay.  So the -- well, in the application that you

14  participated in some degree in preparing and submitted to a

15  federal judge?

16  A.   No, I did not actually participate in the carrying over

17  of that in each FISA application.

18  Q.   Did I -- was that my question?

19  A.   It sounded like your question.  I'm sorry, I may have

20  misunderstood.

21  Q.   Okay.  You and your colleagues put that information in a

22  sworn affidavit, correct?

23  A.   Okay.  Again, you're saying me and my colleagues.  The

24  analyst's role is not involved with the FISA.

25  Q.   Is one of the matters that you're under -- you're going

─────United States v. Danchenko─────

548

1   to be suspended is because you won't admit your involvement in

2   connection with not making a full and proper disclosure?

3   A.   No, I don't believe that's in the write-up in terms of a

4   full disclosure.

5   Q.   In terms of a full disclosure to this jury, you believed

6   and your colleagues believed that that information was coming

7   from Sergei Millian based on what Mr. Danchenko told you;

8   isn't that correct?

9   A.   I believe that's how it's articulated in the FISA

10  application.

11  Q.   Right.   That's how it's articulated --

12  A.   Yes.

13  Q.   -- in the FISA application?

14  A.   That is how it's articulated in the FISA application.

15  Q.   Right.   And assuming you weren't purging yourselves when

16  you said that?

17  A.   It's in the FISA application.

18  Q.   Right.   It came from Mr. Danchenko, correct?

19          MR. ONORATO:   Objection.

20          THE COURT:   I'm going to sustain that objection.   I

21  think you're misstating his testimony.   Go ahead.   You --

22  you -- I think you've gone over this.

23          MR. DURHAM:   Yes, Your Honor.

24  BY MR. DURHAM:

25  Q.   Now, let me see.   With respect to questions on

─────United States v. Danchenko─────

549

1    cross-examination, Mr. Onorato asked you about toll records

2    and whether any toll records were reviewed by you.

3            Let me ask you this:  Do you recall whether or not

4    you or any of your colleagues had asked Mr. Danchenko to look

5    for or to produce records relating to the purported call?

6    A.   I believe in the second day there was a -- I remember

7    some sort of comment in the write-up regarding -- he was going

8    to go back and look to see if he had emails of some sort.

9    Q.   And did anything get produced?

10   A.   I don't know whether that the two emails that are the

11   Zlodorev emails were out of that.  I don't know if that's the

12   case.

13   Q.   Well, you were looking for the record of the call; not an

14   email, the record of the call.

15   A.   Oh, sorry.  The record of the call -- no, there were no

16   record -- there were no call -- I misunderstood.  There were

17   no call records.

18   Q.   Nothing was produced?

19   A.   No.

20   Q.   Do you remember if you went back to look yourselves to

21   see if there was such a call?

22   A.   I don't believe they went back to review that.

23   Q.   And is there some particular reason why experienced FBI

24   personnel wouldn't go and look to see what the phone records

25   reflected?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Redirect Examination - Auten - 5  Page 136 of 167

─United States v. Danchenko─

550

1  A.   Again, you would have to talk to somebody that was in the

2  investigative side of things.  I -- as an analyst, I can't --

3  I can't ask for phone records.  That has to be --

4  Q.   You want this jury to believe that analysts don't

5  participate in investigative decisionmaking?

6  A.   Analysts participate, but analysts aren't the ones that

7  are going to make the decision to go out and actually get

8  phone records or obtain NSLs or the like.

9  Q.   Can you think of any good reason -- not any reason, but

10  any good reason not to have gotten those records and analyzed

11  them?

12  A.   No.

13  Q.   Do you believe whether -- with respect to this

14  information, if people were much too ready, willing, and able

15  just to accept it?

16  A.   I don't know if I would articulate it that way.

17  Q.   Well, you didn't have any corroborative evidence,

18  correct?

19  A.   Correct.

20  Q.   From FBI data banks, correct?

21  A.   Corroborative evidence.

22  Q.   Right?

23  A.   For what was in the dossier material.

24  Q.   Correct.

25  A.   Correct.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

551

1   Q.   Or from the other intelligence agencies in this country?

2   A.   That is correct.

3   Q.   And Steele couldn't provide any or didn't provide any

4   corroborative information?

5   A.   That is correct.

6   Q.   And it still went into the affidavit?

7   A.   It carried over into the affidavit.

8   Q.   Right.  Because you believed, based on what Mr. Danchenko

9   had said, it was accurate?

10  A.   Again, I wasn't the one that carried it over into the

11  FISA application.

12  Q.   Okay.  Well, counsel had asked you questions related to

13  Government's Exhibit -- the report, the FISA report, which was

14  2016/105, and it's Government's Exhibit 112 in this matter.

15  And I ask that we pull that up.

16              (A pause in the proceedings.)

17              THE WITNESS:  I have 112.

18  BY MR. DURHAM:

19  Q.   You have 112?

20  A.   I have 112.

21              MR. DURHAM:  It's 112.  I thought we had moved 112,

22  Your Honor.  Can we just request -- see if 112 has been moved

23  as a -- as a full exhibit?

24              This is the report relating to Mr. Dolan.

25              THE COURT:  I don't have 112.

—United States v. Danchenko—

552

1      MR. DURHAM:  Okay.  We'd ask then just to go over --

2 I thought we had moved it.

3 BY MR. DURHAM:

4 Q.   Sir, are you looking at Government's Exhibit 112?

5 A.   I am, yes.

6 Q.   And what is Government's 112?

7 A.   Government 112 is the company intelligence report

8 2016/105.

9 Q.   And with respect to Government's Exhibit 112, do you

10 recognize the information that's in there?

11 A.   Yes.

12 Q.   And that's information that you had reviewed, correct?

13 A.   Correct.

14      MR. DURHAM:  We move 112 as a full exhibit, Your

15 Honor.

16      THE COURT:  Any objection?

17      MR. ONORATO:  So, Your Honor, just one second.

18      (Counsel confers.)

19      THE COURT:  The 112 I have is a redacted copy.

20      MR. ONORATO:  Right.  When you say the full --

21      (Counsel confers.)

22      MR. ONORATO:  Okay.

23      THE COURT:  All right.  The redacted 112 is

24 admitted.

25 (Government's Exhibit No. 112 was admitted into evidence.)

—United States v. Danchenko—

553

1   Q.   I'd ask that 112 be pulled up.  And with respect to --

2   why don't we do this initially?  Would you just pull up and

3   blow out the top part of the first page of Government's

4   Exhibit 112?

5          This is Russia/Ukraine, the demise of Trump's

6   campaign manager, Paul Manafort, correct?

7   A.   Correct.

8   Q.   And you've seen this previously?

9   A.   I have, yes.

10  Q.   Now, a series of questions were asked of you on

11  cross-examination relating to then the substantive

12  information, which is contained in the paragraph that appears

13  on the second page of the numbered Paragraph 3.

14         I'd ask that Ms. Arsenault bring that up.

15  A.   Yes.

16  Q.   Okay.  Now, is that information -- there's some

17  discussion about whether at least some of the information in

18  there was open source, correct?

19  A.   Correct.

20  Q.   I believe on direct examination you, in fact, said that

21  there was attached to the email a POLITICO article?

22  A.   Yes.

23  Q.   Which is open source, correct?

24  A.   Correct.

25  Q.   With respect to the significance of the report, 105, in

Redirect Examination - by Mr. Durham 10/13/22

──────United States v. Danchenko──────

554

1   Paragraph 3, would you read the first sentence?

2             THE COURT:  105 or 112?  Are we talking about 105 or

3   112?

4             MR. DURHAM:  Did I say 103?  105, I apologize, Your

5   Honor.

6             It's Report 105, Exhibit 112.  Thank you, Your

7   Honor.

8             THE COURT:  All right.

9             THE WITNESS:  (As read):  "Speaking separately, also

10  in late August 2016, an American political figure associated

11  with Donald Trump and his campaign outlined the reasons behind

12  Manafort's recent demise."

13  BY MR. DURHAM:

14  Q.   So with respect to the import of that paragraph, it

15  wasn't the open source information, correct, that was

16  significant?

17  A.   I'm sorry, I would say that it was significant, but I'm

18  not sure -- I guess --

19  Q.   Sure.

20  A.   -- what are you asking for --

21  Q.   Sure.  With respect to that report and that information,

22  the significant part is that it purports to say that an

23  American political figure associated with Donald Trump and his

24  campaign outlined this information, correct?

25  A.   Yes.  And the rest of it is describing exactly what was

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

555

1    brought about by the recent demise or how -- what caused the

2    recent demise.

3    Q.   Right.  And much of that, not all, but much of that was

4    open source and in the POLITICO article, correct?

5    A.   Correct.

6    Q.   But for the FBI's purposes in evaluating 105,

7    Government's Exhibit 112, was of significance this reportedly

8    was coming from, quote, an American political figure

9    associated with Donald Trump and his campaign, closed quote?

10   A.   Yes, that was important.

11   Q.   So with respect, then, to that information, that person

12   that was providing the information, was Donald -- was Charles

13   Dolan, would that be import to you?

14   A.   Yes, that would be of import.

15   Q.   And would it be of import to you that Mr. Dolan was not

16   somebody who was an American political figure associated with

17   Donald Trump and his campaign but, in fact, was a Democratic

18   operative for a long period of time?  Would that have been

19   significant to you?

20   A.   Yes, we were interested in all of the --

21   Q.   Right.

22   A.   -- sources.

23   Q.   So if you knew that that was the case, it wasn't some

24   Republican insider or some associate of Donald Trump's, what,

25   if any, impact did that have on your evaluation of the

─────United States v. Danchenko─────

556

1    validity and credibility of the information that's being

2    conveyed in these dossier reports?

3    A.   Well, it helps -- it would have helped to understand kind

4    of accuracy and things of that sort for the dossier reports.

5    Q.   Now, counsel spent some time talking about referring to

6    Page 20 of Government's Exhibit 100.  I'd ask you to turn to

7    Page 20 of Government's Exhibit 100.

8    A.   I have Page 20.

9    Q.   Okay.  Now, you look at -- and this specific page that

10   counsel was referring to was incorporated in his question was

11   that you had been asked on direct examination about apps and

12   you -- I think you said yes.

13        Do you recall whether or not the questions that were

14   initially asked of you relating to this matter was whether or

15   not Mr. Danchenko had indicated what kind of facility or phone

16   that he had received it on?

17        You said it only had said -- that you only said it

18   was a telephone.  You went to check, and you said, yeah, I

19   just said it was a telephone.

20        Do you remember that was the context of the

21   questions?

22   A.   Yes, I believe so.

23   Q.   Right.  And -- but if you actually read carefully

24   Page 20, he did identify what kind of phone it was, correct?

25   It wasn't just a telephone.

United States v. Danchenko

557

1   A.   What part of --

2   Q.   If you read the very bottom --

3   A.   Bottom of the page?

4   Q.   Bottom of the page going on 21.

5   A.   (As read):  "The call was either a cellular call or it

6   was a communication through a phone app."

7   Q.   Right.  A cellular call, a cellular telephone, correct?

8   A.   Correct.

9   Q.   Was that of import to you?

10  A.   Yes.

11  Q.   Because -- and do you recall whether or not from your

12  view of the cellular -- the review of the email that

13  Mr. Danchenko sent to Millian on July 21st of 2016 had a

14  cellular telephone number on it?

15  A.   That is correct.

16  Q.   And that's how he, Mr. Danchenko, told Millian he could

17  get a hold of him, right, on a cellular telephone?

18  A.   I mean, the tele- -- the signature block at the end of

19  the email had email and telephone.

20  Q.   Right.  Nothing about any app, right?

21  A.   It did not.

22  Q.   Do you know whether or not Mr. Danchenko practiced when

23  he wanted somebody to reach him or communicate on an

24  application that he would say so?

25  A.   I don't know what his -- what his approach or policy is

Redirect Examination - S. Auten 10/13/22

─────United States v. Danchenko─────

558

1  on that.

2  Q.   Did you or your colleagues with Crossfire Hurricane ever

3  look at that?

4  A.   I don't recall looking at that after the three-day

5  interview, and I don't know if it was covered once

6  Mr. Danchenko became a CHS.

7  Q.   Well, did you -- have you ever been made aware of the

8  fact that anybody at the FBI bothered to look at that at the

9  time?

10  A.   I don't recall sitting here whether or not people looked

11  at that.

12  Q.   Okay.  I wonder if we can pull up, if we might, Defense

13  Exhibit 497.  And you were asked to look at a particular Bates

14  number, which is Page 067270.

15  A.   497.

16  Q.   497, 067270.

17  A.   I'm sorry, one more time with the Bates.  270 at the end?

18  Q.   Yup.  067270.

19  A.   Got it.

20  Q.   Do you remember looking at that?

21  A.   Yes, I do.

22  Q.   And those are your notes from the interview, right?

23  A.   Correct.

24  Q.   And they are a little bit hard to read here, but the very

25  bottom part of that -- okay.  Thank you for blowing that up.

────────────United States v. Danchenko────────────

559

1        The very part of that says, "Look back on phone,"

2    correct?

3    A.   Correct.

4    Q.   And do you recall what that was about?

5    A.   Yes, I believe that either we asked Mr. Danchenko or

6    Mr. Danchenko indicated that he would look back on his phone.

7    Q.   And with respect to his looking back on his phone, do you

8    recall whether he produced anything?

9    A.   Not that I was aware of.

10   Q.   Didn't produce any toll records or screenshots or

11   anything of that sort?

12   A.   Not that I'm aware of.

13   Q.   Nothing from any application that he may have had on the

14   phone?  Nothing?

15   A.   Not that I'm aware of.

16   Q.   Now, there's a series of questions that was asked on

17   cross-examination relating to the defendant's travel.  Do you

18   recall those?

19   A.   I do.

20   Q.   And Mr. Onorato had asked whether you had seen some of

21   those records, correct?

22   A.   Correct.

23   Q.   As you told the jurors, you weren't working for this part

24   of the investigation, correct?

25   A.   Your current investigation, no, I was not.

─────United States v. Danchenko─────

560

1   Q.   Right.  And then with respect to -- I want to turn your

2   attention specifically to Defendant's Exhibit 480.  I would

3   ask that you would pull that up.

4           And with respect to the Defendant's 480, this is

5   from -- this is a LinkedIn message, correct, from Millian to

6   Papadopoulos, correct?

7   A.   Correct.

8   Q.   And it reads -- would you just read that for the written

9   record?

10  A.   LinkedIn messaging -- oh, sorry -- from LinkedIn

11  messaging sent Friday July 15, 2016, 3:40 p.m., to Sergei

12  Millian, subject:  "George sent you a new message."

13  Q.   Okay.  And then I think --

14          MR. DURHAM:  Can I just consult with counsel for a

15  quick moment, Your Honor?

16          THE COURT:  Yes.

17          (Counsel confers.)

18  BY MR. DURHAM:

19  Q.   So you were shown this and you looked at it during

20  cross-examination, correct?

21  A.   Correct.

22  Q.   So the date of this is what, July 15?

23  A.   July 15.

24  Q.   And with respect to the information that's contained in

25  here -- and I think we're going to have a redacted exhibit at

─────United States v. Danchenko─────

561

1  some point.  But if you read the last portion of the

2  highlighted section --

3  A.   This is on the second page?

4  Q.   Second page.

5  A.   So -- starting with "please do."

6        (Counsel confers.)

7  BY MR. DURHAM:

8  Q.   Do you see that?

9  A.   Starting with "please do"?

10  Q.   Correct?

11        Would you read that into the record?

12  A.   (As read):  "Please do not hesitate to contact me at

13  +1-212-844-9455 or my personal email, milliangroup@gmail.com.

14  Best regards, Sergei Millian.  P.S. I'm currently on business

15  trip to Asia.  Please leave a VM sent from LinkedIn for iPad."

16  Q.   So this particular exchange or LinkedIn message to

17  Papadopoulos on July 15 of 2016, Millian is not even in the

18  country, correct?

19  A.   That's what it looks like from this, yes.

20  Q.   And with respect to any communications, Mr. Millian,

21  while he's in Asia, has said you can call that 212 number, but

22  leave a voicemail, correct?

23  A.   Yes.  Contact me on 212 number or my personal email and

24  please leave a voicemail.

25  Q.   Right.  Do you recall whether or not the FBI ever did --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

———United States v. Danchenko———

562

1  in Crossfire Hurricane ever run that number down to see what

2  the records might show?

3  A.    The 212 number?

4  Q.    Correct.

5  A.    It's possible.  I don't have a recollection of that while

6  I sit here now.

7  Q.    If you had done that, if the investigators had done that,

8  is that something you think you would recall?

9  A.    Not necessarily.

10  Q.    There's some probability that if you had actually run the

11  numbers to the ground, you would remember that?

12  A.    No.  But, I mean, for a number trace, that may have been

13  one of the analysts that I had under me.  If we did it, again,

14  I don't know whether it was run or not.

15  Q.    But in any event, he's out of the country on July 15,

16  according to this?

17  A.    According to this, yes.

18  Q.    And if you call this number, leave a voicemail?

19  A.    That is what this looks like, yes.

20  Q.    And that's on July 15.  Do you know when Mr. Millian came

21  back into the country?

22  A.    Precisely, no.  I mean, based upon what we looked at here

23  with respect to travel records, there's a possible date.

24  Q.    Okay.  And that was my next question.  With respect to

25  the travel records, do you recall whether or not you folks --

─────United States v. Danchenko─────

563

1   you folks had ever run that to ground?

2   A.   I don't know if the investigators pulled that or not.

3   Q.   Well, you, as the supervisory intelligence analyst, would

4   recognize toll records, travel records would be important,

5   correct?

6   A.   Right.

7   Q.   You have no recollection of that having been done?

8   A.   I don't recall if we pulled those records or not.

9   Q.   Okay.  Let me go next.  Counsel had asked you some

10  questions relating to Mr. Danchenko having provided some

11  source information that was of assistance, correct?

12  A.   Yes.

13  Q.   Would it have been of assistance to you if he had

14  provided the Dolan information?

15  A.   Yes.

16  Q.   And he didn't, did he?

17  A.   At that time, no.

18  Q.   When you say "at that time," you are talking about

19  January of 2017 when you are interviewing him about sources,

20  correct?

21  A.   Correct.

22  Q.   And he didn't provide that information?

23  A.   Yes.

24  Q.   And that would have been important to you?

25  A.   Yes.

United States v. Danchenko

564

1  Q.   Nor did he provide the emails that he had sent to

2  Mr. Millian, correct?

3  A.   Correct.

4  Q.   Would those have been of value to you?

5  A.   Yes.

6  Q.   Now, then Mr. Onorato had asked you some questions

7  relating to -- I think it was Government's -- or rather

8  Defense Exhibit 445.  And he had incorporated in his question

9  he had no reason to doubt defendant's supposed belief.

10        Do you remember along those lines and there was an

11 objection because you had said at the time you had no reason

12 to believe?

13 A.   Yes.

14 Q.   Counsel had asked you a series of questions relating to

15 whether or not the government, this, you know, prosecution in

16 this particular matter had shown you some documents, correct?

17 A.   Correct.

18 Q.   You were shown documents including the Millian emails

19 that Mr. Danchenko had sent to Mr. Millian, correct?

20 A.   That is correct.

21 Q.   And with respect to those particular emails, and most

22 particularly the August 18, 2016, email, where he says -- he

23 is asking Mr. Millian to get back to him -- we can pull that

24 up if would be helpful.  Why don't we pull that up so not to

25 confuse?

─────United States v. Danchenko─────

565

1          Now, if you look at 207T, the translation -- and you

2   can blow that up for Mr. Auten.

3          It's dated Thursday, August 18, 2016, correct?

4   A.   That is correct.

5   Q.   And it says (As read):  "Hello, Sergei.  I wrote you

6   several weeks ago.  We are contacts on LinkedIn."  Correct?

7   A.   Correct.

8   Q.   The very first sentence.

9   A.   Correct.

10  Q.   If Mr. Danchenko had provided you that email, the

11  introduction that I wrote to you several weeks ago, nothing

12  about going to New York to meet with him, correct?

13  A.   Correct.

14  Q.   Nothing about an anonymous call or I got your call,

15  anything like that?

16  A.   That is correct.

17  Q.   If you had known that at the time, would that have been

18  of import to you?

19  A.   Yes.

20  Q.   So when counsel asked you the question about you had no

21  reason to doubt defendant's supposed belief, having looked at

22  this Government's exhibit where he says -- it doesn't say

23  anything about a call, it doesn't say anything along those

24  lines, or trips to meet with Mr. Millian in New York, would

25  that have created some concerns on your part?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

┌─────────────────────────────────────────────────────────────┐
└ United States v. Danchenko ┘

566

1   A.   I mean, yes.  The way that this email is structured at

2   the beginning, I -- as you say, if there had been a meeting or

3   if there had been some sort of discussion, one might assume

4   that there would be some sort of reference to that in the

5   beginning.

6   Q.   And there's no reference there, correct?

7   A.   There is no reference there.

8   Q.   And, in fact, when you look at the email that

9   Mr. Danchenko did provide from August 24, there's a repetition

10  of that basically, right?  When he's talking to -- on the 24th

11  with Mr. Zlodorev, he says that Millian hadn't responded to

12  him, right?  How do I talk to this guy, I don't want to pester

13  him and so forth, right?

14  A.   Something along those lines, yes.

15  Q.   And with respect to if you had both of those emails in

16  combination, would that have raised, in your mind, doubt as to

17  what the defendant had been telling you about this anonymous

18  call?

19  A.   It would help us to weigh kind of an assessment as to

20  whether or not it happened or did not happen, certainly.

21  Q.   And then with respect to what Mr. Danchenko had told you

22  about going to New York to meet with somebody, do you recall,

23  sir, whether or not it seemed at all peculiar to you that he

24  was going to be going to New York to meet some unidentified

25  person in some unidentified bar?

1   A.   I actually didn't find that altogether too concerning

2   given the fact that I work in counterintelligence.

3   Q.   Well, is counterintelligence not intelligent enough to

4   think that somebody going to New York City to a bar of 8

5   million people might make it difficult to find the person?

6   A.   Unless some other way of communicating, yeah, it would be

7   difficult.

8   Q.   Fair point.  And did Mr. Danchenko say anything about any

9   other way he had of communicating with this person?

10  A.   Not in our discussion, no.

11  Q.   Well, other than your discussion, did it ever come to

12  your attention in any way or by any means that he was somehow

13  going to be able to meet an unidentified person in a

14  unidentified bar in a city of 8 million people?

15  A.   Not in our discussion, no.

16  Q.   Was that a matter that was something of interest to you?

17  A.   Certainly.

18  Q.   With respect to the email that was sent on August 18,

19  okay, that's the one that we just talked about, I believe you

20  had indicated that Mr. Danchenko had used a ruse in that,

21  correct?

22  A.   Yes.  This is the email, yes, that discusses the land

23  deal and the real estate issue.

24  Q.   And that was a deception, correct?

25  A.   Well, it was a -- yes, I mean, it's a ruse interview -- I

─────────United States v. Danchenko─────────

568

1   mean -- sorry -- a ruse email.

2   Q.   Okay.  Now, I want to turn your attention to the next

3   matter, which is Defendant's Exhibit 420T.  And that's going

4   to be the full exhibit in this matter.

5          It's on the screen, if that will be helpful to you.

6   A.   I have it here as well.

7   Q.   All right.  And I would ask that that be blown up.

8          So this is from May 26.  This is Zlodorev to

9   Mr. Millian, correct?

10  A.   That is correct.

11  Q.   And in context, Millian is reached out to on July 21,

12  that's the first time based on the records, by Mr. Danchenko,

13  correct?

14  A.   I'm sorry?  Reached out?

15  Q.   Mr. Danchenko reaches out to Mr. Millian by email on

16  July 21?

17  A.   Correct.

18  Q.   And this email from Zlodorev to Millian on May 26 of

19  2016, makes a certain request, right, or ask a question?

20  A.   Yes.

21  Q.   If you look at the very bottom, right, it says, "Can I

22  give him your contact information?"  Correct?

23  A.   Yes.  "Can I give him your contact information, email,

24  phone, or just email?"

25  Q.   Right.  Then I wanted to ask you:  When you were being

─────────────United States v. Danchenko─────────────

569

1   asked about this on cross-examination and you readily adopted,

2   it does say, "Can I give him your contact information,"

3   correct?

4   A.   That is correct.

5   Q.   But what contact information was it that was given to

6   Mr. Danchenko, according to this, as to how to reach Millian?

7   A.   It says email, phone, or just email.

8   Q.   Any reference to any apps?

9   A.   No.   There's no reference to any apps in this.

10  Q.   Can you tell the ladies and gentlemen of the jury, if you

11  know, if there's like one, more than one, dozens of apps?

12  A.   Oh, yeah, there are a multitude of apps.

13  Q.   Like hundreds of them, correct?

14  A.   I don't know how I would characterize that.

15  Q.   Okay.   But lots of them?

16  A.   Correct.

17  Q.   And the only information that Mr. Zlodorev is going to

18  pass on, according to the email, was email, phone, or just

19  email for Mr. Millian?

20  A.   That is what this says, yes.

21  Q.   And the outreach by Mr. Danchenko was by way of email,

22  correct?

23  A.   Yes.

24  Q.   And there's nothing about anything -- anything here about

25  apps being used?

Redirect Examination - 5   Page ID# 10/12/22

————United States v. Danchenko————

570

1    A.    Correct.

2    Q.    And I think I asked you, but if I neglected to, I just

3    want to make sure.  You don't know one way or another whether

4    when Mr. Danchenko wanted to communicate with somebody by way

5    of app he would tell them that?

6    A.    Yeah, I have no way of knowing one way or the other.

7    Q.    But you do know here that with respect to the July 21,

8    2016, email, that Mr. Danchenko provided to Millian, if he

9    chose to respond, did not include any app reference, correct?

10   A.    There were no app references in the email, no.

11   Q.    Okay.  Now, I want to turn to another portion of what

12   defense counsel is asking about travel records.  I guess with

13   respect to the Amtrak records, you don't know what those are,

14   right?  You didn't see -- haven't seen those?

15   A.    I have not seen those, no.

16   Q.    And so when counsel was making reference -- this is on

17   the second page of -- what's Government's Exhibit 1300.

18         MR. DURHAM:  I believe the Court allowed in 1300 and

19   its corresponding defense.

20         THE COURT:  Yes.

21   BY MR. DURHAM:

22   Q.    On the back, the second page of Government's 1300,

23   counsel was asking you questions about 25 July, 5:56 p.m.?

24   A.    Yes, 5:56 p.m., 25th of July, yes.

25   Q.    That's when the receipt was printed or what have you,

—United States v. Danchenko—

571

1   right?

2   A.   Correct.

3   Q.   Does that tell you anything about when the reservation

4   was actually made?

5   A.   It says when -- when -- yeah, it says the receipt was

6   printed and it was purchased.

7   Q.   Right.  So that's when the credit card was charged?

8   A.   I don't know if that's when the credit card, but it's

9   when it was purchased.

10  Q.   All right.  But with respect to this document, it doesn't

11  tell you if and when a reservation was made?

12  A.   No, there's -- I don't see anything on here about a

13  reservation.

14  Q.   Okay.  I'm going to ask you to take a look, if you

15  would -- because the date of that document is July 25,

16  correct?

17  A.   Correct.

18  Q.   And counsel was talking about this appears to have been

19  made in haste or last minute or however it was characterized,

20  you remember that, right?

21  A.   I do remember that, yes.

22  Q.   And you sort of -- you said, yeah, that's what it looks

23  like to you, right?

24  A.   It had that feeling to it, yes.

25  Q.   Had that feeling to it.  Okay.  So let's look at

─United States v. Danchenko─

572

1  Government's Exhibit 204T.  We can just pull it up on the

2  monitor, if that's easier.

3        And if you look at the last full paragraph, just

4  before the sort of closing line, the jury has seen this

5  before.  We spoke about this before.  And it reads (As read):

6  "In any case, it would be interesting if and when possible to

7  chat with you by phone or meet for coffee, beer in Washington

8  or in New York, where I will be next week."  Did I read that

9  correctly?

10  A.   That is correct, yes.

11  Q.   And then counsel asked some question about, well, you

12  know, that's how some people schmooze, you know, I'll meet you

13  when I can.  Do you remember questions along those lines?

14  A.   Yes, I do.

15  Q.   All right.  I want to ask you to -- and you kind

16  of bought that, right?

17  A.   Sorry?

18  Q.   You kind of said, well, yeah, that's how things work?

19  A.   That is one possibility, yes.

20  Q.   Okay.  I want to ask Ms. Arsenault to pull up just enough

21  for -- don't put it on the monitor.  I'd ask that Government's

22  Exhibit 901 be provided to Mr. Auten to review.

23  A.   Is 901 in my book?  I'm not sure.

24  Q.   Do you have 901 in front of you?

25  A.   I don't think I have 901.  I don't have 901.

─United States v. Danchenko─

573

1           THE COURT:  This is Government's Exhibit 901.

2           MR. DURHAM:  Yes, Your Honor.

3    BY MR. DURHAM:

4    Q.   Do you see that document, sir?

5    A.   I do.

6    Q.   And what's the date of that document?

7    A.   That document is dated -- well, it actually has a couple

8    different dates on it.  The top date is July 18, 2016.  And

9    then there is a -- there's a -- an earlier message that's

10   attached to this dated -- I believe it says Thursday, July 14,

11   2016.

12   Q.   And then looking at the July -- Monday, July 18, 2016,

13   11:47 a.m. email, correct?

14   A.   Correct.

15   Q.   Have you read that?

16   A.   Have I read this before or have I read it right now?

17   Sorry.

18   Q.   Right now.

19   A.   Yes.  I -- yes.

20   Q.   And with respect to that document, you would agree, would

21   you not, that July 18, 2016, would have occurred before

22   July 21 when Mr. Millian sent an email to -- I'm sorry -- when

23   Mr. Danchenko sent an email to Mr. Millian, correct?

24   A.   Correct.

25   Q.   This is earlier in time?

———United States v. Danchenko———

574

1   A.   That is correct.

2   Q.   And in the July 21 email that the jurors just looked at

3   and you looked at, Mr. Millian was told in that email that

4   Mr. Danchenko was going to be traveling to New York the next

5   week, correct?

6   A.   Right.  You may have to go to New York next week, yeah.

7   Q.   Might have to go to New York.

8        And now looking at Government's Exhibit 901, which

9   was earlier in time than the July 21 email from Mr. Danchenko

10  to Mr. Millian, does it have information contained on there in

11  Mr. Danchenko's own words relating to his having planned to go

12  to New York?

13  A.   Yes, it does.

14       MR. DURHAM:  We move 901 as a full exhibit, Your

15  Honor.

16       THE COURT:  Any objection?

17       MR. ONORATO:  No objection.

18       THE COURT:  All right.  Without objection, 901 is

19  admitted.

20  (Government's Exhibit No. 901 was admitted into evidence.)

21  BY MR. DURHAM:

22  Q.   Now, if we pull that up and ask -- thank you very much.

23  So, again, so the jurors can see this.  But will you read it

24  at the top part?

25       This is from who to who on what -- on what date?

Redirect Examination - B. Auten - 10/12/22

┌─ United States v. Danchenko ─

575

1   A.   This is from Mr. Danchenko to -- I don't know how his

2   first name is pronounced, Cenk, I believe, Sidar, and it's on

3   Monday, July 18, 2016, at 11:47 a.m.

4   Q.   Do you know who Cenk Sidar is?

5   A.   It's referenced here and I've seen it referenced.

6   Q.   But you don't remember offhand who Mr. Sidar is?

7   A.   I wouldn't have been able to tell you, but it's listed

8   here on this email.

9   Q.   If we could show you, to refresh your recollection, if

10  you take a look at Government Exhibit 100 -- if we can find it

11  ourselves.

12           Well, we're just looking for that.  100.

13           Do you recall, sir, an entity known as Sidar Global

14  Advisors?

15  A.   Yes, I do.  Yes, I do.

16  Q.   And is Sidar Global Advisors -- what can you tell the

17  jury about Sidar Global Advisors?

18           MR. ONORATO:  I'm going to object.

19           THE COURT:  Sustained.  I don't see any relevance --

20           MR. DURHAM:  Okay.

21           THE COURT:  -- in light of the Court's earlier

22  rulings.

23           MR. DURHAM:  I'm sorry, Your Honor?

24           THE COURT:  I said, in light of the Court's earlier

25  rulings, I sustain the objection.

—United States v. Danchenko—

576

1      MR. DURHAM:  I just want to be sure I don't ask a

2 question you don't want me to ask.  Can I ask about this

3 document?

4      MR. ONORATO:  No objection asking about the time

5 frame.

6      THE COURT:  Right.  No, you can.  Right.  I don't

7 think we need to get into Mr. Sidar.

8      MR. DURHAM:  Yes, Your Honor.

9 BY MR. DURHAM:

10 Q.   So looking at Government's Exhibit 901 then, it's the

11 full exhibit, this is Monday, July 18, 2016, correct?

12 A.   Correct.

13 Q.   And this is from Mr. Danchenko to Mr. Sidar?

14 A.   Correct.

15 Q.   And would you read into the record what it is that

16 Mr. Danchenko is telling Mr. Sidar in this July 18th email

17 about New York?

18 A.   Would you like me to -- oh, about New York?

19 Q.   Uh-huh.

20 A.   (As read):  "I may have to go to New York.  I have to --

21 I may have to go to NYC, so let's play it by ear.  If I don't

22 go, we will meet then."

23 Q.   Okay.  So prior to ever contacting or sending an email to

24 Mr. Millian, right, he, Mr. Danchenko, in his own words, is

25 telling Sidar that he had to go -- or let me see -- he had --

—Tonia M. Harris  OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

577

1   he may have to go to New York City the next week.

2   A.   Yes.  Correct.

3   Q.   But wouldn't have anything to do with an anonymous call.

4   This is dated July 18th, correct?  Would you consider

5   July 18th to be late July?

6   A.   I usually characterize July 18th as mid July.

7   Q.   Mr. Danchenko said this supposed call came in late July.

8   A.   Yes.

9   Q.   Okay.  And so on July 18th, prior to any communication

10  being sent to Mr. Millian, Mr. Danchenko is acknowledging he

11  may have to travel to New York the next week?

12  A.   That's correct.

13  Q.   Would you deduce from that that his travel to New York

14  was not the result of an anonymous call but he had other

15  business?

16          MR. ONORATO:  Objection to the characterization.

17          THE COURT:  Sustained.

18  BY MR. DURHAM:

19  Q.   Do you know whether or not, based on any of this

20  information, that Mr. Danchenko expected to have to work in

21  New York or meetings in New York the following week?

22  A.   It appears from this that the possibility was that he

23  might be going to New York.

24  Q.   Prior to any contacts with Millian?

25  A.   Correct.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

578

1    Q.   Prior to any contacts with a supposed anonymous caller,

2    correct?

3    A.   Correct.

4    Q.   And do you know, sir, whether or not this was ever

5    explored or investigated or looked at by the FBI, by Crossfire

6    Hurricane?

7    A.   I don't know -- I don't believe so with Crossfire

8    Hurricane.  I don't know if it was covered once Mr. Danchenko

9    became a confidential human source.

10   Q.   Okay.  And if it had been explored where the FBI

11   investigators had looked at it, you would remember that,

12   wouldn't you?

13   A.   If it was covered under Crossfire, yes, probably.  If it

14   was covered as CHS, not necessarily.

15           MR. DURHAM:  Okay.  Thank you, sir.  I have nothing

16   further.

17           THE COURT:  All right.  May the witness be excused?

18           MR. ONORATO:  Will Your Honor give me, like, two

19   recross?

20           THE COURT:  No.

21           MR. ONORATO:  Okay.  Thank you.  The defendant can

22   be excused.

23           THE COURT:  Yes.  May the witness be excused,

24   Mr. Durham?

25           MR. DURHAM:  Yes, Your Honor.

──────United States v. Danchenko──────

579

1          THE COURT:  All right.  Mr. Auten, you are excused.

2    Do not discuss your testimony outside the courtroom or with

3    any other witness.

4          All right.  Let me see counsel at the bench.

5          (Side bar.)

6          THE COURT:  Who is your next witness?

7          MR. DURHAM:  Charles Dolan.

8          THE COURT:  How long do you think he is going to be?

9          MR. KEILTY:  25 minutes on direct.

10          MR. ONORATO:  Mr. Sears is doing the

11   cross-examination.

12          MR. SEARS:  Not very long.

13          MR. DURHAM:  Less than an hour.

14          THE COURT:  All right.

15          MR. DURHAM:  If you're asking whether we should

16   start him tonight, my thoughts is it's probably not a good

17   idea.

18          THE COURT:  Let's start fresh in the morning.  All

19   right.  Good.

20          (Open court.)

21          THE COURT:  Ladies and gentlemen, we're going to go

22   ahead and recess for the day before we start the next witness.

23   You're excused until tomorrow at 9:30.  Again, please do not

24   discuss this case outside the courtroom.  And, with that, I

25   will see you tomorrow morning.  Thank you.

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

EASTERN DISTRICT OF VIRGINIA

——United States v. Danchenko——

580

1          (Jury dismissed.)

2          THE COURT:  Anything before we adjourn?  All right.

3    I'll see counsel at 9 o'clock tomorrow.  The Court is now in

4    recess.

5

6              **(Proceedings adjourned at 5:42 p.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus IGOR Y.**

8    **DANCHENKO,** Criminal Action No.: 1:21-cr-245, in said court

9    on the 12th day of October, 2022.

10           I further certify that the foregoing 167 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this October 15, 2022.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              581