729

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION

-----------------------------x.
                              :
UNITED STATES OF AMERICA,     : Criminal Action No.
                              :
                 Plaintiff,   : 1:21-cr-245
                              :
          versus              : October 13, 2022,
                              :
IGOR Y. DANCHENKO,            :
                              : Volume 3(PM Session)
               Defendant.     : Pages 729 - 895
-----------------------------x

                    TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ANTHONY J. TRENGA
                UNITED STATES DISTRICT JUDGE

                  A P P E A R A N C E S

 FOR THE GOVERNMENT:     DOJ-USAO
                         JOHN DURHAM, AUSA
                         MICHAEL T. KEILTY, AUSA
                         DEBORAH SHAW, AUSA
                         145 N Street, NE
                         Suite 3e.803
                         Washington, D.C. 20002

 FOR THE DEFENDANT:      SCHERTLER ONORATO MEAD & SEARS,
                         LLP

                         STUART ALEXANDER SEARS, ESQ
                         555 13th Street, NW, Suite 500
                         Washington, DC 20004

                         DANNY ONORATO, ESQ. (DC-NA)
                         901 New York Avenue NW, Suite 500
                         Washington, D.C. 20001

OFFICIAL U.S. COURT REPORTER:    MS. TONIA M. HARRIS, RPR
                                 United States District Court
                                 401 Courthouse Square
                                 Fifth Floor
                                 Alexandria, VA 22314

─── United States v. Danchenko ───

730

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Kevin Helson

Direct examination by Mr. Durham............ 731
Cross-examination by Mr. Sears.............. 787
Redirect examination by Mr. Durham......... 872
Recross-examination by Mr. Sears............ 886
Redirect examination by Mr. Durham......... 889

EXHIBITS

On behalf of the Government:

Admitted

Number 119........................................ 773
Number 120........................................ 775
Number 171........................................ 761
Number 171T....................................... 761
Number 172........................................ 778
Number 172T....................................... 778
Number 173........................................ 731
Number 173T....................................... 779
Number 1811....................................... 731
Number 605........................................ 779
Number 605T....................................... 779
Number 611........................................ 733
Number 612........................................ 734
Number 612T....................................... 734

On behalf of the Defendant:

Admitted

Number 100........................................ 792
Number 102........................................ 814
Number 107........................................ 849
Number 108........................................ 850
Number 109........................................ 854
Number 110........................................ 857
Number 112........................................ 858
Number 117........................................ 866

MISCELLANY

Preliminary matters................................ 731
Certificate of Court Reporter...................... 895

EASTERN DISTRICT OF VIRGINIA

─── United States v. Danchenko ───

731

1      **A F T E R N O O N   P R O C E E D I N G S**

2    (Court proceedings commenced at 1:06 p.m.)

3              THE COURT:  Anything before we proceed?

4              MR. DURHAM: Just one matter, Your Honor.  The court

5    deputy was good enough to let us know.  I think we read

6    Government Exhibit 1811, the stipulation into the record, but

7    it wasn't formally moved.  So we would move it.

8              THE COURT:  All right.  The Court will admit 1811.

9    (Government Exhibit No. 1811 admitted into evidence.)

10             THE COURT:  Anything else?  All right.  Let's have

11   the witness be brought in, please.

12             MR. DURHAM:  Would Your Honor prefer that we have

13   the witnesses in here after the recess before you come out?

14             THE COURT:  Well, no, because -- unless there's

15   something to talk about, never quite know, so...

16             Let's bring the jury in.

17             THE CSO:  Yes, sir.

18             (Witness seated.)

19             (Jury present.)

20             THE COURT:  All right.  Please be seated.  Agent

21   Helson, you remain under oath.  Mr. Durham.

22             MR. DURHAM:  Thank you, Your Honor.

23                         DIRECT EXAMINATION

24   BY MR. DURHAM:

25   Q.  Special Agent Helson, I'll pick up where we were just

─────United States v. Danchenko─────

732

1  breaking off at the time of the luncheon recess.

2        MR. DURHAM:  I'd ask Ms. Arsenault to just quickly

3  bring up Government Exhibit 610T, please.

4  BY MR. DURHAM:

5  Q.  When we broke, we were looking at what has been marked as

6  Government's Exhibit 610T.  This is, again, from Ms. Galkina

7  in the first instance and then Mr. Danchenko's response,

8  correct?

9  A.  Correct.

10  Q.  And so just to pick up at the very bottom of the body,

11  the response of Mr. Danchenko to Ms. Galkina reads how?

12  A.  (As read): "I will try if I can get through directly

13  possibly through Viber or WhatsApp."

14  Q.  Okay.  I want you to take a look at Government's

15  Exhibit 611 for identification, not yet a full exhibit.

16        And looking at Government 611 for identification, do

17  you recognize that as one of the Facebook business records

18  that you received during the time that you were working as

19  Mr. Danchenko's handler?

20  A.  I did not see that until the trial prep.

21  Q.  Okay.  Till trial prep.

22        Do you know where it came from, though?

23  A.  Yes.

24  Q.  Where did it come from?

25  A.  It's from his Facebook account.

─────────United States v. Danchenko─────────

733

1  Q.   Okay.  And looking at Government's Exhibit 611, is there

2  a portion of that document reflecting whether or not

3  Mr. Danchenko is communicating any information to somebody

4  about the use of an app?

5  A.   Yes.

6  Q.   And there are multiple entries.  For purposes of the

7  record, which entry is it where Mr. Danchenko is making the

8  reference to use an app or the use of an app?

9  A.   It was the one where he is stating to Alex, (As read):

10  "Hi, Alex, I'm sorry, but I'll be in Britain next week.

11  Perhaps we can discuss a couple of things here (or on Signal)

12  or obviously by phone, and then follow up towards the end of

13  April."

14          MR. DURHAM:  Your Honor, the Government would move

15  611 as a full exhibit.

16          THE COURT:  Any objection?

17          MR. SEARS:  No objection.

18          THE COURT:  Without objection, 611 is in.

19  (Government's Exhibit No. 611 was admitted into evidence.)

20          MR. DURHAM:  And, Ms. Arsenault, if you would blow

21  up, if you would, or enlarge the entry that Mr. Helson was

22  just referring to.

23  BY MR. DURHAM:

24  Q.   Okay.  So with respect to what's on the jury's monitors

25  now, that's the entry in this Facebook, correct?

734

1    A.    Correct.

2    Q.    This is, "I'm sorry, but I'll be in Britain next week.

3    Perhaps we can discuss a couple of things here (or on Signal),

4    or obviously by phone."

5    A.    Yes.

6    Q.    Is that consistent with your knowledge of Mr. Danchenko

7    that as far as you know, if he wanted somebody to use Signal,

8    he'd -- use an app, he would tell them?

9    A.    Yes.

10          MR. DURHAM:  Government's -- I'd ask that. . .

11          (Counsel confers.)

12          MR. DURHAM:  We ask that 612.

13          THE COURT:  Any objection?

14          MR. SEARS:  No, Your Honor.

15          THE COURT:  Without objection 612, 612T.

16   (Government's Exhibit Nos. 612, 612T were admitted into

17   evidence.)

18          THE COURT:  Do you want. . .

19          MR. DURHAM:  Oh, all right.

20   BY MR. DURHAM:

21   Q.    In that connection, sir, take a look at what is now --

22   well, 612, if you look at that first, does that appear to be

23   in Russian?

24   A.    Yes.

25   Q.    Are you a Russian speaker or no?

────United States v. Danchenko────

735

A.   No.

Q.   And look at 612, it's translation of a certain portion of 612, correct?

A.   Correct.

Q.   And this relates to -- well, it's on the monitor, but will you read into the record what, in this instance, Mr. Danchenko is saying?

A.   In the body, it says, (As read): "About work, yes, let's do it, but it is a very delicate topic.  Maybe you have Signal or Mail.  It is better -- it's better not to write here at all."

Q.   Okay.  So if there's a sensitive subject matter you want to talk about, at least, in this instance, he'd say use Signal or Mail, correct?

A.   Correct, yes.

Q.   With respect to the emails that you were reviewing before the luncheon recess that Mr. Danchenko sent to the Millian group, any reference to using Signal, WhatsApp, Viber, any of the other applications?

A.   No, no.

Q.   Just his -- just his name, his telephone number, and an email address?

A.   Correct.

Q.   Now, with respect to Signal -- I guess I'm assuming.  Do you know what Signal is?

─United States v. Danchenko─

736

1   A.   Yes.

2   Q.   What is Signal?

3   A.   It's an encrypted app in which parties can communicate

4   back and forth in an encrypted format that's -- erases once

5   you -- you're done with it.

6   Q.   Okay.

7   A.   And it's untraceable.

8   Q.   And for those folks that don't use applications, ones

9   who are -- maybe one of them, but are there like a handful of

10  these things or not, if you know?

11  A.   There's more than a handful.  It's a bunch.  They come

12  and go, but there's some -- like a handful of poplar ones,

13  yes.

14  Q.   Okay.  But there are many, many apps out there?

15  A.   Yes.

16  Q.   Okay.  All right.  Now, you have testified earlier that

17  you had had several meetings with Mr. Danchenko where the

18  meetings were recorded, correct?

19  A.   Correct.

20  Q.   I want to go to the third one.  You heard the date of

21  June 15th of 2017.  Did that sound about right?

22  A.   Yes.

23  Q.   All right.  I want to jump out of chronological order for

24  a minute, though, all right?

25  A.   Okay.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

737

```
1   Q.   When you would meet with Mr. Danchenko, when you were a
2   co-handler, would meet with Mr. Danchenko, what if any
3   practices did you follow in connection with recording,
4   memorializing what was said and done at meetings after the
5   third purported meeting had taken place?
6   A.   In the few instances that I wanted to notate actual
7   words, that I would use quotes in my reports if I needed to
8   memorialize a statement that was made.
9   Q.   Okay.  So, again, you had recorded the first three
10  meetings as you've referenced, correct?
11  A.   Correct.
12  Q.   And why did you stop, then, recording meetings with
13  Mr. Danchenko?
14  A.   We began seeing a decrease in topics where the dossier
15  was becoming less and less, and so most of the conversations
16  going forward after we stopped became more non-dossier
17  related.
18  Q.   Okay.  And so you didn't find the need --
19  A.   Need to record it.
20  Q.   -- to record.
21       I want to direct your attention to the date of
22  October 24th of 2017, and if it would help refresh your
23  recollection, if you look in the index of exhibits,
24  Government's Exhibit 102.
25  A.   102.  Okay.  Yes.
```

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

738

1   Q.   Now, without saying, you know, what's on that piece of

2   paper, do you recognize Government's Exhibit 102?

3   A.   Yes.

4   Q.   Do you recognize whose work product that is?

5   A.   Yes.

6   Q.   And whose work product is it?

7   A.   It's mine.

8   Q.   And in connection with that information and that

9   document, did you have occasion to refresh your recollection

10  as to its content?

11  A.   Yes.

12  Q.   With respect to the content that's in that report, does

13  it reflect a meeting that occurred on a particular date?

14  A.   Yes.

15  Q.   And what was that date?

16  A.   October 24, 2017.

17  Q.   With respect to meeting with Mr. -- well, withdrawn.

18          Was that an in-person, face-to-face meeting or was

19  that through some kind of use of a telephone facility?

20  A.   It was in person.

21  Q.   And with regard to the October 24th, 2020 -- '17 meeting,

22  do you recall in what geographical area that had occurred?

23  A.   In Alexandria.

24  Q.   All right.  So, again, at -- here in the Eastern District

25  of Virginia?

─────────────United States v. Danchenko─────────────

739

```
 1   A.    Correct.

 2   Q.    The content or the information that's contained in this

 3   document true and accurate to the best of your recollection?

 4   A.    Yes.

 5   Q.    You told the jurors that with respect to your

 6   memorializing things, if it was significant, you would put it

 7   in quotes or word for word, correct?

 8   A.    Correct.

 9   Q.    Do you recall, sir, based on the independent recollection

10   or review of Government's Exhibit 102, whether or not, in

11   October of 2017, you, once again, had occasion to go back and

12   make inquiry regarding what Mr. Danchenko had to say about an

13   anonymous call?

14   A.    Yes.

15   Q.    And was -- do you remember, was there something that

16   precipitated you're doing that in October of 2017?

17   A.    It was a conversation I had had with Mr. Auten, Brian

18   Auten, and this was the time that he had asked me to go back

19   and clarify, yet again, the details surrounding the

20   conversation that Mr. Danchenko allegedly had with Millian

21   over the phone.

22   Q.    And did you do that on or about October 24th of 2017?

23   A.    I did.

24   Q.    Do you recall, sir -- this just goes to a yes or no, do

25   you recall whether or not Mr. Danchenko made statements to you
```

1   on that date, again, on this same subject matter of contact

2   with Millian or somebody that he claimed to believe was

3   Millian?

4   A.   Yes.

5   Q.   Tell the ladies and gentlemen of the jury, what, to the

6   best of your recollection, Mr. Danchenko said to you on

7   October 24th, 2017, concerning contact with Millian?

8   A.   That the conversation was -- that he had had a

9   conversation with an individual he believed to be Sergei

10   Millian, and he had done so -- he made that assertion after

11   listening to, I think, a YouTube video of Mr. Millian giving a

12   speech.  And the individual on the phone sounded very similar

13   to him, so. . .

14   Q.   And do you recall what, if anything, else Mr. Danchenko

15   said that day about his contact, who the person he claims to

16   believe was Mr. Millian?

17   A.   There was a part of the questioning that we had asked,

18   did he have any personal meet -- face-to-face meeting.  He

19   said no.

20        We confronted that because it was inconsistent with

21   what we were hearing from Mr. Steele, and he also told us that

22   Mr. Steele believed that was because he never corrected

23   Mr. Steele's statement or idea that there was an in-person

24   meeting in New York, and I believe it was in South Carolina.

25   Q.   All right.  I'd ask you to take a look at 102 again and

─────United States v. Danchenko─────

741

1   see whether the information that you just provided to the jury

2   occurred on that date or a later date.

3   A.   It was on October 24th when we had this conversation.

4   Q.   Okay.  You had the conversation with Mr. Danchenko on the

5   24th.  Do you have occasion on that date to put anything in

6   quotes --

7   A.   Yes.

8   Q.   -- because you wanted to be completely accurate as to

9   exactly what it was that Mr. Danchenko said?

10   A.   Yes.

11   Q.   Are you confident that what you put in quotes or recorded

12   in quotes was completely accurate as to what Mr. Danchenko

13   told you on October 24th of 2017?

14   A.   Yes.

15   Q.   And what is it that Mr. Danchenko told you on

16   October 24th, 2017, concerning any contact with Mr. Millian?

17   A.   The first question I asked, I said, you never met with

18   him in D.C.

19           Response was no.

20           I asked, so did you ever meet with him in Virginia.

21           The response was no.

22           I asked, so did you ever meet with him in South

23   Carolina.

24           The answer was no.

25           I asked, so you never met Sergei Millian

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

──United States v. Danchenko──

742

1   face-to-face anywhere in the north or south United States.

2          The response was no.

3   Q.   Okay.  And had you also asked him about and quoted what

4   Mr. Danchenko said relating to ever meeting him in person?

5   A.   I had asked, how many times did you meet face-to-face

6   with Sergei Millian.

7          He stated that I did not meet with him ever in

8   person.  I believe I spoke to him on the phone a couple of

9   times, at least someone who I thought was him.  But when I

10  was -- I scheduled a meeting, time, and place in New York,

11  Millian never showed.

12  Q.   Okay.  And with respect to what you've just testified

13  before the jurors, I did not meet with him ever in person, I

14  believe I spoke to him on the phone a couple of times, at

15  least someone I thought was him, that's in quotes, correct?

16  A.   Correct.

17  Q.   Prior to October 24th of 2017, do you recall whether or

18  not Mr. Millian had ever told you that he had spoken to

19  Millian a couple of times?

20  A.   No.

21  Q.   To the best of your knowledge and recollection, based on

22  your review of the materials that were prepared before you

23  started to serve as Mr. Millian's handler, did you ever see

24  anything in any of the Bureau of Records reflecting that prior

25  to October 24th of 2017, that Mr. Millian -- I'm sorry,

─────United States v. Danchenko─────

743

1   Mr. Danchenko had ever said that he had spoken with Millian on

2   the phone a couple of times?

3   A.   No.

4   Q.   You memorialize that in a report in quotes, correct?

5   A.   I did.

6   Q.   As you sit here today, sir, how confident are you that

7   Mr. Danchenko told you on October 24th that he had spoken to

8   the person that he believed to be Mr. Millian a couple of

9   times?

10  A.   I'm very confident.

11  Q.   Do you recall, sir, whether or not after October 24th, if

12  you had yet another occasion to talk to Mr. Danchenko where

13  the information relating to what essentially is Dossier Report

14  2016/95 that is about Millian came up?

15  A.   On October 24th?

16  Q.   After October 24th?

17  A.   It may have been November time frame.

18  Q.   If you take a look at Government's Exhibit 103 and see if

19  that refresh your recollection as to whether or not there was

20  yet another occasion that you raised or asked questions of

21  Mr. Danchenko relating to these matters?

22  A.   Yes.

23  Q.   And when was it that you met with Mr. Danchenko and

24  Millian came up again?

25  A.   I'm looking at the wrong --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

744

1   Q.   Do you have Government's Exhibit 103 there?

2   A.   I have one -- oh, here we go, yes.

3   Q.   Okay.

4   A.   So it's November the 2nd.

5   Q.   Okay.  So why don't you just take a moment and look at

6   that and see if that refreshes your recollection as to the

7   date which you met with Mr. Danchenko and the Millian matter

8   came up yet again?

9   A.   Yes.

10  Q.   And what was the date?

11  A.   November the 2nd, 2017.

12  Q.   All right.  And on November 2nd, 2017, was that some kind

13  of telephone connection or was that a face-to-face meeting?

14  A.   That was a face-to-face.

15  Q.   So you are with him?  He's not like -- no interference in

16  the phone or anything, right?

17  A.   Correct.

18  Q.   Do you recall, sir, why it was that you had occasion to

19  go back to, yet again, ask about this Millian piece in

20  November of 2017?

21  A.   There had been -- this, I think, goes to the fact that

22  Brian was still saying there was inconsistency in what

23  Mr. Danchenko was saying as opposed to what Mr. Steele was

24  saying with respect to Millian's -- his connection or his

25  contact with Millian.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

745

1   Q.   And so tell the ladies and gentlemen of the jury on

2   November 2nd now, of 2017 -- on October 24th, he now says that

3   there were a couple of calls.  Now, on November 2nd, you're

4   confronting him now about what he told Steele regarding him

5   actually meeting with Millian, correct?

6   A.   Correct.

7   Q.   And with respect to what you were asking Mr. Danchenko on

8   November 2nd, what is it that Mr. Danchenko told you regarding

9   Steele and what he had told Steele or not told Steele about

10  meeting with Millian?

11  A.   He said that Steele had the idea -- that Steele believes

12  that Mr. Danchenko had met in person and he never corrected

13  Mr. Steele's thought in that, is that he was pretty much tired

14  of talking about it.  He -- Steele was pressuring him to

15  answer questions that Steele -- that Millian could potentially

16  answer.

17          So the pressure was get with Millian, get a report,

18  and Igor was -- I let him have what I -- I told him what I

19  know and he still believed that I was in -- it was an

20  in-person meeting and I never corrected him because I was

21  tired of talking about it.

22          MR. SEARS:  Your Honor, I apologize to interrupt,

23  but to the extent Mr. Steele's comments are coming in, my

24  understanding is that they would not be for the truth of the

25  matter asserted --

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

———United States v. Danchenko———

746

1          THE COURT:  Correct.

2          MR. SEARS:  -- just because the agent heard --

3          THE COURT:  Right.

4          MR. SEARS:  It might be appropriate to inform the

5   jury.

6          THE COURT:  Right.  Ladies and Gentlemen, any

7   statements that are attributed to Mr. Steele not being

8   admitted for the purposes of establishing the truth of those

9   statements, but simply for the fact that they were made.

10  BY MR. DURHAM:

11  Q.   Okay.  So that's the Steele part.  But with respect to

12  what Mr. Danchenko said, did you indicate that he told you

13  that when Steele says, talking about Mr. Danchenko, meeting

14  personally with Millian, Mr. Danchenko never corrected him on

15  that?

16  A.   That's correct.

17  Q.   But he's claiming to the FBI that he, in fact, never met

18  the person, right?

19  A.   Correct.

20  Q.   Do you recall, sir, what your reaction was to learning

21  that?

22  A.   It was consistent with what I felt was a trend in the

23  reporting with respect to the dossier.  The idea that Steele

24  was really trying to prove it, even during that time period,

25  because he wanted it to be real or be true, and that was

1   putting pressure on Danchenko to give him that information.

2   Q.   Okay.  But it's clear in your mind, as you sit here now,

3   that he said he never corrected Steele, but Steele's

4   understanding that he, Mr. Danchenko, had actually met with

5   Millian?

6   A.   Correct.

7   Q.   And aside from Mr. Danchenko having talked to Mr. Steele

8   about meeting or not meeting with Mr. Millian, anything in

9   your investigation that would suggest in any way that Steele

10  had any information about Millian other than what was coming

11  from Mr. Danchenko?

12          MR. SEARS:  Your Honor, I'm going to object.  He was

13  not part of the --

14          THE COURT:  Sustained.

15  BY MR. DURHAM:

16  Q.   Based on your interactions with Mr. Danchenko, your

17  review of the files, your discussions with the fellow agents,

18  did you ever come across any information that would suggest

19  that Mr. Steele had information other than what came from

20  Mr. Danchenko?

21          MR. SEARS:  Your Honor, same objection as to what

22  other agents may have told him.

23          THE COURT:  Well, I'm going to -- I'm going to

24  sustain the objection.  Go ahead.

25          MR. DURHAM:  Very well.  We'll move on.

─────United States v. Danchenko─────

748

BY MR. DURHAM:

Q.   Now -- okay.  Just before I leave the subject of
Mr. Millian, do you recall whether or not Mr. Danchenko had
indicated how long this purported call was that he had with
the person he said he believed was Millian?

A.   My recollection was about 15 minutes.

Q.   Okay.  Now, let me turn your attention to another matter.

     Do you recall, sir, whether or not during the course
of your eliciting information from Mr. Danchenko, whether or
not an individual by the name of Charles Dolan came up?

A.   Yes.

Q.   And with respect to your involvement with Mr. Dolan, did
you know anything or did you know the name Charles Dolan
before the -- you became involved in the investigation itself?

A.   No.

Q.   And then during the course of the investigation, did
Mr. Dolan come up?

A.   Yes.

Q.   And what's your best recollection as to how you first
became aware of the name Charles Dolan?

A.   I believe that was through members of the Crossfire
Hurricane team.

Q.   And what's your best recollection as to whether or not
Mr. Danchenko brought Mr. Dolan's name up at any point in time
before you brought it up?

──────United States v. Danchenko──────

749

1   A.   I don't think -- he didn't bring it up to me.

2   Q.   With respect to Mr. Dolan, you've told the jurors that

3   one of the principal focuses of your inquiry, your work trying

4   to illicit information from Mr. Danchenko related to trying to

5   identify sources, correct?

6   A.   Correct.

7   Q.   And why was it that you were so interested in getting

8   sources, the identity of sources?

9   A.   The goal is to get the identity of the sources so that we

10  could corroborate any of the allegations that were being made

11  in the Steele dossier.

12  Q.   With respect to the sources that have been developed up

13  until, say, the middle of June of 2017, do you recall, sir,

14  whether any of the sources that had been identified up to that

15  point were resident in the United States?

16  A.   No.

17  Q.   Would it have been of any significance to you or

18  assistance to you to have the identity of anybody -- or

19  somebody in the United States --

20  A.   Yes.

21  Q.   -- whose information may have been in the dossier?

22  A.   Yes.

23  Q.   And why is that?

24  A.   It's much easier to make contact with those people than

25  it would be from someone inside of Russia.

─────United States v. Danchenko─────

750

1   Q.   Okay.  I want to ask you, sir, with respect to the --

2   going back in time now to the third recorded conversation --

3   A.   Okay.

4   Q.   -- with Mr. Danchenko, do you recall on or about the date

5   that that third recorded conversation took place?

6   A.   Was it in May or June?

7   Q.   If you were to see a transcript of portions of the

8   recording, might that refresh your recollection?

9   A.   Yes.

10  Q.   Take a look, if you would, sir, to Government's

11  Exhibit 171T.

12  A.   Yes.

13  Q.   Having taken a look at 171T, tell us whether or not that

14  refreshes your recollection as to when the third recorded

15  conversation was made?

16  A.   It was in June 15th, 2017.

17  Q.   Do you recall, Special Agent Helson, with respect to that

18  date, June 15th of 2017, and this recording, where that

19  occurred?

20  A.   That was also in Northern Virginia in the Alexandria

21  area, so in the Eastern District.

22  Q.   Okay.  And so you meet with them in the Eastern District

23  of New York -- or Eastern District of Virginia, correct?

24  A.   Correct.

25  Q.   And do you recall, in that particular meeting, whether it

——United States v. Danchenko——

751

1    was you and Mr. Danchenko or any other persons who were there?

2    A.    It was me, Mr. Danchenko, and Jason Rhule.

3          MR. DURHAM:  It's spelled R-h-u-l-e.

4    BY MR. DURHAM:

5    Q.    What do you recall about the meeting with Mr. Danchenko

6    on June 15th of 2017?

7    A.    That was one of the -- I think that may have been the

8    first meeting I brought up Chuck Dolan.

9    Q.    Okay.  Now, I want to ask you a few questions before we

10   get to that recording, if I might.

11         At some point in time, you became aware of the fact

12   that there were emails exchanged between Mr. Danchenko and

13   Mr. Dolan; is that a fair statement?

14   A.    That is a fair statement.

15   Q.    Did that occur before or after you were Mr. Danchenko's

16   handler?

17   A.    After.

18   Q.    At any time -- to the best of your recollection, at any

19   time when Mr. Danchenko was meeting with you, he didn't bring

20   the Dolan's name up or emails?

21   A.    He didn't bring any emails up, no.

22   Q.    And during the course of your trying to elicit

23   information from Mr. Danchenko, beginning in March of 2017 and

24   now we're up to June 15th of 2017, was Mr. Danchenko being

25   paid to right along?

─────United States v. Danchenko─────

752

1   A.   Yes.

2        MR. DURHAM:  I want to ask Ms. Arsenault to quickly

3   bring up Government's Exhibit 712A, which is a full exhibit in

4   this case.

5   BY MR. DURHAM:

6   Q.   And taking a look at Government's Exhibit 712A, which the

7   jury has seen a couple of times now, I'd just ask you:  This

8   is from who to who?

9   A.   This is from Igor Danchenko to Chuck -- Charles Dolan.

10  Q.   And what's the date?

11  A.   August 19th, 2016.

12  Q.   On August 19th of 2016, was Igor Danchenko a paid

13  informant for the FBI?

14  A.   No.

15  Q.   In August of 2016?

16  A.   No.

17  Q.   He wasn't being paid?

18  A.   Igor Danchenko?

19  Q.   Oh, I said Igor -- Igor Danchenko, yeah.

20  A.   Yeah, not in August of 2016, no.

21  Q.   In August of '16 -- I'm -- oh, that's right.  I'm sorry.

22       When you met with him on June 15th of 2017 -- thank

23  you for correcting that -- was he a paid informant?

24  A.   Yes.

25  Q.   He was being paid, but he had been paid from -- by the

─────United States v. Danchenko─────

753

1    Bureau starting back in March, correct?

2    A.    March, correct.

3    Q.    So when you met with him on June 15th of 2017, he was

4    sitting there as a paid Bureau informant, correct?

5    A.    Yes.

6    Q.    He was supposed to be giving you information --

7    A.    Information.

8    Q.    -- on the dossier, correct?

9    A.    Correct.

10   Q.    And you were most interested in --

11         MR. SEARS:  Your Honor, I'm going to object to the

12   leading nature of the question.

13         THE COURT:  You are leading, Mr. Durham.

14         MR. DURHAM:  Yes, Your Honor.

15   BY MR. DURHAM:

16   Q.    At that time, what were your interests?  And when I say

17   "at that time," on June 15th and prior to that, in dealing

18   with Mr. Danchenko, what were your interests relating to the

19   dossier?

20   A.    To identify the sources that contributed to the dossier

21   and anything that he knew about them.

22   Q.    Okay.  So you look at Government's Exhibit 712A, you've

23   identified Mr. Danchenko as the -- who's sending it and the

24   recipient being Dolan, correct?

25   A.    Correct.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────United States v. Danchenko─────────────

754

1  Q.   I'd ask you to read the second paragraph now to your --

2  you can read it into the record, if you would.

3  A.   Okay.  It says (As read):  "Could you please ask someone

4  to commit -- to comment on Paul Manafort's resignation and

5  anything on Trump campaign.  Off the record, of course, any

6  thought, rumor or allegation.  I am working on a related

7  project against Trump.  I ask Greg three months ago, but he

8  didn't say much, although I shared a couple of valuable

9  insights."

10 Q.   All right.

11        MR. DURHAM:   And then I'm going to ask that

12 Ms. Arsenault bring up Government's Exhibit 712B.

13 BY MR. DURHAM:

14 Q.   And ask you to take a look at it.

15        Again, at the time on June 15, 2017, you hadn't seen

16 this, correct?

17 A.   Correct.

18 Q.   Anybody from Crossfire Hurricane showing this to you?

19 A.   No.

20 Q.   Do you know if Crossfire Hurricane investigators had even

21 gone to get this?

22 A.   I don't -- I didn't know.

23 Q.   So what is it that Mr. Dolan says on Friday, August 19,

24 2016, in response to Mr. Danchenko's request for information?

25 A.   He responds and essentially there were -- he says (As

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────
EASTERN DISTRICT OF VIRGINIA

Direct Examination of Helen Aguirre          10/13/22

─────United States v. Danchenko─────

755

```
 1    read):  "Hi, Igor, the other two were -- I can't say that last
 2    name, a minister of the eco-development and iris Tutor,
 3    Ombudsman RF.  Let me dig around on Manafort.  Pretty sure the
 4    new team wanted him gone ASAP and used today's New York Times
 5    story to drive a stake in his heart."
 6    Q.   Okay.  So that's on August 19th.  That request goes from
 7    Mr. Danchenko for any thought, rumor, or allegation relating
 8    to Manafort, correct?
 9    A.   Correct.
10    Q.   And now Mr. Dolan is going to check around for him on
11    that, correct?
12    A.   Correct.
13    Q.   All right.
14         MR. DURHAM:  I'm going to ask that Ms. Arsenault
15    then bring up Government's Exhibit 713A, which is already a
16    full exhibit.
17    BY MR. DURHAM:
18    Q.   And ask you to quickly look at that.  So this is from
19    Mr. Dolan to Mr. Danchenko, correct?
20    A.   Correct.
21    Q.   And would you read the first paragraph into the record?
22    Again, the jury has seen this, but I want to ask you questions
23    about it.
24    A.   Okay.  (As read):  "I had a drink with a GOP friend of
25    mine who knows some of the players and got some of what is in
```

─────United States v. Danchenko─────

756

1   this article, which provides even more detail.  She also told

2   me that Corey Lewandowski, who hates Manafort and still speaks

3   to Trump regularly and played a role.  He is said to be doing

4   a happy dance over it."

5   Q.   Now, in this connection, Mr. Dolan, at this point, what

6   did you -- what do you glean from this email, that is Dolan's

7   response to Mr. Danchenko's request --

8   A.   Request, yes.

9   Q.   -- for thoughts, rumors or allegations about Manafort?

10  A.   That it's the response --

11        MR. SEARS:  Your Honor, I'm going to object to this

12  question.  I think the email speaks for itself.

13        THE COURT:  Sustained.  This is something he

14  hadn't -- he didn't have at the time, correct?

15        MR. DURHAM:  That's correct, Your Honor.

16        THE COURT:  Right.  I'm sustaining the objection.

17  BY MR. DURHAM:

18  Q.   With respect to this email, would that be something that

19  you would have been interested in on June 15th of 2017?

20  A.   Yes.

21  Q.   But you didn't have -- did you have it or not?

22  A.   No.

23  Q.   Did you ever get that other than recently?

24  A.   No.

25  Q.   Okay.  Then I want to direct your attention to

1   Governments Exhibit 714.  And looking at Government 714,

2   that's -- what's the date of that?

3   A.   August the 20th, 2016.

4   Q.   And this is Mr. Dolan responding to Mr. Danchenko?

5   A.   Yes.

6   Q.   And he says he'll let him know if he has anything else?

7   A.   Correct.

8   Q.   Do you know, sir -- or at the time, did you know whether

9   or not there was any information that then appeared in any of

10  the dossier reports relating in some way to these emails?

11  A.   Not until you showed me.

12  Q.   And you're looking at Dossier Report 2016/105 that the

13  jury is seeing.  Do you recall whether or not you have looked

14  at and read a particular paragraph in that report?

15  A.   Yeah, I think so.  I may be --

16  Q.   Let me pull it up for you.

17          Looking at what's on the monitor now, would it have

18  been of value and interest to you in June of 2017, when

19  meeting with Mr. Danchenko, for you to have had that

20  information?

21  A.   Yes.

22  Q.   What about paragraph 3 that's on the screen now from

23  Government's Exhibit 112 that's of significance to you -- or

24  is of significance to you?

25  A.   It's similar to the email exchange between Mr. Danchenko

───United States v. Danchenko───
758

1 and Chuck Dolan.

2 Q.   And with respect to sourcing, what, if anything, is

3 there in that that is of interest?

4 A.   It would imply that Chuck Dolan was a source of that

5 paragraph.

6 Q.   And that paragraph includes reference to an American

7 political figure associated with Donald Trump and his

8 campaign, correct?

9 A.   Correct.

10 Q.   Would an American political figure associated with Donald

11 Trump and his campaign been of any interest or value to the

12 FBI on June 15th of 2017?

13 A.   Yes, I believe so.

14 Q.   In fact, on June -- do you recall whether or not there

15 was any ongoing active investigation being conducted relating

16 to these matters on June 15th of 2017?

17 A.   The Mr. Mueller investigation.

18 Q.   Okay.  But you never got this information, correct?

19 A.   Correct.

20 Q.   What's the date at the bottom of Government's

21 Exhibit 112?

22 A.   August 22, 2016.

23 Q.   And how many days after the emails that you just looked

24 at would this report have been dated?

25 A.   Two days.

—United States v. Danchenko—

759

1   Q.   Now, with regard to or with respect to Mr. Dolan, you

2   told the jurors earlier, just before we quickly went through

3   those emails, that on June 15th of 2017, you had raised, for

4   the first time, Chuck Dolan's -- Charles Dolan's name,

5   correct?

6   A.   Correct.

7   Q.   Describe, if you would, to the jurors, whether that was

8   something that you did on your own or you did that at the

9   request, direction of somebody else.

10  A.   I did it at the request in direction of -- it would have

11  been the Mueller investigative team.

12  Q.   And who were you dealing with -- who would you be

13  interacting with most directly to get questions to pose to

14  Mr. Danchenko?

15  A.   It was a couple of people:  Brian Auten and Amy Anderson.

16  Q.   And who is Amy Anderson?

17  A.   She was a special agent -- I think she may have been an

18  SSA that was assigned to Mr. Mueller's team.

19  Q.   All right.  And for the benefit of the jurors, the

20  acronym SSA stands for?

21  A.   Supervisory special agent.

22  Q.   So Ms. Anderson was a bureau supervisor --

23  A.   Correct.

24  Q.   -- that was working over once the Crossfire Hurricane

25  team merged into Mueller group, correct?

Direct Examination of Jason Rhule - 10/13/22

———United States v. Danchenko———

760

1   A.    Correct.

2   Q.    I want to ask you to please take a look, if you would,

3   sir, at what was premarked as Government's Exhibit 171T, and

4   ask you to look in the notebook as well to see, sir, if you

5   have, in there, a disk that's marked Government's Exhibit 171.

6   A.    I do.

7   Q.    Do you recognize Government's Exhibit 171?

8   A.    Yes.

9   Q.    How do you recognize it?

10  A.    It has my initials on it.

11  Q.    Have you had occasion to listen to that recording and

12  compare it against the transcript marked Government's

13  Exhibit 171T for identification?

14  A.    I did.

15  Q.    What can you tell the jury about the transcript and the

16  CD?

17  A.    It is consistent -- the transcript is consistent with

18  what's on the recording.

19  Q.    And the date of the recording?

20  A.    Is June 15, 2017.

21  Q.    And the participants?

22  A.    Would be myself, Igor Danchenko, and Jason Rhule.

23          MR. DURHAM:  Your Honor, the government would move

24  171 as a full exhibit and 171T as an aid to the jury.

25          THE COURT:  Without objection, 171 and 171T is

─────United States v. Danchenko─────

761

1    admitted.

2    (Government's Exhibit Nos. 171, 171T, were admitted into

3    evidence.)

4            MR. DURHAM:  With the Court's permission, we would

5    ask that Ms. Arsenault be permitted to play 171.

6            THE COURT:  Yes.

7            (Exhibit published.)

8            (Audio played.)

9    BY MR. DURHAM:

10   Q.   Okay.  You recognize that conversation, correct?

11   A.   Correct.

12   Q.   I want to just quickly go through certain portions of it.

13   This occurred on January -- I'm sorry -- on June 15th of 2017,

14   correct?

15   A.   Correct.

16   Q.   At the very beginning of this conversation, you're

17   eliciting some general information, correct?

18   A.   Correct.

19   Q.   And then there is information partway in -- and this is

20   on Government's Exhibit 171T; I think it's page 4; some of the

21   pagination gets off a little bit -- but you ask him the

22   question -- can you find the portion there concerning you

23   asked him does he know Chuck Dolan?

24   A.   Yeah, I'm looking.  Yes.

25   Q.   Okay.  So again, why did you ask him about Chuck Dolan?

─────United States v. Danchenko─────

762

1  A.   It was -- the name was brought to me by director --

2  Special Counsel Mueller's investigative team.

3  Q.   Okay.  In that regard, by June 15th of 2017, were you

4  aware of the fact that BuzzFeed had released the dossier

5  report publicly?

6  A.   Yes.

7  Q.   Do you recall, sir, when you asked Mr. Danchenko about

8  Chuck Dolan, he gave responses they had known each other and

9  the like, correct?

10 A.   Correct.

11 Q.   Did Mr. Danchenko ever mention to you, to the best of

12 your recollection, that immediately after the release of the

13 BuzzFeed information -- let's assume that happened and the

14 jury's heard that that happened on January 10th -- did

15 Mr. Danchenko share with you that he then reached out to Dolan

16 the very next morning, January 11th, to inquire about this?

17         MR. SEARS:  I'm going to object.  This misstates the

18 testimony.

19 BY MR. DURHAM:

20 Q.   Oh, I'm sorry.  Dolan reached out -- that Mr. Dolan had

21 reached out to Mr. Danchenko?

22 A.   No.

23 Q.   Would it have been helpful or useful for you to know from

24 Mr. Danchenko that in the morning after the dossier reports

25 had been made public through BuzzFeed, that Mr. Dolan had

─────────────United States v. Danchenko─────────────
763

1   called Mr. Danchenko?

2   A.   Yes, if it was related to the release of the dossier.

3   Q.   Specifically about the dossier, would that have been of

4   note to you?

5   A.   Yes.

6   Q.   Why would it have been valued to you to know that?

7   A.   Because the objective -- one of the primary objectives

8   was to identify all of the sources of the dossier and run that

9   information to ground.

10  Q.   Now, the jurors have listened to this recording.  Do you

11  recall, sir, based on your present recollections, when you

12  first asked Mr. Danchenko, Do you know Chuck Dolan?

13          And then the response was, Do I know Chuck Dolan?

14  Yeah.

15          And then you said, How long have you known him?

16  You're kind of chuckling, and then there's a pause.

17          Do you have any recollection as to what

18  Mr. Danchenko's demeanor was when you first asked him if he

19  knew Chuck Dolan?

20  A.   To the best of my recollection, there was a bit of

21  hesitation, like he was trying to recall, and then he kind of

22  slowly started going into the conversation.

23  Q.   And then there's a noticeable pause before he answers,

24  correct?

25  A.   Yes.

─────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────────
EASTERN DISTRICT OF VIRGINIA

Direct Examination of ... - 10/15/22

────────────── United States v. Danchenko ──────────────

764

1  Q.   Do you recall whether or not, in any other parts of the

2  conversation that you and Special Agent Rhule had with

3  Danchenko of June 15, 2017, whether or not there are similar

4  kind of long pauses?

5  A.   Is that -- I think that's the one toward the end of the

6  meeting where I think we noted that it was a bit of hesitation

7  or odd behavior.

8  Q.   Now, on June 15th of 2017 -- and I'd ask you to go to the

9  next page of the transcript, Government's Exhibit 171T -- do

10 you recall Mr. Danchenko's characterization of Mr. Dolan at

11 that time as being a very nice guy?

12 A.   Yes.

13 Q.   Do you recall, sir, whether or not at any time after that

14 if Mr. Danchenko's references to Mr. Dolan were different than

15 that?

16 A.   Other than the piece that stood out to me was that he was

17 a little bit naive with respect to the Russians.

18 Q.   Okay.  We'll get to it in a little bit, but that's your

19 current recollection is?

20 A.   Yes.

21 Q.   Okay.  And then you asked him specifically, Okay, so

22 you've had -- was there any -- but you have never talked to

23 him about anything that showed up in the dossier, right?

24          And Mr. Danchenko said no.

25          And you said you don't think so.

─────United States v. Danchenko─────

765

1          And Mr. Dolan said, No, we talked about, you know,

2   related issues, perhaps, but no, no, no, nothing specific.

3   And then there's a rustling sound.

4          Do you recall that on the tape?

5   A.   Yes.

6   Q.   Now, when you were asking Mr. Danchenko about whether he

7   had spoken with, or talked to, Mr. Dolan about anything that

8   showed up in the dossier, what was your intent?  What was your

9   understanding of what you were asking?

10  A.   To get any and all information about Dolan that we could.

11  Q.   All right.  And at least based on your interactions with

12  Mr. Danchenko over a period of time, do you know if -- let me

13  withdraw that.

14         During the period of time that you were interacting

15  with Mr. Danchenko, do you recall instances in which he would

16  make reference to communications of various sorts?

17  A.   Yes.

18  Q.   Some of them -- do you have any recollection of him

19  making reference to speaking on social media?

20  A.   Yes.

21  Q.   Or talking about conversations he had with a person or

22  people?

23  A.   Yes.

24  Q.   And then sending you screenshots --

25  A.   Correct.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────────United States v. Danchenko─────────────────

766

1   Q.   -- of the conversation?

2   A.   Yes.

3   Q.   In those instances, that wouldn't be a verbal talking;

4   that would be -- but it's conversation, as he understood it,

5   based on his --

6   A.   Yes.

7           MR. SEARS:  Objection to what Mr. Danchenko

8   understood.

9           THE COURT:  Sustained.

10  BY MR. DURHAM:

11  Q.   Do you recall, sir, whether or not, on occasion,

12  Mr. Danchenko would send you items referring to conversations

13  that were text messages?

14  A.   Yes.

15  Q.   And in what form would he send those to you?

16  A.   It would be electronic.  It would be snapshots.

17  Q.   All right.  I'll get back to that in just a moment, but

18  just to finish up going through this transcript, if you read a

19  little bit further, Mr. Danchenko is talking about having met

20  with Mr. Dolan on January 1st at a particular location in

21  Washington, correct?

22  A.   Correct.

23  Q.   And that location was what?

24  A.   It was a park.  I think it was --

25  Q.   And he had a recollection that -- do you recall whether

─United States v. Danchenko─

767

1   his recollection was, as reflected here, as January 1st?

2   A.   Yes.

3   Q.   At 12:19?

4   A.   Correct, at Tuckahoe Park.

5   Q.   And you remarked on that as being interested --

6   A.   Yeah.

7   Q.   -- he had that specific recollection, correct?

8   A.   Yeah.  It was --

9   Q.   And then he showed you a picture that he had taken?

10  A.   Correct.

11  Q.   And that was a picture of Mr. Dolan?

12  A.   Correct.

13  Q.   And did -- that picture, did you eventually get a copy of

14  that picture to include in your files and whatnot, if you

15  recall?

16  A.   I don't recall that we did.

17  Q.   Was it of any interest or note to you that Mr. Danchenko

18  was meeting with Mr. Dolan in a park on New Year's Day and

19  then memorializing it in a photograph?

20  A.   I thought it was interesting and of note.

21  Q.   Okay.  And with regard to the leak of the BuzzFeed

22  information, he did not disclose that to you, the call from

23  Dolan?

24  A.   Correct.

25  Q.   Now, if you turn another couple of pages into the

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

┌─ United States v. Danchenko ─

768

1  transcript, do you remember that there's a portion where you

2  had asked, You didn't do any work for them?  That's where

3  Galkina worked, right?

4  A.   Yes.

5  Q.   Okay.  As to that portion, do you recall whether or not

6  Mr. Danchenko ever disclosed to you who was it that introduced

7  Galkina to Dolan?

8  A.   I don't think that was here.  It may have been -- I was

9  under the impression that Mr. Danchenko had introduced Galkina

10  to Dolan.

11  Q.   To Dolan.  Did he describe to you or discuss with you the

12  circumstances, if you recall?

13  A.   I don't recall.

14  Q.   At that time, do you recall whether or not Galkina was

15  somebody who he had identified -- he, Mr. Danchenko, had

16  identified as the source of information?

17  A.   Yes.

18  Q.   Would it have been of interest to you to know about

19  Mr. Dolan and Ms. Galkina and Mr. Danchenko, that those three

20  persons on June 15th of 2017?

21  A.   Yes.

22  Q.   And then there's a portion two pages later where

23  Mr. Danchenko makes reference and said, "Trump isn't," and

24  then it says, "isn't normal, see."  Do you recall today what

25  that was about?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

769

1  A.   I don't recall exactly what it was.

2  Q.   Do you know whether or not Mr. -- well, withdrawn.

3        Toward the very end of the conversations -- so

4  basically, the last page of the transcript -- you had asked --

5  you had said, "Now, would you" -- "Did he ever come up at all

6  with Chris?"  In context, who is Chris?

7  A.   Chris Steele.

8  Q.   And Mr. Danchenko then said "Chuck Dolan?"

9        And you said, "Would Chris know him?"

10        And Mr. Danchenko's response was, "I think he

11 would."

12 A.   Yes.

13 Q.   Did Mr. Danchenko ever share with you that he was working

14 toward trying to broker some kind of working relationship

15 between Dolan -- Mr. Dolan and Mr. Steele?

16 A.   No.

17 Q.   Would it have been interest -- of interest to you that

18 Mr. Dolan was somebody that Mr. Danchenko was trying to work

19 towards brokering a deal?

20 A.   That would be.

21 Q.   Did you know at the time whether Mr. Dolan had any

22 particular political affiliations?

23 A.   I didn't at the time, but I later learned that he was, I

24 think, a democratic lobbyist.

25 Q.   Why would it have been of interest or value to the FBI to

Direct Examination of Auten - 10/13/22

─────United States v. Danchenko─────

770

1    know at the time that Mr. Danchenko had worked toward a

2    relationship, this is a relationship between Christopher

3    Steele and Chuck Dolan?

4    A.   Because it would, again, go back to the idea of who were

5    the sources for the dossier and that would be relevant to

6    figuring that out and answering those questions.

7    Q.   Okay.  With respect to your review of the information

8    from Mr. Dolan, from those emails, and then your review of

9    report, which the jury has seen as 2016/105, that paragraph

10   that you read?

11   A.   Uh-huh.

12   Q.   Was that information in Mr. Dolan's email that -- did

13   that appear to be pretty specific in terms of there's

14   somebody -- it was coming from an insider?

15   A.   It appeared to be.

16   Q.   Would that have been of interest or value to you to be

17   able to plumb that?

18   A.   Yes, it would have been something that I would have

19   passed over to special counsel -- or Mueller's investigative

20   team.

21   Q.   Do you recall, sir, whether or not at some point in time

22   you learned that Mr. Dolan had some relationship with Dmitry

23   Peskov?

24   A.   Yeah, I think, Igor had explained that Chuck Dolan was --

25   had an association with Mr. Peskov.

─────United States v. Danchenko─────

771

1   Q.   Would it have been of interest to you, then, whether or

2   not Mr. Danchenko's getting information either by or through

3   Mr. Dolan?

4   A.   Yes.

5   Q.   Now, I had asked you questions about your understanding

6   of soliciting information from Mr. Danchenko.  You asked him

7   if he had talked to Dolan about what was in the dossier, you

8   recall that?

9   A.   Correct.

10  Q.   And you said that you were talking about more

11  comprehensive way, you know, what he knew about that

12  conversations or whatnot.  I want to ask you to take a look,

13  if you would, at Government's Exhibit 119.

14  A.   Okay.

15  Q.   This is for identification.

16  A.   Okay.

17  Q.   And do you have that in front of you?

18  A.   I do.

19  Q.   Do you recognize, first, you know, what 119 is?

20  A.   Yes.

21  Q.   And what is 119?

22  A.   It's one of my composed reports.

23  Q.   With respect to Government's Exhibit 119 for

24  identification, what's the date of that?

25  A.   Date of contact is May 17th, 2017.

─United States v. Danchenko─

772

1  Q.   And is there any information in that report relating to

2  Mr. Danchenko and his referencing conversations and

3  screenshots?

4  A.   It was bullet point 4 where he's talking about Galkina.

5  (As read): "Her case details in Greek, claims that she can't

6  travel until September, but I made a good pitch.  Will show

7  our conversation here of the screenshots in the meantime."

8  Q.   So if -- just for the record, would you read that again a

9  little bit more slowly so the court reporter can get it down

10  and keep your voice up, if you would.

11  A.   Yeah, sure.  It's bullet point 4.  It says (As read):

12  "Her case details in Greek, claims that she can't travel until

13  September, but I made a good pitch.  Will show our

14  conversation here, our other screens in the meantime."

15  Q.   And then as you look through your report, do you see

16  anything related to that on page 3 of the report?

17  A.   Yes, there are screenshots of their conversation.

18  Q.   And the screenshots appear on, as you look at the

19  exhibit, the attachment to your -- what is it?  It's a

20  two-page report, correct?

21  A.   Correct.

22  Q.   With attachments?

23  A.   Uh-huh.

24  Q.   And they include screenshots of conversation between

25  Galkina, Ms. Galkina and Mr. Danchenko?

Direct Examination of ... - 10/13/22

─United States v. Danchenko─

773

1  A.   Yes, yes.

2         MR. DURHAM:  We move 119 as a full exhibit, Your

3  Honor.

4         THE COURT:  Any objection?

5         MR. SEARS:  No objection.

6         THE COURT:  Without objection, 119 is admitted.

7  (Government's Exhibit No. 119 was admitted into evidence.)

8  BY MR. DURHAM:

9  Q.   Now, looking at Government's Exhibit 119 now, a full

10 exhibit, you made reference to bullet point 4, correct?

11 A.   Correct.

12 Q.   And that's toward the bottom of the page?

13 A.   Correct.

14 Q.   And it reads OAG.  What's that acronym stand for?

15 A.   It would be for -- it's -- OAG is the initials for Olga

16 Galkina.

17 Q.   And it says (As read):  "Her case detail is in Greek,

18 claims she can't travel until September, but make a good

19 pitch, will show our conversation, here are other screens in

20 the meantime."  Correct?

21 A.   Correct.

22 Q.   And then if you look to the attachment, it repeats that?

23 A.   Correct.

24 Q.   And then as part of the attachment, in addition, there

25 are screenshots of the conversation, correct?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

United States v. Danchenko

774

1  A.   Correct.

2  Q.   I want to ask you, if you would, take a look at

3  Government's Exhibit 120.  See if you recognize 120?

4  A.   I do.

5  Q.   And how do you recognize 120?

6  A.   It is another one of my written reports.

7  Q.   And with respect to Government's 120, do you recall how

8  you first saw that?  And it's your report, correct?

9  A.   Yes, it's my report.

10  Q.   Do you recognize 120?

11  A.   I do.

12  Q.   And as to Government Exhibit 120, I want to ask you to

13  turn to the very last page of 120 and tell us whether or not

14  you recognize the unredacted part of Government's Exhibit 120.

15  A.   It is part of his report.  He's actually typing, speaking

16  on social media.  He keeps asking -- when I'm visiting on good

17  terms, asking him about Romeo and Juliet setting.

18  Q.   Okay.  So that's not your -- you didn't type that, you

19  didn't write that in?

20  A.   No, it's -- those are his words.

21  Q.   It came from who?

22  A.   Mr. Danchenko.

23  Q.   And with respect to that Exhibit 120, that's your work

24  product?

25  A.   Yes.

EASTERN DISTRICT OF VIRGINIA

Direct Examination of... Page 47 of 167 10/15/22

──────United States v. Danchenko──────

775

1      MR. DURHAM:  We would move 120 as a full exhibit,

2  Your Honor.

3          THE COURT:  Any objection?

4          MR. SEARS:  No objection.

5          THE COURT:  120 is in.

6  (Government's Exhibit No. 120 was admitted into evidence.)

7  BY MR. DURHAM:

8  Q.   Now, looking at Government's Exhibit 120, there's

9  information that's unredacted, that is it's not redacted, on

10  the first page, right?

11  A.   Correct.

12  Q.   And would you just read that into the record so the jury

13  can see it, but for the written record?

14  A.   It says (As read):  "At this point in the development

15  of -- source understands that his priority is to obtain any

16  and all information that would indicate collusion between the

17  Trump campaign, the Trump administration and the Russian

18  government and/or any of its representatives.  ID continues to

19  iterate that at no time did he communicate that he or any of

20  his contacts were in possession of such material and that all

21  of his information was obtained through conversations with

22  what ID classifies as his social network of friends and

23  professional colleagues."

24  Q.   And then if you go to the very last page of Government's

25  Exhibit 120, is it -- the unredacted portions what you are

─────United States v. Danchenko─────

776

```
 1   referring to in identifying the document?
 2   A.   Yep.
 3   Q.   And what does it say?
 4   A.   (As read):  "Speaking on social media, he keeps asking me
 5   when I am visiting.  On good terms, asking him about Romeo and
 6   Juliet setting."
 7   Q.   So he's speaking on social media?
 8   A.   Correct.
 9   Q.   Okay.
10          MR. DURHAM:  Can I have one moment, Your Honor?
11          (Counsel confers.)
12   BY MR. DURHAM:
13   Q.   So the words "speaking on social media," those aren't
14   yours?
15   A.   No.
16   Q.   Okay.  Now, with respect to Mr. Dolan, and we're getting
17   to the end -- getting to the end here.
18          With respect to Mr. Dolan, do you recall you had
19   indicated that Mr. Danchenko had made reference to the fact
20   that Dolan had a relationship with Dmitry Peskov?
21   A.   Yes.
22   Q.   Now, with respect to Mr. Peskov, do you recall who he was
23   and is?
24   A.   He would be the press secretary for Vladimir Putin.
25   Q.   Now, with respect to Mr. Peskov, do you know whether or
```

───United States v. Danchenko───

777

1   not Mr. Peskov is somebody who's -- the Bureau believed to

2   have been involved in Russian disinformation?

3   A.   I'm not an -- I don't --

4   Q.   Okay.  If you don't know, you don't know.

5   A.   Yeah, I don't know.

6   Q.   Okay.  But that was a name, the Peskov name is a name

7   that's familiar to you?

8   A.   Correct.

9   Q.   Now, I want to move to Government's Exhibit 172T.

10          MR. DURHAM:  Your Honor, I'd say that we probably

11  have about 10 minutes and then --

12          THE COURT:  All right.

13          MR. DURHAM:  Just to alert the Court.

14  BY MR. DURHAM:

15  Q.   If you'd take a look at Government's Exhibit 172T and the

16  corresponding CD, 172.

17  A.   Yes.

18  Q.   As to 172, do you recognize that?

19  A.   I do.

20  Q.   How do you recognize it?

21  A.   It has my initials.

22  Q.   And what, if anything, did you do in connection with

23  Government's Exhibit 172 and then the transcript 172T?

24  A.   I reviewed them and the transcript is consistent with

25  what's on the recording.

─────United States v. Danchenko─────

778

1          MR. DURHAM:  We offer 172 as a full exhibit, Your

2     Honor, and 172T as an aid for the jury.

3          THE COURT:  Any objection?

4          MR. SEARS:  No objection.

5          THE COURT:  Without objection, 172 and 172T are

6     admitted.

7     (Government's Exhibit Nos. 172, 172T were admitted into

8     evidence.)

9          (Exhibit published.)

10    BY MR. DURHAM:

11    Q.   Do you recognize this transcript?

12    A.   Yes.

13    Q.   And you reviewed it and compared against the actual

14    recording Government's Exhibit 172, correct?

15    A.   Correct.

16         MR. DURHAM:  Your Honor, we'd ask permission to play

17    Government's Exhibit 172.

18         THE COURT:  Yes.

19         (Audio played.)

20    BY MR. DURHAM:

21    Q.   With respect to what the jurors have just heard, does

22    that accurately reflect the state of matters on June 15, 2017,

23    when you interviewed Mr. Danchenko?

24    A.   Yes.

25    Q.   And when you're asking about Mr. Dolan?

1   A.   Correct.

2   Q.   And you're interested in pretty much everything?

3   A.   Yes.

4   Q.   And him getting everything that he can as a paid

5   informant?

6   A.   Correct.

7   Q.   Did he get anything for you on Chuck Dolan that you're --

8   that you recall?

9   A.   No.

10          MR. DURHAM:  I want to ask that the jury bring up --

11   the -- that Ms. Arsenault bring up Government's Exhibit 605,

12   please.

13          (Counsel confers.)

14          MR. DURHAM:  Your Honor, ask permission to have 605

15   handed to the witness by a court security officer.

16          THE COURT:  All right.  Is there going to be any

17   objection to 605?

18          MR. SEARS:  I haven't seen it yet, Your Honor.

19          THE COURT:  All right.

20          MR. SEARS:  No objection.

21          THE COURT:  Okay.  605 and 605T, do you want that in

22   as well?

23          MR. DURHAM:  Yes, Your Honor.

24          THE COURT:  All right.  605 and 605T are in.

25   (Government's Exhibit Nos. 605 and 605T were admitted into

─────United States v. Danchenko─────
780

1   evidence.)

2          MR. DURHAM:  We'd ask that Government's Exhibit 605

3   be brought up first or together.

4   BY MR. DURHAM:

5   Q.   Looking at 605 on the left-hand side of your monitor, and

6   then 605T on the right side of your monitor, do you recall

7   whether or not you have ever seen this photograph before?

8   A.   No.

9   Q.   Assuming that this came from Facebook business record on

10  Mr. Danchenko's account, would this have been something that

11  would have been of interest or value to the FBI when you were

12  asking him questions on June 15th of 2017?

13  A.   It would.

14  Q.   Or thereafter?

15  A.   Or thereafter.

16  Q.   But to your knowledge and recollection, this was never

17  produced to you?

18  A.   Not to me, no.

19  Q.   The date of this particular email, Facebook, at the

20  bottom appears to be June 14th of 2016, correct?

21  A.   Correct.

22  Q.   Do you recall whether Mr. Danchenko provided you with any

23  detailed information about being in this location on June 14th

24  of 2016 with Mr. Dolan?

25  A.   No.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─── United States v. Danchenko ───

781

1  Q.   And do you recall, sir, if you look at the back of

2  Government's Exhibit 605T --

3          MR. DURHAM:  If we can get that on the monitor and

4  blow that up.

5  BY MR. DURHAM:

6  Q.   This Facebook exchange begins with both Ms. Galkina,

7  correct?

8  A.   Uh-huh.

9  Q.   Galkina.  And she indicates that she had tried to arrange

10  a good time for Mr. Dolan?

11  A.   Yes.

12  Q.   And then Mr. Danchenko responds, correct?

13  A.   Correct.

14          MR. DURHAM:  And this is an associated Facebook

15  message with the photograph marked Government's Exhibit 605T

16  and 605.

17  BY MR. DURHAM:

18  Q.   Now, you've told the jurors that you have worked in the

19  Washington Field Office, working in Washington matters for

20  many years, correct?

21  A.   Yes.

22  Q.   Do you recall -- or do you know, looking at Government's

23  Exhibit 605, where that is?

24  A.   Yes, it's near the Kremlin.

25  Q.   Okay.  That was not provided to you, though, correct?

United States v. Danchenko

782

1  A.   Correct.

2  Q.   Now, I want to turn your attention -- there's two more

3  matters and we're done on direct.

4        October 23rd of 2017, I want to ask you whether or

5  not you have a recollection of meeting on a report that has

6  the contact on that date, I think the contact date is actually

7  September 22nd.  Do you remember your report?

8  A.   I do remember the report.

9  Q.   And what can you tell the jurors about the mix-up of the

10 dates, if you know?

11 A.   I don't recall.  There was issues I remember during that

12 time with our computer systems getting -- the reports were

13 going in and disappearing, so we would have to reissue them.

14 So it could be the discrepancy on the dates.

15 Q.   Well, let me ask you -- let me ask you this:  In the

16 recording that Mr. Danchenko had with you, you recorded it

17 with Mr. Danchenko, correct?

18 A.   Correct.

19 Q.   Starting on March 16th of 2017, correct?

20 A.   Correct.

21 Q.   And you went forward then on June 15th on 2017, you first

22 asked him, Mr. Danchenko, about Mr. Dolan, correct?

23 A.   Correct.

24 Q.   And in that recording the jury listened to this

25 afternoon, and I asked you specifically about it, do you

United States v. Danchenko

783

1  remember how he characterized Mr. Dolan?

2  A.   As a friend.

3  Q.   And did he say he's a nice guy?

4  A.   He's a nice guy.

5  Q.   Do you recall, sir, whether or not at any point in time

6  he provided other information about Mr. Dolan?

7  A.   Yeah.   In that meeting, one of the underlying themes in

8  sort of our -- in all of our debriefs, especially during the

9  first year, was being concerned about physical safety of any

10  source.

11          And I had asked on a number of occasions, was he

12  aware of anyone that might be aware of his affiliation with

13  Chris Steele and his involvement in the dossier.

14          Could these people be the ones that would expose him

15  publicly as being the primary sub-source.

16          And I believe it was in that -- in that meeting, he

17  gave up Chuck Dolan's name.

18  Q.   Now, with respect to Mr. Dolan, on September 22nd of

19  2017, what, if anything, did Mr. Danchenko say about

20  Mr. Dolan?

21  A.   He said he had dubious connections.

22  Q.   And not just the dubious connections, did he indicate

23  where he had dubious connections?

24  A.   In Moscow or Russia.

25  Q.   Do you recall, sir , whether or not in the course of the

Direct Examination of Auten    10/13/22

————United States v. Danchenko————

784

1  investigation that was being conducted in that time, in

2  September of 2017, if just a few days before September 22nd,

3  2017, any of the investigators had occasion to go meet with

4  somebody?

5  A.    I believe that was at the time that the Mueller

6  investigative team went and interviewed -- or had another

7  interview with Mr. Steele.

8  Q.    Okay.  Do you remember how close in proximity to

9  September 22nd that was?

10  A.    It was like the first -- like a week or so before, I

11  think.

12  Q.    Okay.  So some people going over -- you -- were you in

13  that group?

14  A.    No.

15  Q.    You just knew that -- did you know that they were going

16  over?

17  A.    I knew that -- well, I didn't know at the time.  I knew

18  later when they came back and told me that there was some

19  discrepancy --

20  Q.    Okay.  You can't say what they told you.

21  A.    Yeah.

22  Q.    But you had a conversation with them?

23  A.    Yes.

24  Q.    And then as a result of that, you met to talk to

25  Mr. Danchenko on September 22nd about a number of matters,

─United States v. Danchenko─

785

1   right?

2   A.    Yes.

3   Q.    And Dolan's name came up again?

4   A.    Yes.

5   Q.    And did he describe Mr. Dolan on September 22nd as "a

6   nice guy"?

7   A.    Yes -- or not -- on September the 22nd, it was -- he

8   had -- I think that was when he said dubious connections.

9   Q.    He went from nice guy to, oh, he's got dubious

10  connections in Russia?

11  A.    Yeah.

12  Q.    Do you recall, did you probe with him why the change, why

13  you went -- Dolan went from being a nice guy to now, oh, he's

14  got dubious connections to the Kremlin?

15  A.    I had attributed it to the fact that I was routinely

16  asking him, I need to be aware of the people around you that

17  could be a security risk.  And I can understand why he would

18  bring up Dolan, having the connections he did.  I had concerns

19  about Dolan myself.

20  Q.    Okay.  Now, finally, I want to turn your attention to

21  Government's Exhibit 173 and 173T, and ask you to take a look

22  at that in your book and see if you find those items in there?

23  A.    I did.

24  Q.    Okay.  As the Government's Exhibit 173, do you recognize

25  it?

─────United States v. Danchenko─────

786

1    A.    I do.

2    Q.    How do you recognize it?

3    A.    Has my initials.

4    Q.    Did you compare 173 against the transcript premarked as

5    173T?

6    A.    I did.

7    Q.    What can you tell the jurors about how the transcript

8    compares to the audio recording?

9    A.    The transcripts are consistent with the audio recording.

10              MR. DURHAM:  We'd ask that 173 be admitted as a full

11   exhibit and 173T for identification.

12              THE COURT:  Any objection?

13              MR. DURHAM:  And as an aid to the jury.

14              THE COURT:  Any objection?

15              MR. SEARS:  No.

16              THE COURT:  173 and 173T are admitted.

17   (Government's Exhibit Nos. 173, 173T were admitted into

18   evidence.)

19              MR. DURHAM:  May we play it, Your Honor?

20              THE COURT:  Yes.

21              (Audio played.)

22   BY MR. DURHAM:

23   Q.    Do you recognize that portion of the conversation?

24   A.    Yes.

25   Q.    To your knowledge, you're -- with respect to what you

┌─ United States v. Danchenko ─────────────────────────────────┐

787

1    were saying there, what is it that you're telling

2    Mr. Danchenko?

3    A.   That anything that's stated right now in the dossier, at

4    that point in time, was nowhere near the level of evidentiary

5    material.

6    Q.   And who is it that is saying in there (As read):  "Right,

7    because it's not others, no legally -- there's no attorney

8    that's ever going to put that on as evidence anyway."?

9    A.   Yeah, that was me.

10   Q.   But do you know, sir, now, whether or not the

11   uncorroborated information concerning a well coordinated

12   conspiracy of cooperation portion out of 95, was that used in

13   a legal document?

14   A.   I understand that it -- I think it was used or cited in a

15   FISA application.

16   Q.   And that was against an American citizen, correct?

17   A.   I believe that was -- yes.

18   Q.   And it was completely unvetted?

19   A.   Yes.

20             MR. DURHAM:  Nothing further, Your Honor.

21             THE COURT:  All right.  Mr. Sears.

22                         CROSS-EXAMINATION

23   BY MR. SEARS:

24   Q.   Mr. Helson, just to pick up where Mr. Durham left off, in

25   fact, Mr. Danchenko told you from day one that none of his

Cross-examination of T. Hansen 10/13/22

─United States v. Danchenko─

788

1   reporting to Mr. Steele was likely to be corroborated,

2   correct?

3   A.   Correct.

4   Q.   Because all the information he gathered was from third

5   parties who were reporting conversations they had with other

6   people, correct?

7   A.   Correct.

8   Q.   And that's exactly how you provided that information to

9   Mr. Steele, correct?

10  A.   Yes.

11  Q.   And he was actually shocked when he read the dossier for

12  the first time in January of 2017, correct?

13  A.   Yes.

14           MR. DURHAM:  Objection, Your Honor, to this witness

15  testifying about Mr. Danchenko's statement.  We can inquire

16  to --

17           THE COURT:  That's what he asked.

18  BY MR. SEARS:

19  Q.   Well, he told you that he was shocked how Mr. Steele had

20  represented the information he provided Mr. Steele in the

21  dossier, correct?

22  A.   That's correct.

23  Q.   Because Mr. Steele represented as fact when it was rumor

24  and speculation?

25  A.   Correct.

—United States v. Danchenko—

789

1    Q.    He never claimed that he was going to be able to

2    corroborate anything that was in the dossier, correct?

3    A.    That's correct.

4    Q.    And he said it was unlikely you were going to be able to

5    corroborate anything that was in the dossier, correct?

6    A.    He basically said that the Bureau or the U.S. Government

7    is going to have to figure that out.

8    Q.    It's your job to figure it out; all I did was collect

9    informing and hand it over as raw intelligence?

10   A.    That's correct.

11   Q.    And he never vouched for the accuracy of any of it?

12   A.    Correct.

13   Q.    And you were not involved in the Crossfire Hurricane

14   investigation, at least not intentionally, correct?

15   A.    Correct.

16   Q.    You were actually asked to join the team, and you were

17   smart enough to say, "No thanks," correct?

18   A.    Correct.

19   Q.    But because the Crossfire Hurricane team had developed

20   Mr. Danchenko, they needed someone to handle him as a

21   potential source of information for our government going

22   forward?

23   A.    Correct.

24   Q.    And you had a specialty or an expertise in handling

25   confidential human sources especially as it related to Russian

─────United States v. Danchenko─────

790

1   activity?

2   A.   Correct.

3   Q.   So you were kind of a natural choice, unfortunately for

4   you, to take on that job, correct?

5   A.   That's correct.

6   Q.   Okay.  And you agreed to take that job on, correct?

7   A.   I did.

8   Q.   And during the course of your interaction with

9   Mr. Danchenko, you would communicate with him in person, some

10  of the audio we've heard today was in person?

11  A.   Yes.

12  Q.   You would also communicate with him over encrypted apps.

13  And I would just want to talk to you for a second about these

14  apps.  If you're -- I don't know if you're -- I'm sorry?  Did

15  you say yes?

16  A.   Yes, I did.

17  Q.   I thought you said yes.  You might have to speak up a

18  little louder.

19  A.   Sorry.  Yes.

20  Q.   I don't know if you're allowed to say what kind of apps

21  you used or not with Mr. Danchenko, so I'm not going to ask

22  you that question, but I'm going to ask you in your work or in

23  your personal experience, have you used messaging apps?

24  A.   Yes.

25  Q.   Like WhatsApp or Viber or Wickr, those types of

─────United States v. Danchenko─────

791

1    applications?

2    A.    Yes.

3    Q.    And is it your understanding in order to contact somebody

4    on one of those applications, you just need their phone

5    number?

6    A.    That is correct.

7    Q.    Thank you.

8              Now, my understanding is that you were not involved

9    in the interviews of Mr. Danchenko in January of 2017?

10   A.    That is correct.

11   Q.    But by the time you met Mr. Danchenko for the first time

12   in March of that year, you had some general sense of what he

13   had said during that interview, correct?

14   A.    As it related to the sources, yeah.  They were beginning

15   to let me see some of the stuff.

16   Q.    Okay.  So you knew bits or pieces --

17   A.    Yes.

18   Q.    -- but not the full picture?

19   A.    Not the full picture.

20   Q.    And -- actually, let me just show you -- go ahead and

21   show you what's been marked as Defense Exhibit 100.  If the

22   court security officer can please show that to you.  Take your

23   time.  Once you've had a chance to review it, let me know.

24   A.    Okay.

25   Q.    Do you recognize that?

792

1   A.   I do.

2   Q.   What is that document?

3   A.   It is a source report.

4   Q.   Is that the source opening document that essentially

5   opened up Mr. Danchenko as a confidential human source?

6   A.   It would be, or a portion of it.

7   Q.   Did you generate that report?

8   A.   I did.

9   Q.   Does it look to be a true and accurate copy of the report

10  you would have generated back in March of 2017 to officially

11  document your opening of Mr. Danchenko as a confidential human

12  source?

13  A.   Yes.

14          MR. SEARS:  Your Honor, I would move to admit this

15  as Exhibit 100.

16          THE COURT:  Any objection?

17          MR. DURHAM:  No objection, Your Honor.

18          THE COURT:  Without objection, Defense Exhibit 100

19  is admitted.

20  (Defendant's Exhibit No. 100, was admitted into evidence.)

21          MR. SEARS:  Your Honor, may I publish it to the

22  jury?

23          THE COURT:  Yes.

24          (Exhibit published.)

25  BY MR. SEARS:

─────United States v. Danchenko─────

1   Q.   So as you were saying, Agent Helson, this is the document

2   that you used to basically make a record of the fact that

3   Mr. Danchenko was being opened as a source?

4   A.   That is correct.

5   Q.   And in this document, you wrote what the motivations were

6   for Mr. Danchenko to become a source?

7   A.   Correct.

8   Q.   And among those motivations, you listed patriotism to the

9   United States?

10  A.   Correct.

11  Q.   Mr. Danchenko is a Russian national?

12  A.   Yes.

13  Q.   That was one of his expressed reasons for wanting to

14  become a confidential human source?

15  A.   Yes.

16  Q.   Mr. Danchenko was under no obligation to become a

17  confidential human source for our country, correct?

18  A.   That is correct.

19  Q.   He volunteered to do that?

20  A.   Absolutely.

21  Q.   In exchange for -- he did get compensation, correct?

22  A.   Yes, he did.

23  Q.   He was under no obligation to continue to meet with you;

24  he could have terminated that relationship at any time,

25  correct?

794

```
 1   A.   That is correct.

 2   Q.   He could have declined to answer any one of your

 3   questions at any time had he wanted to, correct?

 4   A.   That is correct.

 5   Q.   He never did?

 6   A.   Nope.

 7   Q.   And he had concern about his own personal safety

 8   throughout his cooperation with you, correct?

 9   A.   Yes.

10   Q.   And you had concerns about his safety throughout his

11   cooperation, correct?

12   A.   Yes.

13   Q.   And you understood why that was?

14   A.   I do.

15   Q.   Given the nature of the type of cooperation he was

16   providing, correct?

17   A.   Correct.

18   Q.   Your job as a handler of confidential human sources is

19   to, one, keep them talking?

20   A.   Mm-hmm.

21   Q.   Is that fair?

22   A.   That's true.

23   Q.   And develop a relationship of trust?

24   A.   Yes.

25   Q.   And over time, he came to trust you, do you believe?
```

Cross-examination - 7   10/13/22

─United States v. Danchenko─

795

```
 1   A.   Yes.
 2   Q.   And you came to trust him?
 3   A.   Yes.  Yes.
 4   Q.   And you also had an obligation, you personally, had an
 5   obligation to keep him safe?
 6   A.   I did.
 7   Q.   And you took that obligation seriously the entire time
 8   that you were handling him as a confidential human source,
 9   correct?
10   A.   I did.
11   Q.   Now, during the course of your relationship with
12   Mr. Danchenko -- which lasted approximately four years?
13   A.   It was March of 2017 until October of 2020.  That last
14   year, it was not a lot of meets because of the COVID, so it
15   was three years.
16   Q.   There was only one time during your three to four years
17   of interacting with Mr. Danchenko where he acted, in your
18   opinion, very odd or very erratically; do you remember that?
19   A.   Yes.
20   Q.   And that was early on in your relationship with him when
21   he walked into an in-person meeting?
22   A.   Correct.
23   Q.   And he, out of the blue, starting demanding more money
24   from the FBI, correct?
25   A.   That is correct.
```

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

796

1   Q.   And that was completely out of character from your

2   previous experiences with him?

3   A.   Yes.

4   Q.   And I think you described it as he was kind of almost

5   jumping up and down in his chair, spinning around, just very

6   upset and erratic?

7   A.   It was obvious.

8   Q.   Okay.  And he later explained to you that the reason he

9   had behaved that way that day and the reason he had asked --

10            MR. DURHAM:  The government is going to object to

11  hearsay statements coming in through this witness.  They're

12  not statements of party opponents and, therefore, not

13  admissible to try to --

14            MR. SEARS:  Your Honor, this is going through his

15  relationship --

16            THE COURT:  Yes.  Overruled.  I'm going to let you

17  ask what was said during these meetings.  Go ahead.

18            MR. SEARS:  Thank you, Your Honor.

19  BY MR. SEARS:

20  Q.   And he had explained to you that the reason for his

21  behavior on that day was because before he came to see you,

22  his wife and his lawyer -- not me, right?

23  A.   Correct, not you.

24  Q.   Okay.  Just wanted to get that out now.

25            -- had basically told him that he should be asking

Cross-Examination of J. Hitchens   10/13/22

─────United States v. Danchenko─────

797

1   for more money?

2   A.   Correct.

3   Q.   And put pressure on him because he was putting himself at

4   risk?

5   A.   Yes.

6   Q.   And he has children?

7   A.   Yes.

8   Q.   And they thought he should be more aggressive about

9   getting more money?

10  A.   Yes.

11  Q.   And he apologized for that, right?

12  A.   Yes.

13  Q.   And your takeaway from that interaction was -- and I

14  think I'm quoting what you said to the OIG when you testified

15  before the OIG -- was that you -- your takeaway was that he

16  was now gold as a cooperator, right?

17  A.   Correct.

18  Q.   Because now you know how he would react if he was lying

19  to you about something serious, correct?

20  A.   Yes.

21  Q.   And he never acted like that ever again, correct?

22  A.   No.

23  Q.   Now, your focus, as Mr. Danchenko's handler, was not on

24  Crossfire Hurricane, but future efforts by Russia actors in

25  the United States, correct?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Cross-Examination of _____ 10/14/22

─────United States v. Danchenko─────

798

```
 1  A.   Initially, there was stuff about the dossier, but that
 2  dwindled down to the other stuff.
 3  Q.   Right.  And it wasn't because you were interested in
 4  that; it was because you were getting requests --
 5  A.   Correct.
 6  Q.   -- for that type of information?
 7            And you would get requests to ask certain questions
 8  from the Crossfire Hurricane team, and at your next meeting
 9  with Mr. Danchenko, you would ask those questions?
10  A.   Correct.
11  Q.   And you would get the answers to those questions and send
12  them back to the Crossfire Hurricane team, correct?
13  A.   That is correct.
14  Q.   And you would never really hear back about whether his
15  information was useful?
16  A.   Correct.
17  Q.   Or truthful?
18  A.   Correct.
19  Q.   It was a one-way street as far as communication -- as far
20  as you were concerned?
21  A.   That is what I would characterize it as.
22  Q.   Okay.  And other than following up on a few occasions
23  about this Sergei Millian contact, the Crossfire Hurricane
24  team never raised any real concerns with you about the
25  information he was providing, correct?
```

Cross-Examination of Tonia Harris 10/13/22

United States v. Danchenko

799

1  A.   Correct.

2  Q.   And Mr. Danchenko provided you a lot of information about

3  a lot of different people, correct?

4  A.   That is true.

5  Q.   People he believed were also involved, potentially, as

6  sources in the dossier, correct?

7  A.   Yes.

8  Q.   And you would agree with me that, at times,

9  Mr. Danchenko, with you, was being asked to kind of speculate

10 about who might have been a source for a certain section of

11 the dossier?

12 A.   Yes.  There were times the stuff that he wouldn't -- he

13 couldn't recall or attributed from him, so then we would

14 elaborate and go deeper in and say, Hey, who do you think this

15 came from?

16 Q.   And it's a uncontroverted fact that Mr. Danchenko did not

17 write the dossier?

18 A.   That is true.

19 Q.   Christopher Steele wrote the dossier?

20 A.   That is true.

21 Q.   Mr. Danchenko didn't even know there was a dossier being

22 created during the summer and fall of 2016, correct?

23 A.   That is correct.

24 Q.   He didn't know there was a dossier until he saw it when

25 it got released in BuzzFeed in January of 2017, correct?

---United States v. Danchenko---

800

1   A.    Correct.

2   Q.    That was the first time, as far as you're aware, that he

3   had ever even seen it before?

4   A.    That is -- yeah, as far as I'm aware.

5   Q.    And he was being asked by the Crossfire Hurricane team

6   and then you, on occasion, to interpret something somebody

7   else had written?

8   A.    That is true.

9   Q.    Thank you.

10         Now, you're aware -- so I think you were discussing

11  on direct examination that Mr. Danchenko, on occasion, would

12  provide you with business cards or other information that he

13  had acquired over his time being a business analyst and

14  talking to his contacts, correct?

15  A.    Correct.

16  Q.    Did the Crossfire Hurricane team ever ask you to make an

17  image of his cell phone?

18  A.    No.

19  Q.    Do you have any reason to believe he would have said no

20  if you had asked?

21  A.    No.

22  Q.    He never said no to anything, right?

23  A.    No.

24  Q.    Did the Crossfire Hurricane team ever ask you to get the

25  log-in information to his email accounts?

———United States v. Danchenko———

801

1  A.   No.

2  Q.   Or his text messages?

3  A.   No.

4  Q.   Or to see what you could download from his messaging

5  applications?

6  A.   No.

7  Q.   Okay.  And you, yourself, it wasn't your responsibility

8  because you weren't part of Crossfire, but you, yourself,

9  never asked for those things either, correct?

10  A.   Technically I wouldn't be allowed to just because I

11  wouldn't have the legal authority to do so.

12  Q.   Okay.  And you're aware, I believe -- if you're not, you

13  can tell me, but you're aware that Mr. Danchenko had told the

14  Crossfire Hurricane team that he had deleted a lot of his

15  communications during the time period when he was doing his

16  reporting for what later turned out to be the dossier,

17  correct?

18  A.   I wasn't aware of that initially, but I've heard that.

19  Q.   Okay.  And, in fact, Agent Helson, once Mr. Danchenko

20  became a confidential human source, and for good reason, you

21  told him that he should scrub his phone, correct?

22  A.   Yeah, at the beginning, there were two times that we had

23  discussed that action was at the beginning to kind of mask and

24  obfuscate his connection to Steele and any connection to us.

25           And then after the three-day interview became

Cross-Examination of . . . Harris 10/13/22

─────United States v. Danchenko─────

802

1    public, we readdressed that as well as we assumed he would be

2    most likely targeted from -- by cyber means by the Russians.

3    Q.    So to the extent it's possible there were any

4    communications that were left on his phone from the period

5    when he was doing the reporting that later ended up being the

6    dossier, they were likely erased?

7    A.    Yeah, depending on how he did it.

8    Q.    Okay.  So I want to talk to you a little bit about

9    Charles Dolan.  I believe you testified on direct that

10   Mr. Danchenko appeared, at least initially, a little hesitant

11   to talk about Mr. Dolan when you first raised his name in June

12   of 2017, correct?

13   A.    Correct.

14   Q.    And he had no idea that you were going to ask him about

15   Charles Dolan until you did, right?

16   A.    Correct.

17   Q.    Okay.  And even though he may have been a little

18   hesitant, in your impression, he told you an awful lot that

19   would have been of interest to the FBI about Charles Dolan at

20   that June 15th interview, correct?

21   A.    Correct.

22   Q.    He told you he had known of him for ten years because of

23   his connections to Russia, correct?

24   A.    Correct.

25   Q.    He told you he worked for Ketchum, which was well known

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────United States v. Danchenko─────

803

1   to have done a lot of work, PR work for the Kremlin, correct?

2   A.   That's correct.

3   Q.   He told you that Charles Dolan really liked Russia?

4   A.   Yes.

5   Q.   He told you that Charles Dolan could be easily played

6   because he's naive about Russia, correct?

7   A.   That's true.

8   Q.   And he told you that Mr. Dolan was on the trip, the YPO

9   trip to Moscow, in October of 2016, correct?

10  A.   That is correct.

11  Q.   He also told you that Mr. Dolan had a connection to

12  Dmitry Peskov, correct?

13  A.   That's correct.

14  Q.   Mr. Durham had asked you whether that was a significant

15  fact that he had a connection to Mr. Peskov who had been

16  President Putin's secretary, correct?

17  A.   Correct.

18  Q.   Mr. Danchenko told you just that?

19  A.   Correct.

20  Q.   Correct?

21          He also told you that Mr. Dolan did work for

22  Servers.com, correct?

23  A.   That is true.

24  Q.   And you're aware that not only did he tell the FBI about

25  Mr. Dolan's work for a company that employed Olga Galkina, but

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

804

1   Mr. Danchenko actually introduced the FBI to Olga Galkina,

2   didn't he?

3   A.   He did.

4   Q.   He set up a meeting, arranged for a meeting for the FBI

5   to travel to Cyprus and interview one of the sub-sources for

6   the dossier?

7   A.   He did.

8   Q.   He did that?

9   A.   Yes.

10  Q.   That was a big deal for the FBI, right?

11  A.   It was.

12  Q.   And Mr. Durham had been asking you about there weren't a

13  lot of people connected to the dossier in the United States

14  and Olga Galkina was not in the United States?

15  A.   That's true.

16  Q.   She was in Cyprus?

17  A.   Yes.

18  Q.   And through Mr. Danchenko, you had the opportunity -- or

19  the FBI had the opportunity to interview her, correct?

20  A.   Yes, that is true.

21  Q.   You also asked Mr. Danchenko during the June 15th

22  interview, and I -- at any point, you want to see the

23  transcript or anything, you don't just have to accept my

24  characterization, okay?  But at some point during that

25  interview, you asked him whether Chris Steele would know Chuck

United States v. Danchenko

805

1   Dolan.  Do you remember that?

2   A.   Yes.

3   Q.   And his answer to that was, yes, he would know him.  And

4   he explained that he didn't believe they had ever met, but

5   that Chris Steele would know of Chuck Dolan because of his

6   trip to Moscow and so on.  Is that right?

7   A.   That is true.

8   Q.   Okay.  Following the June 15th, 2017 interview, you

9   continued to meet with Mr. Danchenko, but you stopped

10   recording the meetings?

11   A.   Correct.

12   Q.   Because at that point, you were kind of up to speed on

13   the names and the players and more confident in your ability

14   to take notes of those conversations?

15   A.   That, and we were basically not getting any new

16   information about the dossier.  It was what it was.

17   Q.   Right.  So at this point, you weren't having to report

18   back to Crossfire Hurricane as frequently?

19   A.   Correct.  The information that was not related to the

20   dossier was compartmented to WFO only, was compartmented to

21   Washington Field Office only.  Yeah, sorry, Washington Field

22   Office.  My apologies.

23   Q.   But on occasion you might get a one-off request from the

24   Crossfire team, saying, hey, can you run this down or ask them

25   about this?

─────United States v. Danchenko─────

806

1   A.   Yes, that's true.

2   Q.   And, again, even though your perception was that he was a

3   little hesitant at first to talk about Mr. Dolan, in October

4   of 2017, Mr. Danchenko raised Mr. Dolan as a concern again,

5   correct?

6   A.   Yes.

7   Q.   Okay.  And his concern was, as Mr. Durham stated

8   previously, was that he had too many dubious connections to

9   kind of senior people in Russia, correct?

10  A.   Correct.

11  Q.   And he even gave you the names of some of those people?

12  A.   He did.

13  Q.   Gave the FBI the names of the people that Mr. Dolan had

14  connections with, correct?

15  A.   Correct.

16  Q.   Now, we covered this a little bit at the beginning, but

17  you learned, during your relationship with Mr. Danchenko, that

18  he provided a lot of information that ultimately ended up, in

19  some form, in the dossier, correct?

20  A.   That is true.

21  Q.   And you're aware that the FBI, over time, had met with

22  Mr. Steele on a few occasions about the dossier?

23  A.   That is true.

24  Q.   But Mr. Steele was not disclosing Mr. -- sorry,

25  Mr. Danchenko's identity?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

───────United States v. Danchenko───────

807

1   A.    Correct.

2   Q.    But you knew Mr. Danchenko's role because Mr. Danchenko

3   told you his role?

4   A.    That is true.

5   Q.    And as we discussed, you knew from your investigation

6   that Mr. Danchenko had never seen the dossier reports until

7   they were released by BuzzFeed in January of 2017?

8   A.    That is true.

9   Q.    Mr. Danchenko didn't even know that those reports were

10  going to the FBI in 2016?

11  A.    That's true.

12  Q.    Now, Mr. Durham asked you some questions about a

13  conversation that came up in November.  I think you testified

14  about pressure that Mr. Steele was putting on Mr. Danchenko to

15  gather information?

16  A.    Yes.

17  Q.    During that summer and fall, correct?

18  A.    Correct.

19  Q.    And Mr. Danchenko acknowledged to you that Mr. Steele

20  would pressure?

21  A.    Yes.

22  Q.    But he never told you that he made something up just to

23  satisfy Mr. Steele, correct?

24  A.    Right, he just didn't correct.

25  Q.    And, in fact, you testified before the OIG that

1   Mr. Danchenko never struck you as someone who would make

2   something up just because Steele asked for the information?

3   A.   That's true.

4   Q.   Now, you were asked some questions about Mr. Danchenko's

5   conversations in October, November of 2017 with Mr. Steele.

6   Do you recall that?

7   A.   Say that again.

8   Q.   So this was the line of questioning where Mr. Danchenko

9   had a conversation with Mr. Steele and reported back that

10  Mr. Steele had a misperception of his interaction with Sergei

11  Millian and he didn't feel the need to correct him?

12  A.   Correct.

13  Q.   All right.  Let's give the jury a little more context

14  about that interaction if we can.

15          So at the time that that conversation between

16  Mr. Danchenko and Mr. Steele occurred was when Mr. Danchenko

17  flew to London while he was cooperating with the FBI?

18  A.   Correct.

19  Q.   And the FBI basically, even now, had Mr. Danchenko

20  cooperating against Mr. Steele for the FBI?

21  A.   He did.

22  Q.   Correct?

23  A.   Well, we did.

24  Q.   And this was ten months after the FBI had first

25  interviewed Mr. Danchenko in January of 2017?

──────United States v. Danchenko──────

809

1  A.   That's correct.

2  Q.   He told you, hey, I'm going to go meet with Steele?

3  A.   Correct.

4  Q.   And you guys were, great, let us know what he's saying.

5  And at that time, correct me if I'm wrong, there was concern

6  in the FBI about a dossier No. 2 being released?

7  A.   It was.

8  Q.   Okay.  And you were having Mr. Danchenko fish information

9  from Mr. Steele about what Mr. Steele was up to?

10 A.   Yes.

11 Q.   And you wanted Mr. Danchenko loyal to the FBI as opposed

12 to Mr. Steele?

13 A.   Yes.

14 Q.   And I think you've used the term that you were trying, as

15 his handler, to drive a wedge between Mr. Danchenko and

16 Mr. Steele, correct?

17 A.   I was.

18 Q.   And you knew by the time of that meeting in London

19 between Mr. Danchenko and Mr. Steele, that Mr. Danchenko had

20 real concerns about sharing any more information with

21 Mr. Steele, right?

22 A.   That is true.

23 Q.   Because he was upset with how Steele had embellished the

24 information he had provided when he was reporting to him in

25 2016?

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

EASTERN DISTRICT OF VIRGINIA

---United States v. Danchenko---

810

1    A.    Yes.

2    Q.    We covered this, but he was particularly frustrated

3    because Mr. Steele had reported as fact in the dossier,

4    information that Mr. Danchenko provided that was rumor and

5    speculation?

6    A.    That is true.

7    Q.    And that he had told Mr. Steele it was rumor and

8    speculation when he gave him the information?

9    A.    Yes, he did.

10   Q.    He was also concerned, when you went to meet with

11   Mr. Steele in London in 2017, that Mr. Steele had become

12   obsessed with trying to prove the dossier true?

13   A.    That is true.

14   Q.    And that, I think it was your words, that Mr. Steele was

15   willing to burn everyone around him to make the dossier true?

16   A.    That's true.

17   Q.    And so he was concerned about sharing any information

18   with Mr. Steele.  What he would do with -- again, I think your

19   words from the OIG testimony -- Mr. Danchenko was concerned

20   about what Mr. Steele would do with any bits and pieces of

21   information he gave him?

22   A.    Yes.

23   Q.    And when he came back from London, he told you, Listen,

24   Millian clearly is under the impression that I met -- Steele

25   is clearly under the impression that I met with Millian in

───────United States v. Danchenko───────

811

1    person, right?

2    A.   Correct.

3    Q.   But he told you, again, like he had through the entire

4    time you were interacting with him, that wasn't true, he had

5    never met with Millian?

6    A.   Yes.

7    Q.   And he said, Mr. Steele may have assumed I met with him,

8    and we were vague at times about how we conveyed information

9    while I was reporting to him, but it's clear that he thinks I

10   met with him in person on more than one occasion?

11   A.   Yes.

12   Q.   And that's the context under which he told you, I didn't

13   feel the need to correct him at this point?

14   A.   Correct.

15   Q.   And I believe he told you that it was because of, at this

16   point, after everything Steele has done to him and the mess

17   that he's created, he doesn't feel the need to correct the

18   record with him anymore?

19   A.   That is true.

20   Q.   Turning back to Mr. Dolan, briefly.  Mr. Danchenko shared

21   with you concerns he had about Mr. Dolan and Ms. Galkina's

22   relationship; is that fair?  Do you remember that?

23   A.   Yeah.  There was a point in time that I think he had

24   mentioned something about that relationship.

25   Q.   And the fact that while he had introduced them, he had

─────United States v. Danchenko─────

812

1  been kind of cut out of the picture, and he doesn't know what

2  they're talking about or what they're up to?

3  A.    Yeah, he implied that, Yes.

4  Q.    Now, Mr. Danchenko is charged, in Count 1 of this case,

5  with lying about whether he had ever talked to Mr. Dolan about

6  anything specific in the Steele reports.  Are you aware of

7  that?

8  A.    Yes.

9  Q.    And that's based on a statement he provided to you in

10  June -- on June 15, 2017?

11  A.    Yes.

12  Q.    Okay.  And we listened to that audio, and we looked at

13  the transcript today, correct?

14  A.    Correct.

15  Q.    But because we have an audio and a transcript, we kind of

16  know exactly what each of you said?

17  A.    Correct.

18  Q.    We don't have to rely on a report that gets generated

19  later based on someone's memory, correct?

20  A.    Correct.

21  Q.    And before you met with Mr. Danchenko on June 15th, the

22  Crossfire Hurricane team had sent you some questions to ask

23  him about during that meeting, right?

24  A.    Yes.

25  Q.    So I want to show you what's been marked as Defense

─────United States v. Danchenko─────

813

1    Exhibit 102.

2           THE COURT:  Which exhibit?

3           MR. SEARS:  102, Your Honor.

4    BY MR. SEARS:

5    Q.   When you've had a chance to review it, let me know, and

6    then I'll ask you some questions.

7    A.   It looks like interview notes.

8    Q.   So if you actually -- if you start on the second page of

9    that document, do you recognize that, what those are?

10   A.   Yeah.  Those are -- it would be -- this would be Special

11   Counsel's stuff --

12   Q.   So --

13   A.   -- the Mueller team.

14   Q.   If you turn back to the first page -- sorry to keep

15   making you jump back and forth --

16   A.   No, you're fine.

17   Q.   -- but on the top, it has a date and then your name,

18   correct?

19   A.   Correct.

20   Q.   And the date is 6/15/17, and it says "DB notes."  Is that

21   debrief notes?

22   A.   That is.

23   Q.   Okay.  And you would take notes during your meetings with

24   Mr. Danchenko?

25   A.   Correct.

—United States v. Danchenko—

814

1   Q.   It looks like there's two very different types of

2   handwriting on this document.

3   A.   It is.

4   Q.   Okay.  Which one are you going to claim is yours?

5   A.   The top one.

6   Q.   Okay.  The neater one?

7   A.   I'll let you be the judge of that.

8   Q.   It'll make it much easier for me.  Thank you.

9        MR. SEARS:  Your Honor, I would like to move this in

10  as Defense Exhibit 102, which are notes and questions from the

11  interview of Mr. Danchenko and --

12       THE COURT:  Any objection?

13       MR. DURHAM:  I don't think that they're admissible

14  in this proceeding, so we would object.  I mean, the witness

15  is here to testify; he can testify, but I don't think the

16  notes themselves, has any consistency.

17       THE COURT:  This is a document this witness received

18  and partially created?

19       MR. SEARS:  Yes, Your Honor.

20       THE COURT:  Over objection, Exhibit 102 is admitted.

21  (Defendant's Exhibit No. 102, was admitted into evidence.)

22  BY MR. SEARS:

23  Q.   So, Agent Helson, if you go to the second page of the

24  document, it has a series of questions typed out, correct?

25       MR. SEARS:  If I could publish this to the jury.

─────United States v. Danchenko─────

815

 1          THE COURT:  Yes.

 2          (Exhibit published.)

 3          MR. SEARS:  And, Charlie, if you could blow up page

 4    2, please.

 5          THE COURT:  Mr. Sears, I think this might be a good

 6    time for --

 7          MR. SEARS:  I think so, Your Honor.

 8          THE COURT:  -- our afternoon break.

 9          Ladies and gentlemen, we're going to have our

10    afternoon recess at this time.  We'll reconvene around 4:30.

11    You're excused to the jury room.  Do not discuss this case

12    among yourselves during the recess.

13          (Jury dismissed.)

14          THE COURT:  All right.  Agent Helson, do not discuss

15    your testimony during the recess.  Court will stand in recess.

16          (Recess, 4:04 p.m. to 4:31 p.m.)

17          THE COURT:  Anything before we bring out the jury?

18          MR. SEARS:  There is, briefly, Your Honor.

19          THE COURT:  Yes.

20          MR. SEARS:  And I think, if we could, come to the

21    bench.

22          (Side bar.)

23          MR. SEARS:  Your Honor, there's a juror in the front

24    row by the name of Terrence Beck, Juror No. 3.

25          During the break, Mr. Danchenko's wife informed me

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

───United States v. Danchenko───

816

1    that her 15-year old son was in the courtroom, he will no

2    longer be here today, believed he was the principal at his

3    high school in Arlington -- Yorktown High School in Arlington

4    County.  Once we received that information, we went and looked

5    him up.  In his questionnaire it appears it's a

6    misidentification.  That juror indicated on his questionnaire

7    he works for the MITRE company in software development.  We've

8    made the special counsel aware of that.  I thought it was

9    appropriate to put that on the record.  It doesn't appear to

10   be an issue.

11            THE COURT:  So there's nothing to be done.  Okay.

12            (Open court.)

13            THE COURT:  All right.  Bring out the jury.

14            (Jury present.)

15            THE COURT:  Please be seated.  Agent Helson, you

16   remain under oath.

17            Mr. Sears.

18   BY MR. SEARS:

19   Q.   Hello again, Agent Helson.

20   A.   Hello.

21   Q.   I think we left off, we had just published to the jury

22   Defense Exhibit 102 --

23   A.   Correct.

24   Q.   -- which related to some questions that you were to ask

25   Mr. Danchenko during your June 15th, 2017, meeting with him?

Cross-Examination of Helson   10/13/22

─────United States v. Danchenko─────

817

1   A.   Yes.

2   Q.   And if you review those questions that are on the screen

3   before you right now, that list of questions doesn't include

4   you asking whether Mr. Danchenko had spoken to Mr. Dolan about

5   anything in the dossier, correct?

6   A.   Correct.

7   Q.   You did ask him about that --

8   A.   Yes.

9   Q.   -- obviously, during that meeting, but that was a

10  question you asked on your own; it wasn't a request of

11  Crossfire Hurricane?

12  A.   This was the last two.  They didn't put it on there.

13  Q.   Okay.  And --

14          MR. SEARS:  We can take that down.

15  BY MR. SEARS:

16  Q.   And you would agree with me, Agent Helson -- and like I

17  said, if you want to see the transcript on the screen or

18  listen to it, just tell me -- but you would agree with me,

19  wouldn't you, that you specifically asked Mr. Danchenko

20  whether he had talked to Mr. Dolan about anything in the

21  report, right?

22  A.   That is what I asked, yes.

23  Q.   You didn't use, in your question, a word like

24  "communicate"?

25  A.   No, I didn't.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────
818

1   Q.   And you didn't use the word, you know, "correspond"?

2   A.   Correct.

3   Q.   You just asked whether he had talked to him?

4   A.   Yes.

5   Q.   Is that fair?

6   A.   Yes.

7   Q.   And I understand, in your mind, you know, when you were

8   asking that question, you may have meant to include all forms

9   of communication --

10  A.   Correct.

11  Q.   -- but you never clarified that with Mr. Danchenko, did

12  you?

13  A.   No.

14  Q.   Okay.  You didn't tell him, when you were asking, like,

15  him that question what you meant or what you -- how you wanted

16  him to interpret that question?

17  A.   No.  It was just an open-ended question.

18  Q.   Okay.  And you didn't define what the term "talked" meant

19  to you --

20  A.   No.

21  Q.   -- at that time?

22  A.   No, I did not.

23  Q.   And you never followed up with him during that interview

24  about whether he had communicated with Mr. Dolan in any other

25  form of communication?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

United States v. Danchenko

819

1   A.   No.

2   Q.   And you would agree that when Mr. Danchenko responded to

3   your question, he used the word "talked" in his answer as

4   well?

5   A.   Yes.

6   Q.   He said, "We talked about related issues, but nothing

7   specific," right?  Do you remember that?

8   A.   Yes.

9   Q.   And you could have asked him what he meant by "related

10  issues," fair?

11  A.   Fair.

12  Q.   And you just didn't?

13  A.   No.

14  Q.   At that moment.

15       And you could have asked what he meant by "related"

16  or "specific," correct?

17  A.   Correct.

18  Q.   Okay.  And the only way you would know or we would know

19  what he meant by that, at that time, would have been if you

20  had asked him those questions?

21  A.   Questions, yes.

22  Q.   And you would agree with me -- or would you agree with me

23  that if Mr. Danchenko had, in fact, never talked or spoken to

24  Mr. Dolan about anything that ended up in the dossier, then

25  his answer to you would have been literally true, correct?

——United States v. Danchenko——

820

1   A.   Yes.

2   Q.   And the next series of questions you asked him was, how

3   long had it been since he had last spoken to Mr. Dolan,

4   correct?

5   A.   Correct.

6   Q.   And he responded, again, using the same words you had

7   used in your question, which was:  Since I talked, since I

8   spoke to Chuck last.  Do you remember that?

9   A.   Yes.

10  Q.   And he mentioned the Moscow trip in October of 2016 as

11  the -- initially, as the last time he had spoken to him?

12  A.   Yes, that's true.

13  Q.   And then he went on to say that he had seen him on

14  January 1st at that park in Arlington.

15  A.   Correct.

16  Q.   And you took notes of your interview on June 15th,

17  correct?

18  A.   I did.

19          MR. SEARS:  And, Charlie, if we could put up 102

20  again, please.

21  BY MR. SEARS:

22  Q.   And while we're pulling that up, Agent Helson, I'm

23  assuming you do the best you can to take notes while you're

24  asking questions; is that fair?

25  A.   Yes.

——Tonia M. Harris OCR-USDC/EDVA 703-646-1438——

EASTERN DISTRICT OF VIRGINIA

Cross-Examination of F. Helson

—United States v. Danchenko—

821

1   Q.   Okay.  And you try and catch and write down the most

2   important things from that conversation?

3   A.   Correct.

4   Q.   And I think you testified that the notes at the top of

5   this page are yours?

6   A.   Correct.

7            MR. SEARS:  And if we could blow those up, Mr. Tent,

8   please.

9   BY MR. SEARS:

10  Q.   And take your time to review them, but nowhere in your

11  handwritten notes during that interview did you write down

12  that he had told you that he had never talked to Mr. Dolan

13  about anything in the dossier; is that fair?

14  A.   That's fair.

15           MR. SEARS:  Thank you, Mr. Tent.

16  BY MR. SEARS:

17  Q.   And in addition to your notes that you took during the

18  interview, you also wrote up a report of the interview?

19  A.   Correct.

20  Q.   And I'm assuming that's one of the worst parts of

21  handling a CHS is all the reports you have to generate all the

22  time?

23  A.   Yes.

24  Q.   The paperwork?

25  A.   Yes.

Cross-Examination — Auten 10/13/22

─────United States v. Danchenko─────

822

1   Q.   And again, you want your, you know, reports to reflect

2   the most important facts?

3   A.   Correct.

4   Q.   That were learned during that interview?

5   A.   Yes.

6   Q.   Okay.  So I'd like to show you what's been marked as

7   Defendant's Exhibit 103.

8            I think you probably know where I'm going with this,

9   but I'm going to ask you if you see in your report that you

10  generated from that interview, whether you wrote in there

11  anywhere about the fact that Mr. Danchenko told you that he

12  had not talked to Mr. Dolan about anything in the dossier.

13  A.   Correct, I didn't.

14  Q.   You did not?

15  A.   No.

16  Q.   You would agree --

17           MR. SEARS:  I'm not offering that as an exhibit,

18  Your Honor.

19           THE COURT:  All right.

20  BY MR. SEARS:

21  Q.   You would agree that there was a lot of information that

22  was contained in the dossier reports?

23  A.   Yes.

24  Q.   About a lot of different topics?

25  A.   Yes.

─────United States v. Danchenko─────

823

1   Q.   And a lot of different people?

2   A.   Yes.

3   Q.   And it would be a lot for any person to remember

4   everything that had been in those reports; is that fair?

5   A.   Yes.

6   Q.   You don't remember everything that was in those reports,

7   do you?

8   A.   No.

9   Q.   Okay.  And you were asking him about Mr. Dolan and his

10   talking to Mr. Dolan, and you were asking him those questions

11   in June 2017, right?

12   A.   Correct, yes.

13   Q.   Almost one year after the email exchange that Mr. Durham

14   showed you where Mr. Dolan had shared information about Paul

15   Manafort's resignation from the campaign?

16   A.   Yes.

17   Q.   Now, you were never asked by the Mueller team or the

18   Crossfire Hurricane team to question Mr. Danchenko about that

19   specific paragraph regarding Paul Manafort; is that correct?

20   A.   Yeah, I was never.

21   Q.   In fact, you were never asked to ask Mr. Danchenko about

22   anything in Report 105; is that right?

23   A.   Not that I recall.

24   Q.   Okay.  The special counsel, Crossfire, nobody ever

25   focused your attention on the paragraph about Paul Manafort

───────United States v. Danchenko───────

824

1  leaving the campaign?

2  A.   No.

3  Q.   Are you aware of the fact that Mr. Auten never asked

4  Mr. Danchenko about that report during his three-day interview

5  in January?

6  A.   Huh-uh.  No, I'm not aware of that.

7  Q.   I think you mentioned on direct examination that

8  Mr. Danchenko, at times, would have documents with him when he

9  would meet with you?

10 A.   Yes.

11 Q.   And I think you indicated that you recall that, at some

12 point, he may have had the dossier or some portions of the

13 dossier?

14 A.   Yes.

15 Q.   Can you say, as you sit here today, whether Mr. Danchenko

16 ever had Report 105 with him when he met with you?

17 A.   No.

18 Q.   Can you say, as you sit here today, whether Mr. Danchenko

19 had ever even seen Report 105?

20 A.   No.

21 Q.   Agent Helson, are you aware, from your own personal

22 knowledge, that the information about Paul Manafort leaving

23 the Trump campaign in the summer of 2016 was pretty widely

24 covered in the news?

25 A.   I didn't know.  I would assume it would have been.

─────United States v. Danchenko─────

825

1   Q.   Okay.  I take it you're not a big political guy?

2   A.   I try to stay away from that.

3   Q.   Understood.  So I want to -- I want to talk to you

4   briefly about two exhibits that Mr. Durham showed you real

5   quick.

6   A.   Okay.

7            MR. SEARS:  If we could pull up Government

8   Exhibit 120, please.

9            This has already been admitted, Your Honor.  If we

10  could publish it.

11           (Exhibit published.)

12           MR. SEARS:  And if you could highlight, Mr. Tent,

13  the bottom part where it's not redacted.

14           THE COURT:  Is this Government Exhibit 120?

15           MR. SEARS:  It is.  It is, Your Honor.  Sorry,

16  Government Exhibit 120.

17           THE CSO:  It fell on the floor.

18           MR. SEARS:  Got it.

19           THE COURT:  I don't have that admitted, frankly.

20  Has it been admitted?

21           THE COURTROOM CLERK:  Yes, Judge.

22           THE COURT:  It has been?  All right.  Thank you.

23  BY MR. SEARS:

24  Q.   I want to focus your attention first, if I could, to the

25  last -- well, to this whole paragraph, and I'm going to read

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

United States v. Danchenko

826

1  it to you (As read):  "At this point in the development of

2  Mr. Danchenko, a source understands that his priority is to

3  obtain any and all information that would indicate collusion

4  between the Trump campaign, the Trump administration, and the

5  Russian government and/or any of its representatives."

6          Do you see that?

7  A.   Yes.

8  Q.   And this is from a report you generated after meeting

9  with him in July of 2017?

10  A.   Yes.

11  Q.   And the next sentence is redacted, and the sentence after

12  that says (As read): "ID," which refers to Mr. Danchenko,

13  "continues to iterate that at no time did he communicate that

14  he nor any of his contacts were in possession of such

15  material."  Right?

16  A.   Correct.

17  Q.   And that's referring to collusion material between the

18  Trump campaign and Russia?

19  A.   Yes.

20  Q.   And that all of the information was obtained through

21  conversations with what he classifies as his social network of

22  friends and professional colleagues?

23  A.   Correct.

24  Q.   And that's consistent with what he told you throughout

25  your meetings with him?

─United States v. Danchenko─

827

1   A.   Yes.

2   Q.   And if we can turn to the third -- sorry, fifth page of

3   that document, please.  And if we could blow up the only

4   unredacted line of the document.

5         And in this document, Mr. Durham asked you some

6   questions about Mr. Danchenko's reference to speaking on

7   social media.  Do you see that?

8   A.   Yes.

9   Q.   Okay.  This wasn't a document that Mr. Danchenko prepared

10  a response to a specific question you had asked him, correct?

11  A.   Correct.

12  Q.   This was him voluntarily providing you information

13  through, I think, what's called an electronic drop?

14  A.   Yes.

15  Q.   And it appears that he's trying to clarify for you that

16  you understand when he uses that term, it's over social media,

17  correct?

18  A.   Yes.

19  Q.   Okay.

20         MR. SEARS:  We can take that down.

21  BY MR. SEARS:

22  Q.   I want to also show you Government Exhibit 119.

23         MR. SEARS:  This has already been admitted and I'd

24  ask to publish it, please.

25         THE COURT:  You may.

Cross-examination of ... House   10/13/22

────United States v. Danchenko────

828

1              (Exhibit published.)

2              MR. SEARS:  And if we could go to the third page,

3    please, Mr. Tent, to the only unredacted line.

4    BY MR. SEARS:

5    Q.   So Mr. Durham asked you some questions about this.  Do

6    you recall that?

7    A.   I do.

8    Q.   And OAG refers to Ms. Galkina who we've been talking

9    about today?

10   A.   Yes.

11   Q.   Okay.  And he writes that her case details are in Greek,

12   claims she can't travel until September, but I made a good

13   pitch.  We'll show our conversation here on other screens in

14   the meantime.  And we can turn to the page if you want, but I

15   think we're all in agreement that he, then, sends you

16   screenshots of a conversation or a back-and-forth over a

17   messaging app with Ms. Galkina?

18   A.   Yes.

19   Q.   Okay.  And again, that was not in response to any

20   question you had asked him about communications he had had

21   with anybody?

22   A.   Correct.  He --

23   Q.   Or whether he had talked with anybody?  He was

24   voluntarily providing you information about communications he

25   had with Ms. Galkina?

┌─ United States v. Danchenko ─
829

```
 1   A.   Yes.

 2   Q.   Okay.  And you're not aware of any communications between

 3   Mr. Danchenko and Charles Dolan over social media

 4   applications, are you?

 5   A.   No.

 6   Q.   Or messaging applications?

 7   A.   Not that I'm aware of, no.

 8   Q.   Okay.  Thank you.

 9        Okay.  So let's turn our attention to Mr. Millian.

10   A.   Okay.

11   Q.   Ready?

12   A.   Okay.

13   Q.   You were asked on direct about what Mr. Danchenko had

14   told you about his phone call over a messaging app with

15   someone he believed to be Mr. Millian.

16   A.   Correct.

17   Q.   I'm sure you recall those questions, right?

18   A.   Yes.

19   Q.   And if I could, you know, to summarize your testimony, is

20   that Mr. Danchenko told you he had received a communication

21   from a journalist with Mr. Millian's information?

22   A.   Yes.

23   Q.   Is that what you recall him telling you?

24   A.   Yes.

25   Q.   Okay.  And once he received Millian's contact information
```

─United States v. Danchenko─

830

1    from this individual, he emailed Mr. Millian to try and set up

2    a meeting or a phone call?

3    A.    Correct.

4    Q.    Is that what you recall from what he told you?

5    A.    (No audible response.)

6    Q.    Okay.  Now, you never asked Mr. Danchenko for the copy of

7    the emails that he referenced about receiving Mr. Millian's

8    information or his email to Mr. Millian?

9    A.    No.

10   Q.    Okay.  I think you testified that you don't even think

11   you could have done that had you wanted to?

12   A.    I wouldn't have been able to actually do legal process to

13   get those emails --

14   Q.    Right --

15   A.    -- but I could have asked.

16   Q.    You could have asked him to do it voluntarily?

17   A.    Yes.

18   Q.    And do you have any reason to believe that he wouldn't

19   have provided you that if he had it?

20   A.    I would have thought he would.

21   Q.    Okay.  Did he ever turn down any requests you've --

22   A.    No.

23   Q.    -- ever given him?

24   A.    No.

25   Q.    And he told you that shortly after he sent the email to

─────United States v. Danchenko─────

831

1   Mr. Millian, he received a call through a messaging app from a

2   man, a male who did not identify himself?

3   A.    Correct.

4   Q.    And that person on that phone call told him about

5   contacts between the Trump campaign and Russian officials?

6   A.    Correct.

7   Q.    And do you remember him also telling you that the person

8   on that phone call told him that it wasn't -- that contact was

9   not necessarily a bad thing?

10  A.    Yes.

11  Q.    And Mr. Danchenko told you that during the course of that

12  phone call, he made plans to meet that anonymous caller in the

13  New York later that week?

14  A.    Correct.

15  Q.    And he told you that he actually went to New York and the

16  individual who was on the other line of that call did not

17  appear at the meeting place?

18  A.    Right.

19  Q.    And he told you that he wasn't sure who that person was,

20  but he believed that person was Sergei Millian?

21  A.    Yes.

22  Q.    And he was -- explained his belief for that was the

23  timing that he received that call after he had reached out to

24  Mr. Millian; is that right?

25  A.    That, and he also thought the voice sounded the --

─────United States v. Danchenko─────

832

1    similar.

2    Q.    Because he had listened to Mr. Millian on some YouTube

3    video speeches, and the voice sounded similar to him?

4    A.    Yes.

5    Q.    Okay.  And he told you, did he not, that even after the

6    missed meeting in New York, that he had reached back out to

7    Mr. Millian to try and connect with him again?

8    A.    It seems like I remember him asking that or saying that

9    he did that.

10   Q.    Okay.  And are you aware that he told Mr. Auten, in

11   January of 2017, that he had emailed Mr. Millian after the

12   missed --

13   A.    No.

14   Q.    You were not aware of that?

15   A.    No.

16   Q.    Now, as Mr. Durham pointed out, you asked him on multiple

17   occasions about this interaction with Mr. Millian?

18   A.    Correct.

19   Q.    Because it was an odd situation?

20   A.    Yes.

21   Q.    Is that fair?

22   A.    That's fair.

23   Q.    Is it also fair to say that the perception of the FBI at

24   that time was that Mr. Danchenko may have been minimizing how

25   much contact he had with Mr. Millian in that time frame?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

—United States v. Danchenko—

833

1   A.   That would be the logical belief.

2   Q.   That he was concealing from the FBI that maybe he had

3   many more discussions with Mr. Millian?

4   A.   Yes.

5   Q.   Okay.  And you asked him about that conversation in

6   March 16th of 2017; you asked him about that conversation in

7   May 18th of 2017; do you recall that?

8   A.   Yes.

9   Q.   And then October 24th, 2017, you asked him again about

10  that interaction?

11  A.   Correct.

12  Q.   As Mr. Durham pointed out to you, Mr. Danchenko said

13  during that interview that he believed he had spoken to

14  Mr. Millian -- that he believed the person he believed to be

15  Mr. Millian a couple of times?

16  A.   Correct.

17  Q.   And that was all from what he had told you the previous

18  times?

19  A.   Yes.

20  Q.   But we don't have a transcript of that interview,

21  correct?

22  A.   No.

23  Q.   Okay.  That's just your recollection of what you put in

24  your notes from that interview?

25  A.   Yes.

─────Cross examination of ... Helson─ 10/13/22

────United States v. Danchenko─

834

1  Q.   And that interview was on October 24th, correct; do you

2  recall?

3  A.   Yes.

4  Q.   Okay.  And I'll tell you -- and if you want to see it,

5  I'll show you -- but you didn't write your report of that

6  interview until November 13th of 2017?

7  A.   Yeah, it's possible that it was that, or that was the one

8  where maybe the computer -- we were having issues with the

9  stuff uploading --

10 Q.   Okay?

11 A.   -- so I'd have to re-upload a couple of times, so it

12 throws the dates off.

13 Q.   Okay.  So you can't be sure --

14 A.   Yeah.

15 Q.   -- when it was exactly when you wrote that report?

16 A.   Yeah.

17 Q.   And you -- is it fair to say that you really kind of

18 confronted him during that interview?

19 A.   If there was any confrontation on that, it would have

20 been the Sergei Millian because of the request by Brian to

21 say, Hey, look this is -- this is what is contradictory.  Can

22 you push him on it just to see if there's anymore information.

23 Q.   Right.  And at least the way it read to me was that you

24 really came out -- all right.  How many times did you meet him

25 face-to-face?

──United States v. Danchenko──

835

```
 1  A.   Yes.

 2  Q.   Trying to see if he was going to, all of a sudden, you

 3  know, reveal something he hadn't revealed yet?

 4  A.   Right.

 5  Q.   And he persisted that he had never met that person?

 6  A.   His answers were the same.

 7  Q.   Okay.  He said he never met him in D.C., right?

 8  A.   Right.

 9  Q.   Never met him in Virginia?  Never met him in South

10  Carolina?

11  A.   (No response.)

12  Q.   And when you wrote the report, you included a note about

13  that exchange; do you remember that?

14  A.   I do remember the -- I don't remember exactly what the

15  note was, but I do remember that there was a note on the back.

16  Q.   Okay.  Can you --

17  A.   If you could refresh my memory.

18          MR. SEARS:  Can we pull up Government's Exhibit 102.

19  Government Exhibit 102.

20          THE WITNESS:  Okay.  Yeah, I see it here.

21  BY MR. SEARS:

22  Q.   So --

23  A.   I have it here.

24  Q.   So just use it to refresh your recollection.  Don't show

25  it to anyone.
```

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

836

1   A.   I've read it.

2   Q.   So does that refresh your recollection that you included

3   a note that said that Mr. Danchenko was perplexed at the

4   questioning as it appeared the handling agents, you and

5   Mr. Rhule, did not believe him?

6   A.   Correct.

7   Q.   And that he didn't inquire as to the nature of why you

8   were asking those questions?

9   A.   Correct.

10   Q.   Did you have any reason to believe at that time that

11   Mr. Danchenko had known what Mr. Steele had told the FBI about

12   his interactions with Mr. Millian?

13   A.   I don't recall that, no.

14   Q.   Do you recall that the FBI was intentionally not telling

15   Mr. Danchenko what Mr. Steele had said?

16   A.   I don't know -- I don't recall that, but that's

17   definitely possible.

18   Q.   Let me see if I can show you something that might refresh

19   your recollection.  I know it's been a while.

20        MR. SEARS:  Can we pull up Exhibit 150.  Can you

21   look at Defense Exhibit 150.

22        THE WITNESS:  150?

23   BY MR. SEARS:

24   Q.   150.  And is this -- before you start turning through the

25   pages, does this appear to be a transcript of your interview

─────United States v. Danchenko─────

837

1   with the OIG?

2   A.   It looks like it, yes.

3   Q.   And you testified before the OIG on October 31st, 2018?

4   A.   Yes.

5   Q.   And you were under oath during that testimony?

6   A.   I was.

7   Q.   If you turn to page 121 -- and I'm looking at the top

8   paragraph, but feel free to read back, you know, back a little

9   to get your orientation or a little ahead, but when you're --

10  A.   The top of 121?

11  Q.   121, where it begins with Mr. Helson.

12  A.   Okay.

13  Q.   And during your questioning with the OIG, you stated --

14  and this was in the same context of, "You know, you said this

15  and Chris is saying that."

16  A.   Correct.

17  Q.   (As read): "Well, we wouldn't let him know that Chris was

18  saying whatever, but he's like -- and he's like, no, this is

19  what -- what I said is how it happened.  Chris is wrong."

20        He actually basically said, "No, Chris is -- he's

21  completely wrong."

22  A.   Yes.

23  Q.   And so, this was a time period when you guys were trying

24  to keep what Mr. Steele was saying about what Mr. Danchenko

25  had told him away from Mr. Danchenko?

Cross Examination of J. Helson 10/13/22

─United States v. Danchenko─

838

1   A.   Yes.

2   Q.   Okay.  And you wrote -- and you can close that now.  And

3   you wrote -- going back to Government Exhibit 102, which was

4   your memorandum of the interview of Mr. Danchenko -- you wrote

5   in addition to that he didn't inquire about the nature of the

6   questions regarding Mr. Millian, quote, "Mr. Danchenko's

7   responses were consistent with what would be expected during

8   this type of questioning."

9   A.   Correct.

10  Q.   And that meant that his reaction to the line of

11  questioning did not lead you to believe he was lying to you,

12  correct?

13  A.   Correct.

14  Q.   Okay.  So I want to fast-forward to other issues with the

15  dossier and Mr. Danchenko.

16          So is it fair to say that Mr. Danchenko took issue

17  with a lot of how Mr. Steele had represented Mr. Danchenko's

18  conversations with him in the dossier?

19  A.   Yes.

20  Q.   And there were parts where Mr. Danchenko would tell you

21  that Mr. Steele had embellished or exaggerated what he had

22  actually told him?

23  A.   Yes.

24  Q.   Well, with regard to his interactions with Mr. Millian

25  and whether he had ever actually spoken to Mr. Millian

─────────United States v. Danchenko─────────

839

1  definitively, he was pretty upset about that?

2  A.   Yes.

3  Q.   Okay.  And he was kind of in disbelief you kept

4  questioning him about it?

5  A.   Yeah.  That was probably the few times I saw him

6  agitated.

7  Q.   Okay.  And he told you flat out, Why would I lie to you

8  about it?  Right?

9  A.   Right.

10  Q.   You -- at that time, as Mr. Durham pointed out, the FBI

11  was paying him money to be a source of information, right?

12  A.   Correct.

13  Q.   His life is also at risk based on what he's doing for the

14  FBI at that time?

15  A.   It is.

16  Q.   And he's relying on the FBI, to some extent, for safety

17  and security, correct?

18  A.   Yes.

19  Q.   He was also having immigration issues that he wanted the

20  FBI to help him get resolved so he could stay in this country,

21  right?

22  A.   Yes.

23  Q.   And lying to the FBI about something like this would

24  compromise his relationship with the FBI potentially?

25  A.   Yes.

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────
EASTERN DISTRICT OF VIRGINIA

──United States v. Danchenko──

840

1   Q.   And it would cut off the support he was getting from the

2   FBI and the money potentially he was getting from the FBI?

3   A.   Correct.

4   Q.   Is that fair?

5   A.   That is fair.

6   Q.   And he wasn't shy about giving you info on Mr. Millian,

7   right?

8   A.   Correct.

9   Q.   He gave you two email addresses for him; do you recall

10  that?

11  A.   I do.

12  Q.   Okay.  He gave you a mobile phone number that he believed

13  was his?

14  A.   Correct.

15  Q.   And despite all the times Mr. Danchenko was asked about

16  that random strange interaction with the anonymous caller that

17  he believed Mr. Millian, he never wavered in his position?

18  A.   No.

19  Q.   And you're aware that Mr. Durham and his team had been

20  investigating Mr. Danchenko's claims about what he believed

21  about that call, right?

22  A.   Correct.

23  Q.   And they've interviewed you on a couple of occasions as

24  part of that investigation?

25  A.   That is correct.

Cross-Examination of Igor Danchenko 10/13/22

────United States v. Danchenko────

841

1   Q.   And you hired an attorney to represent you during those

2   interviews; is that fair?

3   A.   I did.

4   Q.   And you represented [sic] a very prominent attorney, Mr.

5   Koski?

6   A.   Yes.

7   Q.   From a very prominent law firm, Covington?

8   A.   Yes.

9   Q.   And he's present in the courtroom today?

10  A.   He is.

11  Q.   Okay.  And he was present with you during all of those

12  interviews; is that fair?

13  A.   He was.

14  Q.   Now, during Mr. Durham's direct examination of you, he

15  showed you some evidence that they uncovered during your

16  investigation that you had never seen before.  Do you remember

17  that?

18  A.   That's -- yes.

19  Q.   There was some Facebook postings and some emails, right?

20  A.   Correct.

21  Q.   And they showed you an email, and we can pull it up if

22  you would like, between Mr. Danchenko -- that Mr. Danchenko

23  wrote to Mr. Millian after the alleged or supposed anonymous

24  phone call.  Do you remember that?

25  A.   Yes.

─────────────United States v. Danchenko─────────────

842

1   Q.   And Mr. Durham asked you questions about the fact that

2   the way the email read was if they had never had a phone call

3   ever?

4   A.   Correct.

5   Q.   And I think you confirmed that that was a fair reading of

6   that email?

7   A.   Yes.

8   Q.   And I think you already testified to this, but were you

9   aware that Mr. Danchenko had told Mr. Auten about that email

10  in January 2017?

11  A.   No.

12  Q.   Okay.  Were you also aware that he had provided them with

13  an email during the January interviews between him and

14  Mr. Zlodorev, which is the person he got Mr. Millian's contact

15  information from in August?

16  A.   No.

17  Q.   He actually gave him a screenshot of the email?

18  A.   No.

19  Q.   You were not aware of that?

20  A.   No.

21  Q.   Okay.  And so I want to just ask you some questions.  You

22  do counterintelligence work, right?

23  A.   I do.

24  Q.   So I want to give you a hypothetical situation, if you

25  don't mind?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Cross-Examination of ...  Filed 10/15/22

─────United States v. Danchenko─────

843

1   A.   Okay.

2   Q.   If you have any questions, let me know.

3        But let's say Mr. Danchenko receives an anonymous

4   call from an individual who we'll call Sergei Millian in this

5   example, okay?

6   A.   Okay.

7   Q.   Or he believes it's Mr. Millian, but he's not sure.  And

8   this person who calls him has information that's relevant to

9   the work that Mr. Danchenko is doing.  Are you with me?

10  A.   Uh-huh.

11  Q.   But the individual on the phone would not identify

12  himself?

13  A.   Correct.

14  Q.   And so Mr. Danchenko can't be sure who it was, right, in

15  that scenario?

16  A.   Yes.

17  Q.   And he sets up a meeting to meet with that individual and

18  that individual doesn't show up.  Are you with me?

19  A.   Yep.

20  Q.   If Mr. Danchenko was to reach out to him afterwards, an

21  individual who wanted to remain anonymous apparently, wouldn't

22  it make sense or isn't it reasonable for him to write an email

23  as though they've never spoken before?

24  A.   That's a possibility, yes.

25  Q.   I mean, if he emails the guy and says, hey, we talked on

Cross-Examination of ... House 10/13/22

──────United States v. Danchenko──────

844

1    the phone last week when he was trying to be anonymous, the

2    guy's probably never going to talk to him again, fair?

3    A.   Yes.

4    Q.   It's possible that that could be --

5    A.   It's possible.

6    Q.   So if you didn't want to acknowledge that you had a phone

7    call with someone who is trying to be anonymous, it's not

8    unreasonable to write the email the way he did?

9    A.   Correct.

10   Q.   Were you aware that Mr. Durham's team subpoenaed

11   Mr. Danchenko's Amtrak train travel records?

12   A.   No.

13   Q.   As part of their investigation?

14   A.   No.

15   Q.   And you were not a part of their investigation of

16   Mr. Danchenko?

17   A.   No.

18   Q.   You were only involved as far as being someone they

19   wanted to interview, correct?

20   A.   Correct.

21   Q.   Were you aware -- or did they show you when they were

22   showing you all this other evidence they uncovered that you

23   were not aware of, did they make you aware that the Amtrak

24   records prove that Mr. Danchenko was in New York from

25   July 26th to the 28th, that very week when he claims to have

─United States v. Danchenko─

845

1    seen --

2    A.    No.

3    Q.    -- to have a meeting with who he thought was Mr. Millian?

4    A.    No.

5    Q.    Were you aware that they pulled Mr. Millian's travel

6    records?

7    A.    They may have mentioned it at one point in the interview.

8    Q.    And when you say "in the interview," was this a recent

9    interview, getting ready for trial?

10   A.    Maybe.  I'm not for sure.  I can't recall if they --

11   exactly when it was, but it seems like they may have mentioned

12   it.

13   Q.    Okay.  And did they actually show you the records like

14   they showed you those other emails that they've uncovered?

15   A.    Not that I recall, no.

16   Q.    And were you aware that Mr. Durham's investigation has

17   revealed that Mr. Millian was on a flight, arriving in New

18   York on July 27th, that same week --

19   A.    No.

20   Q.    -- that Mr. Danchenko believed he was going to have a

21   meeting with the person he thought was Mr. Millian?

22   A.    No.

23   Q.    Did they share with you evidence they had uncovered that

24   Mr. Danchenko had sent a Facebook message to his wife from the

25   Bronx Zoo in New York where he wrote, among other things,

Cross-examination of Agent Helson 10/13/22

──United States v. Danchenko──

846

1   another meeting tonight on July 28th of 2016?

2   A.   No.

3   Q.   Did they share with you when they were sharing you the

4   evidence they had uncovered in their investigation, that

5   Mr. Millian had been reaching out to George Papadopoulos who

6   was a foreign policy advisor to President Trump at the time,

7   during the same time frame or very close to it, that

8   Mr. Danchenko believed he spoke to Mr. Millian?

9   A.   No.

10  Q.   Would you agree with me, Agent Helson, that those

11  additional facts that were uncovered by the Durham team tend

12  to offer some support for Mr. Danchenko's belief that the

13  caller may have been Sergei Millian?

14  A.   It could, yes.

15  Q.   Agent Helson, it was no -- it was no secret, during the

16  course of your relationship with Mr. Danchenko, that there was

17  a discrepancy between how Mr. Steele described how

18  Mr. Danchenko represented his interactions with Mr. Millian

19  and how Mr. Danchenko told you he actually explained his

20  interactions?

21  A.   Yes.

22  Q.   Okay.  It was no -- it was no secret.  Everyone knew all

23  along that there was a disconnect there?

24  A.   Correct.

25  Q.   And at no point during your entire time of meeting with

──────United States v. Danchenko──────

847

1   Mr. Danchenko over those three years, did you ever walk away

2   thinking that he was lying to you about anything; is that

3   fair?

4   A.   That's fair.

5   Q.   In fact, for years after your conversations with

6   Mr. Danchenko about his anonymous phone call with the person

7   he believed to be Mr. Millian, you would submit reports

8   indicating that he was a reliable source?

9   A.   Correct.

10  Q.   And some of those reports would even mention the Millian

11  discrepancy and you would write that you believed that

12  Mr. Danchenko had accurately reported the information as best

13  you could recall?

14  A.   Yes.

15  Q.   I want to show you what's been marked as Defendant's

16  Exhibit 107.

17         Have you had a chance to look at that document?

18  A.   Yes.

19  Q.   What is that document, Agent Helson?

20  A.   It is another one of my reports.

21  Q.   Okay.  And is this -- this is not kind of a routine

22  report of a contact with Mr. Danchenko, correct?

23  A.   It does -- no.

24  Q.   Are you looking at 107?

25  A.   I am looking at 107.  It's dated 4/2/2019.

Cross-Examination of ... Helson - 10/13/22

──────United States v. Danchenko──────

848

1   Q.   This is what's called a Field Office Annual Source

2   Report?

3   A.   Yes.

4   Q.   And is this something that needs to be filed every year

5   regarding all --

6   A.   Yes.

7   Q.   -- the sources you're handling?

8   A.   Yes.

9   Q.   Okay.  And is it required?

10  A.   It is required.

11  Q.   Okay.  And are you the individual who generated the

12  information in this report?

13  A.   It is -- I am.

14  Q.   Okay.  And I take it it's important to be truthful in

15  these reports?

16  A.   Yes.

17  Q.   Running sources can be dangerous work, and you want to

18  put in the good, the bad, and the ugly in these reports?

19  A.   Correct.

20  Q.   And you believed everything you wrote in that report when

21  you wrote it, right?

22  A.   Yes.

23  Q.   And you indicated in that report that as of April 19th,

24  any inconsistencies in Mr. Danchenko's reporting to you was

25  minor?

—————United States v. Danchenko—————

849

1   A.   Correct.

2   Q.   And that the information he had been providing you,

3   during the course of his relationship as a source, had been

4   corroborated?

5   A.   Yes.

6   Q.   And this report even addresses the inconsistency

7   regarding the Millian issue?

8   A.   Correct.

9   Q.   Correct?

10           And this report that you generated says that

11  Mr. Danchenko's position or story on the Millian situation

12  never changed while the motivation of others came into

13  question, right?

14  A.   Correct.

15  Q.   And that's Chris Steele?

16  A.   That is true.

17  Q.   Okay.  And you indicated in this report that

18  Mr. Danchenko, in your opinion, had been as accurate as he can

19  be and, quote, there is no impact on his overall reporting?

20  A.   Correct.

21           MR. SEARS:  Your Honor, I would ask to admit this as

22  Defense Exhibit 107.

23           THE COURT:  Any objection?

24           MR. DURHAM:  No objection, Your Honor.

25           THE COURT:  Without objection, Exhibit -- Defense

─────United States v. Danchenko─────

850

1   Exhibit 107 is admitted.

2   (Defendant's Exhibit No. 107 was admitted into evidence.)

3   BY MR. SEARS:

4   Q.   And, Agent Helson, if you could turn to the next tab,

5   which is Defense Exhibit 108?

6   A.   Okay.

7   Q.   Is this basically the same type of report, but that was

8   filed in March of 2020?

9   A.   Yes.

10  Q.   Okay.  And I'm not going to make you go through

11  everything we just went through, but take your time to read

12  it.  But is it fair to say that it basically says the same

13  thing as --

14  A.   The same thing.

15  Q.   -- the previous year?

16  A.   Yes.

17  Q.   Okay.

18         MR. SEARS:  Your Honor, for the same reason, I would

19  move to admit Defense Exhibit 108.

20         THE COURT:  Any objection?

21         MR. DURHAM:  No objection.

22         THE COURT:  Without objection, 108 is admitted.

23  (Defendant's Exhibit No. 108 was admitted into evidence.)

24  BY MR. SEARS:

25  Q.   Okay.  You can close that book now, Agent Helson.  Thank

─────United States v. Danchenko─────

851

1    you.  We're almost done.  I promise.

2             You learned, through your meetings with

3    Mr. Danchenko, that he had an impressive source of contacts?

4    A.   Yes.

5    Q.   In Russia and the U.S.?

6    A.   Yes.

7    Q.   And he was always collecting cards and making new

8    contacts?

9    A.   Yes.

10   Q.   And the info -- information that he was providing you

11   while he was a source for you was actually being corroborated,

12   correct?

13   A.   Yes.

14   Q.   In fact, you even testified in the OIG testimony -- and

15   this phrase has been said before -- but you said, "Holy shit,

16   this is real" --

17   A.   Right.

18   Q.   -- "This guy really has helpful information"?

19   A.   Yes.

20   Q.   And it was a big deal for the FBI to have access to

21   someone like Mr. Danchenko, wasn't it?

22   A.   Yes, it was.

23   Q.   During the course of his cooperation with you, he

24   continued to provide information -- or more current

25   information on people who had been referenced in the dossier

─United States v. Danchenko─

852

1   at times, correct?

2   A.   Correct.

3   Q.   And one of them in particular was Mr. Abyshev --

4   A.   Yes.

5   Q.   -- do you remember that?  A-B-Y-S-H-E-V.

6            In fact, during your meetings with him as a

7   confidential human source, he would actually let you listen

8   in --

9   A.   Yes.

10  Q.   -- on conversations he was having, correct?

11  A.   Correct.

12  Q.   And during the time that Mr. Danchenko was cooperating

13  with you as a human source, he would give you the same caveats

14  that he told you he had given Mr. Steele about the sources of

15  his information, correct?

16  A.   Yes.

17  Q.   He would tell you what was rumor and what was fact?

18  A.   Correct.

19  Q.   When he was personally making analytical judgments?

20  A.   Yes.

21  Q.   Or guesses?

22  A.   Yes.

23  Q.   And when he was making conclusions based on open source

24  communications?

25  A.   Yes.

─────United States v. Danchenko─────

853

1   Q.   Consistent with what he told you he told Mr. Steele?

2   A.   Yes.

3   Q.   And as Mr. Durham mentioned, the FBI was paying

4   Mr. Danchenko for his information?

5   A.   Correct.

6   Q.   And his cooperation?

7   A.   Yes.

8   Q.   And you, you personally as the handling agent -- more

9   paperwork -- would have to submit approvals to get -- to get

10   him paid?

11   A.   Yes.

12   Q.   And those -- those payments had to be justified by the

13   information he was providing you --

14   A.   Correct.

15   Q.   -- right?

16           If he wasn't providing you good, useful, truthful

17   information, he wouldn't get paid, right?

18   A.   Right.  It wouldn't get approved.

19   Q.   And the reports that you had to file in order to get

20   approval for the payments had to include information about why

21   you believed the payment was justified, correct?

22   A.   Correct.

23   Q.   Okay.  So I want to go through a couple of these, not all

24   of them, but if you could turn to Defense Exhibit 109.

25           Is this one of those payment requests?

Cross-examination of Helson - 10/13/22

─United States v. Danchenko─

854

1   A.   Yes.

2   Q.   And this is in December of 2017?

3   A.   Correct.

4   Q.   And did you generate this form?

5   A.   Yes.

6   Q.   Is this a form that you were required to generate as part

7   of your duties?

8   A.   Yes.

9           MR. SEARS:  Your Honor, I would move to admit

10  Defense Exhibit 109.

11          THE COURT:  Any objection?

12          MR. DURHAM:  No objection, Your Honor.

13          THE COURT:  Without objection, Exhibit 109 is

14  admitted.

15  (Defendant's Exhibit No. 109 was admitted into evidence.)

16          MR. SEARS:  If we could publish that, Mr. Tent,

17  please, and blow up from "payment amount" down.

18  BY MR. SEARS:

19  Q.   Agent Helson, the words on this document are your words;

20  is that correct?

21  A.   Correct.

22  Q.   And beginning in the second sentence, what looks like the

23  payment amount you're seeking approval for is $10,900,

24  correct?

25  A.   Correct.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

———United States v. Danchenko———

855

1   Q.   And you write in the second sentence that CHS -- which is

2   Mr. Danchenko, correct?

3   A.   Correct.

4   Q.   -- provided critical reporting that aided in a top FBI

5   investigation during this time period?

6   A.   Correct.

7   Q.   In addition, he reported on four additional Washington

8   Field Office priority investigations, correct?

9   A.   Correct.

10  Q.   And some of his reporting has been tagged by somebody as

11  high value product, and that 25-plus potential IIR's for

12  dissemination once operational risk is diminished?

13  A.   Correct.

14  Q.   And the operational risk was that you were worried about

15  him being revealed as a source?

16  A.   Correct.

17  Q.   And you were worried what could happen to him if you did

18  that?

19  A.   Yes.

20  Q.   And you were also worried that he wouldn't be able to get

21  you the information that you wanted?

22  A.   Correct.

23  Q.   And could you explain what an IIR is, please?

24  A.   It's an intelligence report that essentially goes out to

25  the U.S. intelligence community, to pretty much all of our

Cross-Examination of    Helson    10/13/22

─────United States v. Danchenko─────

856

1    agencies.  It provides them the information and then requests

2    feedback on whether or not that information is good.

3    Q.   And is it fair to say that it's raw intelligence?

4    A.   What goes in an IIR is not necessarily raw.  It's already

5    been somewhat vetted and has been approved, but it is -- it's

6    like raw-like.

7    Q.   Does it have to meet some threshold --

8    A.   Yes.

9    Q.   -- of corroboration or vetting before it will go out?

10   A.   Yes.

11   Q.   As of November or December of 2017, you had an

12   understanding that at least 25 reports, based on his

13   reporting, had crossed that threshold?

14   A.   Yes.  I had checked with the intelligence division, and

15   that's what they had kind of reported back to me.

16   Q.   Okay.

17           MR. SEARS:  If we can move to Defendant's

18   Exhibit 110, please.

19   BY MR. SEARS:

20   Q.   Is this another payment request?

21   A.   It is.

22   Q.   Did you generate this document?

23   A.   I did.

24   Q.   And this is April 11, 2018?

25   A.   Correct.

United States v. Danchenko

857

1        MR. SEARS:  Your Honor, we would move to admit this

2   exhibit.

3        THE COURT:  Any objection?

4        MR. DURHAM:  No objection.

5        THE COURT:  Without objection, 110 is admitted.

6   (Defendant's Exhibit No. 110 was admitted into evidence.)

7        MR. SEARS:  And if we could publish, please,

8   Mr. Tent?

9        THE COURT:  Yes.

10        (Exhibit published.)

11  BY MR. SEARS:

12  Q.   And this payment amount request is for $10,000?

13  A.   It is.

14  Q.   And you write in the second sentence that Mr. Danchenko

15  reported on five separate investigations currently opened by

16  the government somewhere?

17  A.   Mm-hmm.

18  Q.   And in addition to the above, he had provided the first

19  download of information that highlighted addition --

20  additional, I'm assuming you meant -- cyber actors targeting

21  the 2016 elections?

22  A.   Yes.

23  Q.   And it's -- you wrote that it's expected that additional

24  reporting by Mr. Danchenko will continue to provide critical

25  intelligence that will drive the above investigations,

────────────────── United States v. Danchenko ──────────────────
858

1   correct?

2   A.   Correct.

3   Q.   Okay.  I'm only going to make you look at one more here.

4        If you could turn to Exhibit -- Defense Exhibit 112,

5   please.

6   A.   Okay.

7   Q.   Are you familiar with this document?

8   A.   I am.

9   Q.   And this is an electronic communication that was sent, it

10  looks like, on December 9th, 2019?

11  A.   Yes.

12  Q.   And did you generate this --

13  A.   I did.

14  Q.   -- communication.

15       MR. SEARS:  Your Honor, I would seek to admit this

16  as Defense Exhibit 112.

17       THE COURT:  Any objection?

18       MR. DURHAM:  No, Your Honor.

19       THE COURT:  112 is admitted.

20  (Defendant's Exhibit No. 112 was admitted into evidence.)

21       MR. SEARS:  And if we could publish it, please.  So

22  if you could do the top half of the page or quarter, Mr. Tent.

23       (Exhibit published.)

24  BY MR. SEARS:

25  Q.   Okay.  So under "synopsis," it appears that this document

─── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───
EASTERN DISTRICT OF VIRGINIA

Cross-Examination of ... House ... 10/13/22

United States v. Danchenko

859

1   is being submitted to increase the amount of money the FBI can

2   pay Mr. Danchenko, correct?

3   A.   Correct.

4   Q.   And it's my understanding, correct me if I'm wrong, that

5   every $100,000 is different threshold that you can't exceed

6   without getting approval?

7   A.   Correct.

8   Q.   And prior to this -- I didn't show it to you, to move

9   things along -- you had submitted a request to get an increase

10  from 100,000 to 200,000?

11  A.   Yes.

12  Q.   In this document, is you seeking to increase it to

13  300,000, correct?

14  A.   Correct.

15  Q.   And you need to explain the justification for why?

16  A.   Yes.

17  Q.   Okay.

18        MR. SEARS:  If we can do the next half, please.

19  BY MR. SEARS:

20  Q.   And this page, in the middle of the page, you wrote that

21  from 2017 until present, Mr. Danchenko provided information on

22  at least 13 investigations and at least two other FBI Field

23  Office investigations, correct?

24  A.   Correct.

25  Q.   In the bottom part of that screen that's been blown up

Cross Examination of Helson - 11/9/22

┌─────────────────────────────────────────────────┐
United States v. Danchenko

860

1   says that since his reporting began, he's contributed to at

2   least 19 reports with additional reports expected in the

3   coming months, correct?

4   A.   Correct.

5            MR. SEARS:  And if you do the bottom paragraph,

6   Mr. Tent, please.

7   BY MR. SEARS:

8   Q.   You also indicated in this report (As read): "In addition

9   to becoming a confidential human source for the United States,

10  Mr. Danchenko also agreed to answer questions from the Senate

11  select committee on intelligence."  Correct?

12  A.   Correct.

13  Q.   And he did do that, to your knowledge, right?

14  A.   Yes.

15  Q.   And in addition to all of that, he's now providing

16  information of possible or ongoing maligned influence efforts?

17  A.   Correct.

18  Q.   Ongoing Russian maligned influence efforts.  Sorry.

19           MR. SEARS:  We can take that down.

20  BY MR. SEARS:

21  Q.   Mr. Helson, I gather from your reporting that you valued

22  Mr. Danchenko's information?

23  A.   Yes.

24  Q.   And you relied on it to send out intelligence information

25  to other agents in the field, right?

Cross-Examination of — House — 10/13/22

─────United States v. Danchenko─────

861

1   A.   Correct.

2   Q.   And to build cases?

3   A.   Yes.

4   Q.   To build cases?  And it's true that prior to

5   Mr. Danchenko, you had almost no Russian influence cases?

6   A.   Correct.

7   Q.   And after him, you had several?

8   A.   Over two dozen.

9   Q.   Or 24?

10  A.   Yes.

11  Q.   In fact, you testified before the OIG that, in your

12  opinion, it would have been a huge win for the FBI if you were

13  able to open up Mr. Danchenko earlier than you did?

14  A.   Yes.

15  Q.   Now, sometime in late 2017 or 2018, you're almost not

16  asking any questions about Crossfire Hurricane anymore, right?

17  A.   Correct.

18  Q.   And Mr. Danchenko, as you just said, has turned into a

19  valuable source?

20  A.   Correct.

21  Q.   He is providing regular reporting?

22  A.   Correct.

23  Q.   You're asking him to do things and he's doing them?

24  A.   Yes.

25  Q.   And as we all know, President Trump ended up winning the

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Cross-examination of   Hines   10/13/2022

┌─────────────────────────────────────────────────────────────────┐
United States v. Danchenko

862

1    2016 presidential election, correct?

2    A.   Correct.

3    Q.   And he ends up putting in place a new attorney general,

4    Mr. Barr, correct?

5    A.   Yes.

6    Q.   And you become aware that Attorney General Barr is now

7    saying that he's going to order an investigation into how the

8    FBI had handled the Carter Page FISA applications, correct?

9    A.   Correct.

10   Q.   And you were aware that, ultimately, Mr. Durham and his

11   team were selected to carry out that investigation?

12   A.   Correct.

13   Q.   And just prior to Mr. Trump leaving office after he lost

14   the 2020 election, Mr. Barr appointed Mr. Durham as special

15   counsel to carry --

16   A.   Correct.

17   Q.   -- to carry out the investigation, correct?

18   A.   Yes.

19   Q.   And you were aware that Mr. Danchenko was becoming a

20   target of exposure due to kind of the political divide in the

21   U.S.?

22   A.   Correct.

23   Q.   The dossier and Mr. Danchenko were like lightening rods

24   at the time?

25   A.   Correct.

EASTERN DISTRICT OF VIRGINIA

┌─ United States v. Danchenko ─
863

1   Q.   Is that fair?

2   A.   Yes.

3   Q.   And you don't care about politics personally, right?

4   A.   No.

5   Q.   You care about national security?

6   A.   Correct.

7   Q.   And you were concerned, in July of 2020, when you became

8   aware that Attorney General Barr was going to release a

9   redacted version of Mr. Danchenko's interview in January of

10  2017?

11  A.   Yes.

12  Q.   You were upset about that?

13  A.   I was.

14  Q.   You found out about that during a telephone conference,

15  right?

16  A.   I did.

17  Q.   And you disagreed with that decision?

18  A.   I did.

19  Q.   The OIG had already completed a report on that

20  investigation, correct?

21  A.   Yes.

22  Q.   And you thought that the release of that document was

23  dangerous?

24  A.   Yes.

25  Q.   You even wrote up a memo of that phone call you were on

────────United States v. Danchenko────────

864

1    in July of 2020 where you learned that they were going to

2    publish a redacted version of his interview, correct?

3    A.    I did.

4    Q.    You had another agent sign it?

5    A.    I did.

6    Q.    And within an hour of Mr. Danchenko's January interview

7    being released to the senate judiciary committee, the senate

8    judiciary committee, I won't say who, released it to the

9    public?

10   A.    They did.

11   Q.    And that concerned you, right?

12   A.    Yes.

13   Q.    And it really concerned Mr. Danchenko, didn't it?

14   A.    Yes.

15   Q.    Because it didn't take long for the internet detectives

16   to figure out who was being interviewed in January 2017?

17   A.    Correct.

18   Q.    And you had discussions with other agents about how the

19   FBI could not protect Mr. Danchenko?

20   A.    Correct.

21   Q.    And ultimately a decision was made to close Mr. Danchenko

22   as a confidential human source, correct?

23   A.    Yes.

24   Q.    And the reason given was that Mr. Danchenko had confirmed

25   to a newspaper that he actually was the person who was the

────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────────

─────────United States v. Danchenko─────────

865

1  primary sub-source?

2  A.   Correct.

3  Q.   And you understood, at that time frame, that

4  Mr. Danchenko had already kind of been outed as the primary

5  sub-source, correct?

6  A.   Correct.

7  Q.   And he needed to defend himself, to some extent, in the

8  press, correct?

9  A.   Yes.

10  Q.   On October 21st of 2020, you drafted an electronic

11  communication requesting a required expense and lump sum

12  payment for Mr. Danchenko, correct?

13  A.   Correct.

14  Q.   And I'm going to ask you to turn to Defense Exhibit 117.

15       (A pause in the proceedings.)

16       THE WITNESS:  Yes, that's. . .

17  BY MR. SEARS:

18  Q.   Is that the electronic communication you requested?

19  A.   Yes.

20  Q.   Did you personally complete this document?

21  A.   I did.

22  Q.   And is this the type of document that you regularly have

23  to complete when you request this type of payment?

24  A.   Yeah, for something like this, you have to go to

25  headquarters for that, and this is part of that communication.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

866

1              MR. SEARS:  Your Honor, I move to admit Defense

2     Exhibit 117.

3              THE COURT:  Any objection?

4              MR. DURHAM:  No, Your Honor.

5              THE COURT:  117 is admitted.

6     (Defendant's Exhibit No. 117 was admitted into evidence.)

7              MR. SEARS:  Can you publish it, please?  Sorry.

8              (Exhibit published.)

9              MR. SEARS:  And if you can go to the first page,

10    please, Mr. Tent, and let's just blow up the first paragraph

11    and heading.

12    BY MR. SEARS:

13    Q.   So, Agent Helson, you wrote in October of 2020 that from

14    2017 until present day, Mr. Danchenko had provided information

15    on at least 25 FBI investigations assigned to at least six

16    field offices?

17    A.   Correct.

18    Q.   In addition, he aided the United States Government by

19    introducing the United States Government to a sub-source who

20    had provided additional information separate to his report,

21    correct?

22    A.   Correct.

23    Q.   You then wrote that due to sensitivities surrounding him

24    and the potential threat to the personal safety of him and his

25    family, the Washington Field Office was strategic in how to

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Cross-Examination of ... House ... 10/13/22

──────United States v. Danchenko──────

867

1   send in information that came from him, correct?

2   A.   Correct.

3   Q.   And his information now, in October of 2020, has

4   contributed to at least 40 of those IIR's, correct?

5   A.   Correct.

6   Q.   And it's noted that he -- his reporting contributed to at

7   least 25 active FBI investigations.

8           MR. SEARS:  Can we do the last paragraph, first

9   page?  Actually, if we can skip to the second page.  Sorry.

10  BY MR. SEARS:

11  Q.   In July of 2020 his identity became public after the

12  release of the redacted version of his interview in January of

13  2017.  Since that public disclosure, he has received

14  threatening messages via social media and email.  It's

15  resulted in significant damage to his reputation from false

16  and baseless claims aimed to undermine his credibility.

17          Those are your words, correct?

18  A.   Correct.

19  Q.   The Washington Field Office had assessed that this will

20  have negative ramifications with respect to his ability to

21  provide for his family via personal income for the foreseeable

22  future, correct?

23  A.   Correct.

24  Q.   And while the FBI cannot promise complete anonymity to

25  anyone who provides information, his identity became public

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────

EASTERN DISTRICT OF VIRGINIA

United States v. Danchenko

868

 1   only after the decision was made to release the redacted

 2   version of his interview, correct?

 3   A.   Correct.

 4   Q.   As a result of that act, his ability to continue to

 5   provide information viable to the FBI is diminished as is his

 6   ability to provide financial support to his family.

 7        For those reasons and for the amount of money that

 8   was assessed that Mr. Danchenko was owed or would need to

 9   recover from what had happened, you put in a request for a

10   total compensation package that included a lump sum payment of

11   $346,000, correct?

12   A.   Correct.

13   Q.   Which would have brought his total payments, had it been

14   approved, to $565,000 for the information he was providing our

15   government?

16   A.   Yes.

17   Q.   And then you wrote (As read): "This payment is part of

18   the FBI's commitment for ensuring the safety and security of

19   this highly valued individual and his family, and will fulfill

20   the FBI's commitment to properly taking care of those

21   individuals who come forward to help our mission, at grave

22   risk to themselves and their loved ones."  Correct?

23   A.   Correct.

24   Q.   Was that payment approved?

25   A.   No.

Cross-Examination of ... House - 10/13/22

─────United States v. Danchenko─────

869

1           MR. SEARS:  You can take it down.

2   BY MR. SEARS:

3   Q.   Mr. Danchenko was a trusted source of the FBI, correct?

4   A.   Yes.

5   Q.   He not only did what was asked of him, but he would even

6   provide information he came across on his own that he thought

7   would be of interest to the FBI, correct?

8   A.   Correct.

9   Q.   Do you remember a situation where Mr. Danchenko was

10  overseas for business purposes and he was left alone in a

11  conference room where there was some information or a chart --

12  A.   Yes.

13  Q.   -- on a table or on the wall?

14  A.   Yes.

15  Q.   Tell the jury what he did when he was in that situation

16  as you recall.

17  A.   He took images of that fairly extensive chart, which was

18  a pretty comprehensive review of professional influential

19  links emanating out of Russia that crossed all of Europe and

20  into the United States.

21  Q.   Did anyone ask him to do that?

22  A.   No.

23  Q.   He took over 20 screenshots of that chart, correct?

24  A.   Correct.

25  Q.   And the FBI was able to piece it back together based on

┌─ United States v. Danchenko ─
870

1  his images?

2  A.   Yes.

3  Q.   Mr. Danchenko told you about people you had never even

4  heard of who ended up being very important to the FBI's

5  counterintelligence activity, correct?

6  A.   Correct.

7  Q.   You wouldn't have known to watch those people if it

8  wasn't for him?

9  A.   That's true.

10 Q.   You never had -- tell me if it's still true today -- an

11 informant with a comparable sub-source network as

12 Mr. Danchenko?

13 A.   Not since I've been at WFO.

14 Q.   Is it fair to conclude that Mr. Danchenko had a high

15 value for identifying potential intelligence officers or

16 influencers?

17 A.   Yes.

18 Q.   He had a high potential for identifying criminal targets?

19 A.   Yes.

20 Q.   Is it true what you said in your OIG testimony, that

21 Mr. Danchenko reshaped the way the U.S. even perceives

22 threats?

23 A.   Yes, when he stood up a squad as a result of some of the

24 reporting.

25 Q.   The development of Mr. Danchenko, correct me if I'm

─────United States v. Danchenko─────

871

 1   wrong, was considered a model for developing sources going

 2   forward with the FBI?

 3   A.   Yes.

 4   Q.   And you never had the impression during your meetings

 5   with him that he was anti-Trump, did you?

 6   A.   No.

 7   Q.   He didn't seem to have any sort of political leaning as

 8   far as you could tell, correct?

 9   A.   No.  In fact, he was reporting on some things that were

10   against Trump.

11   Q.   Would you agree with me that losing Mr. Danchenko as a

12   confidential human source harmed national security?

13   A.   Yes.

14   Q.   There's a lot going on in Russia and Ukraine these days,

15   correct?

16   A.   Yes.

17   Q.   Do you still get requests from agents in the field,

18   asking you to ask Mr. Danchenko questions as related to what

19   is currently going on in the world?

20   A.   The last one was last month.

21   Q.   And you can't go back to him, right?

22   A.   No.

23   Q.   Because the special counsel indicted him?

24   A.   Yes.

25           MR. SEARS:  No further questions, Your Honor.

─────────United States v. Danchenko─────────

872

1          THE COURT:  Okay.  Any redirect?

2          MR. DURHAM:  Thank you, Your Honor.

3          THE COURT:  Yes.

4                    REDIRECT EXAMINATION

5    BY MR. DURHAM:

6    Q.   Sir, let me start here.

7          MR. DURHAM:  I know it's running late and I'm not

8    sure what time the Court wants to break.

9          THE COURT:  We'll go until 6:00.

10         MR. DURHAM:  Thank you, Your Honor.

11   BY MR. DURHAM:

12   Q.   So counsel just asked you a long series of questions, a

13   long series of matters, correct?

14   A.   Correct.

15   Q.   Now, when Mr. Danchenko was being opened as a

16   confidential human source, you had to fill out certain

17   paperwork, didn't you?

18   A.   Yes.

19   Q.   And there's a whole form that needs to be completed,

20   correct?

21   A.   Correct.

22   Q.   And one of the questions that's asked on that form is:

23   Is there any derogatory information about the person that the

24   Bureau is proposing to open as a confidential human source?

25   A.   Correct.

─────United States v. Danchenko─────

873

1    Q.   Correct?

2              And you wrote on that form, with respect to

3    Mr. Danchenko, that there was no derogatory information; isn't

4    that correct?

5    A.   Correct.

6    Q.   And that's untrue?

7    A.   Correct.

8    Q.   That was untrue when you wrote that on that document when

9    Mr. Danchenko was first opened as a confidential human source,

10   correct?

11   A.   It was untrue, the fact that the case that was opened up.

12   Q.   I'm sorry?

13   A.   Previously like ten years ago.

14             MR. SEARS:  Your Honor, could we approach on this,

15   please?

16             THE COURT:  Yes.

17             (Side bar.)

18             MR. SEARS:  I don't know whether it was the intent

19   for Mr. Durham to go into the counterintelligence

20   investigation of 2009, but it sounds like this is where he is

21   going.

22             MR. DURHAM:  We didn't have a conversation since we

23   last talked --

24             THE COURT:  I'm going to let him bring out that

25   there was a -- the fact of the counterintelligence

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

 1    investigation was opened up.

 2         MR. DURHAM:  But I'm not going to get into the

 3    specific allegations against him.

 4         THE COURT:  You can -- you can bring out that it was

 5    closed for whatever reason it was closed.  All right.

 6         MR. DURHAM:  Respectfully, Your Honor.

 7         THE COURT:  Because there was -- there were no

 8    determinations.  They were allegations, correct?  There was

 9    some information that was received that there was never --

10    there were no findings, there were no prosecutions.

11         MR. DURHAM:  With respect to this witness and his

12    testimony, he wrote that there was no derogatory information,

13    which is untrue.

14         THE COURT:  All right.  I think he -- you can bring

15    that out that there was information -- there was derogatory

16    information that had been received.  All right.

17         MR. DURHAM:  I don't want to go beyond what the

18    Court will permit.  The details -- I know you don't want the

19    details of why they opened up the case, but where it was

20    opened and --

21         THE COURT:  What do you want to bring out

22    specifically?

23         MR. DURHAM:  That an espionage case was opened.  It

24    was opened by the Baltimore office.  That they were looking at

25    Mr. Danchenko's conduct for a period of a year-and-a-half, two

──────United States v. Danchenko──────

875

1    years.  They closed it because they (indiscernible).

2              THE COURT:  I'm going to let you bring all of that

3    out.  All right.

4              MR. SEARS:  There was already additional

5    information.  I think the jurors know about, maybe, it came

6    from Mr. Helson.  He was aware of that.

7              THE COURT:  That what?

8              MR. SEARS:  Aware of that information that they

9    continued to use him.

10             MR. DURHAM:  He's fully aware of --

11             MR. SEARS:  I just want to make sure that the jurors

12   are aware that they were aware.

13             MR. DURHAM:  I should -- I don't want to go beyond

14   what the Court intends here, but Mr. Helson was fully aware of

15   this because Mr. Auten was the intelligence analyst who was

16   working on that case.

17             THE COURT:  Okay.  All right.  I mean, it is a new

18   subject area.  I may let you have --

19             MR. SEARS:  Thank you, Your Honor.

20             THE COURT:  -- some follow-up questions and you can

21   follow up on Mr. Sears' questions, all right?

22             MR. DURHAM:  Yes, Your Honor.

23             THE COURT:  All right.

24             (Open court.)

25             MR. DURHAM:  May I proceed, Your Honor?

Recross-Examination of                    Helson                     10/15/2022

┌─────────────────────────────────────────────────────────────┐
                 United States v. Danchenko

                                                          876

1              THE COURT:  Yes, please.

2      BY MR. DURHAM:

3      Q.   Let me ask you again, with respect to the opening of

4      Mr. Danchenko as a confidential human source, you filled out

5      paperwork, correct?

6      A.   Correct.

7      Q.   And in that paperwork, one of the important questions is:

8      Is there any derogatory information about this person,

9      correct?

10     A.   Correct.

11     Q.   And you wrote, there is no derogatory information?

12     A.   Yeah, based on my search.

13     Q.   And that is untrue?

14     A.   It was there was a case on him.

15     Q.   And what was the -- what was the nature of the case?

16     A.   It was a counterintelligence investigation out of a

17     different field office.

18     Q.   It's a 65-day file, correct?

19     A.   Correct.

20     Q.   Is that counterintelligence?

21     A.   Yes.

22     Q.   Of a particular type?

23     A.   Yes, an espionage case.  An espionage case.

24     Q.   And with -- when you wrote there was no derogatory

25     information, were you aware -- had you even looked to see if

                                    Tonia M. Harris OCR-USDC/EDVA 703-646-1438
                        EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

877

```
 1   there was any derogatory?
 2   A.   I had.
 3   Q.   And so you knew that there was that case?
 4   A.   I couldn't see it in the search.
 5   Q.   You knew that there had been an open FBI espionage case
 6   on Mr. Danchenko, correct?
 7   A.   Not at the time.
 8   Q.   Not at -- when --
 9   A.   Not at the time that I did the search.  I learned about
10   it after Brian Auten told me.
11   Q.   Okay.  Brian Auten who testified here -- to your
12   knowledge, do you know Mr. Auten testified?
13   A.   Yes.
14   Q.   And Brian Auten was the person who was involved as an
15   intelligence analyst in that prior matter, correct?
16   A.   I believe so.
17   Q.   And so you knew that there was a case, correct?
18   A.   I knew after he told me, yes.
19   Q.   Did you bother to go and seek access to that case so you
20   would know what it was that the case was about?
21   A.   I spoke to the case agent on that case.
22   Q.   And with respect to the case agent, that was Special
23   Agent Laura Peno, correct?
24   A.   Correct.
25   Q.   And with respect to Ms. Peno, she had been in the
```

Recross-Examination of Helson - 10/13/22

─────────United States v. Danchenko─────────

878

1   Baltimore office when this was opened?

2   A.   That is correct.

3   Q.   And you wrote, did you not, that she said that it was

4   hearsay at best?

5   A.   Yes.

6   Q.   And that was untrue, wasn't it?

7   A.   No.

8   Q.   Do you recall, sir, whether or not you became aware of

9   the actual basis for that case to have been opened?

10  A.   It was that --

11           MR. DURHAM:   I want to just be careful, Your Honor,

12  that I don't go beyond instruction.

13  BY MR. DURHAM:

14  Q.   You can't tell us what somebody said.

15  A.   Okay.

16  Q.   But did you read any of the underlying documents?

17  A.   No.

18  Q.   At some particular point in time, is it not true, Special

19  Agent Helson, that the human validation unit at the FBI

20  headquarters, people in that section of the department, had

21  recommended to you actually read the file?

22  A.   They actually said you should read the file, but it was a

23  65-case and we don't get access to that.

24  Q.   Yeah.  You can get access through an investigative aids

25  kit -- intelligence analysts get access to it, right?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Recross Examination of A. Helson 10/13/22

United States v. Danchenko

879

1   A.   I have not been given access to a 65-case.

2   Q.   You could have asked for access to that file so you knew

3   before you wrote "no derog," what it was about?

4   A.   I could have asked if I knew the case had existed.

5   Q.   But you didn't do that?

6   A.   Because I didn't know the case existed.

7   Q.   Did you subsequently learn what it's about?

8   A.   Yes, and then I called the case agent.

9   Q.   And with respect to what that matter was about, again,

10  without getting into the specifics of that, didn't you, in

11  fact, learn that the FBI had a witness, a firsthand witness

12  that they were relying on?

13  A.   It was my understanding that they also had another person

14  that contradicted that witness.

15  Q.   The answer to my question is to whether or not the FBI

16  had a person --

17  A.   Yes.

18  Q.   -- firsthand information, correct?

19  A.   Yes.

20  Q.   And you still wrote that there's no derog?

21  A.   Because at the time I wrote that, I did not know that.

22  Q.   Okay.  Then did you go back, when you found out that

23  there had been a open espionage case on Mr. Danchenko, to

24  correct that?

25  A.   We actually, at that point, requested the asset

880

1   validation unit to do the review that you spoke of.

2   Q.   My question to you, sir, was whether or not you ever went

3   back in the paperwork for opening Mr. Danchenko as a

4   confidential human source to correct the fact that you had

5   written that there was no derogatory information?

6   A.   No, no.

7   Q.   Did you ever determine what happened to that case that

8   was being run by Special Agent Peno?

9   A.   It was closed.

10  Q.   And did you determine why it was closed?

11  A.   They believed he permanently departed the United States.

12  Q.   And in point of fact, do you know whether or not, at that

13  time, as the time they were getting ready to and then

14  eventually did close the case, whether or not Mr. Danchenko's

15  visa had expired?

16  A.   I believe it had.

17  Q.   And do you know whether he remained in the country

18  despite that fact?

19  A.   No, I don't know.

20  Q.   Well, in all the investigation and background that you

21  did, I guess you didn't learn whether he stayed in the

22  country?

23  A.   Well, I knew he had departed for a period of time, but

24  then he came back like less than a year later.

25  Q.   Do you -- you're not -- are you aware of the fact that he

─────United States v. Danchenko─────

881

1   was supposed to depart the country and didn't?

2   A.   No.

3   Q.   You made reference to the human validation unit.

4          Do you recall, sir, whether or not when the human

5   validation unit of the Federal Bureau of Investigation did an

6   evaluation regarding Mr. Danchenko, that one of the specific

7   recommendations that was made was that there be a

8   determination made about what was going on with his

9   immigration status?

10  A.   There was something to that effect, yes.

11  Q.   Yeah.  In fact, it's to determine whether or not there

12  was fraud committed in connection with his immigration,

13  correct?

14  A.   Correct.

15  Q.   Did you do that?

16  A.   No.  He went -- he had went to --

17  Q.   Well, that's not my question.

18  A.   Okay.

19  Q.   Did you do that?

20  A.   No, no.

21  Q.   To your knowledge, did anybody that's working on

22  Crossfire Hurricane, Mr. Mueller's group or otherwise, ever

23  run that to ground and do what had been recommended?

24  A.   No.

25  Q.   I'll come back to that --

Re-cross Examination of I. Danchenko 10/13/22

─United States v. Danchenko─

882

1           THE COURT:  Well --

2  BY MR. DURHAM:

3  Q.    -- in a moment.  Let me go back to where --

4           THE COURT:  Well, complete it, complete this issue.

5           MR. DURHAM:  Yes, Your Honor.

6           MR. SEARS:  Your Honor, I would object to anymore.

7           THE COURT:  Yeah, let me see counsel.

8           (Side bar.)

9           THE COURT:  What else do you want to ask this

10  witness about this topic?

11           MR. DURHAM:  About the human validation.

12           THE COURT:  You've asked him that.

13           MR. DURHAM:  Asked -- I'll finish it now.

14           THE COURT:  Like what?

15           MR. DURHAM:  I'm sorry?

16           THE COURT:  Like what?  What's the question?

17           MR. DURHAM:  There were -- specific recommendations

18  were made with respect to Mr. Danchenko that would -- evidence

19  or information, testimony would be relevant and responsive to

20  questions asked on cross-examination about his status as a

21  confidential human source and whether or not there were issues

22  relating to reliability and the like.

23           MR. KEILTY:  He was asked to be recommended

24  (indiscernible) polygraphs, Your Honor.

25           THE COURT:  Well, is he aware of any of these

Recross Examination of    Helson    10/13/22

─────────────United States v. Danchenko─────────────

883

1   recommendations?

2            MR. DURHAM:  Oh, he was there.  He's aware.

3            MR. KEILTY:  He's aware of all of that as far as the

4   defendant's reporting mostly open source.  This all goes

5   directly how great of a source he was.  The FBI in -- you

6   know, unit in charge of this is saying the opposite.

7            THE COURT:  All right.  I'm going to let you ask him

8   if he was aware of the recommendations, he personally.  And

9   then if he -- if he says he was, then you can get into it.

10           MR. DURHAM:  Yes, Your Honor.

11           THE COURT:  I want you to close this out and then

12  I'm going to let you ask these questions and go back to you

13  and finish up your redirect.

14           MR. DURHAM:  You want that to happen today?

15           THE COURT:  Yes.

16           (Open court.)

17           MR. DURHAM:  May I proceed, Your Honor?

18           THE COURT:  Yes, yes.

19  BY MR. DURHAM:

20  Q.   Mr. Helson, you made reference to the human validation

21  unit.  Do you recall, sir, whether or not you personally were

22  aware of that, first, the evaluation was done?

23  A.   Yes.

24  Q.   And any recommendations that came from that?

25  A.   Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─United States v. Danchenko─

884

1    Q.   With respect to the recommendations that were made, do

2    you recall, sir, whether or not there was a specific

3    recommendation made that you or folks who were involved in

4    Mr. Danchenko's handling, was to go and check and determine

5    the specific purposes of his international travel and his --

6    that his activities be monitored to confirm that he was

7    conducting the travel he claimed he was conducting?

8    A.   Yes.

9    Q.   Did you do that?

10   A.   The current ones from that on, I did.  He reported when

11   he would leave and when he would document that accordingly.

12   Q.   All right.  Well, what about looking at what he had said

13   as compared to what the records showed?  Did you do that going

14   backward?

15   A.   Not going backwards, no.

16   Q.   Did they make a specific recommendation to you that the

17   Bureau behavioral assessment group conduct an examination to

18   determine what Mr. Danchenko's actual motives, allegiances and

19   vulnerabilities were?

20   A.   Yes.

21   Q.   And did you do that?

22   A.   No.

23   Q.   Did they make a specific recommendation to you that with

24   respect to the reporting that you've referred to, that it

25   should be more precise and specific and not general open

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

──United States v. Danchenko──

885

1    source information?

2    A.   Yes.

3    Q.   And did you do that?

4    A.   We began isolating and down --

5    Q.   Because --

6              THE COURT:  Finish your answer.

7              MR. DURHAM:  Oh, sorry.

8              THE WITNESS:  We began to reduce it down into

9    various topics in reducing the open source stuff.

10   BY MR. DURHAM:

11   Q.   Because a great deal of the information that you are

12   getting was just open source information, correct?

13   A.   There was open source -- it wasn't -- like I would say

14   40 percent, 50 percent, half and half, but that was critical

15   to the understanding of the stuff that was an open source.

16   Q.   Were you -- was it recommended that you do an assessment

17   or to look at the financial nature of Mr. Danchenko's

18   employment because of the concern that he may be prone to

19   shopping around his information in search of work and

20   pre-composing reporting containing unsolicited material, which

21   may indicate the FBI is not the primary audience for his

22   information?

23   A.   Yeah, I saw that in the report.

24   Q.   Did you do that?

25   A.   No.

──Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

EASTERN DISTRICT OF VIRGINIA

Recross-Examination - Helson - 10/15/22

─United States v. Danchenko─

886

```
 1  Q.   Was it recommended that the Washington Field Office

 2  determine whether Mr. Danchenko committed any unauthorized

 3  illegal activity for the apparent falsehoods and inaccuracies

 4  contained in his visa and immigration documents?

 5  A.   Yes, they recommended that.

 6  Q.   Did you do that?

 7  A.   No.

 8  Q.   Did they specifically recommend to the Washington Field

 9  Office and you that you considered administering a polygraph

10  of Mr. Danchenko to determine if he has ever been tasked by a

11  foreign individual, entity or government to collect

12  information or to perform actions adverse to the U.S.

13  interest?

14  A.   They recommended that, yes.

15  Q.   Did you do that?

16  A.   No.

17           MR. DURHAM:   That's what I would inquire about on

18  this particular subject matter, Your Honor.

19           THE COURT:   All right.   Mr. Sears.

20                    RECROSS-EXAMINATION

21  BY MR. SEARS:

22  Q.   Agent Helson, I'll be brief.

23           Is it fair to say that everybody was full aware that

24  there had been this counterintelligence investigation in 2009?

25  A.   Yes.
```

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

887

1   Q.   At the time you opened Mr. Danchenko in March of 2017,

2   you were not aware on that date of that counterintelligence

3   investigation?

4   A.   Correct.

5   Q.   You later learned, I think, maybe 60 days later?

6   A.   Yes.

7   Q.   Of that fact?

8   A.   Correct.

9   Q.   And as a result of that, you went and spoke to the agents

10  who had actually carried out that investigation?

11  A.   Yes.

12  Q.   Correct?

13       And it was your takeaway from your conversations

14  with those agents that that case should have never been opened

15  in the first place?

16  A.   Correct, the way it was.

17  Q.   Excuse me?

18  A.   It shouldn't have been opened the way that it was.

19  Q.   Correct.  And do you recall that the plan, before it was

20  closed down, was to try to use that investigation or

21  opportunity to open up Mr. Danchenko as a source for the

22  United States?

23  A.   I did not know that.

24  Q.   You were not -- were you informed then?

25  A.   No.

Redirect Examination of   Helson   10-13-22

United States v. Danchenko

888

1   Q.   Okay.  Mr. Durham asked you a series of questions about

2   source validation, human source validation?

3   A.   Correct.

4   Q.   Is that a pretty common practice anytime you're

5   developing a high-level confidential human source?

6   A.   Yes.  That level of report usually goes -- reporting

7   is used more for the more sensitive or politically charged

8   sources.

9   Q.   And would it be fair to say that that report would

10  happen, in particular, for a Russian national who's providing

11  information about a Russian --

12  A.   Correct.

13  Q.   In fact, you actually requested to have that validation

14  report done?

15  A.   Yes.

16  Q.   Correct?

17         And I take it you didn't agree with everything they

18  had to say?

19  A.   No.

20  Q.   You had real issues with at least one of the individuals

21  who was involved with that validation report, correct?

22  A.   I did.

23  Q.   And you even sent some text messages, which I'm not going

24  to show you, complaining about how poorly written or supported

25  that report was?

United States v. Danchenko

889

A.   Yes.

Q.   And you had actually drafted a rebuttal to that report?

A.   I did.

Q.   But at the end of the day, the conclusion of that report was:  The information he's providing is so valuable, you should continue to operate him, but we recommend that you do these various things?

A.   Correct.

Q.   Right?  So that's why he was continued to be operational after --

A.   They recommended him to be operated.

Q.   And is it fair to say -- and I'm not going to go through everything that Mr. Durham just read, but polygraphing a confidential human source is something you typically wouldn't do for any confidential human source, correct?

A.   Typically not, but there are circumstances that we would.

Q.   But in this situation, you didn't feel that was necessary?

A.   Not at this point.  It was always an option on the table.

         MR. SEARS:  Thank you.

         THE COURT:  All right.  Thank you.

         MR. DURHAM:  Did Your Honor say I could just follow up on that or...

         THE COURT:  Go ahead.

                  REDIRECT EXAMINATION

─────United States v. Danchenko─────

890

```
 1   BY MR. DURHAM:

 2   Q.   So let me just ask you this:  With respect to the person

 3   you had a conflict with, that was the person who was in the

 4   human validation unit, correct?

 5   A.   Yes.

 6   Q.   And that person's opinion, based on everything that she

 7   had looked at, was that this is a real problem.

 8            Wouldn't that be a fair statement?

 9   A.   Yeah, she also had --

10   Q.   The answer to my question is yes?

11            MR. SEARS:  Your Honor, that's not --

12            THE COURT:  I'll let you answer more fully if you

13   need to.

14            THE WITNESS:  I'm sorry?

15            THE COURT:  I'll let you answer more fully if you

16   need to.

17            THE WITNESS:  Yeah, she had also implied that he was

18   a GRU officer, which was just simply not true.

19   BY MR. DURHAM:

20   Q.   And you know that?

21   A.   Yes.

22   Q.   Did you polygraph him on that?

23   A.   No.  But there was nothing --

24   Q.   But the person --

25            MR. SEARS:  Can you please just let the witness
```

Redirect Examination of [                        ] Hellman 10/15/22

United States v. Danchenko

891

1   answer?

2           MR. DURHAM:  I'm sorry.  Yeah, sure.

3           THE WITNESS:  There's nothing in his history, his

4   actions, anything that we know about him would indicate that

5   he is an intel officer, period.

6   BY MR. DURHAM:

7   Q.   The woman who made this recommendation, the comments she

8   was concerned about, do you know what she did before she came

9   to the Bureau?

10  A.   She was an army counterintelligence officer.

11  Q.   For how long was she an army counterintelligence officer

12  in Europe?

13  A.   19 years, I think is what it was.

14  Q.   19 years.  She said that you should look further,

15  correct?

16  A.   She did.  But, however, army counterintelligence officer

17  in Europe does not make you an expert in Russian SPR activity

18  in the United States.

19  Q.   Okay.  So then with respect to the question that counsel

20  asked you about, well, concerning continuing to operate, the

21  human validation unit doesn't have the authority to shut a CHS

22  down, correct?

23  A.   If they recommend closure, we have to close.

24  Q.   But they no longer recommend closure on anybody, right,

25  because of the conflict with the field?

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─────United States v. Danchenko─────

892

1   A.   I'm not aware of that, but...

2   Q.   And isn't it, in fact, true in this case that with

3   respect to the specific, usually touched on recommendations,

4   like polygraphing the person had this controversy surrounding

5   him, that didn't happen?  You didn't do it?

6   A.   No.

7   Q.   And with respect to counsel's question concerning the

8   opening, you disagree with the opening in the case in

9   Baltimore?

10  A.   Correct.

11  Q.   Would it be a fair statement, sir, that you've disagreed

12  that it should have been opened as a 65A-case as opposed to

13  105-case?

14  A.   Correct.

15  Q.   And that's sort of inside FBI paperwork, isn't it?

16  A.   It's a little more than that.

17  Q.   Yeah.  In this particular case, did you ever determine

18  what the underlying reason was for Special Agent Peno and her

19  colleagues to have opened that 65-case on Mr. Danchenko?

20  A.   The -- it was -- I was told that it was about the

21  conversation or what he had said.

22  Q.   Okay.  And did you pursue that any further?

23  A.   No, I was speaking with the case agent.

24  Q.   Okay.  Let me ask this because it's six -- well, it's

25  5:59, so let me finish this today.

─────United States v. Danchenko─────

893

1          Do you recall, sir, whether or not you or any of

2    your colleagues who were looking at the dossier and trying to

3    corroborate the information there, did you or anybody to your

4    knowledge in the FBI attempt to run to ground and complete or

5    conclude, resolve that case that had to be closed because the

6    FBI mistakenly thought he had left the country?  Anybody do

7    anything to resolve that?

8    A.   No.

9          THE COURT:  All right.

10         MR. DURHAM:  This may be a good place to break, Your

11   Honor.

12         THE COURT:  Thank you.  Yes.  All right.  And this

13   is -- just so we're clear, this closes out this issue.  You

14   can continue redirect tomorrow morning.

15         Ladies and gentlemen, I'm going to release you until

16   tomorrow morning at 9:30.  Please do not discuss this case

17   among yourselves or anyone outside of the courthouse during

18   the evening recess.  We'll see you tomorrow morning.

19         (Jury dismissed.)

20         THE COURT:  All right.  Mr. Durham, how much longer

21   do you have with Mr. Helson?

22         MR. DURHAM:  I would say maybe half an hour.

23         THE COURT:  All right.

24         MR. DURHAM:  I don't think much more than that, Your

25   Honor.

United States v. Danchenko

894

1        THE COURT:  All right.  And what's the lineup for

2   tomorrow?

3        MR. DURHAM:  The lineup tomorrow would be Brittany

4   Hertzog and then Special Agent Amy Anderson, and then I think,

5   in all likelihood, we get to Special Agent James.

6        THE COURT:  All right.  Are we still on track for

7   completing by tomorrow midday?

8        MR. DURHAM:  I think -- I believe so, yes, Your

9   Honor.

10        THE COURT:  All right.

11        MR. DURHAM:  Maybe afternoon, but I -- we'll be done

12   tomorrow, yes.

13        THE COURT:  All right.  Great.  All right.

14        MR. DURHAM:  Thank you, Your Honor.

15        THE COURT:  Agent Helson, do not discuss your

16   testimony during the evening recess.  You're to report here

17   tomorrow morning at 9:30.

18        THE WITNESS:  Okay.  Thank you, sir.

19        THE COURT:  Court will stand in recess.  See counsel

20   at 9 o'clock.

21

22        **(Proceedings adjourned at 6:01 p.m.)**

23

24

25

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4   the Eastern District of Virginia, do hereby certify that I

5   reported by machine shorthand, in my official capacity, the

6   proceedings had and testimony adduced upon the Jury Trial

7   in the case of the **UNITED STATES OF AMERICA versus IGOR Y.**

8   **DANCHENKO,** Criminal Action No.: 1:21-cr-245, in said court

9   on the 13th day of October, 2022.

10         I further certify that the foregoing 167 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16  name, this October 13, 2022.

17

18

19

20

21  _____

22  Tonia M. Harris, RPR
    Official Court Reporter

23

24

25

                                                            895