```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION

 3   UNITED STATES OF AMERICA,    )  Case 1:21-cr-245
                                  )
 4               Plaintiff,       )
                                  )
 5        v.                      )  Alexandria, Virginia
                                  )  October 17, 2022
 6   IGOR Y. DANCHENKO,           )  9:00 a.m.
                                  )
 7               Defendant.       )  Volume 5 (AM Session)
     _____ )  Pages 1092 - 1221
 8

 9                   TRANSCRIPT OF TRIAL

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11          UNITED STATES DISTRICT COURT JUDGE

12                   AND A JURY

13
     APPEARANCES:
14
     FOR THE PLAINTIFF:
15
          JOHN DURHAM, ESQUIRE
16        MICHAEL T. KEILTY, ESQUIRE
          D. BRITTAIN SHAW, ESQUIRE
17        U.S. DEPARTMENT OF JUSTICE
          145 N Street, N.E.
18        Washington, D.C.  20002
          (203) 410-2641
19
     FOR THE DEFENDANT:
20
          STUART A. SEARS, ESQUIRE
21        DANNY ONORATO, ESQUIRE, PRO HAC VICE
          SCHERTLER, ONORATO, MEAD & SEARS
22        555 13th Street, N.W., Suite 500 West
          Washington, D.C.  20004
23        (202) 628-4199

24   THE DEFENDANT, IGOR Y. DANCHENKO, IN PERSON

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

1093

1        **I N D E X**

2                                                                    PAGE

3   Charge of the Court                                              1108

4   Closing Argument by Mr. Keilty                                   1132

5   Closing Argument by Mr. Sears                                    1153

6   Rebuttal Argument by Mr. Durham                                  1195

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1       (The jury is not present.)

 2            MR. DURHAM:  Good morning, Your Honor.

 3            MR. SEARS:  Good morning, Your Honor.

 4            THE COURT:  Good morning.

 5            THE CLERK:  Criminal Case No. 1:21-cr-245,

 6    *United States v. Igor Danchenko.*

 7            Counsel, will you please note your

 8    appearances for the record.

 9            MR. DURHAM:  Good morning, Your Honor.  John

10    Durham for the United States along with Michael Keilty

11    and Brittany Shaw, and at counsel table is Paralegal

12    Kori Arsenault and Supervisory Special Agent Ryan

13    James.

14            MR. SEARS:  Good morning, Your Honor.  Stuart

15    Sears on behalf of Mr. Danchenko, who is present.

16    Along with me is Danny Onorato, Paola Pinto, and

17    Charlie Tent.

18            THE COURT:  All right.  Welcome.

19            The issues I'd like to talk about are the

20    jury instructions, the verdict form, and I know you-all

21    had raised an issue as to what could be shown to the

22    jury.

23            Any other issues?

24            MR. SEARS:  No, Your Honor.  I would just

25    note that we do intend to in our case, I guess,

1    introduce an additional stipulation that we reached

2    with the government this weekend.  It relates to

3    Defendant's Exhibit 422B, as in boy.  The Court may

4    recall that those are Amtrak records related to

5    Mr. Danchenko's travel to New York in July of 2016.

6              THE COURT:  All right.

7              MR. SEARS:  There's an issue with the records

8    in that the travel dates and times at the time of

9    purchase are in Eastern Standard Time.  But when the

10   ticket is actually scanned on the train, those numbers

11   are reflected in Pacific Time, and that information

12   came directly from a representative from Amtrak.  I

13   shared that information with the government so there's

14   a stipulation just indicating that that time --

15             THE COURT:  And you'll introduce that during

16   your case?

17             MR. SEARS:  Yes, Your Honor.  I don't intend

18   to do it through a witness.

19             THE COURT:  No.  What I'll do is tell the

20   jury that the government has rested.  I'll call upon

21   you to present any evidence you want, and you can

22   introduce the stipulation.

23             MR. SEARS:  Yes, sir.

24             THE COURT:  All right.  Any other issues,

25   Mr. Durham, other than those that I mentioned?

1    MR. DURHAM:  Nothing other than what Your

2  Honor's mentioned.

3    THE COURT:  All right.  Let's take up what

4  you want to show the jury.  I understand you both want

5  to show portions of the transcript.  Is that right?

6    MR. DURHAM:  That's correct, yes, Your Honor.

7    THE COURT:  Given that both of you want to do

8  it, I'll allow it understanding the jury is not going

9  to be permitted to have the transcripts even if they

10  ask for them.

11    MR. SEARS:  I was just trying to save Your

12  Honor from that question, but I think it's more

13  accurate to do it that way.  They obviously are going

14  to be told that their recollections control through the

15  instructions.

16    THE COURT:  Right.

17    All right.  On the verdict forms, I've looked

18  at them.  What I understand to be the defense's

19  proposed form really conforms with the standard

20  practice here.  So I'm going to give the defense's

21  verdict form.

22    If you-all want, I can put under each count

23  that it is a false statements count, but other than

24  that, I'll just go ahead and give the defense's form.

25    MR. DURHAM:  Thank you, Your Honor.

```
 1              Just one matter.  This is going to come up in
 2   connection with the Court's jury instructions, but it
 3   relates to Count 5.  I'll just point the Court to
 4   page 20 -- I'm sorry, page 31 of Your Honor's
 5   instructions.  I think the parties are in agreement --
 6   the very bottom of page 31.
 7              THE COURT:  On the nature of the offense
 8   charged?
 9              MR. DURHAM:  That's correct, yes, Your Honor.
10              THE COURT:  Yes.
11              MR. DURHAM:  It says at the very bottom,
12   Count 5 of the indictment charges that on or about
13   November 16.  The evidence is really related to
14   November 2.  So I think the parties are in agreement
15   that it makes more sense to make that November 2.
16              THE COURT:  All right.
17              MR. DURHAM:  And then the corresponding
18   change would then need to be made on Count 5 of the
19   verdict form.
20              THE COURT:  All right.  November 2?
21              MR. DURHAM:  Yes, Your Honor.
22              THE COURT:  All right.
23              MR. DURHAM:  Thank you.
24              THE COURT:  Very good.
25              All right.  Any other issues as to the jury
```

1   instructions?

2           MR. SEARS:  Yes, Your Honor, briefly.  The

3   Court's Instruction No. 6 relates to Rule 404(b)

4   evidence.  I think, from our perspective, we don't

5   think that instruction is necessary because we don't

6   think there was that type of evidence presented in this

7   case.  So we think it might spark more confusion than

8   clarity for that reason.  I don't know what the

9   government's position is on that, but that was one I

10  wanted to flag.

11          THE COURT:  I will say I had some conflicting

12  thoughts about that one.

13          Mr. Durham, what's your view on it?  Given

14  the Court's ruling, what's the 404(b) evidence at this

15  point on Count 1?

16          MR. DURHAM:  I think it may be in a sort of

17  technical sense the testimony in evidence that came in

18  regarding the counterespionage matter.  Arguably, it

19  would be 404(b), but we don't have any issue with the

20  Court removing it.

21          THE COURT:  All right.  I'll go ahead and

22  remove Instruction No. 6.

23          MR. SEARS:  With regard to Instruction

24  No. 17, Your Honor, the fact that the defendant's

25  failure to testify, which I believe is on page 20 --

```
 1                THE COURT:  Yes.
 2                MR. SEARS:  -- I did notice there was a gap
 3  between the first two sentences.  I don't know if that
 4  was intentional or not, but I'm just flagging that for
 5  the Court.
 6                THE COURT:  When you say "a gap," you may be
 7  looking at a different version.  There's an additional
 8  spacing between those two sentences?
 9                MR. SEARS:  It looks like that was fixed in
10  the version we got today.
11                THE COURT:  All right.  What I'm going to do
12  is renumber these given that we're taking 6 out.
13                MR. SEARS:  Okay.
14                THE COURT:  All right.
15                MR. SEARS:  Lastly, Your Honor, I did just
16  want to preserve our argument on Instruction No. 25
17  with regard to willfully.  The Court had accepted the
18  government's proposed instruction --
19                THE COURT:  Yes.
20                MR. SEARS:  -- on this.  We had asked the
21  Court to specifically include language that read, "An
22  act is done willfully if it is done with an intention
23  to do something the law forbids, that is, with a bad
24  purpose to disobey the law."  We continue to believe
25  that that's what needs to be shown when the statute
```

 1  requires a violation to be willful.

 2          I have the case, the *Bryan* case, which is a

 3  Supreme Court case from 1998, which I can hand up to

 4  the Court.  We did cite it previously.  So I know the

 5  Court has reviewed it, but I did want to at least

 6  preserve that argument if the Court has made up its

 7  mind that it will not include that.

 8          THE COURT:  That was a false statement case?

 9          MR. SEARS:  It was not a false statement

10  case.  It was not.

11          THE COURT:  Okay.  All right.  That objection

12  is preserved.

13          Anything else?

14          MR. SEARS:  No, Your Honor.

15          THE COURT:  All right.  Let me also just

16  review with you what I intend to tell the jury about

17  the fact that Count 1 is no longer in the case.  I'm

18  happy to hear any comments about it.  What I intend to

19  tell them is as follows:

20          You're no longer asked to consider

21  Mr. Danchenko's statement to Special Agent Helson on

22  June 15, 2017, that he had not talked to Mr. Dolan

23  about anything specific in the Steele dossier as

24  alleged in Count 1.  You should not consider or in any

25  way be influenced by your no longer needing to consider

1  that count in connection with your deliberations on

2  Counts 2 through 5.

3          MR. DURHAM:  The government has no concerns

4  about that, Your Honor.

5          MR. SEARS:  No concerns, Your Honor.  Thank

6  you.

7          THE COURT:  All right.  Good.  I tried to

8  make it as neutral as possible.

9          MR. DURHAM:  Your Honor, the only additional

10 issue the government wanted to raise with the Court

11 concerning the jury instructions relate to what was

12 marked as Instruction 27.  I guess it would be 26 now.

13 It appears on page 30 of the copy of the instructions

14 given this morning.  We would ask the Court at the very

15 bottom of that page, if the Court gives the

16 instruction, which it certainly intends to and should,

17 that if evidence in the case leaves the jury with a

18 reasonable doubt and so forth, that that be balanced

19 out with one additional sentence saying, "If, on the

20 other hand, the evidence in the case convinces the jury

21 that the defendant acted with intent," et cetera, then

22 the jury should return a guilty verdict against the

23 defendant.

24         THE COURT:  This was the government's

25 proposed good faith instruction with the exception of

1  one paragraph that I took out, right?

2          MR. DURHAM:  That's my error, Your Honor.  I

3  did that to myself earlier.

4          THE COURT:  I understand.

5          Mr. Sears.

6          MR. SEARS:  Your Honor, I believe that tracks

7  the language of the standard instruction, and we would

8  ask the Court to use.

9          THE COURT:  I'm not going to put that in.  I

10 think that's within the scope of argument, Mr. Durham,

11 that you can make.

12         All right.  Anything else?

13         MR. SEARS:  Your Honor, obviously, we're not

14 putting on a case other than that exhibit.  I did want

15 to preserve a Rule 29 argument.  I don't intend to

16 argue it for the third time in this case.

17         THE COURT:  Right.

18         MR. SEARS:  So I didn't know if the Court

19 just wanted to excuse the jury for me to do that or do

20 it at the bench.

21         THE COURT:  Why don't we just do it at the

22 bench.

23         MR. SEARS:  Okay.

24         THE COURT:  All right.  Anything else?

25         MR. DURHAM:  The government has nothing.

1    Thank you, Your Honor.

2              THE COURT:  All right.  In terms of closing

3    argument, we talked about an hour for each side, which

4    would include your rebuttal.  Is that still something

5    you would like to do?

6              MR. DURHAM:  It may be that the government

7    would need a little bit more time, certainly not more

8    than 90 minutes.  But I would ask for a little bit of

9    leave in that regard.

10             THE COURT:  Mr. Sears.

11             MR. SEARS:  Your Honor, I hope to speak

12   slowly through my closing, not that slowly.  I think my

13   closing will probably be in the neighborhood of

14   30 minutes to 35 minutes.

15             THE COURT:  All right.

16             MR. SEARS:  You know, 90 minutes seems a

17   little excessive from my perspective, but certainly,

18   you know, I think both parties should have the

19   opportunity to make their arguments.  I would ask that

20   the government be constrained a little bit.

21             THE COURT:  I'll give you a little bit more

22   than an hour, say an hour and 15 minutes, Mr. Durham.

23             MR. DURHAM:  Thank you, Your Honor.

24             THE COURT:  All right.  Anything else?

25        (No response.)

```
 1            THE COURT:  All right.  Great.  As soon as
 2   the jury is here, we'll begin.
 3            The Court will stand in recess.
 4       (Recess from 9:19 a.m. until 9:47 a.m.)
 5       (The jury is not present.)
 6            THE COURT:  You've received a copy of the
 7   jury note asking about redactions.  I think all of the
 8   redactions have been agreed to; haven't they, Counsel?
 9            MR. SEARS:  Well --
10            THE COURT:  I mean, they've been redacted by
11   agreement.
12            MR. SEARS:  I don't know that I would say
13   that, Your Honor.  Some of the redactions in what we've
14   been provided from the classified discovery wasn't by
15   our agreement.
16            THE COURT:  I see.  Right.  No, I understand.
17            MR. SEARS:  We just don't know what's in
18   there ourselves.  So I think to avoid saying too little
19   or too much, our position would be to just tell the
20   jury that they're not to concern themselves with why
21   matters are redacted and leave it at that.  Because I
22   do think if you start to give an explanation, it might
23   give the wrong impression.
24            THE COURT:  Mr. Durham, any thoughts about
25   this?
```

1    MR. DURHAM:  The government would take the

2  same position, maybe for different reasons.  I think

3  that there are instances in the evidence here where

4  there was an agreement about redactions.  The Court

5  might recall, for example, that with respect to the

6  government's exhibit, which is Report 95, we thought it

7  would be more expeditious to maybe move ahead and come

8  back to redactions.  So I don't think it's completely

9  accurate to say that it was by agreement.

10    THE COURT:  Right.  All right.  Well, I

11  agree.  I think I simply need to tell them that

12  redactions were made through a process that really

13  shouldn't concern them and that they shouldn't attach

14  any significance or draw any inferences from the fact

15  of the redactions.  Does that sound acceptable?

16    MR. SEARS:  That's acceptable, Your Honor.

17    MR. DURHAM:  Yes, Your Honor.

18    THE COURT:  All right.  Any other issues

19  before we bring the jury out?

20    MR. SEARS:  No, Your Honor.

21    MR. DURHAM:  No, Your Honor.

22    THE COURT:  All right.  Let's bring the jury

23  out.

24    (The jury enters at 9:48 a.m.)

25    THE COURT:  Good morning.  Please be seated.

1       We're now ready to proceed.

2       I did receive your note about redactions.  I

3  understand your curiosity about seeing portions of

4  documents blacked out, and I've reviewed it with

5  counsel.  What I can tell you is that those redactions

6  were made pursuant to a process that really has no

7  bearing on the issues that you need to consider, and

8  you should attach no significance or draw any

9  inferences from the fact of those redactions.

10      All right.  We're ready to proceed.  The

11 government has rested.

12      Mr. Sears.

13      MR. SEARS:  Thank you, Your Honor.

14      Your Honor, the defense will not be calling

15 any witnesses in our case.  However, there is an

16 exhibit, which is a stipulation that was reached with

17 the government, that we would like to read into

18 evidence and admit into evidence.

19      THE COURT:  All right.  Ladies and gentlemen,

20 again, as I've told you on prior occasions, a

21 stipulation is simply an agreement between the parties

22 as to the matters stated in that stipulation.  You may

23 accept it as sufficient proof of what's been stated.

24 However, what significance you attach to it is entirely

25 up to you.

1       Mr. Sears.

2       MR. SEARS:  Your Honor, if we could publish

3  it to the jury?

4       THE COURT:  All right.

5       MR. SEARS:  Thank you, Ms. Arsenault.

6       This is what's been marked as Government

7  Exhibit 1812.  The following -- it is hereby stipulated

8  and agreed between the undersigned parties as follows:

9       The following times referenced on the Amtrak

10  records admitted as Defendant's Exhibit 422B are

11  provided in Pacific Standard Time and, therefore, are

12  three hours earlier than the actual time of travel in

13  Eastern Standard Time.

14       Therefore, the actual time of travel on

15  July 26, 2016, was 3:57 a.m. Eastern Standard Time, and

16  the actual time of travel on July 28, 2016, was

17  10:23 p.m. Eastern Standard Time.

18       This stipulation is admissible as evidence at

19  this trial.

20       THE COURT:  All right.  Thank you, Mr. Sears.

21       MR. SEARS:  Your Honor, with the admission of

22  that exhibit, the defense rests.

23       THE COURT:  All right.  Thank you.

24       Mr. Durham, any further evidence?

25       MR. DURHAM:  No.  Thank you, Your Honor.

```
 1              THE COURT:  All right.  May I see counsel at
 2   the bench, please.
 3        (Conference at the bench, as follows:)
 4              THE COURT:  All right.  Mr. Sears.
 5              MR. SEARS:  Thank you, Your Honor.  At this
 6   point, we would renew our Rule 29 motion on the same
 7   grounds we raised on Friday afternoon.
 8              THE COURT:  All right.  The Court is going to
 9   overrule that as well.
10              All right.  Anything further?
11              MR. DURHAM:  Thank you, Your Honor.
12        (Proceedings continued in open court, as follows:)
13              THE COURT:  Ladies and gentlemen, we're now
14   at the point where all the evidence has been presented
15   and what's left to be done is to instruct you as to the
16   law to be applied to the issues that will be submitted
17   for your consideration.
18              As you will see from the instructions that
19   I'm about to give you, you are no longer asked to
20   consider Mr. Danchenko's statement to Special Agent
21   Helson on June 15, 2017, that he had not talked with
22   Mr. Dolan about anything specific in the Steele dossier
23   as alleged in Count 1, and you should not consider or
24   in any way be influenced by your no longer needing to
25   consider that count in connection with your
```

1   deliberations on Counts 2 through 5.  These

2   instructions will apply to those counts.

3            Each of you will have a copy of what I'm

4   going to read to you.  So you're certainly free to take

5   notes, but know that you will actually have in written

6   form, each of you, a copy of everything that I'm going

7   to read to you.

8            You'll also see, when you do receive the

9   instructions, that they are numbered and have a title.

10  Those have no significance to your deliberations.

11  There's nothing significant about the order in which

12  I'm giving you these or the title of the instruction.

13  That's simply for your convenience.

14            Now that you've heard all of the evidence

15  that is to be received in the trial, it becomes my duty

16  to give you the final instructions of the Court as to

17  the law that is applicable to this case.  You should

18  use these instructions to guide you in your decisions.

19            All of the instructions of law given to you

20  by the Court, those given to you at the beginning of

21  the trial, those given to you during the trial, and

22  those final instructions must guide and govern your

23  deliberations.

24            It is your duty as jurors to follow the law

25  as stated in all of the instructions of the Court and

1   to apply these rules of law to the facts as you find

2   them to be from the evidence received during the trial.

3   Counsel may quite properly refer to some of the

4   applicable rules of law in their closing arguments to

5   you.  If, however, any difference appears to you

6   between the law as stated by counsel and that as stated

7   by the Court in these instructions, you, of course, are

8   to be governed by the instructions given to you by the

9   Court.

10          You are not to single out any one instruction

11  alone as stating the law but must consider the

12  instructions as a whole in reaching your decisions.

13          Neither are you to be concerned with the

14  wisdom of any rule of law stated by the Court

15  regardless of any opinion you may have as to what the

16  law ought to be.  It would be a violation of your sworn

17  duty to base any part of your verdict upon any other

18  view or opinion of the law than that given in these

19  instructions of the Court just as it would be a

20  violation of your sworn duty, as judges of the facts,

21  to base your verdict upon anything but the evidence

22  received in this case.

23          You were chosen as jurors for this trial in

24  order to evaluate all of the evidence received and

25  decide each of the factual questions presented by the

1  allegations brought by the government in the indictment

2  and the plea of not guilty by the defendant.

3       In resolving the issues presented to you for

4  decision in this trial, you must not be persuaded by

5  bias, prejudice, or sympathy for or against any of the

6  parties to this case or by any public opinion.

7       Justice, through trial by jury, depends upon

8  the willingness of each individual juror to seek the

9  truth from the same evidence presented to all the

10  jurors here in the courtroom and to arrive at a verdict

11  by applying the same rules of law as now being given to

12  each of you in these instructions of the Court.

13       There is nothing particularly different in

14  the way that a juror should consider the evidence in a

15  trial from that in which any reasonable and careful

16  person would deal with any very important question that

17  must be resolved by examining facts, opinions, and

18  evidence.

19       You're expected to use your good sense in

20  considering and evaluating the evidence in this case.

21  Use the evidence only for the purposes for which it has

22  been received and give the evidence a reasonable and

23  fair construction in light of your common knowledge of

24  the natural tendencies and inclinations of human

25  beings.

1        If the defendant is proven guilty beyond a

2   reasonable doubt, say so.  If not proved guilty beyond

3   a reasonable doubt, say so.

4        Keep constantly in mind that it would be a

5   violation of your sworn duty to base a verdict upon

6   anything other than the evidence received in the case

7   and the instructions of the Court.

8        Remember as well that the law never imposes

9   upon a defendant in a criminal case the burden or duty

10  of calling any witnesses or producing any evidence

11  because the burden of proving guilt beyond a reasonable

12  doubt is always with the government.

13       The evidence in this case consists of the

14  sworn testimony of the witnesses, regardless of who may

15  have called them, all exhibits received in evidence,

16  regardless of who may have produced them, all facts

17  which may have been agreed to or stipulated, and all

18  facts and events which may have been judicially

19  noticed.

20       When the attorneys on both sides stipulate or

21  agree as to the existence of a fact, you should accept

22  the stipulation as evidence and should regard that fact

23  as proved.

24       The Court has taken judicial notice of

25  certain facts or events.  When the Court declares that

1  it has taken judicial notice of some fact or event, you

2  may accept the Court's declaration as evidence and

3  regard as proved the fact or event which has been

4  judicially noticed.  You are not required to do so,

5  however, since you are the sole judges of the facts.

6         Any proposed testimony or proposed exhibit to

7  which an objection was sustained by the Court and any

8  testimony or exhibit ordered stricken by the Court must

9  be entirely disregarded.

10         Anything you may have seen or heard outside

11  the courtroom is not evidence and must be entirely

12  disregarded.

13         Questions, objections, statements, and

14  arguments of counsel are not evidence in the case

15  unless made as an admission or stipulation of fact.

16         You are to base your verdict only on the

17  evidence received in the case.  In your consideration

18  of the evidence received, however, you are not limited

19  to the bald statements of the witnesses or to the bald

20  assertions in the exhibits.  In other words, you are

21  not limited solely to what you see and hear as the

22  witnesses testify or as the exhibits are admitted.  You

23  are permitted to draw from the facts which you find

24  have been proved such reasonable inferences as you feel

25  are justified in light of your experience and common

1   sense.

2          There are two types of evidence which are

3   generally presented during trial, direct evidence and

4   circumstantial evidence.  Direct evidence is the

5   testimony of a person who asserts or claims to have

6   actual knowledge of a fact, such as an eyewitness.

7   Circumstantial evidence is proof of a chain of facts

8   and circumstances indicating the existence of a fact.

9   The law makes no distinction between the weight or

10  value to be given to either direct or circumstantial

11  evidence, nor is a greater degree of certainty required

12  of circumstantial evidence than of direct evidence.

13  You should weigh all the evidence in the case.

14          Inferences are simply deductions or

15  conclusions which reason and common sense lead the jury

16  to draw from the evidence received in the case.  If any

17  reference by the Court or by counsel to matters of

18  testimony or exhibits does not coincide with your own

19  recollection of that evidence, it is your recollection

20  which should control during your deliberations and not

21  the statements of the Court or counsel.

22          You are the sole judges of the evidence

23  received in this case.

24          The questions asked by a lawyer for either

25  party to this case are not evidence.  If a lawyer asks

1    a question of a witness which contains an assertion of

2    fact, therefore, you may not consider the assertion by

3    the lawyer as evidence of that fact.  Only the answers

4    are evidence.

5            It is the duty of the Court to admonish a

6    lawyer who out of zeal for his or her cause does

7    something which I feel is not in keeping with the rules

8    of evidence or procedure.  You're to absolutely draw no

9    inference against the side to whom an admonition of the

10   Court may have been addressed during the trial of this

11   case.

12           Tape recordings of conversations have been

13   received in evidence and have been played for you.

14   Typewritten transcripts of these tape-recorded

15   conversations have been furnished to you.  These

16   typewritten transcripts of the conversations are being

17   given to you solely for your convenience in assisting

18   you in following the conversation or in identifying

19   speakers.  The tapes themselves are evidence in the

20   case, and the typewritten transcripts are not evidence.

21   What you hear on the tapes is the evidence.  What you

22   read on the transcript is not.  If you perceive any

23   variation between the two, you will be guided solely by

24   the tapes and not by the transcripts.

25           If you cannot, for example, determine from

1  the tape recording that particular words were spoken or

2  if you cannot determine from the tape recording who

3  said a particular word or words, you must disregard the

4  transcripts insofar as those words or that speaker are

5  concerned.

6          The defendant is not on trial for any act or

7  conduct not specifically charged in the indictment.

8          A separate crime is charged in each count of

9  the indictment.  Each charge and the evidence

10 pertaining to it should be considered separately by the

11 jury.  The fact that you may find the defendant guilty

12 or not guilty as to one of the counts should not

13 control your verdict as to any other count.

14         Your decision on the facts of this case

15 should not be determined by the number of witnesses

16 testifying for or against the party.  You should

17 consider all the facts and circumstances in evidence to

18 determine which of the witnesses you choose to believe

19 or not believe.  You may find that the testimony of a

20 smaller number of witnesses on one side is more

21 credible than the testimony of a greater number of

22 witnesses on the other side.

23         Testimony and exhibits can be admitted into

24 evidence during a trial only if they meet certain

25 criteria and standards.  It is the sworn duty of the

1    attorney on each side of a case to object when the

2    other side offers testimony or an exhibit which that

3    attorney believes is not properly admissible under the

4    rules of law.  Only by raising an objection can a

5    lawyer request and obtain a ruling from the Court on

6    the admissibility of the evidence being offered by the

7    other side.  You should not be influenced against an

8    attorney or his client because the attorney has made an

9    objection.

10          Do not attempt, moreover, to interpret my

11   rulings on objections as somehow indicating how I think

12   you should decide this case.  I am simply making a

13   ruling on a legal question regarding the particular

14   piece of evidence or exhibit.

15          You, as jurors, are the sole and exclusive

16   judges of the credibility of each of the witnesses

17   called to testify in this case, and only you determine

18   the importance of the weight, if any, that their

19   testimony deserves.  After making your assessment

20   concerning the credibility of a witness, you may decide

21   to believe all of that witness' testimony, only a

22   portion of it, or none of it.

23          In making your assessment of that witness,

24   you should carefully scrutinize all of the testimony

25   given by that witness, the circumstances under which

1  each witness has testified, and all of the other

2  evidence which tends to show whether a witness, in your

3  opinion, is worthy of belief.

4          Consider each witness' intelligence, motive

5  to falsify, state of mind, appearance, and manner while

6  on the witness stand.  Consider the witness' ability to

7  observe the matters as to which he or she has testified

8  and consider whether he or she impresses you as having

9  an accurate memory or recollection of these matters.

10          Consider also any relation a witness may bear

11  to either side of the case, the manner in which each

12  witness might be affected by your verdict, and the

13  extent to which, if at all, each witness is either

14  supported or contradicted by other evidence in the

15  case.

16          Inconsistencies or discrepancies in the

17  testimony of a witness or between the testimonies of

18  different witnesses may or may not cause you to

19  disbelieve or discredit such testimony.  Two or more

20  persons witnessing an incident or a transaction may

21  simply see or hear it differently.  Innocent

22  misrecollection, like failure of recollection, is not

23  an uncommon human experience.  In weighing the effect

24  of a discrepancy, however, always consider whether it

25  pertains to a matter of importance or an insignificant

1   detail and consider whether the discrepancy results

2   from innocent error or intentional falsehood.

3           After making your own judgment or assessment

4   concerning the believability of a witness, you can then

5   attach such significance or weight to that testimony,

6   if any, that you feel it deserves.  You will then be in

7   a position to decide whether the government has proven

8   the charges beyond a reasonable doubt.

9           The testimony of a witness may be discredited

10  or, as we sometimes say, impeached by showing that he

11  or she previously made statements which are different

12  than or inconsistent with his or her testimony here in

13  court.  The earlier inconsistent or contradictory

14  statements are admissible only to discredit or impeach

15  the credibility of the witness and not to establish the

16  truth of those earlier statements made somewhere other

17  than during this trial.  It is the province of the jury

18  to determine the credibility of a witness who has made

19  prior inconsistent or contradictory statements.

20          If a person is shown to have knowingly

21  testified falsely concerning any important or material

22  matter, you obviously have a right to distrust the

23  testimony of such an individual concerning other

24  matters.  You may reject all of the testimony of that

25  witness or give it such weight or credibility as you

1  may think it deserves.

2          The defendant in a criminal case has an

3  absolute right under our Constitution not to testify.

4  The fact that the defendant did not testify must not be

5  discussed or considered in any way while deliberating

6  and in arriving at your verdict.  No inference of any

7  kind may be drawn from the fact that a defendant

8  decided to exercise his privilege under the

9  Constitution and did not testify.

10          As stated before, the law never imposes upon

11  a defendant in a criminal case the burden or duty of

12  calling any witnesses or producing any evidence.

13          An indictment is only a formal method used by

14  the government to accuse a defendant of a crime.  It is

15  not evidence of any kind against the defendant.  The

16  defendant is presumed to be innocent of the crime

17  charged.  And even though this indictment has been

18  returned against the defendant, the defendant begins

19  this trial with absolutely no evidence against him.

20          The defendant has pled not guilty to this

21  indictment and, therefore, denies that he is guilty of

22  the charges.

23          The indictment charges that the offenses

24  alleged in the indictment were committed on or about a

25  certain date.  However, it is necessary for the

1   government to prove beyond a reasonable doubt that the

2   offenses were committed on a date reasonably near the

3   date alleged in the indictment.  It is not necessary

4   for the government to prove that the offense was

5   committed precisely on the date charged.

6           I instruct you that you must presume the

7   defendant to be innocent of the crimes charged.  Thus

8   the defendant, although accused of crimes in the

9   indictment, begins the trial with a clean slate with no

10  evidence against the defendant.

11          The indictment, as you already know, is not

12  evidence of any kind.  The law permits nothing but

13  legal evidence presented before the jury in court to be

14  considered in support of any charge against the

15  defendant.  The presumption of innocence alone,

16  therefore, is sufficient to acquit the defendant.

17          The burden is always upon the prosecution to

18  prove guilt beyond a reasonable doubt.  This burden

19  never shifts to a defendant for the law never imposes

20  upon a defendant in a criminal case the burden or duty

21  of calling any witnesses or producing any evidence.

22  The defendant is not even obligated to produce any

23  evidence by cross-examining the witnesses for the

24  government.

25          It is not required that the government prove

1  guilt beyond all possible doubt.  The test is one of

2  reasonable doubt.

3         Unless the government proves beyond a

4  reasonable doubt that the defendant has committed each

5  and every element of the offenses charged in the

6  indictment, you must find the defendant not guilty of

7  the offenses.

8         Section 1001(a)(2) of Title 18 of the United

9  States Code provides, in pertinent part, that:

10  Whoever, in any manner within the jurisdiction of the

11  executive, legislative, or judicial branch of the

12  government of the United States knowingly and willfully

13  makes any materially false, fictitious, or fraudulent

14  statements or representations shall be guilty of an

15  offense against the United States.

16         Now I'm going to read to you the essential

17  elements of the offenses charged in this case.  In

18  order to sustain its burden of proof for the crime of

19  knowingly and willfully making a false statement to the

20  United States government, as charged in Counts 2

21  through 5 of the indictment, the government must prove

22  the following four essential elements beyond a

23  reasonable doubt:

24         One:  The defendant made a false, fictitious,

25  or fraudulent statement or representation to the

1  government as detailed in the count of the indictment

2  under consideration.

3          Two:  In making the false, fictitious, or

4  fraudulent statement, the defendant acted willfully

5  knowing that the statement was false.

6          Three:  The statement was made in a matter

7  within the jurisdiction of the executive branch of the

8  government of the United States; and

9          Four:  The statement made by the defendant

10 was material to the Federal Bureau of Investigation.

11         A false or fictitious statement or

12 representation is an assertion which is untrue when

13 made or when used or which is known by the person

14 making it to be untrue.

15         A fraudulent representation is an assertion

16 which is known to be untrue and which is made or used

17 with the intent to deceive.

18         The term "knowingly" as used in these

19 instructions to describe the alleged state of mind of a

20 defendant means that he was conscious and aware of his

21 act, realized what he was doing or what was happening

22 around him, and did not act or failed to act because of

23 ignorance, mistake, or accident.

24         The term "willfully" as used in these

25 instructions to describe the alleged state of mind of

1   the defendant in Counts 2 through 5 means that he

2   knowingly made a false statement deliberately and

3   intentionally, as contrasted with accidentally,

4   carelessly, or unintentionally.

5           A statement is material if it has a natural

6   tendency to influence or is capable of influencing

7   either a discrete decision or any other function of the

8   government agency to which it is addressed.  Proof of

9   actual reliance on the statement by the government is

10  not required.  Accordingly, the government is not

11  required to prove the statement actually influenced a

12  decision or other function of the FBI.

13          A false statement's capacity to influence a

14  specific decision of a governmental agency must be

15  measured at the point in time that the statement was

16  uttered.

17          A statement is not material if it relates to

18  an ancillary, nondeterminative fact.

19          The good faith of a defendant is a complete

20  defense to all of the charges in the indictment because

21  good faith on a defendant's part is simply inconsistent

22  with a finding of knowingly and willfully making false,

23  fictitious, or fraudulent statements alleged in

24  Counts 2 through 5.

25          A person who acts on a belief or an opinion

1  honestly held is not punishable under the statute

2  merely because the belief or opinion turns out to be

3  inaccurate, incorrect, or wrong.  An honest mistake in

4  judgment or an error in management does not rise to the

5  level of intent to defraud.

6          The law is written to subject to criminal

7  punishment only those persons who knowingly and

8  willfully make false, fictitious, or fraudulent

9  statements.

10         While the term "good faith" has no precise

11  definition, it means, among other things, a belief or

12  opinion honestly held in absence of malice of ill will

13  and an intention to avoid taking unfair advantage of

14  another.

15         In determining whether or not the government

16  has proven that the defendant acted with an intent to

17  knowingly and willfully make false, fictitious, or

18  fraudulent statements or whether the defendant acted in

19  good faith, the jury must consider all of the evidence

20  in the case bearing on the defendant's state of mind.

21         The burden of proving good faith does not

22  rest with the defendant because the defendant does not

23  have any obligation to prove anything in this case.  It

24  is the government's burden to prove to you beyond a

25  reasonable doubt that the defendant acted with the

1  intent to knowingly and willfully make false,

2  fictitious, or fraudulent statements.

3        If the evidence in the case leaves the jury

4  with a reasonable doubt that the defendant acted with

5  an intent to knowingly and willfully make false,

6  fictitious, or fraudulent statements or a belief that

7  the defendant acted in good faith, the jury must acquit

8  the defendant.

9        I'm now going to read to you the nature of

10  the offenses charged in each of Counts 2 through 5:

11        Count 2 of the indictment charges that on or

12  about March 16, 2017, within the Eastern District of

13  Virginia, the defendant did willfully and knowingly

14  make a materially false, fictitious, and fraudulent

15  statement or representation in a matter within the

16  jurisdiction of the executive branch of the government

17  of the United States, namely, that the defendant stated

18  to agents of the FBI that he received a late July 2016

19  telephone call from an individual who he believed was

20  probably Sergei Millian, when in truth and in fact, as

21  the defendant well knew, Sergei Millian never called

22  Danchenko.  That's the allegation in Count 2.

23        Count 3 of the indictment charges that on or

24  about May 18, 2017, within the Eastern District of

25  Virginia, the defendant did willfully and knowingly

1   make a materially false, fictitious, and fraudulent

2   statement or representation in a matter within the

3   jurisdiction of the executive branch of the United

4   States, namely, that the defendant stated to agents of

5   the FBI that he was under the impression that a late

6   July 2016 call that he received was from Sergei

7   Millian, when in truth and in fact, as the defendant

8   well knew, Millian never called Danchenko.

9           Count 4 of the indictment charges that on or

10  about October 24, 2017, within the Eastern District of

11  Virginia, the defendant did willfully and knowingly

12  make a material false, fictitious, and fraudulent

13  statement or representation in a matter within the

14  jurisdiction of the executive branch of the government

15  of the United States, namely, that the defendant stated

16  to agents of the FBI that he believed he spoke to

17  Sergei Millian on the telephone on more than one

18  occasion, when in truth and in fact, and as the

19  defendant well knew, the defendant never spoke to

20  Sergei Millian.

21          Count 5 of the indictment charges that on

22  November 2, 2017, within the Eastern District of

23  Virginia, the defendant did willfully and knowingly

24  make a materially false and fictitious and fraudulent

25  statement or representation in a matter within the

1  jurisdiction of the executive branch of the government

2  of the United States, namely, that the defendant stated

3  to agents of the FBI that he believed that he had

4  spoken to Sergei Millian on the telephone, when in

5  truth and in fact, and as the defendant well knew,

6  Danchenko never spoke to Sergei Millian.

7        Upon retiring to your jury room to begin your

8  deliberations, you must elect one of your members to

9  act as your foreperson.  The foreperson will preside

10 over your deliberations and will be your spokesperson

11 here in Court.

12       Your verdict must represent the collective

13 judgment of the jury.  In order to return a verdict, it

14 is necessary that each juror agree to it.  Your verdict

15 in other words must be unanimous.

16       It is your duty as jurors to consult with one

17 another and to deliberate with one another with a view

18 towards reaching an agreement if you can do so without

19 violence to individual judgment.  Each of you must

20 decide the case for yourself but do so only after

21 impartial consideration of the evidence in the case

22 with your fellow jurors.

23       In the course of your deliberations, do not

24 hesitate to reexamine your own views and to change your

25 opinion if convinced it is erroneous.  Do not surrender

1  your honest conviction, however, solely because of the

2  opinion of your fellow jurors or for the mere purpose

3  of thereby being able to return a unanimous verdict.

4           Remember at all times you are not partisans.

5  You are judges, judges of the facts in this case.  Your

6  sole interest is to seek the truth from the evidence

7  received during the trial.

8           Your verdict must be based solely upon the

9  evidence received in the case, and nothing you have

10 seen or read outside of court may be considered.

11          Nothing I have said or done during the course

12 of this trial is intended in any way to somehow suggest

13 to you what I think your verdict should be.  Nothing

14 said in these instructions and nothing in any form of

15 verdict, which has been prepared for your convenience,

16 is to suggest or convey to you in any way or manner any

17 intimation as to what verdict I think you should

18 return.

19          What the verdict shall be is the exclusive

20 duty and responsibility of the jury, and as I have told

21 you many times, you are the sole judges of the facts in

22 this case.

23          The punishment provided by law for the

24 offenses charged in the indictment is a matter

25 exclusively within the province of the Court and should

1    never be considered by the jury in any way in arriving

2    at an impartial verdict as to the offenses charged.

3              As I indicated, a form for the verdicts have

4    been prepared for your convenience.  You will take this

5    form to the jury room and, when you have reached an

6    unanimous agreement as to your verdicts, you will have

7    your foreperson write your verdicts, date and sign the

8    form, and then return with your verdicts to the

9    courtroom.

10             If it becomes necessary during your

11   deliberation to communicate with the Court, you may

12   send a note signed by your foreperson or by any one or

13   more members of the jury through the bailiff,

14   Mr. Burns.

15             No member of the jury should ever attempt to

16   communicate with the Court by any means other than a

17   signed writing, and the Court will never communicate

18   with any member of the jury concerning the evidence,

19   your opinions, or the deliberations other than in

20   writing or orally here in court.

21             You will note from the oath about to be given

22   by the bailiffs that they too, as well as all other

23   persons, are forbidden to communicate in any way or

24   manner with any member of the jury concerning the

25   evidence, your opinions, or deliberations.

1          Bear in mind also that you are never to

2    reveal to any person, not even the Court, how the jury

3    stands numerically or otherwise on the question of

4    whether or not the government has sustained its burden

5    of proof until you have reached a unanimous verdict.

6          Mr. Burns, would you be sworn, please.

7       (The oath is administered.)

8          THE COURT:  Ladies and gentlemen, before we

9    hear closing argument, we're going to take a short

10   recess.  You're excused to the jury room.  Do not

11   discuss this case during the recess, and I'll bring you

12   back shortly.

13      (The jury exits at 10:19 a.m.)

14         THE COURT:  All right.  We'll take a

15   ten-minute recess.

16         Anything?

17         MR. SEARS:  Your Honor, do you intend to go

18   back to back to back?

19         THE COURT:  Well, it depends on how long the

20   government's closing is.  If it approaches an hour, I

21   think we'll take short break.

22         MR. SEARS:  Understood.  Thank you.

23         THE COURT:  All right.  The Court will stand

24   in recess.

25      (Recess from 10:20 a.m. until 10:36 a.m.)

1132

```
 1        (The jury is not present.)

 2             THE COURT:  Anything before we bring out the

 3   jury?

 4             MR. DURHAM:  The government has nothing.

 5   Thank you, Your Honor.

 6             THE COURT:  All right.

 7             MR. SEARS:  No, Your Honor.

 8             THE COURT:  Does either counsel have any

 9   objection to the jury instructions as read?

10             MR. SEARS:  No, Your Honor.

11             MR. DURHAM:  No, Your Honor.

12             THE COURT:  All right.  Let's bring out the

13   jury.

14        (The jury enters at 10:36 a.m.)

15             THE COURT:  Please be seated.  We're now

16   ready to proceed with closing argument.

17             Mr. Keilty.

18                    CLOSING ARGUMENT

19             MR. KEILTY:  Thank you, Your Honor.

20             Ladies and gentlemen, when I first came

21   before you about a week ago, I asked you not to abandon

22   your common sense, and I know you haven't done that.

23   You've paid attention to the evidence, and you've paid

24   attention to what is actually in the record, what

25   actually relates to the charges in this case.
```

1      Now, a week ago I also told you that I would
2  have the opportunity to come before you at the end of
3  the case, and that time is now.  The government has
4  proven to you beyond a reasonable doubt every fact that
5  I told you about in my opening statement because that
6  is our burden.  We embrace that burden, and we have met
7  that burden over the past week.
8      Now, undoubtedly, you've heard a lot of
9  information over the course of the last week.  You've
10 also heard a lot of information that has, frankly,
11 nothing to do with the charged crimes.  Focus on the
12 evidence as it relates to the charged crimes.  That is
13 the only question before you.  What the defendant did
14 or didn't do outside of the charged crimes is not an
15 issue before you, and what some of the stuff that the
16 FBI did or didn't do is not an issue before you.  The
17 only issue before you is whether the defendant made a
18 false statement and whether that false statement could
19 have affected the FBI's actions.  That's it, nothing
20 more.
21     So let's go through the charges and how the
22 government has proven those charges beyond a reasonable
23 doubt, which is our burden.  As Judge Trenga has
24 explained to you, there's four charges here, four
25 counts, four false statements.  Judge Trenga has just

1    described for you the elements of the offense, so I'm

2    not going to go through that again.  But you will have

3    the law back there with you during your deliberations.

4           Again, Counts 2 to 5 involve the defendant's

5    false statements to the FBI about Sergei Millian on

6    four different occasions:  March 16, 2017; May 18,

7    2017; October 24, 2017; and November 2, 2017.

8           More law that the judge has described for

9    you.

10          Here's Count 2 which the judge has read to

11   you:  That the defendant stated to the agents of the

12   FBI that he received a late July 2016 telephone call

13   from an individual who Danchenko believed was probably

14   Chamber President 1 -- and that's Sergei Millian --

15   when in truth and in fact, as the defendant well knew,

16   Chamber President 1 never called Mr. Danchenko.

17          Count 3, May 18, the defendant stated to the

18   agents of the FBI that he was, quote, under the

19   impression that a late July 2016 telephone call that he

20   received was from Chamber President 1, Sergei Millian,

21   when in truth and in fact, and as the defendant well

22   knew, Millian never called Danchenko.

23          Count 4, it's very similar.  October 24,

24   2017, this defendant stated to agents of the FBI that

25   he believed he spoke to Sergei Millian on the telephone

1  on more than one occasion, when in truth and in fact,

2  as this defendant well knew, Danchenko never spoke to

3  Sergei Millian.

4         Finally, Count 5.  November 2, 2017, the

5  defendant stated to agents of the FBI that he believed

6  he had spoken to Sergei Millian on the telephone, when

7  in truth and in fact, as the defendant well knew,

8  Danchenko never spoke to Chamber President 1.

9         Ladies and gentlemen, we have proven to you

10 beyond a reasonable doubt every one of those counts,

11 that the defendant never received a call from Sergei

12 Millian, and that he never received a call from an

13 anonymous caller.

14        The government's burden is to prove to you

15 beyond a reasonable doubt but not beyond all possible

16 doubt, and that's an important distinction I want you

17 to remember.

18        So let's talk about the evidence in this

19 case.  We learned about the Steele dossier and how the

20 Steele dossier was an effort to link Donald Trump to

21 Russia, and we know from this defendant's very own

22 words that he was responsible for collecting 80 percent

23 of the information that ended up in those dossier

24 reports.  And we know from his very own words that he

25 was responsible for 50 percent of the analysis in those

1   dossier reports.

2          That's Government Exhibit 1502, which you'll

3   have.  I recommend taking a look at all of these

4   exhibits that we're going to show you today.  You'll

5   have them.  Look at them very carefully.  Look at the

6   defendant's own words.

7          Now, you heard testimony that nothing in the

8   Steele dossier was able to be corroborated despite the

9   fact that the FBI offered Christopher Steele a million

10  dollars, a million dollars for any such corroboration.

11         We also know that critical information that

12  was contained in Dossier Report 95 ended up in multiple

13  FISA applications against a U.S. citizen for nearly a

14  year.

15         We know that the defendant identified Sergei

16  Millian as the source for this information.  Take a

17  look at it.  Government Exhibit 109A is Report 95, and

18  then take a look at the FISA applications.  There were

19  four of them.  Compare what's in Dossier Report 95 to

20  what's in the FISA applications.

21         So let's take a look at the evidence.  We're

22  going to go slowly and methodically through all the

23  evidence that you have seen.  We know that on July 21,

24  2016, the defendant, Igor Danchenko, sent an email to

25  Sergei Millian.  This was the first time the defendant

1   ever reached out to Millian, the first contact, period,

2   and the evidence establishes that.

3          Look at the date, Igor Danchenko to Millian

4   Group, July 21, 2016.  This is Exhibit 204T.  Look at

5   this carefully.  Read the defendant's own words

6   carefully.  The defendant asked Millian to provide

7   information about Donald Trump's trips to Russia.  He

8   also tells Millian that he plans on being in New York

9   next week.  He plans on being in New York next week,

10  and that's important.

11         Why is that important?  Because the defense

12  has made a big deal about Amtrak records and the fact

13  that he bought tickets the day before he traveled to

14  New York insinuating that the reason he bought tickets

15  was to go visit Sergei Millian.  But this email debunks

16  that.

17         The defendant planned on being in New York

18  all alone.  See, the evidence shows he was going on a

19  sightseeing trip with his daughter.  You've seen

20  Facebook posts that show him being at the Bronx Zoo,

21  Central Park, the Domino's Sugar Factory sign.  This

22  email proves this trip was planned a long time before

23  Sergei Millian.

24         And we have a second email, which we'll show

25  in a second, which also proves that.  Ladies and

1  gentlemen, these are the defendant's own words,
2  powerful evidence.
3          In this email, the defendant says, "In any
4  case, it would be interesting if and when possible to
5  chat with you by phone or meet for a coffee/beer in
6  Washington or New York where I will be next week."
7          He says it's possible to chat with you by
8  phone, and what does he provide, ladies and gentlemen?
9  What is in that signature block?  He provides his phone
10  number, his office phone number, his cell phone number,
11  and his email address.  On July 21, 2016, show me where
12  the defendant says anything about the use of an
13  Internet app.
14          The government will return to this again
15  because it's important, but how was Sergei Millian on
16  July 21, 2016 -- how was he supposed to know what
17  Internet apps this defendant was using, somebody he had
18  never met, somebody he had never spoken to?  Does it
19  make sense that Millian would just run down a list of
20  apps randomly trying to figure out if this defendant
21  had that app?  Common sense, common sense.
22          Now, the evidence has shown that Sergei
23  Millian at this time was in Asia on July 21 when he
24  received the initial outreach from the defendant.
25  You've seen Millian's travel records, and you know he

1  was in Asia.  And on July 26, he sends Dmitri Zlodorev

2  an email and asks who the defendant is.  An email came

3  from Igor.  Who is that?  What sort of person?  Who is

4  this guy asking me about Donald Trump?  It seems like a

5  sensible question.  So we know as of July 26, Sergei

6  Millian had not responded to this defendant.

7           So let's look at how Mr. Zlodorev responds

8  because this is important:  "Sergei, hello, do you

9  remember I said that a friend of my colleague wanted to

10 get acquainted with you?  You gave permission to give

11 your email.  The way I understand it, this is who this

12 is.  He and I are not personally acquainted, though, he

13 is, it seems, in my LinkedIn.  And I didn't know what

14 he wanted to talk about.  If I remember correctly, he

15 works at some think tank in Washington."  That's

16 Government Exhibit 206T.

17           Does that sound like a ringing endorsement of

18 someone's credibility?  Would you read that email and

19 feel comfortable providing that person with very

20 sensitive information that's going to blow up a

21 presidential campaign?

22           He says he's not personally acquainted with

23 him.  What else does this email not say?  Do you see

24 anything about whether Sergei Millian planned to give

25 the defendant a call in his initial reach-out to

1  Zlodorev?  Do you see any questions about whether

2  Mr. Millian asked Mr. Zlodorev whether there was any

3  Internet apps this guy used?

4           Ladies and gentlemen, you're going to see a

5  number of slides like this, what the emails do not say

6  and what you would expect them to say, right.  Does the

7  email say, Should I give this guy a call?  Does the

8  email say, Do you know if this person uses any Internet

9  apps?  Is there any reason I should meet with this guy?

10 The email does not say that.  You do not see that.

11          And I told you there was another email that

12 proves the defendant planned on being in New York, that

13 this trip had nothing to do with Sergei Millian, and

14 here's that email.  On July 18, 2016, three days before

15 he sends his initial reach-out to Millian, he tells one

16 of his bosses that he plans to be in New York.  Look at

17 the email:  I may have to go to New York City, NYC.

18 That's Government Exhibit 901.

19          In connection with 901 and 204T, that is

20 evidence beyond a reasonable doubt that this defendant

21 planned to be in New York three days before his initial

22 reach-out to Sergei Millian.

23          There's no evidence in this record before you

24 that the defendant reached out to Millian at any time

25 after his July 21st email to arrange a day, to arrange

1 a time, or a location for a purported meeting.

2           So let's turn to the August 18 email.  This

3 was the second email three weeks after his initial

4 reach-out to Mr. Millian.  Look at what the defendant

5 says.  Look at his own words:  I wrote you several

6 weeks ago.  I wrote to you several weeks ago.  If

7 there's opportunity and interest, let's meet and let's

8 chat about other projects.

9           Common sense.  Does that sound like someone

10 who spoke on the phone with Sergei Millian three weeks

11 ago?  Of course not.

12          The defendant also tells Millian that he uses

13 LinkedIn and they're contacts on LinkedIn.  There's

14 nothing about any Internet apps again.  You won't see

15 that anywhere in the defendant's own words, nothing

16 about an Internet app.

17          He says at the end:  Write, call, my contact

18 information is below.

19          Does that sound like someone who received a

20 call from Sergei Millian three weeks ago?  It doesn't.

21          What the email doesn't say:  Hey, I received

22 a call from you last month, and I thought it might have

23 been you.  Hey, I thought we were supposed to meet in

24 New York.  Where the heck were you?  I showed up to the

25 meeting.  You didn't keep your end of the bargain.

 1          Wouldn't you have expected to see that?

 2          But there's more.  Again, we have the best

 3  proof available, this defendant's own words.  Because

 4  on August 24, 2016, the defendant emailed Dimitri

 5  Zlodorev and explicitly stated that Sergei Millian had

 6  not responded to him.  Quote, For some reason, Sergei

 7  doesn't respond.  For some reason, Sergei doesn't

 8  respond.  What is your relationship with him like?

 9  Would you be able to ask him to reply to me?  I could

10  call or write on LinkedIn, but until he responds, I

11  don't want to pester him.  Until he responds, I would

12  not like to pester him.

13          That's Government's Exhibit 115T.

14          What the August 24, 2016, email does not say:

15  Hey, I received a call from someone.  I thought it

16  might be Millian.  Do you know anything about this?

17  Maybe, more importantly, we were supposed to meet in

18  New York, but he never showed up.  Do you know anything

19  about that?

20          Common sense.  Ladies and gentlemen, I know I

21  say it over and over again, common sense, but you

22  didn't check your common sense at the courthouse door.

23  You need to use it.

24          In his own words, this defendant makes it

25  clear that Sergei Millian had not responded by phone,

1  had not responded by email, apps, social media,

2  nothing.  He didn't respond on July 21, and he didn't

3  respond on August 18.

4         Let's take a look at what the August 24 email

5  does say:  For some reason, Sergei doesn't respond.

6  It's the plain admission of the defendant's guilt in

7  his own words.

8         So let's now talk about what the defendant

9  told the FBI about his call with Sergei Millian or an

10 anonymous caller.  You heard Agent Helson testify that

11 the FBI will often have a source repeat a version of a

12 story because if the person is lying, it gets harder

13 and harder to keep those lies straight.  Kevin Helson's

14 own words:  It's hard to keep that lie straight through

15 the course of a repeating story.

16        That's what happened here, a shifting story.

17 You heard testimony from Supervisory Intelligence

18 Analyst Brian Auten, who was asked:  Now, you told the

19 juror that Mr. Danchenko had told you he sent one

20 email, correct?

21        Answer:  Correct.

22        Question:  And then the first day, only after

23 the second email that he received this purported call,

24 correct?

25        Answer:  Correct.

1           The second day he said it was after the first

2    email?

3           Answer:  Correct.

4           That's in the January 2017 interviews.  It

5    was not a consistent story, a shifting story.

6           Then we go to the interviews of the defendant

7    when he's now a CHS, a confidential human source.

8    Again, you heard from Special Agent Helson that the

9    defendant's story materially changed on October 24,

10   2017.  Now the FBI -- the defendant told the FBI that

11   he had a, quote, a couple of calls with the person he

12   believed to be Sergei Millian.

13          He goes from one call consistently in January

14   to October.  He now has had a couple of calls with

15   Sergei Millian.  That's significant, and it's

16   consistent with what Agent Helson said about lying.

17   It's hard to keep track of lies through a repeating

18   story.

19          Agent Helson told you that was a significant

20   material change to what the defendant had previously

21   told him, and he told you he put the phrase "a couple

22   of calls" in quotes because that's what he did when he

23   wanted to emphasize that that's what an individual was

24   saying verbatim.  It was "a couple of calls."

25          So let's turn to the phone records that

1  you've seen in evidence and that you will have back

2  there with you in the jury room.  Supervisory Special

3  Agent Ryan James methodically walked you through each

4  and every call the defendant received from July 20

5  through the end of August, not just late July.  The

6  government wanted to make sure he covered the whole

7  time period.

8            There is not one call, not one with any

9  number associated with Sergei Millian.  Almost every

10 single call has been identified by the government and

11 the vast majority of those calls come from this

12 defendant's very own email contacts.

13           The couple of calls that we have not

14 identified are one minute or less, so they don't match

15 up to the defendant's description of a 10- to 15-minute

16 call with Millian.  So there was no call with Millian,

17 and there was no call with any anonymous individual.

18 These phone records prove that.  Take a look at them

19 when you begin your deliberations.

20           Now, you've heard a lot of testimony about,

21 you know, could this have been an Internet app, right?

22 There's no evidence of that.  There's no evidence in

23 this record that this call was on an Internet app.  The

24 government's burden is beyond a reasonable doubt, not

25 beyond all possible doubt.

1    Take a look at the July 21 email that the
2  defendant sent to Millian.  Where does it say anything
3  about an Internet app?

4    So here's what you'd have to believe to
5  accept as true what the defendant told the FBI:

6    First, an unidentified individual, who the
7  defendant purportedly believed to be Sergei Millian,
8  knew that the defendant communicated through Internet
9  apps.

10   Evidence in the record:  None.

11   Second, that an unidentified individual, who
12  the defendant purportedly believed to be Sergei
13  Millian, randomly selected an Internet app and
14  correctly guessed that the defendant had that Internet
15  app.

16   Evidence in this record:  None.

17   The evidence does show, however, that when
18  the FBI explicitly asked this defendant for phone
19  records of any type, the defendant produced nothing, no
20  phone records, no app records, no screenshots, nothing.

21   You heard Brian Auten's testimony about that,
22  and you heard Kevin Helson's testimony about that.  And
23  the evidence shows that the defendant previously
24  provided screenshots of app calls, but not in this
25  case.

1    This is really important:  When the defendant

2   wanted to communicate on an Internet app, he was

3   explicit, and that makes sense.  How else would the

4   person know which app to use?  You see his Facebook

5   messaging with Olga Galkina:  Call me possibly -- so I

6   can get through directly -- possibly through Viber or

7   WhatsApp.

8    That's Government Exhibit 610T, 611:  I'm in

9   Britain next week.  Perhaps we can discuss a couple of

10  things here or on Signal or obviously by phone.

11    And then a follow-up towards the end of

12  April, 612T:  It's a very delicate topic.  Maybe you

13  have Signal or mail.  It's better not to write here at

14  all.

15    So when the defendant wanted to communicate

16  on an Internet app, he was very explicit.  Again, that

17  makes sense.  But you heard Agent James say that

18  there's dozens of these Internet apps.

19    So what you'd have to believe to accept as

20  true what the defendant told the FBI:

21    First, that the defendant received a call

22  from Sergei Millian.  There's no evidence of that.

23    Second, that the defendant received an

24  anonymous call.  There's no evidence of that.

25    Third -- and this is important, I submit --

1   Sergei Millian, a known Donald Trump supporter and a

2   vocal Donald Trump supporter, a person that the

3   defendant had never spoken to, tells Sergei Millian, a

4   person the defendant has never spoken to, provides him

5   with damaging information about the Kremlin and Donald

6   Trump.

7            Why would Sergei Millian, a vocal supporter

8   of then-candidate Trump, provide this information to

9   somebody he's never met before, he's never spoken to

10  before?  It doesn't make sense.

11           You'd also have to accept that this defendant

12  traveled to a city of 8 million people and planned to

13  meet with an unidentified individual at an unidentified

14  bar with his young daughter at night.  How was he going

15  to meet this person?  Unidentified individual at an

16  unidentified bar in a city of 8 million people with his

17  young daughter at night.  How are they going to

18  recognize each other?

19           Fifth, that the defendant was sightseeing all

20  day on July 28, 2016.  You saw the Facebook records of

21  that.  He had a fever, but then he went to a purported

22  meeting, again, with an unidentified individual at an

23  unidentified bar in New York.

24           So let's recap -- common sense -- there was

25  no call.  He was not meeting an unidentified individual

1 at an unidentified bar.  If anyone can explain that

2 away -- I certainly can't.  It's a not-to-be-believed

3 story, ladies and gentlemen.  Think about what you'd

4 have to accept to believe the defendant's story to the

5 FBI.  Look at the inconsistencies the defendant has

6 going from one email to two emails and then going from

7 one call to two calls.  Those are important.

8        So let's now talk about why the defendant's

9 lies matter.  The defendant's lies about Sergei Millian

10 mattered because the information he allegedly received

11 from Millian ended up in a FISA warrant against a U.S.

12 citizen, one of the most intrusive tools the FBI has at

13 its disposal.  The FBI gets to listen to your calls and

14 read your emails.  It's a really significant thing.

15        You heard Brian Auten testify that that

16 Millian information -- alleged Millian information was

17 contained in every single FISA application on four

18 different occasions.  The FBI surveilled a U.S. citizen

19 for nearly a year based on those lies.  You heard Brian

20 Auten testify that it was a significant part of the

21 FISA application.  And you know it allegedly came from

22 Mr. Millian because that's what the defendant told the

23 FBI.

24        Now, you also heard testimony from Agent

25 Helson that the FBI would've had an affirmative duty to

1   correct that information with the FISA court if it had
2   known it was a lie.  They would've gone back to the
3   court, and they would've had to correct that
4   information.  That didn't happen, and the defendant
5   lied to the FBI.

6          So here's an important question:  Why would
7   the defendant lie?  What was his motivation in lying?
8   Well, let's take a look at it.  We all know the
9   dossier -- what was the point of the dossier?  It was
10  to tie Donald Trump to Russia, and the bedrock
11  allegation of that dossier was a, quote, conspiracy of
12  cooperation between Trump and the Russian government.

13         Now, you also heard evidence that Christopher
14  Steele -- that the defendant told Christopher Steele
15  that he had met with and he had received evidence about
16  this information directly from Sergei Millian.  So this
17  defendant tells Christopher Steele that he had met with
18  Sergei Millian not on one occasion but on two occasions
19  in person.

20         Now, the defendant had to provide the FBI
21  with a story as to how he received that information if,
22  in fact, he did meet with Sergei Millian.  That's why
23  he lied.  He had to have some rationale how he received
24  this information.  He's telling Steele that he's
25  meeting with him in New York and in South Carolina, and

1    then he's telling the FBI:  Yeah, but I never met with

2    him.

3              So how did you get the information?  He's got

4    to have some way of providing that story.

5              I'm almost done.  Thank you for your

6    attention.  Again, these are just some of the points

7    that we've hit, what you'd have to believe to accept

8    and to acquit this defendant.

9              Again, for some unknown reason, a vocal Trump

10   supporter is providing damaging information to somebody

11   he's never met.  The defendant, a trained analyst,

12   remembered no details about the origins of the call,

13   whether it was an Internet app, whether it was a phone

14   call, and recorded no information about the caller,

15   provided no records of any call, no screenshots, no

16   toll records, no phone bills.  The defendant actually

17   believed this person to be Sergei Millian and that the

18   defendant planned on meeting with an unidentified

19   individual at an unidentified bar in a city of 8

20   million people with his young daughter at night.  I

21   keep repeating that because it is just an unbelievable

22   story.

23             You heard defendant's own words:  Millian

24   never responded to him.

25             So that's the evidence in this case.  Make no

1   mistake.  This is an important case.  Before I sit

2   down, ladies and gentlemen, I want to thank you, each

3   and every one of you, for your service, and I really

4   mean that.  Thank you for paying close attention to the

5   evidence in this case.

6           You've heard some evidence that this wasn't

7   the FBI's finest hour, and you heard some evidence

8   about the defendant's role as a confidential human

9   source.  But neither of those issues are actually

10  before you.  All you must do is to decide whether this

11  defendant made a material false statement to the FBI.

12  In other words, whether that false statement could have

13  affected the actions of the FBI.

14          Winston Churchill famously said that a lie

15  gets halfway around the world before the truth gets a

16  chance to put its pants on.  Well, ladies and

17  gentlemen, in this case, the truth never got dressed,

18  and this defendant's lie caused intrusive surveillance

19  on a U.S. citizen.  You now must hold him accountable.

20          The government has proven its case.  I'm

21  going to ask you to do your job.  Listen carefully to

22  the instructions that Judge Trenga has provided you and

23  which you will have back in the jury room.  Examine all

24  the evidence, please.  If you do that, I'm confident

25  you will come to the only verdict that is both

1    supported by the law and by the facts, and that is the

2    defendant is guilty.

3            Thank you very much.

4                      CLOSING ARGUMENT

5            MR. SEARS:  Good morning.  Thank you, ladies

6    and gentlemen, for your attention throughout this case

7    and for serving as jurors this past week.

8            Just as Mr. Onorato told you in his opening,

9    the government's own evidence in this case proves that

10   Mr. Danchenko is not guilty.  As you heard throughout

11   the trial, on January 10, 2017, BuzzFeed published what

12   later would be termed the Steele dossier or the Steele

13   company reports.

14           On that day, Mr. Danchenko, like everybody

15   else, found out for the first time that that

16   information had been shared with the FBI during the

17   course of a 2016 presidential election.  Mr. Danchenko

18   also learned that day that the work he had been asked

19   to do was not only used to create portions of the

20   dossier but had also been sent to the FBI.

21           Mr. Danchenko through no fault of his own and

22   not by his choice was about to take center stage in one

23   of the most high-profile, widespread, and politically

24   charged investigations in the history of our country.

25           Within days of the release of the dossier,

1  the FBI came knocking on his door because they wanted

2  to speak with him.  They wanted to know if he would

3  meet with them, if he would talk to them about his

4  sources, if he would talk about what corroboration he

5  had for the information that was in the reports.  He

6  was under no obligation to speak with the FBI.  He

7  didn't have to.  He could've said no, and there's

8  nothing they could have done about it.  But he agreed

9  to do it anyways.

10          In the last week of January 2017, just two

11 weeks from when he read the dossier for the first time

12 himself, he agreed to be interviewed by the FBI over

13 three days.  He told them then -- and you heard this

14 from the agent testimony and consistently ever since --

15 that the information he provided to Steele that had

16 made its way into the report was an uncorroborated mix

17 of rumor and speculation, that came second and third

18 hand from people he had spoken to in his social

19 network.  And he told the FBI, when he first met with

20 them in January 2017, that he didn't know that anything

21 in the dossier could be proven.

22          As Agent Helson testified last week,

23 Mr. Danchenko was shocked and upset with the way Steele

24 had represented the information he had provided as fact

25 when it was rumor and speculation.  While the special

1   counsel may complain that that explanation comes from

2   Mr. Danchenko himself, they have offered no evidence to

3   contradict what he said.

4          Importantly -- and this is crucial to your

5   analysis of this case, especially the charged counts

6   regarding Mr. Millian -- Mr. Danchenko told the FBI at

7   that very first meeting in January that he had deleted

8   most of his communications from the relevant time

9   period that they were going to be looking into.  Agent

10  Helson even told you that he instructed -- or told

11  Mr. Danchenko to scrub his phone, to delete information

12  on his phone when he was going to become a human

13  source.

14         Without any documents really, any emails, any

15  messages, Mr. Danchenko sat down with the FBI for three

16  days and went only off his memory in explaining what

17  had happened, not just with Mr. Millian but with

18  everything that had happened in connection with his

19  collecting information for the dossier.

20         And while the agents testified that he

21  provided a lot of information on a lot of different

22  people, this case is concerned only with what he said

23  about one person, an anonymous caller who he never said

24  was Sergei Millian.  The government's whole closing is

25  Sergei Millian, Sergei Millian, Sergei Millian.  He

 1  said Sergei Millian did this.  He never said that, not
 2  once.  Go read the transcripts, see the testimony.  He
 3  never said that.  He only said he thought it could be
 4  Sergei Millian; yet, the whole closing by the
 5  government is about it was Sergei Millian.
 6          Both Agent Auten and Agent Helson were
 7  consistent in their testimony about that.  He never
 8  said that he was certain who it was.  He was
 9  speculating.  He was trying to help the FBI.  And even
10  without any records, any emails to help refresh his
11  recollection like every witness in this trial had to
12  use to refresh their recollection, he provided them a
13  lot of details about the lead-up to that anonymous call
14  and the communications he believed he had at that time.
15          First, he told them he had reached out to a
16  Russian journalist, Dmitri Zlodorev, who referred him
17  to Millian and who provided him with Millian's contact
18  information.  He also told them from memory that he had
19  emailed Millian in late July to see if he could make
20  contact with him but that he never received a response.
21  He told them from memory that after he sent that July
22  email to Sergei Millian, he received an anonymous call
23  on a messaging app.  He said a phone call or a
24  messaging app -- and we'll show you the transcript in a
25  minute so there's no confusion about that -- but that

1   the person on the call did not identify themselves.

2   The person told him on the call of a connection between

3   Russia and the Trump campaign but that it wasn't really

4   a bad thing.  Mr. Danchenko and the anonymous caller

5   agreed to meet in New York later that week.

6           That's what he told the FBI.  The FBI never

7   asked him where they were going to meet.  They never

8   asked him any information about the details of the

9   meeting place ever.  If they had, he would've told

10  them.

11          So the government makes a huge deal about

12  some unidentified person, some unidentified person.

13  They never asked him who he was going to meet.  No one

14  ever inquired of that information.  He could've told

15  them had they asked.

16          When Mr. Danchenko went to New York -- and

17  it's not in dispute that he was in New York -- the

18  anonymous caller never showed up to the meeting place.

19  He told the FBI that he didn't know who was on the call

20  because he never met the anonymous caller, but that

21  based on the circumstances surrounding the call, which

22  we're going to go through today, and the sound of the

23  voice, he believed it was probably Millian.

24          Importantly, he also told them that he

25  emailed Millian after the anonymous call in the midst

1   of the July meeting in New York.

2           He also not only told them, he also not only

3   showed them, but he also gave them emails he had with

4   Dimitri Zlodorev after the anonymous call and after the

5   missed meeting in New York.  The same emails that the

6   government just put up to say that proves his guilt,

7   the smoking gun, Mr. Danchenko gave them those emails

8   in January 2017 when he was describing the situation.

9           Why would he hand over emails that he

10  believed show he was guilty?  They don't, and we're

11  going to go through that.  And actually, Agent Helson

12  through his testimony confirmed that.

13          As you heard throughout this trial,

14  Mr. Danchenko was a Russian national.  He is not an

15  American citizen.  He sat and met with the FBI to

16  answer questions related to the dossier.  He did it for

17  three days in January and for many months after that.

18  But he also volunteered to become a confidential human

19  source for the Federal Bureau of Investigation and to

20  provide information on Russian activity that impacted

21  our national security.  From 2017 to 2020, nearly four

22  years, he did just that.

23          And at no point -- and his testimony couldn't

24  have been clearer.  At no point did his handling agent,

25  Special Agent Helson -- who knows him better than

1  anyone in this courtroom and spent more time with him

2  than anyone else.  At no point did Agent Helson feel

3  that Mr. Danchenko was ever not truthful with him for

4  four years.

5          Agent Helson also told you that

6  Mr. Danchenko's information was vital to national

7  security and led to the opening of more than two dozen

8  active influence cases.  He became a trusted source of

9  information for our government that even led to the

10 creation of a new team at the FBI as a result of the

11 information he provided, the guy they are saying is a

12 liar.

13         But as you've also heard at trial, the

14 political winds in this country changed once

15 then-President Trump appointed a new attorney general,

16 William Barr.  Barr not only essentially revealed

17 Mr. Danchenko's identity by releasing a redacted

18 version of his January 2017 interview to the Senate

19 Judiciary Committee, but that committee released that

20 report within an hour of receiving it to the public.

21         Attorney General Barr also ordered an

22 investigation into the investigation of the Trump

23 campaign and its connections to Russia.  So a new

24 special counsel was appointed, this special counsel, to

25 lead that investigation.

1       I submit to you that if this trial has proven

2  anything, it's that the special counsel's investigation

3  was focused on proving crimes at any cost as opposed to

4  investigating whether any occurred.

5       I submit to you that a fair and reasonable

6  look at the evidence in this case shows that the

7  special counsel -- they started out with the

8  presumption of guilt, that Mr. Danchenko had lied, and

9  they read guilt into every piece of evidence they came

10 across and at every detail they saw.  They ignored --

11 and we're going to show you.  They ignored how their

12 own evidence showed he was not guilty, that he was

13 innocent.

14      So when the special counsel set out to prove

15 him a liar, they knew he didn't have a lot of records.

16 He could not locate the number for the anonymous

17 caller.  It happened seven months before he was ever

18 even interviewed by the FBI, and that's exactly what he

19 told the FBI.

20      It didn't stop them, of course, from arguing

21 throughout the trial and then again today that he

22 should have provided this, he should have provided

23 that.  They're shifting the burden onto him.  He

24 doesn't have to prove anything.  You can read the

25 instructions.  They have the burden of proof in this

1    case.  They have to show that they've proven all the

2    elements of the offense.

3              As you heard from Special Agent James on

4    Friday, the FBI has a lot of tools at its disposal.

5    The special counsel has a lot of tools at its disposal.

6    They do interviews and search warrants and subpoenas to

7    third parties -- because Mr. Danchenko didn't have any

8    material anymore.  They thought they were going to

9    gather evidence to prove the case they set out to

10   prove, which is that Mr. Danchenko had lied to the FBI.

11             And Mr. Danchenko had provided them a lot of

12   detail, as I mentioned, about that anonymous call.

13   There were a lot of places he could have messed up if

14   that was a lie.  All the government had to prove was

15   one or more of the following to show Mr. Danchenko was

16   a liar:

17             First, that Mr. Danchenko never reached out

18   to Dimitri Zlodorev, like he said he did, from

19   Millian's contact information.

20             Second, that Mr. Danchenko never even reached

21   out to Sergei Millian.

22             Third, that Mr. Danchenko never went to New

23   York.

24             Fourth, that if he did go to New York, he

25   wasn't there for work.

1      Fifth, that if he was not in New York -- that
2  Mr. Millian was not even in New York at the same time
3  as Mr. Danchenko.

4      Sixth, that Mr. Millian never contacted
5  Mr. Danchenko via a messaging app.

6      Seventh, if all else failed and they couldn't
7  prove it with those six items, they could always bring
8  the FBI agents in here to tell you that he lied to
9  them.

10      Well, let's go through their investigation
11  and what it actually showed.

12      First, with regard to the Zlodorev email --
13  remember, Mr. Danchenko didn't have emails.  He was
14  going off memory about his conversation and when he had
15  these conversations over email regarding this phone
16  call.

17      So the government went and got Sergei
18  Millian's emails, and guess what they found in Sergei
19  Millian's emails:  A May 26 email from Dmitri Zlodorev
20  to Sergei Millian writing:  In addition, my colleagues
21  have an acquaintance, Igor Danchenko, who works here in
22  consulting.  Through them, he requested if I find out
23  if it's okay to get in touch with you?  If I understand
24  correctly, it's about Trump and Russia.  Can I give him
25  your contact information, email, phone, or just email?

1        That is exactly what Mr. Danchenko told them

2   how this whole chain of events started when he was

3   being interviewed in January 2017, seven months after

4   this happened.  The special counsel's investigation and

5   the seizure of Sergei Millian's emails proved

6   Mr. Danchenko told the truth about that.

7        Second, whether Mr. Danchenko ever even

8   reached out to Sergei Millian.  Again, the government

9   had Sergei Millian's emails.  And what do you know?

10  Just like Mr. Danchenko told them in January 2017,

11  about an email in July of 2016 to Mr. Millian, there it

12  is, Mr. Danchenko reaching out:  In any case, it would

13  be interesting, if and when possible, to chat with you

14  by phone or meet.

15       Mr. Keilty read that evidence as showing

16  guilt; yet, this piece of evidence Mr. Danchenko did

17  not have in his possession in January of 2017 or later

18  when he spoke to the government or the FBI.  It was

19  uncovered by the government in their investigation to

20  prove him a liar, and it proved him true.  It proved he

21  was telling the truth.

22       So, third, whether Mr. Danchenko ever even

23  went to New York like the story he told about going to

24  New York.  Special counsel sought to prove that

25  Mr. Danchenko didn't go to New York when he said he

1    did.   So they subpoenaed his Amtrak records to see what

2    they would show, see if they would prove the lie to

3    what he had said, and those records show that he

4    purchased his tickets on Monday, July 25 -- these were

5    not in Mr. Danchenko's possession because they

6    recovered these directly from Amtrak -- and that he

7    left for New York at 3:57 a.m. on the morning of

8    Tuesday, July 26, and returned on a train that left at

9    10:05 on Thursday, July 28.

10             Those records also confirm that

11   Mr. Danchenko's tickets were scanned on the train to

12   New York at 3:57 a.m.   These times are provided in

13   Pacific Standard Time.   That was the stipulation we had

14   read before we rested.   They were scanned on a return

15   trip to D.C. at 10:23 p.m.   They also show that he

16   traveled with his daughter, just like he told the FBI

17   in January 2017.

18             So far from proving Mr. Danchenko had lied

19   about anything to the FBI, again, his travel records

20   confirmed, their investigation confirmed he told the

21   FBI the truth and his story was adding up.

22             So then the government set out to prove --

23   and they made this argument today -- that if he did go

24   to New York, he wasn't there to do work.   But the

25   government obtained Mr. Danchenko's Facebook messages

1   from that time period through a search warrant or a

2   subpoena.  And what did they show?  They show that

3   Mr. Danchenko sent a message to his wife on July 28 at

4   4:23 p.m.  That not only showed he was in New York, but

5   it even included a reference to having another meeting

6   that night, July 28.

7            They uncovered another message saying at

8   6:40 p.m. that night, he indicated his work was done.

9            These are real-time communications in July

10  2016 that corroborate everything he's telling the FBI

11  in January 2017 and afterwards about his recollection

12  of what happened.  He had no reason to believe July of

13  2016 that he was going to be the subject of this

14  massive investigation into a dossier.  He had no reason

15  to believe that.

16           They went back to seize records to prove him

17  a liar, and the records are getting back.  If they're

18  looking at them neutrally, they're proving that he told

19  them the truth.

20           Lastly -- and this is one of my favorite

21  parts of this investigation -- is that the government

22  sought to prove that Mr. Millian couldn't even have

23  been in New York when Mr. Danchenko claims to have been

24  there.  They're not having luck, as you just saw, in

25  their mission to prove him a liar.  So they decided to

1  take a look at Millian.  What are his whereabouts when

2  Mr. Danchenko was in New York?  And you heard the

3  testimony.  They elicited it.  He travels overseas a

4  lot.  He's always out of the country.

5       I'm sure they believed -- I'm sure they

6  believed they were going to be able to show he was out

7  of the country, but guess what happened.  Millian's

8  travel records actually prove that he just happened to

9  be in New York on the day Mr. Danchenko referenced

10 having another meeting.  That's devastating for the

11 government's case, devastating.

12      He had no way of knowing where Sergei Millian

13 was that week.  He didn't have his travel records.  He

14 didn't know.  It just so happens he arrived on July 27

15 in the evening, and Mr. Danchenko's reference to a

16 meeting is on July 28.

17      Either he's the luckiest man on the face of

18 the earth, or he was telling the truth.  Investigation,

19 more evidence supporting what he told them, supporting

20 what he believed, and they just blow right past it like

21 it's not even there because it doesn't fit their

22 narrative that he's a liar.

23      By the way, we now know from the evidence

24 that the government uncovered in this investigation why

25 it was that Mr. Millian may not have shown up to that

1   meeting if it was him on that call.  It looks like

2   Mr. Zlodorev may have been the person who scared

3   Millian off from the in-person meeting from the July 26

4   email that the government referenced.  I couldn't agree

5   more with Mr. Keilty.  This is the opposite of a

6   glowing endorsement.  This is basically a message that

7   would probably scare Sergei Millian away from having

8   that meeting on the 28th.  I couldn't agree more with

9   the government on this:  I am not personally acquainted

10  with it.  I don't know what he wants to talk about.  He

11  works at some think tank in Washington.

12          To the extent that an anonymous caller wanted

13  to meet with him and if it was Millian and he got that

14  email, it makes perfect sense why he didn't show up.

15          But, again, with Mr. Millian's travel

16  records, information like this corroborated

17  Mr. Danchenko's version of events.  The government then

18  has to go look somewhere else to try and find something

19  to show he's guilty.  So that brings us to the

20  anonymous phone call or the anonymous message.

21          The government set out to prove -- Mr. Keilty

22  told you in his opening statement he was going to prove

23  Mr. Danchenko never received an anonymous call.  Now,

24  this is where -- if you recall during the trial,

25  special counsel got a little tricky here.  Remember,

1  they asked Agent Auten to refresh his recollection by
2  reviewing a document, a report he had written, that
3  Mr. Danchenko claimed to have received a cellular call
4  from an anonymous caller.  That was all they had him
5  review.  Just read that part, and what does it say?  A
6  cellular call, a cellular phone.
7          Then Mr. Onorato got up on cross-examination
8  and literally said:  Review the same report but read
9  the rest of the sentence onto the next page.
10         And the full sentence that Agent Auten
11 actually read out loud read:  The call was either a
12 cellular phone, or it was a communication through a
13 phone app.
14         It was a good try, but it didn't work.  And
15 it was a try because they know they have no evidence at
16 all from which you could conclude there was not a call
17 through a messaging app.  They don't have it.  It's
18 their burden.  They don't have it.  He doesn't have to
19 prove he received a call on a messaging app.  They have
20 to prove he didn't.  Where is that evidence?
21         And the transcript of Mr. Danchenko's own
22 interview with the FBI establishes without a doubt that
23 he believed it was through a phone call or messaging
24 app.  He even goes so far -- this liar, he even goes so
25 far to say, "Hey, it wouldn't have been that app.  I

1  didn't use that at that time."

2         Why wouldn't he give them dozens and dozens

3  of apps and let them chase around and see what they can

4  find?  He's actually excluding apps for them so they

5  don't -- aren't looking for things that wouldn't be

6  there.  He's trying to help them like he was ever since

7  he first met them in January 2017 until they exposed

8  him as a source.  He helped them, helped the FBI.

9         There's a stipulation in this case,

10 Stipulation 1810, which is an agreement between the

11 parties that reads:  Calls made via Internet-based

12 applications, for example, WhatsApp, Viber, Wickr, or

13 Skype would not appear in records of a cellular

14 telephone provider.  They wouldn't show up in phone

15 records that Special Agent James reviewed.  They

16 wouldn't show up.

17        They told you they would prove he never

18 received a call in his opening statement.  They may

19 have proved he didn't receive a cellular call.  They

20 haven't proven -- they haven't even given you evidence

21 to rely on to find that he didn't receive a

22 message-based call, an app-based call.  They've given

23 you no evidence for you even to make that conclusion

24 regardless if it's beyond a reasonable doubt.

25        So when they realized they couldn't prove it

1  through that evidence, they only had one other place to

2  go.  Call the FBI agents so that they would come in

3  here and tell you that Mr. Danchenko lied to them.

4  Well, that didn't turn out their way either; did it?

5       The first witness in this case, the analyst

6  who led Mr. Danchenko's three-day marathon interview in

7  January 2017, told you that he gave sworn testimony

8  under penalty of perjury in 2020 where he said he had

9  no reason to doubt the information Mr. Danchenko

10 provided him about who he received information from,

11 which was the analyst's primary focus.  No reason to

12 doubt under oath, penalty of perjury, 2020.

13       He was asked whether that statement was true

14 when he made it in 2020.  He said, "Correct."

15       Mr. Onorato asked him, "And it's true today?"

16       "Correct."

17       He said that last week under penalty of

18 perjury to you.

19       The government's third witness, Special Agent

20 Helson, who was Mr. Danchenko's handler for almost four

21 years, was asked, "And at no point during your entire

22 time meeting with Mr. Danchenko" -- remember, he

23 interviewed him for a lot of these counts.  But when

24 Agent Helson was interviewing -- they are all after the

25 -- At no point during your entire time of meeting with

1  Mr. Danchenko over those three years did you ever walk

2  away thinking that he was lying to you about anything?

3  Is that fair?

4          Agent Helson:  Fair.

5          And I asked him:  For years after your

6  conversations with Mr. Keilty about his anonymous phone

7  call -- let's get right to the heart of this case.  I

8  want to ask him exactly about this allegation:  For

9  years after your conversation with Mr. Danchenko about

10 his anonymous phone call with the person he believed to

11 be Mr. Millian, you would submit reports indicating he

12 was a reliable source?

13          Correct.

14          And some of those reports would even mention

15 the Millian discrepancy, the issue you're being asked

16 to decide.  They would even mention the Millian

17 discrepancy, and you would write that you believed that

18 Mr. Danchenko had accurately reported the information

19 as best you can recall?

20          Yes.

21          That's under oath testimony from that seat

22 right there at this trial.

23          It was devastating testimony for the special

24 counsel's case.  Keep in mind these agents who got on

25 the stand and talked to you about their interactions

1   with Mr. Danchenko, they're in the room with him when

2   they interviewed him.  They could observe his

3   mannerisms, his voice, his body language, and they

4   never thought at any point that he was lying about

5   anything.

6           If anything, Mr. Auten thought -- with regard

7   to Millian, he thought maybe he talked to Millian more

8   than what he was saying, not that he didn't talk to him

9   at all.

10          Remember, Agent Helson testified that he

11  trusted Mr. Danchenko and never got the impression he

12  ever lied to him.  This is a trained

13  counterintelligence agent at the FBI who manages

14  confidential human sources, two decades of experience.

15  He told you that Mr. Danchenko was, quote, gold as a

16  cooperator because he couldn't handle uncomfortable

17  situations or topics.  So they would be able to tell if

18  he lied to them.  And other than that one time, if you

19  recall, when Mr. Danchenko acted oddly because he was

20  under pressure to ask for money, he never saw him act

21  like that at any other point.

22          Now, keep in mind these agents who testified

23  at this trial, they knew what the special counsel was

24  trying to prove at this trial.  They know what this

25  trial is about.  Every witness that testified, with the

1  exception of the summary agent, was represented by

2  counsel, lawyers, FBI agents represented by lawyers to

3  testify in this case in connection with their

4  investigation.

5          Every one of them knew the special counsel

6  had been investigating them as well.  Even under that

7  pressure, which I can't imagine -- even under that

8  pressure, they came in here, and they told you the

9  truth.  They told you the truth.  And when they did,

10 what happened?  Special counsel attacked them,

11 mercilessly attacked them, attacked their competence,

12 their judgment, their truthfulness.  They attacked the

13 credibility of the very witnesses they called in here

14 to prove their case to you because they didn't say what

15 they wanted them to say.  That speaks volumes about the

16 special counsel's case.

17         Despite the lack of evidence in this case to

18 support a claim that Mr. Danchenko lied about anything,

19 they just continued undeterred by suggesting or arguing

20 that the anonymous call could not have happened for

21 various unconvincing reasons without evidence to

22 support it.

23         One of my favorite ones is they've proved

24 that -- proved beyond a reasonable doubt that

25 Mr. Danchenko couldn't have received a call on an app

1  because he didn't write in his email to Mr. Millian

2  that he wanted to be contacted via app, and he didn't

3  provide the specific app to be contacted.

4       There's dozens of apps.  We heard it in the

5  closing today.  So how could you even know which app to

6  use had he wanted to?  Agent Helson, a witness,

7  testimony, evidence -- not argument, evidence told you

8  all you need to contact someone on a messaging app is

9  their phone number.  Some of you may have common

10 experience with that.

11      While there may be many apps, there are only

12 a few that people widely use, and there was only a few

13 that he specifically mentioned.  He told them which

14 ones it could have been.  They failed to produce any

15 evidence regarding those applications.

16      It's not a persuasive argument to begin with,

17 but it certainly doesn't prove anything beyond a

18 reasonable doubt because we all know from common sense

19 that a person can contact someone else however they

20 choose.  The anonymous caller can just look through one

21 or two apps to see if Mr. Danchenko's number showed up.

22      If you're going to be anonymous -- it makes

23 all the more sense if you want to be anonymous that you

24 would reach out through an app as opposed to using your

25 own cellular number.  That would defeat the whole

1  purpose of being anonymous.

2         Then there's what the special counsel

3  believes is a smoking gun, and we spent some time on it

4  in the government's closing.  Now, when Mr. Danchenko

5  emailed Mr. Millian after the anonymous call, he never

6  referenced the anonymous call or that they had had a

7  missed meeting in New York.  They believe that that

8  shows that Mr. Danchenko knew that call had never

9  happened and the trip to New York had never happened.

10 Sure, look, that's one way of reading it.

11        But the more logical explanation given the

12 surrounding circumstances is that the caller had wanted

13 to remain anonymous.  So why would Mr. Danchenko write

14 an email exposing the identity of the anonymous caller

15 to potentially the anonymous caller when that's exactly

16 what the caller didn't want to happen?  Why alienate a

17 potential source of information by blowing them up in

18 an email after a call if you thought it was them?

19        And you don't have to take my word for it.

20 Agent Helson, who has two decades doing

21 counterintelligence work for the FBI, agreed with me.

22 I asked:  So if you didn't want to acknowledge that you

23 had a phone call with someone who is trying to be

24 anonymous, it's not unreasonable to write the email the

25 way he did?

1        Correct.

2        It only corroborates this email, which he

3   told them about in January 2017 but he didn't have.  It

4   only corroborates that that call was anonymous.

5        Now, the government also argues that a

6   similar email that Mr. Danchenko sent to Mr. Zlodorev

7   around the same time also proves that the call didn't

8   happen.  For the same reason, why would Mr. Danchenko

9   out that he had spoken to the person he believed was

10  Millian, when it was clear that he didn't want to be

11  identified, to the person who provided him Millian's

12  information?

13       And if you look on the left at Government's

14  Exhibit 0115, that image, that's a screenshot from

15  Mr. Danchenko's phone, the one he provided to the FBI

16  in January 2017, the very piece of evidence that the

17  government claims he gave to them in January when he

18  explained this whole situation.  Do you know how many

19  times he was asked about that email over the next four

20  years?  Not once.  Not once.

21       I just want to -- the government's theory

22  just doesn't make sense.  It didn't really occur to me

23  until I was sitting here right now.  But if their

24  theory is that Mr. Danchenko made up Sergei Millian as

25  a source for the dossier sometime in July -- because

1  that information ends up in Report 95 sometime in late

2  July -- why on earth would he be reaching back out to

3  him in August?  He's already made up his mind that he's

4  going to lie that Millian is the source of the

5  information.  What's the point?  Why would you reach

6  out to Mr. Zlodorev or Mr. Millian to start a

7  conversation if it doesn't matter whether you talked to

8  them or not?  You're making them up as a source.  It

9  actually makes zero sense.

10        The fact that he's reaching out afterwards

11  shows that he's not sure whether he spoke to him or

12  not, and he's trying to get more information from the

13  anonymous caller that he believes is Millian.  If he's

14  a liar and he made it all up, these emails make no

15  sense.  They make no sense.

16        The government also argues that because

17  Mr. Danchenko was already planning to go to New York,

18  then that means the trip wasn't to meet Millian.  Guess

19  what?  We agree.  Obviously, this was not strictly a

20  work trip.  We've never argued that or suggested that.

21        Mr. Danchenko had his daughter with him on

22  that trip.  They are clearly doing things other than

23  work, like visiting the zoo.  As you will see in the

24  exhibits, he releases a lot of photos of the things

25  they've been doing that week when he gets back from New

 1  York.

 2          But it's equally clear from those Facebook

 3  messages that he had another meeting on the evening of

 4  the 28th and that later at night he sends a message

 5  stating that the work is done.  There's no reason to

 6  believe that Mr. Danchenko lied that he had a meeting

 7  that night.  It was to his wife.  He had no idea this

 8  was going to be a massive investigation and people were

 9  going to be pouring through his personal records years

10  and years later.

11          The government is just stretching the facts

12  to make something out of nothing because they don't

13  have evidence on the most important things in this case

14  that they have to prove.  They're distracting you with

15  conjecture and speculation but no evidence.

16          The timing of those Facebook posts are

17  perfectly consistent with his version of events and

18  that the meeting did not take place.  He was done and

19  was ready to return home.

20          Remember, what are the odds that Sergei

21  Millian just happened to arrive in New York the night

22  before that meeting date?

23          Now, special counsel also makes a big deal

24  out of the fact that in an October 2017 interview with

25  Special Agent Helson, Mr. Danchenko states that he

1  talked to the anonymous caller a couple of times.  And

2  that was different than what he had said in some of the

3  earlier conversations, and that proves he's lying

4  because it was different than what he said in his prior

5  conversations.

6        But keep in mind the circumstances

7  surrounding that interview and that conversation.  It's

8  15 months after the anonymous call in July 2016.  It's

9  more than five months after the last time they had

10 discussed the anonymous call with Mr. Danchenko, and

11 Agent Helson told you that.  He was aggressively asking

12 him questions, peppering him with accusatory questions:

13 How many times did you meet with him?  Where?  Did you

14 meet with him in New York?  Did you meet with him in

15 South Carolina?

16        Agent Helson testified, and I asked him about

17 that interview.  He said that Mr. Danchenko was

18 perplexed by the questions.  And a couple of times

19 there's an expression people use.  It's more likely to

20 resolve to being flustered and caught off guard than

21 because he made the whole thing up, especially when

22 you've seen all the evidence that they've uncovered.

23        People can slip up or not be careful about

24 their words when they're nervous or don't have time to

25 think through an answer.  It's happened during this

1 trial a number of times where witnesses had to be shown

2 what they had previously said that contradicted their

3 testimony.

4           Special Agent Anderson got completely

5 impeached claiming that she didn't have information

6 that she could have used for Mr. Danchenko that he

7 actually provided her in June.  Mr. Onorato

8 cross-examined her and showed her that after she just

9 testified under oath that he had not.

10          But the most important part -- and I think

11 the most important takeaway for you as you consider

12 that interview and all the others -- is that Agent

13 Helson was the agent who was interviewing him.  He was

14 in the room face-to-face with Mr. Danchenko.  He's the

15 one who figured out he could tell when Mr. Danchenko

16 was lying, and he told you that he did not get the

17 impression that Mr. Danchenko was lying to him about

18 that or anything else.

19          The government has also suggested that

20 because Mr. Danchenko did not correct Mr. Steele's

21 belief that Mr. Danchenko had met with Millian multiple

22 occasions, that somehow shows he's guilty.

23          I want to segue for a second here because I

24 want to address the FISA warrant that the government

25 has made a big deal out of.  The FISA warrant was

1    predicated on information that Christopher Steele had

2    provided to the FBI unbeknownst to Mr. Danchenko.

3             The first two FISA warrants were issued

4    before the FBI ever interviewed Mr. Danchenko.  When

5    the FBI interviewed Mr. Danchenko in January 2017, the

6    information he provided them is what called into

7    question what was in the FISA warrants.  Because the

8    FISA warrants were based on Steele's representation

9    that Mr. Danchenko told him that he had met with

10   Millian on several occasions.  When they interviewed

11   him in January 2017, he said:  No, no, no.  I never met

12   him in person.  I'm not even sure I ever met him or

13   spoke to him.

14            He is the one who called into question the

15   information that was in that warrant.  He's the reason

16   that warrant should have been withdrawn or corrected,

17   because he provided truthful information.  So for them

18   to throw the FISA warrant at Mr. Danchenko is

19   outrageous.  He gave them the information they needed

20   to correct the warrant and go back to the court.  The

21   fact that they didn't do it is not his fault.

22            But, again, back to this argument that

23   Mr. Danchenko never corrected Mr. Steele's perception,

24   you need to remember the context of that conversation

25   as well.  It was a context that, again, was not brought

1  out on special counsel's direct examination.  They

2  provided no context.  They just said:  Oh, Steele said

3  they met in person, and Danchenko never corrected.

4           But we brought it out on cross-examination.

5  That was in the context of a meeting Mr. Danchenko had

6  with Steele in October 2017, long after Mr. Danchenko

7  had become a source.  Mr. Danchenko was already a

8  source for the FBI at that time.  He was working for

9  the FBI.

10          He came back, and he reported the whole

11  conversation and even told the FBI that after what

12  Steele had done to him, he didn't feel the need to

13  correct him.  And that was because, as Agent Helson

14  told you, he had seen what Steele had done with

15  information he had provided him.  He read the dossier.

16  He saw how Steele had misrepresented their

17  conversations.

18          And as Agent Helson also told you, the FBI

19  had intentionally driven a wedge between Mr. Danchenko

20  and Steele because they wanted Mr. Danchenko on their

21  side.  They wanted Mr. Danchenko reporting back to the

22  FBI on what Steele was doing, what he was up to.  Was

23  there going to be a second dossier?

24          There's no point in even correcting

25  Mr. Steele at this point.  That issue is long over.

1  The election is over.  The FBI has already

2  investigated.  It doesn't prove anything.  Again, it's

3  just argument.  It's nonsense just to distract you from

4  the lack of evidence in this case that he's a liar.

5          Which brings us to another one, that it would

6  make no sense for Sergei Millian to provide info that

7  would hurt Trump since he was a Trump supporter.

8  Again, I don't know if I can say this enough:

9  Mr. Danchenko never said that he knew the person on

10 that phone call was Sergei Millian, not once.  Yet,

11 that's all you hear:  He said Millian to this.  He said

12 Millian to that.

13         He didn't.  He never did.  He said:  I don't

14 know.  It's anonymous.

15         But the FBI is trying to run an

16 investigation.  Who could it be?  Who could it be?  I

17 don't know.  Probably this guy because I just sent him

18 an email because the voice sounded familiar.  He was

19 trying to help.

20         He's speculating.  He's trying to assist the

21 FBI, and now they're indicting him for it.  They're

22 prosecuting him for it.

23         It's entirely possible it wasn't Sergei

24 Millian, but even if it was, the caller only said there

25 was coordination between the campaign and Russia and

1    that there was nothing bad about it.  Agent Helson told

2    you that.  That's not anti-Trump, and we do know from

3    the government's own evidence that Millian was at least

4    telling people he was going to meet with Trump campaign

5    people the week before the phone call, the anonymous

6    phone call.

7             July 15, 2016, that's an email that the

8    government recovered that Mr. Danchenko would've had no

9    reason to know about even existing until this trial.

10   Sergei Millian reaching out saying, I'm meeting with

11   Trump and his people.

12            Here's another one the same day.  This is to

13   Dmitri Zlodorev.  Remember the journalist who put

14   Mr. Danchenko in touch with Mr. Millian.  I'm meeting

15   with Trump and his people again a week before the phone

16   call, the anonymous phone call.  I'm meeting with Trump

17   and his people.  I can assume we will discuss Russia.

18            Are you convinced that Sergei Millian

19   couldn't have been on that call?  Most of the evidence

20   seems to point towards him.

21            We also know, as if that was not enough, that

22   Sergei Millian was communicating with Trump's foreign

23   policy advisor at the time, George Papadopoulos.

24   July 15, again, a week before, another connection to

25   the Trump campaign.

1    We also know through the testimony of this
2  case that whether it was true or not, it was George
3  Papadopoulos' comments to a friendly foreign government
4  that started this whole investigation, the whole
5  Crossfire Hurricane investigation, his alleged comments
6  between the campaign in Russia and the Trump campaign.
7    Moreover, regardless of whether the caller
8  was Millian or not, they wouldn't have known that the
9  information they were reporting to Mr. Danchenko in an
10  anonymous phone call was going to the FBI.  It would've
11  later come to surface.  The argument makes little
12  sense, and again, it just reflects the weakness of this
13  case against Mr. Danchenko.  They're just filling in
14  the holes where there should be evidence with argument
15  and speculation.
16    Now, you were instructed that in addition to
17  showing the statement was not true, the special counsel
18  must prove the statement was material.  I don't think
19  you ever even get to that point, frankly, because they
20  had not and they cannot prove that he lied.
21    But regardless, you heard testimony during
22  this trial that Sergei Millian was under investigation
23  before they ever met Igor Danchenko.  They also knew
24  that Steele had told them that Millian had been the
25  source of some of the information in the dossier.  By

1  the time they interviewed him, it wouldn't even have

2  mattered what he said.  They were going to continue to

3  investigate Millian regardless.  You've seen the

4  context.

5          So his statements, true or not, were not

6  capable of influencing any decision.  Even if he had

7  said, "No, I never had an anonymous call; I never spoke

8  to Sergei Millian ever in my life," they weren't going

9  to just take his word for it with all of these other

10 red flags and what Steele had said.  They were going to

11 continue to investigate given what they already knew or

12 believed.

13         Which brings me to another point, which is it

14 doesn't make any sense to me and maybe to you that if

15 Mr. Danchenko was going to lie and he was going to lie

16 about Sergei Millian, why would he tell this lie?  That

17 he had an anonymous call from a person who may have

18 been -- if you're going to lie, you're either going to

19 say you definitely spoke with him or met with him even

20 if you didn't, especially if that's what Steele was

21 saying.  That lie might make sense.

22         Or you lie and say you never spoke to him

23 because you're trying to protect him or not implicate

24 him.  That lie might make sense too.

25         Or you just say, you know, that information

1  came from an anonymous caller.  I don't know who it

2  was.  It was just a random phone call.  Then that's it.

3  Don't give out the name of a person if it's not true.

4          Saying it was anonymous and then suggesting

5  that it could have been Millian doesn't make any sense

6  unless it's actually true.

7          And if you're lying, you don't then tell them

8  about an email you sent where you don't reference the

9  anonymous call, and you certainly don't start handing

10 over numbers and email addresses so that the FBI can

11 contact that person directly.

12         He gave the FBI the contact information he

13 had for Sergei Millian, cell phone number, email

14 addresses.  Why would you be handing that information

15 over to the FBI for a person who could say you were a

16 liar?  Again, it just doesn't make any sense.

17         Finally, any claim that Mr. Danchenko lied

18 about receiving an anonymous call or anything else is

19 completely inconsistent with every other aspect of his

20 relationship with the FBI.  You heard the testimony

21 from Agent Helson.  It was compelling, compelling.  You

22 saw the reports he filed for the years that

23 Mr. Danchenko was his source.  They're in evidence.

24 You saw the amount of money his information was worth

25 to our country.  You saw Agent Helson's request for a

1   $300,000 lump sum payment for Mr. Danchenko and his

2   family when he could no longer be used as a source.

3           You heard testimony about Mr. Danchenko being

4   overseas on regular business, not even FBI work,

5   collecting information that would help on his own, not

6   being asked.

7           You heard the government argue during the

8   trial from witnesses that -- trying to prove or

9   disprove the dossier was so difficult because so many

10  people were located overseas.  They weren't people in

11  the United States.

12          This liar who lied about the dossier actually

13  is the one who brokered a meeting between the FBI and a

14  foreign source of information in the dossier.  He's the

15  reason it happened.  He set it up.  He convinced that

16  person to meet with FBI overseas.  Think about that.

17  He was going above and beyond anything that could have

18  ever been expected of him to help the FBI, to help our

19  country.  Agent Helson told you point blank that losing

20  him as a source damaged our national security.

21          All the evidence in this case that we just

22  walked through, it points to innocence, but the

23  government started with the presumption of guilt.  I

24  don't know how you can look at this evidence and see

25  guilt as opposed to innocence when it all lines up with

1  everything he ever told them.  And it colored the way

2  they looked at every piece of evidence and every

3  detail.  They've been viewing this case one way since

4  the outset, and they can't unsee it.  They can't unsee

5  it, which is why you're here.

6          That's why we have juries decide guilt in

7  this country.  It's the most important part of our

8  justice system.  Twelve citizens who never met each

9  other before, don't know the parties, listen to the

10  evidence and argument and decided whether the

11  government has met its burden to prove his guilt beyond

12  a reasonable doubt.

13          They have to go through you first.  You get

14  to decide whether he's guilty or not, and you start

15  with fresh eyes.  You've been instructed.  You start

16  with the presumption of innocence, not guilt.  You

17  start with the presumption that Mr. Danchenko is

18  innocent, and he remains innocent unless and until

19  you're convinced they proved his guilt beyond a

20  reasonable doubt.

21          And if they have not convinced you beyond a

22  reasonable doubt that he did not receive an anonymous

23  call through a phone app, that's the end of the case.

24  They had to prove that.

25          They told you they would, but did they?  Are

1  you convinced beyond a reasonable doubt, as you sit

2  here today, that Millian or perhaps someone else didn't

3  reach out to him anonymously over a messaging app in

4  July 2016?  What evidence do you have to make that

5  conclusion?  What evidence do you have to make that

6  conclusion beyond a reasonable doubt?  There's none.

7  It's a giant hole in the case, and they can't fill it

8  with conjecture, speculation, and argument.  Where is

9  the evidence?

10         So a verdict of not guilty in this case, it

11 doesn't mean you 100 percent approve of the way the FBI

12 handled the Crossfire Hurricane investigation, whether

13 it should have been opened or not, or that they

14 shouldn't have obtained a FISA warrant on anybody, or

15 that they didn't make their own mistakes at some point.

16 I'm sure if you look backwards at anything five years

17 later you'll find mistakes.

18         A verdict of not guilty simply means in this

19 case that the government has failed to prove beyond a

20 reasonable doubt that Mr. Danchenko lied to the FBI

21 about that anonymous call, and it's the only reasonable

22 verdict in this case.

23         So now is the part where I have to sit down

24 in a minute, and it's the hardest part of the case for

25 a defense attorney because they get the last word.  And

1   so we just have to sit there and listen and think about

2   the things we meant to say when we were up here and

3   forgot or the things that we think they're getting

4   wrong and that we feel like we can correct, like I was

5   just able to do now, and we can't.

6          And it's particularly concerning in this case

7   and difficult in this case because the burden shifting

8   I heard in the government's closing about where is the

9   evidence that Mr. Danchenko did this or did that.  He

10  didn't have any burden.  You're not going to see an

11  instruction back there that says he has a burden to do

12  anything.  It's the government's burden to prove their

13  case.  It's not his burden to disprove it.

14         The special counsel at times through its

15  questions and arguments, they've not given you the full

16  picture.  They haven't told you the whole story.  Just

17  like when they were showing the agents and had the

18  agents testifying, well, if you knew this or if you

19  knew that, what would you think?  Oh, yeah, that would

20  affect my views of that, or I would think that was

21  important.  They only showed them the stuff that they

22  think helped their case.

23         We showed them on cross-examination:  What if

24  you knew that Sergei Millian arrived in New York on

25  July 27, the day before?  Would that tend to

1  corroborate what Mr. Danchenko told you?  Yeah, it

2  would.

3        What if he found out they pulled his travel

4  records, and he was actually in New York that week?

5  Would that tend to corroborate?  Yeah.  Yeah.

6        So I'm worried more so than usual when I go

7  back to sit down about what you're going to hear now

8  and what I can't respond to.  And while I can't do

9  that, you can.  You can pay attention to what's said

10 now, and you can discover those inaccuracies or

11 misstatements, if there are any, when you go back to

12 deliberate and consider the actual evidence in this

13 case.

14        But they get the last word because it's their

15 burden to prove the case, and they failed to do so.  I

16 expect you are going to have a lot of doubts about the

17 case, and you should.  But be sure you have them now.

18 Don't have them a week from now or a month from now.

19 That's too late for Mr. Danchenko.  Those doubts you

20 have when you go back in that room to deliberate, those

21 are his rights to an acquittal, a not guilty verdict,

22 and they're not to be traded away or bartered.  They

23 mean he's not guilty.

24        And for many of us in this courtroom, this

25 trial is part of our job.  For you, it's kind of a

1  brief opportunity to serve your country as a juror and
2  then return back to your normal life.  But for
3  Mr. Danchenko, what happens in this courtroom will
4  impact the rest of his life.
5          I'd submit to you that Mr. Danchenko would
6  not risk his life and essentially provide information
7  against his own country to help support our national
8  security team and at the same time lie to the people
9  who were both supporting him and were in charge of
10 protecting him.
11         Agent Helson told you both he and
12 Mr. Danchenko were worried for his safety and what
13 Russia might do to him if they found out what he was
14 doing or if he was exposed.  Little did they know they
15 had to fear what our own politicians were going to do
16 to him.  He deserved more than to be exposed because a
17 bunch of politicians believed that politics were more
18 important than national security.
19         Fortunately for Mr. Danchenko, this case is
20 not about politics.  It's about facts, and it's about
21 evidence.  And I couldn't be more thankful for that.
22 Because I want you to decide this case on the evidence
23 you heard in this courtroom because that evidence is
24 exactly what proves he is not guilty.  And I ask you to
25 find him not guilty on all counts.

1      Thank you.

2           THE COURT:  All right.  Let me see counsel at

3  the bench, please.

4      (Conference at the bench, as follows:)

5           THE COURT:  I thought the government's

6  closing was going to be a lot longer than it was.  How

7  long were you intending for rebuttal?

8           MR. DURHAM:  I would say half an hour, 40

9  minutes.

10          THE COURT:  Well, I'll give you half an hour.

11 All right.

12          MR. DURHAM:  Yes, Your Honor.

13          THE COURT:  All right.  We'll take a short

14 recess.

15          MR. SEARS:  Yes, sir.

16          THE COURT:  All right.

17     (Proceedings continued in open court, as follows:)

18          THE COURT:  Ladies and gentlemen, we're going

19 to take a short recess, and then I'll bring you back

20 shortly for the government's rebuttal.  Please do not

21 discuss this case among yourselves during the recess.

22 You're excused to the jury room.

23          (The jury exits at 12:16 p.m.)

24          THE COURT:  All right.  We'll take a

25 15-minute recess.  The Court will stand in recess.

1    (Recess from 12:16 p.m. until 12:33 p.m.)

2    (The jury is not present.)

3         THE COURT:  Ready to proceed?

4         MR. DURHAM:  Yes, Your Honor.

5    (The jury enters at 12:34 p.m.)

6         THE COURT:  Please be seated.

7                    REBUTTAL ARGUMENT

8         MR. DURHAM:  Like the other counsel, I want

9    to thank you for your attention.  I'm going to try to

10   March through some of the things that you just heard

11   from Mr. Sears, and I'll have some more general

12   comments concerning what was stated during Mr. Sears'

13   summation.

14        Let me start out basically where Mr. Sears

15   started out.  He made reference to the fact that

16   Mr. Danchenko didn't know what was being written by

17   Mr. Steele until the BuzzFeed articles came out.  Now,

18   the BuzzFeed articles, you might remember from the

19   testimony of the evidence, came out in January of 2017,

20   at a point in time prior to when the FBI approached

21   Mr. Danchenko.

22        Now, counsel says that he, Mr. Danchenko,

23   didn't know what was in there, and he was upset about

24   it.  And he told the FBI it's just rumor and

25   speculation.

1    Well, let's find the context for that.
2  Mr. Danchenko had been working hand in glove with
3  Mr. Steele over a period of time to put together these
4  reports, the reports which were designed to tie
5  then-candidate Trump to the Russians.  That was the
6  basic object of that particular exercise.
7    Now, when BuzzFeed comes out and the
8  information is now all over the public airwaves, then
9  things begin to happen.  People start to talk about it.
10    Now, counsel says that he, Mr. Danchenko,
11  didn't know what Steele had been writing and it was
12  just rumor and speculation.  Did you hear any testimony
13  in this case that with respect to the FBI's dealing
14  with Steele, that Steele was told by Mr. Danchenko or
15  anybody else that this was all rumor and speculation?
16  I think the answer is no.
17    But more particularly, what do you know from
18  the defendant's own words about whether or not it was
19  simply rumor and speculation?  You'll recall it was a
20  particular exhibit that was introduced in this case.
21  It's Government's Exhibit 1502.  Maybe it's not one
22  that immediately jumps to mind, but with respect to
23  what the defendant said when he wasn't talking to the
24  FBI and, as I'll get into in a moment, when he had to
25  cover his own interests -- what does he say on his own

1  when he's communicating by way of LinkedIn?  Does he

2  say, "This is all speculation and rumor.  I didn't know

3  what Steele was writing?"  No.

4          When Mr. Danchenko is communicating and

5  doesn't think that he might be held accountable for it,

6  he tells the truth, and the truth is that he collected

7  80 percent of the raw intelligence and half the

8  analysis for the Steele dossier.  That's what he says.

9          Do you see any language in the defendant's

10  own words, as expressed or shown in Government's

11  Exhibit 1502, and, oh, by the way, what Steele wrote

12  was all rumor and speculation; I never told him those

13  things?  The answer is, no, he doesn't say that because

14  aside from Mr. Danchenko telling the FBI that, there's

15  no evidence of it.

16          The only evidence that you really have in

17  front of you, based on what was presented in this

18  courtroom under oath before you, is Government's

19  Exhibit 1502.  He collected 80 percent of the

20  intelligence, half the analysis was his, and he never

21  backed off from what was in the dossier.  That's what

22  the evidence is in the case.

23          We move to, I think, what was Mr. Sears' next

24  point, that he, Mr. Danchenko, had deleted everything

25  that he had.  All right.  He was with -- the BuzzFeed

1198

1    article came out, and he went ahead and deleted things.
2    And Mr. Helson had testified regarding deleting things,
3    scrubbing his phone, right.  Well, piece that together.
4    What did Helson testify to?  It was when
5    Mr. Danchenko's name became public that he, Mr. Helson,
6    had a conversation with him telling him:  You should
7    probably clean up your phone.
8             But what do you also know about that?  And
9    don't forget what the evidence is.  Mr. Sears wants to
10   put this on Bill Barr.  He wants to put it on
11   politicians or whatever.  You heard testimony from
12   Mr. Helson that Mr. Danchenko himself, when he was
13   interviewed by the press -- all right.  I think it was
14   couched in the terms of your recollection controls, of
15   course, but I think it's couched in terms of, well, he
16   had to do what he had to do to protect himself.  He
17   went and talked to the press.
18            Mr. Sears kind of glosses over what the
19   actual sequence of events was here concerning what it
20   is that Mr. Danchenko told the FBI, but you have in
21   evidence before you what the sequence was concerning
22   this purported anonymous call.  All right.  You know
23   the first day of the interview that was done on
24   January 24 of 2017.  Mr. Danchenko had said he sent two
25   emails in July, and then he got a call in late July

1  from this anonymous source.

2          Even Mr. Auten went back to that the next day

3  and wanted to revisit it.  What did he say

4  Mr. Danchenko said the next day?  The next day he said

5  there was one email.  And then I got this anonymous

6  call, and then I sent another email in September.

7          Now, what do you know that the FBI agents

8  asked him to do at the time?  They asked him at the

9  time:  Well, do you have any records on this?  And he,

10  Mr. Danchenko, was not able to produce any records

11  relating to that.

12          But at some point in short order he did

13  produce what was marked in this case as Government's

14  Exhibit 115T.  You might recall that's the screenshot

15  or document that was dated August 24.

16          All right.  So Mr. Sears doesn't answer the

17  fundamental question here; does he?  He says to you on

18  more than one occasion that he, Mr. Danchenko, didn't

19  have records.  Well, he produced this document,

20  Government's Exhibit 118T.  He had that document to

21  produce to the FBI, but he didn't produce what you had

22  previously seen in the case.  He didn't produce

23  Government's Exhibit 204T, right, which was the initial

24  July 21, 2016, email.  He didn't produce the August 18

25  email where he is saying -- you know, he didn't

1    respond.  He didn't provide those.

2              So be careful listening to counsel's argument

3    about he didn't have something to produce.  If he had

4    Government's Exhibit 115 -- that is the exchange that

5    occurred on August 24 -- it is certainly reasonable to

6    believe that similarly, he had the July 21 and the

7    August 18 emails that were not helpful to him and chose

8    not to provide those to the FBI.

9              And why would that be the case?

10   Respectfully, the reason that that is the case is

11   because if you look at Government's Exhibit 204T, 207T,

12   and 115T together, it points out the lie that the

13   defendant was telling; that is, that is the defendant

14   had not heard from Mr. Millian, and he knew he had not

15   heard from Mr. Millian.

16             Let me address another issue that Mr. Sears

17   raised in his opening statement, which he suggests --

18   what was it -- a lucky guess that Mr. Danchenko would

19   know to go to New York on July 26 and Millian was

20   coming in on the night of July 27.  Is that a good

21   guess?

22             Well, take a step back.  What do you know

23   from the evidence in this case?  Number one, there is

24   no evidence at all that the defendant had any knowledge

25   that Millian was flying back to the United States on

1    the 27th, right.  That question presumes facts not in

2    evidence.  Counsel puts that in Mr. Danchenko's head

3    when there's no evidence of that.  What the evidence is

4    is that Millian lived in New York, right, not that

5    Mr. Danchenko knew Millian was coming back to New York

6    on July 27.  That's how it happened.  But there's no

7    suggestion or evidence that Mr. Danchenko knew that.

8            What's in evidence is that that's a

9    preplanned meeting that Mr. Danchenko had that is --

10   right?  If you look at the exhibits -- and that's why

11   we tried to go through them.  But if you look at the

12   exhibits and what the actual sequence of events is, on

13   July 18, there's the exchange between Mr. Sidar and

14   Mr. Danchenko, and the meeting that they were supposed

15   to have is going to get pushed off for a week, right.

16           Mr. Danchenko says:  Yeah, I figured that was

17   going to happen, and I have to be in New York next week

18   anyway.

19           So before he even sends an email to Millian,

20   he already thinks he has to be in New York the

21   following week.  If you then look at the August 24

22   email, right, the August 24 email is the one that

23   Mr. Danchenko had sent to Mr. Zlodorev.  He's talking

24   about, you know, I'm in Washington, D.C.  I'm

25   occasionally in Manhattan.

1    The point being that Mr. Danchenko travels to
2  New York on occasion for business.  And so his travel
3  in July, specifically on July 26, was part of what he
4  occasionally does.  He travels to New York.  In this
5  instance, he was going to do some sightseeing and the
6  like.  But that's the sequence of events.

7    It isn't the case that he, Mr. Danchenko,
8  somehow knew that Millian was flying back to the United
9  States on the 27th.  There's no evidence that he
10 would've known that, that he did know that.  That's a
11 creation of counsel.

12   Now, let's turn to what I believe -- and it's
13 your recollection, having listened to defense counsel,
14 that controls, but I believe that Mr. Sears concedes
15 here that, based on the email exchange between
16 Danchenko and -- I'm sorry, between Mr. Millian and
17 Mr. Zlodorev on July 26 -- and I think that's
18 Government's 205T, which we can pull up and you might
19 want to take a look at.  But I believe counsel concedes
20 that, yeah, in view of that email exchange -- and I
21 don't want to put words in Mr. Sears' mouth, but it
22 probably was the case that there would be a
23 disincentive, a disincentive for Millian to have
24 reached out to Mr. Danchenko.

25   And a fair reading of that email and the

1    contents would say, yeah, there's no way -- or there's

2    no reason that Mr. Millian would be reaching out to

3    Mr. Danchenko in late July of 2017.

4              There's another piece that I wanted to

5    address quickly.  Again, you -- as the judge has told

6    you, it is your recollection of events that occur.  But

7    Mr. Sears made reference to a portion of testimony

8    concerning the phone call and then whether it was a

9    cell phone call or it was an app or the like.

10             Your recollection of the evidence is

11   obviously what controls here, but try and remember

12   whether or not -- what that question had to do with was

13   Mr. Auten was asked a question about what kind of phone

14   it was, the phone call.  Was it a call to a cell phone?

15   Was it a call to a hard line?  And then Mr. Auten said

16   he didn't remember.  He just thought it was, you know,

17   a phone or whatever.  He checked his report to see what

18   it was, and that's what that exchange was about, what

19   kind of phone was used.  The call came in on a cell

20   phone or a hard line phone?

21             Counsel suggests that somehow in asking

22   Mr. Auten to refresh his recollection that we are

23   trying to hide something.  Well, we'll rely on your

24   recollection as to what the context of that questioning

25   was with Mr. Auten.

 1          Counsel then turns to some other subject

 2    matters which I want to address.  He makes reference --

 3    he, Mr. Sears, makes reference to the sworn testimony

 4    of Brian Auten from 2020 and whether or not Auten in

 5    2020 believed that Mr. Danchenko had misled him or lied

 6    to him in any way.  Okay.  Well, when Auten testified

 7    in 2020, Mr. Auten had not seen the emails that you

 8    have seen.  Mr. Auten had not seen that the defendant

 9    had said he had not heard from Mr. Millian or

10    Mr. Millian had not responded to his emails.

11          But, again, when you look at Government's

12    Exhibits 204, 207, and 115 in order, that's the

13    information that shows and establishes that Mr. Millian

14    had not reached out to the defendant, and the defendant

15    clearly knew that.

16          I'll address another issue that was raised by

17    counsel.  With respect to any hesitation that the

18    defendant had in answering questions, he, Mr. Auten,

19    had testified that with regard to answering questions

20    or hesitation -- I think it was Mr. Auten.  It could

21    have been Special Agent Helson.  But he had only on one

22    occasion showed some kind of hesitation or whatnot.

23    See if that comports with your recollection.  Remember,

24    there was testimony relating to when he, Mr. Helson,

25    first raised Mr. Dolan's name.  All right.  And he was

1  hesitant.  You listened to the recording, and he paused

2  and whatnot.  There's hesitation over that as well.

3         Counsel then turns to a discussion about,

4  well, the caller would want to remain anonymous.

5  Whether it was Mr. Millian or somebody else, the caller

6  would want to remain anonymous.  And just think through

7  that for a minute.  If Mr. Danchenko is telling the

8  truth when he said that there was this purported

9  meeting that was set up in New York, how does that

10  work?

11         Somebody calls, and the explanation provided

12  by counsel is, well, he wanted to be anonymous and

13  whatnot.  He didn't want people to know who he was.

14  Well, how does that work if you then set up a meeting?

15  You are going to have a meeting in a bar someplace in

16  New York City.  How does anonymity play into that?  It

17  obviously doesn't play into it.  If the person wanted

18  to remain anonymous, he's not going to set up a meeting

19  to then meet in a bar in New York because there goes

20  one's anonymity.  So that makes no sense at all based

21  on the evidence that was presented in this case.

22         Counsel then turned to a reference to the

23  October 24, 2017, exchange between Mr. Danchenko and

24  Mr. Helson and explains away -- or attempts to explain

25  away the fact that the statement that Danchenko had

1    given had changed yet again.  Recall that on January 24

2    there were two emails and then the call.  On

3    January 25, there was one email and then the call and

4    then a much later email in September.  The issue had

5    been reviewed several more times because, as Helson

6    said, if there's an important question that you are

7    concerned about, you keep going back to it to see if

8    the person's story, explanation remains consistent.

9              Well, on August 24, 2017, Mr. Danchenko for

10   the first time tells the FBI that he spoke a couple of

11   times with Mr. Millian.  That's the first time he said

12   it.  He spoke with him a couple of times, which is a

13   significant and obvious change.

14             It was inconsistent with what he had

15   previously told the FBI and speaks volumes about

16   whether the story in the first instance is true or not.

17             Let me turn quickly before I get into more

18   substantive matters.  Mr. Sears referenced the FISA

19   warrants, and he makes reference to the fact that the

20   first two FISA warrants that the FBI obtained on Carter

21   Page preceded or predated January 24.  That's true, and

22   then there were two more that occurred after that.

23             And in each of those additional instances,

24   the information that was in government's exhibit

25   reflecting Dossier Report 95 remains in those

1  affidavits, right.  These are material matters because

2  if you heard the testimony here, if Mr. Danchenko had

3  said, hey, 95, that information, I don't know where

4  that came from, that's not true or whatever, the FBI

5  would have had an obligation not only to go back to the

6  FISA court and tell the FISA court information

7  contained in the first two applications had false

8  information in it, but they wouldn't be able to go

9  forward with the next two on Carter.

10          So the information that is central to this

11  case clearly is material, and it would have affected

12  not just -- not just had the possibility to affect.  It

13  would have had an effect on what the FBI did and did

14  not do regarding that information.

15          Let me turn next to several different

16  matters.  One is what is the purpose of this whole

17  statute?  Why is there a statute known as 18 U.S.C.,

18  Section 1001?  What's it there for?  It's there to

19  safeguard and protect the functioning of our

20  governmental institutions.  It's intended to protect

21  the agencies from both real and potential effects of

22  material false statements and to protect the citizens

23  of the United States from the consequence of false

24  statements being provided to government agencies.

25          And it's aimed to protect government agencies

1  broadly because it doesn't just cover false statements

2  that affect a specific or discrete decision that might

3  be made by a government agency.  It covers false

4  statements that affect any function of the government.

5  Most importantly, it even covers material false

6  statements whether or not they actually affect or

7  influence a decision or step taken by the government.

8          So as you consider the evidence in this case,

9  please keep in mind what this law protects, not

10 government agents from their own failures or omissions

11 but government institutions, and not particular special

12 agents from Crossfire Hurricane or those assigned to

13 other investigations by our federal governmental

14 institutions who are responsible for protecting the

15 rights and interest of the American people.  That's

16 what this case is about, if you lie to the FBI.

17         Whether those FBI agents are competent, not

18 so competent, or they fall someplace in between, can

19 you do it with impunity?

20         Let me turn to the next issue because this

21 one is really one that is of importance to this case.

22 It should be of importance to everybody in this

23 courtroom.  Mr. Sears spent some time talking about

24 Mr. Danchenko's values as a confidential human source.

25 It's not a simple matter.  The defense has suggested

1  that his statements were true to the FBI because the

2  FBI believed they were true and because the defendant

3  was a highly valuable paid and trusted confidential

4  informant.

5       But even if that were true up until his CHS

6  status was subjected to a detailed review -- and Ill go

7  into that in a moment -- none of that makes the

8  defendant's false statements here any truer.  And if

9  they were false when he gave them, even if he did good

10 things thereafter, they are still false statements.

11 The defendant's value as a source on other matters is

12 not an issue that's properly before you.  You don't

13 have to consider and shouldn't consider whether he was

14 truthful or valuable in other matters.

15      On the other hand, it may be something, based

16 on the defense's arguments in this case and

17 cross-examination of witnesses, that as recommended by

18 the bureau's own people, those people charged with

19 assessing human sources reliability, that certain

20 things did not occur here that the experts said are

21 recommended should happen.

22      Mr. Helson decided that he wasn't going to

23 polygraph Mr. Danchenko to determine if he ever was

24 tasked by a foreign individual entity or government to

25 collect information or perform actions adverse to the

1   U.S.'s interests.  That was not done.

2              The FBI's behavioral assessment group needed

3   to conduct an examination to determine what the

4   defendant's actual motives, allegiances, and

5   vulnerabilities were.  That wasn't done.

6              The Washington Field Office was to conduct an

7   assessment of the financial nature of the defendant's

8   employment.  That was not done.

9              So when counsel does talk to you about

10  certain monies weren't paid or certain monies were paid

11  or whatnot, this all occurred in a particular context

12  that you're not charged with trying to sort out.  What

13  you do know is that Mr. Helson didn't do things that

14  were recommended by the experts within the bureau who

15  deal with human sources needed to be done.

16  Mr. Danchenko was not polygraphed.  The behavioral

17  group did not assess where his allegiances were and the

18  like.  What you do know is he was an informant for the

19  FBI.

20             Second, even if the agents who described him

21  as a valuable CHS said it was highly important to

22  them -- I'm sorry.  The very agents who described him

23  as a valuable source said it was highly important to

24  them whether the defendant, in fact, spoke with

25  Millian.  Then they described their own course of

1  conduct going back repeatedly to Mr. Danchenko to get

2  to the bottom of this claim.

3           Mr. Helson told you how the defendant's story

4  had shifted, how he wasn't consistent about whether he

5  received one or two phone calls, and exactly when that

6  call supposedly occurred.

7           Supervisory Intelligence Analyst Auten

8  testified that it didn't make sense why an anonymous

9  caller would provide this information to Danchenko

10 without identifying himself in some fashion.

11          Those agents expressed some concern or

12 skepticism about that.  That should cause you to pause

13 and give credence to all of the other evidence in this

14 case, which clearly shows that the defendant made false

15 statements and lied to the FBI.

16          Let's turn to maybe the elephant in the room,

17 the FBI.  Was the FBI simply incompetent?  Are they

18 some kind of -- you know, people working in

19 coordination, whatever?  From the evidence presented in

20 this case, you could easily conclude that the FBI

21 mishandled the investigation at issue, but it's not

22 itself in any sense -- that is the bureau.  Bureau

23 agents are not in any sense victims of the defendant's

24 false statements.

25          The evidence is material because it changed

1  and had the ability to change what the FBI has been

2  doing, but don't feel bad for the FBI agents.  Whether

3  the FBI performed here well or poorly, it is not a

4  relevant issue for you to consider, and it would not in

5  any way excuse or erase the defendant's false

6  statements.

7          That said, you have no doubt seen during the

8  course of the trial that the government is not here to

9  defend the FBI's handling of these matters.  There are

10 things that they didn't do that they quite clearly

11 should have done.  The evidence in this case quite

12 clearly shows -- that is, respectfully suggested --

13 that there was a certain mind-set that for whatever

14 reason, agents didn't do what they should have done in

15 trying to collect evidence relating to this purported

16 call from an anonymous source.

17         The evidence shows that the FBI failed here

18 on a number of occasions, but I expect you may ask

19 yourself how the agents possibly could have done it.

20 How did they fail to uncover these lies sooner and

21 investigate them more fully?

22         Now, I think that counsel's suggestion is,

23 oh, it's Bill Barr.  Bill Barr did this for political

24 reasons.  But reflect on how this came about.  The

25 Mueller report had come out, and there's no collusion

1   that was established.  It's not an illogical question

2   to ask, well, then how did this all get started?  Now,

3   you can call that political.  You can suggest, I guess,

4   inferentially that somehow people who have spent a

5   considerable period of time away from their families

6   and whatnot did this for political reasons or what have

7   you.  If that's your mind-set, I suppose that's your

8   mind-set.

9           But to look into the question of how did this

10  all happen -- Director Mueller, a patriotic American,

11  the former director of the FBI, concludes there's no

12  evidence of collusion here or conspiracy.  Is it the

13  wrong question to ask, well, then how did this get

14  started?  Respectfully, that's not the case.

15          THE COURT:  You should finish up, Mr. Durham.

16          MR. DURHAM:  Yes, Your Honor.

17          It's not the agent's on duty, though, who are

18  the two victims of the lies that were perpetrated by

19  Mr. Danchenko.  It's the FBI's as an institution and

20  ultimately the American taxpayers, the American people.

21          Let me touch on one additional matter given

22  the shortage of time, and then I'll conclude.

23          You know that the defendant didn't receive an

24  anonymous call here on an app from Millian or anyone

25  else for at least three reasons:

1       First, there's absolutely no evidence in the
2  record of such a call, none.

3       Second, the statements the defendant made to
4  the FBI are not in any way consistent with how someone
5  would describe an anonymous call.  They're consistent
6  with how somebody would describe a call that they made
7  up.

8       Even though Danchenko was a trained business
9  intelligence analyst whose entire task from orders from
10 Christopher Steele was to find evidence of collusion
11 between Trump and the Russians -- if he had received an
12 anonymous call, whether he thought it was Millian or it
13 was somebody else, that would be the very evidence of
14 collusion that he was looking for so eagerly.  As a
15 trained researcher, he clearly would have noted every
16 detail possible:  What's the incoming call number?
17 What's the area code number?  What other details are
18 there?  What do you know about the person's speech
19 pattern?  None of that information is recorded or
20 provided.  It's simply an anonymous caller.

21      He would have known to remember the cell
22 phone application if it was a cell phone application
23 that was involved.  Look, that's what a good research
24 analyst does, looks into the details, records those
25 details, and reports on those details.  Mr. Danchenko

1  did none of that.  He didn't provide any of that

2  information to Steele, and he didn't provide any of

3  that information to the FBI.

4         Third, the most conclusive evidence that such

5  a call never occurred, if you look at Government's

6  Exhibit 207T, the defendant's August 18 email to

7  Mr. Millian where the defendant states in his own

8  words -- I mean, he can't get away from his own words.

9  His words state that he wrote to Millian several weeks

10 earlier and that they were contacts on LinkedIn but

11 says nothing about the call that he told the FBI he

12 thought was probably Millian.  What possible reason

13 could explain why the defendant wouldn't at least ask

14 Millian if he had called?

15         I want you to look at Government's

16 Exhibit 115T, the August 24 email --

17         Can I have five more minutes, Your Honor?

18         THE COURT:  One minute.

19         MR. DURHAM:  One minute.

20         Use your common sense to evaluate this.  When

21 you use your common sense and apply this to the

22 dossier, why did this happen?  Why did Mr. Danchenko

23 have to tell this lie?  Because he told Christopher

24 Steele that he had been meeting with Millian and

25 Millian had given this information.  Then when he went

1   to the FBI, he's stuck.  If he tells the FBI, hey, this

2   didn't happen, I was just telling Steele that, the

3   whole house of cards in the dossier crumbles.  He's out

4   of Orbis.  He's out of the FBI.  He's out of his

5   financial monies.  He's done.  The whole house of cards

6   collapses if he tells them that.

7          That's why he has to make up the anonymous

8   call.  That's why he has to try to thread this needle

9   in the way that he did with an anonymous call thinking

10  that you'd never get behind it.  But Special Agent Ryan

11  James and his colleagues get the records.  They walk

12  through those records, and they establish and prove to

13  you beyond a reasonable doubt, a reasonable doubt, when

14  the defendant told the FBI that he had gotten this

15  anonymous call, it was a false statement.

16         So let me conclude here.  Mr. Keilty told you

17  at the beginning of the trial in his opening statement

18  that we would have this chance, which both the

19  government and the defense have now had.  But you were

20  asked to do three things:

21         First, to pay close attention to the facts as

22  the evidence came in, something that I think the

23  observation is that you've all been conscientious

24  jurors.

25         Second, to listen carefully to Judge Trenga's

1    instructions on the law, which we know you have done

2    during the trial and you will continue to do throughout

3    your deliberations.

4            And, third, you were asked to use your common

5    sense, the same common sense you use every day of your

6    lives.  Again, we ask you to do that.

7            We suggested if you do these three things,

8    the defendant would get a fair trial, and you'd be able

9    to reach the only conclusion consistent with the law

10   and the facts in this case.  And that is that the

11   defendant is guilty as charged.

12           That time for you has now arrived, ladies and

13   gentlemen, and we urge you to return the only verdicts

14   that are consistent with the law and the evidence in

15   this case, and that is that the defendant is guilty as

16   charged on all four counts.

17           I want to thank you for your time.  I want to

18   thank you for your attention.  Thank you for your

19   service, and thank you for your good judgment.

20           Thank you very much, Your Honor.

21           THE COURT:  Thank you.

22           Ladies and gentlemen, we're now at the point

23   where you need to begin your deliberations.

24           It's also at the point in time when it's

25   always my unwelcome duty to excuse the three alternates

1 that have been seated.  I want you to know that your

2 contribution to this trial has been as valuable as

3 anyone else.  I know you all have been very diligent in

4 paying attention.  Again, I thank you for your service.

5          There is also the possibility that you could

6 be called back to participate in deliberations if any

7 of the jurors can't complete their service.  So I would

8 ask that you continue to shield yourself from any

9 publicity until the trial is over.

10          You may retire to the jury room with the rest

11 of the jurors, but you'll have to excuse yourself

12 before they begin their deliberations.  So, again,

13 thank you on behalf of the Court for your service.

14          For those of you that will deliberate, when

15 you go back to the jury room -- it may be sort of past

16 the normal lunch hour -- you may want to break for

17 lunch before you begin your deliberations.  Just

18 coordinate with Mr. Burns.  It will take some time for

19 the exhibits to get back to you.

20          But when you begin your deliberations, the

21 first thing you should do is select one of yourselves

22 as the foreperson.  That person will simply have the

23 obligation to ensure that everybody has a fair

24 opportunity to discuss the case and preside over the

25 proceedings.

1    You can conduct your deliberations in any
2  fashion that you deem appropriate, but it is imperative
3  that you conduct all of your deliberations as a group.
4  Don't break up into smaller groups even within the jury
5  room and certainly not when you recess for lunch or
6  whatever breaks you may want.  Don't break up in
7  smaller groups and talk about the case.  It's important
8  that everybody has the benefit of everybody's thinking
9  as you consider this case.  But other than that, you
10 may proceed in any fashion that you want.

11   There are no deadlines.  You have no time
12 limits.  You should take as much time as you need to
13 consider the evidence and reach a verdict.

14   So with those instructions, you're excused to
15 the jury room to begin your deliberations.

16     (The jury exits at 1:11 p.m.)

17     THE COURT:  All right.  We'll stand in recess
18 until we hear from the jury.  If they need to
19 deliberate past 5:30 or 6:00 at the latest, I'll call
20 them out and have them recess until tomorrow.

21     All right.  The Court will stand in recess
22 pending hearing from the jury.

23     (Recess from 1:12 p.m. until 5:47 p.m.)

24     (The jury is not present.)

25     THE COURT:  I'm going to release the jury at

1 this time until tomorrow morning at 9:30.

2          My practice is once they're all assembled,

3 Mr. Burns will tell them to begin their deliberations

4 without calling you back in here.

5          So let's bring the jury out.

6      (The jury enters at 5:48 p.m.)

7          THE COURT:  Please be seated.

8          Ladies and gentlemen, I'm going to release

9 you at this time until tomorrow morning at 9:30.  It's

10 been a long day for you, and I think it will be good if

11 you just start in the morning fresh.

12          Please make arrangements to be here in the

13 jury room by 9:30.  Once all of you are assembled,

14 Mr. Burns will tell you to go ahead and begin your

15 deliberations.  Do not begin your deliberations until

16 all of you are present.

17          Also, let me emphasize what I've told you

18 before and, that is, do not discuss this case outside

19 of the courtroom.  It's particularly important at this

20 point that you not talk about this case outside of the

21 courtroom and also that you shield yourself from any

22 publicity that you may find yourself in front of, on

23 radio or television or any other source.

24          So with that, you're released until tomorrow

25 morning at 9:30.

1221

1     (The jury exits at 5:49 p.m.)

2          THE COURT:  All right.  We'll have the jury

3   begin deliberations, and then we'll reconvene when we

4   hear from the jury.

5          Yes.

6          MR. SEARS:  Your Honor, if I understand you

7   correctly, we need to be within the vicinity by 9:30

8   tomorrow morning but not in the courthouse?

9          THE COURT:  Correct.

10          Very good.  The Court will stand in recess.

11          -----------------------------------
                      Time:  5:51 p.m.
12

13

14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
    accurate transcription of my stenographic notes.
23

24
                              _____
                                      /s/
25                            Rhonda F. Montgomery, CCR, RPR